# EXH "86"

---

Psychological Evaluation 2009

Defendant's
Exhibit

86

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
UNITED STATES PENITENTIARY
POLLOCK, LOUISIANA

## PSYCHOLOGICAL EVALUATION

NAME:                                    **SPARKS, TONY**

BOP REGISTRATION NUMBER:        91929-080

DATE OF BIRTH:                      May 25, 1983

DATE OF REPORT:                     February 3, 2009

### REFERRAL ISSUES:
A psychological evaluation was requested by the inmate's unit team, in accordance with Program Statement 5212.06--Control Unit Programs, to permanently designate inmate Sparks to the ADX.

### PROCEDURES CONDUCTED:
Clinical Interview
Mental Status Examination
Review of Relevant Records
    Sentry Records
    Psychological Data System Records
    Presentence Investigation Report dated February 13, 2001
    SIS Report dated April 17, 2008

### RELEVANT HISTORY:
Inmate Sparks is a 24 year-old African American male. He is currently serving a life sentence for carjacking. The offense was premeditated and lasted approximately four hours. The victims were shot then set on fire. After he was arrested, he attempted to escape from custody. He was placed in the custody of the Federal Bureau of Prisons on April 3, 2001, and arrived at USP Pollock on June 18, 2007.

When asked about his legal history, inmate Sparks reported he was 15 years-old when he was first arrested. He stated he was arrested for stealing a bicycle. He reported he was 16 years-old when he was arrested for the current offense. The PSI documents his being adjudicated for burglary of a habitation and theft from a person when he was 15 years-old. He stole a mountain bike from one victim and a gold ring from another victim. He was placed on one year probation for the offense. He was arrested on four other occasions, however the charges were eventually dismissed. The charges included burglary of a habitation and theft over $50 Under $500; evading arrest, failure to identify; failure to identify; and aggravated assault with a deadly weapon. He was not

FOI EXEMPT

86-1

tried for the aggravated assault due to the current offense.

Inmate Sparks has exhibited a pattern of violating the rules and regulations while incarcerated. According to the PSI, he violated the rules at a juvenile detention center on many occasions. Additionally, he and another inmate attempted to escape from the juvenile facility by choking an officer until she was unconscious, then stealing her keys. Inmate Sparks flushed his toilet to mask the officer's screams as the other inmate choked her. Since his incarceration with the Bureau of Prisons he has been sanctioned for 23 incidents. These include four for refusing to obey an order; two for being absent from assignment; two for possession of intoxicants; two for assaulting with serious injury; four for possessing a dangerous weapon; two for assaulting without serious injury; and one each for being insolent to a staff member; refusing to take an alcohol test; possession of an unauthorized item; rioting; being in an unauthorized area; stealing; and fighting with another person. He currently has an incident report pending for attempted killing as a result of the current incident. It should be noted, his disciplinary history exhibits a pattern of increasing violence. For the most part, the most recent incidents are the most violent incidents.

Inmate Sparks has a history of engaging in violent acts while incarcerated with the Bureau of Prisons. In July of 2006, he stabbed his cellmate in SHU approximately 12 times in the back, neck, head, and right arm. In September of 2007, he stabbed an inmate in the neck resulting in the inmate having a laminectomy on the C3-C4 vertebra due to an open spinal cord injury. The victim remains unable to walk or urinate by himself.

Inmate Sparks and another inmate attempted to kill the inmate victim on March 31, 2008. Inmate Sparks entered the victim's cell at 6:37 pm and remained in the cell until 7:55 pm. His accomplice left the cell approximately 30 minutes prior to inmate Sparks departing the cell. It is presumed inmate Sparks remained with the victim until he lost consciousness so the victim would not be able to summons assistance. The victim received multiple stab wounds to the head. One stab wound was to his right eye and into the brain. The inmate lost his eye as a result of the injury. Emergency surgery at an outside hospital had to be conducted to save the victim's life.

Inmate Sparks was born in Schweinfurt, Germany, on May 25, 1983. He denied any knowledge of his mother experiencing any problems during her pregnancy or the delivery. According to inmate Sparks, his parents were never married, however the PSI states they were married and later divorced. His mother was a German citizen and his father was an American with the military. Inmate Sparks

FOI EXEMPT

TS0000000

stated he lived in Germany until the age of 12. At that time, his mother married his step-father and they all moved to Killeen, Texas. He was living in Killeen, Texas with his mother at the time of the current offense. He reported a good relationship with his mother and father and an "alright" relationship with his step-father. His mother and step-father have divorced since his incarceration. He stated he has no contact with his step-father, however he sees and talks with his parents "as much as possible." During the clinical interview, inmate Sparks denied having any siblings, however the PSI documents one half brother. He denied any prior marriages or fathering any children.

Inmate Sparks reported he completed the ninth grade. He was placed in an alternative school in the ninth grade, however he did not complete school due to his incarceration. He stated he made average grades consisting of B's and C's while in school. He reported he got in trouble for fighting on several occasions, however he denied ever being suspended or expelled. He reported an "alright" relationship with his teachers and his peers. He stated he has not obtained his General Equivalency Degree. The PSI states he was in the tenth grade at the time the PSI was written. Inmate Sparks denied any form of employment, however the PSI documents his working at two different pizza places as a cook in 1998. He denied ever serving in the military.

Inmate Sparks denied a history of substance use or abuse. The PSI documents the use of alcohol and marijuana beginning at age 15. He told the writer of the PSI he did not believe he had a problem with either substance. There is no known documentation of his participating in any substance abuse treatment program.

Inmate Sparks denied any medical problems. The available records did not document any medical problems.

MENTAL HEALTH HISTORY:
Inmate Sparks denied any history of mental illness, mental health treatment, or suicide attempts. There is no known documentation to indicate a history of mental health problems or suicide attempts. The PSI documents his participation in a psychological evaluation in August 1999. He was diagnosed with Conduct Disorder, Adolescent Onset Type. The evaluator described his decision-making style as calculating and unemotional. Further he stated when relating to his environment, inmate Sparks will likely be predatory and aggressive. His contacts with Psychology Services, since his incarceration with the Federal Bureau of Prisons, have been routine contacts consisting of intake screenings and 30-day Special Housing Unit reviews.

BEHAVIORAL OBSERVATIONS AND/OR MENTAL STATUS EXAMINATION:
During all contacts with inmate Sparks, since his incarceration

FOI EXEMPT

86-3

at USP Pollock, his mental status has been within normal limits. He has always been alert and oriented to person, place, time, and situation. He has denied all forms of hallucinations and has never appeared to be responding to stimuli not present. His thoughts have always been rational, organized, and goal-directed. There has never been evidence of a thought disorder. His mood has never been either significantly elevated nor depressed. He has shown an appropriate range of affect. He has never expressed any genuine thoughts of harming himself or others. There have been no signs of a mood disorder. His memory for recent and remote events has always appeared to be intact. The inmate's speech has always been within normal limits in terms of quality and quantity. His use of vocabulary and general fund of information has suggested average intelligence. His gait and motor movements have been normal. There have never been any obvious signs of head trauma or brain injury.

CLINICAL FORMULATION:
There is no evidence inmate Sparks has ever, nor is now, suffering from any major mental illness. His disregard for the safety of others, aggressiveness, failure to conform to societal norms, and his lack of remorse all indicate antisocial traits and behavior. In 1999, inmate Sparks was diagnosed with Conduct Disorder, Adolescent Onset Type. He was 15 at the time he was first adjudicated and was on probation for that adjudication when he was arrested, at age 16, for the current offense. The current offense involved the armed carjacking of two individuals which resulted in their deaths. It is also documented his substance use began when he was 15 years-old. Incarceration has not deterred his criminal activity. Since 2006, he has been involved in three serious assaults on other inmates. The most recent incident involved inmate Sparks observing his victim suffer until unconsciousness to ensure the victim was unable to summons assistance. His disciplinary record demonstrates a pattern of increasing violence. As such, inmate Sparks easily meets the diagnostic criteria for Antisocial Personality Disorder.

DIAGNOSES:
Axis I    V71.09    No Diagnosis on Axis I
Axis II   301.7     Antisocial Personality Disorder
Axis III  None known
Axis IV   Incarceration, pending prosecution
Axis V    GAF (current)= 88

RECOMMENDATIONS/PROGNOSIS:
Inmate Sparks is a 24 year-old African-American male. He is currently being considered for placement in a Control Unit due to the homicide of another inmate. There is no evidence of current or past mental illness. Personality factors and behavior indicate the presence of Antisocial Personality Disorder. The prognosis

FOI EXEMPT

86-4

for an individual such as inmate Sparks, is considered guarded, at best. He exhibits personality factors that are deeply ingrained and tend to run an unremitting course. To change these factors requires intense work, persistence, and a strong desire to make that change. Most individuals with Antisocial Personality Disorder see no problem with their behavior or perspective, thus they see no need to make any changes. At this time, a Control Unit appears to be an appropriate placement, as he is not likely to change his behavior in the near future. He does not suffer from a major mental illness, therefore, there is no need for psychological treatment beyond the norm. He should adjust appropriately to the environment of a Control Unit.

Melissa Hughes Albert, Psy.D.
Chief Psychologist
USP Pollock, Louisiana

FOI EXEMPT

86-5

# EXH "87"

Psychological Evaluation 1999

Defendant's
Exhibit

87

James N. Shinder, Ph.D., M.P.H.
3925 South IH-35
Waco, Texas 76706
(817)714-0189

PSYCHOLOGICAL EVALUATION

Confidential Report

Client:  Tony Sparks
Date of Evaluation:  9-30-99
Date of Birth:  5-25-83
Chronological Age:  16 years, 4 months
√Referred By:  Court Ordered by Judge Walter Smith, United States
Federal Judge - Western District
Techniques Utilized:  Bender Visual Motor Gestalt Test
Memory Bender Test
Kaufman Brief Intelligence Test
Wide Range Achievement Test - Revised
Level III (WRAT-R)
Beck Depression Inventory
Thematic Apperception Test
(Selected Cards)
Personality Inventory for Youth (PIY)
Clinical Interview Technique

Evaluation Team:  Shannon Baumbach, M.A., L.P.A., Supervisee of
James N. Shinder, Ph.D., M.P.H.
James N. Shinder, Ph.D., M.P.H., Licensed
Psychologist #2833

Tony Sparks is a 16 year, 4 month old Biracial male who was Court
Ordered for participation in psychological evaluation by the
Honorable Judge Walter Smith in an effort to assess emotional and
behavioral functioning.   Although Tony refused to discuss the
charges pending against him upon his attorney's advice, records
indicate that Tony is one of several suspects who were allegedly
involved in a recent Fort Hood car jacking and double murder.   Tony
was transported to the evaluation by two United States Deputy
Marshals, both of whom remained outside of the testing room
throughout the entirety of evaluation.   He arrived with both arm
and leg restraints, but was allowed freedom of his left arm for
writing purposes.   Tony completed a consent form prior to this
evaluation and was advised of the limits of confidentiality
associated with the evaluation.   It was at this time that Tony
indicated that he had been instructed by his attorney to not
discuss the charges pending against him at this time.   He did,
however, indicate that he has been charged with "juvenile
delinquency, Car Jacking and Aiding and Abetting."   He was further
aware that these charges related in some manner to the deaths of

two individuals, but denies being charged with Murder. The requested evaluation was conducted in a private conference room of this practitioner's office, which was a suitable environment for the stated purpose. There were no significant interruptions or distractions that might serve as variables that would influence test results. All tests were administered in keeping with standard procedures.

Tony presents as being adequately oriented in all spheres and was free of significant communication and sensory barriers. He is 5 feet, 6 inches tall, weighs 134 lbs, and is a light completed individual with cropped black hair. He generally appears his stated chronological age. All background information as provided in this report was obtained through interview with Tony and was unverified. He was fully aware of the purpose of the current evaluation and he related to the examiner in a passively cooperative manner. Tony was unable to provide the name of his Court appointed attorney; however, he indicated that he had visited with his attorney on only a limited number of occasions and that his mother, Danielle Brown, was frustrated that this individual was not more involved in the case. Ms. Brown has reportedly petitioned the Court to provide her son with alternative representation. Tony's affect throughout the evaluation remained apathetic and emotionally constricted. He never smiled and he exhibited similar disinterest regarding the various test instruments. With the exception of the current offense, Tony was verbally responsive to all areas of inquiry. He often provided information of a potentially damaging nature.

Tony describes an adolescent lifestyle which is characterized by impulsive, risk taking behaviors. He readily acknowledges gang involvement and has reportedly been a member of the "Bloods" gang for the past 1 ½ years. Tony states that he was initiated into the gang by being "jumped in" and that he has since been involved in a number of physical altercations with opposing gangs. When questioned regarding ownership and use of weapons, Tony indicated that he has previously carried a firearm for protection. This weapon was reportedly provided to him by a friend. Tony relates that, on the day preceding the alleged car jacking incident, he had "given" the gun to another of the suspected perpetrators and that he had stated that "whatever you do with it, you keep it." Tony added that this weapon was connected to the deaths of the people involved and has been confiscated by law enforcement officials. He further divulged that, in addition to the above noted charges, he was also charged with "five counts of Assault with a Deadly Weapon." These charges reportedly stemmed from Tony's involvement in a gang related drive-by shooting. He was unable to clarify if

87-2

anyone had been seriously injured and was generally nonchalant in discussing this incident. Prior criminal involvement was reportedly limited to a Burglary of a Habitation charge in which he stole a bicycle at fifteen years of age. He reportedly served a six-month probationary sentence in relation to this charge. Tony reportedly failed to comply with various probationary stipulations. One particular incident was described in which he did not comply with mandated curfew, engaged in a physical altercation and "ran from the police." Tony consistently minimizes his involvement in criminal actions and he tends to present himself as having been an uninformed, innocent bystander. He has been incarcerated in a Killeen juvenile detention facility for approximately four months, during which time it has been necessary to confine him to his cell on several occasions as a result of gang related confrontations.

When questioned regarding his understanding of the legal process, Tony demonstrated knowledge of basic courtroom procedures and legal roles. He was capable of describing the duties of a jury and the defending and prosecuting attorney. Tony is aware that his attorney is available to support and defend him; however, he perceives his own legal counsel with some degree of distrust, stating "sometimes he acts like he don't want to help me." He is further aware of the potential consequences of criminal actions, specifically he relates that he himself could be provided with a life sentence if convicted. When presented with an unfamiliar concept, Tony was able to benefit from instruction and clarification as provided by this examiner. As such, he would likely be capable of benefitting from the assistance and guidance of legal counsel.

A review of medical and developmental history revealed that Tony is free of significant illness or physical anomaly. At present, there are no prescribed medications in use and there have been no corrective surgeries. Tony describes a heterosexual orientation and indicates having engaged in unprotected sex with several individuals. Accidental injuries have been of a minor nature, with no history of head injury. Tony reports that he consumes alcohol, specifically a 40 oz. beer or gin, approximately two times per week. He occasionally drinks to the point of intoxication. He has reportedly abused marijuana in the past and has experimented with LSD on one occasion. A childhood history of physical and sexual abuse was denied. This is Tony's first experience with psychological evaluation or related treatment services. At eight years of age, Tony was reportedly placed outside of his home in Germany for a two year period. Tony maintains that he was removed because "I was acting up", which included acts of vandalism, shoplifting and physical violence. He describes residing in a

87-3

"village" composed of various homes for children with behavioral difficulties. Although this environment appears to be reminiscent to U.S. psychiatric treatment centers, Tony could not recall having received any counseling or psychiatric treatment while in this setting. Educationally, Tony was most recently enrolled as a tenth grade student at Killeen High School, where he attended regular classes. He was reportedly retained in the fourth grade. Numerous suspensions were reported for fighting and disruptive behaviors. Tony indicates that he was expelled twice in the ninth grade in relation to gang related behaviors and involvement in gang "riots." Tony displays little motivation to complete his academic career. He has reportedly considered attending college only to participate in collegiate sports. Additionally, Tony states that he has considered pursuing a career in the United States military in an attempt to emulate his father. Employment history has been limited to work as a cook at Pizza Now and Bruno's Pizza in Killeen. Tony relates that he was compensated for his services "under the table." A familial history of psychiatric disorder, mental retardation, significant substance abuse and criminal involvement was denied. Major medical problems were limited to a history of cardiovascular disease for Tony's maternal grandfather.

Tony is an only child. His biological father is African-American and his mother is German. The couple met in Germany, where Mr. Sparks was stationed with the U.S. Army. They were never legally married and eventually separated when Tony was five years of age. Following their separation, Tony remained with his mother and continued to have contact with his father on a regular basis. He resided with his father for a one year period following his discharge from the previously cited "village." Tony readily notes that he is more obedient when in his father's care. His mother met and married another U.S. soldier and the family relocated to Fort Hood when Tony was 12-years-old. Tony describes a positive relationship with both his mother and his stepfather. It appears that his mother may be lenient in her use of discipline and his stepfather is unavailable at this time as he is currently stationed in Germany. His mother remained in the States to maintain the family household and to retain her employment with Rainbow Carpets. Tony's father has retired from the Army and he is presently employed as security supervisor at Ram Stadium in Illinois. Tony reports that it is his intention to reside with his father should he ultimately be released from jail. Despite Tony's presentation of his family as being caring and involved, it should be noted that adolescents often associate with gangs in an attempt to obtain a sense of unity and acceptance which is otherwise unavailable in their homes.

87-4

Socially, Tony relates that he associates primarily with other gang members. He reportedly has "two or three girlfriends" with whom he maintains an intimate relationship. Tony reports enjoying "chilling", swimming and watching movies as favorite leisure time activities. His sense of self-worth has diminished of late, reportedly due to his current incarceration. As such, Tony is displaying a degree of situational depression which appears to be entirely related to the loss of an independent, unsupervised lifestyle. He relies heavily upon his peers for feedback and support. Tony appears to be easily influenced by others and he is highly susceptible to peer pressure. When discussing the topic of death and murder, Tony remained quite detached. He demonstrates little regard for human life and would experience difficulty in recognizing the rights, thoughts and feelings of others. By his own report, Tony is easily angered and is rarely sad. Manipulative and deceptive behaviors are utilized primarily as a means of self-preservation. Tony relates that he has recently began reading the Bible while incarcerated. Moral and ethical development is primitive and Tony may tend to manipulate his beliefs in an attempt to justify his behaviors. Tony displays a strong gang mentality in which violence and intimidation is an acceptable means of solving problems. Personal needs are placed above the needs of others and there is a strong tendency to infringe upon the rights of others.

An adequate degree of rapport was established and evaluation proceeded without complication or complaint. There was no indication of test related anxiety or apprehension. Tony appeared to be physically comfortable in the testing setting and his continued physical restraint did not appear to impede his test performance. Coordination, gait and posture were unremarkable, with activity level being well controlled. Tony was able to focus his attention on the tasks presented to a sufficient extent to permit accuracy of assessment. Impulsive traits were evidenced and Tony often appeared to respond to test items without deliberation. He readily conceded to failure. Praise and encouragement were accepted without comment. Speech was characterized by poor grammar and frequent mispronunciations. Tony responded in a soft tone of voice and, as such, clarification was necessary on a number of occasions. He was sufficiently adaptable to handle the diversity of task demands and was generally organized in his approach to problem solving.

Formalized testing was initiated with the administration of the Bender Visual Motor Gestalt Test so as to screen for perceptual motor functioning. This device is used primarily for screening and, if more conclusive data is desired, further testing is essential. Tony replicated the nine geometric patterns presented

87-5

within 3 minutes and 25 seconds, which is considered to be a slightly abbreviated amount of time. The size of the designs drawn were somewhat reduced when compared to the size of the stimulus card patterns. This indicates a tendency toward withdrawal. The designs were placed on the page in an irregular format. Line quality was consistent which suggests normative motor coordination. Limited concern for quality was demonstrated, although visual contact with the stimulus cards was of appropriate duration. There was no observable effort at self-correction. Replication errors were limited to closure difficulty, substitution and overlapping difficulty. From the standpoint of personality implications, the protocol suggests that Tony displays impulsive and immature characteristics. His behaviors may be characterized by a lack of inhibition with possible aggressive, acting out potential. He may experience difficulty in completing tasks due to self-doubt and insecurity. Difficulties in interpersonal relationships are anticipated due to insensitivity and behavioral unpredictability. There is no indication of significant perceptual motor difficulties and Tony would likely experience success in performing precise visual motor tasks. Assessment of short term recall for visual stimuli was conducted utilizing the Memory Bender Test. Tony recalled four of the nine designs from memory with a reasonable degree of accuracy. This quantity and quality of short term recall for visual stimuli is considered average and suggests that his memory for events and circumstances in his everyday life would be accurate. Overall, the Bender suggests that Tony may tend to engage in impulsive behaviors without regard for their consequences.

Assessment of intellective functioning was conducted utilizing the Kaufman Brief Intelligence Test. Tony's response to the intellective assessment was impatient and without concern for success. He readily conceded to failure. With 100 being considered normative and a standard deviation of 15, Tony achieved the following standard scores, percentiles and descriptive categories:

|  | STANDARD SCORES | PERCENTILES | DESCRIPTIVE CATEGORIES |
|---|---|---|---|
| Vocabulary | 69 | 2 | Lower Extreme |
| Matrices | 97 | 42 | Average |
| Composite | 81 | 10 | Below Average |

As noted by the scores above, Tony achieved a Vocabulary IQ score of 69, which is in the Lower Extreme range, and a Matrices IQ score of 97, which is in the Average range. The difference between these

87-6

scores is considered to be statistically significant at the .01 level. Discrepancies of this magnitude are often suggestive of learning disabilities. The resulting Composite IQ score of 81, is in the Below Average range of intellective functioning. This score equals or exceeds that of only 10 percent of the population and meets the criteria necessary for a diagnosis of Borderline Intellective Functioning.

Assessment of academic achievement was conducted utilizing the Wide Range Achievement Test - Revised Level III. Tony achieved the following standard scores, percentiles and grade equivalents:

|  | STANDARD SCORES | PERCENTILES | GRADE EQUIVALENTS |
|---|---|---|---|
| Reading | 80 | 9 | Fifth Grade |
| Spelling | 75 | 5 | Fourth Grade |
| Arithmetic | 83 | 13 | Sixth Grade |

These scores indicate that Tony possesses uniform academic deficits in relation to his achieved educational level. He would likely benefit from specialized programming if such has not been implemented. The intellective and academic assessments yielded scores which are relatively congruent. Based upon observed behavior and the general nature of the test responses, it is this examiner's opinion that the achieved intellective and academic scores are truly indicative of Tony's current level of functioning. These scores further suggest that Tony would experience difficulties in most endeavors requiring average intellectual skills. Vocational training would be most realistic for Tony and he may perform optimally in those areas which require tactile skill.

Personality assessment was conducted utilizing the Beck Depression Inventory, Thematic Apperception Test (Selected Cards), Personality Inventory for Youth and Clinical Interview Technique. Tony's response to the projective test battery remained listless. He responded guardedly to the need for self-disclosure. Qualitatively, his projective test responses were consistent with his stated intellective level. Tony's responses to the Beck Depression Inventory indicate the presence of moderate depressive symptomatology with limited risk of self-destructive behavior. Items endorsed on the Beck suggest feelings of disappointment and emotional detachment. Sleep disturbance was noted. Although Tony indicated that he feels that he is being punished, he denies any feelings of guilt or discouragement. As previously noted, it is likely that Tony's depression is situational in nature and would

87-7

dissipate upon his release from incarceration. When presented with
the stimulus cards for the Thematic Apperception Test, Tony
provided scenarios which were based primarily on his perception of
the obvious physical cues. The stories he developed were provided
in the present tense and were typically left unresolved. Tony was
able to perceive conventional role and generational boundaries;
however, he failed to include any type of family interaction in his
stories. The stimulus cards which typically evoke sexually
oriented material were not acknowledged as containing such. Tony's
TAT stories contained themes of violence and pessimism. The
characters were awaiting "bad news" in two stories. There was a
tendency to project responsibility for personal failures.
Utilizing the themes presented, it appears that Tony perceives his
environment as being uncaring and unfulfilling. He appears to
anticipate disaster rather than success. The simplistic quality of
Tony's stories further suggest that he may tend to perceive his
environment in concrete terms.

The Personality Inventory For Youth was administered so as to gain
further insight into personality functioning. Tony's validity
scales are considered to be valid and suggested that he was
responding to inventory items in a cooperative, consistent and
nondefensive manner. The resulting clinical profile appears to be
an adequate indication of his present personality functioning. An
analysis of the PIY scales revealed no significant elevations.
However, Tony obtained several scores just below significant levels
and it is relevant to explore these areas. Such scores were
obtained in the Impulsivity and Distractibility, and Delinquency
Scales. Individuals with elevations on these scales are considered
to be impatient, impulsive and unable to delay immediate
gratification. They exhibit poor planning and organizational
skills. Judgement is poor and there is an inability to learn from
past mistakes. These individuals experience difficulty in
complying with parental and societal rules and there is an
increased likelihood of familial, academic and legal problems.
They associate primarily with others who display similar
characteristics. In summary, the PIY appears to suggest the
presence of antisocial traits.

SUMMARY AND CONCLUSIONS:

Tony Sparks is a 16 year, 4 month old Biracial male who was Court
Ordered to participate in psychological evaluation relation to
criminal proceedings. Tony is currently confined in a Killeen
juvenile detention center. He was somewhat vague and unspecific
when describing his alleged offenses, stating that he is being

87-8

charged with "juvenile delinquency, Car Jacking and Aiding and Abetting." He denies being charged with Murder. Tony refused to discuss details regarding these charges upon his attorney's advice. He conveyed basic knowledge of Court proceedings, including the role of the judge, jury and defending and prosecuting attorneys. Tony was aware of the consequences of criminal actions and he indicates that his attorney has informed him that his maximum punishment could be a life sentence. When presented with unfamiliar concepts, Tony was able to learn from the instruction provided by the examiner and he was capable of grasping basic concepts in this manner. As such, he would be able to benefit from legal counsel and would be capable of contributing to his defense.

Tony presents as being an emotionally detached and withdrawn adolescent. He describes a lifestyle characterized by impulsive and risk taking behaviors. Tony acknowledges association with the "Bloods" gang and he readily describes gang related altercations. It should be noted that, in addition to the above noted charges, Tony relates that he is also being charged with five counts of Assault with a Deadly Weapon. These charges reportedly relate to Tony's involvement in a gang related drive-by shooting. Tony admits that he has previously carried a firearm for protection and that his firearm was reportedly connected to the deaths of the individuals involved in the alleged car jacking. However, he denies any responsibility for these events and maintains that he had "given" the weapon to another alleged perpetrator on the day proceeding the incident. Tony appears to be strongly associated with the gang lifestyle and he readily accepts violence as a viable means of conflict resolution. He displays little concern for the rights of others and is highly self-serving. Tony appears to have received limited supervision within the home and he may utilize gang association as a means of obtaining personal recognition.

Test data suggest the presence of antisocial traits. Tony is impatient, impulsive and unable to delay immediate gratification. Judgement is poor and Tony experiences difficulty in learning from his actions. He lacks appropriate inhibition and may engage in aggressive acting out behaviors as a means of concealing self-doubt and insecurity. Intellective functioning is within Borderline ranges. Academic functioning is similarly deficient, possibly due to learning disability, insufficient motivation and/or a lack of environmental stimulation. A moderate level of depression was noted; however, this depression appears to be situational in nature and would likely dissipate upon Tony's release from incarceration. It was noted that Tony denies any feelings of guilt, although he perceives that he is being punished for his actions. Moral and

87-9

ethical development is primitive, at best, and Tony may tend to manipulate his moral standards to accommodate his immediate needs. Tony receives little satisfaction from his environment. Although he provides a positive description of his family life, it is noteworthy that he continues to associate with a gang. Gang involvement is often utilized as a means of achieving a sense of belonging or recognition which is otherwise absent within one's environment.

Based upon the history and evaluation data presented in this report, it appears that Tony comprehends the nature of the charges against him and that he is aware of the potential consequences of these charges. He is capable of assisting in his defense. Due to Tony's cognitive deficits, he should be provided simplistic, concrete guidance during legal counsel. Tony demonstrates obvious violent potential and would be considered a potential threat to the safety of others. He may benefit from participation in anger management classes so as to explore more socially acceptable and constructive problem solving skills. Such instruction may be better received if provided in an individual, rather than group setting. This is suggested due to Tony's susceptibility to the negative influence of his peers and his obvious desire to gain their approval. The prognosis for effective utilization of treatment is guarded.

James N. Shinder, Ph.D., M.P.H.

Date: 10/15/99

JNS/rbn

87-10

# EXH "88"

Psychological Evaluation 1998

Defendant's
Exhibit

88

IN ASSOCIATION WITH:
EUGENE C. WATERS, PH.D

(817) 774-8272

FRANK A. PUGLIESE, PH.D., P.C.
PSYCHOLOGIST
DIPLOMATE IN FORENSIC PSYCHOLOGY, AMERICAN BOARD OF PROFESSIONAL PSYCHOLOGY
19 SOUTH 25TH STREET, SUITE 100
TEMPLE, TEXAS 76504

**ORIGINAL**

## PSYCHOLOGICAL EVALUATION

Tony Sparks                                        October 27, 1998

Tony is a 15 year old biracial male referred by the Bell County Juvenile Probation Department for an evaluation. He is an only child who lived with his mother and stepfather prior to his placement in the juvenile detention facility approximately four days ago. He was enrolled in the Killeen Ninth Grade Center and reported being a subaverage academic achiever. His stepfather is in the Army currently stationed in Germany, his mother is employed locally, and his birth father resides in Illinois and has had intermittent contact with him throughout his life.

Tony is a thin youngster of average height who entered the session in a quiet and reserved manner. He responded to most questions hesitantly and rarely expounded upon any of his answers. His affect was flat and his mood was serious and he maintained a highly defensive and evasive stance towards the evaluation process. There were no suggestions, nonetheless, of gross perceptual distortions or impaired reality testing and he denied episodes of depression, excessive anxiety or nervousness, and appetite or sleep disturbance. He did say he smoked marijuana on two occasions but said he has not used any other substances.

Tony indicated he was placed into the detention center four days ago after being charged with evading arrest and providing false information to a peace officer. He explained he had been placed on house arrest approximately two months ago by juvenile authorities for stealing a bicycle from a neighborhood house and chose to "go to a fight in my neighborhood" rather than comply with the conditions of house arrest. Although he initially denied having any involvement in the altercation last week, he later acknowledged that he and some of his friends, who were members of the gang Bloods, attempted to challenge a rival gang, the Crips, to fight after school. He offered little explanation as to why he acted in a defiant and aggressive manner and simply shrugged his shoulders and said "I guess I just wanted to go to be with my friends."

In discussing the burglary of a habitation charge pending against him, Tony stated he took a bicycle from a neighborhood residence because "I was tired of walking and needed a bicycle to get home." He related he gave little thought to the wrongfulness or illegality of his actions and had little concern for the impact his behavior had on the owner of the bicycle. He went on to say he has also been implicated in burglarizing another home and stealing a ring from a youngster and insisted he did not engage in any other

88-1

unlawful activities. He did say, however, that another youngster willingly gave him a ring that he had asked for and said the youngster later filed a complaint against him for stealing the ring from him.

Tony was quite reluctant to discuss virtually any aspect of his life with me in any detail and attempted to minimize and/or rationalize his misconduct at home and school. He said he was born and raised in Germany and did generally well until his mother married his stepfather three years ago and his family transferred to the Killeen area shortly thereafter. He claimed he is very happy to get away from Germany because of the very limited number of recreational activities available to him and noted he was particularly pleased with the large number of new friendships he established following the relocation. Despite his contention he did not have any significant adjustment problems in the two years following the move from Germany, he said his decision to join the Bloods gang about a year ago seemed to have a negative impact on his overall attitude towards school and his family. He explained he seemed more interested in socializing with his friends than in completing his assignments and developed "a hot temper." He mentioned he becomes quickly annoyed over minor irritations at school and did not hesitate to act in a verbally and/or physically aggressive manner when he was provoked by others. He went on to say this academic year has been particularly difficult for him since he is failing virtually all of his academic subjects and has had at least five discipline referrals for disrupting the class and being noncompliant. Although he recognized that his behavior was counterproductive and resulted in many personal as well as legal difficulties, he never expressed any regret for his misconduct nor verbalized any intention of exercising better social judgment and self-discipline.

Tony characterized his relationship with his mother and stepfather as being close but was unable to recall any recent family-oriented activities that he and either parent participated in. He maintained he has been very careful to conceal information related to his gang involvement from his mother and surmised she will be very unhappy with him when she learns about his affiliation with the group. He further noted he and his mother made a decision to allow him to spend some time with his birth father in June, 1997 while his dad was stationed at Fort Knox, Kentucky and said he remained with him until January of this year when he returned to Killeen. Although he commented he and his father and stepmother got along well and did not have any significant disagreements, his reluctance to elaborate on any aspects of their relationship causes me to suspect he was not very open or forthcoming about that aspect of his life.

TESTS ADMINISTERED: Peabody Picture Vocabulary Test-Revised, Rorschach, Thematic Apperception Test, Sentence Completion Form.

88-2

TEST RESULTS: On the Peabody, Tony obtained a score of 101 which is consistent with the average range of receptive language ability. The score does appear to be an accurate estimate of his intellectual level of functioning.

Tony's responses revealed a highly defensive individual who avoids self-disclosure and attempts to project an image of being independent and self-sufficient. Beneath the surface, however, is a very angry and hostile adolescent who has strong oppositional tendencies and often feels alienated from the majority of adults in his life. As a tough-minded and impatient individual with a low tolerance for any type of stress, Tony has trouble delaying initial urges and routinely acts out his aggressive impulses whenever he feels annoyed or aggravated. Such persons are excessively self-focused and place a premium on obtaining immediate gratification of their selfish needs. They also resent others placing demands on them and resist the efforts of most people to modify their deviant behavior pattern.

Other test responses reflected Tony's lack of insight into his behavior and inflexible approach to managing his interpersonal relationships. There were several indications he often pushes the limits in social situations without regard for the concerns of others and will not hesitate to be demanding and challenging. Moreover, he is likely to be quite manipulative and intimidating towards anyone perceived as being weak and vulnerable and has difficulty showing empathy and compassion for others. In general, his accentuated needs for approval and recognition far outweighs his ability to exercise adequate self-discipline and prompt him to engage in many unacceptable activities. Unfortunately, he will likely be resistant towards changing his problematic behavior since he derives much pleasure and satisfaction from exploiting situations to his advantage.

On the Sentence Completion Form, Tony stated his biggest problem is "talking back to my parents," wished his father would "still live with my mother," noted his greatest need is a "tight job," and contended he will "have a good job, a car, and a nice house" five years from now. In addition, he said he is most afraid of failure when "I got a temper," would like his parents to "hook back together," and feels sad when he thinks about "what my mom is going through when I screw up."

In conclusion, Tony is a 15 year old male who admitted to burglarizing a neighborhood home last month and violating the conditions of his house arrest. The evaluation revealed a highly oppositional and rebellious youngster who seems to have a strong attachment to a local gang and has essentially adopted an antisocial attitude in his interpersonal dealings. I am most concerned about his lack of remorse for his misconduct as well as his continued allegiance to his friends in the gang. In light of these observations, it is my impression Tony be placed on intensive supervision with the

88-3

stipulation any violation of the rules result in placement at a boot camp. Group counseling is also suggested to help him understand how self-defeating his behavior is and to learn more constructive ways of managing his anger and needs for approval.

DIAGNOSTIC IMPRESSION: Conduct Disorder, Adolescent-onset type.

Frank A. Pugliese, Ph.D.
Psychologist

FAP/rme

88-4