# EXH "89"

Psychological Evaluation Conducted by Dr. John Huber

Defendant's Exhibit

89

# John D. Huber, Psy.D.
## Clinical Psychologist

1825 Fortview Road #101 • Austin, Texas 78704 • (512) 541-2133

## -CONFIDENTIAL-

## PSYCHOLOGICAL EVALUATION

*The contents of this report are based on the clinical interpretations of psychological test results. The examiner will not be responsible for additional interpretations or uses that are made of any reported test scores, clinical findings or background information that are contained within this report.*

**Client Name:** Tony Sparks
**Date of Birth:** 05/25/1983
**Age:** 34 years, 0 months
**Referred by:** David Sergi, Esq.

**Examiner:** Zackery A. Tedder, LPA
**Date of Testing:** 06/22/2017
**Date of Report:** 07/10/2017
**Medications:** None

## PURPOSE OF EVALUATION

Mr. Tony Sparks was referred to the practice of John Huber, Psy.D. at the request of his counsel, David K. Sergi, Esq. to perform a risk-assessment based on Mr. Sparks' criminal history. This evaluation was conducted in order to provide current information about Mr. Sparks' levels of cognitive and psychological functioning.

## BACKGROUND INFORMATION

The following information was obtained from Mr. Sparks during the clinical interview.

**Referral Information:** Mr. Tony Sparks was referred for evaluation in order to determine his risk potential, as his legal team was working towards having his sentence commuted from Federal custody.

**Physical and Behavioral Description:** Mr. Sparks presented as a gentleman of his stated age. He presented with good hygiene, and reported that he had just showered prior to the assessor arriving. He appeared to be compliant with the testing process. Mr. Sparks was primarily left handed, and held his pen with an atypical holding style. He presented with numerous tattoos which were vague in their overall theme, but were suggestive of feeling despondent, along with exhibiting some anger and aggression (i.e., his left arm had a figure holding a gun outward). He spoke with a notable accent. Overall, he was forthcoming with information throughout the interview. He was able to answer questions thoughtfully, and put forth good effort in completing the evaluation.

---

*This report is confidential and is intended for your professional use only.*

89-1

**Orientation to the Evaluation & Evaluator:** Mr. Sparks was oriented for time, place, and person. Short-term memory appeared intact. Psychomotor functioning appeared within normal limits. He denied the presence of suicidal ideations. He also denied any prior auditory or visual hallucinations.

**Significant Background and History:** Mr. Sparks reported that he was born in Schweinfurt, Germany. He indicated that his parents separated when he was approximately four-years-old, and was primarily raised by his mother and step-father. He reported having two step-siblings. He indicated that he moved to Killeen, Texas at the age of twelve, as his step-father was in the Army, prompting their move.

Regarding his offense of record, Mr. Sparks reported that he was broke, and was with two of his friends. One had just been kicked out of his house. They were "selling and banging" at the time, and were "thinking about jacking someone." He reported that during their first attempt of carjacking resulted in being arrested. The officers noted they were all juveniles out past curfew and contacted their parents. Mr. Spark suggested that his friend who was kicked out began staying with his family. The next day, they decided to get a few friends and went around looking for someone else to carjack. He reported that they tried a few different places, and then went to a gas station. They approached someone to ask for a ride, and was able to get a ride with his two friends, and asked to go to his uncle's house. They all pulled out guns, and gave directions to the driver where to go. They then demanded that the victims get out of the car, obtained their jewelry, and then placed both of them in the trunk of their Buick Lasabre. Mr. Sparks reported they attempted to use the victim's ATM cards, and pawned their jewelry. He noted they were able to get a small amount of money out of the ATM.

As Mr. Sparks was talking to the victims, he learned they were missionaries from Iowa, and they began preaching to him while they were in the trunk. This interaction resulted in Mr. Sparks changing his mind, and he then told his friends to drop him off. Mr. Sparks admitted to taking some jewelry, and then went home and went to sleep. The next morning, Mr. Sparks learned that his friends burned the victims in the trunk after shooting them. He suggested that he saw a report on the television news. Mr. Sparks was later implicated in the crime, but police did not have much evidence, per his report. Approximately three weeks after the incident, Texas Rangers came and picked him up, interrogated him, and then released him. He was later arrested for an aggravated assault charge, and while he was in custody, he was detained by the US Marshalls. Mr. Sparks' recollection of the events that led to his arrest were similar to records related to his instant offense.

**Medical Issues and Current Medications:** At the time of this evaluation, Mr. Sparks was not taking any prescribed medications, nor did he have any significant medical concerns.

**Current Living Situation:** At the time of this evaluation, Mr. Sparks was an inmate at Bastrop County Jail in Bastrop, Texas. He indicated that he was transferred to this facility in February of 2017. He indicated that he will be appearing in court to determine the results of his re-negotiated sentence.

**Emotional Status:** When asked about his current mental state, Mr. Sparks admitted to being significantly anxious, was experiencing nightmares approximately twice per week, and had repeatedly woken up panicked and sweaty. He suggested that the themes of his nightmares were not recurring, but did have to do with his future. He admitted that he has felt scared and nervous about his future, and what could potentially occur if he had to return to prison after being released. He noted this was a marked change for him, as he had spent eighteen years "programmed to do time one way." He suggested that he was changing his mentality related to being incarcerated, and now knows there is a potential end to his sentence, and does not want to "mess that up." He admitted that he had seen many people get killed in prison, and he has worried that he could do something to ruin his potential release or lose his own life. He also reported that he had previously not concerned himself with these thoughts, as he did not feel he had anything to lose with a life sentence. Now, he feels that he needs to protect his future to ensure that he is able to get out.

**Drug & Alcohol Use/Health and Habits:** Mr. Sparks reported that he began using alcohol at the age of fourteen, but denied any significant use history. He suggested that he had only used alcohol on several occasions. He did admit to drinking "hooch" in 2010 while incarcerated in Colorado. He reported that began using marijuana at the age of thirteen, but also noted that he has not had any significant use since that time, but did acknowledge there were opportunities for him to smoke marijuana throughout his incarceration. Mr. Sparks acknowledged that he would engage in riskier behaviors when he was using drugs, suggesting that it led to an increase in his negative behaviors. Records suggested that he may have used LSD on one prior occasion.

**Social Functioning:** Mr. Sparks reported that he was single with no children. He reported having five good friends. He admitted that he was previously gang-affiliated with the Bloods, but suggested that he was no longer associated with them. He reported that he had chosen to follow the Nation of Islam, and was attending Jummah. He stated that he does not consider himself Muslim, per se, buy was "taking aspects of all religions to get closer to God." He now considers himself an "Islamic person, and a man of peace."

## ASSESSMENT TECHNIQUES

The following specific technique was utilized for gathering clinical data:

Clinical Interview  
Behavioral Observations  
Records Review:
- *Psychological Evaluation, Frank A. Pugliese, Ph.D., PC (dated 10/27/1998)*
- *Psychological Evaluation, James N. Shinder, Ph.D., M.P.H. (dated 09/30/1999)*

Peabody Picture Vocabulary Test (PPVT)  
Wide Range Achievement Test – 4 (WRAT-4)  
Minnesota Multiphasic Personality Inventory – Second Edition (MMPI-2)  
HARE PCL-R: 2nd Edition (Interview and Checklist)  
Violence Risk Appraisal Guide (VRAG)

## CURRENT TEST FINDINGS

**COGNITIVE AND ACADEMIC ACHIEVEMENT TESTING:**

**Peabody Picture Vocabulary Test, Fourth Edition (PPVT-4):** The Peabody Picture Vocabulary Test measures the receptive (hearing) vocabulary of children and adults. It is a normed-referenced, wide-range instrument that is untimed and individually administered. It is available in two parallel forms, designated as Form A and Form B. Each form contains 228 test items, each consisting of four full-color pictures arranged on a page. The examinee selects the picture that best illustrates the meaning of a stimulus word spoken by the examiner.

Mr. Sparks obtained a PPVT-4 standard score of 91. The chances are about 95% that the range of scores from 84 and 99 includes his true score. His percentile rank of 27 means that Mr. Sparks scored as well as or better than 27% of examinees of his age. His test-age equivalent corresponded to an age of 18:11. Mr. Sparks' receptive vocabulary functioning appears to be within the Average range of development. A prior evaluation yielded similar results; however, suggested that the results were invalid, but did not specify as to why.

**Wide Range Achievement Test-IV (WRAT-IV):** This is a norm-referenced test that measures basic academic skills, including word reading, sentence comprehension, spelling, and math computation. It was standardized on a representative national sample of over 3,000 individuals ranging in age from 5-94 years. Percentile scores, standard scores and grade scores are provided for each of the four subtest areas. When used in conjunction with a test measuring general intelligence which has the same standard deviation units, it can be use to help determine learning ability or learning disorder.

The following information for Mr. Sparks was scored upon age-based norms:

| Test | Standard Scores | 95% Confidence Intervals |
|---|---|---|
| Word Reading | 95 (Average) | 87-104 |
| Sentence Comprehension | 88 (Below Average) | 81-96 |
| Spelling | 91 (Average) | 82-101 |
| Reading Composite | 90 (Average) | 84-96 |

Mr. Sparks' basic reading ability was Average in development according to the WRAT-4 (Word Reading Scaled Score=95; 95% Confidence Interval=87-104). His capacity to understand what he reads was Below Average in development (Sentence Comprehension Scaled Score=88; 95% Confidence Interval=81-96). His spelling ability was Average in development (Spelling Scaled Score=91; 95% Confidence Interval=82-101). His overall reading skills fell within the Average range (Reading Composite Scaled Score=90; 95%

Confidence Interval=84-96). His level of achievement appeared commensurate with his level of intelligence.

**PERSONALITY, EMOTIONAL, AND BEHAVIORAL CHARACTERISTICS:**

**Minnesota Multiphasic Personality Inventory-2 (MMPI-2):** This standardized questionnaire elicits an array of self-descriptive responses from the test taker. The responses cluster to give information about emotional adjustment and attitude that is broken down into ten clinical/personality scales and three validity scales. The MMPI-2 is the most widely used clinical personality inventory and provides clinical diagnostic information useful in treatment planning.

Mr. Sparks' test results on the MMPI-2 are as follows:

| Validity Scale | F | L | K | S | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| T-Score | 79 | 52 | 39 | 37 | | | | | |
| Clinical Scale | Hs | D | Hy | Pd | Mf | Pa | Pt | Sc | Ma | Si |
| T-Score | 57 | 61 | 43 | 77 | 50 | 94 | 68 | 72 | 88 | 57 |

Mr. Sparks' approach to the MMPI created a valid personality profile; however, his responses may suggest a pervasive acquiescence, and may be somewhat over-reported. The following information should be read with these limitations in mind.

Mr. Sparks' endorsements on the MMPI created a two-point elevation, namely, 6-9. This elevation suggests that Tony may be rather dependent, and has a strong need for affection. He may feel vulnerable to real or imagined threats, and may feel anxious and tense much of the time. In addition, he may appear tearful and trembling. A marked overreaction to minor stressors is also potentially characteristic of Tony. His response to severe stress may be to withdraw into fantasy. Tony may be unable to express his emotions in an adaptive, modulated way, and he may alternate between overcontrol and direct, undercontrolled emotional outbursts.

There appear to be concerns related to paranoid ideation, and Tony may exhibit signs of a thought disorder. He may complain of difficulty concentrating, and his stream of thought may be dysregulated. He may be ruminative, overideational, and obsessional. He may exhibit speech that is irrelevant and incoherent. He may also appear disoriented and perplexed, and will likely exhibit poor judgment.

**HARE Psychopathy Checklist – Revised (HARE PCL-R):** The Hare PCL-R is a 20-item inventory of perceived personality traits and recorded behaviors, intended to be completed on the basis of a semi-structured interview along with a review of collateral information such as official records. It yields dimensional scores, but also may be used to classify or diagnose individuals for clinical purposes.

| Facets | T-Score | Descriptor |
|---|---|---|
| 1 – Interpersonal | 45 | Within Normal Limits |
| 2 – Affective | 31 | Within Normal Limits |
| 3 – Lifestyle | 45 | Within Normal Limits |
| 4 – Antisocial | 50 | At-Risk |
| **Factors** | | |
| 1 – Interpersonal/Affective | 36 | Within Normal Limits |
| 2 – Social Deviance | 48 | Within Normal Limits |
| | | |
| **Total Score** | 39 | Low |

Mr. Sparks was rated based on information obtained during the clinical interview and structured Hare interview. The results are suggestive that he does have potential to exhibit psychopathic behavior, but more especially is suggestive of a notable violence potential. Facet 4 fell within the At-Risk range, which suggests poor behavioral controls, early behavioral problems, and juvenile delinquency.

**HARE Interview**

- **Current Status:** At the time of this interview, Mr. Sparks was incarcerated at the Bastrop County Jail as of February 2017. He reported that he had previously been in federal incarceration at facilities in Colorado, Louisiana, Pennsylvania, California, and Beaumont, Texas. He reported that he was adjudicated for charges related to Carjacking and Aiding and Abetting, resulting in a sentence of Life in Prison. When asked about his current status, Mr. Sparks reported that he was feeling better overall, knowing that his case was returning to court. He suggested that he believed it would result in positive outcome, and was feeling relieved and blessed. He denied having any problems while being incarcerated in Bastrop, but suggested that he did not like it. He reported having prior institutional charges due to a prior Attempted Murder in a Louisiana Prison, but suggested that the charges were never proven.

- **School History:** Mr. Sparks denied that he liked school as a child, suggesting that there was nothing about it that he enjoyed. He suggested that he did not like being around other children, and did not feel he was capable regarding his math abilities. He felt that his teachers would have described him as "bad." He suggested that his attendance was "always good," and that he skipped school rarely. He denied ever failing a grade. He acknowledged being a "troublemaker" in school, and reported that others would fight with him, but denied being the aggressor. He also acknowledged engaging in physical fights, and admitted that he began fighting in the seventh grade. He reported that he had changed school, and was gang affiliated, leading to physical interactions. He denied being referred to as a bully at school. He reported that when he was in the third grade, he once kicked a peer in the head. At the age of eight, he was placed in a group home, and was CPS involved due to being physically abused, and was going to school with bruises. He suggested that his experiencing physical abuse led to an increase in his own bad behavior. He indicated that while he was in his group home, he was working with

a psychologist, and admitted to meeting with some counselors. He reported that he was suspended twice due to fighting while in school. He reported that while he was once expelled for hitting a peer with a desk. He reported that he did not graduate from high school due to being incarcerated while he was in the tenth grade. He admitted that he began tenth grade in juvenile detention in Killeen, Texas. He reported that he obtained his GED in July 2010 while incarcerated in Colorado. He also had completed the following college courses since being incarcerated: Peloponnesian War (Part I & II), Books that Made History (Part I & II), America at War (Part I, II, & III), Stress Management, 500 Nations, Math from the Visual World, Great Presidents (Part I & II), The Universe (Part II), Grief, Legends of the Silver Screen, The Human Body, Solar System, The American Experience (Part V), Steven Hawking's Universe, Brief World History (Part I & II), Faces of Freedom, Discovering Psychology, Health & Biology, Lost Cities, Paranormal Psychology, Breaking Barriers, Health Education, The Mind, Houses of Healing, The World's Greatest Paintings, Engineering Disasters, Roots of Human Behavior, Self-Improvement, Founding Fathers & Brothers, How the Earth Works (Part I & II), The National Parks, We Shall Remain, and Events that Changed History (Part I).

- **Work Experience:** Mr. Sparks reported that he had worked at two different pizza restaurants in Killeen, Texas, doing marketing, making pizza, and doing deliveries. He reported that his bosses would have suggested that he was a good worker, but noted that he did not like any of his bosses, though could not identify why. He also suggested that he quit his first job because the owner fired his friend due to a missing firearm, and the boss blamed his friend. He denied that he had ever shown up late, intentionally missed work, ever used drugs or alcohol while at work, and did not get into trouble for not obeying the rules.

- **Career Goals:** Mr. Sparks reported that he desired to be a Personal Trainer, or to work with animals. He also expressed a desire to help at-risk teenagers. He felt that having a job was important to him, and felt that he needed both money and structure, and enjoyed the routine of having a job. He felt that his long-term goals were to own a food truck or restaurant, being a personal trainer, and wanted to produce his own work-out videos. He felt that if given the opportunity, he would be able to obtain his goals.

- **Finances:** Mr. Sparks denied having any outstanding debts, never had a bank loan, never owed others money, and has had never had a credit card.

- **Health:** Mr. Sparks suggested that he had been treated by mental health professionals during his childhood. He reported having annual evaluations, and had been previously diagnosed with Conduct Disorder and Antisocial Personality Disorder. He also reported that his last evaluation occurred prior to being placed in Maximum Security detention. He had been ordered to complete Anger Management while incarcerated. He acknowledged a history of self-harm behaviors, and admitted to cutting in the past. He suggested that he had "a death wish" and suggested that he lost the desire to live prior to going into Maximum Security between 2007 and 2009.

- **Family History:** Mr. Sparks reported that he was primarily raised by his mother and step-father. He suggested that his parents separated when he was approximately three-years-old. He indicated that his biological father was in the Army, and had been stationed overseas and stateside. He reported having one step-brother, but no natural siblings. He reported that his relationship with his mother while growing up was "not too good," while his relationship with his father was "perfect" and "great." Currently, he sees his relationship with his parents as great. Mr. Sparks felt that life growing up was "hard," and suggested that he was constantly struggling. He felt that he had "lots of issues," including abuse, domestic violence, and suggested that his step-father was aggressive to him, but more towards his mother. Mr. Sparks made an outcry of being sexually abused at the age of five, and reported that he was shown pornography, had oral sex performed on him, and was made to hump a female. He reported that he was perpetrated by a military member, but did not disclose their name. Mr. Sparks reported that he consistently got in trouble for not obeying rules, had run away from home, lied to his parents, but did not steal from his parents, and did not treat them badly. He reported that he was removed from his home when he was approximately eight-years-old, and was placed in a group home.

- **Friends/Intimate Relationships:** Mr. Sparks reported that he had five close friends. He felt that trust, loyalty, and love were important factors for friends. He felt that having someone close who would not judge him was also important. He reported that he started dating at the age of seven. He denied any significant relationships, but noted a close friendship with a friend named Jessica. He admitted to having five prior sexual partners, and became sexually active at the age of fourteen. He denied having any children.

- **Anger Control/Emotions:** Mr. Sparks acknowledged that he would get angry easily in the past. He suggested that he will typically pace or react when he gets angry. He reported that he previously became angry over another inmates' desire to watch Spanish-language television shows, and he wanted to watch the NBA finals. He suggested that he instead went to his bed, and kept to himself. He admitted that others have told him he has a bad temper, and when he was previously sent to maximum security, he would react "fast" to "any threat." He suggested that he had also intervened between others, and felt he "had to be hostile" and "temperamental," but had learned to reasonably control those feelings. He acknowledged engaging in several fights since he had turned eighteen, but suggested that it had "been a while." He denied to ever "losing control." He acknowledged being verbally or physically threatening, but felt that he was a passionate person with "strong feelings."

- **Antisocial Behaviors:** Mr. Sparks reported that he began engaging in antisocial behaviors when he was approximately thirteen-years-old, citing that he began fighting and engaging in burglary of habitations around that time. He admitted that he had also been engaged in shoplifting. He acknowledged being arrested for Burglary of a Habitation, Aggravated Assault with a Deadly Weapon, Evading Arrest, Car Jacking, and Aiding and Abetting. Regarding the Aggravated Assault, Mr. Sparks admitted to being in a vehicle which was engaged in a drive-by shooting, but denied being involved in the actual shooting. He denied any charges as an adult. He felt that his original

*This report is confidential and is intended for your professional use only.*

attorney was not working for his best interest, leading to his current appeal. He believed that his criminal history would work against him, and will have a potential for being disruptive to his future.

**Violence Risk Appraisal Guide (VRAG):** The VRAG is a scale developed to assess violence risk potential (VRAG). Its primary use is to assess for general violence potential, and is used in conjunction with the HARE-PCL. Records are also used in order to formulate risk assessments based on childhood and adult experiences.

Mr. Sparks' VRAG risk category fell within the Medium range of risk, suggesting that he is considered moderate risk for future violence potential and aggressive behaviors. It is considered possible that he may engage in future activities regarding violent assault.

## SUMMARY

Mr. Tony Sparks was referred to the practice of John Huber, Psy.D. at the request of his counsel, David K. Sergi, Esq. to perform a risk-assessment based on Mr. Sparks' criminal history. He presented as a thirty-four-year-old, bi-racial male. This evaluation was conducted in order to provide current information about Mr. Sparks' levels of cognitive and psychological functioning.

The results of testing suggested that Mr. Sparks obtained a PPVT-4 standard score of 91. The chances are about 95% that the range of scores from 84 and 99 includes his true score. His percentile rank of 27 means that Mr. Sparks scored as well as or better than 27% of examinees of his age. His test-age equivalent corresponded to an age of 18:11. Mr. Sparks' receptive vocabulary functioning appears to be within the Average range of development. This was commensurate with prior testing; however, was rather disparate from other testing, suggesting that his vocabulary skills were in the Extremely Low range. It is suggested that the results of prior testing were not indicative of Mr. Sparks' true abilities. It is also noted that his level of participation may have artificially

The WRAT-4 was utilized to assess Mr. Sparks' level of academic achievement. Results suggested that his basic reading ability was Average in development according to the WRAT-4 (Word Reading Scaled Score=95; 95% Confidence Interval=87-104). His capacity to understand what he reads was Below Average in development (Sentence Comprehension Scaled Score=88; 95% Confidence Interval=81-96). His spelling ability was Average in development (Spelling Scaled Score=91; 95% Confidence Interval=82-101). His overall reading skills fell within the Average range (Reading Composite Scaled Score=90; 95% Confidence Interval=84-96). His level of achievement appeared commensurate with his level of intelligence.

Mr. Sparks' approach to the MMPI created a valid personality profile, and a two-point elevation, namely 6-9. This elevation suggests that Tony may be rather dependent, and has a strong need for affection. He may feel vulnerable to real or imagined threats, and may feel anxious and tense much of the time. He may complain of difficulty concentrating, and

his stream of thought may be dysregulated. He may be ruminative, overideational, and obsessional. Many of these experiences are considered typical to life while incarcerated. Knowing that these symptoms are present does suggest the need for treatment outside of confinement to allow him time to adjust to life in the free-world. His history was remarkable for a prior diagnosis of Antisocial Personality Disorder and Conduct Disorder. Based on his reported history, along with a review of relevant records, it is believed that Mr. Sparks' level of pathology does reflect an overt antisocial mentality. Therefore, it is the finding of this evaluation that a diagnosis of Antisocial Personality Disorder be maintained by history.

### DSM-5/ICD-10 DIAGNOSTIC IMPRESSIONS FOR TONY SPARKS

F60.2         Antisocial Personality Disorder

### RISK ASSESSMENT AND RECOMMENDATIONS

Based on the information obtained during the clinical interview and HARE structured interview, VRAG assessment, along with a review of relevant records, it is suggested that Mr. Sparks could be considered a Moderate risk for future violence potential. It is also acknowledged that Mr. Sparks has admittedly engaged in several dangerous and life-threatening actions since being incarcerated. It is believed that he would be a Low-to-Moderate risk for engaging in these behaviors outside of a correctional setting, and was likely engaged in these behaviors in order to "survive" a prison setting. Based on his admitted history of gang-affiliation, it is suggested that Mr. Sparks may be a Low-to-Moderate risk to engage in future gang-related activity. It is also suggested that when presented with an opportunity to be released from custody, Mr. Sparks has made notable and significant changes to his attitudes, beliefs, and behaviors, and is believed to be a good candidate who can be reintegrated successfully back into society. He has also engaged in self-improvement education and coping skills training, which may benefit him in the future.

It is believed that further coping strategy training will likely be a necessary requirement for Mr. Sparks. These skills can be taught via social workers or thought individual counselors. Mr. Sparks should be given unfettered access to these counselors to address these pressing needs to ensure his success upon release. Mr. Sparks may also benefit from individual life-skills training, and training related to activities of daily living, as he has not had to use these skills to live on his own in his entire lifetime. Access to the internet may also be beneficial to help him understand the needs and functions of today's society.

Mr. Sparks, at minimum, may require individual counseling to address his fears and concerns related to being released from custody. While these other trainings are considered beneficial, allowing him to express his concerns and fears in a comfortable setting is a more desirable treatment setting.

*This report is confidential and is intended for your professional use only.*    89-10

## LIMITATIONS & DISCLOSURE

All forensic opinions in this report were based on the information available at the time of the evaluation. Therefore, the opinions presented in this report must be interpreted within the limited scope of the existing information at the time of the evaluation. All forensic opinions were based on a reasonable degree of scientific certainty. Subsequent forensic evidence that may arise after the current evaluation may be used to modify or supplement the forensic opinions presented in this report.

It has been a privilege to be included among the professionals working with Mr. Sparks. I will be happy to discuss this evaluation with persons involved in providing professional care for him, upon receipt of Mr. Sparks' signed authorization.

*John D. Huber, Psy.D.*          07/10/2017
_____      _____
John D. Huber, Psy.D.            Date
Licensed Clinical Psychologist
License Number 34416

*Zackery A. Tedder, M.A., LPA*   07/10/2017
_____      _____
Zackery A. Tedder, M.A.          Date
Licensed Psychological Associate
License Number 36417