# EXH "90"

---

Psychological Evaluation Conducted by
Dr. J. Fabian

Defendant's
Exhibit

90

# JOHN MATTHEW FABIAN, PSY.D., J.D., ABPP
## BOARD CERTIFIED FORENSIC & CLINICAL PSYCHOLOGIST
## FORENSIC & CLINICAL NEUROPSYCHOLOGIST

·5716 W US Hwy 290, Suite 110 Austin, TX 78735 ·North Loop 1604 East, Suite 150 San Antonio, TX 78232 ·Telephone: 512.487.7216 ·Fax 512-840-1980·Email john@johnmatthewfabian.com

## FORENSIC PSYCHOLOGICAL EVALUATION

## RESENTENCING MITIGATION EVALUATION

1/5/18

|  |  |
|---|---|
| **DEFENDANT:** | Tony Sparks |
| **CASE NUMBER:** | W-11-CV-123, W-16-CV-435, (W-99-CR-070-3) |
| **COURT:** | United States District Court for the Western District of Texas, Waco Division |
| **DATE OF BIRTH:** | 05/25/1983 |
| **AGE:** | 34 Years |
| **JUDGE:** | The Honorable Lee Yeakel, United States District Judge |
| **CHARGES:** | Juvenile Tried as an Adult for Count 1 Armed Carjacking Resulting in Death of Another, Aiding and Abetting |
| **SENTENCE:** | Life Without the Possibility of Parole |
| **DATE OF EVALUATION:** | 09/26/2017 |

### LEGAL REFERRAL:

David Sergi, Attorney at Law, has been representing his client, Mr. Tony Sparks, in his litigation. Mr. Sparks was serving a life sentence for carjacking and aiding and abetting in federal court and has been housed in the Federal Bureau of Prisons (BOP). Records indicate that Mr. Sparks received a life sentence which also involved a charge of murder. While he was in custody, he obstructed justice by attempting to escape. Mr. Sergi requested the court for an investigation and forensic psychological and neuropsychological evaluation pursuant to a resentencing. Mr. Sergi indicated there were two co-defendants with Mr. Sparks and these two co-defendants received the federal death penalty while Mr. Sparks received a life sentence. He noted that Mr. Sparks was a youth at the time of the commission of the crime (age 16). This evaluation addresses resentencing investigation assessment pursuant to U.S. Supreme Court holdings in *Miller v. Alabama* and *Graham v. Florida*.

### STATEMENT OF NON-CONFIDENTIALITY/INFORMED CONSENT:

Prior to my examination with Mr. Sparks at the Bastrop County Jail, I informed him of the nature and purpose of the evaluation and its limits of confidentiality. He talked with his attorney, Mr. Sergi, about the nature and purpose of this examination. He was aware that I was appointed

TS000001:

by the court as a defense expert. He was aware that any information he provided to me would initially be confidential. He was aware that he was subject to a resentencing evaluation in light of U.S. Supreme Court case law. He was also aware that this evaluation could be implemented into a written forensic report that I would initially share with Mr. Sergi. Mr. Sparks was aware that if he and his lawyer wanted to utilize this report in court, then the U.S. attorney and federal judge would receive copies of such evaluation. He knew that I also could testify to this information in a court of law. Mr. Sparks understood these issues and agreed to proceed.

## SOURCES OF INFORMATION/EVALUATIVE PROCEDURES:

1) Forensic and clinical interview of Mr. Tony Sparks
2) Summary of interviews of collateral informants by defense team
3) Sexual abuse records
4) Federal Bureau of Prisons records
5) Federal Bureau of Prisons Psychology Data System reports
6) United States Army Department of Criminal Investigation Command
7) Continuation of Tracking Juvenile Designations
8) Jeanne Woodford expert report
9) Life Events Checklist-5
10) PTSD Checklist-5

## BACKGROUND FAMILY HISTORY:

Mr. Sparks was born in Schweinfurt, Germany. His father was in the military. His biological parents' names are Danielle and Thomas. He was uncertain how old his mother was when she gave birth to him, "perhaps 20." His biological parents were never married. He lived with them together when he was younger. They separated when he was 3 or 4 years of age. He has no biological brothers or sisters. He was an only child. He lived in Germany for about 12 years. After his parents separated, he was living with his mother. They then moved to the United States when he was about 12 years of age.

It should be noted that his mother was born and raised in Germany and that is her nationality, while his father is African-American and was born and raised in the United States.

Mr. Sparks reported that his parents separated and he was eventually placed in a group home in Germany. He stated, "I was in a group home when I was 8. So, L was in a group home from 8 to 11." I asked him why he was in a group home, and he said, "Child Protective Services (in Germany) took me away. They said my mom couldn't handle me." I asked him why his mom could not handle him, and he said, "I was acting up. Plus, they had a lot of complaints from the teachers because I was going through child abuse. So, I guess between them two, Child Protective Services took me away from them."

I asked Mr. Sparks about any abuse he suffered as a child, and he said, "Growing up with my momma, she was angry. When my mom and dad split up, my mom was still young. She still wanted to go out and party and do whatever she wanted to do as a young person would. She was

2

TS000001

angry a lot.  Anything that happened to her through the day or whatever she go through or whatever, she takes it out on me."

I asked Mr. Sparks if his mother had any alcohol or drug problems, and he said, "Alcohol."  I asked him about her specific use of alcohol and drugs, and he said, "I have no idea what, just alcohol."  I asked what she did and if she drank in front of him, and he said, "She didn't really drink a lot.  She didn't drink a lot.  But, there's been times when she was drunk, partying."  I asked him if his mother left him home alone, and he said, "Yeah."

I asked him specifically how his mother abused him, and he said, "Through anything.  From hitting, belt, belt buckle, choked me out, trying to drown me, stomping me, kicking me.  There's been a lot of times I got to school and the teachers see the bruises on my body.  They make me take off my shirt and my whole back would be bruised up."  I asked him how this made him feel, and he said, "Now, it doesn't really make me feel no way.  Then, it messed me up.  I felt like I wasn't loved, like she didn't care about me, like she didn't love me, like she hated me."

I asked how often his mother was abusive to him, and he said, "I couldn't even give you a number, just whenever she was angry at the time.  It could have been two or three times a day.  It could have been once a day, every other day."  I asked him how many years this abuse went on, and he said, "Until they took me to the group home when I was 8."  He added that he was often locked up in his mother's house, tried to escape via bed sheet, had no food, and went to his friend's house when he could.

He reported Child Protective Services (CPS) was involved because the teachers primarily saw the bruises on his body.  He said his teachers first started asking him questions about the bruises.  He said, "I first denied it and then they started calling my mom and she denied it."

Mr. Sparks reported no history of sexual abuse by his mother.  I asked him about emotional abuse such as name calling, and he said, "That came with the whoopings.  That came with the abuse.  She couldn't stand me.  I hate you.  I wish you wasn't my son.  I wish you was dead."  Mr. Sparks was not aware if his mother had to go through any type of CPS parental fitness training.

I asked Mr. Sparks about any sexual abuse he experienced, and he said, "I was younger, before I went to the group home, there was sexual abuse going on.  I used to go to the park with my friend.  There was this guy.  I don't know his name.  He was in the military.  White guy.  We used to go to the soccer field over there or just walk the park.  He would talk to us and made us do sexual things."  I asked what friends he was with, and he said, "My friend was a female."  I asked him what the man made him do, and he said, "At first, he asked me if she was my girlfriend and made me and her do things like get naked, play house, hop on each other, acting like we having sexual intercourse when we wasn't.  We was too young."  I asked him if this happened in the park, and he said, "Yeah. In the woods.  The wooded area.  He made a little bonfire and he just watched us.  He come with a pack full of pornography books and make us look at pornography and tried to show us how to do certain things that they was doing in magazines."  He said the man was an

3

adult male. He said he was at a park bench and he would have them come over and would fondle them. Mr. Sparks said he was about 6 or 7 years of age. This happened before he went to the group home. His female friend was about 6 or 7 years of age, as well.

I asked Mr. Sparks how the sexual progressed from fondling to more serious sexual abuse, and he said, "That was it. Just him touching on us, and him wanting us to touch on him, and him doing oral sex on me." I asked him over what period of time this occurred, and he said, "No longer than a month or two until I finally told my momma." He reported no history of physical abuse by this perpetrated.

Mr. Sparks did report telling his mother about the sexual abuse. He said, "I told my mom. When she found out, she got a friend and she got her dog. We went to the park. The next day when I told her, as we go to the park, sure enough he was there in the park again. He didn't think that my momma or my momma's friend was my parents because my mom was young. So, he was trying to call us all over there. We walked a big circle around the park. We met him. My momma told him who she was. He got scared and tried to take off, but they called the police on him, and he got arrested." This man was sentenced to six years in military prison.

Mr. Sparks stated that he responded to this sexual abuse at the time by perceiving it as essentially playing house or doctor and went along with it, but he was likely confused about what was happening. I asked him if this affected him in any way regarding later emotional or sexual development, and he said, "I tried to – over the years, I thought I erased it out of my mind until just recently when it came back up. No, it really didn't affect me that I think of."

I asked Mr. Sparks if anyone else sexually abused him, and he said, "No."

Mr. Sparks reported that he continued to live with his mother while growing up. I asked him further about his life and being raised with his mother and her parenting skills, and he said, "After the abuse, I went to the group home for a year or two later. Before that, it was the same, the same abuse. Still in the same boat. Still struggling. When Child Protective Services got involved, they took me to the group home one time and showed me around, asked me if it was a place I'd like to go to. I didn't want to, so they took me back home to stay with my momma. After a while, she got frustrated and called the Child Protective Services and told them it's time, go ahead and take him. And they took me."

I asked Mr. Sparks about his adjustment in the group home, and he said, "It was all right. It took a while for me to get used to. But, me growing up as a single child and all of a sudden being around in a town full of kids, so much things to do for a kid. It was good. It was a good thing. I liked it. It took me a while to adjust, and after a while I liked it. I was homesick a lot. I missed my dad."

I asked him how often he was seeing his father, and he said, "He got stationed back to America.

4

But, every time I had my birthday or Christmas, he'd always find a way to come see me and visit me. That's the only time I'd see him. Easter, and special holidays. He would come see me. Me and my dad had a close relationship. We'd call, make phone calls. But, I'd only see him on special occasions."

After the group home experience, he reported living with his dad. I asked him about that, and he said, "I lived with my dad and his wife, Charlene, for about a half a year until my mom got situated in Texas, when she moved to Texas. It was a good. I went to school when living with my dad, and everything was good."

I asked Mr. Sparks about his mother remarrying, and he said, "She got married to Alphonso Brown. She was happy. It was like her dream to always come to America – get married and come to America. So, I guess she fulfilled her dream. Alfonzo was all right at first in the beginning. He was real cool. He was real cool in the beginning. After a while, I started seeing the real him. He was abusive, not toward me too much, but now like the table turned and he was real abusive to my momma. Real bad. He beat on her all the time, and was real strict." I asked him if he witnessed any physical abuse to his mother, and he said, "All the time." Alphonso and his brothers were gang members and brought the gang lifestyle into the house.

It should be noted that Mr. Sparks initially lived with his father after being released from the group for about six months to a year. His mother then got adjusted, and she had moved to the United States. She had met Alfonzo in Germany who was also a military man. They adjusted and moved to Texas and were leaving Killeen by Fort Hood. It was always the plan that he would return and live with his mother.

I asked him about the physical and emotional abuse by his stepfather, Alfonzo, toward his mother, and he said, "It was a lot. Like I said, he was real cool, but after a while he started hitting on my momma a lot, beating on her, holding her down and choking her, being verbally abusive toward her. He made her sleep in the car. Just a lot of stupid childish stuff he used to do to her."

He reported living with his mother and stepfather for about four years until his instant offense. He still continued to see his father who was stationed in the military in Maryland and Kentucky.

I asked Mr. Sparks about any type of alcohol or drug problems for his parents. He again stated his mother had some alcohol problems early on. She also smoked marijuana or hash. He also said there was no evidence of mental illness for either parent. He reported no history of criminal offenses for his parents.

**Collateral Informant Interviews**

The defense team interviewed Liane Fidani who was a childhood friend of Mr. Sparks when he lived in Germany. She lived very close to him where he grew up and was constantly together with him. Liane does not like Mr. Sparks' mother because she said Mr. Sparks' mother neglected

5

TS000001:

him constantly. Mr. Sparks' mother was more interested in going out with United States soldiers than raising her son. There were often soldiers going in an out of her apartment to see her. She also reported being the victim of sexual assault by a local man. She said Mr. Sparks witnessed the abuse one time when he was with her. Mr. Sparks left immediately and told Liane's mother, Rita, who called the police and filed charges.

Rita Cicek was also interviewed. She is Liane's mother. Rita described Mr. Sparks as being a "completely normal boy" and that he was willing to help if she needed it. He was nice and friendly. He was never violent, deceptive, or aggressive. She described Mr. Sparks' mother as being strict and more of a party type.

Christiane Nicola Heger was also interviewed. She was one of Mr. Sparks' teachers in elementary school. She described Mr. Sparks as not initiating things but would go along with what other children did, as he wanted to be accepted. She said there were some difficulties with some of the other elementary school children because Mr. Sparks came from the children's home and the kids from intact families in town would offer refer to the children's home children negatively. She also said Mr. Sparks was a subject of abuse by a school director, Stephan Schmidt, as Schmidt would often call Mr. Sparks and some other children and slap them in the face and on the ears. They would return to class with red marks in those areas.

Thomas Klose was also interviewed. He was a civil servant of the Child Protection Service's office and was responsible for Mr. Sparks. He said the area where Mr. Sparks lived was a problem area and that he had several clients who lived close to Mr. Sparks. Thomas attempted to negotiate with Mr. Sparks' mother to have her relinquish Mr. Sparks to CPS care, but his mother was very reluctant at first. She eventually came in, and Mr. Sparks was placed in a children's home in Riedenberg beginning at age 8 or 1991. In addition to his mother's neglect, Mr. Sparks sprayed graffiti all over town with the slogan "Tony was here," and he also jumped on cars. He was aware of the abuse on the part of the Riedenberg Elementary School director, Mr. Schmidt. He said Mr. Sparks was making progress in the home and that it was very unfortunate that his mother decided to take him out of Riedenberg, as Mr. Sparks and other child services workers were convinced that he was not ready to be released from the assisted care.

Yvonne Bullan said she knew Mr. Sparks and grew up with him and was a constant companion with him in Niederwern. Yvonne was a foster child. Both of her parents were alcoholics and CPS removed her from their care. She said Mr. Sparks was very afraid of his mother and never wanted to go home. He spent most of his time with her and they were always running around the town, doing things outside. In the evening, he often ate at Yvonne's house and did not want to return home. She said Mr. Sparks was left at home on one occasion for about two days. He was hungry and got his bedsheets together. On one occasion, he came to Yvonne's house and said he wanted to move in with her. Yvonne said Mr. Sparks' mother was often away and she preferred partying. She said he never said anything bad about his mother. Yvonne also stated that she was with Mr. Sparks when he was sexually abused by a United States soldier. It happened at a playground in Niederwern. Yvonne said she thought the soldier was more interested in boys than girls. He gave her chocolate, and she went to eat it on a bench while Mr. Sparks was in the woods with the man. This happened a few times. She could not remember how many times it occurred.

6

TS000001

She told her father, Franz, about it, and he said up a trap to catch the solder, which he did.

Carmen Lapiccirella was interviewed and said that she called CPS after she saw that Mr. Sparks had been physically abused. She said Mr. Sparks was small. It was a hot Sunday and she put out a plastic pool for Mr. Sparks and Yvonne to cool off. She told Mr. Sparks to take off his shirt and he refused. She told him that his mother would get very mad if he returned home with a wet t-shirt, and he reluctantly took it off. That is when she saw his back was full of welts. She could also see the strap marks from the belt. He said, "My mother hits me." Carmen was shocked about this. Carmen then went to talk to Mr. Sparks' mother and asked why she beats her son. Danielle told Carmen that Mr. Sparks does not listen and that is why she beats him. Carmen then called CPS. Carmen described Mr. Sparks as overall a very good kid and he nearly always was with Yvonne and at their house.

The team also interviewed Manuela Brown who also knew Mr. Sparks when he was growing up. She said since she is older than Yvonne and Mr. Sparks that she did not play much with them when she was a child. She remembered Mr. Sparks always being at their house. She also remembered it was well known that Mr. Sparks' mother did not take care of him and that she was more concerned with dating United States soldiers than dealing with her son. She said, "I really knew that his mother didn't look after him." She added that Mr. Sparks' was not his mother's priority. There were often various United States soldiers coming in and out of the apartment.

Franz Hess is the father of Yvonne and the biological father of Manuela. Franz confirmed that Mr. Sparks was constantly with Yvonne and always at their house. He remembered that Mr. Sparks wanted to move in with them. Franz said he contacted CPS early on but was told that there was no reason to take action. Franz described Mr. Sparks as a kid who always wanted to be accepted but also a kid who would follow and never lead. Yvonne was the one who came up with things to do, good and bad, and Mr. Sparks always followed along.

Franz said he found Yvonne on a playground on a bench with candles and two marks and asked her where she got that. Yvonne told her a man who spoke English. Franz decided to set up a trap and got some boys from the village to hang out in the park. He ended up apprehending the soldier and called the German police who told him there was nothing they could do and that he needed to contact the United States military police, which he did. Franz said Yvonne and Mr. Sparks were then asked to testify, which they did.

A woman named Ms. Weber was contacted. She was one of the supervisors in the children's home in Riedenberg when Mr. Sparks was there. She authored a discharge letter which stated the home reluctantly discharged Mr. Sparks because she and others in charge believed that he should still remain at the home for further education and training before returning to his family. She said that Mr. Sparks was fixated on his father and always talked about him. He was always looking to see if his father was going to visit him, but that did not happen. She remembered him waiting for his father to show up on the weekends at the children's home, and, when that did not happen, he would be consoled by others. She said Mr. Sparks' mother wanted another partner and that was a priority over her son. Ms. Weber said Mr. Sparks was the victim of long-term neglect by his

7

mother.   Before he was in the children's home, he would have to get up and feed himself breakfast and get himself to school.   This was when he was about 8 years of age or so.   His mother was often partying with United States soldiers late at night and had to sleep in the morning.   His mother was more at home with the United States Army barracks than she was at home taking care of her son.   Ms. Weber said she tried to help Mr. Sparks' mother and talked to her about way she could improve her parenting skills and help Mr. Sparks.   The mother always said yes but never did anything.   She believed Mr. Sparks' mother was too young to be a parent.   She remembered Mr. Sparks smearing "Tony was here" all over the walls in Niederwen, a small town where he lived.   This was a cry for help, in her opinion.   Ms. Weber said Mr. Sparks was preprogrammed to fail in the United States as he did not complete his therapeutic treatment at the children's home.   He spoke no English and was not familiar with United States customs.   He had such an insecure home life.   He looked for security with others and it was quite understandable that he would follow along with a crowd as it provided him with a sense of community.   She described him as not being an aggressive child, rather he kept everything in.

The defense team also interviewed Murat Demikan.   They found him on Facebook.   Murat was one of Mr. Sparks' best friends in the Riedenberg children's home.   He recalled hanging out with Mr. Sparks.   He said they would wait on the hill for visits with their fathers who never came.   When Murat was 19 years of age, he was charged and convicted of attempted murder and sentenced to four years and four months in prison.

## ACADEMIC HISTORY:

Mr. Sparks went to school in Germany through fifth grade and then Texas through ninth grade.   He reported taking his GED on a number of occasions.   It took him about ten years to receive his GED.   He denied getting held back or failing grades.   He reported suspensions.   He said, "I was suspended a few times in school.   I went to alternative schools for fighting.   Mostly fighting."   I asked him if he ever had a psychoeducational evaluation for behaviors and/or intelligence with testing, and he said, "No."

I asked him if anyone ever said he had a history of attention deficit hyperactivity disorder (ADHD), and he said, "No."   I asked him if he ever had any language or speech therapy, and he said, "No, I was in ESL class, if that's the same."   He reported when he immigrated to the United States his school teacher in Texas believed he had a German accent and that his English was not up to par as he should be.   He then took classes for English as a second language from sixth through ninth grades.

Mr. Sparks eventually obtained his GED in July 2010 at Florence ADX.   He also participated in college courses including Peloponnesian War Parts 1 and 2, Books that Made History Parts 1 and 2, America at War Parts 1, 2, and 3, Stress Management, Five-Hundred Nations, Math from the Visual World, Great Presidents Part 1 and 2, Universe Part 2, Great Legends of the Silver Screen, the Human Body, the American Experience Part 5, Steven Hawking's' Universe, Brief World History Parts 1 and 2, Face of Freedom, Discovering Psychology, Health and Biology, Lost Cities, Paranormal Psychology, Breaking Barriers, Health Education, the Mind, Houses of Healing, the World's Greatest Paintings, Engineering Disasters, Roots of Human Behavior, Self-Improvement,

8

Founding Fathers and Brothers, How the Earth Works Parts 1 and 2, the National Park, We Shall Remain, and Events that Changed the World Part 1.

The prior USP psychological report indicated that he was placed in alternative school in the ninth grade and did not complete school due to his incarceration. He typically earned B's and C's while in school. He denied being suspended or expelled. He reported an "alright" relationship with his teachers and peers. He had not obtained his GED by the time he had a psychological evaluation in 2009.

**MILITARY HISTORY:**

Mr. Sparks has no military history.

**EMPLOYMENT HISTORY:**

The PSI stated that in the tenth grade he denied employment, but then there was evidence that he worked two different pizza places as a cook in 1998.

Mr. Sparks obviously has employment essentially only in prison. However, before prison, he worked at two different pizza restaurants in Killeen, Texas, and was involved with making pizza and doing deliveries. He said he quit the first job because the owner fired Mr. Sparks' friend, as he was missing a firearm.

**RELATIONSHIP HISTORY:**

Mr. Sparks has never been married and has no children. He has had close relationships with females. One prior psychological evaluation stated that he started dating at 7 years of age. He has denied close intimate or significant relationships other than with a female named Jessica. He has had sexual intercourse and relations with about five different females. He reported first having sexual intercourse around 15 years of age. He denied homosexual experiences. He denied ever being sexually assaulted or raped in prison.

**MENTAL HEALTH HISTORY:**

Mr. Sparks has no history of inpatient psychiatric treatment. He did report to me some suicide attempts when he was younger. I asked him about this, and he said, "It wasn't a suicide attempt, like I wanted to cut my throat, I wanted to hang myself, or shoot myself. Since I've been in the system, there's been times that I just – there's been times that I gave up. I just wanted to act up or do something to somebody to force their hand where they would have to kill me."

I asked him if he ever felt suicidal before his arrest, and he said, "No." I asked him if he ever tried to self-mutilate, and he said, "I cut myself before." I asked him when, and he said, "I was about 18 or 19." He said he is not currently depressed.

Mr. Sparks did not have much significant mental health assessment or treatment during childhood

TS000001

or adolescence. He apparently has told me and other examiners or interviewees that he had a history of conduct disorder and antisocial personality disorder. He also participated in anger management programming while incarcerated. He said he has cut himself in the past and has had suicidal thoughts and wanting to die in the past. He said he had most significant mental health issues of despair and depression and suicidal wishes between 2007 and 2009.

The PSI reveals diagnoses relevant to a psychological evaluation in 1999 with conduct disorder, adolescent onset type. The evaluator described his decision-making style as calculating and unemotional. He stated he was likely to be predatory and aggressive in his environment and how he related to his environment. His Federal BOP psychological evaluation report dated 02/03/2009 indicated his contact with Psychological Services since his incarceration with the Federal BOP had been routine contacts consisting of intake screenings and 30-day review.

It should be noted that Mr. Sparks was examined by BOP psychologist, Dr. Melissa Albert. She is a psychologist at the BOP U.S. Penitentiary Pollock in Louisiana 2309. This was requested by an inmate unit team in accordance with program statement 5212.06 Control Unit Programs to designate Inmate Sparks with ADX. This psychologist diagnosed him with antisocial personality disorder. She described him as having a personality and factors of behavior that indicate presence of antisocial disorder. Prognosis for him was considered guarded at best. He exhibited personality factors that are deeply ingrained and tends to run on an unremitting course. To change these factors would require intense work, persistence, and a strong desire to make that change. Most individuals with antisocial personality disorder see no problem with their behavior or perspective and see no indication to make changes. A Control Unit appears to be an appropriate placement as he is not likely to change his behavior in the near future. He is not suffering from a major mental illness and there is no need for psychological treatment beyond the norm. He should be able to adjust appropriately to the environment of a Control Unit. He reported no history of auditory or visual hallucinations. He denied any history of paranoid or grandiose delusions.

As noted, Mr. Sparks was evaluated by prison psychologist Dr. Melissa Hughes Albert at USP Pollock, Louisiana, on 02/03/2009. This evaluation occurred when he was 24 years of age. He reported being arrested at age 15 for stealing a bicycle. He was arrested at age 16 for the instant offense. He had four other arrests and charges were eventually dismissed, such as burglary of habitation and theft under five hundred dollars, evading arrest, failure to identify, and assault with a deadly weapon. He was not charged with aggravated assault due to the current offense. The doctor explained that Mr. Sparks had exhibited a pattern of violation of rules and regulations while incarcerated. He violated rules at the juvenile detention center on many occasions. She noted he had a history of engaging in violent acts while incarcerated at the Federal Bureau of Prisons. She described as him being born in Germany and living there until 12 years of age. His mother then married his stepfather and they all moved to Killeen, Texas, where he lived until the time of the instant offense. He reported a good relationship with his mother and father and no relationship with his stepfather. (Obviously, this is in question relevant to his other reports of having difficulty with his mother.) His mother and stepfather have divorced since his incarceration. He said he has no contact with his stepfather. He denied siblings in the evaluation, but USP documented that he had one half-brother. He reported completing ninth grade and being placed in alternative school in ninth grade, but he did not complete school due to his incarceration.

10

The prior prison psychological evaluation indicated that his participation in a psychological evaluation was in 1999 when he was diagnosed with conduct disorder, adolescent onset type. The evaluator at that time described his decision making at that time as unemotional. Related to his environment, Mr. Sparks would likely be predatory and aggressive. He had routine Bureau of Prisons contacts with psychology services consisting intake screenings and 30-day special unit review. In the 2009 evaluation, Dr. Hughes Albert, described Mr. Sparks as having a normal mental health status that was within normal limits. He was correctly oriented in all spheres. Thoughts were rational and organized. There was no evidence of thought disorder. He never experienced any thoughts to hurt himself or others. There was no evidence of a mood disorder. His speech was within normal limits with quantity and quality. He used vocabulary and had knowledge information to suggest average intelligence.

Dr. Hughes Albert stated that since 2006 he had been involved with three serious assaults on other inmates. The most serious inmate involved inmate Sparks observing his victims until unconscious to ensure the victim is not able to summon assistance. His discipline record demonstrated a pattern of increasing violence. She did not diagnose him with any mental disorder, but she did diagnose him with antisocial personality disorder. The prognosis was considered guarded at best. He exhibited personality factors that were deeply ingrained and in an unremitting course. She stated he did not suffer from any major mental illness and there was no need in psychological treatment beyond the norm.

## MEDICAL HISTORY:

It is my understanding that Mr. Sparks has had no significant medical history or treatment.

## SUBSTANCE USE HISTORY:

Mr. Sparks told me that he used alcohol and smoked marijuana. PSI documented this information. He was using substances by age 15. He told me this was accurate. He said he did not abuse the substances. He was able to stop for weeks when he was having his urine tests while on probation. He denied a history of other harder drugs.

Mr. Sparks has also shared with other examiners that he was using alcohol at least by age 14. He used alcohol on several occasions and has been intoxicated at least once. He reported using marijuana beginning at age 13, but he was not using it on a regular basis. He did smoke marijuana and used hooch and alcohol throughout his incarceration. He said he did not use other illegal drugs such as PCP, cocaine, and methamphetamine, but he may have tried LSD on at least one occasion.

## LEGAL HISTORY:

Mr. Sparks had a murder which is relevant to the instant offense. The crime involved several co-defendants including Christopher Andre Vialva, age 19, Brandon Bernard, age 18, Christopher

11

Lewis, age 15, Terry Brown, age 17, and Mr. Sparks, age 16, who agreed to participate in a carjacking for the purpose of obtaining money from the bank account of the victim of the carjacking. The victims in this case were Todd Bagley and Stacie Bagley, husband and wife. The crime occurred on 06/21/1999 in Texas.

The presentence report indicated that the defendants stood in front of Mickey's Convenient Store and asked the Bagleys for a ride. The victim agreed to provide the three defendants, Vialva, Sparks, and Lewis, a ride. Defendants Bernard and Brown were in a separate car and defendant Vialva, Sparks, and Lewis left in the Bagley car. Once inside the car, Vialva pulled out a 40-caliber Glock and said there was a change in plans. Sparks pulled out a 22-caliber gun. The three defendants obtained the wallet and purse from the Bagleys and removed the ATM card and ID card as well as money from the purse. Mr. Bagley was ordered to drive the vehicle to a remote area where he and Mrs. Bagley were placed in the trunk of the car. Their personal jewelry was also removed, and the trunk was closed. The defendants then drove back to Mickey's Convenience Store to locate defendants Bernard and Brown. They then drove to an ATM machine and attempted to remove money. Lewis spoke with the Bagley and they admitted that they had given the wrong PIN number. The defendants made another unsuccessful attempt to get money from the ATM machine. They then drove to Wendy's to buy food. They then drove to Copperas Cove, when Vialva realized he did not have an identification card. They then drove back to Killeen, Texas, to obtain Vialva's identification card from his home. They then drove back to Copperas Cove where Vialva tried to pawn Mrs. Bagley's ring. He was unsuccessful. The Bagleys talked about God and what He had given them.

Mr. Sparks commented to others that he did not want to go through with this. He related to Dr. Woodford that he became concerned after Vialva told that group that they would get in a shootout if they are stopped by the police.

Vialva had started talking about the Bagleys and burning the car because the Bagleys had seen his face. Sparks disputed this, stating there was never any mentioned of killing of the Bagleys while he was present. He also told me this as well.

The defendants drove around more and met up with Brown. Brown got in the car with Vialva, Lewis, and Sparks. Brown threatened to kill the Bagleys, but Vialva told him not to do it. Brown perceived that Vialva, Sparks, and Lewis would not hurt the Bagleys because they had told him not to kill them. They dropped Brown off at Bill Rories' house where he was living at the time. Vialva was told to locate Bernard. He was able to locate Bernard who then picked up Brown and they met up with Vialva and the other defendants. Vialva then stated he was going to kill the Bagleys. Sparks disputed this, stating there was no discussion of killing the Bagleys when he was present. (It should be noted that Mr. Sparks has been consistent with his claim that he did not plan or conspire to kill the Bagleys.) Lewis also now confirms that Sparks did not know that the Bagley's were going to be killed. Vialva headed to Sparks house to drop him off because Sparks had a curfew. Sparks stated he asked to be dropped off around 5:00 p.m., but then he regretted being involved in the carjacking. He was concerned that they would be stopped by the police and that Vialva would attempt to engage the police in a shootout. The defendants then proceeded to drive the Bagleys to a rural location resulting in the death of both Bagleys. Mr. Bagley was shot

12

in the head and Mrs. Bagley was shot in the face but did not immediately die. The car was lit on fire. Apparently, the lighter fluid had been purchased by Brown and Bernard at 8:03 p.m. that evening. Mrs. Bagley eventually died of smoke inhalation. Brown and Bernard were present with Vialva shot both Bagleys. Brown and Bernard poured lighter fluid inside the car, and defendant Lewis ran down the hill about the time that Vialva ordered the trunk to be opened. Vialva's lighter fluid was then poured in the trunk by Brown. Brown ran down the hill, and Vialva directed Bernard to light a match and throw it inside the vehicle, which ignited the fire of the Bagley's vehicle. The fire caught the attention of several people in the area, which resulted in law enforcement response. Vialva, Bernard, Brown, and Lewis were retained in custody near the scene of the crime.

Vialva and Bernard were sentenced to death for their role in the crime. Lewis received a terminate term and has been released from custody. Brown received a terminate and is supposed to be released in 2018. Further, Gregory Lynch received a 60-month sentence for providing a gun that was utilized in the murder.

Mr. Sparks was tried as an adult for the offense of Count 1: Armed Jacking Resulting in Death of Another and Aiding and Abetting. He received a sentence of life without the possibility of parole.

Mr. Sparks has been consistent with my examination and the examination of Dr. Woodford about his ultimate sentencing in his court cases. He reported agreeing to plead guilty to the charge of kidnapping relevant to the nature of the escape situation from the detention jail. He said he had an agreement that he would serve 5 to 15 years, but the day before his sentencing attorney came to visit him and informed him that he was getting life in prison. Mr. Sparks stated he was confused and did not know what the attorney was talking about. He said he was sentenced to life in prison without the possibility of parole and had no idea that he was going to be sentenced to this amount of time.

The Continuing of Tracking Juvenile Designations records indicated that Mr. Sparks had prior juvenile arrests including burglary of habitation and theft, which was refused or dismissed, evading arrest, and failure to identify two times in 1998, and the case was refused or dismissed. He was charged with aggravated assault with a deadly weapon in 1999 with a motion nonsuit granted by the court based on arrest for the instant offense. He and codefendants flashed gang signs. They stuck their hand out of the window and starting firing at a person. He was also referred by the CCM office in San Antonio to Santa Fe County Youth Development program.

## INSTITUTIONAL ADJUSTMENT:

Mr. Sparks was housed in the Bell County Juvenile Detention Center during his pretrial status and from the time of his arrest on 07/02/1999 until he was convicted and sentenced for this case. He was then transferred to the Federal Transfer Center for processing on 04/03/2001. The presentence report indicated that Mr. Sparks was housed in the Juvenile Detention Center as a resident. He and another resident, Christopher Kirvin, attempted an escape by asking for a cup of water from an officer. The officer opened the cell door to allow the resident to get a cup of water, and the resident turned in his cell and grabbed the officer around the neck with his hands. He

13

TS000001

pulled the female officer in his cell and sat on his bed still choking her. The officer passed out. When she gained consciousness, she screamed and other officers came to her aid, finding the officer in the cell crying and holding her neck. The officer was removed from the cell, and the resident was lying in bed pretending to sleep. The officer noticed the key to C-pod was missing. The officer searched the resident's cell and located the key under Kirvin's mattress. Kirvin stated that she should not have opened his door.

Other prison documents indicated that resident Sparks and resident Kirvin planned the incident about two days before it occurred. There was an informant who talked about Mr. Sparks flushing the toilet so no one could hear the officer's screams while Kirvin choked her. Mr. Sparks was never charged for this crime administratively or criminally. He has denied both with me and with Dr. Woodford that he participated in this escape attempt.

Mr. Sparks was incarcerated in the Federal Transfer Center in Oklahoma City on 04/03/2001. This is an administrative security Federal Transfer Center. He was then transferred to Federal Correctional Institution (FCI) Beaumont Medium Secure Facility on 08/14/2001. He was incarcerated there for about three years.

Mr. Sparks volunteered in a youth diversion program. He also took some classes there. He had eight disciplinary infractions at FCI Beaumont, seven of them were nonviolent. The disciplinary infractions included: Refusing a direct order, absent from assignment, insolent to staff, refusing to take an alcohol test, and possession of alcohol. The considered violent infraction was participating in a riot. This riot occurred on 07/16/2004 involving 600 inmates. He reported using a baseball bat to defend himself, but he was found guilty of involvement in the riot.

He reported there were a number of violent situations in FCI Beaumont. He then was transferred to USP Beaumont on 09/22/2004. He was there for about two years, which is a high security federal correctional institution and U.S. penitentiary. He attended school and worked in the kitchen. He had five disciplinary infractions in that facility: Being in an unauthorized area, refusing to obey an order, fighting with another person, and assault on an inmate with a weapon. The stabbing assault occurred on 07/20/2006. He was charged with stabbing his cell partner resulting in serious injury. He has stated consistently that it was the decision of the gang that this inmate should be stabbed for disrespecting their group. An inmate with a release date was chosen to carry out the stabbing, and Mr. Sparks did not want this person to lose his release date; therefore, Sparks carried out the assault. He reported witnessing significant violence within the prison community and also hearing about sexual and violent physical assaults.

Mr. Sparks then transferred to USP Victorville on 08/23/2006. He was there for about 10 months. USP Victorville is a high security U.S. penitentiary. He received three disciplinary infractions while at USP Victorville: Possessing a weapon, assaulting without a serious injury, and refusing to obey an order. He reported this was also a violent facility similar to Beaumont with gang activity and physical and sexual violence.

Mr. Sparks was transferred to USP Pollock on 06/18/2007, which is another high security U.S. penitentiary. He worked as an education orderly there. He said this was perhaps the most violent

14

institution he was at. Similarly, there were a number of fights, weapons, and gang activity as well as sexual assaults. He received a total of nine disciplinary infractions for being absent from work, two for possession of a weapon, three for refusing a direct order, being in an unauthorized area, assault with serious injury, and attempted murder. He was involved in a stabbing assault with serious injury in September 2007. The victim suffered serious injuries. The victim was confined to a wheelchair and restricted to utilizing a catheter. There was one confidential informant who said that Sparks was intoxicated at the time of the stabbing. Mr. Sparks has admitted that his involvement with the stabbing was prison politics. He said he was a gang leader but a soldier involved in a gang.

On 03/31/2008, Mr. Sparks received a second disciplinary infraction for the stabbing/attempted killing of an inmate. The stabbing caused permanent injury to the stabbing victim. Mr. Sparks was found guilty on 03/31/2008 for stabbing/attempted murder of an inmate. It should be noted that Mr. Sparks was stabbed on 03/03/2008. He was sentenced to a 68-month term in ADX for the stabbing assault of 03/31/2008.

While at Florence ADX, Mr. Sparks received a disciplinary ticket for possessing an intoxicant which was manufactured wine that he made. He had indicated to me and Dr. Woodford that he had struggled with suicidality in a number of his placements including Florence ADX. He also improved his educational pursuits and had completed over a hundred educational courses while at ADX. He was involved with a pilot gang project there trying to facilitate better gang relationships.

The Federal Bureau of Prisons Psychology Data System records indicated that Mr. Sparks denied depression or anxiety and stated he was happy at ADX. He also received numerous Federal Bureau of Prison psychological reviews while housed in ADX. These reports indicated Mr. Sparks was a low risk under the category of threat to others and threat to self. He apparently had good relationships with staff. He was then transferred to USP Allenwood which is a high security federal prison. He said he wanted to pursue a physical training certification there. He then received a disciplinary infraction for ordering an inmate to hit another inmate while at USP Allenwood. The hearing officer reviewed a videotape of this incident and found Mr. Sparks not guilty. He was classified to transfer to another facility, as USP Allenwood did not have programs to benefit him.

He was transferred to USP Canaan in March 2015, which is a high security federal prison. He was at USP Canaan until he was transferred to the jail awaiting his presentence proceedings for this case.

While at USP Canaan, he received two disciplinary infractions for nonviolent offenses. They found stamps during his search and extra food items or cleaning supplies. The second disciplinary infraction involved a staff member observing Mr. Sparks give something to another inmate. This inmate was searched, and they found small pieces of blue paper among the items wrapped in brown paper. Mr. Sparks said he was selling Kool-Aid to make coffee money. He denied any incident that involved drugs. Overall, his infractions included the following:

15

- 08/23/2003 – Refusing to take alcohol test, loss of commissary 180 days.
- 03/01/2004 – Possessing unauthorized item, loss of telephone.
- 03/13/2004 – Possessing intoxicants, inmate made alcohol, loss of visiting 180 days.
- 05/31/2004 – Possessing intoxicants, inmate made alcohol, loss of good conduct time.
- 07/16/2004 – Rioting, loss of telephone visits 365 days.
- 08/22/2005 – Unauthorized area, loss of LP visits 30 days.
- 06/11/2005 – Refusing to obey orders/stealing, commissary suspended 180 days.
- 02/13/2006 – Refusing to obey an order, none listed.
- 06/22/2006 – Fighting with another person, loss of commissary 180 days.
- 07/28/2006 – Assaulting with serious injury, inmate transferred.
- 12/18/2006 – Possessing a dangerous weapon, 40 days CS.
- 01/08/2007 – Assaulting without serious injury, possessing a danger weapon, refusing to obey an order, 40 days CSR
- 02/13/2007 – Assaulting without serious injury, minor assault, 27 days loss of good time.
- 07/02/2007 – Being absent from assignment, 30 days CS.
- 08/01/2007 – Possessing dangerous weapon, 30 days CS.
- 09/03/2007 – Assault with serious injury, 6 months CS, loss of phone.
- 12/25/2007 – Possessing dangerous weapon, 10 days CS.
- 10/02/2008 – Refusing to obey an order, disruptive conduct, moderate, loss of commissary, loss of phone 30 days.
- 03/31/2008 – Being in unauthorized area, disciplinary transfer due to violence and use of weapons.
- 03/31/2008 – Killing (attempting to kill), stabbing, 2 years loss of commissary and loss of visits.
- 10/30/2008 – Refusing to obey order, loss of commissary 30 days.
- 05/13/2009 – Refusing to obey order, breaking fire sprinkler head, 21 days disciplinary detention.
- 02/27/2010 – Possessing intoxicants, inmate made alcohol, 30 days disciplinary segregation.
- 02/17/2016 – Destroy/dispose items at search, 30 days CS.
- 01/25/2017 – Possessing narcotics, guilty, 60 days, disciplinary detention.

## CURRENT PSYCHOLOGICAL TESTING RESULTS:

### *Psychopathology*

I administered Mr. Sparks the Life Events Checklist-5 (LEC-5) to assess different types of traumatic experiences he has been exposed to. He reported being exposed to a natural disaster, fire explosion, witnessed a transportation accident, experienced physical assault, experienced physical assault with a weapon, experienced sexual assault, experienced other unwanted or uncomfortable sexual experiences, lived in a warzone in the community or prison, was subject to some captivity or robbery, and witnessed severe human suffering. He also witnessed a sudden death.

TS000001:

*Trauma*

I also administered Mr. Sparks the PTSD Checklist-5 (PCL-5) to be aligned with the DSM-5 PTSD diagnosis. This is a face-valid self-report with no validity scales. He reported significant traumas as mentioned above. He also reported disturbing unwanted memories of a stressful experience; extreme repeated disturbing unwanted memories of the stressful experience; extreme feeling jumpy or easily startled; having quite a bit of repeated disturbing dreams of the stressful experience; having strong physical reactions that remind him of the stressful experience; avoiding memories, thoughts, or feelings related to the stressful experience; avoiding external reminders of the stressful experience; having strong negative feelings such as fear, horror, anger, guilt, or shame; taking too many risks or doing things that would cause him harm; being super-alert, watchful, or on guard; and feeling jumpy or easily startled.

He has moderate evidence of feeling very upset when something reminds him of the stressful experience; he has trouble remembering important parts of the stressful experience; blames himself or someone else for the stressful experience; feeling distant or cut off from other people; having difficulty concentrating; and having trouble falling or staying asleep. He has a little evidence of suddenly feeling or acting as if the stressful experience was actually happening again (flashbacks); loss of interest in activities that he used to enjoy; and irritable behavior such as angry outbursts or acting aggressively.

## DSM-5 DIAGNOSTIC FORMULATION:

Posttraumatic Stress Disorder (Complex Trauma)

Antisocial Personality Disorder

## FORENSIC OPINION:

Mr. David Sergi, Attorney at Law, is representing Mr. Sparks for his criminal court case in the United States District Court for the Western District of Texas. As noted, Mr. Sparks was charged as a juvenile and tried as an adult for armed carjacking resulting in death of another and aiding and abetting. Essentially, he and several other males, both juveniles and adults, were involved in a carjacking incident that led to the deaths of an adult couple (the Bagleys). At that time, Mr. Sparks was sentenced to life without the possibility of parole.

A number of cases held by the U.S. Supreme Court have addressed Eighth Amendment issues relevant to sentencing of juveniles for serious crimes including murder. This U.S. Supreme Court cases, such as *Graham v. Florida* (2010) 130 S. Ct. 2011; and *Miller v. Alabama* (2012) 132 S. Ct. 2455, and *Montgomery v. Louisiana* (2016) 136 S. Ct. 718 have emphasized in part that there are brain-related mitigating factors to be considered at sentencing for juveniles in serious crimes of murder and homicide. For example, in *Miller*, the Court held that mandatory sentences of life without the possibility of parole are unconstitutional for juvenile offenders even to those persons who had committed murder. Under *Graham*, the court held that juvenile offenders cannot be

17

sentenced to life in prison without parole for non-homicide offenses.

The brief of American Psychological Association, American Psychiatric Association, National Association of Social Workers, and Mental Health America as Amica Curie Supporting Petitions (2009) outlined research recognizing the developmental characteristics of adolescents, recent neuroscience research revealing adolescents brains were not yet fully developed in regions related to higher order executive functions such as impulse control, planning ahead, and risk evaluation with evidence that anatomical immaturities consonant with juveniles demonstrates psychosocial immaturity. The brief highlighted adolescents who are represented in virtually every category of reckless behavior and are more impulsive than adults and they have low exercise of self-control. The brief addressed the court's holding in *Graham* concerning brain development and a degree of adolescent culpability when they commit criminal acts. Sex offender acts often result from impulsive and ill-considered choices driven by psychosocial immaturity. The brief also focused on the fact that psychosocial immaturity is consistent with the emergence of research relevant to brain development and the recent neurobiological research demonstrating the brain system governs many aspects of social and emotional maturity including impulse control, weighing risks and rewards, planning ahead, simultaneously considering multiple sources of information, and coordinating emotion and cognition and this system continues to mature through adolescence and young adulthood.

Further, the U.S. Supreme Court also opined in *Miller v. Alabama* (2012) that mandatory sentences of life without the possibility of parole are unconstitutional for juvenile offenders. The brief for the American Psychological Association, American Psychiatric Association, and National Association of Social Workers as Amica Curie (see www.apa.org/pubs/highlights/spotlight/issue-73.ASPX) in Support of Petitioners (*Miller v. Alabama* (2012)) again cited neuroscience research supporting a potential physiological basis for recognized characteristics of adolescents and, in particular, why adolescent brains are not yet fully mature in regions consistent with higher-order executive functions including impulse control, planning ahead, and risk avoidance.

The mitigation and culpability issues in this case to be considered in my opinion, especially when resentencing an adult now who committed the offense as a juvenile, include Mr. Sparks' history of trauma and the neurodevelopmental issues. Briefly, I will summarize his background history and then these specific sentencing issues.

Mr. Sparks was born in Germany. His father was in the military. His parents were never married. He lived with his parents together briefly, and then they separated when he was about 3 years of age. He is an only child. Mr. Sparks lived in Germany for the first 12 years of his life, and then he lived with his mother after his parents separated. He then moved to the United States when he was 12 years of age.

Reportedly in this case, Mr. Sparks reported an unsteady relationship with his mother while growing up. There are a number of collateral informants who indicated that Mr. Sparks was frequently at their houses playing with friends, and his mother was often carousing with different military men who came in and out of her house. He described to me during the evaluation that his mother was "angry." He and the records suggest that she was very young when she gave birth

18

to him and that she was likely not ready to have a child. He described her as using alcohol and seeing her intoxicated, as she was often partying with military guys. When asked if there was abuse, he stated his mother would hit him with a belt buckle, choke him out, and try to drown him. Obviously, there appears to be an abusive background into the neglect when she was away from the home. He said he was abused by his mother until he was sent to a group home. The German social services agency was contacted by one of the teachers who had found bruises on his body when he pulled up his shirt. He said this was from physical and emotional abuse by his mother.

In addition to the neglect and abuse by his mother, Mr. Sparks also added that he was sexually abused. He described being abused by an older white adult male. He recalled, "At first, he asked me if the girl with me was my girlfriend and made me and her do things like get naked, play house, and act like we were having sexual intercourse. We were too young to do that." He added that he also was taken into the woods by this man who came with a bag of pornographic books. He said, "He tried to show us how to do things that were in the magazines." Mr. Sparks recalled being about 6 or 7 years of age when he was sexually abused by this male and that he had to engage in sexual relations with a female around the same age. He described that the man progressed from showing him pornography to sexually molesting him.

When asked how he processed the sexual abuse, Mr. Sparks responded that he would essentially stuff it and try not to think about it nor did he ever engage in professional help or counseling to deal with it appropriately. Similarly, he never seemed to deal with the abuse by his mother in a healthy fashion.

Fortunately, Mr. Sparks did not have any significant abuse at the group home.

Mr. Sparks described a similarly neglectful relationship of his father. While he said they had a close relationship, it was typically through telephone, as his father was stationed in the United States while Mr. Sparks continued to live in Germany. He said he reconnected with him for about six months in the United States until his mother returned to the United States and he lived with her again.

In addition to the abuse noted above, Mr. Sparks also stated that there was other domestic violence and physical abuse by his stepfather toward his mother. He said, "He was hitting on my mom a lot, beating her, holding her down, and choking her."

In summary of his background family history through childhood, there were notable traumatic events including physical, sexual, and emotional abuse and neglect that were noteworthy in this case and that should be considered mitigating.

Mr. Sparks did not appear to have a history of neurodevelopmental conditions such as ADHD or learning disorders. He obtained his GED in federal prison and had participated in continuing education courses and college courses through the Bureau of Prisons.

From a mental health perspective, Mr. Sparks reported no history of inpatient or outpatient mental health treatment. He has been examined through the Bureau of Prisons and essentially had no

TS000001:

mental health assessment, treatment, or medication other than required Bureau of Prisons psychology staff check-ins to make sure he is not suicidal or homicidal. Prior psychological evaluations by the defense in this case and by the Bureau of Prisons staff indicated evidence of conduct disorder and antisocial personality disorder. He did report to me and others that he had a suicide attempt when he was younger. He described to me, "It was a suicide attempt. Like, I wanted to cut my throat, I wanted to hang myself or shoot myself." He did state, however, there were times when he has been in the prison system when he has experienced bouts with what would be described as major depressive symptomatology, suicidality, hopelessness, and despair. Unfortunately, he had no intensive psychological counseling or therapy essentially as a youth to deal with that ongoing trauma.

It also seems to me that Mr. Sparks was developing a substance use disorder condition as an adolescent. He was using marijuana and alcohol by ages 13 or 14. He was using these substances sporadically. Obviously, he was incarcerated permanently by age 16. It is very possible that it would have developed into a full substance use disorder if he had remained in the community.

As highlighted above, the major issues that I was asked to evaluate and examine in this case would be the factors of trauma and brain development, which both act as mitigating factors as sentencing, as well as are germane to Mr. Sparks' culpability in this case and should be considered as critical when resentencing him.

It is difficult to diagnose Mr. Sparks with any type of psychiatric disorder since he, in my opinion, has lived in a "bubble" for the last 18 years. He was still developing emotionally, behaviorally, and cognitively at the time of his arrest and eventual incarceration. Obviously, there were signs of conduct disorder with some of his rule- and law-breaking behaviors, and one could also describe concerns about substance use disorders to alcohol and marijuana at that time. The psychiatric diagnosis of antisocial personality disorder also could be considered, as he had continued antisocial and aggressive conduct within the institutions. However, these facilities are chaotic and breed aggression and violence due to their nature, and often the consideration of psychiatric diagnosis is certainly considered based on the environment and situation to which the person is exposed.

Relevant to the nature of my evaluation, Mr. Sparks, in my opinion, has suffered from posttraumatic stress disorder likely in a developmental fashion. The types of trauma include the following:

1. Neglect by both parents
2. Physical and emotional abuse and neglect by mother
3. Witnessing physical and emotional abuse by stepfather toward mother
4. Sexual abuse by male and female
5. Witnessing and experiencing perpetrating physical violence and being exposed to sexual assaults while incarcerated

20

TS000001

The current psychological testing results indicated evidence of a number of PTSD symptoms such as unwanted memories of prior traumatic events, repeated and disturbing dreams of the traumatic events, feeling upset when something reminds him of the stressful experiences, and having strong physical reactions when reminded of the stressful experiences.  He has typically avoided memories, thoughts, or feelings or external reminders of the stressful experiences.  Again, in my opinion, he has never adequately dealt with his prior psychological and emotional trauma.  He has had evidence of having strong negative feelings such as fear, horror, anger, guilt, or shame.  He also has been a risk-taker, impulsive, and feeling super-alert, jumpy, or on guard.  He has had modest evidence of feeling distant or cutoff from other people and has blamed himself for the prior traumatic events.

In this case, Mr. Sparks not only qualifies for PTSD, but he also qualifies for poly-victimization, polytrauma, as well as complex trauma.  An individual who has polytrauma obviously has a number of diverse and varied traumatic events that they have experienced or been exposed to.  Complex trauma is described as experiencing multiple and/or chronic and prolonged, developmentally averse traumatic events, most often of an interpersonal nature especially with early life onset.  These traumatic exposures often occur within a child's caregiving system including physical, emotional, and educational neglect and maltreatment beginning at early childhood, which are all present in this case.  Complex trauma is associated with extremely problematic combination of persistently diminished adaptive arousal reactions, episodic maladaptive hyperarousal, impaired information processing and impulse control, aggression, endorsing cognitive schemas and thought processes, as well as peer relationships that reinforce disinhibited reactions, and aggression, maladaptive ways of thinking and behaving, which are all present in this case of Mr. Sparks.

Another area of this early trauma is evidence of attachment disorder for Mr. Sparks.  Basic attachment between parent and child is the emotional tie that develops between them the infant, child, and caregiver (the mother or father) and behavior problems evolves as a result.  A human infant has an inborn biological need for proximity to a caregiver, be protected, particular in times of danger and distress.  The connection the child forms when the primary attachment to the caregiver serves to facilitate the regulation of feelings and behaviors that emerge when there are threats to a child's sense of safety.  Insecure attachments in this case, place a youth at particular risk for relationship problems, behavioral difficulties, deficits in empathy, and social competence.  Evidence suggests that secure attachment in infancy provides protection from psychopathology.  Unfortunately, disorganized and damaged attachment such as in this case are strong predictors for later psychopathology and developmental psychopathology which are present here. Insecure attachment represents the caregiver's failure to adequately meet the child's needs or rejects the child.  Insecure attachment leads to aggressive and hostile behavior, depression, poor peer relationships, and low self-esteem in offspring.  When the caregivers are emotionally absent, inconsistent, frustrated, violent, intrusive, or neglectful, children are liable to become emotionally distressed and unlikely to develop a sense of their external environment is able to provide support or relief.  Thus, children with insecure attachment patterns have trouble relying on others to help them trust their environment.  Early attachment relationships serve as a lens to which all future

21

TS000001:

interpersonal interactions are interpreted. Early attachment history is critical for social and emotional adaptation. The child's matter of engagement in the environment during subsequent developmental periods would be predictable from patterns of attachment in infancy. Disturbed early attachment, as in this case, is viewed as a marker beginning of the pathological process that leads to later pathology and developmental psychopathology such as conduct disorder. Early damaged attachment experiences support the view that the person is isolated, unable to achieve emotional closeness, and are unworthy of care. Social relations may be viewed as alien and treated with hostility. Early insecure attachment in relationships are associated with a higher degree of adult psychopathology and severe disturbance relatedness.

Mr. Sparks suffered from significant evidence of deficient attachment, lack of connection to his father who was never there for him, and damaged attachment by his abusive, aggressive, and unstable mother. Obviously, Mr. Sparks was exposed to significant traumatic events and poly-complex trauma that was never considered at his initial sentencing.

Unfortunately, Mr. Sparks went from a traumatic and chaotic environment in his early life to a similarly chaotic traumatic and violent environment which is his jail and prison placements. Again, he was not even an adult by the time he was exposed to further prison violence.

Given the holdings of *Miller* and *Graham* related to the social science and neuroscience of brain development, I do want to highlight my concerns about the issue of trauma and neurodevelopment. We do know that when a brain operates in a survival mode relevant to experiencing complex trauma, chronic changes can occur in psychological-behavioral functioning (such as hypervigilance, depression, reduced tolerance, frustration, delayed gratification, and impulsivity). Such neurological changes can compromise one's physical and mental health, learning, development of brain-related reward motivation systems, stress tolerance system, and executive functioning symptoms related to emotion and information processing in the limbic and prefrontal cortex areas, especially. Childhood trauma simply interferes with normal development of the brain. Traumatic stress appears in the normal development of neurocircuitry critical to one's development and compromises one's ability to cope adequately in emotional and stressful situations. The right hemisphere of the brain especially is dominant for processing information related to emotion, social interaction, and physiological states. A healthy attachment is important in development in key areas of the right brain early on in life.

Chronic complex traumatic stress caused by child abuse and neglect compromises right brain developmental, resulting in potential neuronal damage and atrophy and ineffective pruning during brain development years between ages 15 and 24. Neural circuits that connect cortical and subcortical areas are modifying ways that may have detrimental psychological and neuropsychological consequences. Impairments in areas of the brain such as orbitofrontal cortex and circuits connecting (subcortical areas) can damage a child's sense of self, resulting in disconnection with other people. This area of the brain connects important centers of the cerebral cortex, the limbic system, the hypothalamus and brain stem. It has a critical role in integrating many important processes and helps regulate emotional states and responses. Through its connections with the hypothalamus and limbic system, it regulates automatic responses with social stimuli and mediates emotionally attuned communication. The prefrontal cortex in general

TS000001

should be considered as being one of the critical areas but later areas of the brain to most fully develop. It is not typically not fully developed by age 16 when Mr. Sparks' offense occurred. This area of the brain is important in its regulation of mood and social adjustment and is ultimately a component of one's personality including empathy. This area of the brain is known to inhibit areas in the hypothalamus and is associated with aggression. The anterior cingulate cortex is also an area of the brain in the prefrontal cortex which is critical to experience emotions and understanding the effects of one's actions on others. Severely abused and neglected children often have deficient neural pathways and difficulty controlling affect, emotions, and behaviors.

In addition to the orbitofrontal area of the prefrontal cortex, the dorsolateral area of the prefrontal cortex is also critical to consider relevant to brain development and adolescence. This area of the brain of the prefrontal cortex again is another area neuroanatomical area that reveals maturation lasting into adulthood. This area of the brain is connected with the orbitofrontal cortex and is important for executive functions such as working memory, cognitive flexibility, planning, inhibition, abstract reasoning, and decision making.

In additional to the orbitofrontal part of the frontal cortex, the ventromedial prefrontal cortex area is also important to consider relevant to brain development. This area is located in the frontal lobe at the bottom of the cerebral hemisphere and is implicated in processing risk and fear. It has a role in inhibition to control emotional responses and the process of decision making and self-control. This area of the brain is also not fully developed at age 16. Recent research in developmental neuroscience suggests that neural networks in the medial and ventromedial prefrontal cortex are rapidly developing during adolescence and young adulthood supporting emotional regulation through the amygdala.

Similarly, the limbic system of the brain assists in regulation of emotion, memory, and behavior. It mediates the responses of unpleasant stimuli in both healthy individuals as well as those suffering from the effects of trauma. Certain parts of the limbic system are activated only in an individual with PTSD. The amygdala, for example, is the heart of the limbic system that filters incoming sensory information relevant to emotional survivor. It is critical in that it assesses risk, dangerousness, and fight or flight reactions. The site identified as the amygdala is smaller in abuse survivors. This area of the brain is important in perceiving and processing emotions.

The holding of the U.S. Supreme Court again highlights neurodevelopment and brain development issues that need to be considered in Mr. Sparks' case. Modern brain research technology reveals studies that reveal certain regions in adolescent brains do not reach a fully mature state until after age 18 and that psychosocial maturity is not complete until about age 19, if not later. Adolescents rely more so than adults on the amygdala, which is the emotional center of the brain as noted above and is associated with primitive impulses, aggression, anger, and fear. Adults tend to process similar information with the prefrontal cortex which is the cerebral area associated with impulse control and good judgment. The frontal lobes of the brain which are tied to a variety of cognitive abilities including decision making, risk assessment, ability to judge future consequences, evaluating reward and punishment, behavioral inhibition, impulse control, deception, response to positive and negative feedback, and making moral judgments exert control over the amygdala which is associated with aggressive and impulsive behavior. The rub here is that again an

TS000001

adolescent, especially at age 16, has a prefrontal cortex area of the brain which serves as a protector over impulse of the amygdala area of the brain that is typically not fully formed.

The susceptibility of juveniles to immature and irresponsible behavior means that irresponsible conduct may not be as morally reprehensible as that of an adult. Juveniles are more vulnerable and lack control of their immediate surroundings more so than adults. Furthermore, this is a perfect example of a case of a teenager who was at risk for a number of factors to have difficulties in decision-making and risk-taking behaviors. The typical adolescent is more vulnerable to peer pressure than an adult. Social interactions and affiliation with peers take on importance during adolescence. Adolescents are susceptible to peer pressure and a risk-prone impulsive teen will have a higher propensity to gravitate toward others who reinforce their behavior. In essence, adolescents such as Mr. Sparks at the time of his offense have cognitive deficiencies which are also compounded by deficiencies in adolescents' social, emotional, and cognitive capabilities. Some researchers have found that there are psychosocial immaturity issues that adolescents experience in that they lack self-reliance and independence, they have difficulty taking others' perspectives, and they have deficiencies in temperance which encompasses the ability to limit and control impulsivity. Essentially, youth are often influenced by other peers, have difficulty taking others' perspectives and appreciating how their behaviors affect others, and have brain-based flaws in decision-making capacities due to their brain-based impulsivity. As highlighted above, a number of areas of the brain of the prefrontal cortex govern these psychosocial deficits and brain-based executive functions pertaining primarily to decision making, impulse control, and appreciating consequences.

It is difficult to predict Mr. Sparks' future since he has been holed up for so long during his developmental teen and young adult years. He has demonstrated a positive trend relative to incarceration adjustment during the last approximate 10 years. While at ADX, he exhibited much improved behavior modification and while at both Bastrop and Waco jails, he has not had any behavioral problems/incidents. He is getting closer to middle age and his mid-thirties. Mr. Sparks entered the prison system as a young kid and has eventually found a more stable place, has exhibited a more mature attitude, and has been able to more adequately participate in prison programming while exhibiting much improved self-discipline.

Respectfully submitted,

**John Matthew Fabian**

**_/s/ John Matthew Fabian**

**e signature**
John Matthew Fabian, PSY.D., J.D., ABPP
Board Certified Forensic & Clinical Psychologist
Forensic & Clinical Neuropsychologist

24

TS000001

# TRACKING JUVENILE DESIGNATIONS

**Name:** SPARKS, Tony    **Register Number:** 91929-080

**City and State of Residence:** Killeen, Texas

**Designated Facility:** _____

**NOTE:** Complete the following questions for all juveniles sentenced on or after July 1, 1998.

1) Is the juvenile a foreign national?

☐ YES    ■ NO

2) If the answer to question #1 is no, is the juvenile designated to a facility within 250 miles of the juvenile's residence?

☐ YES    ☐ NO

3) If the answer to question #2 is no, please check one of the following options:

_____ a)    There are no contract beds available within 250 miles of the juvenile's residence.

_____ b)    There are beds available within 250 miles of the juvenile's residence, but the security level is inappropriate.

_____ c)    There are beds available within 250 miles of the juvenile's residence, but programmatic needs require designation to another facility.

_____ d)    There are beds available within 250 miles of the juvenile's residence, but the sentencing court recommended another program.

_____ e)    There are beds available within 250 miles of the juvenile's residence, but other considerations require designation to another facility.

**Comments:**

Inmate Sparks received a LIFE sentence which involves Murder. While he was in custody he Obstructed Justice by attempting to escape. He devised the plan and attempted to escape from custody by choking a guard to unconsciousness and stealing her key. I am also providing additional information concerning that involvement.

Inmate Sparks is a seventeen year old, who was certified as an adult effective November 22, 1999. Page 37 of the PSI indicates that SPARKS is a confirmed member of the 212 Piru Bloods. The PSI indicates that SPARKS bragged about being a "master thug" for what he (and his co-defendants) had done.

At the time the instant offense was committed, he was on probation. He was arrested ~~the evening before his arrest~~, but was released.

FOI EXEMPT

APR 1 8 2001
CCM, EL PASO, TX

APR 1 8 2011

CCM, EL PASO, TX

During the instant offense, Law Enforcement officials were advised of a large amount of smoke emitting from an area on a military reservation and they responded to the area. Upon their arrival, they notice a vehicle in a ditch, which was fully engulfed in smoke. When the fire department arrived they put the fire out and discovered a dead body in the trunk. Further investigation revealed there were two dead bodies, and were the remains of Mr. and Mrs. Bagley. Investigators also found two .40 caliber Smith and Wesson shell casings in the trunk of the vehicle. It should be noted that the individuals who committed the crime were at the scene and were apprehended.

The PSI indicates that SPARKS and his co-defendants had discussed robbing somebody several times, and calculated the plan at least two days prior to committing the crime. SPARKS had a .22 caliber firearm, but indicated that it would be too small. They discussed their plan on several occasions, finally deciding they would need an additional gun (Glock .40). SPARKS was the individual who actually obtained the gun from a friend, he went to the door and picked up the Glock.

The subjects were driving, and stated "they were on a mission," looking for someone to rob. SPARKS got out of the vehicle asking people for a ride. He approached numerous individuals who refused to give him a ride. However, when he approached Mr. Bagley (who was on the phone), both of the Bagley's agreed. SPARKS and his co-defendants got into the back seat of the car, pulled a gun on the Bagley's and told them there was a change in plans. The subjects ordered the Bagley's to get out of the car. SPARKS pointed each of the guns (.22 and .40 Glock) at the Bagley's and told them to get in the trunk. First, SPARKS asked for their personal jewelry. SPARKS got into an argument over who was going to hold the money. SPARKS also told the group they would get into a shootout if they were stopped by police. They even stated that they would act as if they had guns (those who didn't have a weapon) so the police would shoot them. The subjects continued to discuss different ways on how to kill their victims.

The subjects drove the vehicle, with the victims in the trunk, and indicated they were going to go to a "hang out," and went to pick up a friend. They told their friend about the car jacking and indicated that they were going to kill the victims. They drove to several different homes, ate at a restaurant, and stopped at convenience stores. They decided they wanted to purchase some lighter fluid to set the car on fire after killing the victims. They also attempted to utilize the victims ATM card at several ATM locations.

The subjects told the victims they were going to kill them and decided to drive to a secluded area. They were driving recklessly and could hear the victims banging and rolling around in the trunk of the car. The Bagley's were talking, singing, praying, and asking them when they were going to get out. One of the subjects reiterated that they were going to die.

When they were driving to the location, the car couldn't make it up the hill and got stuck, and rolled into a ditch. The subjects got out of the car to kill the victims. Mr. Bagley was shot in the head with a .40 caliber. Mrs. Bagley told the individual that Jesus loved him, and with no hesitation, he shot Mrs. Bagley in the face. They continued to ignite the vehicle with lighter fluid. During the four hour ordeal prior to their murder, the victims pleaded for their lives. When the autopsy was completed, it was determined that Mr. Bagley died instantly, while his wife was still alive when they set the car on fire. The medical examiner ruled the manner of Mrs. Bagley's death as homicide as a result of a gun shot wound of the head associated with smoke inhalation and thermal injuries.



FOI EXEMPT

**Attempted escape from custody:** While SPARKS was in custody for the instant offense, he attempted to escape. SPARKS and his cell mate asked an Officer for a drink of water. As he returned to his cell, he grabbed her around the neck with his hands. He pulled her into the cell and sat on his bed, still choking her. When the Officer started screaming, SPARKS started flushing the toilet so her screams could not be heard. She passed out after being deprived of air. When the Officer regained consciousness, she screamed. Officers came to her aid. The Officer noticed one of her keys was missing. They located the key under the mattress in SPARKS cell.

An investigation revealed that SPARKS and his cell mate planned the escape two days prior to the incident. It was revealed that SPARKS made the plan.

**Additional information:** SPARKS has prior (juvenile) arrests to include: Burglary of a Habitation and Theft (98/refused/dismissed). Evading Arrest, Failure to Identify (Two times/98/Case refused/dismissed). Aggravated Assault With a Deadly Weapon (99/Motion for Non-Suit granted by the Court based on the arrest for the Instant Offense.) During this incident, he (and co-defendants) flashed gang signs and yelled insults, stuck his hand out of the window and started firing at him. After they shot at the victim five or six times they left the area.

He is being referred by the CCM office in San Antonio, Texas. Please refer to the Santa Fe County Youth Development Program.

**Designation Date:**_____



UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
UNITED STATES PENITENTIARY
POLLOCK, LOUISIANA

## PSYCHOLOGICAL EVALUATION

NAME:                             **SPARKS, TONY**

BOP REGISTRATION NUMBER:     91929-080

DATE OF BIRTH:               May 25, 1983

DATE OF REPORT:            February 3, 2009

### REFERRAL ISSUES:
A psychological evaluation was requested by the inmate's unit
team, in accordance with Program Statement 5212.06--Control Unit
Programs, to permanently designate inmate Sparks to the ADX.

### PROCEDURES CONDUCTED:
Clinical Interview
Mental Status Examination
Review of Relevant Records
     Sentry Records
     Psychological Data System Records
     Presentence Investigation Report dated February 13, 2001
     SIS Report dated April 17, 2008

### RELEVANT HISTORY:
Inmate Sparks is a 24 year-old African American male. He is
currently serving a life sentence for carjacking. The offense was
premeditated and lasted approximately four hours. The victims
were shot then set on fire. After he was arrested, he attempted
to escape from custody. He was placed in the custody of the
Federal Bureau of Prisons on April 3, 2001, and arrived at USP
Pollock on June 18, 2007.

When asked about his legal history, inmate Sparks reported he was
15 years-old when he was first arrested. He stated he was
arrested for stealing a bicycle. He reported he was 16 years-old
when he was arrested for the current offense. The PSI documents
his being adjudicated for burglary of a habitation and theft from
a person when he was 15 years-old. He stole a mountain bike from
one victim and a gold ring from another victim. He was placed on
one year probation for the offense. He was arrested on four other
occasions, however the charges were eventually dismissed. The
charges included burglary of a habitation and theft over $50
Under $500; evading arrest, failure to identify; failure to
identify; and aggravated assault with a deadly weapon. He was not

FOI EXEMPT

stated he lived in Germany until the age of 12. At that time, his mother married his step-father and they all moved to Killeen, Texas. He was living in Killeen, Texas with his mother at the time of the current offense. He reported a good relationship with his mother and father and an "alright" relationship with his step-father. His mother and step-father have divorced since his incarceration. He stated he has no contact with his step-father, however he sees and talks with his parents "as much as possible." During the clinical interview, inmate Sparks denied having any siblings, however the PSI documents one half brother. He denied any prior marriages or fathering any children.

Inmate Sparks reported he completed the ninth grade. He was placed in an alternative school in the ninth grade, however he did not complete school due to his incarceration. He stated he made average grades consisting of B's and C's while in school. He reported he got in trouble for fighting on several occasions, however he denied ever being suspended or expelled. He reported an "alright" relationship with his teachers and his peers. He stated he has not obtained his General Equivalency Degree. The PSI states he was in the tenth grade at the time the PSI was written. Inmate Sparks denied any form of employment, however the PSI documents his working at two different pizza places as a cook in 1998. He denied ever serving in the military.

Inmate Sparks denied a history of substance use or abuse. The PSI documents the use of alcohol and marijuana beginning at age 15. He told the writer of the PSI he did not believe he had a problem with either substance. There is no known documentation of his participating in any substance abuse treatment program.

Inmate Sparks denied any medical problems. The available records did not document any medical problems.

MENTAL HEALTH HISTORY:
Inmate Sparks denied any history of mental illness, mental health treatment, or suicide attempts. There is no known documentation to indicate a history of mental health problems or suicide attempts. The PSI documents his participation in a psychological evaluation in August 1999. He was diagnosed with Conduct Disorder, Adolescent Onset Type. The evaluator described his decision-making style as calculating and unemotional. Further he stated when relating to his environment, inmate Sparks will likely be predatory and aggressive. His contacts with Psychology Services, since his incarceration with the Federal Bureau of Prisons, have been routine contacts consisting of intake screenings and 30-day Special Housing Unit reviews.

BEHAVIORAL OBSERVATIONS AND/OR MENTAL STATUS EXAMINATION:
During all contacts with inmate Sparks, since his incarceration


FOI EXEMPT

at USP Pollock, his mental status has been within normal limits.
He has always been alert and oriented to person, place, time, and
situation. He has denied all forms of hallucinations and has
never appeared to be responding to stimuli not present. His
thoughts have always been rational, organized, and goal-directed.
There has never been evidence of a thought disorder. His mood has
never been either significantly elevated nor depressed. He has
shown an appropriate range of affect. He has never expressed any
genuine thoughts of harming himself or others. There have been no
signs of a mood disorder. His memory for recent and remote events
has always appeared to be intact. The inmate's speech has always
been within normal limits in terms of quality and quantity. His
use of vocabulary and general fund of information has suggested
average intelligence. His gait and motor movements have been
normal. There have never been any obvious signs of head trauma or
brain injury.

## CLINICAL FORMULATION:

There is no evidence inmate Sparks has ever, nor is now,
suffering from any major mental illness. His disregard for the
safety of others, aggressiveness, failure to conform to societal
norms, and his lack of remorse all indicate antisocial traits and
behavior. In 1999, inmate Sparks was diagnosed with Conduct
Disorder, Adolescent Onset Type. He was 15 at the time he was
first adjudicated and was on probation for that adjudication when
he was arrested, at age 16, for the current offense. The current
offense involved the armed carjacking of two individuals which
resulted in their deaths. It is also documented his substance use
began when he was 15 years-old. Incarceration has not deterred
his criminal activity. Since 2006, he has been involved in three
serious assaults on other inmates. The most recent incident
involved inmate Sparks observing his victim suffer until
unconsciousness to ensure the victim was unable to summons
assistance. His disciplinary record demonstrates a pattern of
increasing violence. As such, inmate Sparks easily meets the
diagnostic criteria for Antisocial Personality Disorder.

## DIAGNOSES:

Axis I      V71.09      No Diagnosis on Axis I
Axis II     301.7       Antisocial Personality Disorder
Axis III    None known
Axis IV     Incarceration, pending prosecution
Axis V      GAF (current)= 88

## RECOMMENDATIONS/PROGNOSIS:

Inmate Sparks is a 24 year-old African-American male. He is
currently being considered for placement in a Control Unit due to
the homicide of another inmate. There is no evidence of current
or past mental illness. Personality factors and behavior indicate
the presence of Antisocial Personality Disorder. The prognosis