# EXH "91"

Report of Corrections/ Rehabilitation
Expert Jeanne Woodford

Defendant's
Exhibit

91

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

TONY SPARKS

                                            W-11-CV-123

V.                                         W-16-CV-435

                                     (W-99-CR-070-3)

UNITED STATES OF AMERICA

EXPERT REPORT OF JEANNE S. WOODFORD
COMPLETED JANUARY 3, 2018

1. **Finding**

I have been retained to review and assess all information made available to me
regarding Tony Sparks and offer an expert opinion regarding the level of risk Mr.
Sparks presents to the public if paroled.  Based on my assessment of information
available to me, which includes an extensive interview of Mr. Sparks, it is my
conclusion that he does not pose a risk to public safety.   It is therefore my opinion
that Mr. Sparks be resentenced to a term that allows for his release from custody.

II. **Introduction**

A. **Engagement**

I, Jeanne S. Woodford have been retained as an expert witness and consultant on
behalf of Tony Sparks (Petitioner) in the matter of Tony Sparks v. United States of
America W-11-CV- 123, W-16-CV-435 (W-99-CR-070-3) In the United States District
Court for the Western District of Texas Waco Division.  Tony Sparks is entitled to
resentencing pursuant to Miller v. Alabama, 567 U.S. 460 (2012).  In this capacity, I
have been asked to provide my expert opinion regarding the level of risk Mr. Sparks
presents to the public and public safety.  My opinion is based on all case factors
related to Mr. Sparks, including his age, his behavior and programming in prison,
Bureau of Prisons records and reports, the nature of prison environments and
culture, an extensive interview of Mr. Sparks and my experience working in criminal
justice.

I base my opinions on over 30 years of experience in criminal justice at the State and
County level in the State of California and on my education and research of criminal
justice policy and practices.

I am being compensated for my time spent reviewing documents, meeting with Mr.
Sparks and preparing a report, as well as for my time providing court testimony.  I
am also reimbursed for my expenses incurred in relation to the services I provide.
No part of my compensation is contingent upon the results of my analysis and
findings or the outcome of the case.  I reserve the right to modify or supplement the

2

facts and opinions expressed herein as well as the basis for the same should new information become available to me.

## B.  Qualifications

I received my B.A. from Sonoma State University in 1978. Since that time, I have experience working at all levels of California correctional facilities. In 1978, I became a correctional officer at San Quentin State Prison. I worked for the California Department of Corrections and Rehabilitation for the next 27 years in various custodial and management positions, including Correctional Counselor, Program Administrator, Captain, Litigation Coordinator, Associate Warden, Chief Deputy Warden and was appointed as Warden of San Quentin in 1999. I served as Warden from 1999 through 2004.

In March 2004, Governor Schwarzenegger appointed me as the Director of what was then the California Department of Corrections ("CDC"). As the Director, I worked with the Secretary of the Agency to add Rehabilitation to the mission of the CDC. On July 1, 2005, the California Department of Corrections was reorganized and renamed the California Department of Corrections and Rehabilitation ("CDCR"). In July 2005, Governor Schwarzenegger appointed me to the position of Undersecretary for the CDCR.  I also served as Acting Secretary of the CDCR for a short time.

In both my positions as Undersecretary and Acting Secretary, I served as the Chair of the Prison Industry Board. I also led efforts to address conditions of confinement for inmates to include overcrowding, health care and mental health care. I advocated for the expansion of the visiting program for the incarcerated and their families. I also started the gender responsive commission to create policies and appropriate programs for women incarcerated in the CDC. I retired from the CDCR in July 2006.

From November 2006 until May 2008, I was the Chief Adult Probation Officer for the City and County of San Francisco. In that position, my responsibilities included the administration of the Adult Probation Department, formulating polices and plans for the rehabilitation of adult probationers, managing the budgetary and fiscal activities and services of the organization, working with other agencies to improve services for

3

individuals on adult probation, directing the preparation, approval, review and maintenance of records and reports, and cooperating with various social service agencies, law enforcement bodies and interested groups regarding crime prevention programs and services.

I served as the Executive Director of Death Penalty Focus, a non-profit organization devoted to the abolition of the death penalty from April 2011 until May 2013. I also served as a Senior Fellow at the Chief Justice Earl Warren Institute on Law and Social Policy, University of California, Berkeley School of Law as a criminal justice expert. I worked on several criminal justice projects for the institute and provided direction and assistance to student interns engaged in criminal justice policy development. I have been involved in the evaluations and needs studies for federal, state and local correctional facilities including jail needs studies for the Placer County Jail in California and for the cities of Kirkland and Bellevue, Washington. I also participated in investigations for various civil rights complaints filed by ICE detainees confined in a county correctional facility in Pinal County, Arizona in 2011. From 2007 through 2010, I was a member of a task force on the American Bar Association (ABA) Criminal Justice Standards on the Treatment of Prisoners.

In the past 10 years, I have spoken at more than 60 meetings and conferences regarding correctional issues, and I have testified before the California State Legislature and Congress on at least 12 occasions. I have also taught courses regarding correctional policy in California at Sonoma State University in 2009, 2010, and 2015 and through Stanford University's Continuing Studies program in 2011.

A complete description of my educational and employment background, my prior publications, and the cases in which I have previously served as an expert witness is set forth in my curriculum vitae, which is attached as Appendix A.

All of my positions with the CDCR involved working with prisoners, including oversight of the inmate disciplinary process, inmate appeals process and classification of inmates. I was responsible for the overall safety and security of the prison, (s). I also had direct and indirect oversight over custody staff and am experienced in handling staff misconduct, investigations against staff, and

4

disciplinary matters. I also have experience with policies and procedures related to adult custody and security operations, personnel matters, and investigations against staff. My opinions, as detailed below, are based upon my years of correctional experience, my review of documents provided to me and my review of research of criminal justice related issues.

## C.  Materials Considered

I have reviewed all documents provided to me by the legal team representing Mr. Sparks.  The documents include pre-conviction arrest and incarceration records, Bureau of Prison records pertaining to Mr. Sparks, the Pre-Sentence Investigative Report, court records made available to me pertaining to Mr. Sparks case, and information from the Bureau of Prison web site regarding the prisons that have incarcerated Mr. Sparks.

## III. Summary of Opinions

I have been asked to review documents provided to me related to Mr. Sparks from the Bureau of Prisons to assess whether he is currently a risk to public safety should he be released.  In order to complete a full and thorough evaluation, a review was conducted of court records made available to me related to the conviction of Mr. Sparks.  I also included in my review information obtained or provided regarding Mr. Sparks social and criminal history.  I also interviewed Mr. Sparks for over six hours at the Bastrop County Jail, (BCSO) over a two-day period.

## IV. Analysis

## A.   Offense Leading to Incarceration:

The full official version of the crime can be found in court records to include the Pre-sentence Investigative Report. I have summarized the official version of the offense as follows:

5

Summary of the offense:  The crime involved several co-defendants: Christopher Andre Vialva, (age 19), Brandon Bernard, (age 18), Christopher Lewis, (age 15), Terry Brown, (age 17) Mr. Sparks, (age 16) agreeing to participate in a carjacking for the purpose of obtaining money from the bank account of the victim of the carjacking. The victims in this case are Todd Bagley and Stacie Bagley, husband and wife.  The crime occurred on June 21, 1999 in Texas.

The carjacking was accomplished by the Defendants standing in front of Mickey's Convenience Store and asking the Bagleys for a ride. The Bagleys agreed to provide the three Defendants, Vialva, Sparks, and Lewis a ride. Defendants Bernard and Brown were in a separate car and did not see Defendants Vialva, Sparks and Lewis leave in the Bagley car.

Once inside the car, Vialva pulled out a .40 caliber Glock and said there was a change in plans. Tony Sparks pulled out a .22 caliber gun.  The three Defendants obtained the wallet and purse from the Bagleys, removing the ATM card, an ID card and money from the purse.  Mr. Bagley was ordered to drive his vehicle to a remote area where he and Mrs. Bagley were placed in the trunk of the car.  Their personal jewelry was removed and the trunk was closed.

The Defendants drove back to Mickey's Convenience Store to locate Defendants Bernard and Brown.  Unable to do so, they drove to an ATM machine and attempted to remove money.  Defendant Lewis spoke with the Bagleys, and they admitted they had given the wrong PIN number.  The Defendants made another unsuccessful attempt to get money from the ATM machine.  They then drove to a Wendy's to buy food.  They continued driving and headed for Copperas Cove, when Defendant Vialva realized he did not have an identification card.  They proceeded to drive back to Killeen to obtain Vialva's identification card from his home.

They then drove back to Copperas Cove where Vialva tried to pawn Mrs. Bagley's ring.  He was unsuccessful.  The Bagleys talked about God and what He had given them.  According to the Pre-sentence report, Sparks commented to the others that he did not want to "go through with this".  Sparks relayed to me that he became concerned after Vialva told the group they would get in a shootout if they were

6

stopped by the police. The official version of the crime as detailed in the Presentence Investigative Report, (PIR), states that Vialva then started talking about killing the Bagleys and burning the car because they, (the Bagleys) had seen his face. Defendant Sparks disputes this, stating there was never any mention of killing the Bagleys while he was present.

Terry Brown, one of the co-defendants in this case, was interviewed by Miriam Widman, Mitigation Specialist, on December 22, 2017. Mr. Brown has been released from prison and is now employed and living in a halfway house in Texas. He will be fully released from custody in March of 2018. Mr. Brown, was asked by the Mitigation Specialist, if Tony, (referring to Tony Sparks), knew the Bagleys were going to be killed? Mr. Brown responded, "No he didn't." Mr. Brown stated that he didn't even know the Bagleys were going to be killed and he, (Mr. Brown), was at the scene of the crime. Mr. Brown further stated that Vialva had only talked about burning the car because he wanted to get rid of the fingerprints.

The PIR states they drove around some more, finally meeting up with Brown. Brown got into the car with Vialva, Lewis and Sparks. The PIR reflects that Brown threatened to kill the Bagleys but Vialva told him not to do it. At that point, according to the PIR, Brown stated he believed Vialva, Sparks and Lewis would not hurt the Bagleys because they had told him not to kill them. Mr. Brown in his December 22, 2017 interview confirmed this occurred. Mr. Brown told the Mitigation Specialist that at one point Lewis gave him the .22 caliber gun and he, (Brown), said he was going to kill the Bagleys. Mr. Brown said he did this to point out the futility of using a .22 caliber weapon. Mr. Brown said everyone in the car told him not to shoot them. Mr. Brown stated, "if they wanted to kill the Bagleys why would they have told me to not shoot them?".

They then dropped Brown off at Bill Rorie's house where he was living at the time. Brown was told to locate Bernard. Brown was able to locate Bernard. Bernard picked up Brown and they met up with Vialva and the other Defendants.

According to the PIR, Vialva then stated he was going to kill the Bagleys. Again, Defendant Sparks disputes this, stating there was no discussion of killing the Bagleys

7

when he was present. This is confirmed by the statements of Mr. Brown to the Mitigation Specialist on December 22, 2017.   Vialva headed to Sparks' house to drop him off.  The PIR states that he did this because Sparks had a curfew.  Sparks disputes this stating that he never paid attention to his curfew.   The fact that Mr. Sparks was caught, just the night before, for violating his curfew corroborates this statement.

Mr. Sparks states he asked to be dropped off around 5:00 P.M.  because he regretted being involved in the carjacking.   He was also concerned that they would be stopped by the police and that Vialva would attempt to engage the police in a shoot-out. Mr. Sparks stated to me, he began to realize that the "whole thing was pointless."

Sadly, the remaining defendants proceeded to drive the Bagleys to a rural location resulting in the death of both Mr. Bagley and his wife.  Mr. Bagley was fatally shot in the head. Mrs. Bagley was shot in the face but did not immediately die.  The car was lit on fire, utilizing lighter fluid purchased by Brown and Bernard at 8:03 PM according to the PIR.   Mrs. Bagley died of smoke inhalation.

The PIR indicates Defendants Brown and Bernard were present when Vialva shot both Mr. Bagley and Mrs. Bagley. Defendants Brown and Bernard poured lighter fluid inside the car.   Defendant Lewis ran down the hill about the time Vialva ordered the trunk to be opened.  Following the shooting of the Bagleys by Vialva, lighter fluid was poured into the trunk by Brown.  Brown then ran down the hill. Vialva directed Bernard to lite a match and throw it inside the vehicle which ignited the fire of the Bagleys' vehicle.   The fire caught the attention of several people in the area resulting in law enforcement response.  Defendants; Vialva, Bernard, Brown and Lewis were taken into custody near the scene of the crime.

Defendants Vialva and Bernard were sentenced to Death for their role in this crime. Defendant Lewis received a determinate term and has been released from custody. Defendant Brown also received a Determinate term and is currently living in a halfway house in Texas.  It should be noted that Gregory Lynch received a 60-month

8

sentence for providing the gun that was utilized in the murder.  He has been released from custody.

Defendant Sparks was tried as an adult for the offense of Count 1: Armed Carjacking Resulting in the Death of Another and Aiding and Abetting.  Defendant Sparks received a sentence of Life Without the Possibility of Parole.  Mr. Sparks is, based on Miller v. Alabama, entitled to relief and resentencing.

It should be noted that I summarized the version of the offense by utilizing the Pre-Sentence Investigative Report.  I did not have access to source documents.  The information obtained regarding the actions of individuals or statements made by each of the Defendants was obtained from the Defendants themselves or from friends of the Defendants during the investigative process.  It is important to be mindful that all statements might not be accurate, as they were based on each individuals memory during a very stressful time and when the witnesses were facing prosecution for their involvement in the crime.   It is also important to note that this tragic incident played out over approximately a four-hour time frame.  There is some discrepancy about the length of time Mr. Sparks was in the car.   Mr. Sparks informed me he left the car shortly after 5:00 PM.  The PIR documents the time as around 6:00 or 6:30. It is believed the carjacking started between 3:30 and 4:00 PM, as Mr. and Mrs. Bagley were last seen by church members sometime between 3:15 and 3:30 PM.  It is documented in the PIR that the lighter fluid was purchased at 8:03 PM.  These facts add to the credibility of Mr. Sparks statement that he was not aware of a plan to kill Mr. and Mrs. Bagley.  Mr. Brown's statements on December 22, 2017 corroborates Mr. Sparks statement.

**B.  Pre-Conviction Incarceration:**

Mr. Sparks was housed in the Bell County Juvenile Detention Center from the time of his arrest on July 2, 1999 until he was convicted and sentenced for this case. He was transferred to the Federal Transfer Center for processing on 04/03/2001.

9

According to the PIR, while housed in the Juvenile Detention Center a resident, (Christopher Kirvin) attempted an escape by asking for a cup of water from an Officer. The Officer opened the cell door to allow the resident to get a cup of cold water. As the resident returned to his cell he grabbed the Officer around the neck with his hands. He pulled her into the cell and sat on his bed, still choking her. The Officer passed out. Upon gaining consciousness, she screamed. Other Officers came to her aid, finding the Officer in the cell crying and holding her neck.

The officer was removed from the cell. The resident was lying in bed, pretending to be asleep. An Officer noticed the key to C-Pod was missing. Officers searched the residents cell and located the key under his, (Christopher Kirvin's) mattress. The resident stated, "She should not have opened my door."

According to the reports detailing the incident involving Resident Kirvin, one of the residents, here after identified as the Informant, provided information to staff regarding this incident. The Voluntary Statement – (Not under Arrest) dated August 1, 2000 reflects the following:

Last night, night during the 2nd shift, I was in my room. I was laying in my bed. I heard Mr. Castillo come into the pod. Chris Kirvin, and Tony Sparks were talking to him. They were asking Mr. Castillo if he was working third shift. He asked them why they wanted to know. Sparks said, 'Just because." Castillo then told him that he was not going to work the third shift. We laid back down. I had gotten up when Castillo came into the pod. While I was reading a book, I heard Chris and Tony talking. They were waiting for Mr. Castillo to leave the parking lot. They asked me if he had left yet. I saw a car leaving, so I told them that he had left. Sparks waited for about five minutes then he beat on Kirvin's wall. He said, "Let's get crump." That means that he wanted to get rowdy. I heard Chris push the call button. A pod officer asked him what he needed. He told her that he needed toilet paper and a cup of water. He said that his water was hot. I heard someone open Chris' door. I saw Chris go get some water. I sat back down after that. I could still see out the window of my door. I saw Chris going back to his room. I saw him drop the cup of water. The pod officer was holding the door open. I saw Chris grab her around the neck and put her in a choke hold, like a sleeper hold. They went into the cell. She was screaming. The door closed shut. I heard a toilet getting flushed two or three times when the officer

was screaming. The noise was drowning out the officer's screams. A female pod officer came in real quick. I heard her asking for Ms. Johnson. The pod officer went to room #24. By that time, Chris had let go of the guard and got into his bed. Ms. Johnson was now banging on the door telling the other officer that she was inside the room. I was standing at my door looking out the window. I could see inside of Chris' room because of the security mirror. They brought Ms. Johnson out after that. The staff started to curse out Chris. I did not see anyone else watching out their doors when this happened. Chris Kirvin and Tony Sparks are always talking. They do not let me hear what they were saying. Yesterday, Chris and Tony were talking about getting cars and BB guns. They were talking like they were leaving. I heard them talking about getting the guard in a sleeper hold. Chris was suppose to take the officer's key after she went to sleep. Chris is telling Sparks this while Sparks is listening. Chris is saying that he will open up the door for Sparks. He said that they were going to run out there and beat up the pod officers. They both said that they were going to get Lynch and this other guy. Sparks was going to get Lynch while Chris went and got the other guy. They said that they were going to go into control and take the keys for the guard's cars. They also said that they were going to shackle the guards. They said that they were going to go to Mexico. I was not a part of their plan. I was shocked when I saw Chris drag the officer into his room. I was very upset over what I saw. I told Chief Sutton about what I saw. I also told her about them planning to escape.

Officer Castillo wrote a report dated August 1, 2000 confirming that Resident Sparks asked him if he was working third shift. Officer Castillo responded by stating, "Why are you so concerned about me working third shift?" and, according to his report, left the pod. Officer Castillo's report further states he "exited the detention facility and noticed Residents Sparks and Kirven at their windows watching me leave the facility." If Sparks and Kirvin observed Officer Castillo leave the facility why would they need to check with another resident to determine if he was gone?

A report by Officer Jacobs written July 31, 2000 included in the incident report package stated that on July 30, 2000 Resident Davis kept getting up asking questions such as: Who's working and how many people are here? Where is Lieutenant Gray

11

as well as other questions.  Officer Jacobs stated in this report that Residents Sparks and Kirvin would come to their doors to see if he would answer his questions.

I find this report odd in that Resident Davis' name isn't mentioned as being involved in a plot to escape and inmates/residents routinely pay attention to the conversations between inmates/residents and staff. It is a big jump to conclude that Sparks and Kirvin were trying to determine if Officer Jacobs would answer Resident Davis' questions.

A document included in the incident package of this incident titled, Internal Investigation, Subject: Assault on Staff dated July 31, 2000 Name: Maria Johnson (victim) Christopher Kriven (sp) written by Patricia Sutton, COS Investigating Officer, documents the statement by the informant.  This document states: Everyone on the unit stated that they did not see anything except for -----Resident.  ----- gave the following statement:

Resident Sparks and Resident Kirven (sp) had planned this incident approximately two days ago. (It should be noted that the incident occurred on July 31, 2000 at approximately 10:30 PM. In the informant's voluntary statement, he said that he heard Kirvin talking about the plot on July 31st), "At first they would not tell me what they were planning because they said I would not do it.  Then they decided to tell me the plan." (again, it should be noted that the informant stated in his voluntary statement that "they (Chris and Tony) do not let me hear what they were saying.) Sparks made the plan." (In the informant's voluntary statement, he said that Kirvin "is telling Spark this while Sparks is listening."

The informant then proceeds to explain what he saw except this time he states that Sparks started flushing the toilet "so no one could hear her screams."  In the informant's previous voluntary statement, he stated he heard a toilet flush two or three times.  It is unknown how he could have seen anyone flush the toilet.  Further no staff mentioned hearing a toilet being flush.  Staff only document hearing the screams and immediately responding as is also noted in the voluntary statement of the informant.

12

In this document the informant states, "Then I saw the staff go down pass the window and I could not see anything else.  His earlier statement said he could see "inside of Chris' room because of the security mirror."

The finding of Patricia Sutton, COS Investigating Officers report is stated as follows:

"Finding: After questioning resident Kriven (sp) about the incident, he admitted that he tried to choke the staff because he was upset with Y.W. Mullen.  All allegations concerning the resident assaulting staff are found to be true. "

It is noted that Mr. Sparks was never charged for this crime administratively or criminally.  Mr. Sparks informed me that he never received a write up for this crime, nor did he ever receive anything in writing.  Mr. Sparks adamantly denies any involvement in this escape attempt.  It is noted that there are many errors in his BOP prison record regarding this incident.  The BOP records reflect that the missing key was found under Mr. Sparks' mattress. The key was found under Resident Kirvin's mattress in an entirely separate room.     It appears his classification status has been impacted by this incident.

Mr. Sparks informed me that resident, Christopher Kirvin told all the residents that he was planning to escape. According to Mr. Sparks no one took him seriously. Mr. Sparks thought he was just talking.   As far as Mr. Sparks recalls he was asleep when the incident occurred.  He woke up and went to the bathroom.  While utilizing the facilities he heard a scream, and reacted by thinking, what is going on?  He then finished utilizing the bathroom as quickly as possible, flushed the toilet and went to the front of his cell.  He observed staff responding to the incident.

It is of concern that the information provided by one informant was given so much weight, as this incident appears to have had serious consequences for Mr. Sparks.  It is also a concern that Mr. Sparks was never given the opportunity to address the accusation that he was involved in something so serious.   The inconsistencies in the informant's statements provide reason to question the allegation.   By any standard, there is insufficient information or facts to hold Mr. Sparks culpable for being involved in an escape plot or an attempt to escape.

13

According to Mr. Sparks, he had agreed to plead guilty to the charge of kidnapping with an agreement that he would serve 5 to 15 years.   The day before sentencing his attorney came to visit him briefly.  His attorney informed him that he was getting life, stating, "You attempted to escape," apparently referring to the incident involving Christopher Kirvin.   The attorney then left.  Mr. Sparks recalls that he was confused and didn't know what the attorney was talking about. When he was sentenced to Life in Prison Without the Possibility of Parole the next day, he remembers being in shock.  Mr. Sparks said he was angry, upset and just confused by the judicial process and his sentence, given the sentence he had agreed to.  This set of circumstances would have an impact on his incarceration.

## C.  Bureau of Prisons Records Review

Mr. Sparks was placed in the Federal Transfer Center Oklahoma City on 04/03/2001 following his conviction. The facility is described as an administrative security federal transfer center.

He was transferred to FCI Beaumont Medium Facility on 08/14/2001.  He remained at this facility for nearly three years.

Mr. Sparks stated he volunteered in a youth diversion program.  He described this program as similar to a scared straight program.  Mr. Sparks enjoyed talking to at-risk youth.  He believes this is important work, trying to keep youth from ending up where he is.   He further states he took two education classes but found he had difficulty concentrating.  He also worked in the facility kitchen.

While housed in FCI Beaumont Medium Facility he received a total of eight disciplinaries. Seven of the disciplinaries were nonviolent in nature consisting of refusing a direct order, absent from assignment, insolent to staff, refusing to take an alcohol test, and possession of alcohol.  The eighth infraction was for participating in a riot.

According to Mr. Sparks, he was present when a riot broke out on July 16, 2004.  The riot involved over 600 inmates.  He utilized a baseball bat to defend himself, but was found guilty of involvement in a riot. Mr. Sparks admitted to having the baseball bat and refusing to put it down, stating that inmates were coming at him from all

different directions.  A review of the incident report reflects the following, "the disturbance consisted of approximately 600 inmates fighting each other with weapons on the recreation yard."  The incident was contained after firing warning shots and chemical agents.

He admits he adjusted poorly to prison.  Entering prison was overwhelming.  The LWOP sentence made him feel hopeless.  He felt the justice system had not treated him fairly.  He was the youngest person in the prison.  Not only was he young, he was small.  He felt that he needed to stay with inmates who were compatible to the gangs he hung out with on the streets.

There were no special programs for young offenders.  There was no documented classification process that took his age into consideration when assigning housing. The prison had lots of blind spots.  He had to be vigilant and concerned about his safety.  Today looking back, knowing what he knows now, he realizes that he could have done his own time in this medium security prison.  He just didn't know how to do time independent of the influence of other inmates and the negative politics of prison.

Mr. Sparks stated that most staff had a negative attitude.  He did have contact with one staff member who tried to tell him he was going to end up in a maximum-security prison if he continued to associate himself with the inmates he was hanging around.   This staff member did try to offer advice.  Mr. Sparks stated he was just too young to handle the situation or accept the advice. He could not envision a way he could "do his own time". While at Beaumont Medium there were weekly inmate-on-inmate fist fights.  There were a least three stabbings and the above mentioned major riot.

Following the finding of guilty for the disciplinary for rioting, Mr. Sparks was transferred to USP Beaumont, a high security facility.   The transfer occurred on September 22, 2004. Mr. Sparks remained at USP Beaumont for nearly two years.

Mr. Sparks stated he worked in the kitchen initially and later became a unit orderly. He also attended school.  He continued to have trouble concentrating and progressing with his education.

15

While housed at USP Beaumont, Mr. Sparks received five disciplinaries. The infractions include being in an unauthorized area, refusing an order, fighting with another person and assault on an inmate with a weapon.

The assault on an inmate with a weapon occurred on July 28, 2006, Mr. Sparks was charged with the stabbing assault of his cell partner resulting in serious injury. Tony admitted to his involvement in this stabbing. He told me it was the decision of the gang that this inmate should be stabbed for disrespecting the group. An inmate with a release date was selected to carry out the stabbing. Mr. Sparks did not want this individual to lose his release date so he agreed to carry out the assault. When staff responded Mr., Sparks stated, "Hey Skinner, I did that stabbing."

Mr. Sparks stated he was again the youngest person in this facility. USP Beaumont was known as Bloody Beaumont. Inmate-on-inmate violence felt like it was a daily occurrence. On the date of his arrival two inmates were stomped to a state of unconsciousness by several inmates. Staff response seemed slow. The facility has blind spots. At least five inmates were killed while he was there. There were many suicides. The prison had lots of inmate manufactured weapons. He was told of many incidents of inmate-on-inmate rapes. The facility was locked down frequently. He was there during Hurricane Katrina. The inmates were without water, electricity, air conditioning, or flushing toilets for over two weeks. This prison was very violent. Mr. Sparks did not do well in this environment. His age, vulnerability and housing in a maximum prison were certainly a factor.

As a result of a guilty finding for the involvement in the stabbing assault, Mr. Sparks was transferred to USP Victorville on August 23, 2006. He was housed in this facility for about 10 months.  USP Victorville is described as a high security U. S. penitentiary.

Mr. Sparks was unable to participate in programming of any type while housed in USP Victorville.

Mr. Sparks received three disciplinaries while housed in USP Victorville. The infractions are for possessing a weapon, assaulting without serious injury, (described as a minor assault), and refusing to obey an order.

16

Mr. Sparks stated that USP Victorville was "real racial". He describes the staff as behaving like the inmates, including having gang tattoos, and associating with each other by race and geographic location. Staff got caught up in inmate politics and helped gangs they sided with. Mr. Sparks stated every inmate had a weapon at this facility. There was lots of violence and several incidents of inmate on inmate violence. Mr. Sparks describes USP Victorville as a very scary place.

Mr. Sparks was transferred to USP Pollock on June 18, 2007. USP Pollock is described as a high security U. S. penitentiary.

Mr. Sparks states that while at Pollock he was assigned to the position of Education Orderly.

Mr. Sparks describes USP Pollock as a wide-open prison with violence like no other place he has been. Everyday something happened. The staff encouraged violence facilitating a "soul train" kind of line to greet newly arriving inmates. The staff would yell out to inmates, "Fresh meat coming in." In this prison, every inmate carried a weapon. He saw inmates with long sword-like weapons. He even saw inmates pull weapons out of their shoes during a basketball game when a fight broke out. At this prison, he heard inmates being raped and gang raped. The experience of hearing people being raped impacted Mr. Sparks. It is my experience that prison rape is one of the top fears of inmates. This is even more true of younger, smaller inmates. The inmate-on-inmate violence was out of control and staff, for the most part, stayed out of the way. After an incident, the staff would clean up the incident scene and return the prison back to normal operation immediately. Inmates were killed at this prison during Mr. Sparks time there.

Mr. Sparks received a total of nine disciplinaries for being absent from work, two for possession of a weapon(s), three for refusing a direct order, being in an unauthorized area, assaulting with serious injury, and attempted murder.

In September of 2007, Mr. Sparks was involved in a stabbing assault with serious injury. The last notation regarding the victim, contained in Mr. Sparks file, indicated the victim was confined to a wheel chair and restricted to utilizing a catheter. It is

17

noted that one confidential informant stated that Mr. Sparks was intoxicated at the time of the stabbing.

Mr. Sparks admits his involvement in this stabbing, stating it was prison politics. As part of his gang involvement everyone is expected to "put in their work." He was expected to do the same. Mr. Sparks was not a gang leader but a soldier expected to do his share in the furtherance of maintaining respect for his gang.

It is noted that this incident went unnoticed by staff. The victim was only found after an inmate alerted staff to the incident. This incident is an indication of the lack of safety for inmates. When serious incidents like this go undetected by staff it is clear that constant and direct supervision of inmates is lacking in a high security prison. The failure to provide a safe environment furthers the belief by inmates that they must protect themselves. This type of environment promotes gang involvement and gang violence leaving inmates without the ability to make choices for themselves without jeopardizing their safety.

Unfortunately, On March 31, 2008 Mr. Sparks received a second serious disciplinary for the stabbing/attempted killing of an inmate. Mr. Sparks admits to his participation in this stabbing. The stabbing was ordered, as the inmate had provided information in violation of gang rules. Mr. Sparks describes this as prison politics and seemed unavoidable at the time.

This is a very brutal incident resulting in significant and permanent injury to the stabbing victim. It is also an incident that again sheds some light into how dangerous this prison is. The victim was not discovered by staff for over 3 ½ hours despite the stabbing occurring in a housing unit. The lack of constant and direct supervision of high security inmates coupled with overcrowded prison conditions has a direct impact on inmates and their behavior. I cannot overstate the impact of an unsafe correctional environment. An unsafe correctional environment promotes gang involvement and violence. When inmates believe that, staff cannot provide for their safety, they are more prone to be gang involved for personal safety. This gang culture leaves inmates without the ability to make personal choices out of fear for jeopardizing their personal safety. The outcome in this situation is predictable. Violence and fear is increased, jeopardizing the safety of both staff and inmates.

18

Mr. Sparks himself was a victim of a stabbing assault shortly before this incident. On March 3, 2008 Mr. Sparks was stabbed from behind for an unknown reason. This incident had a profound impact on Mr. Sparks. The result of the prison violence he had seen and heard made him hyper vigilant before the stabbing. The stabbing made him even more jumpy. He reacted to every noise or sudden movement. His friends told him he was suffering from Post-Traumatic Stress. Mr. Sparks believes he does suffer from PTSD. The fact that Mr. Sparks had been the victim of a stabbing assault, that went undetected by staff, certainly had an impact on Mr. Sparks level of fear and vulnerability.

Despite the escalating pattern of violence by Mr. Sparks, I found no evidence in the BOP records to indicate an attempt by staff to intervene in an effort to determine the appropriate classification, program or housing for Mr. Sparks to address his behavior. His behavior provided a clear indication that intervention was needed for the safety of staff and inmates.

Mr. Sparks was found guilty for the March 31, 2008 stabbing assault/attempted murder of an inmate. As a result of this incident and his extensive disciplinary record, Mr. Sparks' case is referred for a higher classification review with a recommendation that he be placed in USP Florence ADMAX. The classification process included a psychological report as well as a detailed history of his crime and presentence incarceration, (there are many errors in this report) and his in-custody behavior. Mr. Sparks is approved for transfer to USP Florence ADMAX located in Colorado.

Mr. Sparks is transferred to USP Florence ADMAX on August 21, 2009. This prison is referred to as the ADX. Mr. Sparks was sentenced to a 68-month term in the ADX for the stabbing assault of March 31, 2008.

Mr. Sparks recalls being very afraid of ADX Colorado before going there and when he first arrived. Shortly after his arrival he received a disciplinary for possessing an intoxicant. Mr. Sparks informed me the intoxicant was inmate-manufactured wine, (pruno) that he made. He said following this disciplinary something changed in him. He realized he couldn't continue down the path he had been taking, as it was leading nowhere. He realized he was angry. He realized he had a death wish because he felt

19

powerless and hopeless.  He came to understand that without hope you have nothing to lose.  For the first time since his incarceration he felt safe.  He was in a cell by himself, and did not have to look over his shoulder.  He found peace in the ADX.  His mind became quiet, he could think and make decisions.  For the first time, he was doing his own time.  He immediately got involved in programs.  He was able to obtain his GED within six months of arriving to the ADX.  Mr. Sparks explained he had attempted to obtain his GED for six years prior to arriving at the ADX but could never concentrate long enough to do so. Obtaining his GED was a big accomplishment and he felt good for the first time in a long time.  Once he obtained his GED the world of educational opportunities was open to him. He was surprised at how proud he felt when he received certificates of accomplishment.  He also felt proud sharing his accomplishment with his mother and father.  He began taking every class he could. He also began painting.   He is very proud of the portraits he has painted.  His mother and father have some of his work on the walls of their homes.

While at ADX he got into a routine.  He continues to follow a routine each day.   His routine at ADX was as follows:

| TIME | TONY'S SCHEDULE |
|------|-----------------|
| 6:00 AM | Breakfast |
| 7:00 AM | Work out |
| 8:00 AM | Clean cell and shower |
| 10:00 AM | Work on education or other program assignments |
| Noon | Lunch |
| 12:45 PM | Paint |
| 3:00 PM | Clean up and have a cup of coffee |
| 4:00 PM | Watch TV |
| 5:00 PM | Dinner |
| 6:00 PM | Mail Call and write letters |
| 7:00 PM | Watch TV or read |
| 11:00 PM | Go to sleep |

Mr. Sparks found staff at the ADX to be very professional.  He really liked and respected Counselor Haywood and got along with all other staff he came in contact with.

20

For Mr. Sparks the ADX allowed him to calm down, take a breath, (Mr. Sparks actually takes a breath when describing this) and think.  He took several psychology classes.  He came to understand his anger and so much more about himself.  Mr. Sparks told me the ADX was a blessing and probably saved his life.  He learned how to do his own time.  There are no prison politics in the ADX.   He also learned that he can be productive.  He found he has talent as an artist and that he can and is a good student. The experience at ADX allowed Mr. Sparks to mature and grow as a person. He discovered a love of learning that continues to this day.

While at ADX Mr. Sparks completed over 110 educational courses.  He credits these courses with facilitating his growth as a person.  The more courses he took the more he wanted to take. He particularly liked the psychology courses.  Mr. Sparks was able to talk to me about several of the courses including Managing Your Stress, Mindfulness, Five Steps to Decision Making, (he continues to utilize the steps he learned in this course today), and Breaking Barriers.  Mr. Sparks watched many films several times including Anger Management and the Human Brain and, according to him, learned so much about himself.   I also reviewed several Certificate of Achievement Awards earned by Mr. Sparks following completion of numerous health related classes.

Mr. Sparks also participated in a pilot project at ADX which consisted of meeting with inmates of other races and gang affiliations.  The program is modeled after the group therapy program developed for security housing unit inmates at Pelican Bay State Prison in California.  I am very familiar with the Pelican Bay program.

Mr. Sparks describes this experience as powerful.  The inmates, to include himself opened up to each other, sharing their life experiences, their concern for their families and their hope for the future.  Mr. Sparks said he came to realize that they were all the same.  They shared the same fears and concerns.  This program added to his growth as a human being. He decided he was no longer going to be involved in gangs and considers himself inactive.

I reviewed a Federal Bureau of Prisons Psychology Data System report dated 9/30/2013. The mental health professional documented a conversation she had with Mr. Sparks. Mr. Sparks expressed concern that he is not depressed or anxious but rather considers himself the "happiest guy at the ADX." I asked Mr. Sparks about this report and he did remember talking to the mental health professional and asking if there was something wrong with him because for the first time he was at peace with himself. He felt so calm.

Mr. Sparks completed the assessed 68-month term early as he was given credit for good behavior and program participation. All of his Control Unit Executive Panel monthly reviews were positive, following the one negative report for possession of alcohol. He had several negative drug tests while housed at ADX.

Mr. Sparks received numerous Federal Bureau of Prisons Psychological reviews while housed in the ADX. All of these reports deem Mr. Sparks at low risk under the category of Threat to Others and Threat to Self. It is also noted that while at the ADX there is much documentation indicating very purposeful and professional interaction between staff and Mr. Sparks. Mr. Sparks certainly felt like staff knew their jobs and were committed to carrying out their duties in a professional and caring manner.

Mr. Sparks was transferred to USP Allenwood in October 2014, described as a high security federal penitentiary. He requested transfer to this facility, following the early completion of his sentence to the ADX, because the facility offered a certified physical trainer program. Mr. Sparks is very interested in physical training and wants to become certified as a physical trainer. Unfortunately, he discovered after his arrival, that he was not eligible for the program due to his lengthy sentence.

Mr. Sparks did not have an opportunity to participate in programs at this facility.

Mr. Sparks received a disciplinary for ordering an inmate to hit another inmate while at USP Allenwood. The Hearing Officer reviewed the tape of the incident and found Mr. Sparks not guilty, indicating there was no evidence that Mr. Sparks was involved in the incident. According to Mr. Sparks, he was classified for transfer to another facility, as USP Allenwood did not have programs that would benefit him. Mr. Sparks

also believes that Allenwood staff did not want him there as he had just been released from the ADX.

Mr. Sparks received a non-adverse transfer to USP Canaan in March 2015.   USP Canaan is described as a high security federal penitentiary.

Mr. Sparks remained at USP Canaan until he was transferred for the purpose of this case.

While at USP Canaan Mr. Sparks received two disciplinaries, both for non-violent offenses.  The first disciplinary was for disposing of stamps during a search.   Mr. Sparks admits to this.  He explained to me that stamps are a commodity utilized in the federal prisons to purchase haircuts, extra food items or even obtaining cleaning supplies.  Mr. Sparks stated staff is aware of this and look the other way most of the time.  Occasionally staff decide to crack down and search inmates to confiscate stamps in excess of the allotted amount. Staff then use the confiscated stamps to give to inmates who they favor.  Mr. Sparks said he just didn't want staff to utilize his stamps in this manner so he flushed them down the toilet rather than give them to staff. He accepted responsibility for his actions.

The second disciplinary involves a staff member observing Mr. Sparks give something to another inmate.  That inmate was searched resulting in the discovery of small blue pieces of paper among the items in his pocket wrapped in brown paper.  When the paper was tested, it tested positive for methamphetamine. Mr. Sparks denied passing drugs to the inmate.  He said he gave the inmate stamps in exchange for an extra hamburger and Kool-Aid. The inmate who was discovered with the methamphetamine told the Hearing Officer that Mr. Sparks did not give him the methamphetamine.  When asked if he received the folded brown paper from Sparks, he stated, "No, I already had it. I was selling Kool-Aid to make coffee money." Mr. Sparks adamantly denies involvement in this incident or with drugs.  It is noted that he has had several negative random drug tests and has had no other infractions for narcotics.  He has and admits to alcohol use with the last incident of drinking occurring shortly after arriving to the ADX in March of 2010.  As I write this report I cannot say with certainty that Mr. Sparks did not possess the methamphetamine but it does seem out of character for him.  I also note that he has

23

been very forthcoming with me about his behavior.   It is a reality that drugs are prevalent inside prisons. Given the realities of the prison culture, this incident would **NOT** justify retaining Mr. Sparks in prison for the remainder of his life.

Mr. Sparks describes USP Canaan as a violent prison.  The prison has a high rate of inmate on staff violence and inmate-on-inmate violence.  Inmate manufactured weapons, in particular razor blades, are a problem.  Because of the time he spent at the ADX he is respected.  He is viewed as a leader by both staff and inmates in a positive way.  Staff come to him to check on problems they hear are brewing.  He acts to mediate conflicts so they don't get blown out of proportion.  For Mr. Sparks this is a delicate line to walk. He cannot be viewed as overly helpful to staff at the same time Mr. Sparks is committed to keeping the drama down.  He communicates with inmates of all races, helping them to understand that the issue, whatever it may be, is not that serious and can be addressed without violence. Mr. Sparks told me he "keeps the peace" by communicating.  He also shared with me that the role he has taken on as a peacekeeper is very stressful.  He has seen too many people stabbed or killed for saying the wrong thing.  He stressed how careful he must be.

Mr. Sparks has continued his painting, and participates in programs that are available to him, including horticulture, which he finds very relaxing. He has also taken courses in plumbing, electrical, and carpentry.  He works as a Unit Orderly. Mr. Sparks is on the waiting list to participate in the culinary arts program.  Mr. Sparks is interested in becoming a chef.

Mr. Sparks considers himself a spiritual person.  He was raised a Catholic.  He practices Islam but is open to all religions. He believes that many religions offer good rules and philosophies to live by.  He has opened his thinking up to all faiths including the Jewish faith.  He participates in Ramadan as he finds doing so brings him peace and resolve.

He loves working out and motivating others to work out.  He tries to mentor young people offering ten books of stamps to anyone who completes their GED. Stamps are a precious commodity inside the prison.  They are utilized to purchase cleaning supplies, books, obtain haircuts, and just about anything a person needs. Inmates utilize all kinds of things including drugs and weapons as commodities, Mr. Sparks

24

utilizes stamps and books to obtain the things he needs to survive. He needs cleaning supplies, clean clothing, and haircuts as an example.    He spends time walking the track and talking to younger inmates who are close to going home. He prides himself on being a mentor. Mr. Sparks shared with me that some inmates get jealous when someone is about to be released. He on the other hand is happy for people going home and does what he can to not let anyone interfere or cause someone to lose their release date.  One of his mentees was paroled a short time ago.  Mr. Sparks is certain he will do well.

It should be noted that I reviewed a Bureau of Prisons Psychology Services General Administrative note dated 01/30/2017 referencing a Posted-Picture File for Mr. Sparks.

The entry states: POSTED-PICTURE FILE. Life sentence for Carjacking.  This offense was premeditated & lasted app. 4 hours' w/a plan to end w/a police shootout.  The victims were shot to death then set on fire.  Sparks attempted to escape from custody after he was arrested.  Rioting IR.  This hyper-aggressive, calculating, unemotional, predatory I/M was sent to the ADX for attempted murder of another I/M.  No hx. Mental health issues, suicidal attempts, or self-harm.  Dx: Antisocial PD (1/2017).

I read this entry to Mr. Sparks.  He said he always wondered what a Posted-picture file was. He thought the entry may explain why many staff treated him as the most dangerous, horrible person they had ever met.  The entry is not accurate when describing Mr. Sparks' role in the crime.  It also states that Mr. Sparks attempted to escape.  Based on the information I have reviewed this statement is not accurate. This misinformation can and likely has had negative consequences for Mr. Sparks.

Mr. Sparks in custody behavior was reviewed as discussed previously.  His early disciplinary behavior is very serious.  It is noted that he has not had a rule violation involving weapons or violence since 2008. Video tapes were utilized in several of these incidents in adjudicating the disciplinary. Copies of these video tapes were not made available for my review.

| Date | Violation | Disposition |
|------|-----------|-------------|
| 10/01/2001 | Refusing a direct order | Remove from food service. |
| 12/19/2001 | Absent form Assignment | Loss of telephone. |
| 08/01/2002 | Insolent to Staff Member | Loss of visitation, phone and commissary. |
| 08/23/2003 | Refusing to Take Alcohol Test | Loss of commissary (180 days), loss of good time and assessed ad. seg. placement. |
| 03/01/2004 | Possessing Unauthorized Item | Loss of telephone, loss of good time and assessed ad. seg. placement. |
| 03/13/2004 | Possessing Intoxicants, Inmate made alcohol | Loss of visiting 180 days. |
| 05/31/2004 | Possessing Intoxicants, Inmate made alcohol | Loss of good conduct time, assessed ad. seg. placement, and commissary loss. |
| 07/16/2004 | Rioting | Loss of telephone, commissary, and visits, (365 Days), loss of good time, assessed ad. seg. placement. |
| 05/22/2005 | Unauthorized Area | Loss of LP visit 30 Days. |
| 06/11/2005 | Refusing to obey order/stealing | Commissary suspended 180 Days, loss of good time and assessed ad. seg. placement. |
| 02/13/2006 | Refusing to Obey an Order | Phone loss 30 days. |
| 06/22/2006 | Fighting with Another Person | Loss of commissary, telephone and visiting (180 Days), loss of good time and assessed ad. seg. placement. |
| 07/28/2006 | Assaulting with Serious Injury | Loss of good time and ad. seg. placement pending transfer. |
| 12/18/2006 | Possessing a Dangerous Weapon | 40 days CS loss. |
| 01/08/2007 | Assault w/o Serious Injury, Poss. a Weapon, Refusing an Order | 40 Days CSR, assessed ad. seg. placement, loss of commissary, (one year). |
| 02/13/2007 | Assaulting Without Serious Injury (minor assault) | 27 days loss of good time, assessed ad. seg. placement and loss of visiting, (one year). |
| 07/02/2007 | Being Absent from Assignment | 30 Days CS loss. |

| 08/01/2007 | Possessing a Dangerous Weapon | Six months CS loss, loss of good time and assessed ad. seg. placement. |
|---|---|---|
| 09/03/2007 | Assault With Serious Injury | Six months CS, loss of phone and assessed ad. seg. placement. |
| 12/25/2007 | Possessing a Dangerous Weapon | 10 Days CS. |
| 10/02/2008 | Refusing to Obey an Order, Disruptive Conduct-Moderate | Loss of Commissary, loss of Phone (30 Days). |
| 03/31/2008 | Being in Unauthorized Area | Rx Disciplinary transfer due to violence and use of weapons, assessed ad. seg. placement. |
| 03/31/2008 | Killing (Attempted to Kill) Stabbing | Two years loss of commissary & loss of visits, assessed ad. seg. placement. |
| 10/03/2008 I have it as 10/02 | Refusing to Obey an Order | Loss of commissary and phone 30 days. |
| 05/13/2009 | Refusing an order and breaking fire sprinkler head | 21 days disciplinary detention, pay $70.00 for sprinkler head. |
| 02/27/2010 | Possessing Intoxicants Inmate made alcohol | 30 days disciplinary seg., loss of CS, loss of visits, phone, (120 days). |
| 02/17/2016 | Destroy/Dispose Item at Search | 60 days loss of CS, loss of Mp3 player and phone, loss of good conduct credits and assessed ad. seg placement. |
| 01/25/2017 | Possession of narcotics | 60 days disciplinary detention, loss of good conduct credit, and 1 year loss of CS/email/Mp3 player, phone and visits. |

**Work/Education/Program Participation:**

I reviewed the information available to me regarding Mr. Sparks work/education and program participation while in custody of the BOP.

Early in Mr. Sparks incarceration he made an effort to participate in education and self-help courses with limited success.  His file reflects completion of educational,

27

vocational, health, and other life skills courses beginning in 2010. Mr. Sparks was also able to obtain his GED in July 2010 while housed at the USP Florence, ADX. He has developed a love of learning. When I visited Mr. Sparks in the Bastrop County Jail I asked the entry Officer as I was leaving about Mr. Sparks. Among other positive statements the Officer told me Mr. Sparks loves to read and asks for books every time you see him. Mr. Sparks has over 60 Certificates of Completion or Achievement, representing hundreds of hours of course work.

Mr. Sparks' file reflects he has worked as expected for most of his incarceration. He has not had an absent from work disciplinary since 2007.

### D.   Interviews of Correctional Staff Regarding Mr. Sparks

On 11/16/2017 I participated in one conference call with Officer Keyes to talk about Mr. Sparks' time at the ADX. Officer Keyes was very complimentary of Mr. Sparks' attitude and behavior. Officer Keyes shared with us that Mr. Sparks was always saying, "Mr. Keyes we need a program. We need a program." Officer Keyes stated that "Tony" stood out in a positive way. A Superior Achievement Program was started.   The program had various levels to complete. Tony Sparks was the first inmate to sign up for the program, according to Officer Keyes. Officer Keyes saw Mr. Sparks nearly daily. He always had a positive attitude. Officer Keyes states that Mr. Sparks worked hard to change his situation.

Doctor Davis, a psychiatrist during Mr. Sparks' stay at the ADX, participated in a conference call with the legal team. From the notes of this call, Dr. Davis found Tony to be very interested in re-entry and trying to change what he was doing. Tony participated in a group that started to engage inmates from varied ethnicities and backgrounds. Tony took feedback well and began to make better decisions by refraining from being disruptive for attention or to get what he wanted. Tony did his homework. Tony was supportive of other group members.

Mr. Sparks told me that one staff member in the Bastrop County Jail did not agree with the procedures for food for him during Ramadan. Mr. Sparks said he did not get angry. He simply solved the problem by utilizing his personal food items. The

28

county jail is a very stressful environment with the ever-changing inmate population. The fact that Mr. Sparks has not had any problems in this situation speaks to his maturity and growth.

### E.   Interview with Petitioner

I interviewed Mr. Sparks on two consecutive days; November 8, 2017 from 3:30 to 5:15 and November 9th from 8:00 AM to 11:45 and again from 1:30 to 3:30. The interviews took place in the conference room of the Bastrop County Jail. The purpose of the interview was to obtain social information, discuss the crime, his incarceration experience to include disciplinary behavior and work/program participation. It is my experience that much can be learned from listening to offenders talk about their lives, their criminal behavior and their incarceration. These interviews over a two-day period are essential to forming an opinion about Mr. Sparks and his risk level, should his sentence be reduced.

All statements noted in this section of the report are based on information provided by Mr. Sparks, coupled with information obtained from his legal team.

Mr. Sparks was born in Germany. His mother is a German citizen. His father, a U.S. citizen, was in the military and stationed in Germany. His mother and father separated when Mr. Sparks was two or three years old. They were never legally married. He remained in Germany with his mother until coming to the United States when he was 11 or 12 years old. His mother married an American soldier. His childhood was difficult, as his mother had a drinking problem. His mother physically abused him – so much so that a neighbor called Child Protective Services, which got involved with the family. Tony's CPS worker, Mr. Klose, encouraged Tony's mother to place him in a CPS home, as Mr. Klose did not believe Tony's mother was capable of providing adequate care. Roughly at the age of eight, Tony was sexually abused by a U.S. soldier at his neighborhood playground. The soldier was prosecuted and sent back to the United States.

When he came from Germany he did not speak English and had a tough transition. He lived with his mother and stepfather. His stepfather was physically abusive to his

mother.  He lived and grew up in a tough neighborhood in Texas.  A large portion of the neighborhood was inhabited by gang members from a variety of gangs to include The Latin Kings, The CRIPS, The Bloods, Mexican Gangs and a variety of White gangs.  His stepfather was a member of the Gangster Disciples and his stepfather's brothers, both of whom lived for a time with the family, were both CRIPS.  Mr. Sparks was small, didn't speak English and as a result was being bullied in school.  His stepfather asked his two brothers who were CRIP gang members to provide protection for Mr. Sparks.  Mr. Sparks was encouraged to join a gang by his stepfather.  His mother and his stepfather are no longer married, divorcing following Mr. Sparks' incarceration.

Mr. Sparks talks about his mother with respect and love stating, "She is my best friend."  When I said, "Your mother must have a lot of guilt" he responded, "She does, but it is ok, she did the best she could do."   Mr. Sparks told me his mother has gotten her life together and has a very nice boyfriend.  His mother has visited him regularly since his arrest and incarceration. Mr. Sparks has developed a very good relationship with his father.  He feels supported by both parents and expressed his appreciation and love for both parents.

Mr. Sparks has much insight into how complicated the world is and as a result does not place any blame on his parents for his childhood or for his circumstances.

Mr. Sparks' best friend joined the Bloods when he was in junior high so he followed him and joined the Bloods.  It is not surprising that Mr. Sparks joined a gang given the neighborhood he grew up in and given the gang involvement of his stepfather.

Mr. Sparks was arrested less than one month after turning 16 for the crime that is before the court today.  As a result, he did not finish high school.

Mr. Sparks denied that alcohol or drugs are a problem for him.  He admitted to alcohol use both before and during his incarceration.  The last time he drank alcohol was when he was in ADX Colorado.  He has remained alcohol free without any problem. He stated he doesn't even think about alcohol.   Mr. Sparks stated his only vice is coffee.

**F. Criminal History:**

Prior to the offense before the court Mr. Sparks had no adult criminal history. His
juvenile arrest consisted of stealing a 10 Kt. Gold ring from an individual.   According
to the Presentence Investigative Report the Petitioner took a 10 kt. Gold ring from
an individual. The victim was visiting a friend when Mr. Sparks approached him. He
was asked by Mr. Sparks to look at the ring he was holding in his hand. It is alleged
that Mr. Sparks snatched the ring and fled on foot.

Following this incident Mr. Sparks was charged with a burglary of a habitation and
theft from a Person. The circumstances as detailed in the Presentence Investigative
Report indicate that on August 24th at the age of 15 an individual observed a male,
who was later identified as Tony Sparks, take the victim's bike from the garage.
According to the witness, Mr. Sparks was with three other males who were all riding
bikes.   The witness notified the owner. The victim and the witness began chasing
the four males. When they caught up with the four males riding bikes, Mr. Sparks
dropped the bike he had stolen from the garage and got on another bike with one of
the other males. Mr. Sparks and the other male he was riding with abandoned the
bikes they were riding.  Mr. Sparks was apprehended by the victim and the witness.
They held Mr. Sparks until the police arrived.  Mr. Sparks was placed on one year
probation as a result of this arrest.

It is noted that both arrests appear to be crimes of opportunity and did not include
weapons or violence.

Mr. Sparks has an additional arrest dated June 30, 1999 for aggravated assault with
a deadly weapon.  This case was closed following his arrest for carjacking. The PIR
states that Larry Taylor was standing in front of his residence when he saw Tyrone
Lewis and Hector Colon drive by.  The victim believed the other person riding in the
passenger seat was Tony Sparks. Taylor stated the car drove by a couple of times
and the passengers flashed gang signs and yelled insults. Taylor stated the car drove
up the street and stopped to speak to Christina Mangalavite. The individuals got
back into the car and drove back up the street. This time as the car got to his
residence, Tyrone Lewis, who was seated in the right rear, stuck his hand out of the
window and started firing at him. Lewis shot at him five or six times. After they

31

shot, the vehicle left the area. Taylor stated Hector Colon drove the vehicle and the vehicle belonged to Colon's mother.

### G. The crime before the court:

Mr. Sparks is able to talk about this crime openly and candidly. He calls the murder of Mr. and Mrs. Bagley senseless. He expressed great regret for involving himself in the carjacking. He said he never planned for anyone to be killed and did not participate in or hear any discussion to kill the Bagleys. He became involved in the carjacking to help Vialva, whose situation seemed desperate. Vialva appears to have had a leadership role over the defendants, including over Mr. Sparks. It was Mr. Sparks' belief that, after unsuccessfully obtaining money from the Bagley's bank account, the Bagleys would be released unharmed and the car would be taken to a chop shop and sold.

Mr. Sparks' version of the events leading up to the crime in brief are as follows:

The day before the murder, he was with Chris Vialva. Vialva told him he was kicked out of his house and needed money.

On the night before the murder, Vialva and Lewis came to Sparks' home. They stated they were looking for someone to rob. Sparks left with Lewis and Vialva. Lewis had a .22 caliber pistol. They were stopped by a Killeen Police Officer with backup for a curfew violation. Lewis threw the gun in the bushes. Vialva was released, as he was an adult. Mrs. Brown, Mr. Sparks' mother, was contacted to pick up her son because of the curfew violation. Mrs. Brown picked up both Mr. Sparks and Mr. Lewis.

Mrs. Brown would not let Mr. Lewis stay in her home that night. Mr. Lewis spent the night in an abandoned house next door to the Sparks' home, returning to Mr. Sparks' home after his mother left for work the next morning. They were joined by Vialva and Bernard bringing with them the .22 caliber pistol that was retrieved from the bushes. The .22 caliber pistol was given to Mr. Sparks. Vialva and Bernard called

Gregory Lynch from Mr. Sparks' residence to get the .40 Caliber gun from Lynch.  Mr. Sparks rode with Bernard, Vialva, Lewis and Brown to get the gun from Lynch.

They made attempts to obtain a ride from various people without success. The plan was to get money from whomever gave them a ride.

They approached Todd Bagley while he was on the phone in front of Mickey's Convenience store and asked for a ride to the probation office.  The Bagleys agreed to give them a ride.  The Bagleys began driving Vialva, Lewis, and Sparks toward the Bell County Probation Office.  Vialva pulled his gun on the Bagleys while they were driving and told them there was a change in plans.  Mr. Sparks pulled the .22 caliber pistol out of his shoe and placed it on his lap.  Vialva kept telling Mrs. Bagley to turn around and put the mirror up.

Todd Bagley was told to drive to a wooded area near Rancier Middle School.  Vialva told Mr. Bagley to stop the car.  The Bagleys were told to get out of the car.  Vialva told them to take off their jewelry.  They tried to give their jewelry to Vialva. Vialva directed the Bagleys to give the jewelry to Mr. Sparks.  The Bagleys were then placed in the trunk of the car.

Mr. Sparks got into the car with Lewis and Vialva and they began looking for Bernard and Brown.  They drove back toward Mickey's but they could not find them so they went to Copperas Cove, Texas.

They attempted to utilize the bank card taken from the Bagleys in Copperas Cove, but the card would not work.  They then drove to Vialva's house to get his identification and license so he could buy cigarettes.  Vialva, Lewis, and Sparks went to Wendy's to get something to eat.  They then began driving toward Copperas Cove and went to Vialva's house to get a cassette tape.  They then drove the vehicle to the mall.  When they spotted a police car Mr. Sparks pulled over and Vialva began to drive.

They again drove to Copperas Cove. Lewis called Brown.  Vialva told Mr. Sparks he was not going to jail.  He stated he would shoot the police so they would shoot him because he was not going to jail.  Mr. Sparks didn't understand this statement by Vialva.  Vialva had spent some time in jail and had recently been released.  Mr.

Sparks didn't believe anything happened to him in jail to cause him to want to die at the hands of the police rather than return to jail. Mr. Sparks said he would run if they were stopped by the police. Vialva directed Lewis to act like he had a gun so police would shoot him. Mr. Sparks did not agree with this plan.

Lewis called Brown from Copperas Cove and they then drove back to Killeen and met Brown near Billy Rorie's house. Mr. Sparks, Brown, Lewis and Vialva were all in the car at this point. They began looking for Bernard. While they were driving in the car, Brown was pointing the .22 caliber at the back seat of the vehicle. Mr. Sparks took the gun from Brown and put it in the front seat. Vialva asked Billy Rorie if he wanted to go with them, he declined.

Sparks, Vialva, Brown, and Lewis drove to Long Branch Park and met Bernard and Joseph Presley at the park. They parked at the pavilion and Bernard and Vialva began talking. It was around 5:00 pm and Mr. Sparks asked to go home. Mr. Sparks stated that he asked to go home because he regretted getting involved in the carjacking. They kept driving around in a car without the proper licensing sticker and he believed they were going to get stopped by the police. He was concerned by Vialva's statements about shooting it out with the police. According to Mr. Sparks it was becoming clear to him that the whole thing was "pointless."

They then drove by Bernard's girlfriend's home where Mr. Sparks exited the car in his neighborhood. He was given the Bagleys jewelry. Mr. Sparks left the .22 caliber pistol in the car. He asked Lewis if he wanted to go home with him. Lewis declined.

Lewis continued with Vialva as a passenger in the Bagleys car. They were followed by Presley, Brown and Bernard in a car belonging to Bernard. Mr. Sparks walked home and that was the last time he saw these individuals. Mr. Sparks is adamant that he believed the Bagleys would be released at some point during the evening.

Mr. Sparks went on to share other details of that night. He informed me that he and Lewis talked to the Bagleys and assured them they would not be killed. Mr. Sparks stated that he discovered they attended the same church he had once attended. He felt a connection to them and did not even consider physically harming them in any way. Mr. Sparks also shared with me that his thinking, at the time of this crime, was

34

that it was ok to rob or steal from civilians, (non -gang members) but not ok to hurt them in any way.

The next day when he was told what happened he said his immediate reaction was shock and he thought, "This makes no sense".

Mr. Sparks expressed remorse for the role he played in this crime and sincerely regrets the tragic death of Mr. and Mrs. Bagley.

## V. Opinions and Conclusions

Mr. Sparks entered the federal prison system as a young man.  For several years, he was the youngest person at the facilities he was housed in.  He came from a family where his stepfather and step-uncles were gang members.  He grew up in a gang-infested neighborhood.  His mother was struggling with her own addiction issues. Mr. Sparks joined a gang as a young man in need of a support system and entered prison as a member of the Bloods.

In making my assessment of Mr. Sparks I am mindful of his age and what we now know about brain development and youthful offenders.  The United States Supreme Court has concluded that people under 18 are immature, irresponsible, susceptible to peer pressure and often capable of change.

Those of us who work in the criminal justice system know young inmates are more susceptible to the negative influences inside prison than older inmates. The age of 25 is often used as an age when inmates start to settle down inside prison.  Young inmates, overwhelmed by feelings of helplessness and hopelessness cannot focus on changing their thinking and behavior.  These young inmates are consumed with how to survive the prison experience.  Young inmates lack the maturity and often the physical stature to feel safe and be safe in adult maximum security prisons.

We also know from research that younger inmates can change if offered the opportunity to do so.  For Mr. Sparks the opportunity presented itself when he was sent to the ADX. In my over 30-year career I have personally witnessed the changes in young people as they matured and where given opportunities for treatment, education and programs.

Today, many states have developed youthful offender programs to isolate young inmates with long sentences from the general population to facilitate a supportive protective environment. Classification has changed since Mr. Sparks was incarcerated to create individualized case plans that address risk and needs of individuals. The Prison Rape Reform Act of 2003 is being implemented across the nation to provide protection to all inmates to include youthful inmates and inmates who are vulnerable due to size, medical conditions, mental health conditions or disabilities. This was not Mr. Sparks' experience. None of these current correctional practices were in place in 1999. In 1999 Mr. Sparks was expected to enter the prison system and adjust despite the fact that he did not have the maturity or the tools to do so. It was an unreasonable expectation given his age and his sentence.

With his background and age, Mr. Sparks' behavior in prison was predictable. His behavior escalated when he was moved to a maximum-security prison. He is small in stature and very youthful in appearance. Mr. Sparks relied on his association with other gang members for protection. Unfortunately, gang protection comes at a price. Gang members must abide by the rules of the gang, including following orders that include violence and harm to others.

The circumstances in the prisons Mr. Sparks was housed in, including the lack of a safe environment, his own stabbing and the witnessing of violence and rape, had a dramatic impact on him. He felt more hopeless and helpless than ever. He observed staff slowly responding to incidents or even worse, not even aware inmates were assaulted for hours. Inmates were killed. Many committed suicide. These circumstances would be hard for anyone to handle, imagine what it was like for this young person. He himself had been the victim of sexual assault as a child - a topic he still finds hard to discuss. His continued use of prison-made alcohol was his way of self-medicating and was also the cause of many of his in-custody disciplinaries. Mr. Sparks repeated more than once, "The ADX saved my life."

Mr. Sparks' prison file refers to him as a gang associate, gang member and gang leader. I was not provided with any documents associated with these designations to know how the various designations were made.   In reviewing his file, it is evident that he was a gang member. I see no indication that he was a gang leader. The fact that he possessed weapons and was involved in gang sanctioned/ordered hits lends

36

me to believe he was a follower or a soldier.  Gang leaders do not typically possess weapons. Their followers are ordered to do so. Gang leaders do not carry out hits. Again, this is the work of the lower level gang members.

It is clear to me that Mr. Sparks was scared and has remained afraid inside the prison system.  The difference between him today and who he was as a young man entering the prison system is that he now knows how to handle himself in prison. He has learned to do his own time, free from violence and other violent behavior. Mr. Sparks admits that because he did time at the ADX he managed to gain the respect of inmates. He is not challenged to prove himself or do anything he does not choose to do. He considers himself an inactive gang member.  He has committed no acts of violence since 2008.

Mr. Sparks has also found a love of learning and has a vision for his future.  He learned to utilize his time to improve himself by learning about himself.  He has taken every course available to him to understand his anger, his decision making and the steps he must take to change his thinking and behavior.   He also has an eye on the future with very specific plans for his release. He plans to continue his education. He also plans to live with his father.  His father has a confirmed job offer for him working for an asbestos removal company.  His long-term goals include becoming a certified personal trainer and attending culinary school.

Mr. Sparks now has leisure time activities, which include drawing and painting.  He is also an avid reader and has a very strict exercise routine.  These positive activities help Mr. Sparks to manage stress and remain focused on his goals.

Mr. Sparks wants to spend time volunteering with at-risk youth.  He believes he has the ability to communicate with young people.  He has practiced this skill inside the prison system, taking young people under his wing and providing mentorship.  He has been happy to see more than one of his mentees go home and hopes for their success.

Mr. Sparks' ultimate goal is to make his family proud of him.  He talks about this with great optimism. Mr. Sparks plans and goals are well thought out and realistic.  He

demonstrates great insight and maturity. He has the support of family members in the United States and in Germany.

Mr. Sparks has the ability, the intellect and the maturity to be successful. Mr. Sparks is fortunate to have good health and intellectual abilities. These factors, when coupled with his outstanding effort to educate himself and obtain the tools to improve himself, make him an above average candidate for a successful parole. I am also impressed by the self-discipline he places on himself to follow his daily routine. This self-discipline will serve him well as he adjusts back to society.   He has great insight into his behavior. He shows remorse for his actions and talks about the value of all human life. The multiracial group therapy taught him much about people and what we all share in common. He very clearly has learned empathy for other people. Mr. Sparks has a community support system. It is my view that he has all he needs to be successful upon his release from custody.

It should be noted that Mr. Sparks also has an offer to live and work in Germany. Franz Hess has known Mr. Sparks since he was a child. Mr. Hess cared for Mr. Sparks when he ran away from his mother's home. Mr. Hess and his wife have offered Mr. Sparks a home and a job, working as a tradesman with Mr. Hess' construction company. This option also provides Mr. Sparks with additional support as the German Government provides living assistance, medical insurance, training, and unemployment pay to German citizens returning to Germany following incarceration and or deportation.   Mr. Sparks has more than one viable option for a successful parole.

## VI. Findings:

I have relied upon all the information provided in this Expert Report to assess whether Mr. Sparks is currently a risk of danger to public safety. Based on my assessment it is my opinion that Mr. Sparks does not pose a risk of danger to public safety.

# **<u>Appendix A</u>**

| CURRICULUM VITAE OF JEANNE S WOODFORD | |
|---|---|
| DATE | TITLE |
| March 19, 2004 | California Judicial Council in Monterey – Speaker: The State of Criminal Justice in California |
| April 21, 2004 | Senate Budget Sub 2 Committee Hearing – Testify regarding the need for a new death row in California. |
| April 22, 2004 | Briefing Director's Introduction Remarks Little Hoover Commission regarding the State of Corrections in California and the need for reform |
| May 4, 2004 | Opening Statement (Senator Romero) Hearing on the state of corrections |
| May 5, 2004 | Assembly Oversight Hearing- Testimony regarding the need to repair the structural deficiency in the CDC's budget |
| May 21, 2004 | Medal of Valor-California State Capitol-Speaker |
| June 1, 2004 | Joint Hearing Assembly Committee on Health – Testimony regarding health care in the CDC |
| June 8, 2004 | Friends Outside Annual Dinner-Keynote Speaker: The Need for Rehabilitation |
| June 23, 2004 | Confirmation Hearing Opening Remarks Senate Rules Committee |
| June 28, 2004 | Statewide Training of Chief Probation Officers – Keynote Speaker: The Need for Reform |
| August 16, 2004 | Mule Creek State Prison Media Event with the Governor – Speaker: The Need for Rehabilitation |
| August 23, 2004 | NOVA Conference Speaker: Reforming the CDC. |
| September 13, 2004 | 5th Annual Centerforce Inside/Out Summit – Keynote Speaker: The State of Criminal Justice in California |
| September 15, 2004 | League of Women Voters-Speaker: The Need for Sentencing Reform in California |
| September 17, 2004 | Odyssey-Speaker: The need for Sentencing Reform in California |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| September 29, 2004 | Legislative Hearing "The Inmate Health Care Challenge:  Fixing a Broken System in Light of the Deukmejian Report" (Senate Select Committee on Government Oversight and Senate Select Committee on the California Correctional System) – Speaker |
| October 9, 2004 | California Judges Association Conference in Monterey-Panel w/Senator Jackie Speier. |
| December 8, 2004 | Sonoma State University: Perspective on the Future - Speaker |
| January 2005 | Article:  Managing Death Row – co-author. Published in Managing Special Populations in Jails & Prisons text |
| February 8, 2005 | Senate Select Committee on the California Correctional System (Hearing on Racial Segregation in Prisons) – Speaker |
| February 23, 2005 | Sonoma County Peace Officer of the Year Banquet-Keynote Speaker |
| March 10, 2005 | Harvard University, John F. Kennedy School of Government Forum-Panel on Corrections – Panel Member |
| March 16, 2005 | Forensic Mental Health Conference Speaker: The Need for Improved Mental Health Care in the CDC |
| April 21, 2005 | Citizen's Advisory Committee Conference, Opening Remarks: The Need for Reform |
| April 23, 2005 | California Correctional Supervisor's Organization Keynote Speaker: The Need for Reform |
| April 24, 2005 | Hospitals & Institutions Conference Speech: Health Care in CDCR |
| May 12, 2005 | Alcoholic's Anonymous Volunteers in Parole Keynote Speaker: The Importance of Volunteers in Prisons and in Our Community. |
| May 25, 2005 | Rehabilitation Conference Speaker: The Need for Drug Treatment |
| June 6, 2005 | National Institute of Corrections Faith-Based Conference. Washington D.C. – Speaker: The Importance of Religious Volunteers in our Prisons |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| June 14, 2005 | Friends Outside Annual Dinner Speaker: The Importance of Programs for Inmates and Their Families |
| June 24, 2005 | Basic Correctional Officer Academy Graduation – Speaker: Professionalism and Ethics |
| July 20, 2005 | California Youth Authority Medal of Valor – Speaker |
| July 27, 2005 | Channel City Club Keynote Speaker: Correcting Corrections |
| October 17, 2005 | Educators Keynote Speaker-Lake Tahoe. The Importance of Education |
| October 20, 2005 | Employers Forum "San Diego County's Undiscovered Labor Resource" (Community Reentry Project) Keynote Speaker |
| October 21, 2005 | Basic Correctional Officer Academy Graduation – Speaker: Professionalism and Ethics |
| January 25, 2006 | Little Hoover Commission (Sacramento) Opening Remarks: The Need for Sentencing Reform and Rehabilitation |
| February 1, 2006 | Fire Chiefs Return to Work Coordinators Conference – Opening Remarks |
| February 2, 2006 | Senate Hearing "Have California's Prisons Been Rehabilitated" – Speaker |
| May 19, 2006 | Medal of Valor Speaker-California State Capitol |
| May 23, 2006 | Coalition of Alcohol and Drug Associations Public Policy Conference – Morning Speaker: The Importance of Drug Treatment |
| May 27, 2006 | Sonoma State Commencement Exercises Speaker |
| June 8, 2006 | American Institute of Architects National Convention and Design Exposition – Speaker: The Need to Build Prisons for Programming and Safety |
| August 2006 | Los Angeles Times OP Ed:  "Why I quit the Prison System" |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| November 27, 2006 | Speaker at USC Annenberg Institute for Justice and Journalism Topic: Sentencing Reform |
| February 4, 2007 | Article: The Future of Prison Design featured in the American Institute of Architect's magazine |
| May 18, 2007 | Sonoma Learning – Sonoma State University Speaker: Future of Corrections |
| July 14, 2007 | Judicial Council of California Symposium – Speaker: The Need for Sentencing Reform |
| July 17, 2007 | Sonoma State – Speaker: Criminal Justice Time for Reform |
| September 6, 2007 | Northern California Service League – 12th Annual Reentry Conference – Speaker |
| September 11, 2007 | Hastings Law School, San Francisco – Speaker: The Need for Sentencing Reform |
| October 23, 2007 | Eighth Annual Inside/Out Summit – Critical Juncture – Innovative Solutions for Addressing the Impacts of Youth & Adult Incarceration in our communities – Speaker |
| November 2007 | Association of Women Executives in Corrections – Speaker: My Career in CDCR |
| November 28, 2007 | White House Faith & Community Initiatives National Summit on Prisoner Re-entry – Speaker: The Importance of Re-entry Programs |
| January 23, 2008 | USC Annenberg Institute for Justice and Journalism – Speaker: Sentencing Reform |
| March 4, 2008 | Center for Collaborative Solutions (CCS) Annual Labor Management Conference – Presenter/Speaker: The Importance of Working with Unions |
| March 14, 2008 | UC Berkeley – Violence Conference – Speaker: Prison Overcrowding Must be Addressed |
| March 15, 2008 | USF – Symposium – Solutions for California Prisons – Speaker: Why Criminal Justice Reform is Important for Public Safety |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| March 31, 2008 | John Jay College of Criminal Justice – Speaker: The Importance of Prison Education and Vocational Programs |
| April 22, 2008 | Testified before the US Subcommittee on Crime, Terrorism, and Homeland Security in support of revising the Prison Litigation Reform Act |
| May and June 2008 | Review, audit and report of the San Mateo Youth Services Center following an escape of a youth facing an adult trial as an adult. |
| September 24, 2008 | Testified before the California Legislative Subcommittee in support of Proposition 5 |
| October 2008 | Signed rebuttal to argument in favor of Proposition 9 for the California General Election official voter information guide |
| October 7, 2008 | Centerforce Summit Forum panel participant. The Need for Expanding Rehabilitation |
| October 10, 2008 | Berkeley Law Center Conference panel: The Need for Sentencing Reform |
| November 6, 2008 | American Institute of Architects speaker regarding design influence on corrections |
| November 8, 2008 | Panel participant with American Institute of Art and Design discussing the influence of Architectural design on criminal justice reform |
| January 2009 | Appointing to the Prison Industries Authority (PIA) Board by Senate Rules |
| February 3, 2009 | Testified as an expert for the Plaintiffs before the Federal Three Judge Panel regarding the impact of overcrowding on health care and mental health treatment. Case: Ralph Coleman, et al Plaintiffs, v. Edmund G. Brown JR., et al, Defendants No.2:90-cv-0520 LKK DAD (PC) Three Judge Court No.C01-1351 TEH |
| February 27, 2009 | Speaker Berkeley Criminal Justice Forum:  The Need for Criminal Justice Reform |
| March 9, 2009 | Speaker Sonoma State University Criminal Justice Forum |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| March 19, 2009 | Speaker Hastings School of Law, Defining the Problem-The State of Criminal Justice in Ca. |
| April 2009 | Entered into 5-month contract with Drug Policy Alliance to develop criminal justice policy strategy for Ca. |
| May 2009 through August 2009 | Volunteered consulting services at the request of Legislators working on Ca. Correctional budget issues |
| May 2009 | Editorial in San Diego Tribune regarding corrections and accountability |
| June 30, 2009 | Guest speaker The Fellowship Forum, a group of Stanford graduates and Hewitt Packard executives: The State of Criminal Justice in California |
| August 12, 2009 | Interviewed for Time Magazine regarding corrections in Calif.  (On-line edition) |
| August 13, 2009 | Interviewed for NPR- All Things Considered, regarding correctional issues in Ca. |
| September and October 2009 | Taught a series of classes at Sonoma State University entitled Overview of Corrections |
| September 2009 | Jail needs study Cities of Kirkland and Bellevue, Washington. |
| October 1, 2009 | Guest Speaker Saint Mary's College: Criminal Justice in California |
| October 2, 2009 | Guest Speaker University of California Berkeley: Criminal Justice in California |
| October 21, 2009 | Education Seminar Los Angeles Public Defenders Office "An Overview of California Prisons" |
| October 27, 2009 | Participated in panel discussion regarding Criminal Justice and the State of California |
| October 2009 to present | Contracted for Needs Study Placer County Jail |
| February 2010 | Contracted to assist implementing the Second Chance Reentry Grant for the City and County of San Francisco |
| February 2010 | ABA Criminal Justice Standards on Treatment of Prisoners completed.  I was a member of the task force for a portion of the five-year project. |
| April 12, 2010 | Appeared on Pod Cast regarding Correctional Reform for the UC Berkeley Criminal Justice Center |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| April 13, 2010 | Taught six-week course at Sonoma State University regarding the State of Corrections in California |
| May 11, 2010 | Testified before the Ca. Legislature regarding Options for Improving Prison Operations and Outcomes |
| June 30, 2010 | Testified before the Ca. Legislature regarding SB 399, The Fair Sentencing for Youth Act. |
| September and October 2010 | Taught six-week course at Sonoma State University regarding the State of Corrections in California |
| November 3, 2010 | Attend Cal RAPP training and participate in strategic planning to assist SF Adult Probation to implement evidence based practices and procedures. |
| November 9, 2010 | Appointed Senior Fellow Chief Justice Earl Warren Institute Berkeley School of Law |
| November 15, 2010 | Guest speaker for Dr. Barbara Bloom regarding corrections in California; Sonoma State University |
| November 17, 2010 | Panelist at the American Society of Criminologist.  The State of Criminal Justice in California |
| November 18, 2010 | Testified before the Little Hoover Commission Topic: Reorganization of the California Department of Corrections |
| December 2, 2010 | Three Strikes Conference Stanford University |
| January 4, 2010 | Speaker Hastings Law School Topic: Corrections in California |
| January 7, 2011 | Presenter SALT Award to the Prison Law Office for Human Rights work. |
| January 20, 2011 | Speaker UC Irvine Topic: Death Penalty and California Criminal Justice |
| February 8, 2011 | Speaker-Stanford for Professor Nation, Public Policy class Corrections in California |
| February 22, 2011 | Speaker-Stanford School of Law, Joan Petersilia class on Criminal Justice |
| March 31, 2011 thru May 19, 201116, 2011 | Attorney General transition team meeting-Smart on Crime Project Strategies for Improving Criminal Justice in California |

| CURRICULUM VITAE OF JEANNE S WOODFORD | |
|---|---|
| April 5, 2011 | Speaker-1st Congregation Church of Sonoma Criminal Justice in California |
| April 6, 2011 | Speaker-UC Berkeley Criminal Justice Course Criminal Justice in California |
| April 18, 2011 | Speaker UC Berkeley Litigation in California Prisons |
| April 26, 2011 | Speaker-Mills College, Death Penalty Symposium |
| April 2011 to present | Expert for Plaintiffs Armstrong v. Brown, United States District Court Northern District of California C-94-2307 CW<br> Primary Issue: Compliance with the American with Disabilities Act, ADA |
| May 2011 to present | Expert for New York State Office of Children and Family Services regarding violence in NY Juvenile Secure facilities. |
| May 2, 2011 | Speaker-USC 3-Strikes Conference |
| May 3, 2011 | Speaker Oakmont Symposium Topic: The State of Corrections |
| May 10, 2011 | Speaker-SF Public Defender's Conference on Criminal Justice:  The Need for Sentencing Reform |
| June 7, 2011 | Guest Speaker-Bob Edwards KQED:  The Death Penalty |
| June 26, 2011 | Guest Speaker-CVS Channel 5: The Death Penalty |
| June 28, 2011 | Guest Speaker National Latino Peace Officers Sonoma County Chapter. |
| August 1, 2011 | Guest Ron Owen Radio Show KGO The Death Penalty and Criminal Justice Reform |
| August 4, 2011 | Guest Pacifica Radio: The Death Penalty |
| August 8, 2011 | Guest KCEO Radio, Kent Peters Show: The Death Penalty and Criminal Justice Reform |
| August 10, 2011 | Speaker Chevron Retirees Luncheon Topic: Criminal Justice in California |
| August 11, 2011 | Speaker Junior Statesmen of America, Sacramento, Ca.  The State of Criminal Justice |
| August 14, 2011 | Guest KGO Lara Starr Producer: The Death Penalty |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| August 17, 2011 | Testified before Ca. Legislative Appropriations Committee regarding SB 490 bill to place death penalty on the Ca. ballot |
| August 30, 2012 | Debate Participant vs.  District Attorney, Wagstaff  Topic: The Death Penalty |
| September 13, 2011 | Speaker Fountain Grove Men's Club topic: Criminal Justice in Calif. |
| September 15, 2011 | Speaker Solano Reentry Council Topic: The Importance of Reentry Councils |
| September 22, 2011 | Guest KGO Peter Collins Show: Criminal Justice and the Death Penalty |
| September 24, 2011 | Guest Speaker PAX Christi Event in LA regarding the Death Penalty |
| October 13, 2011 | Speaker Hastings Law School Professor Blocks class:  The Need for Sentencing Reform |
| October 27, 2011 | Participated in Criminal Justice Realignment Panel Hastings Law School. |
| November 3, 2011 | Speaker Mt. Diablo Peace and Justice Conference: The Death Penalty and Public Safety |
| November 6, 2011 | Speaker Ignatius Church San Francisco: The Death Penalty and Public Safety |
| November 13, 2011 | Speaker Grace Episcopal Church Bakersfield, Ca. Topic: The Death Penalty and Public Safety |
| November 14, 2011 | Speaker California State University Bakersfield: The Death Penalty and Public Safety |
| November 29, 2011 | Speaker Rotary Club of San Francisco:  The Death Penalty and Public Safety |
| November 30, 2011 | Speaker Berkeley Women's Club:  The Death Penalty and Public Safety |
| December 6, 2011 | Speaker Marin Bar Association Topic: The Death Penalty in California |
| December 14, 2011 | Guest KCBS Jeff Ball Host:  Sentencing Reform |
| January 9, 2012 | Guest KQED Cate Cochran CBC Radio Canada: The Death Penalty and Public Safety |
| January 10, 2012 | Speaker Saint Mary's College Speakers Series on Criminal Justice |
| January 17, 2012 | Speaker Trinity United Methodist Church:  The Death Penalty and Public Safety |

# CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| January 17, 2012 | Speaker Sisters of Saint Joseph of Orange:  The Death Penalty |
| January 18, 2012 | Speaker Law Offices of the Public Defender Riverside: The Death Penalty and Public Safety |
| January 18, 2012 | Speaker Scripps College Balch Hall:  The Need for Sentencing Reform |
| January 25, 2012 | Speaker for the showing of the movie Incendiary, The Metreon San Francisco |
| January 26, 2012 | Speaker San Ramon Valley Democratic Club: The Death Penalty |
| January 31, 2012 | Speaker Women of Westminster Tiburon:  The Death Penalty |
| February 1, 2012 | Speaker UC Irvine event held in San Francisco : Sentencing Reform |
| Fall Semester 2012 | Professor UC Hastings School of Law Course: Overview of Criminal Justice |
| February 6, 2012 | UCLA Law School Forum on the death penalty |
| February 11, 2012 | Panel Hastings School of Law Topic: Realigning California's Criminal Justice System |
| February 16, 2012 | Speaker Los Altos Country Club:  The State of Criminal Justice and the Need for Sentencing Reform |
| February 24, 2012 | LMU Restorative Justice Panel |
| February 26, 2012 | Speaker Berkeley Sunday Gathering Topic: Death Penalty |
| March 1, 2012 | Safe Ca Signature Filing Press Conference |
| March 7, 2012 | Speaker Sacramento Jesuit High School: The Death Penalty |
| March 14, 2012 | Speaker: San Francisco Academy of Architecture for Justice: The Need for Sentencing Reform |
| March 16, 2012 | Speaker Caleb Foote Symposium UC Berkeley Topic: Criminal Justice Realignment |
| April 5, 2012 | Guest Canadian Radio the Matt Holmes Show: The Death Penalty and Sentencing Reform |
| April 12, 2012 | Debate Saint Mary's College Death Penalty LA Deputy DA Stirling |
| April 16, 2012 | Speaker UC Berkeley Professor C Gardner: The Death Penalty and Criminal Justice in California |
| April 19, 2012 | Speaker Santa Clara University School of Law: The Death Penalty |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| April 24, 2012 | Panel Golden Gate University topic: Death Penalty |
| April 27, 2012 | Speaker ACLU Sonoma County Annual Dinner: Criminal Justice in California |
| May 8, 2012 | Speaker: The Arthur Benjamin High School Sacramento: Criminal Justice in California |
| May 10, 2012 | Guest Student Radio Station El Cerrito:  The Death Penalty |
| May 14, 2012 | Speaker Heald College Concord:  Criminal Justice in California |
| May 16, 2012 | Guest Bruce Robinson Radio Show Rohnert Park:  The Death Penalty |
| May 17, 2012 | Speaker Diocese of San Diego: The Death Penalty |
| May 20, 2012 | Speaker Sunday Gathering Pacific Palisades: The Death Penalty |
| May 21, 2012 | Speaker Young Democrats LA.: The Death Penalty |
| June 5, 2012 | Speaker Ron Owen Show KGO Radio: The Death Penalty |
| June 7, 2012 | Speaker Sheriffs Association Meeting Placer Co.:  The Death Penalty and Public Safety |
| June 17, 2012 | Unitarian Universalist Breakfast Forum San Francisco Speaker: The Death Penalty and Public Safety |
| June 27, 2012 | LA Press Victims Press Conference; The Need to End the Death Penalty |
| July 25, 2012 | KTVU Radio Interview: The Death Penalty and Public Safety |
| July 26, 2012 | Speaker Vanguard Court Watch of Yolo County: The Death Penalty |
| August 13, 2012 | Guest KRXA Hal Ginsberg show: The Death Penalty |
| August 16, 2012 | Speaker Democratic Women Club Monterey: The Death Penalty and Criminal Justice Reform |
| August 17th, 2012 | Speaker St. Paul's Episcopal Church Monterey: The Death Penalty |
| August 18, 2012 | Speaker Old Mission Church Monterey: The Death Penalty |

# CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| August 19, 2012 | Speaker United Methodist Church Atascadero: The Death Penalty |
| August 30, 2012 | Debate  Participant Topic: Death Penalty DA Wagstaff |
| September 7, 2012 | Speaker Marin Library Mill Valley: The Death Penalty |
| September 12, 2012 | KQED Forum Radio Guest: The Death Penalty |
| September 13, 2012 | Speaker UC Berkeley, Professor David Onek: Criminal Justice and Sentencing Reform |
| September 18, 2012 | Testified before California Legislature Prop 34 |
| September 20, 2012 | Speaker Safe Ca. Event LA: The Death Penalty |
| September 25, 2012 | Speaker USF ST Thomas More Society; The Death Penalty |
| September 25, 2012 | Speaker Christ the King Church Pleasant Hill: The Death Penalty |
| September 27, 2012 | Speaker Stanford University Law School: Sentencing Reform |
| September 27, 2012 | Speaker Stanford Chapter of the NAACP: Sentencing Reform |
| September 30, 2012 | Debate Asian Pacific Islander Political Forum Sacramento Deputy Sacramento DA: The Death Penalty |
| October 2, 2012 | NPR Richard Gonzales: The Death Penalty |
| October 5, 2012 | Speaker California Agriculture Leadership.  The Death Penalty |
| October 7, 2012 | Speaker Holy Families Catholic Church LA: The Death Penalty |
| October 9, 2012 | Catholic Press Conference Church of Saint Raphael and Mission San Rafael:  the Death Penalty |
| October 23, 2012 | Debate Participant Prop 34 Congregation Sha'ar  DA Wagstaff |
| October 24, 2012 | Speaker Alamo Woman's Club Walnut Creek: The Death Penalty |
| October 25, 2012 | Guest Democracy Now topic: The Death Penalty |
| October 25, 2012 | San Jose Mercury News on line Debate Death Penalty McGregor Scott |
| October 26, 2012 | Guest Fox Radio:  The Death Penalty |
| October 29, 2012 | Guest KALW Radio: The Death Penalty |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| November 1, 2012 | Guest KCBS Radio: The Death Penalty |
| November 8, 2012 | Capitol Weekly Panel Post-Mortem Conference 2012 Election |
| November 13, 2012 | Guest KQED radio: The Need for Criminal Justice Reform |
| November 21, 2012 | Guest KQED radio host Dick Gordon: The Need for Criminal Justice Reform |
| November 28, 2012 | Faculty: Miller Implementation Training Conference Atlanta, Georgia |
| December 9, 2012 | Recipient of the Chief Justice Earl Warren Civil Liberties Award ACLU of Northern California |
| January 31, 2013 | Speaker UC Berkeley Wine and Crime event. The State of Criminal Justice |
| February 6, 2013 | Panelist in Sonoma State University career day: A Career in Criminal Justice |
| February 8, 2013 | Awarded the June Morrison-Tom Gitchoff Founders Award Western Society of Criminologist |
| February 21, 2013 | Panelist Marquette University School of Law Topic: The Death Penalty |
| April 22, 2013 | Speaker Sonoma State University Topic: Ethical Dilemmas in Criminal Justice |
| May 16, 2013 | Speaker: Death Penalty Focus Awards Dinner Los Angeles, Ca. |
| July 2013 | Expert: Riverside Public Defenders Office Prop 36 case |
| August 15, 2013 | Speaker: League of Women Voters Berkeley, California Topic: Criminal Justice in California The Politics of Improving Public Safety |
| September 2013 | Advisory Board Northern California Innocence Project member |
| September 14, 2013 | Entered into five-year contract with US Department of Homeland Security to investigate civil rights complaints filed by immigration detainees |
| October 25, 2013 | Testified as an expert for Plaintiffs in *Coleman, et al., v. Brown, et al.*, U.S. District Court, Eastern District of California, Case No. CIV S 90-0520 LKK-JFM |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| October 29, 2013 | Retained as an expert for Plaintiffs in *Davis, et al. vs. Abercrombie*, et al, U.S. District Court for the District of Hawaii, Case No. 11-00144 LEK/BMK, a religious rights case involving Hawaiian inmates housed in Arizona |
| March 2016 | Retained as an expert for Plaintiffs in *McKibben, et al. vs. McMahon, et al.,* U.S. District Court, Central District of California, Case No. EDCV 14-02171 JGB-SP, a case involving conditions of confinement for LGBTI inmates |
| May 2016 | Speaker Santa Cruz County Employers Forum on re-entry and employment for former inmates |
| October 5, 2016 | Testified as a defense expert in *People v. Darrel Gurule,* Los Angeles Superior Court, Case No. BA369369-01 |
| November 9th, 2016 | Speaker Santa Clara Law School Topic: The Death Penalty. |
| November 2016 | Retained by Plaintiffs as an expert in *Frank O Connell vs. JD Smith, et al.,* U.S. District Court, Central District of California, Case No. 13-CV-01905 (MWF-PJW), a wrongful conviction case |
| May 2017 | Retained as an expert by Plaintiff in *Ramos, et al. vs. Swatzell, et al.,* U.S. District Court, Central District of California, Case No. 12-cv-01089 (BRO)(SP), a prison sex misconduct case |
| May 2017 | Retained confidentially as a defense expert by the Tulare County Public Defender's Office in a death penalty case |
| May 2017 | Appointed confidentially as a defense expert by the Los Angeles Public Defender's Office in a criminal case |
| June 2017 | Retained confidentially as a defense expert by the Tulare County Public Defender's Office in a death penalty case |
| June 2017 | Retained as an expert by the United States Department of Justice regarding the housing of LGBTI inmates. |

## CURRICULUM VITAE OF JEANNE S WOODFORD

| | |
|---|---|
| November 2017 | Retained as an expert in Sparks v. United States of America. In the United States District Court for The Western District of Texas Waco Division, W-11-CV-123, W-16-CV-435, (W-99-CR-070-3 |