COPY

1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                       WACO DIVISION

4   UNITED STATES OF AMERICA        *
                                    *
5                                   *
    VS.                             *  CRIMINAL ACTION NO. W-99-CR-70
6                                   *
    TONY SPARKS (3)                 *  March 22, 2001

7
        BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
8                       SENTENCING PROCEEDINGS

9   APPEARANCES:

10  For the Government:          Mark Frazier, Esq.
                                 Assistant United States Attorney
11                               PO Box 828
                                 Waco, Texas  76701
12
    For the Defendant:           Rodney S. Goble, Esq.
13                               PO Box 266
                                 Waco, TX  76703
14
    Court Reporter:              Kristie M. Davis, CSR, RPR, CRR
15                               United States District Court
                                 PO Box 20994
16                               Waco, Texas  76702-0994

17

18

19

20

21

22

23

24

25

Government
Exhibit
W-99-CR-070 (03)
083

2

1    (March 22, 2001, 10:15 a.m., defendant present.)

2        MS. WILLIS:  Sentencing proceedings in Criminal Action

3    No. W-99-CR-70 styled United States of America vs. Defendant

4    No. 3, Tony Sparks.

5        MR. FRAZIER:  Mark Frazier for the United States, Your

6    Honor.

7        MR. GOBLE:  Rod Goble on behalf of Mr. Sparks, Your

8    Honor.

9        THE COURT:  Good morning, counsel.

10       MR. GOBLE:  Good morning.

11       THE COURT:  Mr. Sparks, you appeared before the Court on

12   April the 17th of 2000 and entered a guilty plea.  You're here

13   this morning for sentencing.  Have you had an opportunity to

14   review the presentence report?

15       THE DEFENDANT:  Yes, sir.

16       THE COURT:  Have you read it and discussed it with

17   Mr. Goble?

18       THE DEFENDANT:  Yes, sir.

19       THE COURT:  Do you have any comments or corrections to

20   the report that you'd like to call to my attention that would

21   be in addition to those objections he's filed on your behalf?

22       THE DEFENDANT:  No, sir.

23       THE COURT:  Mr. Goble, what matters do we need to rule on

24   this morning?

25       MR. GOBLE:  Your Honor, I have five objections.   They

1    fall into three general categories.

2         My first objection dealt with Paragraph 93, and I

3    objected, and my argument is simply that there were points

4    added because a firearm was discharged during the carjacking.

5    We're taking the position on all these points that Mr. Sparks'

6    role in the carjacking was completed at the time the weapon

7    was discharged, and, therefore, we would argue that the

8    various matters should not apply to Mr. Sparks.

9         THE COURT:  At the time the weapon was discharged?

10        MR. GOBLE:  At the time the weapon was discharged,

11   Mr. Sparks was at home and was --

12        THE COURT:  You're saying -- you meant to say before the

13   time the weapon was discharged?

14        MR. GOBLE:  I'm sorry, Your Honor.

15        Mr. Sparks was at home prior to the weapon being

16   discharged.

17        THE COURT:  Well, I have a question for Mr. Russell.

18        In looking at Paragraph 93, it says, If a firearm was

19   discharged, increase by seven levels, and there is a plus 11

20   to the right?

21        MR. RUSSELL:  Yes, Your Honor.  The guidelines --

22   Mr. Goble had objected because we had originally charged or

23   had given him a 13 level increase using Paragraph 93 and 94,

24   but the guidelines say you can only give him a 11 level

25   increase using those same two paragraphs.  So what I did was I

1    combined Paragraph 93 and 94 for the 11 levels so that the six

2    on the other page is -- should not be there.  That should have

3    been removed.  But it's 11 levels for both those paragraphs,

4    Your Honor.

5         THE COURT:  So the plus six was not added in?

6         MR. RUSSELL:  No, sir.

7         THE COURT:  All right.  Go ahead, Mr. Goble.  I'm sorry.

8         MR. GOBLE:  The area that may be significant, Your Honor,

9    we are also objecting to cross-referencing on this matter to

10   the murder count.

11        Those are my objections.  They're Objection No. 2 and

12   Objection No. 4.  And, again, our argument is that at the time

13   the murder occurred, Mr. Sparks was no longer a part of the

14   offense.

15        THE COURT:  All right.  Will witnesses be called?

16        MR. FRAZIER:  Yes, Your Honor.  There -- the witness that

17   we intend to call is on the obstruction enhancement and also

18   denial of acceptance responsibility having to do with conduct

19   the defendant engaged in while in detention in Bell County

20   juvenile detention.

21        We're prepared to argue the other two points, because we

22   believe the evidence and the law under the guidelines is

23   sufficient for him to be held accountable.

24        THE COURT:  All right.

25        MR. FRAZIER:  Your Honor, basically -- would you want me

5

1    to proceed at this time or put on the evidence?

2        THE COURT:  Why don't we put on the witness first or

3    witnesses?

4        MR. FRAZIER:  Yes, sir.  We only have one witness.  It's

5    Dan Chadwick, Your Honor.

6        (The witness was sworn.)

7                        DIRECT EXAMINATION

8    BY MR. FRAZIER:

9        Q.    Would you please state your name for the record,

10   sir?

11       A.    It's Daniel W. Chadwick.

12       Q.    And how are you employed?

13       A.    I'm a special agent for the Federal Bureau of

14   Investigation.

15       Q.    And are you the case agent on this case involving

16   the defendant Mr. Tony Sparks?

17       A.    Yes, sir.  I am.

18       Q.    And did you assist the U.S. Army CID and other law

19   enforcement agencies in the actual investigation of the case

20   that gave rise to his indictment?

21       A.    Yes, sir.  I did.

22       Q.    Have you since the time he's been incarcerated

23   become familiar with his conduct while at the Bell County

24   juvenile detention facility since I believe it would have been

25   August of 1999?

1        A.    Yes, sir.

2        Q.    Okay.  And how have you become familiar with his

3   conduct there at Bell County juvenile detention?  What type of

4   information have you received that you've relied on?

5        A.    I've seen reports that have been prepared by the

6   staff at the correctional facility.

7        Q.    Likewise, have you seen a Killeen police report

8   regarding an attempted escape and an assault that occurred

9   last year at that facility?

10       A.    Yes, sir.

11       Q.    All right.  I want to ask you, first of all,

12   regarding Mr. Sparks' conduct while at the facility, are

13   you -- could you tell us about the number of incidences that

14   he has engaged in that were reported to you?

15       A.    This is approximately six, which it includes the

16   escape.

17       Q.    All right.

18       A.    Does not include -- which I'm not aware of an

19   official report being on the disturbance that was caused in

20   the detaining cell here which happened before he was -- during

21   one of the pretrial detention type hearings.

22       Q.    All right.  That would have been one of the first

23   hearings he had when he was taken into custody?

24       A.    Yes, sir.

25       Q.    If you could, inform the Court what happened that

7

1    occurred here in this building while he was either awaiting or

2    after he was arrested for this crime and awaiting his

3    detention hearing.

4         A.   We received a call from the US Marshal's office, who

5    was responsible for maintaining custody of him while he was

6    over here for a hearing.  And one of the jail cells had --

7    there was numerous -- I mean, scratched into the paint on the

8    bars and on the walls and on -- I mean, like on the bench or

9    written with an ink pen gang graffiti relating mainly to the

10   212 PIRU, and also had some nicknames, and I believe Little

11   Gotti was one of the nicknames that were -- that was scrolled

12   into the different portions of the cell.

13        Q.   All right.  And this occurred while -- Mr. Sparks

14   and another individual actually were the ones that engaged in

15   the scratching the graffiti while they were awaiting their

16   hearing?

17        A.   Yes, sir.

18        Q.   This particular type of gang graffiti, was it

19   specific to the gang that Mr. Sparks belonged to?

20        A.   Yes, sir.

21        Q.   And that would be the 212 PIRU?

22        A.   Yes, sir.

23        Q.   All right.  And who is Little Gotti?

24        A.   That's Mr. Sparks.

25        Q.   Okay.  Making reference to John Gotti, I assume?

8

1      A.    That's the best impression we got, I mean, from the

2   information we received.

3      Q.    All right.  Now, after that incident what type of

4   actual misconduct was he engaged in at the Bell County

5   juvenile detention facility?

6      A.    He was -- he's been engaged in three causing a

7   disturbance or disruption type offenses against the rules that

8   the correctional facility has.  Also involved in the

9   destruction of property, assault of a youth, and then the

10  escape attempt.  Three of the -- two of the disturbances that

11  were caused and one of the destruction of property were

12  associated with some type of gang type activity.

13     Q.    Meaning there was one gang, Mr. Sparks on one side

14  as a member of one gang versus some other member who was

15  housed in Bell County who was a member of another gang?

16     A.    Yes, sir.

17     Q.    All right.  Do these disturbances, did they involve

18  fighting?

19     A.    One of them, the assault of a youth was a fight.

20     Q.    All right.

21     A.    It involved a fight.

22     Q.    And was that against another gang member?

23     A.    Yes.  Yes, sir.  It was against another individual

24  that was here in this courtroom earlier.

25     Q.    Okay.  That would be Christopher Lewis?

1        A.    Yes, sir.

2        Q.    And the other incidences, these were all documented

3    again in the reports as to what happened; is that correct?

4        A.    Yes, sir.

5        Q.    All right.  And the other incidences, the

6    disturbance instances, in addition to fighting, what other

7    type of disturbances -- what did that constitute?  In other

8    words, what did he actually do other than fighting?

9        A.    He was -- he would make noises or disrupt like in a

10    classroom situation, and he would -- you know, the teacher or

11    the officer that was teaching the class would come and to, you

12    know, to quieten down or something.  He'd just start making

13    more noises.  His first disturbance was basically, from what I

14    understand, kind of like a shouting match between another --

15    I'm assuming an opposing gang member, somebody from a

16    different gang.  But it was just that type, I mean, disrespect

17    the authority of the correctional facility officers and just

18    would try to disrupt whatever they were trying to accomplish.

19        Q.    Okay.  And does that cover the incidences that you

20    know of other than the escape attempt?

21        A.    Yes, sir.

22        Q.    All right.  Tell us then about this attempted escape

23    that Mr. Sparks was involved in.  When did this take place?

24        A.    July 31st of 2000.

25        Q.    Okay.  Can you tell the Court what happened?

1       A.   Yes, sir.

2       According to information that we received, this was a

3   plan that was started between another individual that was

4   incarcerated at the youth correctional facility and

5   Mr. Sparks.  They were planning on trying to overpower one of

6   the guards and obtain a key or try to make their escape by

7   some means.  On the day of the incident both individuals were

8   asking correctional officers out there earlier on who would be

9   on the third shift that night, which is the late shift,

10  specifically trying to get -- you know, seeing who -- if it's

11  going to be somebody that they could overpower.

12      Q.   All right.  And let me stop you there for just a

13  second.  The two individuals who were doing the asking, who

14  were those persons?

15      A.   One was -- I believe his name was Curvin, and then

16  the other one was Tony Sparks.

17      Q.   All right.  And, in fact, staff members were

18  interviewed by the Killeen Police Department and they gave

19  statements to the effect that Mr. Sparks and Mr. Curvin had

20  been asking during the day who was going to be working the

21  third shift?

22      A.   Yes, sir.

23      Q.   All right.  Tell us what happened.

24      A.   Okay.  And during -- when the third shift -- it was

25  a female correctional officer was -- was in charge I guess of

1  that wing or was responsible for that wing -- and, again, I

2  believe I'm pronouncing the name right.  Curvin called her

3  over and was basically wanting to get a drink of water, and

4  she opened his cell.  He went and got a drink of water and

5  came back to the cell, which at that point he grabbed her and

6  put her in a choke hold to the point where she lost

7  consciousness.  When she came to, she started screaming for

8  the other guards, which they came to her rescue at which point

9  they found her, you know, obviously in distress locked inside

10 of Curvin's cell, and Curvin was pretending to be asleep on

11 the bed.

12     Q.  Okay.

13     A.  A subsequent search of his cell they found a key

14 that would open doors in that particular wing.

15     During the assault, we have information from other

16 inmates of that facility that advised that they heard

17 flushing, and they believe Tony Sparks was responsible for the

18 flushing of the commode.  It happened like two or three, four

19 times.  In their mind, it was to cover up her screams for

20 help.

21     Q.  All right.  And Mr. Sparks was not in the same cell

22 with Mr. Curvin, correct?

23     A.  No, sir.

24     Q.  Was he in an adjoining cell?

25     A.  I'm not for sure how close the cells were, but it

1    was on the same block with Mr. Curvin.

2        Q.    That was my question.

3        And during the interviews, were other inmates

4    subsequently interviewed regarding this breakout attempt once

5    it was foiled?

6        A.    Yes, sir.  There was one inmate advise that he had

7    heard Curvin and Sparks were discussing about how -- about

8    obtaining BB guns and a car and trying to get out -- make an

9    escape of the facility and possibly by choking out one of the

10   guards.

11       Q.    Okay.  And this was heard -- the discussion was

12   heard prior to?

13       A.    Prior to.  Yes, sir.

14       Q.    And was -- and, in fact, did that inmate give any

15   indication that there was some discussion amongst them as to

16   who would be working on this particular shift?

17       A.    Yes, sir.  I believe so.  They had a particular

18   correctional officer in mind that they wanted to be working

19   that they figured that they could overpower.

20       Q.    And was it this female guard who was working that

21   day?

22       A.    Yes, sir.

23       Q.    All right.  And when he -- when the inmate who gave

24   the statement -- by the way, you have the statement there; is

25   that correct?

1    A.    Yes, sir.

2    Q.    And who was the inmate that gave the statement,

3    please, sir?

4    A.    Last name I believe is Davis.    Devonne Davis.

5    Q.    All right.    And he was in the same cell block or the

6    same area; is that correct?

7    A.    Yes, sir.

8    Q.    Okay.    And did he indicate he could see and hear the

9    plan as it was being made?

10    A.    Yes, sir.    He heard -- indicated that he heard them

11    talking about the plan.

12    Q.    All right.    And after -- did he understand what was

13    to happen or did he overhear them discussing what was to

14    happen after the guard was overpowered?

15    A.    They were making plans to go to Mexico.

16    Q.    And were they going -- were there any statements

17    made that he overheard relative to if they were going to

18    assist others in escaping?

19    A.    Yes, sir.    I mean, I believe -- I don't think any

20    particular individual was named, but they were talking about

21    letting some other people out.

22    Q.    All right.    As a result of that incident, what

23    happened at the Bell County juvenile detention facility

24    regarding Mr. Sparks?

25    A.    I'm under the impression they put him in some type

14

1    of -- I mean, a more secure type of detention.

2       Q.   All right.  Based on this incident?

3       A.   Yes, sir.

4       Q.   All right.

5       MR. FRAZIER:  That's all we have, Your Honor.  We'll

6    pass the witness.

7       MR. GOBLE:  We don't have any questions, Your Honor.

8       THE COURT:  You may step down, sir.

9       MR. FRAZIER:  That's all the evidence we have to present,

10   Judge.

11       THE COURT:  All right.

12       MR. GOBLE:  May I have one moment, Your Honor?

13       THE COURT:  Certainly.

14       (Conference between Mr. Goble and the defendant)

15       MR. GOBLE:  Your Honor, Mr. Sparks and I have previously

16   discussed this matter and he has decided this morning he would

17   prefer not offering any evidence, and we have no testimony for

18   the Court.

19       THE COURT:  All right.  I'll hear your argument then on

20   your objections.

21       MR. GOBLE:  Thank you, Your Honor.

22       I think where we are, just to make sure I'm clear on the

23   record, I mentioned my objection in the first --

24       THE COURT:  Before you -- before you get into that -- I'm

25   sorry to interrupt you.  Your client pled guilty to Count One

1    of the second superseding indictment; is that accurate?

2        MR. GOBLE:  That's my memory, Your Honor, is a

3    carjacking.

4        THE COURT:  Is that right, Mr. Frazier?

5        MR. FRAZIER:  Yes, Your Honor.  That is my recollection,

6    as well.

7        THE COURT:  I can't find that in my file.  If you have a

8    copy of it, I'd like to look at it.

9        MR. FRAZIER:  Yes, sir.

10        THE COURT:  Never mind.  The clerk has one.

11        MR. FRAZIER:  Yes, sir.  Thank you.

12        THE COURT:  Go ahead, Mr. Goble.

13        MR. GOBLE:  Thank you, Your Honor.

14        I think I previously mentioned my two objections, which I

15    listed as Objection No. 1, and then I combined Objection No. 2

16    and Objection No. 4 together referencing the cross --

17    referring to the cross-referencing.

18        My Objection No. 5, which is a third objection for us to

19    take up today, my client essentially denied being involved in

20    an escape attempt, and we would just simply argue the evidence

21    isn't sufficient to give him obstruction of justice points for

22    that matter.

23        And then Objection No. 4 deals with our request for

24    acceptance of responsibility because of the matters just

25    discussed by the special agent.  The probation department felt

16

1   that my client should not get acceptance of responsibility,

2   and we would argue that he pled guilty and should at least

3   receive the benefit of acceptance of responsibility.

4   THE COURT:  I'll get that out of the way.  Based on the

5   undisputed evidence in the record, the Court would find that

6   Mr. Sparks has obstructed justice and does not exhibit

7   responsibility for his actions.

8   That leaves us with the cross-reference.

9   MR. GOBLE:  Yes, sir.

10  We would just simply argue that it should not be

11  cross-referenced.  He pled guilty to a carjacking case.

12  Mr. Frazier has --

13  THE COURT:  He pled guilty to aiding and abetting in a

14  carjacking case, taking the car from the person and presence

15  of Todd Bagley by force and violence and did shoot Todd Bagley

16  with a firearm.  That's what he pled guilty to.

17  MR. GOBLE:  Yes, sir, and I think during the plea bargain

18  and the factual basis --

19  THE COURT:  There is no plea bargain.

20  MR. GOBLE:  I'm sorry.  During the factual -- there was a

21  factual basis, and I think he agreed to being involved in the

22  carjacking, having a weapon during the carjacking, but denied

23  being present at the time of the murder.  And so we're --

24  THE COURT:  I think it's undisputed he was not present at

25  the time of the murder.

17

1          MR. GOBLE:  That is correct, Your Honor, and that's

2     just -- my argument is that since he was not present, that the

3     cross-referencing should not apply.

4          THE COURT:  All right.  Mr. Frazier?

5          MR. FRAZIER:  Your Honor, this goes back to the very

6     heart of the sentencing guidelines is why they are written the

7     way they are and why relevant conduct applies the way that it

8     does.  The defendant pled guilty as an aider and abetter.  The

9     fact that he wasn't present doesn't make any difference,

10    because under 1B1.3(a), all acts aided and abetted by a

11    defendant are to be considered, including adjustments as to

12    specific offense characteristics and cross-reference.

13         To the extent he did not aid and abet the act, even if we

14    were going that far, all reasonably foreseeable acts in this

15    case would be held accountable as to him.  It is undisputed

16    that not only was this defendant present in Long Branch Park

17    where Mr. Vialva made the decision to kill Todd and Stacie

18    Bagley.  He knew it was going to happen and went home.  It is

19    not only reasonably foreseeable as to him.  He knew it.

20         Under any standard, under any test -- and I have to cite

21    for the record a case US vs. Anderson, a Fifth Circuit case,

22    5, Fed. 3rd, 795, Pages 800 through 801.  Very similar set of

23    facts -- circumstances where the defendant in that case

24    maintained, "I did not rape the woman that I am charged with

25    aiding and abetting in the kidnapping of," and the Court held

18

1     that even though he did not commit the rape, he is legally

2     accountable as relevant conduct and the fact that he had pled

3     guilty as an aider and abetter.  Almost exactly the fact

4     scenario we have in this case, and a plain reading of the

5     guidelines would -- the only conclusion is that he is

6     responsible legally for their deaths under the guidelines.

7         That's all we have.

8         THE COURT:  The Court agrees that the cross-reference

9     used in this case is appropriate.  The offense level is 45.

10    The criminal history is 2.  The guideline sentence is simply

11    life.

12        Mr. Sparks, do you have anything you would like to say in

13    your own behalf or in mitigation of punishment?  If you care

14    to, this would be your opportunity to do that.

15        THE DEFENDANT:  Thank you, Your Honor.

16        This goes to my family, to Todd and Stacie Bagley and to

17    Your Honor.  I stand before you today.  I ask the Lord for

18    forgiveness and to give me strength to be here and read this

19    letter.

20        As I wrote this, the only thing that is left to say is

21    that the crime I have committed was unexcusable and my actions

22    were poor judgment.  And I stand here with shame and guilt

23    that I brought upon myself and my family because of my

24    wrongdoing.  I'm just glad I left the scene, because I didn't

25    want to have any association with the harm of the Bagley

1 | family. If I could, I would change the time and stop the

2 | crime I have committed and stop the horrific act of my fellow

3 | associates. Even though I wasn't present at the tragic deaths

4 | of the victims, I feel responsible for what has been done. I

5 | cannot try to justify my actions except for the fact that I

6 | foolhardily proceed in taking items that did not belong to me.

7 | I have asked to God for forgiveness and now I ask for

8 | mercy as I stand before Your Honor. Thank you.

9 | THE COURT: Are there any victims in this case that would

10 | like to exercise their right of allocution, Mr. Frazier?

11 | MR. FRAZIER: No, Your Honor, for the same reasons given

12 | in Mr. Brown's case earlier. They believe their letters

13 | attached to the PSR is sufficient.

14 | THE COURT: Anything further, Mr. Goble?

15 | MR. GOBLE: No, Your Honor.

16 | THE COURT: Do you know of any legal reason why sentence

17 | should not be imposed this morning?

18 | MR. GOBLE: No, Your Honor.

19 | **SENTENCE**

20 | THE COURT: Then it is the sentence of the Court in this

21 | case that Mr. Sparks be incarcerated for the rest of his life.

22 | In the event he is in some manner released from incarceration,

23 | he would be -- he would serve a term of five years of

24 | supervised release. A fine of $5,000 will be imposed, and,

25 | again, there is restitution of $22,769.18 that would be shared

1    with the other three defendants who we sentenced this morning.

2       This is a case where there was no plea agreement or

3    waiver of appeal.

4       Mr. Sparks, you have the right to appeal the sentence in

5    this case.  If you desire to do that, you should give notice

6    of appeal within ten days of the entry of judgment.  If you're

7    unable to pay the cost of an appeal or hire an attorney to

8    represent you in that endeavor, you should move to proceed in

9    forma pauperis and you should do that within the same ten-day

10   period.  The clerk has for you now a letter setting forth your

11   rights in that regard in detail.

12      Are there counts or preceding indictments to be

13   dismissed, Mr. Frazier?

14      MR. FRAZIER:  Yes, Your Honor.  The original and

15   superseding indictment as to this defendant we move to

16   dismiss.

17      THE COURT:  That motion will be granted.

18      There are also -- there is also a special assessment of

19   $100 under the Victims of Crime Act.

20      Anything further, Mr. Goble?

21      MR. GOBLE:  May I bring one other matter to the Court's

22   attention?

23      THE COURT:  Yes, sir.

24      MR. GOBLE:  My client has informed me and we discussed

25   the cross-referencing and those matters prior to the plea.

21

1        THE COURT:  Yes, sir.

2        MR. GOBLE:  And at this point in time I would ask the

3   Court if I could withdraw from representation, because I know

4   Mr. Sparks does want to give notice of appeal, and I would --

5   I would ask the Court to be allowed to withdraw at this time

6   and let him proceed with the appeal on his own.

7        THE COURT:  If he wants to file a frivolous appeal,

8   that's his right, but I'll allow you to withdraw, sir.

9        MR. GOBLE:  Thank you, Your Honor.

10       THE DEFENDANT:  Thank you, Your Honor.

11       THE COURT:  Court will stand in recess.

12       (Hearing adjourned at 10:40 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS      )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8      I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11      Certified to by me this 21st day of May 2001.

12

13                          KRISTIE M. DAVIS, CSR, RPR, CRR
                            Official Court Reporter
14                          P.O. Box 20994
                            Waco, Texas  76702-0994
15                          Telephone No.:  (254) 754-7444

16

17

18

19

20

21

22

23

24

25