**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **TONY SPARKS** | § | |
| | § | |
| **V.** | § | **W-11-CV-123** |
| | § | **W-16-CV-435** |
| **UNITED STATES OF AMERICA** | § | **(W-99-CR-070-3)** |

## MEMORANDUM OPINION REGARDING RESENTENCING

On April 17, 2000, Tony Sparks pleaded guilty to carjacking. On March 22, 2001, the district court sentenced Sparks to life in prison. On November 18, 2016, with the permission of the Fifth Circuit, Sparks filed an Unopposed Successive Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (#509) on the basis of the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012). On January 17, 2017, the parties filed a joint motion in which the parties agreed that Sparks was entitled to resentencing under *Miller*. This court granted Sparks's motion based on *Miller*.[1] The court held a resentencing hearing from February 5 through 7 and 21 through 22, 2018. With the agreement of the parties, the court conducted the hearing in Austin, Texas.

---

[1] On May 17, 2011, Sparks filed a Subsequent Motion to Vacate, Set Aside, or Correct Sentence by Person in Federal Custody Pursuant to 28 U.S.C. § 2255 (#437) on the basis of the Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48 (2010). The court denied the motion on July 30, 2013. On February 10, 2015, the case was remanded to this court on the unopposed motion of the Government, following the grant of a certificate of appealability. Rather than pursue that motion, Sparks filed the *Miller* motion. In light of the court's grant of the *Miller* motion and subsequent resentencing, Sparks's subsequent motion is dismissed.

## I.  Background

The Fifth Circuit summarized the factual background of this case in its opinion in *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), affirming the convictions of two others charged in connection with the same crime:

> On June 20, 1999, Christopher Andre Vialva, Christopher Lewis and Tony Sparks, members of a gang in Killeen, Texas, met to plan a robbery. The three gang members decided on the following plan: they would ask someone for a ride, get in the car and pull a gun on the victim, steal the victim's money and personal effects, obtain the pin number for the victim's ATM card, force the victim into the trunk of the car and drive somewhere to abandon the car with the victim locked in the trunk.

*Id.* at 471.

That night, using a .22 caliber handgun that belonged to Sparks, Vialva, Lewis, and Sparks attempted to locate a victim for their plan, but were unsuccessful. Around 2:00 a.m. on June 21, a Killeen police officer made contact with Vialva, Lewis, and Sparks. They discarded the gun into nearby bushes. The officer took Lewis and Sparks back to the Killeen police station, because they were juveniles and were in violation of the Killeen juvenile-curfew law. Sparks's mother, Daniele Brown, picked them up from the police station. Vialva went back later in the evening to retrieve the gun.

> The following day, Vialva, Lewis and Sparks enlisted two fellow gang members, Brandon Bernard and Terry Brown, to assist in the carjacking plan. Initially, the group only had one gun, a "tiny .22 pistol" that they considered "too small to frighten anyone." The group decided that a second gun was necessary. Bernard owned a Glock .40 caliber handgun that he had lent to Gregory Lynch. Vialva, Bernard, Lewis, Sparks and Brown drove to Lynch's house and obtained Bernard's gun. The group then set out in search of a victim.

> Sometime after 2:00 p.m. on the afternoon of June 21, Bernard drove Vialva, Brown, Lewis, and Sparks to a local supermarket to find a victim. Having had no luck there, the group continued their search by driving around parking lots at other local stores.

The search ended at a convenience store in Killeen, where they found Todd Bagley using a pay phone.

Todd Bagley and his wife, Stacie, were youth ministers from Iowa. Before moving to Iowa, Todd had been stationed at Fort Hood, where the couple attended Grace Christian Church and worked with the youth group. About a week before their deaths, the Bagleys returned to Killeen to visit friends and to attend a revival meeting at the church. On Sunday, June 21, they attended a morning worship service and had lunch with friends. Afterward, Todd stopped at "Mickey's" convenience store to use the payphone, while Stacie waited for him in their car.

Lewis and Sparks approached Todd and asked him for a ride to their uncle's house. Todd agreed. Vialva, who was standing nearby, got in the backseat of the Bagleys' car with Lewis and Sparks. Todd and Stacie occupied the front seat. Vialva gave Todd directions, and then pulled out the .40 caliber gun, pointed it at Todd and told him that "the plans have changed." At the same time, Sparks pointed the .22 handgun at Stacie. On Vialva's orders, Todd stopped the car, and the Bagleys got out. The gang stole Todd's wallet, Stacie's purse and the Bagleys' jewelry. Vialva demanded the pin numbers for the Bagleys' ATM cards, and then forced the Bagleys into the trunk of their car.

After locking the Bagleys in the trunk, Vialva drove around for several hours. He went to ATM machines to withdraw money from the Bagleys' account, but was largely unsuccessful because the Bagleys had less than one hundred dollars on deposit. Vialva drove to a "Wendy's" where Lewis and Sparks used the Bagleys' money to purchase some food. Vialva then attempted to pawn Stacie's wedding ring, and stopped at a tobacco store to purchase cigars and cigarettes.

While they were locked in the trunk, the Bagleys spoke with Lewis and Sparks through the rear panel of the car. Lewis testified that the Bagleys asked them questions about God, Jesus, and church. The Bagleys told Lewis and Sparks that they were not wealthy people, but that they were blessed by their faith in Jesus. The Bagleys informed Lewis and Sparks about the revival meeting at Grace Christian, a church which Lewis said he had attended. Urging them to have faith, the Bagleys advised Lewis and Sparks that God's blessings were available to anyone. After this conversation, Sparks told Vialva he no longer wanted to go through with the crime. Vialva, however, insisted on killing the Bagleys and burning their car to eliminate the witnesses and the gangs' fingerprints.

Vialva drove to his house. While he was inside, the Bagleys had another conversation about God with Lewis and Sparks. By this time, the victims had been locked in the trunk for several hours. The Bagleys pleaded with Lewis and Sparks for their lives.

Vialva returned to the car with a ski mask and some additional clothing. Vialva, Lewis, and Sparks then met Bernard and Brown, and Vialva repeated that he had to kill the Bagleys because they had seen his face.

*Id.* at 471-72.

At this point, Sparks told the others that he needed to be taken to his house, because his 8:00 p.m. curfew was approaching. He indicated that, because he had been in violation of the curfew the previous night, his mother would be particularly upset if he violated it again. The group dropped off Sparks at his house. Sparks took the Bagleys' jewelry with him, and Vialva told Sparks they could pawn the jewelry together the next day. Vialva also requested that Sparks leave his .22 handgun with Vialva. After initially refusing, Sparks agreed.

Bernard and Brown set off to purchase fuel to burn the Bagleys' car. Vialva, Bernard, Lewis and Brown drove to an isolated spot in the Belton Lake Recreation Area on the Fort Hood military reservation. Vialva parked the Bagleys' car on top of a little hill. Brown and Bernard poured lighter fluid on the interior of the car while the Bagleys sang and prayed in the trunk.

According to Brown, Stacie's last words were "Jesus loves you" and "Jesus, take care of us." Vialva crudely cussed at her in reply. Vialva put on his mask, and told Lewis to open the trunk. Vialva then shot Todd in the head with the .40 caliber gun, killing him instantly. Vialva shot Stacie in the right side of her face, knocking her unconscious, but not killing her. Bernard set the car on fire. An autopsy later revealed that Stacie died from smoke inhalation.

Vialva, Bernard, Lewis and Brown ran down the hill to Bernard's car. Their getaway was foiled when the car slid off the road into a muddy ditch. Local law enforcement officers, informed of a fire, arrived at the scene while the assailants were trying to push the car out of the ditch. When firemen discovered the bodies in the trunk of the Bagleys' burning car, the four were arrested.

*Id.* at 472-73. Approximately two weeks later, while police were executing an unrelated search warrant at Sparks's house, they found the Bagleys' jewelry and Sparks was taken into custody.

Sparks has been in custody since August 2, 1999. On April 17, 2000, Sparks pleaded guilty to carjacking. On July 31, 2000, while imprisoned at the Bell County Juvenile Detention Center awaiting sentencing, Sparks participated in an escape attempt with another inmate, Christopher Kirvin. Kirvin lured a correctional officer into Kirvin's cell and choked her, taking her keys. She regained consciousness and began screaming. At that point Sparks, in an adjacent cell, began flushing his toilet repeatedly to mask her screams.

At the time Sparks was sentenced, the federal sentencing guidelines had not yet been ruled advisory by the Supreme Court. *See United States v. Booker*, 543 U.S. 220, 259 (2005). Sparks's offense level and criminal history, including the adjustments for his role in the escape attempt, led to a range including just one sentence: life in prison without the possibility of parole. At the time of the offense, Sparks was 16 years old. The Guidelines at that time stated that "[a]ge (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S. Sentencing Guidelines Manual § 5H1.1 (2000). On March 22, 2001, in accordance with the Guidelines, the district court sentenced Sparks to life in prison.

Vialva and Bernard were tried, found guilty of first-degree murder, carjacking, and conspiracy to commit murder, and sentenced to death. Lewis and Brown testified at the trial of Vialva and Bernard. As a result of their cooperation, Lewis and Brown signed plea agreements whereby they pleaded guilty to two counts of second-degree murder, aiding and abetting; one count of carjacking; and possession of a firearm during the commission of a crime of violence. The district court sentenced both Lewis and Brown to 248 months.

## II. Analysis

### A. Juvenile-Sentencing Jurisprudence

In recent years, the Supreme Court has addressed juvenile-sentencing issues in several cases, beginning with *Roper v. Simmons*, 543 U.S. 551 (2005). In *Roper*, the Court found that juveniles were not eligible for the death penalty because of their diminished culpability and their capacity for change. In *Graham v. Florida*, 560 U.S. 48 (2010), the Court held that juveniles could not be sentenced to life without parole in crimes that did not involve homicide. In *Miller v. Alabama*, 567 U.S. 460 (2012), the Court held that juveniles could not be sentenced to mandatory life without parole. In *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the Court held that the *Miller* decision was retroactive to cases on collateral review.

In each of these decisions, the Court addressed the rationale for punishing juveniles differently than adults. In *Miller*, the Court summarized the state of its Eighth Amendment jurisprudence as it relates to juveniles. As the Court explained:

> *Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, "they are less deserving of the most severe punishments." *Graham*, 560 U.S. at 68. Those cases relied on three significant gaps between juveniles and adults. First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S. at 569. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "control over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Id.* at 570. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievable depravity." *Id.*

*Miller*, 567 U.S. at 471.

Identifying a juvenile as "among the worst offenders" is a suspect classification because "[t]he susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult." *Roper*, 543 U.S. at 570 (citations omitted). In addition, youth can be a mitigating factor because "the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.* (citations omitted).

Furthermore, a sentence of life without parole is "the second most severe penalty permitted by law." *Graham*, 560 U.S. at 69. Such a sentence for juvenile "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." *Id.* (citations omitted). "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." *Id.* at 72. "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* (citing *Roper*, 543 U.S. at 573). The "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472.

Although the Court declined to declare all life-without-parole sentences for juveniles unconstitutional, it cautioned that such sentences would be appropriate only in rare circumstances:

> [G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be

uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' *Roper*, 543 U.S. at 573; *Graham*, 560 U.S. at 68. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id.* at 479-480.

In light of these issues, the Supreme Court outlined five factors for a court to consider when conducting the individualized determination that must be performed before a juvenile offender may be sentenced to life without parole. *Miller*, 567 U.S. at 477-478. Those factors are: (1) the juvenile's "chronological age and its hallmark features–among them, immaturity, impetuosity, and failure to appreciate risks and consequences;" (2) "the family and home environment that surrounds [the juvenile]-and from which [the juvenile] cannot usually extricate himself–no matter how brutal or dysfunctional;" (3) "the circumstances of the homicide offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected him;" (4) whether the juvenile "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth-for example, [the juvenile's] inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys;" and (5) "the possibility of rehabilitation," including the extent or absence of the juvenile's criminal history. *Id.*

The Supreme Court's juvenile-sentencing jurisprudence from *Roper* forward instruct sentencing courts to painstakingly examine all facts and circumstances of a juvenile's crime and impose a penalty of life without parole only in the rarest of cases. This court cannot read the

Supreme Court's writing in any way other than to presume that juvenile law breakers, no matter how heinous their crime, are to receive a lesser sentence than life without parole, except where the record as a whole, including the nature of the crime, indicates the juvenile offender is irreparably corrupt. This is a high bar. The court's examination of the *Miller* factors will explore which factors lead away from and which lead toward leaving Sparks's existing sentence in place.

### III.    Application of the *Miller* Factors

The probation department completed an amended presentence-investigation report for this court in preparation for Sparks's resentencing. The report calculates Sparks's total offense level as 45, leading to a recommended sentence under the United States Sentencing Guidelines of life in prison.[2] The resentencing hearing included the presentation of evidence relevant to the *Miller* factors.

#### A.    Immaturity, Impetuosity, and Failure to Appreciate Risks and Consequences

Because Sparks was 16 years of age at the time of the offense, his culpability is tempered due to the immaturity of youth. *See Roper*, 543 U.S. at 570 ("The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult."). In addition, because of his age, Sparks lacked the ability to fully appreciate the risks and consequences of his actions. *See Miller*, 567 U.S. at 471 (citing *Roper* 543 U.S. at 569) (discussing juvenile's "underdeveloped sense of responsibility" leading to recklessness).

Sparks's own behavior at the time of the offense also supports these general conclusions. Testimony at the resentencing hearing and the presentence-investigation report indicate he was a member of the "212 PIRU" gang, an affiliate of the much larger Bloods gang. Largely in connection

---

[2] The guidelines project sentences to a total offense level of 43, however "an offense level of more than 43 is to be treated as an offense level of 43." U.S. Sentencing Guidelines Manual ch. 5, pt. A, n.2 (2000).

with assorted gang activities, Sparks had developed a lengthy juvenile criminal record. This led to him being placed on juvenile probation, which was the reason for his 8:00 p.m. curfew–the rationale he gave for being dropped off at home prior to the murder of the Bagleys. Sparks had thus exhibited a lack of appreciation for the risks and consequences of his behavior including sneaking out of his house while under probation, and continuing to proceed with the planned carjacking despite being picked up by police during the first attempt. Furthermore, his desire to avoid another curfew violation was in stark contrast to his criminal behavior of the previous several hours. This indicates an immature understanding of the risks and severe consequences associated with his actions.

In contrast, however, Sparks was not a tangential participant in the gang. As testified to by Sandra Hunt, Sparks was known as an enforcer by the Killeen gang unit. Sparks's nickname was "Little Gotti" and he played at least some leadership role in the gang. Arguably, Sparks's lengthy juvenile record indicates that was familiar with the risks and consequences of his actions, since he had faced such consequences. Sparks's actual behavior, however, indicates the hallmarks of his age. Despite a path that was clearly heading toward much more severe consequences, Sparks continued to plan, participate in, and even lead, in part, the carjacking and abuse of the Bagleys.

Two expert witnesses, Dr. John Fabian and Dr. Marisa Mauro, concur that brain development in juveniles is not fully complete. As Fabian explained, juveniles, as a class, are scientifically less culpable than adults, due to the way in which juvenile brains work differently than adult brains. This factor weighs against irreparable corruption.

## B. Family-and-Home Environment

Another factor the court must consider is the family-and-home environment of Sparks and the extent to which it may have affected his development. The resentencing testimony painted a

complicated picture of Sparks's upbringing. Sparks was born in Germany to a German mother, Daniele Brown (then Daniele Gerber), and an American father (Tony Sparks, Sr.). Sparks's father was in the United States military and stationed in Germany at the time of Sparks's birth. Sparks's parents were unmarried, and Sparks's father separated from Sparks's mother when Sparks was three or four years old.[3]

While Daniele was at work, her sister took care of Sparks. Daniele testified that she was not a good mother because she was too young. She testified she went out to clubs in the evenings, occasionally not bothering to go back to her sister's house for Sparks. Other times she would go out in the evenings with friends after she was sure Sparks was asleep.

Carmen Lapiccirella testified that Sparks was friends with her daughter Yvonne and would regularly come over to work on homework and stay for meals. She indicated Sparks was obedient, agreeable, and never aggressive.

Sparks was sexually molested by an American soldier on several occasions during the ages of seven and eight. The soldier was tried by court martial and found guilty of indecent acts upon a child, indecent assault upon a child, enticing a child to commit lewd acts, and lewd gestures towards a minor. The soldier was confined in correctional custody for six years and given a punitive discharge.

Sparks began acting out. He spray painted his name on the wall of a house, killed chickens, shoplifted candy, displayed "a brutal attitude toward his classmates" including kicking them in the heads while they were lying down, and exhibited "unacceptable sexual behavior" grabbing girls by the leg and groping them. Daniele testified she did not abuse Sparks, but admitted to frequently

---

[3] At that time, Sparks was known as "Tony Gerber," using his mother's name.

spanking him and, on at least one occasion, hitting him with a belt and leaving marks on his back. A neighbor saw the marks and eventually German Child Protective Services ("CPS") was notified.

After a few discussions between Daniele and Thomas Klose, a German CPS worker, Sparks was placed in a children's home, with Daniele's consent. At the time, Sparks was nine years old. Several individuals testified that Sparks thrived in the children's home. One of his teachers, Christiane Nicola-Heger, testified that he was a well-behaved child, a good student, and was willing to help others. Christiane Carton, another teacher, testified that she supervised the "house" in which Sparks and other children resided and lived with the children. She testified Sparks was a normal child, who was funny and liked to help in the kitchen. After two years in the children's home, Daniele withdrew Sparks in the summer of 1994.

Daniele told school officials that she was removing Sparks because she had married Antonio Brown, an American soldier, and they would be moving to Texas. Daniele and Antonio did move to Texas, but left Sparks behind. Sparks moved in with his father, who was still in Germany. Approximately six months later, Sparks joined Daniele and Antonio in Killeen, Texas. From the beginning, Antonio was violent toward Daniele, injuring her frequently. He would bring other women to the house as well. Sparks's aunt visited and saw Antonio throw things at Sparks, if he did not obey. Antonio and his younger brother were both in the Bloods, and Antonio would take Sparks to places where gang members would hang out. Daniele testified that she believes Antonio and his brother–who lived with them for a period of time–convinced Sparks to join the gang.

Sparks started acting out again at home, sneaking out at night to visit friends and disobeying his mother. Daniele asked Sparks's father, who had then returned to the United States, if he could look after Sparks. Sparks moved to Kentucky and lived with his father, step-mother, and half-brother

for a year from 1996-97. At the time Sparks would wear red–a Bloods gang color–and told his half-brother that his step-father was in a gang and he had to join. Sparks moved back to Daniele and Antonio in Killeen, Texas, at their request.

Fabian, a forensic psychologist, testified for Sparks. He interviewed Sparks and reviewed Sparks's childhood records, including the records of sexual abuse suffered by Sparks. He testified that the trauma and abuse Sparks experienced as a child would have affected his brain development. He also testified that juveniles generally have poor decision-making ability, because the front of the brain does not fully develop until around age 23, but that psychosocial risk factors like abuse and poverty can alter or delay that development even further.

Sparks's home environment was not the sort of "brutal" one present in *Miller*, where a 14-year old had been in and out of foster homes because his mother was an alcoholic and drug addict, his stepfather abused him, and he had attempted suicide four times, including the first time at six years of age. *Miller*, 567 U.S. at 467. However, the court notes the chronology of Sparks's behavior and how it coincided with the sexual abuse he suffered. Sparks's stepfather influenced Sparks's joining the Bloods gang. The record is clear that by the time of Sparks's crime, he was deeply committed to the 212 PIRU gang. But even this comes up short of irreparable corruption.

### C.    Circumstances of the Homicide Offense

#### 1.    Extent of Participation

There is a significant amount of agreement between Sparks and the Government about his participation in the crime. Sparks, Lewis, and Vialva worked together to concoct their plan to carjack someone in order to obtain money. Lewis and Sparks both approached potential victims in parking lots asking for a ride, and Sparks was eventually the person who approached Todd Bagley. Sparks

possessed a .22 handgun. When Sparks, Lewis, and Vialva got into the Bagley's car, Sparks pointed his gun at Stacie Bagley's head in the front seat. Sparks and Vialva together got the Bagleys out of the car, pointing weapons at them, took the Bagleys' wallets and jewelry, and forced the Bagleys into the trunk of the car. The group then drove to various locations for approximately five hours, with the Bagleys in the trunk the entire time. At one point, Vialva indicated that there might be a shootout with the police. At a different point, Sparks indicated that he no longer wanted to be a part of the crime. Yet, Sparks remained in the vehicle with the others while they continued to drive around and when the group met with other gang members, Sparks bragged about being a "master thug." Sparks eventually told the others he needed to be dropped off at his house before his 8:00 p.m. curfew. Sparks took the Bagleys' jewelry with him and agreed with Vialva to pawn it the next day. Vialva also requested that Sparks leave his .22 handgun with Vialva. After initially refusing, Sparks agreed.

Sparks and the Government disagree, however, about whether Sparks knew that Vialva was going to kill the Bagleys prior to Sparks leaving the group. Even assuming Sparks was not present at the moment that Vialva said that the Bagleys would have to be killed, Sparks, at a minimum, had a strong suspicion that the murder would transpire, based on the chain of events before he left the group.

Even before he separated from the group, Sparks had participated in a violent and disturbing crime. It was June, in Texas, and he drove the car with the Bagleys in the trunk of a car for five hours. In addition, based on Vialva's request for the gun and the previous discussion about the possibility of a shootout, Sparks was not oblivious to the possibility that the Bagleys would be killed and he did nothing to prevent that from occurring. On the other hand, Sparks was not present at the time of the murders. Nonetheless, his participation in the crime favors a significant sentence.

14

## 2. Peer Pressure

Sparks was a gang member. The 212 PIRU gang and the Bloods exert extreme pressure on their members to avoid incriminating one another. As Hunt, a former Killeen police officer in the gang unit, testified, Sparks was known as an enforcer in the gang–his nickname was "Little Gotti"–and had put in a lot of "work," which is what the gang calls violent acts in support of the gang, both in and outside of prisons. In short, Sparks has become a prominent gang member. Sparks's stepfather introduced Sparks to gang life and pressure from the gang and its structures likely played a role in Sparks's participation in this crime. Charles Meyer, a retired federal agent, testified that, while the Bagleys were in the trunk, Sparks, Vialva, Brown, Bernard, Lewis, and Joey Presley met at Long Branch Park, which was the main meeting point for the 212 PIRU gang. Meyer also testified that Presley was one of the founders of the 212 PIRU gang. The presence of one of the founders during the commission of the crime is significant and likely increased any pressure Sparks felt to impress the gang. Fabian testified that Sparks's membership in the gang was likely an attempt to find a supportive family environment where one had been missing. He also testified this made Sparks more susceptible to outward influences. Fabian further observed that Sparks was likely influenced by pressure from Vialva, focusing on the moment when Vialva asked Sparks for Sparks's gun and Sparks initially refused, only to change his mind and give the gun to Vialva.

Peer pressure played a significant part in Sparks's decision to become involved with a gang generally and to participate in the crime. Peer pressure also played a role in his failure to take any action to prevent the murder. On the other hand, Sparks chose his peers and was comfortable in the gang environment.

15

## D.    Inability to Deal with Police or Prosecutors

The record is unclear as to the extent to which Sparks's youth affected his ability to deal with police or prosecutors. Once arrested for the crime for which he was sentenced, Sparks refused to cooperate with the prosecution, but his reasons for refusing are unknown. He also pleaded guilty, without a plea agreement. Again, the record is silent on whether Sparks's youth played a role in his decision. There is an indication that Sparks may have been under the impression, at the time he entered his guilty plea, that his sentence would be in the 10-to-15-years-of-incarceration range.[4] Any discussion of a proposed sentence before Sparks entered his plea of guilty was altered by Sparks's involvement in the escape attempt prior to sentencing. Although the court finds it plausible that a potential 10-to-15 year sentence was discussed, the record contains no evidence that Sparks refused to cooperate because of the assurance of such a sentence. The record, rather, supports a conclusion that he refused to cooperate based on his strong ties to his gang.

There is some evidence that perhaps Sparks, while in Killeen, was not able to adequately understand the English language, because he was more comfortable speaking German. The psychological evaluation of Sparks at that time indicates low proficiency in verbal communication. However, the evaluator notes that it appears Sparks may not have put forth significant effort. Mauro testified that she conducted tests on Sparks that indicated that Sparks's verbal comprehension in his earlier examination is likely due to low effort, though it is possible that Sparks lacked verbal comprehension because of he was less comfortable speaking English than German. Further, the court

---

[4] The Government filed a Motion to Compel Disclosure of Information (#635) seeking to compel the affidavits of Sparks's former attorneys on this issue, but the court does not require additional information in order to analyze this factor. Thus, the Government's motion is denied. The court further notes that neither party called or attempted to call Sparks's former attorneys as witnesses in this proceeding.

notes that Sparks was bilingual even when he lived in Germany and had been living in Texas for nearly five years at the time of the offense. The record does not support that Sparks's comprehension of English at that time was so low as to render him unable to understand his lawyer or the sentencing judge. It is possible, however, that his English proficiency, combined with his youthfulness, impeded his decision-making before his guilty plea and sentencing. Sparks's youthfulness clearly played a role in his dealings with his lawyer and the prosecution, including his decision not to cooperate.

### E.    Possibility of Rehabilitation

The possibility of Sparks's rehabilitation in this case is complex and calls for a detailed analysis. On the one hand, the Supreme Court has said that sentencing a juvenile to life in prison without parole is too harsh because such a sentence fails to account for the malleability of a youth's character and the possibility that even the most heinous crimes may not indicate that a youth is irredeemable. *Graham*, 560 U.S. at 72. Thus, at least initially, this factor weighs in favor of a sentence other than life.

In *Miller*, for example, the Supreme Court reviewed the convictions of two 14-year old offenders who had been convicted of murder for separate crimes. *Miller*, 567 U.S. at 465. The first, Kuntrell Jackson and his friends decided to rob a video store. *Id.* Jackson learned that one of the group had a gun and Jackson decided to stay outside the store while the others went in. *Id.* Jackson then went into the store. *Id.* When the clerk threatened to call police, a youth other than Jackson shot and killed the clerk. *Id.* at 466. In the second crime, Evan Miller, was at home when a neighbor came to buy drugs from his mother. *Id.* at 467. Miller and a friend drank alcohol and smoked marijuana with the neighbor. *Id.* at 468. The neighbor passed out and Miller stole his wallet. *Id.* When the neighbor woke up, Miller repeatedly beat the neighbor with a baseball bat, saying "I am God, I've

come to take your life," before delivering the fatal blow. *Id.* Yet the Supreme Court found each juvenile entitled to individualized sentencing, accounting for the possibility of rehabilitation due to his youth. *Id.* at 478-79.

If this court considers the possibility of rehabilitation for Sparks at the time of Sparks's original sentencing, this factor weighs in favor of a sentence other than life, because Sparks's crime alone does not indicate irreparable corruption. The fact that Sparks backed out of the crime before the murders indicates, at a minimum, a window of possible rehabilitation. Sparks, at the time of his conviction, was at least as amenable to rehabilitation as any youth–and certainly as amenable as the youths in *Miller*.

After being sentenced, however, Sparks's prison record for his first seven or eight years in federal custody starkly indicates irreparable corruption. During that time, when Sparks was then 17-to-25-years old, he was heavily involved in the Bloods and committed numerous disciplinary violations. Sparks was disciplined for multiple violations associated with either producing or consuming alcohol. Of greater consequence, in 2004, Sparks participated in a riot involving approximately 600 inmates and was carrying a baseball bat during the fighting. In January 2007, Sparks was punished for assaulting another inmate, causing seven puncture wounds and requiring the inmate to be transferred to a local hospital. In March 2007, Sparks was disciplined for throwing fecal matter at an officers face and stating "I can't wait to see you on the compound, I'm going to kill you!" In November 2007, Sparks was disciplined for another assault with serious injury. In January 2009, Sparks was disciplined for an attempt to kill by stabbing. The victim had numerous stab wounds including one which penetrated his skull, damaging his right eye and his brain. The

victim lost his eye due to the severity of the injury. Further, on three additional occasions, Sparks was disciplined for possession of a dangerous weapon.

And yet, further complicating the issue, since being punished for possessing intoxicants in March 2010, the last eight years of Sparks's prison record are free of violent conduct.[5] In part, this is due to his transfer to ADX Florence, the highest security unit in the Bureau of Prisons, as a result of his violent conduct culminating in the attempt to kill. ADX Florence houses only 490 inmates out of approximately 185,000 in the prison system, according to the testimony of Randall Calhoun. In addition, Sparks was placed in the Control Unit at ADX Florence, which houses the 78 most dangerous offenders. Sparks was at ADX Florence for five years, and during that time he obtained his GED, took over 100 classes, some of which were required in order to transfer out of ADX Florence, and participated in a re-entry group session with Dr. Francis Davis in 2014. Davis testified that Sparks was particularly engaged in the group.

Dr. John Huber is a forensic psychologist who testified for Sparks. His conclusion is that Sparks is a moderate risk for offending again. He also testified that Sparks has problems with anger control and exhibited aggressive behavior. He testified that Sparks had found religion in prison and that his time in ADX Florence, along with his desire not to hurt his chances at his resentencing, may have accounted for the reduction in his violent behavior. He testified that Sparks was approaching the possibility of resentencing in a rational way. He stated that Sparks's improved behavior in preparation for resentencing indicated he may have hope, an emotion he would not previously have experienced in prison, due to his life sentence. However, Huber's report regarding Sparks's

---

[5] There was an incident in 2014 where Sparks was allegedly responsible for instructing two other inmates to assault a third inmate, and Sparks was transferred as a result of the incident. It was not made a part of his disciplinary record, however.

dangerousness and his psychological assessment was largely discredited on cross-examination. It was revealed that Huber was not provided the entirety of Sparks's criminal history or prison disciplinary records. He testified that his conclusions might be different if he had all of Sparks's records. The court gives little weight to Huber's testimony.

Fabian, on the other hand, analyzed the decline in Sparks's violent conduct in prison and testified that it is likely due to the higher-security facility making such behavior more difficult and Sparks's growing maturity. He also testified that aging affects brain development and offered that the complete picture of Sparks indicates a marked change in the development of his brain from his youth to present day. In his professional opinion, Sparks finally experienced less chaos in his life for the first time when he was placed at ADX Florence in isolation. It might have been the first time that Sparks would have felt safe in prison. Fabian testified that he believed Sparks suffers from post-traumatic stress disorder (PTSD) due to both the trauma suffered in his youth and the traumas, some even arising from violent acts of Sparks himself, that Sparks has suffered in prison. He admitted that it is difficult to ascertain whether Sparks had PTSD at the time of the carjacking and murders. He testified, however, that Sparks had symptoms and trauma in his background that could have lead to PTSD at that time. Fabian concluded that Sparks has the capacity for change, based on the evidence of Sparks's disciplinary improvement in the last decade.

Calhoun, a Special Investigative Services officer for the Bureau of Prisons, testified that Sparks is a validated member of the Bloods based on Sparks's self-admission, tattoos, and association with other known members. He testified that the Bloods in prison require a member to do their "work"–violent acts and other actions advancing the illicit missions of the gang–in order to build the respect of other members. Sparks's actions in prison indicate that he has significant respect

and support from other Bloods. Calhoun testified that Sparks's actions may indicate he is approaching "shot caller" level, where he no longer needs to do the bad acts himself, but can direct others to do them. Calhoun further testified that Sparks's tattoos, covering his entire back, all relate to membership in the Bloods and indicate that Sparks is in the gang for life. Finally, Calhoun testified that Sparks had not been prosecuted for his violent acts in prison because the Bureau generally finds that the resources are not well spent to prosecute when a prisoner is already serving a life sentence.

Mauro, a forensic psychologist, testified for the Government regarding Sparks's mental health and future dangerousness. Her conclusion is that Sparks falls within the 91 to 94th percentile for psychopathy. In other words, Sparks has more psychopathic traits than 91 to 94 percent of the population. On that basis, she found that Sparks is at a high risk for future violence. She noted, however, that he is a low risk for immediate violence, because violence would jeopardize his chance at a lower sentence. She indicated that she did not believe Sparks felt remorseful. Instead he spoke about the carjacking and murder in a cold and distant manner. She admitted, however, that during her interview with Sparks he stated that he was extremely sorry and wished he had never left the car because he believes he could have prevented the Bagleys from being killed. Mauro testified that she had access to all of Sparks's records. She also testified that she was unable to compare her analysis to Huber's because Huber did not have access to all of Sparks's records.

Finally, as the Supreme Court explained, a life sentence, particularly for a juvenile is a sentence which invites a lack of hope. *Graham*, 560 U.S. at 69. Considering Sparks's gang connections prior to entering prison, his youthfulness, and his lack of hope due to the life sentence, it is perhaps unsurprising, though certainly still reprehensible, that Sparks continued on a violent

path with the Bloods. His record might be cited as an example of the potential negative consequences of sentencing a juvenile to life without parole. The evidence is inconclusive as to Sparks's current propensity for violence and reflects that, at the time of his initial incarceration, he maintained the violent, lawless, gang-influenced life-style pattern on which he had embarked at the time of the crime for which he was sentenced.

## IV.    Section 3553 Factors

This court has very little guidance in applying the Supreme Court's juvenile-sentencing jurisprudence at resentencing, particularly after the passage of 17 years. Much has occurred in Sparks's life since his original sentence was imposed. For the first several years of his incarceration Sparks did nothing to indicate that he could ever be integrated back into lawful society. The Government argues that this is reason enough to keep Sparks's life sentence in place. Sparks argues that his ill behavior as a prisoner is exactly what worries the Supreme Court about destroying all hope of release in a juvenile offender. Sparks argues that his more recent history of not engaging in violent acts should be the primary consideration of the court. But to do that would relegate this court to examining this case through the eyes of a parole board and considering whether Sparks's sentence should be reduced by virtue of his activities arguably showing rehabilitation. But there is no parole in the federal system.

The court concludes that it must place itself in the position of the original sentencing court at the time of original sentencing. The November 1, 2000 Guidelines Manual was used by the sentencing court in computing a Guidelines sentence for Sparks. The result was a total offense level of 45 and a criminal history category of II, which yielded a life sentence. But the calculation was derived after considering Sparks's presentencing escape attempt. This most likely caused an increase

in five criminal-history points, as Sparks was assessed two points for obstruction of justice and did not receive a three-point reduction for acceptance of responsibility.[6] Had these adjustments been made, the sentencing judge would have been considering a total offense level of 40 and a criminal history category of II, resulting in a range of incarceration of 324 to 405 months–not a mandatory life sentence. Does the addition of the escape attempt lead inexorably to a finding that in 2001 Sparks was irretrievably depraved? The court thinks not. Yet the escape attempt may not be ignored. It was before the court at the time the court imposed the original sentence.

When this court considers both the Guidelines and the Supreme Court's juvenile-sentencing jurisprudence, the court is left with the firm belief that the court must step outside the Guidelines and impose a sentence that is "sufficient, but not greater than necessary" to satisfy the Sentencing Reform Act of 1987, 18 U.S.C. § 3553(a), while at the same time recognizing that Sparks was a juvenile at the time he committed the crime.

The court has previously discussed the juvenile-sentencing factors. The court now turns to the factors set forth in the Sentencing Reform Act of 1987 including:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

---

[6] "The district court's determination not to adjust Sparks's offense level for acceptance of responsibility" was upheld on appeal because "the district court did not clearly err." *United States v. Sparks*, 31 Fed. Appx. 156 (5th Cir. Dec. 14, 2001).

        (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available; . . .

(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7). The court has considered each factor, but will only discuss those that need discussion beyond consideration and have not been subsumed in the court's discussion of the juvenile-sentencing factors.

First and foremost, the nature and circumstances of the offense are that Sparks was convicted of a violent felony. His participation in the crime resulted in the deaths of two wholly innocent people, whose willingness to help others and provide a ride to three kids was exploited by Sparks and his associates to kidnap and rob them, with a fatal effect. Sparks terrorized the Bagleys for five hours both driving and riding in the Bagleys' vehicle with the Bagleys in the trunk, while the Bagleys pleaded for their lives. In addition, Sparks failed to take any action to prevent the death of the Bagleys. The court cannot imagine a worse offense, nor can the court imagine a more callous perpetrator than the defendant.

Combining several of the factors, the court considers what would instill in Sparks a respect for the law, what would afford adequate deterrence to criminal conduct by Sparks and others, and what will protect the public from further crimes of Sparks. The court finds that Sparks has no respect for the law and did not at the time of the crime. The court finds that he is more likely than not to reoffend upon release from imprisonment. There is no easy answer to what sentence will provide adequate deterrence to Sparks committing future crimes. Sparks has not separated himself from the

24

Bloods gang. His lack of specific activity with the gang over the past several years is best explained by the amount of time he spent in isolation and the fact that he is now seeking release from imprisonment. The court has no confidence he will not go back to gang life upon release.

Sparks argues that the court must avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. He directs the court's attention specifically to his accomplices Lewis and Brown, each of whom received a sentence of 248 months and has now either been released from prison or is soon to be released. But there are profound differences between Lewis and Brown on the one hand and Sparks on the other. Lewis and Brown cooperated with the Government and entered into plea agreements. Before sentencing, neither attempted to escape. Thus, they were given credit for acceptance of responsibility and no enhancement for obstruction of justice.

The court concludes that, considering all of the factors and overlaying them with the Supreme Court's juvenile-sentencing jurisprudence, a sentence of less than life in prison, but one that takes into account the nature and circumstances of Sparks's background and the crime for which he was convicted is appropriate. The court concludes that the following sentence is tailored to meet the facts and circumstances of Sparks's background and the crime for which he was convicted; that this sentence adequately accounts for all of the factors in Title 18, United States Code, Section 3553, some of which are discussed in this opinion, but all of which have been carefully considered by the court; that this sentence takes into account all of the Supreme Court's juvenile-sentencing jurisprudence; and that this sentence is a reasonable sentence to impose.

The court will impose a sentence of 420 months confinement followed by a term of supervised release of five years.

Signed this _19th_ days of March 2018.

LEE YEAKEL
UNITED STATES DISTRICT COURT