## BEFORE THE PRESIDENT OF THE UNITED STATES AND THE UNITED STATES PARDON ATTORNEY

---

*In re*

### BRANDON BERNARD,

Petitioner.

---

## PETITION FOR CLEMENCY
## SEEKING COMMUTATION OF DEATH SENTENCE

<span style="color:red">**EXECUTION DATE: DECEMBER 10, 2020**</span>

---

| | |
|---|---|
| Robert C. Owen | John R. Carpenter |
| Law Office of Robert C. Owen, LLC | Asst. Federal Public Defender |
| 53 West Jackson Blvd., Suite 1056 | 1331 Broadway, Suite 400 |
| Chicago, Illinois 60604 | Tacoma, Washington 98402 |
| Phone: 512-577-8329 | Phone: (253) 593–6710 |
| robowenlaw@gmail.com | john_carpenter@fd.org |
| Texas Bar No. 15371950 | Washington Bar No. 23301 |

Counsel for Petitioner
Brandon Bernard

November 10, 2020

*Petitioner Requests the Opportunity to Make an Oral Presentation before the Pardon Attorney*

**EXHIBIT 1 pg. 001**

## TABLE OF CONTENTS

LIST OF EXHIBITS ................................................................................iii

I.    An Introductory Comment ................................................................ 1

II.   Brandon Bernard was sentenced to death for acting as an accomplice to a crime committed in 1999, when he was only 18 years old. He did not have a leading role in that crime and has demonstrated positive behavior throughout his 20 years of incarceration, even reaching out to and counseling others not to follow in his path. When critically important charging and sentencing decisions were made in his case, both the Government and the jurors had an incomplete picture of Brandon and the offense. Today, with the ringleader in the case having been executed, five of the nine surviving jurors believe that a sentence of life imprisonment would provide sufficient punishment for Brandon. ................................................................................2

III.  Commutation is appropriate because Brandon was neither the shooter nor the ringleader in the carjacking and murder of the Bagleys. ................................................................................ 6

      A.    The juror who presided over deliberations in Brandon's trial agrees that Brandon's limited role in the offense is a basis for mercy. ................................................................................ 8

      B.    Summary of the trial evidence ................................................... 10

      C.    The jurors found that Christopher Vialva, who has been executed, was far more culpable than Brandon for the events that led to the Bagleys' deaths. ..................................................... 13

      D.    Christopher Lewis and Terry Brown — who were at least as culpable for the Bagleys' deaths as Brandon — received 20-year prison terms and are now free. Tony Sparks's life sentence was reduced to 35 years. .............................................. 14

      E.    Juror Gary McClung — who is praying that the President will grant Brandon mercy — cites Brandon's lesser role as one of the many reasons he now repudiates the sole death verdict he and his fellow jurors imposed on Brandon ................. 15

IV.   Brandon, only 18 at the time of the offense, barely met the legal age requirement for a capital prosecution. Perhaps more important, our

EXHIBIT 1 pg. 002

nation's growing understanding of brain development in emerging adults argues against carrying out his death sentence ......................... 16

V.     Squarely disproving the "junk science" evidence presented at trial to convince jurors of his supposed future dangerousness, Brandon has never posed any problem for prison authorities. Mark Bezy, a former warden for the federal penitentiary where Brandon is currently held, has reviewed Brandon's entire BOP record and concluded that if his life is spared, Brandon would integrate well into the general inmate population. ................................................................................. 20

VI.    The jury's decision to impose death was a direct consequence of Brandon's trial lawyers' failure to challenge the prosecution's forensic evidence. ................................................................................ 27

VII.   Brandon came from a troubled family background and spent much of his adolescence trying unsuccessfully to fill the void left by an absent father. .............................................................................................. 31

VIII.  Brandon's sole death sentence was a consequence of serious and repeated misfires of the legal machinery intended to ensure reliable verdicts in capital cases. But understanding how that death sentence came to be imposed is less urgent than commuting it now. .................. 40

IX.    Executing Brandon would inflict additional suffering on his own family, in whose lives he plays an important and constructive role..... 44

X.     Brandon has consistently, repeatedly, and wholeheartedly demonstrated remorse for his crime. .................................................... 49

XI.    Brandon has counseled others to avoid straying down a destructive path. .............................................................................................. 51

XII.   What Brandon would like to say to those who loved Todd and Stacie Bagley. ............................................................................................ 56

XIII.  Conclusion ...................................................................................... 57

EXHIBIT 1 pg. 003

## LIST OF EXHIBITS

A.     Law Enforcement Chart Showing Gang Hierarchy

B.     Declaration of Juror Calvin Kruger

C.     Declaration of Juror Jason Fuller

D.     Declaration of Dr. Steven Pustilnik

E.     Declaration of Juror Gary McClung, Jr.

F.     Declaration of Dr. Adam Andreassen

G.     Declaration of Dr. David Fassler

H.     Declaration of Novotny Baez

I.     Declaration of Juror Laird Cooper

J.     Declaration of David A. Ruhnke

K.     Declaration of Mark Bezy

L.     Email of Juror Chris Tyner

M.     Declaration of Charles Formosa

N.     Declaration of Stacey Brownstein

O.     Mitigation Report of Jill Miller

P.     Declaration of Quiona Bernard

Q.     Declaration of Thelma Bernard

R.     Declaration of Melsimeon Jordan Pollock

S.     Declaration of Bonnie Wainwright

T.     Declaration of Debra King

U.     Declaration of Pastor Andres Terry Johnson

V.     Letter of Russell Hunt (Aug. 30, 1999)

W.     Jury Verdicts

X.     Declaration of Max Bernard

Y.     Declaration of Sherise Scott

Z.     Declaration of Taneah Scott

iii

EXHIBIT 1 pg. 004

AA.   Declaration of Reverend Elmer "Jack" Hetzel

BB.   Declaration of David Boyd

CC.   Declaration of Michael Boyd

DD.   Declaration of Pastor Aaron Chancy

EXHIBIT 1 pg. 005

## I.   An Introductory Comment

We start with this observation. The death penalty, if we are to have it, should be reserved for the worst murderers. For others who kill, our society deems it sufficient to imprison them for life without any possibility of release — itself a harsh and permanently life–altering punishment. As we detail below, Brandon Bernard was just eighteen at the time of the crime, had no prior violent criminal record, did not shoot either victim, and has lived quietly for twenty years as a model prison inmate. He has used his time to try to mitigate the harm he caused, by encouraging others to remain on a virtuous path. He is not by any measure the offender for whom the average person contemplates the death penalty. If Brandon's trial counsel had developed the available information and presented it to the Government prior to trial, the Government would likely have agreed and never sought a jury verdict authorizing Brandon's execution. Similarly, if his counsel had done their job at trial, presenting jurors with the readily available information discussed below, the jury likely would not have reached a verdict of death on the sole count where they did reach that verdict, as several jurors now confirm. In short, Brandon Bernard is someone who should not be on Death Row, and would not be if the system had not misfired. His sentence should be reduced to life imprisonment without the possibility of release.[1]

---

[1] While this petition contains powerful arguments showing why President Trump should spare Brandon's life, counsel was unable to marshal all evidence and arguments on Brandon's behalf because the on-going pandemic, coupled with the short time-frame between the announcement of the scheduled execution and the execution date, prevented the completion of necessary work.

1

EXHIBIT 1 pg. 006

II.    Brandon Bernard was sentenced to death for acting as an accomplice to a crime committed in 1999, when he was only 18 years old. He did not have a leading role in that crime and has demonstrated positive behavior throughout his 20 years of incarceration, even reaching out to and counseling others not to follow in his path. When critically important charging and sentencing decisions were made in his case, both the Government and the jurors had an incomplete picture of Brandon and the offense. Today, with the ringleader in the case having been executed, five of the nine surviving jurors believe that a sentence of life imprisonment would provide sufficient punishment for Brandon.

Brandon Bernard is one of the youngest people ever sentenced to death in federal court. In June 1999, when he was 18, Brandon was one of a group of Black teenagers involved in a plan to commit a carjacking and robbery. The carjacking ultimately ended with the murders of Todd and Stacie Bagley, a white couple, on the Ft. Hood military reservation in Killeen, Texas. Although Brandon faced three capital charges, the jury sentenced him to life imprisonment for all offenses other than the murder of Stacie Bagley. Christopher Vialva, described by the Government as the "ringleader" behind the murders,[2] received death sentences for all three capital charges and was executed on September 24, 2020.

Brandon did not play a leading role in the crime. Although he provided the gun that co–defendant Christopher Vialva later used to kill the Bagleys, that was done under the belief that gun would only be used scare someone. Brandon was not present when the Bagleys were abducted, was absent for most of the events of the carjacking, and did not shoot anyone. He helped set

---

[2] *See, e.g.,* Brief of the United States in Opposition to Petition for a Writ of Certiorari and to Application for a Stay of Execution at 26, *Vialva v. United States*, Nos. 20-5766 and 20A49 (United States Supreme Court, September 22, 2020).

2

EXHIBIT 1 pg. 007

fire to the victims' car, but only at Vialva's direction and after it appeared to all present that the Bagleys had been killed by the shots fired by Vialva. Up until that point, Brandon never fully comprehended that the Bagleys were not going to be released. Todd Bagley was immediately killed by Vialva's gunshot, and the trial testimony showed that Stacie was immediately rendered unconscious when shot and did not regain consciousness before dying.

Recognizing Brandon's lesser role, the jury imposed life sentences on two of three capital counts against him, while giving Vialva death sentences on all three. As we show below, had the jury been fully advised of both the facts of the case and who Brandon is, Brandon would not have received a death sentence for the murder of Stacie Bagley. This is not idle speculation. The record makes very clear that if this case were tried today to the same jurors, a life sentence would result. We know this because five of the nine surviving jurors have stated in writing that they now believe that a sentence to life imprisonment without the possibility of parole would constitute sufficient punishment for Brandon, with four of them urging commutation of Brandon's death sentence. The jurors cite various reasons for this view, including the perception that executing Brandon would be fundamentally unfair, the fact that Brandon was neither the shooter nor the ringleader in this crime, and the fact that his counsel did little to assist him at trial.

In short, and as set forth in more detail below, Brandon's trial counsel failed him by not presenting readily available mitigation or alerting the jury to forensic issues that undoubtedly would have saved Brandon's life.

The jury also did not hear the full truth regarding Brandon and his position in the youth gang. To help secure a death sentence against Brandon, the Government argued that the teenage gang to which he belonged had no formal hierarchical structure, but that Bernard nevertheless yearned to be a

3

EXHIBIT 1 pg. 008

"top dog" within it. A Government's central theme in its case for death was that Bernard was an irredeemable gangster, who would continue to embrace that identity in prison and pose, in the language of the jury charge, a "continuing and serious threat to the lives and safety of others" around him. In turn, the Fifth Circuit cited this theme when affirming Brandon's death sentence.

Unknown to the defense, however, the Government's own gang expert, Killeen Police Department Sergeant Sandra Hunt, had told the Government prior to trial that the gang was in fact hierarchically organized and that Bernard occupied its very lowest level – far below codefendants Christopher Vialva, Terry Brown, and Tony Sparks. During a 2018 resentencing for Mr. Sparks, the Government disclosed Sgt. Hunt's expert opinion regarding the gang's hierarchical nature, relying on it to secure a lengthy prison term for Sparks (who, Hunt testified, occupied a powerful position in the gang, while Brandon sat at the very bottom of its power structure). Sgt. Hunt's illustration of Bernard's relative lack of power (36 levels below Sparks) is graphically illustrated in the chart that she produced prior to the Bernard-Vialva trial, which is attached as Exhibit A.

Two other teenagers in the case — one of whom was almost 18, and both of whom played roles at least as substantial as Brandon's ––– received 20–year prison sentences and have satisfied their prison terms. In contrast, Brandon has now spent more than twenty years on death row. In that time, he has not just stayed out of serious trouble (such as violence or possession of contraband) — he has *never been written up for a single disciplinary infraction*.

Brandon understands that he is responsible for the Bagleys' deaths and the family's grief. He wishes he had been more of a leader in his youth, so that he would have stepped up and saved Todd and Stacie Bagley. While he cannot turn back the hands of time, he has done what he can to make modest amends,

4

**EXHIBIT 1 pg. 009**

by living a life of faith and by counseling others not to follow an errant path.

Specifically, he reached outside of the prison walls to take part in religious activities aimed at helping at–risk youth.



In 2006 Brandon was profiled in this magazine, in which Brandon counseled at-risk youth to stay with God

The unique circumstances of Brandon's case cry out for mercy now. As the facts presented here demonstrate, jurors in 2000 would have withheld even a single death verdict for Brandon if they had been given a fuller picture of the events of the murder and of Brandon's remorse, troubled background, and demonstrated capacity for redemption. Additionally, insights gained from Brandon's positive adjustment to prison and advances in neuroscience regarding an 18 year-old's brain development buttress the case for clemency today.

Declarations from a wide range of people who support Brandon's plea for clemency are attached here. The declarants include former jurors, clergy who ministered to Brandon (before, during, and after trial), a psychiatrist specializing in adolescent brain development, a former warden of the penitentiary in which Brandon is held, and numerous family members and friends. These statements show that Brandon has continuously expressed his sorrow over his callous acts as an adolescent. Today, Brandon spends much of his time crocheting and presents no danger to anyone.

EXHIBIT 1 pg. 010



> *Brandon has learned how to crotchet in prison.*
> *Examples of his "throws" are pictured above.*

If spared from execution, Brandon will continue to counsel others, and be the best son, brother, and father that he can be.

The public response to Brandon's scheduled execution reinforces the conclusion that whatever one might believe about the death penalty in the abstract, Brandon is hardly among the "worst of the worst" for whom that ultimate punishment should be reserved. As of this writing, more than 5,978 people have sent letters to President Trump, asking that he show compassion by exercising his broad powers of clemency to spare Brandon's life. *See* www.helpsavebrandon.com. All these people share the recognition that while the crime was horrible, Brandon is not.

### III. Commutation is appropriate because Brandon was neither the shooter nor the ringleader in the carjacking and murder of the Bagleys.

As the Government has repeatedly acknowledged, Brandon was not a leader in the events that led to the Bagleys' deaths. Rather, Christopher Vialva, who was executed on September 24, 2020, was the ringleader who bore

6

**EXHIBIT 1 pg. 011**

primary responsibility for the Bagleys' deaths and for the fire that may have contributed to Mrs. Bagley's death.[3]

More than fifteen years ago, the Government unequivocally declared that the trial evidence "showed that the Bagleys' car was set on fire based on the [sic] Vialva's plan and 'at the direction of Mr. Vialva.'"[4] More recently, the Government emphatically told the Supreme Court that Mr. Vialva was the mastermind behind these offenses, calling him "the ringleader of the murders of Todd and Stacey Bagley."[5]

And at the joint plea hearing for codefendants Christopher Lewis and Terry Brown, the Government similarly recognized that Vialva directed the codefendants to set the car on fire. Specifically, when the court asked him to describe the factual basis for the guilty pleas, the Assistant United States Attorney stated that Vialva had directed both the pouring of the lighter fluid and the actual lighting of the vehicle.[6] These facts were accepted by the court

---

[3] As explained below, whether the fire contributed to Mrs. Bagley's death is debatable. But even if it did, the Government's own evidence shows that she could not have experienced any additional pain from the fire, since Vialva had inflicted an unsurvivable gunshot wound that knocked Mrs. Bagley unconscious before that fire was set.

[4] Response to Motion to Vacate, Set Aside or Correct Sentence, (dkt. 418) (December 8, 2004) at 75, *United States v. Bernard*, No. W-99-CR-70(2) (WDTX, December 8, 2004).

[5] Brief of the United States in Opposition to Petition for a Writ of Certiorari and to Application for a Stay of Execution at 26, *Vialva v. United States*, Nos. 20-5766 and 20A49 (U.S. Sup. Ct., September 22, 2020).

[6] At the change of plea hearing for codefendants Terry Brown and Christopher Lewis, the government declared this as fact:

AUSA: Before the trunk was shut, and at the direction of Vialva, Brown poured some lighter fluid into the trunk area. *At the*

7

EXHIBIT 1 pg. 012

when it approved Lewis and Brown's guilty pleas.[7] Numerous other government pleadings have also recognized that "Bernard had a lesser role [a]s opposed to Vialva's leadership role."[8]

Brandon's minor role was a fact emphasized by several jurors who have written in support of Brandon's request for clemency.

### A. The juror who presided over deliberations in Brandon's trial agrees that Brandon's limited role in the offense is a basis for mercy.

Presiding Juror Calvin Kruger has identified Brandon's lesser role in the crime, as well as the fact that Brandon's counsel failed to adequately represent Brandon, as reasons why he now prays for President Trump to prevent Brandon's execution:

---

*direction of Christopher Vialva*, Bernard then lit a match and threw it inside the vehicle, which ignited the fire in the vehicle.

Transcript of Rearraignment Proceedings, *United States v. Terry Terrell Brown*, W-99-CR-061 (1) and *United States v. Christopher Michael Lewis*, W-99-CR-061 (2) (December 16, 1999) at 35 (AUSA Mark Frazier, describing the factual basis for the guilty pleas of both Brown and Lewis), attached as Exhibit 5 to Motion to Vacate, Set Aside, or Correct Judgment and Sentence, *Bernard v. United States*, No. 6:04-cv-00164-WSS (June 14, 2004), dkt. 377-3 at 109, 144 (emphasis added).

[7] *Id.* at 47, dkt. 377-3 at 150 (ROA.19-70021.1062).

[8] *See*, *e.g.*, Gov't Response to Motion to Authorize Successive Motion, *In re Bernard*, No. 19-50837 (5th Cir., November 20, 2019) at 13; *see also id.* ("Ultimately, the jury was already aware of evidence that Vialva was a leader, that Vialva and Sparks were more powerful members of the gang than Bernard, and that Vialva called the shots during the crime.").

EXHIBIT 1 pg. 013

> *I do not think Brandon Bernard's attorney[s] did a good job in defending him. To me, it seemed like his attorneys were going through the motions and nothing more.*
>
> *While the evidence proved that Brandon Bernard is guilty beyond any doubt, it also clearly showed that Brandon Bernard was not the ringleader behind these offenses, but a follower. Because of this, I support Bernard's death sentence being commuted to life without the possibility of parole. I am praying the President commutes Brandon Bernard's death sentence.*

Declaration of Presiding Juror Calvin Kruger at ¶¶ 3-4 (November 6, 2020) (Attached as Exhibit B, paragraph numbering removed).

Juror Jason Fuller also is opposed to Brandon's execution, citing Brandon's lesser role, compared to that of Vialva:

> *I felt that Brandon was a kid who got caught up with the wrong crowd, and I think that Brandon was prejudiced by being on trial with Christopher Vialva. It made it hard for me to disassociate Mr. Vialva's role in the crimes from Mr. Bernard's role.*
>
> *It was clear to me that Brandon was just an adolescent, trying to find belonging. Unfortunately, I think he found belonging with the wrong crowd and was in the wrong place, at the wrong time. Brandon clearly is responsible for making some horrible decisions that had horrendous outcomes. However, his young age at the time does weigh on me. I do not believe that Brandon should be executed for bad choices he made when he was 18.*
>
> *If he was the shooter or if I thought that Brandon was the mastermind behind this terrible crime, I would not feel this way about Brandon getting a second chance.*
>
> *I support clemency for Brandon Bernard.*

Declaration of juror Jason Fuller at ¶¶ 9–10 (July 21, 2016) (text reformatted with paragraph breaks) (Attached as Exhibit C).

9

EXHIBIT 1 pg. 014

### B.  *Summary of the trial evidence*

A more detailed review of the facts helps illustrate why so many of Brandon's jurors feel that executing him would be an excessive punishment.

Brandon was convicted of four offenses related to the murders of Todd and Stacie Bagley. He faced possible death sentences for three of those crimes: Todd's murder, the carjacking resulting in Todd's death, and Stacie's murder. Brandon was tried jointly with Christopher Vialva, who was 19 at the time of the offenses. Three other adolescents were involved in these crimes: Christopher Lewis (then age 15); Tony Sparks (then age 16), and Terry Brown (then age 17). As noted, the evidence unequivocally demonstrated that Vialva led this group and issued the orders throughout the criminal episode. *See supra*, nn. 4-6 and accompanying text.

While this group of adolescents did talk about abducting and robbing a victim by using his ATM card, neither Brandon nor any of his peers ever planned to commit murder. As the trial record documents, their original plan never involved hurting anyone. More or less following that original plan, Vialva, Lewis, and Sparks solicited a ride from the Bagleys and then abducted them, threatening them with a gun and forcing them into the trunk of their own car. Vialva, Lewis, and Sparks then drove around the area for hours with the Bagleys in the trunk as they tried to pawn the Bagleys' wedding rings and use their ATM card.

Brandon and Brown were not even present when the Bagleys were abducted or while they were driven around as captives. Brandon and Brown were playing video games in a nearby laundromat when Vialva, Sparks and Lewis abducted the Bagleys. When Brandon and Brown emerged from the laundromat, Vialva, Sparks and Lewis had vanished. Brandon and Brown drove around for a while looking for the others, but soon abandoned that effort;

10

EXHIBIT 1 pg. 015

they went by a local supermarket and applied for jobs before each returned home.

Vialva, Lewis, and Sparks were mostly unsuccessful in their attempts to pawn the Bagleys' rings and obtain money from their bank account. Vialva, Lewis, and Sparks were all trying to figure out what to do with the Bagleys. Eventually Vialva had Lewis call Brown to ask for Brown's help. Vialva then drove the Bagleys' car to Brown's house, with the Bagleys still locked in the trunk. Brown suggested taking the Bagleys' car to a park, leaving it there, and calling the police. The group seemed to agree on this plan, which would require another car. Brown phoned the only person they knew who had access to one: Brandon.

Brandon eventually picked up Brown in Brandon's mother's car. They (along with another teen who was not charged) drove to a local park where they met with the others, who were still in the Bagleys' car with the Bagleys locked in the trunk. After Brandon arrived, Vialva told Brown that he could not just let the Bagleys go, because his fingerprints were in their car. Vialva stated that he would have to kill the Bagleys. Even then, Brown had doubts about whether Vialva would actually follow through on his plan, later testifying that he thought Vialva "might burn the car, because it did have fingerprints in it, but [he still] didn't believe that he [Vialva] would harm the people."[9] Brandon has stated that although he was probably naïve to think so, he never really thought the Bagleys would be killed, as he had never been involved in anything like this before. He thought that the most Vialva would do was burn the Bagleys' car.

---

[9] Government direct examination of Terrence Brown, May 25, 2000 Trial Transcript at 1905, *United States v Bernard*, W-99-CR-070(3) (WDTX, Waco Division, May 25, 2000); Fifth Cir. ROA.19-70021.4465.

EXHIBIT 1 pg. 016

Vialva initially stated that he would buy gas himself to burn the vehicle, but later gave $10 to Brown to purchase gas. Brandon and Brown ultimately purchased lighter fluid at a convenience store. Presley and Sparks were dropped off, and then both cars were driven to a remote area on Fort Hood.

At Fort Hood, Vialva donned a mask before opening the trunk of the Bagleys' car, suggesting that he wanted to hide his face and — with his identity protected — release them and tell them to flee. But then he fired two shots, striking each of the Bagleys once in the head. Mr. Bagley died instantly, and Vialva's bullet rendered Mrs. Bagley immediately unconscious. According to Brown's trial testimony, Brandon poured lighter fluid on the front seat of the car, and Brown poured lighter fluid on the back seat of the car and also in the trunk, where the Bagleys' bodies lay. Brown further testified that Brandon lit the fire, although he admitted that he could not see who did so. As noted *supra* at n. 6, the Government agreed that these actions were done at Vialva's direction.

After Vialva shot her, Mrs. Bagley never regained consciousness. A forensic medical examiner testifying for the prosecution, as well as another testifying for Vialva, opined that even after being shot directly in the face, Mrs. Bagley may have been breathing as the fire consumed the car in which she lay. A prominent Texas forensic pathologist has reviewed the evidence and concluded that Mrs. Bagley was likely already medically dead by the time she was exposed to the fire, as the unsurvivable gunshot wound administered by Vialva likely immediately killed her.[10]

---

[10] *See* Declaration of Stephen Pustilnik, M.D. (former Chief Medical Examiner of Galveston County, Texas, and current Chief Medical Examiner of Fort Bend County, Texas), at ¶¶ 12, 14, 15 (October 25, 2012) (Attached as Exhibit D).

EXHIBIT 1 pg. 017

Regardless of whether Vialva's gunshot immediately killed Mrs. Bagley, both the Fifth Circuit and the Government have acknowledged that the wound immediately rendered her unconscious.[11] And the fact that Mrs. Bagley was instantly "knock[ed] unconscious" by the gunshot means that she did not suffer between that moment and her death very shortly thereafter, if she in fact survived that wound. As the Government has elsewhere recognized, consciousness is a prerequisite to experiencing pain or suffering.[12] Thus, the fire could not have contributed to any suffering by Mrs. Bagley.

### C. The jurors found that Christopher Vialva, who has been executed, was far more culpable than Brandon for the events that led to the Bagleys' deaths.

The jurors found that life imprisonment without the possibility of release was an appropriate punishment for Brandon's aiding and abetting in Todd Bagley's murder and for his part in the carjacking that ultimately resulted in

---

[11] *See United States v. Bernard*, 299 F.3d 467, 472–73 (5th Cir. 2002); *see also, e.g.,* Appellee's Brief of the United States of America, *United States v. Bernard*, No. 19-70021 (5th Cir., Feb. 21, 2020) at 2; Brief of the United States in Opposition to Petition for a Writ of Certiorari and to Application for a Stay of Execution, *Vialva v. United States*, Nos. 20-5766 and 20A49 (U.S. Sup. Ct., Sept. 22, 2020) at 5; "Statement by Department of Justice Spokesperson Kerri Kupec on the Execution of Christopher Andre Vialva," U.S. Dept. of Justice Press Release No. 20-999 (September 24, 2020) ("Vialva shot both Todd and Stacie in the head – killing Todd and *knocking Stacie unconscious*") (emphasis added).

[12] For example, in defending its current execution protocol, the Government states that pentobarbital ensures a humane death precisely because it causes the condemned prisoner to "lose consciousness within 10-30 seconds," with the result that he is "unaware of any pain or suffering before death occurs within minutes." *See* Application for a Stay or Vacatur of the Injunction Issued by the United States District Court for the District of Columbia, *United States v. Lee*, No. 20A8 (U.S. Sup. Ct., July 13, 2020).

EXHIBIT 1 pg. 018

the Bagleys' deaths. They sentenced Brandon to death only for Stacie Bagley's murder.

By contrast, Christopher Vialva — who led the others in abducting the Bagleys, drove their car around for hours with the Bagleys confined in the trunk, and ultimately fired the shots that killed them — received death sentences on all three capital counts, and was executed on September 24, 2020.

### D. Christopher Lewis and Terry Brown — who were at least as culpable for the Bagleys' deaths as Brandon — received 20-year prison terms and are now free. Tony Sparks's life sentence was reduced to 35 years.

Christopher Lewis, who was then 15 years old and who, unlike Brandon, actively participated in abducting, robbing, and confining the Bagleys, as well as providing assistance at the site of the killings, testified for the prosecution. He was sentenced to 20 years and 4 months in prison for his role in the murders. He has completed that sentence.

Terry Brown also testified and received the same sentence as Lewis. At the time of the offense, Brown was not quite 18 years old, which is why he did not face a capital trial, while Brandon, who was 18, did. Brown's actions were also similar to Brandon's, in that he was neither present during the carjacking nor with the Bagleys in the hours that immediately followed, but did purchase lighter fluid and help burn the Bagleys' car at Vialva's direction. Like Lewis, Brown has completed his twenty-year sentence.[13]

---

[13] Given that Brown's accomplice liability mirrored that of Bernard's, this case shows the extreme arbitrariness of the administration of the death penalty. Brown escaped a capital trial because he missed the eligibility for one by roughly two months – at the time of the offense, Brown was 17 years, 9 months, and 21 days in age.

14

EXHIBIT 1 pg. 019

Tony Sparks, who was then 16 years old, actively participated in the Bagleys' abduction and the extended carjacking. He originally received a term of life imprisonment, but that sentence was later reduced to 35 years under *Miller v. Alabama*, 567 U.S. 460 (2012) (barring mandatory sentences of life imprisonment without the possibility of parole for juveniles), *see United States v. Sparks*, 941 F.3d 748 (5th Cir. 2019).

### E. *Juror Gary McClung — who is praying that the President will grant Brandon mercy — cites Brandon's lesser role as one of the many reasons he now repudiates the sole death verdict he and his fellow jurors imposed on Brandon*

Juror Gary McClung, Jr., has been troubled by Brandon's death sentence ever since he played a part in issuing it. Like jurors Kruger and Fuller, Mr. McClung authored a declaration that cites Brandon's relatively minor role as one of his many reasons for supporting this clemency petition. Portions of that declaration provide:

> *The evidence presented during the guilt phase of the trial made it clear to me and the other jurors that Mr. Bernard had a part in the crime[,] but I do not believe that his role was as significant as that of Christopher Vialva. ….*

> *I had no reservations about finding Mr. Bernard guilty. The penalty phase was not as easy for me. I was uncomfortable giving Mr. Bernard the death penalty and have been bothered with my decision since trial. ….*

> *I thought Mr. Bernard was only in that situation that led to the murders because of peer pressure from his friends.*

Declaration of Juror Gary McClung, Jr. at ¶¶ 3–5 (August 13, 2020) (Attached as Exhibit E).

15

**EXHIBIT 1 pg. 020**

The point that juror McClung makes about peer pressure is particularly acute, as it is consistent with what scientists have discovered since Brandon's trial about the brains of emerging adults, as detailed below.

IV.    **Brandon, only 18 at the time of the offense, barely met the legal age requirement for a capital prosecution. Perhaps more important, our nation's growing understanding of brain development in emerging adults argues against carrying out his death sentence**

As he was only eighteen at the time of the offense, Brandon was barely eligible for a federal death sentence. Since his trial, the Supreme Court has ruled that the Constitution forbids executing anyone who commits a capital crime before age 18, no matter how heinous the crime or how substantial the individual's role. *Roper v. Simmons*, 543 U.S. 551 (2005). Brandon's death sentence fits uneasily with this constitutional rule, given that he was barely eligible by age, never planned to murder anyone, and did not take a leading role in the events.

Following *Simmons*, and again citing society's evolving understanding of the slow pace at which the human brain fully matures, the Supreme Court forbade sentencing juveniles convicted of non–homicide crimes to life imprisonment without chance of parole. *Graham v. Florida*, 560 U.S. 48 (2010). For much the same reasons, the Court two years later barred mandatory sentences of life imprisonment without the possibility of parole for juveniles even in homicide cases. *Miller*, 567 U.S. at 471-74.

Underlying all these cases is a newfound appreciation that the brain from adolescence through young adulthood differs vastly from a fully mature adult brain, both in its structure and its reasoning abilities. Magnetic imaging studies that were unavailable at the time of Brandon's trial have proved that even for persons in their late teens and early twenties, regions of the brain that

16

**EXHIBIT 1 pg. 021**

control reasoned decision–making are underdeveloped relative to the ones that provide for emotional and impulsive decision making. This helps explain why Brandon failed to assert himself to save the Bagleys.

Dr. Adam Andreassen — formerly a Youth Pastor who ministered to Brandon before and during his trial, and now a clinical psychologist who has worked with both the defense and the prosecution in criminal cases — has provided a declaration that describes Brandon's expressions of remorse in the immediate aftermath of the offense and also explains the limits that Brandon's adolescence imposed on his reasoning capacity at the time. Sadly, jurors did not hear from Andreassen, since trial counsel failed to even identify him (or two other supportive men of the cloth) as potential mitigation witnesses. In part, Dr. Andreassen's declaration recites:



> *Brandon was penitent and expressed regret for his role in the killing of the Bagleys. Brandon was only 18 years old at the time, and I believe that he was as contrite as he could be considering his developmental level and presentation as a somewhat immature adolescent. Brandon would share his regrets, and we would pray together.*
>
> *Now that I am a clinical psychologist, I am able to look back on my conversations with Brandon with a more learned eye. At the time of this crime, Brandon was very immature and I do not believe he fully understood the severity of what transpired. He did not possess the insight or emotional development to perceive the situation as an adult — both with regard to his experience of the killings and their aftermath. Brandon was only a teenager at the time of the incident. As such, he likely lacked the impulse control and ego strength that would have allowed him to assert himself and prevent the crimes from happening. At that age, many adolescents do not have the capacity to make good decisions. Brandon's teenage brain gave him limitations into his own insight.*
>
> *…*

17

EXHIBIT 1 pg. 022

*I was concerned about Brandon and liked him very much. I attended some of his trial to provide a measure of support. From what I saw, the picture that emerged during that trial seemed neither accurate nor fair as he did not appear nearly so sophisticated nor "hardened" as his co–defendant. It did not reflect the Brandon that I knew. I do not believe that Brandon was, or is, a hardened criminal. I wish that his attorneys would have done more to push back against the Government's portrayal of him and what I perceived as an unfair grouping together with his co– defendant. Had I been called to serve as a character witness for Brandon, I would have gladly conveyed my experiences with him, and the regret and concern that he had expressed for the victims and their families.*

*I know that this incident forever changed the lives of many people. This includes the families of the victims. They have suffered an immense and unimaginable loss and I wish them peace as they continue to live with the loss of their children.*

*Although then 18 years–old, Brandon was really only a kid when he participated in these horrific crimes. It is my hope that Brandon should be granted leniency in light of that fact. Neuroscience has now shown that an adolescent brain is not fully developed at age 18, and the portions of the brain that control decision making are the last to develop. Thus, the adolescent brain's ability to make good decisions is already compromised, relative to an adult's brain. And we know too, from scientific studies, that this limited ability is compromised even further when one is in the company of other adolescents, as was the case here. Thus, while Brandon's actions, or lack of action, resulted in the deaths of two innocent people, he should be sentenced as a kid, not as an adult. I don't believe the death penalty is appropriate for Brandon and I hope that President Trump commutes his death sentence to a life sentence. A life sentence will continue to hold Brandon accountable for his role in this crime.*

Declaration of Dr. Adam Andreassen, ¶¶ 3–4 & 6–8 (August 17, 2020) (Attached as Exhibit F).

18

EXHIBIT 1 pg. 023

Dr. David Fassler, a Respected Fellow of the American Academy of Child and Adolescent Psychiatry and a Distinguished Fellow of the American Psychiatric Association, has also provided a declaration that explains recent advances in our biological understanding of the adolescent brain. Dr. Fassler has vast expertise in this area, as he has authored or co–authored over 30 books, chapters, and scholarly articles on topics pertaining to mental health and child and adolescent development.

As Dr. Fassler's declaration explains, the adolescent brain continues to mature into the 20s, with the regions that control impulses and enable reasoned decision–making being the last to develop. In part, the adolescent brain often fails to consider the long–term consequences of the actions that it directs, because efficient neural connections have not yet been biologically formed. As another researcher has put it, the operation of the adolescent brain can be compared to "starting the engines without a skilled driver behind the wheel." *See* Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 16:3 ANN. REV. CLINICAL PSYCHOL. 47, 56 (2009). Relevant parts of Dr. Fassler's declaration provide:

> *The brain undergoes a growth spurt in early adolescence, when neurons develop new connections. This phenomenon is known as "arborization." It is followed by a period of "pruning", during which neurons which have not been consistently utilized are selectively eliminated, thereby allowing for greater efficiency of the remaining neural connections—which is associated with heightened regulation of behavior and improved impulse control. This period can last until the mid–20's.*

> *The lack of a fully developed frontal cortex makes adolescents and young adults more likely to act on instinct or impulse. It also makes it harder for them to modulate emotional responses, regulate behavior, control impulses, assess risks or fully contemplate the consequences of their actions.*

19

EXHIBIT 1 pg. 024

> *These vulnerabilities—compounded by underdeveloped cognitive functions—render adolescents and young adults particularly prone to reckless, impulsive behavior and poor judgment.*
>
> *Research further demonstrates that such relative deficits are particularly pronounced and exacerbated when adolescents and young adults are in the presence of peers.*
>
> *In summary, scientific advances in the understanding of brain development since the time of Mr. Bernard's trial demonstrate that adolescents and young adults are biologically more likely to act on impulse, without stopping to think things through, modify their behavior or fully consider the consequences of their actions.*

Declaration of David Fassler, M.D., at ¶¶ 17–20 (September 6, 2016) (Attached as Exhibit G along with his curriculum vitae).

These new scientific insights strongly suggest that it was pure speculation to contend, as was suggested at trial, that Brandon would pose a "continuing and serious threat to the lives and safety of others" if not executed. As the next section explains in detail, Brandon's twenty years of successful, non–violent adjustment to incarceration have proven that prediction to be profoundly mistaken.

V.  **Squarely disproving the "junk science" evidence presented at trial to convince jurors of his supposed future dangerousness, Brandon has never posed any problem for prison authorities. Mark Bezy, a former warden for the federal penitentiary where Brandon is currently held, has reviewed Brandon's entire BOP record and concluded that if his life is spared, Brandon would integrate well into the general inmate population.**

According to their special findings at sentencing, the jurors imposed a death sentence in part because they found that Brandon would pose a "continuing and serious threat to the lives and safety of others." This prediction has been conclusively disproven, as Brandon has grown on death row from an

EXHIBIT 1 pg. 025

adolescent into an adult without ever having any disciplinary problems or posing any threat to anyone's life or safety. The jurors reached their erroneous conclusion on this key point because of incomplete and misleading information.

Prior to this case, Brandon had no adult criminal history. Nor did he have any violent criminal history, even as a juvenile. He had also performed extremely well while under supervision as a juvenile, both in an independent living facility in another city and later back home in Killeen. His juvenile probation officer Novotny Baez could have told the jury about that, had Brandon's trial counsel ever identified her as a potential witness. Because they did not, the jury never heard from her. However, Ms. Baez has provided a declaration in support of this petition:

> *I supervised Brandon Bernard when he was 16 or 17 years old and remember him well. Brandon was always very low–key and respectful. He was a sweet, nice kid. …*
>
> *I never felt threatened or feared Brandon, unlike other juveniles I supervised. … I put his home visits as my last one of the day, usually at 8 or 9 at night … I never thought twice about my safety when visiting Brandon in the evening. …*
>
> *He was well liked by the staff at the probation office. He was an easy person to supervise and his supervision was terminated early because of good behavior. It does not surprise me that Brandon has done well in custody over the years.*
>
> *When I heard of Brandon's involvement in the murders, I thought the crime did not fit Brandon's character. Brandon was a follower. I did not think Brandon would do anything like this on his own. It was part of his "go along to get along" character. I thought that Brandon would not have gone along if he knew people would be killed.*

Declaration of Novotny Baez, Jr. at ¶¶ 2–3 (August 25, 2020) (Attached as Exhibit H).

EXHIBIT 1 pg. 026

No juror who decided Brandon's fate heard any evidence of his positive responses to rehabilitation. Juror Gary McClung laments that being deprived of that information prevented him from reaching the correct sentencing result:

> *I felt that Mr. Bernard's defense team made a "token" attempt at a defense during the entire trial. It was like Mr. Bernard's attorneys were "phoning it in." I felt like there might [be] something more to Mr. Bernard than what was presented. Some people had testified on Mr. Bernard's behalf during the penalty phase, which already gave me pause about sentencing him to death. I recently learned from Mr. Bernard's investigators that Mr. Bernard's juvenile probation officer says that she never felt threatened by Mr. Bernard and thought he was basically a good person. I was also told that Mr. Bernard's minister has said that Mr. Bernard expressed remorse to him before the trial. This kind of testimony would have been helpful to me in holding my ground that a life sentence was appropriate, not a death sentence.*

Declaration of Juror Gary McClung, Jr. at ¶ 9 (August 13, 2020) (Attached as Exhibit E).

Juror Laird Cooper also cites the inert performance of Brandon's trial counsel as a factor that favors clemency:

> *While the evidence [at trial] proved that there is no doubt that Mr. Bernard is guilty, I also believe Mr. Bernard's trial attorneys, failed to even adequately represent him. Due to this failure in legal representation, I am not opposed to Mr. Bernard requesting his death sentence be commuted to life without the possibility of parole.*

Declaration of Juror Laird Cooper at ¶ 3 (May 26, 2016) (minor punctuation alteration from original) (Attached as Exhibit I).[14]

---

[14] Space does not permit us to catalog in this application the many grave errors and omissions by Brandon's trial counsel. We therefore attach a comprehensive critique of trial counsel's performance by David A. Ruhnke, one of the country's most experienced federal capital defense lawyers. *See* Declaration of David A. Ruhnke (June 8, 2004), attached as Exhibit J.

EXHIBIT 1 pg. 027

Instead of hearing about the positive adjustments that Brandon had made as a teenager while under supervision, the jury heard junk science from the mouth of a now-discredited "future dangerousness expert," psychiatrist Richard Coons. Dr. Coons attested that anyone associated with a gang outside prison would join the same gang in prison and inevitably grow more violent over time. While this testimony was technically offered only against Vialva, jurors almost certainly weighed it against Brandon, because his counsel took no steps to have them instructed otherwise. By their own terms, Coons's conclusions applied to anyone involved in gang activity, which according to the evidence included Brandon. Indeed, on direct appeal the Fifth Circuit cited Coons's testimony as supporting the jury's finding of future dangerousness *against Brandon.*[15] Since then, Coons's "methodology" has been debunked as a series of uninformed subjective guesses. The Texas Court of Criminal Appeals has rejected Coons's testimony about future dangerousness as wholly unscientific and thus unworthy of consideration as expert opinion.[16] The "junk science" nature of Coons's testimony is of great concern, since it is highly likely to have played a role in Brandon's death sentence.[17]

The entire premise of Coons's testimony — that association with a local youth gang meant affiliation with a violent prison gang — was premised on the

---

[15] *See Bernard*, 299 F.3d at 482 n.11 and accompanying text (5th Cir. 2002).

[16] *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).

[17] *See* Cunningham, Mark D.; Sorensen, Jon R.; and Reidy, Thomas J.; *Capital Jury Decision–Making: The Limitations of Predictions of Future Violence*, 15 PSYCHOL., PUB. POLICY & L. 223, 234–35, 244–45 & Table 1 (2009) (over 13–year study period, 82.4 percent of federal defendants who were found to constitute a future danger were sentenced to death, while 81.6 percent of those who were not so found were spared).

EXHIBIT 1 pg. 028

false assumption that the juvenile delinquents with whom Brandon associated were affiliated with some national group. They weren't, as Officer Baez makes clear:

> *In terms of Brandon and his friends' "gang affiliation," they were a bunch of neighborhood "wannabes." They were not in a real organized gang. They were playing like they were in a gang but had no affiliation to any. Brandon and his friends would wear the clothes and bandanas that made them appear to be in a gang, but it did not mean anything.*

Declaration of Novotny Baez at ¶ 4 (August 25, 2020) (minor punctuation alteration from original) (Attached as Exhibit H). Moreover, we now know from an expert – Sgt. Hunt – that Brandon's own connection to this "wannabe" gang was peripheral; had the jury been aware of her opinion, it would have judged it unlikely that Brandon would join a violent gang in prison.

Studies commissioned by the Department of Justice mirror Officer Baez's opinion: The Office of Juvenile Justice and Delinquency Prevention has concluded that the gangs that developed outside of major metropolitan areas during the 1980s and 1990s were not actually affiliated with the national gangs they tried to mimic. *See*, *e.g.*, *Hybrid and Other Modern Gangs*, OJJDP Juvenile Justice Bulletin (December 2001), U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, at 5 (available at https://www.ncjrs.gov/pdffiles1/ojjdp/189916.pdf) (noting that such gangs did not show allegiance to traditional gang colors [e.g., "Crip gang graffiti painted in red (the color used by the rival Blood gang)"], adopted symbols from a range of different national gangs, included members claiming "multiple affiliations, sometimes involving rival gangs," sometimes "change[d] their names or suddenly merge[d] with other gangs to form new ones," and were "increasingly diverse in both race/ethnicity and gender"); *id.* (in a national survey of law

24

**EXHIBIT 1 pg. 029**

enforcement officers, 61% of respondents indicated the presence in their localities of such "youth gangs 'that don't fit the mold'").[18]

But the jury didn't hear from Officer Baez or Sergeant Hunt, or learn anything about the research underlying the DOJ's conclusions. Hearing nothing to rebut Coons, the jurors found that Brandon would pose a "continuing and serious threat to the lives and safety of others" even if incarcerated for the rest of his life. As required by the special verdict form, they then weighed this conclusion when deciding Brandon's fate. The conclusion, however, has been proven false.

Mark Bezy was once the Warden of the BOP Correctional Complex where Brandon is confined. His accompanying letter attests that Brandon's good behavior during his confinement has been "remarkable." In fact, Warden Bezy "anticipate[s] that should Bernard's death sentence be commuted, he could and would function exceptionally well in a less–restrictive environment without posing any risk to institutional security and good order, or posing any risk to the safety and security of staff, inmates or others." His declaration explains why, notwithstanding the claim made at trial that Brandon was involved in a dangerous youth gang:

> During Bernard's sentencing hearing, the government raised the issue of his gang involvement, suggesting that an inmate identified with the Bloods gang in the outside world would necessarily affiliate with the Bloods gang in prison, and cause problems in prison because of that affiliation. The trial record

---

[18] See also, e.g., Highlights of the 2001 National Youth Gang Survey (OJJDP Fact Sheet), U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention (April 2003, #01), available at https://www.ncjrs.gov/pdffiles1/ojjdp/fs200301.pdf); Modern–Day Youth Gangs, OJJDP Juvenile Justice Bulletin (June 2002), U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, available at https://www.ncjrs.gov/pdffiles1/ojjdp/191524.pdf).

EXHIBIT 1 pg. 030

*suggests that whatever "gang" Bernard may have been involved with prior to his admission to the Bureau of Prisons was not terribly well organized. Moreover, in my opinion the trial testimony that suggested that Bernard would necessarily associate with any such gang in prison was exaggerated and inaccurate. The truth of the matter is that the Bloods lack a common leadership or council which would direct or influence all Blood sets; because of this lack of centralized leadership, an individual who may have associated himself with some Blood set in the neighborhood where he grew up will not necessarily associate himself with a similar set in prison.*

*And it should be noted that the Bureau of Prisons classifies the Bloods as a "Security Threat Group," which reflects a lower level of violence than that exhibited by groups that the BOP deems "Disruptive." This fact seems to have been left out of the future dangerousness testimony presented in Bernard's trial, which suggested incorrectly that the Bloods were among the most dangerous entities that the BOP confronts.*

*In any event, nothing in Bernard's records suggests that he has affiliated with any gang inside the BOP. Indeed, his record of zero disciplinary infractions … is strong evidence of no gang involvement, since gang activity in prison frequently leads directly to disciplinary infractions (indeed, simply displaying gang paraphernalia, clothing, signs, etc., is itself a disciplinary infraction).*

Letter of Warden Mark A. Bezy (retired) at 2 (August 20, 2016) (Attached as Exhibit K).

To our knowledge, since the federal death penalty was restored in the late 1980s, no other death-sentenced prisoner has been confined for a comparably long period without committing a single disciplinary infraction.

26

EXHIBIT 1 pg. 031



*Brandon smiles at the memory of a rare family visit at the penitentiary where he has lived for more than 20 years. His family can afford to visit him only once a year.*

**VI.    The jury's decision to impose death was a direct consequence of Brandon's trial lawyers' failure to challenge the prosecution's forensic evidence.**

Only one fact can explain why jurors spared Brandon's life for his role in Todd Bagley's death but condemned him to die for his role in Stacie's. Specifically, the jurors believed that Stacie had suffered more than Todd because she died in part from smoke inhalation caused by a fire that Brandon set. There are several problems with this assumption.

The first and most obvious problem is that the Government agrees that Mrs. Bagley was immediately rendered unconscious by Vialva's gunshot. *See* Section III.B, *supra* at 11-12. Even though this critically important fact was undisputed at trial, Brandon's trial counsel failed to even mention to the jury that her unconsciousness meant that she suffered no pain, even if she remained alive briefly after Vialva shot her in the face. Counsel's failure directly led to Brandon's single death sentence, as explained by juror Jason Fuller:

> *I also understand that Mrs. Bagley was likely unconscious immediately after being shot by Christopher Vialva, and that her lack of consciousness would have meant that she did not feel any*

27

**EXHIBIT 1 pg. 032**

*pain. I did not understand this at the time I made my sentencing decision because Brandon Bernard's trial attorneys did not highlight this fact. Had that been highlighted, I also would have made a different decision at sentencing. I would have voted that Brandon receive a life sentence for Mrs. Bagley's murder, as I voted for the other two death penalty counts that Brandon faced.*

Declaration of Juror Jason Fuller at ¶ 8 (July 21, 2016) (Attached as Exhibit C).

Even if it were true that Mrs. Bagley died in part from smoke inhalation, Brandon's participation in burning the car is not the sort of egregious act that should support a death sentence. Helping set the car on fire was simply not an intentional act of torture. Given that he was expecting the Bagleys to be released, Brandon was shocked when Vialva instead shot them. When the fire was set, Brandon and everyone else present believed that Mrs. Bagley was dead. Having heard all the evidence at trial, juror McClung shares this view:

*I do not think that Mr. Bernard would have taken part in the events if he knew the Bagleys would be killed. I did not think Mr. Bernard would have burned the car if he knew anyone was alive in the car. I believe Mr. Bernard assumed that both Bagleys were dead after Mr. Vialva shot them, in the head.*

Declaration of Juror Gary McClung, Jr. at ¶ 3 (August 13, 2020) (Attached as Exhibit E).

A final problem with assuming that Mrs. Bagley must have suffered from the fire because there was soot in her airways is that evidence developed during post–conviction proceedings shows that Vialva's gunshot likely caused Mrs. Bagley's immediate medical death. If so, then the soot simply reflected "agonal respiratory effort," a primitive physiological process distinct from live breathing. This is the opinion of Dr. Stephen Pustilnik, the Chief Medical Examiner for Fort Bend County, Texas:

EXHIBIT 1 pg. 033

> *One may reasonably conclude from the evidence I have reviewed that Mrs. Bagley, who had suffered an unsurvivable gunshot wound that damaged the structures of her brain, was medically dead after sustaining that injury. That Mrs. Bagley would ultimately arrive at forensic death, as a result of the damage from this gunshot, was a foregone and inevitable conclusion.*
>
> *…*
>
> *If Mr. Bernard's attorneys had contacted any reasonably competent pathologist in 1999–2000, that person could have explained to counsel the distinction between medical death and forensic death, and how the autopsy findings with respect to the soot in Mrs. Bagley's airways and the carbon monoxide in her blood are consistent with physiological processes occurring in the wake of medical death from traumatic brain injury.*

Declaration of Stephen Pustilnik, M.D. at ¶ 12, 15 (October 25, 2012) (Attached as Exhibit D). Dr. Pustilnik made clear that the findings were not simply "consistent with" such a conclusion; he stated that medical death, followed by agonal respiratory effort, was a "more likely explanation for the postmortem finding of soot in the airways of Mrs. Bagley's body, as well as carboxyhemoglobin of 45% in her blood." *Id.* at ¶ 14. Evidence that these phenomena occurred "in the wake" of Stacie Bagley's medical death from the gunshot wound inflicted by Vialva could have prevented Brandon's death sentence, by persuading jurors that the fire did not cause her death and did not cause her to suffer in any event.

But Brandon's trial counsel failed to consult any "reasonably competent pathologist" — indeed, they didn't contact any pathologist at all. Two jurors have expressly lamented trial counsel's failure to provide the jury with information similar to that provided here by Dr. Pustilnik.

When meeting with Brandon's clemency investigators, juror Chris Tyner remarked that Brandon's trial attorneys were plainly overwhelmed and did a terrible job. The jurors even discussed this deficiency during deliberations,

29

EXHIBIT 1 pg. 034

feeling as if Brandon's attorneys had "laid down" for the prosecution. It was as though Brandon had no legal representation at all. Shown Dr. Pustilnik's declaration, juror Tyner became emotionally upset, stating that this information would have been important to have known at trial. He added that this was an example of what Brandon's trial attorneys could have done to save Brandon's life. At trial, the testimony left juror Tyner believing that Mrs. Bagley must have felt something from the fire. He subsequently e–mailed Brandon's clemency investigators with his "approval to move forward with a life in prison without parole sentence vs. the death penalty." *See E–mail of Chris Tyner to Clemency Investigators Stacey Brownstein and Charles Formosa* (March 15, 2015) (Attached as Exhibit L); *see also* Declarations of Clemency Investigators Charles Formosa and Stacey Brownstein, describing conversation with juror Tyner at ¶ 7 of each declaration (Attached as Exhibits M and N, respectively).

The views expressed by juror Tyner are echoed by juror Fuller, who unambiguously declares that he would have voted for life if he had been armed with the information provided by Dr. Pustilnik:

> *Though we ended up agreeing at the time that Brandon should receive a death sentence, we had limited information available to us that would have guided us in choosing a different sentence based on the two options available to us. If the jury had the information provided in Dr. Pustilnik's report, heard about Brandon's remorse from his minister, and heard about Brandon's upbringing, it would have helped support my feeling that Brandon did not deserve the death penalty. However, with the information we had available to us and the jury instructions, we were unable to support a sentence of life without the possibility of parole.*

> *I voted for death for Brandon Bernard because of the autopsy report presented by the prosecution. It stated that Stacie Bagley did not just die from the gunshot wound, but also from smoke inhalation. There was no rebuttal to this. Brandon's attorneys did*

30

EXHIBIT 1 pg. 035

*not do anything to dispute this. I have since reviewed Dr. Pustilnik's report and learned that it is likely that Mrs. Bagley was medically dead immediately after she was shot by Mr. Vialva and the fire did not cause her death. If the information presented in this report had been presented at trial, I would have made a different decision at sentencing.*

Declaration of Juror Jason Fuller at ¶¶ 6–7 (July 21, 2016) (Attached as Exhibit C).

### VII.    Brandon came from a troubled family background and spent much of his adolescence trying unsuccessfully to fill the void left by an absent father.[19]

Another important fact that the jurors did not know when they had Brandon's life in their hands was that Brandon grew up in a troubled home, marked by violence, which, while it does not excuse the crime, is traditionally recognized as a basis for withholding a death sentence. His father Kenneth Bernard was distant and abusive, but still the most present parent that Brandon had — until his parents divorced and Kenneth disappeared for years. The divorce followed a violent assault in which Kenneth punched Brandon's mother Thelma in the chest shortly after she had heart surgery. After he was released from custody following the assault, Kenneth came to the house and threatened to kill Thelma. She then obtained a protection order. About a month later, Kenneth burglarized the family home. He was arrested for that too, and eventually served time for violating the protection order. After that conviction,

---

[19] This section provides an overview of Brandon's adolescence. A detailed description of Brandon's life history is contained in the Mitigation Report of Jill Miller, MMSW (June 4, 2004), which was produced well after the trial, under direction of Brandon's current counsel (attached as Exhibit O).

31

EXHIBIT 1 pg. 036

Kenneth abandoned the family for an extended period, during much of which time he was homeless. Brandon went three years without seeing his father.



**Brandon, pictured here at age 17 or 18, with his mother and younger sister and brother**

Worrying about how his father — who had few employable skills — could even survive, Brandon slipped into depression. It was during this time, around age twelve or thirteen, that Brandon became lost and began to follow a troubled crowd. When Brandon and his father finally reconnected, his dad was living in a small, roach–infested apartment, frequented by homeless friends from his days on the streets. Brandon had no room of his own, sleeping instead on the living room sofa. Brandon's father could only keep breakfast food on hand; for lunch and dinner, he and Brandon had to line up at the local soup kitchen.

Friends, family members, and Brandon's former pastor have all submitted declarations describing this bleak series of events. At trial, however,

32

EXHIBIT 1 pg. 037

all the jurors knew was that Brandon's parents had been divorced. Brandon's sister Quiona sets the stage for what their childhood was really like:



> *We were not raised in a home of loving parents. Our mom did her best to raise us, teach us morals through our faith, and work to pay the bills. Our dad was not really a dad to any of us. He was always in and out of our lives, and when he [was] present, he was rarely a good influence. He never acted loving or acted like a dad, really. He was particularly hard on Brandon, always giving him orders. He treated us all like servants. My dad did not get along with Brandon, and I don't think he even liked Brandon very much growing up. There was no reason for this, it was just the way he was. He did not spend time with us even when we stayed with him. He always seemed to drink.*

Declaration of Quiona Bernard at ¶ 7 (July 12, 2016) (Attached as Exhibit P).

In her declaration, Brandon's mother Thelma describes the violence that was never spoken of during the trial:

> *I tried my best to raise Brandon but was not around as much as I should have been when he was growing up. When I could not take care of Brandon, he was left with his father. Kenneth struggled to be a parent, having had no good role models of his own. …*



> *One time when Kenneth hit me, I called the cops on him. …. We got into an argument and he began pushing me around. I threatened to spray him with mace that I kept in my handbag for*

33

**EXHIBIT 1 pg. 038**

> *personal protection. Kenneth grabbed the mace from me and sprayed me. Then he hit me in the chest where I recently had heart surgery three months prior. I was shocked he would hit me, especially in the place I just had surgery. He was trying to hurt me. Despite this attack, I was able to call the police and Kenneth was arrested. Brandon witnessed this attack and took the younger kids outside. This assault precipitated my filing for divorce from Kenneth. Kenneth did not return to live in our home following his release from jail, but he came back and threatened to kill me. After that, Kenneth did not see his children for about three years by his own choice.*

Declaration of Thelma Bernard at ¶¶ 3, 10 (August 14, 2020) (Attached as Exhibit Q).

Kenneth's absence hurt Brandon deeply and put him at risk because, despite his father's failings, Brandon missed even the limited guidance and structure that life with Kenneth provided. He began to fall under the sway of others, including a troublemaker cousin who came to live with him during that time, Melsimeon Pollock. Melsimeon eventually reformed; he now has a successful career and is a proud father. Reflecting on that time, Melsimeon realizes that he was lucky to escape his own delinquency, and believes that Brandon would have done so, too, if only he had had appropriate guidance:

> *When Brandon's parents split up, he stayed with his mother, Thelma, and my family moved from Indiana to live with them.*
>
> *…*
>
> *I noticed a difference with Brandon after Brandon's father moved out of their family home. I know that Brandon needed and missed a father figure in his life.*
>
> *…*
>
> *I moved away for about six months and then moved back to Killeen. When I moved back, I was introduced to these kids [the kids Brandon was arrested with] by Brandon. I believe that these kids filled a void in Brandon's life after I left. Brandon turned to them for a sense of belonging. …*

34

EXHIBIT 1 pg. 039

*…*

*I know Brandon and it is hard for me to believe that he would have been involved in any of this if he had really appreciated that people were going to be killed[.] That is completely out of character for Brandon. I believe that Brandon's new friends took advantage of his need for a sense of belonging and his willingness to go along with what they wanted to do. However, had Brandon known that going along with his friends was going to lead to two innocent people being killed, I know that Brandon would have held his line and said no.*

*I believe that the victims' families have suffered a great, unimaginable loss. As a parent myself, I cannot fathom experiencing and living through the death of a child. I regret any pain that my efforts on Brandon's behalf might cause them to feel and I pray that they are able to find peace.*

*…*

*I believe that my life's journey is a good example of how an African American youth can turn his life around if lucky enough to have the chance. I got into trouble when I was a teenager and had trouble following some rules. By the grace of God, my immaturity never led me into a situation as serious as the one in which Brandon ended up. If things had gone just a little differently, I could easily be in Brandon's place today. Instead, I grew to see that I needed to change and better myself. That led me to college, a degree, a good job, and a happy marriage blessed with four children. I left the life of crime years ago, and I believe Brandon would have done the same once he grew in maturity and understanding[.]*

Declaration of Melsimeon Jordon Pollack at ¶¶ 6, 9, 13–15, 18 (June 3, 2016) (Attached as Exhibit R).

When living with his mother, Brandon regularly attended the Seventh Day Adventist Church in Killeen. The pastor of that church and a number of members of his congregation confirm the view that Brandon was basically a

35

EXHIBIT 1 pg. 040

good kid who was adversely affected by his father's absence and the negative influences of others. Church member Bonnie Wainwright explains:



*Brandon lost a father figure in the home and Thelma was not really a role model because she was busy and gone all of the time. That was when Mel was in the house and Mel became the only role model Brandon had. With all of the dysfunction at home, I think Brandon looked for a place of acceptance.*

*…*

*Brandon is a good natured, sweet person. It is still hard for me to believe that he got into a situation where people were killed. The victims' families have lost so much. My heart goes out to them as they have suffered a terrible loss. But, I also do not think Brandon should be executed. Brandon is naturally a good person who got caught up in a bad situation at a time when he lacked the strength and especially the maturity to get himself out of it. I will hope and pray that President Trump will spare Brandon's life and commute his death sentence to a life sentence in prison.*

Declaration of Bonnie Wainwright at ¶¶ 6, 8 (August 13, 2020) (Attached as Exhibit S).

Another church member, Debra King, provides a declaration in which she describes a physical fight between Brandon and his father, shortly after Kenneth was released from jail. She, too, saw a change in Brandon when his father was sent away to jail, noting that "the absence of a father figure seemed to negatively impact Brandon…." Declaration of Debra King at ¶ 5 (September 9, 2020) (Attached as Exhibit T). Ms. King reports the congregation's shock at learning that Brandon was involved in this horrible crime. She also describes a letter that Brandon wrote to the church, expressing his remorse and begging for forgiveness. The jury heard none of this evidence because Brandon's trial attorneys never asked anyone to explain how this letter came to be written or

36

EXHIBIT 1 pg. 041

what it meant to the congregation. Here is what Ms. King could have testified to, had she been identified or called as a witness:

> *I first heard about the tragic incident involving the Bagleys from reading the newspaper. I noticed that Brandon's name was in the paper and associated with this horrendous crime. …. I couldn't believe what I was reading. This was not the Brandon that I knew.*
>
> *…*
>
> *I remember a letter that Brandon wrote to the congregation while he was in jail awaiting trial. Brandon wanted to apologize to the church for having become involved in the crime and he wanted the church members to know and understand that he felt remorse for what he had participated in. I remember that in the letter, Brandon wanted us to know that he was going to accept his punishment for what he had done. I truly appreciate that Brandon was able to say he was sorry and that he wanted his church to know that. I believe that under Pastor Johnson's leadership, we were able to hold Brandon and forgive him. ….*
>
> *…*
>
> *The congregation was very sad to learn about Brandon's death sentence. I was dumbfounded as well as sad for Brandon and his family. It was hard for me to understand why Brandon was charged and tried with the shooter and mastermind of the crime.*

Declaration of Debra King, Exhibit T at ¶¶ 7, 9, 11–12.

Pastor Terry Johnson also knew Brandon as a kid in trouble. He met with Brandon at the jail while he was awaiting trial and heard Brandon report that "he felt the crime never should have happened and that he felt bad for not having done something to stop it." Declaration of Pastor Andres Terry Johnson at ¶ 6 (August 12, 2020) (Attached as Exhibit U). Like so many others, Pastor Johnson was never called to the witness stand. Had he been, his testimony would have been powerful:

37

EXHIBIT 1 pg. 042

*The years I have spent as a Pastor have given me some insight on how children respond when their parents' relationship breaks down. Brandon had a void in his life that he was trying to fill. He needed to belong to something and be accepted.*

*Unfortunately for a young man facing such a struggle, Brandon was a lamb and not a lion. He seemed easily influenced and impressionable. He was nowhere near emotionally or morally an adult when he reached age 18. He was more like fourteen or fifteen, "a little boy in a man's body." He could not say "no" to anybody. At church functions, this tendency was positive; Brandon seemed at ease and fit in naturally. But when he was on his own and away from the church, Brandon's tendency to be a follower left him vulnerable to the negative influences of others.*

*…*

*Brandon wrote a letter expressing his remorse to the Church. I believe that we posted it on the Church bulletin board. The Church felt a lot of grief for what happened, especially towards the families of the victims. The congregation was shocked by the circumstances of the crime. Everyone knew Brandon as a kind, gentle, young man, not a killer. Brandon had a way about him that indicated being easy going, a follower and not a leader. Brandon was someone who wanted to be accepted.*

*Even at the time, I did not believe Brandon should receive a death sentence. I did not think this should have been a death penalty case, but knowing Texas, I was not surprised — especially when I considered that it was a black on white crime. I do not want my thoughts about the justice system to mean I thought less of the victims themselves. I saw the victims as good Christian people and this crime was a senseless tragedy.*

38

**EXHIBIT 1 pg. 043**

Declaration of Pastor Andres Terry Johnson at ¶¶ 4–5, 8–9 (August 12, 2020) (Attached as Exhibit U). [20]

---

[20] While Pastor Johnson sees a death verdict as unsurprising because this was a "black on white" crime, it is impossible to know just how much the outcome in Brandon's case was influenced by race. But one cannot deny that race plays a significant role in how the death penalty is administered in this country: data gathered by the FBI shows that more than 75 percent of death row defendants who have been executed were sentenced to death for killing white victims, even though in society as a whole about half of all homicide victims are Black. *See* https://deathpenaltyinfo.org/policy-issues/race/race-and-the-death-penalty-by-the-numbers (citing Puzzanchera, C., Chamberlin, G., and Wang W. (2018) ("Easy Access to the FBI's Supplemental Homicide Reports).

Research has consistently produced robust findings that correlate race with prosecution and sentencing decisions in capital cases around the nation. *See*, *e.g.*, American Bar Association Death Penalty Due Process Review Project, *The State of the Modern Death Penalty in America: Key Findings of State Death Penalty Assessments*, 2006–2013, at 8 ("Issue 5: Charging Practices and Disparate Outcomes") (data indicates that race influences the outcomes of capital cases in Georgia, Indiana, Ohio, and Tennessee) (available at http://www.americanbar.org/content/dam/aba/administrative/death_penalty_moratorium/aba_state_of_modern_death_penalty_web_file.authcheckdam.pdf); Beardsley, Meg; Kamin, Sam; Marceau, Justin F.; and Phillips, Scott; *Disquieting Discretion: Race, Geography & the Colorado Death Penalty in the First Decade of the Twenty–First Century*, 92 DEN. U. L. REV. 431 (2015) (in Colorado, even after accounting for the heinousness of the crime, the race of the accused is a statistically significant predictor of whether prosecutors will seek the death penalty); Katherine Beckett and Heather Evans, *Race, Death, And Justice: Capital Sentencing In Washington State, 1981-2014*, 6 Colum. J. Race & L. 77 (2016) (jurors in Washington were more than four times more likely to impose a death sentence upon an African American defendant, after controlling for other factors).

The above research focuses primarily on capital prosecutions in state courts. But similar racial effects existed in federal prosecutions in the era when Brandon was tried and sentenced. In September 2000 (just four months after

EXHIBIT 1 pg. 044

As noted, the problems in Brandon's family situation do not excuse his actions. But they do help explain why he was adrift as a teenager and started following a troubled crowd, which ultimately led to his involvement in this crime. Information about Brandon's background shows that he did not and does not possess a fundamentally evil character. *See, e.g.*, Exhibit O at 22 ("no strong anti–social tendencies" were found when Brandon was evaluated by a psychologist after being arrested for property crimes at age 14). Instead, Brandon was someone whose painful past left him less equipped to deal with a highly-charged situation like the one that led to the Bagleys' deaths. Had the jury been presented a full and accurate picture of Brandon's background, it is far more likely that they would have spared him the death penalty.

VIII.    **Brandon's sole death sentence was a consequence of serious and repeated misfires of the legal machinery intended to ensure reliable verdicts in capital cases. But understanding how that death sentence came to be imposed is less urgent than commuting it now.**

Few of the key facts discussed in this application were known to the Government when it made its decision to pursue the death penalty, or to the jury when it levied that sentence for the murder of Stacie Bagley. To appreciate

---

Brandon was sent to death row), the Justice Department issued *The Federal Death Penalty System: A Statistical Survey* (1988–2000), a review that found numerous racial and geographic disparities in federal capital prosecutions. The report revealed that 80% of the cases submitted by federal prosecutors for death penalty review in the preceding five years (*i.e.*, during the era when it was decided to seek Brandon's execution) had involved racial minorities as defendants. In more than half those cases, the defendant was Black. Department of Justice officials described themselves as "troubled' and "disturbed" by the data. *See* Mark Lacey and Raymond Bonner, *Reno Troubled by Death Penalty Statistics*, The New York Times (Sept. 12, 2000) (available at: http://www.nytimes.com/2000/09/13/us/reno–troubled–by–death–penalty–statistics.html).

EXHIBIT 1 pg. 045

why, a review of the procedural facts of the case is helpful. We offer this account to explain why it has fallen to the President to keep that inappropriate and excessive sentence from being carried out.

Brandon's case was assigned to, and ultimately tried before, U.S. District Judge Walter S. Smith.[21] Judge Smith failed to follow the required statutory protocol of consulting with the Federal Public Defender's Office before assigning counsel. The court appointed a single attorney who had no federal

---

[21] In December 2015, Judge Smith was suspended from assignment to new cases for one year after a finding that in 1998 (two years before Brandon's trial), he came close to sexually assaulting a woman who worked in the courthouse. *See* Tommy Witherspoon, *Waco federal judge reprimanded for sexual misconduct, stripped of new cases for a year*, Waco Tribune (Dec. 11, 2015) (available at http://www.wacotrib.com/news/courts_and_trials/waco–federal–judge–reprimanded–for–sexual–misconduct–stripped–of–new/article_319e2f91–f1d7–5dfe–8311–550de00981a4.html).

Excessive drinking may have played a role in this misconduct (according to the employee, when the incident took place at 8:30 a.m., Judge Smith's breath smelled strongly of liquor). *Id.* Questions about Judge Smith's fitness in 1998 aside, it is worrisome that the Committee on Judicial Conduct and Disability of the Judicial Conference of the United States ultimately ordered the Fifth Circuit to take another look at the matter, in part because Judge Smith is said to have "allowed false factual allegations" to be made on his behalf in responding to the complaint in 2014–2015. *See* Committee on Judicial Conduct and Disability of the Judicial Conference of the United States, Memorandum of Decision C.C.D. No. 16–01 (*In re: Complaint of Judicial Misconduct Proceeding in Review of the Order and Memorandum of the Judicial Council of the Fifth Circuit, J.C. No. 05–14–90120*), filed July 8, 2016, at 3 (available at http://www.uscourts.gov/file/document/complaint–judicial–misconduct–16–01). Judge Smith retired effective September 14, 2016. *See* Tommy Witherspoon, *Federal judge Smith retires during Ongoing Investigation*, WacoTrib.com, available at http://m.wacotrib.com/news/courts_and_trials/federal-judge-smith-retires-during-ongoing-investigation/article_a44e8589-2cfb-5719-97ec-a1362bce08f2.html?mode=jqm.

41

EXHIBIT 1 pg. 046

death penalty experience. That attorney waited eight months before seeking co–counsel, and then had the court appoint his own son.

While that attorney was representing Brandon solo, it was his duty to attempt to dissuade the Government from pursuing Brandon's execution. He undertook no meaningful investigation into Brandon's background to that end, visiting Brandon just three times between the day he was appointed and the day he sent the Government a cursory letter asking for a non–death resolution in Brandon's case. That letter — the substance of which occupies just three–quarters of a page — comprises just 334 words. *See* Letter of Russell D. Hunt to Mark Frazier (August 30, 1999), attached as Exhibit V.

Ultimately, the father and son team responsible for Brandon's defense collectively logged just 20% of the preparation time typically spent on a federal capital case, and compressed most of what they did into the eight weeks immediately preceding trial. Unsurprisingly, their presentation concerning Brandon's life and background was hollow, lackluster, and — most critically — incomplete.

Brandon's lawyers made no opening statement at either phase of trial. Nor did they challenge the Government's forensic evidence, including the claim that Stacie Bagley was still breathing as the fire burned, even though readily available expert opinion could have shown that, at that time, she was likely already medically dead. This was a key issue for the jurors, who, after asking for the autopsy report, sentenced Brandon to death for Stacie's murder, believing that she was alive when the fire was lit. More important, Brandon's lawyers utterly failed to emphasize the undisputed fact that after she was shot, Mrs. Bagley was unconscious and unable to feel pain. Had they done more to ensure that the jurors fully understood that Mrs. Bagley was beyond suffering once Vialva shot her, it is likely that no death verdict would have been returned

42

EXHIBIT 1 pg. 047

against Brandon. This conclusion follows from the fact that jurors sentenced Brandon to life imprisonment for his role in the death of Todd Bagley, who was instantly killed by Vialva's gunshot, but struggled to reach a sentencing verdict for his role in Mrs. Bagley's death, despite having been told little about Brandon's background or character.[22]

Counsel let Brandon's mother decide which penalty–phase witnesses to call (a gambit the Supreme Court has expressly condemned[23]) and did not prepare any of them to testify. Jurors heard nothing about the destructive violence young Brandon witnessed between his parents, or his struggle with depression as a teen. Nor did counsel call any of the many people (*e.g.*, ministers, a former juvenile probation officer, and fellow church goers) who could have described Brandon's remorse and good qualities. As mentioned, the Government presented a psychiatrist, who, resting on a method since repudiated by the Texas state courts, speculated that anyone with Brandon's background would pose a "future danger" even in prison; that prediction has proved wildly inaccurate, as Brandon has been completely well–behaved in custody.

In post–conviction review, Judge Smith refused to let Brandon present evidence to support his challenges to his death sentence. Then, in approving

---

[22] Sentencing deliberations began around 4 p.m. on June 12, 2000. Before breaking for the night at 7 p.m., jurors condemned Vialva to death on all three death–eligible counts. *See* Jury Verdicts, attached as Exhibit W, pgs. 1–3. During the same session, and despite the horrific nature of the crime, jurors sentenced Bernard to life for his part in the carjacking and in Todd Bagley's murder. Exhibit W, pgs. 4–5. Only after unsuccessfully requesting the autopsy report on Stacie Bagley and returning for further deliberations the following day did jurors impose a death sentence on Bernard for Mrs. Bagley's murder. Exhibit W, pg. 6.

[23] *Sears v. Upton*, 561 U.S. 945 (2010).

43

EXHIBIT 1 pg. 048

that decision without allowing a full appeal, the Fifth Circuit employed the same approach – imposing an unfairly steep standard when deciding whether to allow a full appeal – that would lead to its third reprimand from the Supreme Court in fourteen years. *See Buck v. Davis*, 137 S. Ct. 759 (2017); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341-48 (2003), and *Tennard v. Dretke*, 542 U.S. 274, 283-89 (2004). Unfortunately, the ruling in *Buck* came too late for Bernard.

The fact that the legal apparatus malfunctioned here is deeply troubling. But thankfully, the Executive is unconstrained by formal limits on what information to consider and technical rules about how to weigh it. This clemency proceeding is the only point in the long history of Brandon's case at which that unbounded assessment may be made. For that reason, the appropriate question for the President is not "*Who let this case get to this point?*", but "*Is taking Brandon's life the morally appropriate response, given everything that we know now?*" The answer to that question is a forceful "no."

## IX.  Executing Brandon would inflict additional suffering on his own family, in whose lives he plays an important and constructive role.

Despite having lived his entire adult life behind bars, Brandon has had a positive impact on the lives of others. In fact, Brandon's younger brother Max credits Brandon with saving him:



*I was about seven years old when Brandon was arrested.*

*If Brandon were executed, I would be devastated. I would feel as if there were no hope in the world. He is my big brother and has always been there for me. I know that he made horrible choices years ago and I have great sympathy for the Bagleys and their families. But I believe that he has learned*

44

EXHIBIT 1 pg. 049

*from those mistakes. Even though he is in prison — and maybe in some ways because he is in prison — he has helped me stay clear of getting into trouble or getting mixed up with the wrong crowd. Brandon is supportive of me and has helped me through some very hard times. He has been supportive of me in positive ways, without judging me. I appreciate that. I don't have this sort of connection with anybody else.*

Declaration of Max Bernard at ¶¶ 1–2 (June 27, 2016) (Attached as Exhibit X).

Brandon's other family members would also be devastated if their father, son, brother, friend, and best friend were to be executed. Select testimonials include:

*I believe he is worth saving. ….. He encouraged me to get good grades and graduate from high school and medical assistant training. He is still my older brother and fills that role when I need him. . . . He gives me good advice. He helps keep me calm and keep things in perspective. He helps me remember that I should not worry about things that I can't control. I love him very much.*

> *…*

*I tell him everything. He is my best friend and my big brother. He is a kind hearted person …. Brandon cautions me against people he thinks might take advantage of me. I depend on Brandon to advise me and he helps me make better decisions.*

Declaration of Quiona Bernard at ¶¶ 13, 15 (July 12, 2016) (Attached as Exhibit P).

45

**EXHIBIT 1 pg. 050**



Despite getting to visit Brandon only once a year through a glass partition, Brandon's mother appreciates the time she can have with her son, even as she recognizes the suffering his actions have caused the Bagley family:



*If Brandon were executed, it would weigh heavily on my soul. My faith is a tremendous source of strength and optimism[,] but even my faith cannot overcome the longing to hold my eldest child in my arms. I enjoy visiting him and talking with him over the phone, but it's hard for me not to be able to hug my son. At every visit, we put our palms up against the glass, but it is a poor substitute for an embrace. However, I am grateful for it since that is all I can do.*

*I would ask that President Trump spare my son's life. People lost their lives because of Brandon's poor decisions and it fills me with immense sorrow. I pray for their families too and know that whatever happens, it is God's will. I wish the victims could be*

46

EXHIBIT 1 pg. 051

> *brought back to make their families whole again. I know it is a lot to ask for, but I hope they can forgive Brandon.*

Declaration of Thelma Bernard at ¶¶ 14–15 (August 14, 2020) (Attached as Exhibit Q).

Brandon is also the father of two young girls, who he proudly reports are already growing into strong young women.

 

He has never been able to hold either one of them. Nevertheless, they all cherish the relationships they can have.

Sherise Scott, the mother of Brandon's 16 year–old daughter Taneah, stresses how important Taneah's relationship with Brandon has been, and hopefully will continue to be. She worries that if Brandon were executed, this would create yet another grieving family:

47

**EXHIBIT 1 pg. 052**

 *Brandon is important to Taneah because he is her father, and she treats him like one. Brandon's experience serves as an important life lesson for her[.] Taneah has never gotten into trouble and does well in school. Brandon encourages her to keep up her grades. He explains to her that who she has as friends is very important. He is an example of what can happen if she hangs out with the wrong friends. Taneah does not wish to make the same mistakes, so she goes to school and to work and does not go out to parties. Brandon continually reminds her of what her choices mean.*

*I ask that the President commute Brandon's death sentence to a life sentence. It is important for Taneah to have her father around. He can never be replaced. She can continue to learn from him and seek his guidance. He is a different person than the one who got into trouble …. If he was executed, more victims would be created, like my daughter Taneah. He has much to offer even though he is in prison. Please do not punish my daughter for something her father did. Brandon will still be punished . . . by spending the rest of his life in prison, with no chance to ever be home with his family.*

*I understand that the Bagley family has lost two people because of the crimes that Brandon was involved in. I am very sorry for that and wish there was something I could do to change things for them. They have suffered, and if I were them, I too would want to see Brandon punished harshly. I truly believe that if Brandon could trade places with the victims, he would. But executing Brandon will not bring back their children. It will only punish another child, our daughter Taneah. I ask the Bagleys to understand that although this was a terrible crime, Brandon committed it when he was young and that he is not that person any more. I hope that someday they can find it in their hearts to forgive him, even though they will never forget the pain of their loss.*

48

**EXHIBIT 1 pg. 053**

Declaration of Sherise Scott at ¶¶ 3–5 (August 23, 2016) (Attached as Exhibit Y).

Taneah admits that it is not easy to maintain a relationship with an incarcerated parent, but values even the unconventional connection that she and her dad have established:



*My father is there for me as much as he can be from prison. I have never been able to hug my dad, but mentally and emotionally he is there for me as much as possible. It might not seem like much of a relationship, but it is the best one I have and it is important to me. I will never have a normal father–daughter relationship with my dad. He will never be able to attend my graduation or take part in my wedding, but I hope to be able to share those things with him.*

*I have learned a lot about the consequences of my actions from my father. He is very firm with me about making the right choices, staying out of trouble, keeping away from the wrong crowd, and keeping my grades up. He stresses to me how important those things are and how one bad choice could ruin my life.*

*I am hoping and asking the President to spare my dad's life. I know he has done wrong, but also know he is sorry. It would be a tremendous loss to me if my dad was executed. I depend on him for his guidance and support and hope I will be able to continue to get it from him while he is in prison for the rest of his life.*

Declaration of Taneah Scott at ¶¶ 3–5 (August 23, 2016) (Attached as Exhibit Z).

## X. Brandon has consistently, repeatedly, and wholeheartedly demonstrated remorse for his crime.

As discussed earlier, the accounts of Youth Pastor (now Dr.) Andreassen and Pastor Johnson make clear that Brandon expressed remorse for his role in

49

EXHIBIT 1 pg. 054

the Bagleys' deaths from the very beginning. Yet another minister counseled Brandon as he awaited trial and could have been called upon to attest to Brandon's sorrow and regret. His name is Reverend Elmer "Jack" Hetzel; he supports the death penalty in general, but not for Brandon.[24]

Reverend Hetzel ministered to Brandon after Brandon reached out to him through another inmate who was held at the local jail. At their very first meeting, Brandon asked "how he could possibly be forgiven for what happened to the Bagleys." He also "wanted to apologize to the victims' families and ask for forgiveness, but did not know how to reach out to them or if the families even wanted to hear from him." Reverend Hetzel has provided spiritual guidance to many inmates over his lifetime; he believes that Brandon's remorse was sincere, and regrets not having had the chance to explain this to the jury:



*Brandon showed true remorse during our conversations. I counsel and minister a lot of individuals in custody. Many of them fail to see the seriousness of their actions and seem unaware of the need to reform themselves. Brandon was different. He showed true remorse during our conversations, [and] applied himself to the task of understanding where he had gone wrong….*

*Over time, Brandon told me that he felt ashamed for not having tried to stop the events that led to the Bagleys' deaths. He wanted to apologize to the victims' families and ask for forgiveness, but did not know how to reach them or if the families even wanted to hear from him….*

---

[24] *See* Declarations of Clemency Investigators Charles Formosa and Stacey Brownstein, describing conversation with Reverend Hetzel at ¶ 3 of each declaration (Attached as Exhibits M and N, respectively).

**EXHIBIT 1 pg. 055**

*I was never contacted by anyone on Brandon's trial team. Had I been, I would have liked to have shared with the jury my experiences with the young man I came to know over the year we spent talking and praying together in the Waco Jail. I would also have told the jury how remorseful and grief–stricken he was over what happened. I could have been able to tell the victims' families that Brandon had regret and sorrow for his actions.*

*I pray for the victims' families. I know they have suffered an insurmountable loss and nothing can be said or done to bring their children back. My wish for Brandon's life to be saved does not take away my sorrow for their loss.*

*I pray that President Donald Trump will spare Brandon and commute his death sentence to a life sentence. I am grateful that I had the opportunity to minister to this young man. In my professional opinion, based on years of ministering to people, Brandon Bernard could make a positive contribution to society, even if he spent the rest of his natural life in prison. I believe that his life is worth saving.*

Declaration of Reverend Elmer "Jack" Hetzel at ¶¶ 11–16 (August 12, 2020) (Attached as Exhibit AA). Like the painful regrets he expressed to Andreassen and Johnson, none of Brandon's statements of remorse to Rev. Hetzel were made known to the jury.

## XI.    Brandon has counseled others to avoid straying down a destructive path.

Pastor Hetzel's belief has already been shown correct. Brandon can make a positive contribution to society if allowed to live, as he has shown by repeatedly reaching out to others, holding up his own life's terrible mistakes and their grim consequences as cautionary tales to other wayward youth.

Growing up, Brandon knew twin brothers David and Michael Boyd, five years his junior, as kids from his church. In 2006, Brandon saw a magazine article reporting that the grown up Boyd Brothers were launching an

51

EXHIBIT 1 pg. 056

"Enlightenment Tour" to travel the country reaching out to troubled youth and trying to steer them towards God. To support their efforts, Brandon offered to write a personal testimony about the perils of sin. As documented in a subsequent article, the Boyd brothers found Brandon's testimony to be "most moving":

> *Of all the blessings, one of the most moving was when Brandon Bernard, a Seventh–day Adventist and the youngest person to be put on federal death row, read our article in the Southwestern Union Record and responded to us with: "As soon as I read your article, I knew what God wanted me to do." Brandon wrote his testimony and asked us to share it with others in danger so that they won't walk the same path.*

*The Enlightenment Tour*, Insight Magazine Online (December 9, 2006), attached as Exhibit A to the Declaration of David Boyd (August 7, 2020), which is attached to this application as Exhibit BB.

David Boyd is a former correctional officer for the State of Texas. From his days as a prison guard, he remembers offenders "who were proud to be incarcerated," but emphasizes that Brandon, in contrast, has opened his heart to God and humbled himself. Declaration of David Boyd at ¶ 9 (August 7, 2020). In his declaration, he elaborates on the value of Brandon's help, citing Brandon's testimony at length:

> *Brandon provided powerful testimony to kids that we were trying to help. He explained how quickly he fell, how much he regretted it, and how others should learn from his mistakes. It was the most powerful testimony that we received. Here is a sample:*

>> *At 18 years old most kids are preparing to embark on life. At 18, I was getting processed by the FBI, but [at] 19 I was sitting on death row ....*

>> *A person reading this might think to themselves ... this would never happen to me. Don't be a fool! This whole place is filled with people who thought it*

52

EXHIBIT 1 pg. 057

*couldn't happen to them; now they wish they would of [sic] listened. Most of the time it starts from doing small things. It just continues to escalate at such a rapid pace, that before you know it, it's over and your [sic] left either dead, in prison, or in here (which actually is combination of both.) How do I know, because I thought the same way ....*

*I didn't have a violent record or an adult [record] (matter of fact[,] I barely had a record at all.) I went to church every week. I attended numerous church functions. I even went to church school, but sin does not discriminate about whose life it will destroy. Maybe you'll understand this better if I put it this way. It took me only 3 years to ruin my life. 3 yrs from the time I first stole from my moms [sic] purse to being in death row. Now marinate on that! ...*

*It may be too late for me (only God knows the answer to that), but it is not too late to help others. It's not too late to let youths know that this [criminal] lifestyle is not glamorous. There are no rewards. There is only pain ....*

*Stop breaking those who care about your hearts! Make the decision to do what is right, walk the path of righteousness ....*

*Listen to my words and learn from my life's mistakes so you don't have to experience it yourself.*

Declaration of David Boyd, Exhibit BB at ¶ 7 (August 7, 2020).

Both David and Michael confirm that Brandon's statement helped them redirect many at–risk youth. As Michael recalls,

*We integrated Brandon's statement and his story into our presentation. His story changed the lives of a lot of kids for the better. Brandon's story was a real life example of what could happen to them if they followed the wrong crowd or thought only about themselves rather than others.*

53

EXHIBIT 1 pg. 058

> *I believe Brandon's statement and story helped many kids stay out of trouble. It was a very effective statement. Brandon did this out of his own will. We never asked him to do anything and Brandon did not expect anything from us other than to get his message out to the kids. The fact that Brandon reached out to us is an example of the Brandon I always knew.*

Declaration of Michael Boyd at ¶¶ 5–6 (August 9, 2020) (Attached as Exhibit CC).

After he reached out to them, the Boyds' visited Brandon on death row. There they found a young man deserving of mercy. Here is how David Boyd describes that meeting and why he believes that clemency is appropriate:

> *Michael and I visited Brandon on death row in 2008. Brandon was calm, but happy that we cared enough to come see him. We talked about how Brandon was trying to turn his life around and stay positive in a place where it is always easy to feel sorry for yourself rather than think about how your own actions put you there. Brandon said he was doing his best to stay positive. Helping us with the Enlightenment Tour was a way Brandon stayed positive. To Brandon, it was doing something right. Brandon wishes he made better decisions when he was eighteen and blames only himself for what happened. There was no sense of falseness from Brandon. He was not pandering to us. He was being honest. He was remorseful. Michael and I told Brandon to keep his faith and Brandon said he would.*

> *If I could say anything to the victims' families, I would tell them I am deeply sorry for their loss. I would tell them that Brandon has a good heart and Brandon knows he made terrible, life–altering decisions. I would tell them I think Brandon was following his friends and I believe he would not have gone with them if he had fully grasped the potential consequences that could follow. I would tell them Brandon apologizes to all the people and families he hurt that day.*

> *I would also ask President Trump to spare Brandon's life and commute his death sentence to life imprisonment without the possibility of parole. It is clear to me that Brandon recognizes that*

54

EXHIBIT 1 pg. 059

*he has made seriously bad decisions and an awful tragedy resulted from his decisions. He has reached out and helped other kids stay out of trouble by sharing his story. These are the actions of a remorseful person who deserves mercy.*

Declaration of David Boyd at ¶¶ 10–12 (August 7, 2020) (Attached as Exhibit BB).

Similar information comes from Pastor Aaron Chancy, a childhood friend who had his own struggles with the law, but has tried to use those struggles positively, as warnings for others:

*My name is Pastor Aaron Chancy. I am a friend of Brandon Bernard and his family. I am two years younger than Brandon. I have known Brandon since he was about 7 years old.*

*…*

*I had a ministry and travelled all over parts of the country, like New York, Tennessee, North Carolina and other states and have spoken at many churches in those states. In 2008, I asked Brandon to help me use his story to reach out to kids in the community who might stray from the Lord's path.*

*…*

*Here are brief excerpts from [the letter that Brandon wrote in response]:*

> ***I'm a grown man sitting on Federal Death Row. Twelve years of my life (written in 2011) is gone. Since the age of 18 (now 31 in 2011) I have called concrete walls, electric doors, and handcuffs my home.***
>
> ***The Bible says, "The wages of sin is death". When I embraced what I knew was contrary to what I was taught as a Seventh–day Adventist, I turned in my application to the devil. I had an arrogance that came with my youth, which masked my ignorance to my future. I was fixated on the here and now. For an immediate good time I was willing to throw away my whole life.***

55

EXHIBIT 1 pg. 060

*I ultimately got what I wanted for a little bit of time, then got what I deserved for a lifetime.*

*Brandon wanted to reach out to kids and keep them from making the same mistakes he did. It was a way for Brandon to contribute to society from where he was. I have presented this to many people through the many states and think it has had a huge positive impact on the people who heard it.*

*I believe that even if Brandon spends the rest of his life in prison, he can still continue to reach out to people who have strayed from the Lord's path. Brandon could still help me spread his word. The people who hear Brandon's story could reach out to him and learn from the mistakes he made in his life. If Brandon is put to death, we will lose the best messenger for his important story. Executing Brandon will also deprive other listeners of the opportunity to reach out to him and learn even more from his experiences.*

Declaration of Pastor Aaron Chancy at ¶¶ 4–6 (July 28, 2016) (Attached as Exhibit DD).

XII.    **What Brandon would like to say to those who loved Todd and Stacie Bagley.**

Brandon's personal plea for clemency is included in a video that accompanies this petition, which can be downloaded here: https://www.dropbox.com/s/6ovaj951aojqpgt/Bernard.mp4?dl=0.    Brandon would like everyone involved in deciding whether to proceed with his execution to know that he is no longer the traumatized and insecure youth he was in 1999. He wishes that 18–year–old Brandon had been strong enough to step up and stop the Bagleys from being killed, at whatever cost to himself and his friends. As Pastor Johnson's declaration notes, Brandon has always wished that he could communicate his shame and regret to the Bagleys. Here is a

56

**EXHIBIT 1 pg. 061**

sampling of what he would have said, as he expressed to members of his clemency team during a visit (lightly edited for readability):

> *I would first want to tell the Bagleys that I am sorry. I am sorry for the role that I played in the death of their family …*

> *I would like to tell them that — that wasn't me — that wasn't the person I was raised to be by my parents. I attended church every week and that is the person that I should have been at that exact moment, when they taught me to step up and do the right thing, and I didn't do it, and I wish I did. And every day that goes on, I wish I did.*

> *I would like to tell them that I have tried to be a better person since that day, and I have continuously tried to work in bettering myself. I can't imagine how they feel about losing their family, and I wish that we could all go back and change it. And I am sorry for all the pain that I caused.*

## XIII.    Conclusion

Brandon's own actions — and failures to act — contributed to the deaths of Todd and Stacie Bagley. Their deaths are an outrage and a tragedy. But Brandon was not the leader or primary actor in those events. And even with the limited defense that was presented, the jury declined to sentence Brandon to death for Mr. Bagley's murder. Given Brandon's youth, his limited and lesser role in the crime, and our improved understanding that the brain of an 18-year-old is not yet fully mature in its function, the Government would likely decline to pursue his execution if the decision were made today. Even in 1999–2000, if Brandon's appointed counsel had better acquainted themselves with Brandon's background and made a meaningful presentation to the Government, a death penalty prosecution against Brandon might well not have been authorized.

Had Brandon's jurors been fully informed when Brandon's life was in their hands, they likely would have imposed life sentences on all three death–

EXHIBIT 1 pg. 062

eligible counts, instead of on just two of them. This essential truth is well summarized by juror Jason Fuller:

> *I support clemency for Brandon Bernard. This is based on information I have learned about the medical status of Mrs. Bagley after she was shot, as well as information on how well Brandon has done while in custody in Terre Haute, IN. This includes him taking responsibility for his actions and having remorse for the pain and suffering and hurt he has caused. Also, my understanding now, as I am older, with more life experiences, about teenagers and our brain and social development factors into my current wishes for clemency. I do not want Brandon to be executed for bad decisions he made when he was a teenager. I believe that Brandon's single death sentence should be commuted to life without parole.*

Declaration of Juror Jason Fuller, Exhibit C at ¶ 10 (July 21, 2016).

For the last twenty years, Brandon has spent almost 23 hours of every day in solitary confinement. And during that entire time, he has kept to himself, following the rules and behaving peaceably. His punishment has been severe and will continue to be severe; even if the President spares him from execution, Brandon will spend the rest of his life confined in a United States Penitentiary. That is an appropriate punishment for Brandon's role in Mrs. Bagley's murder. We echo the urgent words of juror Gary McClung:

> *I have always thought about whether there was anything I could do to try to change Mr. Bernard's death sentence to a life sentence. I thought about writing a letter to the court expressing my belief that a life sentence was the appropriate punishment and that Mr. Bernard did not deserve to be put to death. I had no idea where to start, so I never did. I am grateful to have this opportunity to clear my conscience by speaking what has always been in my heart. I hope that my speaking up can help Mr. Bernard have his death sentence commuted to a life sentence. I never thought this opportunity would come. I pray that President Trump rights this wrong and commutes Mr. Bernard's sentence to life imprisonment.*

58

**EXHIBIT 1 pg. 063**

Declaration of Juror Gary McClung, Jr., Exhibit E at ¶ 10 (August 13, 2020).

We return to our starting observation. The death penalty should be reserved for the worst of the worst. Brandon is far from that: just eighteen at the time of the crime, with no prior violent criminal record, a follower – not a leader – in the crime, and a model prison inmate for the ensuing twenty years. Brandon can never undo the harm he has caused the Bagleys, but he has earnestly tried to do all that he can to deter others from making similar mistakes and hopefully prevent other families from having to endure an unimaginable loss like that of the Bagleys. He asks for mercy for his crime.[25]

---

[25] Executing Brandon would be especially arbitrary, given the Government's willingness in other cases to accept sentences less than death for offenders who are more morally culpable. For example, in May 2019 the Government agreed to spare Mariah Ferry, Chase Smothermon, and Jose Torrez. The three conspired to abduct two victims after the victims stole their marijuana and cash. They beat one with a baseball bat, bound him, and then videotaped his further assault and death. They then committed "unthinkable acts of desecration" on his body. Showing pictures of the desecrated victim's body to the other victim, they assaulted him for hours and threatened to do the same to him unless he showed where the stolen drugs were, stating they killed the first victim to "serve as a lesson to others." *See* Courtney Allen, *Two final suspects take plea deals in brutal killing*, KRQE (February 13, 2020) (https://www.krqe.com/news/crime/two-final-suspects-take-plea-deals-in-brutal-killing/); United States Sentencing Memorandum, *United States v. Smothermon*, No. 18-cr-930-2 MV, dkt. 263 (D.NM, June 10, 2020).

In November 2019, the Government chose not to pursue the death penalty against Ryan Bacon and Dontae Sykes. As a result of dispute between drug dealers, Bacon, Sykes and others stalked the other dealer for over a month, placed a bounty on his head, kidnapped and murdered his girlfriend (shooting her five times), and accidentally shot a 6-year-old boy while attempting to shoot the other dealer. The boy has been left largely paralyzed. *See* Xerxes Wilson, *Drug dealer who admitted role in 6-year-old's shooting, woman's execution takes plea*, Delaware Online (January 10, 2020) (https://www.delawareonline.com/story/news/2020/01/10/man-takes-plea-

59

EXHIBIT 1 pg. 064

death-penalty-case-boys-shooting-womans-murder/4429530002/);        Redacted
Indictment, *United States v. Bacon*, No. 18-75-DNA, dkt. 3 (D. Del. October 4,
2018).

In May, 2019, the Government elected to forego the death penalty as to
Jeremiah Farmer. Farmer was convicted at trial of two RICO murders in
connection with gang activity. The victims died of extensive head injuries due
to blunt force trauma. The charges were originally brought by the state, but
were dismissed after critical witnesses recanted their statements to police
following threats and intimidation. Farmer also engaged in robbery, threat to
kill, and a shooting that appeared intended to kill; he described his pleasure in
hitting people hard enough to break their bones. *See* Meredith Colias-Pete,
*Gang member convicted in 1999 Hammond double murder*, Chicago Tribune
(July 11, 2019) (https://www.chicagotribune.com/suburbs/post-tribune/ct-ptb-
hammond-farmer-sentence-st-0711-20190711-32s7ti6nkbgzzd33rxhrt4wr4i-
story.html); Government's Sentencing Memorandum, *United States v. Farmer*,
No. 2:15 CR 72, dkt. 2791 (ND Ind. October 21, 2020).

These cases differ from Brandon's in that in each case the defendants
were the principal actors in their horrific crimes. In contrast, Brandon was an
18–year–old accomplice who did not occupy a leading role in the offense for
which he has been sentenced to death. They also differ in that these defendants
are demonstrably more dangerous than Brandon: These cases involve torture,
lying-in-wait, and other acts showing the deaths were carefully calculated.
Meanwhile, Brandon has been a model prisoner and counseled others to follow
the teachings of Christ.

60

**EXHIBIT 1 pg. 065**



We respectfully request that Brandon Bernard's death sentence be commuted.

Sincerely,

Robert C. Owen
Law Office of Robert C. Owen, LLC
53 West Jackson Blvd., Suite 1056
Chicago, IL 60604
512.577.8329
robowenlaw@gmail.com

John R. Carpenter
Assistant Federal Public Defender
1331 Broadway, Suite 400
Tacoma, Washington 98402
253.593.6710
john_carpenter@fd.org

EXHIBIT 1 pg. 066

Case 6:99-cr-00070-ADA   Document 701-3   Filed 11/18/20   Page 67 of 334
Case 6:99-cr-00070-ADA   Document 656-13   Filed 02/05/13   Page 1 of 1



Government
Exhibit
W-99-CR-070 (03)
065
EXHIBIT 1 pg. 067
Exhibit A

## DECLARATION OF CALVIN KRUGER

I, Calvin Kruger, do hereby declare:

1. My name is Calvin Kruger. I was the jury foreman in case number W-99-CR-70, in the Western District of Texas, in which Brandon Bernard and Christopher Vialva were tried and convicted of one count of carjacking and two counts of murder. The defendants faced possible sentences of death on all three of these counts. The jury sentenced Brandon Bernard to death for one of these counts and sentenced Christopher Vialva to death for all three of these counts. I am aware that Brandon Bernard is asking that the President commute his death sentence to a life sentence and that this declaration will be submitted with his clemency petition.

2. I have no doubt that Brandon Bernard and Christopher Vialva are guilty of the crimes that we the jury convicted them of.

3. I do not think Brandon Bernard's attorney did a good job in defending him. To me, it seemed like his attorneys were going through the motions and nothing more.

4. While the evidence proved that Brandon Bernard is guilty beyond any doubt, it also clearly showed that Brandon Bernard was not the ringleader behind these offenses, but a follower. Because of this, I support Bernard's death sentence being commuted to life without the possibility of parole. I am praying the President commutes Brandon Bernard's death sentence.

I declare under the penalty of perjury under the laws of Texas and the United States of America that I have read the foregoing declaration and it is true and correct.

Executed this 6 day of November, 2020 in Waco, Texas.

Calvin Kruger

EXHIBIT 1 pg. 068

Exhibit B-1

Declaration of Jason Fuller

I, Jason Fuller, make the following declaration:

1.  I am Jason Fuller, I was a juror on Case W-99-CR-70 in the Western District of Texas which charged both Christopher Vialva and Brandon Bernard with carjacking and murder. Both were found guilty by our jury and both received the death penalty.

2.  I have been made aware that Brandon Bernard is seeking clemency from the President, and is asking for his sentence to be commuted from Death to a Life sentence. I am aware this declaration will be used in that petition and I support Brandon's request for his death sentence to be commuted.

3.  I often think about the Bagleys and their families. I know they have suffered an unimaginable loss. I pray for them and for their comfort and peace.

4.  There was no doubt, in my mind, that both young men were guilty of the crimes they were charged with. There was not any disagreement among the jurors about their guilt.

5.  Jury deliberation in the penalty phase with regard to Christopher Vialva was also without any contention or disagreement. Christopher Vialva was the clear ringleader and shooter and we all quickly agreed that he deserved the death penalty.

6.  Though we ended up agreeing at the time that Brandon should receive a death sentence, we had limited information available to us that would have guided us in choosing a different sentence based on the two options available to us. If the jury had the information provided in Dr. Pustilink's report, heard about Brandon's remorse from his minister, and heard about Brandon's upbringing, it would have helped support my feeling that Brandon did not deserve the death penalty. However, with the information we had available to us and the jury instructions, we were unable to support a sentence of life without the possibility of parole.

7.  I voted for death for Brandon Bernard because of the autopsy report presented by the prosecution. It stated that Stacie Bagley did not just die from the gunshot wound, but also from smoke inhalation. There was no rebuttal to this. Brandon's attorneys did not do anything to dispute this. I have since reviewed Dr. Pustilnik's report and learned that it was likely that Mrs. Bagley was medically dead immediately after she was shot by Mr. Vialva and the fire did not cause her death. If the information presented in this report had been presented at trial, I would have made a different decision at sentencing.



EXHIBIT 1 pg. 069

Exhibit C-1

8.  I also understand that Mrs. Bagley was likely unconscious immediately after being shot by Christopher Vialva, and that her lack of consciousness would have meant that she did not feel any pain. I did not understand this at the time I made my sentencing decision because Brandon Bernard's trial attorneys did not highlight this fact. Had that been highlighted, I also would have made a different decision at sentencing. I would have voted that Brandon receive a life sentence for Mrs. Bagley's murder, as I voted for the other two death penalty counts that Brandon faced.

9.  I felt that Brandon was a kid who got caught up with the wrong crowd, and I think that Brandon was prejudiced by being on trial with Christopher Vialva. It made it hard for me to disassociate Mr. Vialva's role in the crimes from Mr. Bernard's role. It was clear to me that Brandon was just an adolescent, trying to find belonging. Unfortunately, I think he found belonging with the wrong crowd and was in the wrong place, at the wrong time. Brandon clearly is responsible for making some horrible decisions that had horrendous outcomes. However, his young age at the time does weigh on me. I do not believe that Brandon should be executed for bad choices he made when he was 18. If he was the shooter or if I thought that Brandon was the mastermind behind this terrible crime, I would not feel this way about Brandon getting a second chance.

10. I support clemency for Brandon Bernard. This is based on information I have learned about the medical status of Mrs. Bagley after she was shot, as well as information on how well Brandon has done while in custody in Terre Haute, IN. This includes him taking responsibility for his actions and having remorse for the pain and suffering and hurt he has caused. Also, my understanding now, as I am older, with more life experiences, about teenagers and our brain and social development factors in to my current wishes for clemency. I do not want Brandon to be executed for bad decisions he made when he was a teenager. I believe that Brandon's single death sentence should be commuted to life without parole.

I have read the foregoing declaration. Under the laws of the United States and Texas, I declare under penalty of perjury that this declaration is true and correct.

Executed at Silsbee, Texas on ___7/21/2016___

Jason Fuller

EXHIBIT 1 pg. 070

Exhibit C-2

Received Fax :        Oct 25 2012 10:31AM     Fax Station :   DEFENSECLINIC            p . 2

409 935 8305        GALVESTON CO. M.E.                          09:51:14 a.m.   10-25-2012        2 /7

## DECLARATION OF STEPHEN PUSTILNIK, M.D.

Stephen Pustilnik, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Stephen Pustilnik. I am over the age of 18, and I currently reside in Harris County, Texas. I have never been convicted of a crime and I am fully competent to make this affidavit. Unless expressly stated otherwise, I either have personal knowledge of the facts stated herein or I have described the documents from which I have acquired my information. I believe the statements made in this declaration to be true and correct.

2. I am the Chief Medical Examiner for Galveston County, Texas, and an Assistant Professor of Pathology for the University of Texas Medical Branch. I am board certified in both Anatomic and Forensic Pathology by the American Board of Pathology and I am a licensed physician in the state of Texas.

3. I received my BA from the University of Pennsylvania and my MD from the Washington University School of Medicine. I interned at the University of Connecticut and did my residency at the Yale University School of Medicine. I did my fellowship in Forensic Pathology at the Dade County Medical Examiner Office.

4. At the request of Robert C. Owen, attorney for Brandon Bernard, I have reviewed materials in the case of *United States v. Christopher Vialva and Brandon Bernard*. Those materials included the report of the autopsy of Mr. Todd Bagley, performed by Southwest Institute of Forensic Sciences, the report of the autopsy of Mrs. Stacie Bagley, performed by Southwest Institute of Forensic Sciences,

**EXHIBIT 1 pg. 071**

Exhibit D-1

Received Fax :        Oct 25 2012 10:31AM        Fax Station :    DEFENSECLINIC              p.  3

409 935 8305        GALVESTON CO. M.E.                        09:51:27 a.m.    10-25-2012        3 /7

photographs of the crime scene, photographs from the autopsies, and the trial

testimony of Dr. Joni McClain, Dr. J.K. Townsend-Parchman, and Dr. Robert

Bux.

5.    The report of the autopsy of Mrs. Bagley describes and identifies black

soot as being present in Mrs. Bagley's central and distal airways.  The report

also notes a toxicology analysis demonstrating a carboxyhemoglobin of 45%.

The report also indicates that Mrs. Bagley's brainstem was not directly

affected anatomically by the projectile that caused her gunshot wound.

6.    During Dr. McClain's testimony at trial, the prosecutor asked her to

describe her findings regarding Mrs. Bagley's cause of death.  Dr. McClain

responded that the "[c]ause of death was gunshot wound of the head

associated with smoke inhalation and thermal injury." T. 2057.  Asked further

whether "the portions of [Mrs. Bagley's] brain that were hit with this -- by the

bullet" had "cause[d] death in Mrs. Bagley immediately," Dr. McClain

answered, "No," explaining that Mrs. Bagley at the time she was shot "most

likely would've been unconscious."  T. 2061.    Asked by the prosecutor

whether the bullet struck "any areas of the brain that are vital ... that would

've caused instant death," Dr. McClain responded, "No," adding that

"[u]sually, the ... brain stem is the portion of the brain that is an instantaneous

death, and that was not hit." T. 2061.  Dr. McClain further testified that her

examination during the autopsy of Mrs. Bagley's larynx, trachea, and bronchi

revealed that "there was soot deposition lining [those airways], so that

indicates that she's inhaling smoky, sooty material." T. 2061-62.  She added

EXHIBIT 1 pg. 072

Exhibit D-2

Received Fax :          Oct 25 2012 10:31AM      Fax Station :    DEFENSECLINIC          p   4

409 935 8305          GALVESTON CO. M.E.                    09:51:40 a.m.    10-25-2012          4 /7

that "a toxicologic examination of [Mrs. Bagley's] blood ... showed a carbon monoxide level of 45 percent," which indicated that Mrs. Bagley was "breathing in those products of smoke, and that certainly contribute[d] to [her] death." T. 2062.  She later agreed with the prosecutor's characterization of this effect as "smoke inhalation" which was a "contributing cause" to Mrs. Bagley's death.  T. 2062.

7.    The hypothesis that Mrs. Bagley remained alive and breathing after sustaining a gunshot to the face is one hypothesis that explains the presence of soot in her airways and the carbon monoxide in her blood.  In my opinion, there is an alternative explanation which is equally possible and consistent with the evidence from the autopsy.

8.    To understand this alternative explanation, it is necessary to appreciate the distinction between medical death and forensic death.  An individual is medically dead when either brain death or cardiac death has occurred, even though other autonomic functions may still be ongoing.  Those functions are physiochemically driven, not voluntarily mediated.  For example, the heart can continue to beat for 30-45 minutes after a fatal head injury, such as a gunshot wound.  Medical death marks an important point because, for example, an organ donor who is medically dead can have his organs removed for donation and transplantation.

9.    While the heart is beating, blood is circulating in the body and carbon dioxide levels in the bloodstream are rising.  The medically dead body's physiochemical response to rising carbon dioxide levels in the blood stream,

EXHIBIT 1 pg. 073

Exhibit D-3

409 935 8305          GALVESTON CO. M.E.                          09:51:52 a.m.    10-25-2012          5 /7

in the presence of a persistent agonal heartbeat, is to produce diaphragmatic movement which is mediated through the peripheral chemical receptors in the cardiovascular system and the respiratory centers in the brainstem.. This diaphragmatic movement, in turn, produces persistent agonal diaphragmatic movement and respiratory effort – a "bellows" effect that results in the movement of air from the surrounding environment into the airways of the medically dead body. This agonal respiratory effort is a deep primitive reflex and has nothing to do with consciousness or any higher brain function.

10.     By contrast to medical death, an individual is forensically dead only when all physiologic and agonal activity has ceased.

11.     Mrs. Bagley suffered a gunshot wound to the head that did enter her brain. Any gunshot wound to the brain can be both immediately incapacitating and immediately fatal whether or not it directly damages the brain stem.

12.     One may reasonably conclude from the evidence I have reviewed that Mrs. Bagley, who had suffered an unsurvivable gunshot wound that damaged the structures of her brain, was medically dead after sustaining that injury. That Mrs. Bagley would ultimately arrive at forensic death, as a result of the damage from this gunshot, was a foregone and inevitable conclusion.

13.     Even if Mrs. Bagley was medically dead after sustaining this gunshot injury, physicochemically driven autonomic functions were taking place for some period of time. As noted, the heart can continue to beat for 30-45 minutes after a fatal head injury. This continuing, but inexorably slowing heartbeat is called a "persistent agonal heartbeat." In the circumstances of

**EXHIBIT 1 pg. 074**

Exhibit D-4

Received Fax :        Oct 25 2012 10:31AM    Fax Station :    DEFENSECLINIC            p . 6

409 935 8305        GALVESTON CO. M.E.                        09:52:06 a.m.    10-25-2012        6 /7

Mrs. Bagley's case, this agonal respiratory effort and agonal circulation, occurring in the wake of traumatic brain injury and in an environment of high carbon monoxide and high soot, could lead to soot being deposited throughout the airways, as well as high levels of carbon monoxide in the blood. All these effects would be subsequent to fatal traumatic brain injury, *i.e.*, traumatic brain injury that caused medical death.

14.    This scenario is, in my opinion, an equally possible and more likely explanation for the postmortem finding of soot in the airways of Mrs. Bagley's body, as well as carboxyhemoglobin of 45% in her blood. In this situation, the fire may not have contributed to Mrs. Bagley's death. I do not believe that there was passive diffusion of the smoky environment down through the airways of Mrs. Bagley after she was shot.

15.    If Mr. Bernard's attorneys had contacted any reasonably competent pathologist in 1999-2000, that person could have explained to counsel the distinction between medical death and forensic death, and how the autopsy findings with respect to the soot in Mrs. Bagley's airways and the carbon monoxide in her blood are consistent with physiological processes occurring in the wake of medical death from traumatic brain injury. That information, in turn, could have supported an argument that the person who set fire to the Bagleys' car did not cause Mrs. Bagley's death.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at ᠊SCMEO    (place) on 10-25-2012 (date).



KIMBERLY J. GLASS
Notary Public, State of Texas
My Commission Expires
August 12, 2016

**EXHIBIT 1 pg. 075**

Exhibit D-5

Received Fax :        Oct 25 2012 10:31AM      Fax Station :   DEFENSECLINIC            p . 7

409 935 8305        GALVESTON CO. M.E.                                    09:52:19 a.m.    10-25-2012          7 /7

Stephen Pustilnik

EXHIBIT 1 pg. 076

Exhibit D-6

## Declaration of Gary McClung, Jr.

I, Gary McClung, Jr., make the following declaration:

1. My name is Gary McClung, Jr. I was a juror on Case W-99-CR-70 in the Western District of Texas which charged both Christopher Vialva and Brandon Bernard with carjacking and murder. They were both charged with crimes punishable by either a life sentence or the death penalty. I am aware that this declaration is being presented by Brandon Bernard in his petition for clemency to the President of the United States of America in which Mr. Bernard is asking for the President to commute his death sentence to a life sentence.

2. I want to express my condolences to the victim's families. Their loss is tragic. I realize they have suffered greatly and do not want anything in this declaration to indicate that I think otherwise.

3. The evidence presented during the guilt phase of the trial made it clear to me and the other jurors that Mr. Bernard had a part in the crime but I do not believe that his role was as significant as that of Christopher Vialva. There was not any disagreement or indecision among the jurors regarding Mr. Bernard's guilt. There was a consensus among the jurors. I had no reservations about finding Mr. Bernard guilty.

4. The penalty phase was not as easy for me. I was uncomfortable giving Mr. Bernard the death penalty and have been bothered with my decision since trial. Judging from the way he acted, I believe another juror, who I think was named Ronald Sulak, also felt uncomfortable with giving Mr. Bernard the death penalty.

5. I thought Mr. Bernard was only in that situation that led to the murders because of peer pressure from his friends. I do not think that Mr. Bernard would have taken part in the events if he knew the Bagleys would be killed. I did not think Mr. Bernard would have burned the car if he knew anyone was alive in the car. I believe Mr. Bernard assumed that both Bagleys were dead after Mr. Viava shot them, in the head.

6. I remember Mr. Bernard's mother's testimony during the penalty phase. She said Mr. Bernard and the rest of the family followed the Christian faith. Mr. Bernard came from a good faith- based background. I think everyone deserves another chance, Mr. Bernard included.

**EXHIBIT 1 pg. 077**

Exhibit E-1

7.  Part of my thinking is based upon my observations of Mr. Bernard during the trial. Mr. Bernard seemed afraid of the consequences of his actions. He sat at counsel table in what seemed to be a daze, overwhelmed by what he was facing.

8.  I was also uncomfortable with giving the death penalty because of my religious beliefs. I remember Mr. Bernard's mother testifying during the penalty phase that he had some faith in Christ. I thought she was telling the truth and that Mr. Bernard was a Christian, but that he had ended up in this situation by getting caught up with the wrong people.

9.  I felt that Mr. Bernard's defense team made a "token" attempt at a defense during the entire trial. It was like Mr. Bernard's attorneys were "phoning it in." I felt like there might something more to Mr. Bernard than what was presented. Some people had testified on Mr. Bernard's behalf during the penalty phase, which already gave me pause about sentencing him to death. recently learned from Mr. Bernard's investigators that Mr. Bernard's juvenile probation officer says that she never felt threatened by Mr. Bernard and thought he was basically a good person. I was also told that Mr. Bernard's minister has said that Mr. Bernard expressed remorse to him before the trial.  This kind of testimony would have been helpful to me in holding my ground that a life sentence was appropriate, not a death sentence.

10.  I have always thought about whether there was anything I could do to try to change Mr. Bernard's death sentence to a life sentence. I thought about writing a letter to the court expressing my belief that a life sentence was the appropriate punishment and that Mr. Bernard did not deserve to be put to death. I had no idea where to start, so I never did. I am grateful to have this opportunity to clear my conscience by speaking what has always been in my heart. I hope that my speaking up can help Mr. Bernard have his death sentence commuted to a life sentence. I never thought this opportunity would come. I pray that President Trump rights this wrong and commutes Mr. Bernard's sentence to life imprisonment.

I have read the foregoing declaration. Under the laws of the United States and Tennessee, I declare under penalty of perjury that this declaration is true and correct.

Executed at Centerville, TN on: _8-13-20_

_____
Gary McClung, Jr.

**EXHIBIT 1 pg. 078**

Exhibit E-2

Declaration of Dr. Adam Andreassen

I, Adam Andreassen, make the following declaration:

1.      My name is Adam Andreassen and I live and work in Springfield, Missouri. I am the Chief Operating Officer at Burrell Behavioral Health and President/CEO of the National Psychology Training Consortium. I am a clinical psychologist with substantial experience providing forensic evaluations. I earned a Doctorate of Psychology from the School of Professional Psychology at Forest Institute in 2008. Prior to my entrance into higher education and clinical psychology, I was a Youth Pastor at the Seventh-Day Adventist Church, in Killeen, Texas, where I worked closely with Pastor Terry Johnson. I was a Youth Pastor in 1999 and 2000. It is through my ministry work that I came to meet Brandon Bernard.

2.      I met with Brandon for the first time after he was arrested and was awaiting trial. My first meetings with Brandon were joint meetings with Pastor Johnson.  I also went a couple of times on my own to talk with Brandon at the jail in Waco and attended portions of his trial as well.  I wanted to offer as much support to Brandon as I could.

3.      Based on his trial attorney's advice, Brandon was not able to talk about the specifics of the crimes for which he was accused. But without getting into the details of those crimes, Brandon was penitent and expressed regret for his role in the killing of the Bagleys. Brandon was only 18 years old at the time, and I believe that he was as contrite as he could be considering his developmental level and presentation as a somewhat immature adolescent. Brandon would share his regrets, and we would pray together.

**EXHIBIT 1 pg. 079**

Exhibit F-1

4.      Now that I am a clinical psychologist, I am able to look back on my conversations with Brandon with a more learned eye. At the time of this crime, Brandon was very immature and I do not believe he fully understood the severity of what transpired. He did not possess the insight or emotional development to perceive the situation as an adult - both with regard to his experience of the killings and their aftermath. Brandon was only a teenager at the time of the incident. As such, he likely lacked the impulse control and ego strength that would have allowed him to assert himself and prevent the crimes from happening. At that age, many adolescents do not have the capacity to make good decisions. Brandon's teenage brain gave him limitations into his own insight.

5.      There is substantial evidence that adolescents are not identical to adults in reasoning capacity. For example, Stenberg and Scott noted:

> However, the results of studies using paper-and-pencil measures of future orientation, impulsivity, and susceptibility to peer pressure point in the same direction as the neurobiological evidence, namely, that brain systems implicated in planning, judgment, impulse control, and decision making continue to mature into late adolescence. Thus, there is good reason to believe that adolescents as compared with adults are more susceptive to influence, less future oriented, less risk averse, and less able to manage their impulses and behavior and that these differences likely have a neurobiological basis. The important conclusion for our purposes is that juveniles may have diminished decision-making capacity compared with adults because of differences in psychosocial capacities that are likely biological in origin.

Steinberg, L., Scott, E. (2003). Less guilty by reason of adolescence. *American Psychologist.* 58 (No.12), 1009- 1018.

6.      I was concerned about Brandon and liked him very much.  I attended some of his trial to provide a measure of support. From what I saw, the picture that emerged during that trial seemed neither accurate nor fair as he did not appear nearly so sophisticated nor "hardened" as his co-defendant. It did not reflect the Brandon that I knew.  I do not believe that Brandon was, or is, a hardened criminal. I wish that his attorneys would have done more to push back against the

EXHIBIT I pg. 080

Exhibit F-2

Government's portrayal of him and what I perceived as an unfair grouping together with his co-defendant. Had I been called to serve as a character witness for Brandon, I would have gladly conveyed my experiences with him, and the regret and concern that he had expressed for the victims and their families.

7.      I know that this incident forever changed the lives of many people. This includes the families of the victims. They have suffered an immense and unimaginable loss and I wish them peace as they continue to live with the loss of their children.

8.      Although then 18 years-old, Brandon was really only a kid when he participated in these horrific crimes. It is my hope that Brandon should be granted leniency in light of that fact.  Neuroscience has now shown that an adolescent brain is not fully developed at age 18, and the portions of the brain that control decision making are the last to develop. Thus, the adolescent brain's ability to make good decisions is already compromised, relative to an adult's brain. And we know too, from scientific studies, that this limited ability is compromised even further when one is in the company of other adolescents, as was the case here. Thus, while Brandon's actions, or lack of action, resulted in the deaths of two innocent people, he should be sentenced as a kid, not as an adult. I don't believe the death penalty is appropriate for Brandon and I hope that President Trump commutes his death sentence to a life sentence. A life sentence will continue to hold Brandon accountable for his role in this crime.

I have read the foregoing declaration. Under the Laws of the United States and the State of Missouri, I declare under penalty of perjury that this declaration is true and correct.

Executed in Springfield, MO on: ____08-17-2020_____

_____

Dr. Adam Andreassen

EXHIBIT 1 pg. 081

Exhibit F-3

**AFFIDAVIT OF DR. DAVID FASSLER**

1.    I, David Fassler, being duly sworn, state the following:

**Professional Background**

2.    I am a child and adolescent psychiatrist practicing at Otter Creek Associates in Burlington, Vermont, where I serve as Clinical Director. I have been in my current position since 1986. I am also a Clinical Professor of Psychiatry at the University of Vermont College of Medicine.

3.    I obtained my bachelor's degree from Wesleyan University in 1978. I obtained my medical degree from Yale Medical School in 1982.

4.    I was a Resident in Psychiatry at the University of Vermont College of Medicine from 1982 to 1985 and a Fellow in Child Psychiatry at Cambridge Hospital from 1985 to 1987.

5.    I am Board Certified in both general adult and child and adolescent psychiatry.

6.    I am licensed to practice medicine in Vermont and New York.

7.    I am a member of various professional organizations. I am also a Fellow of the American Academy of Child and Adolescent Psychiatry and a Distinguished Fellow of the American Psychiatric Association.

**EXHIBIT 1 pg. 082**

Exhibit G-1

8.    I have authored or co-authored over 30 books, chapters, and peer-reviewed articles on topics pertaining to mental health and child and adolescent development.

9.    I have given numerous presentations in my career on topics pertaining to child and adolescent development, including presentations specifically on the subject of adolescent brain development.

10.    My curriculum vitae is attached hereto.

11.    I was contacted by Brandon Bernard's attorneys to provide testimony in connection with a clemency application, to explain the neuroscience behind adolescent brain development.

12.    I have not met or personally evaluated Mr. Bernard.

**Brain Development and Behavior in Adolescents and Young Adults**

13.    Since the time of Mr. Bernard's trial in 2000, there has been a significant increase in our understanding of adolescent brain development. Advances in research methodology, including the expanded use of Functional Magnetic Resonance Imaging ("fMRI") technology, have allowed scientists to better study the structure and function of the human brain.

**EXHIBIT 1 pg. 083**

Exhibit G-2

14.    Such research has demonstrated that the more primitive regions of the brain, such as the amygdala develop first. This region is responsible for instinctual behavior, such as aggression, anger and fear.

15.    Conversely, the region of the brain called the frontal cortex develops last, and its maturation continues throughout adolescence and into the mid 20's. The frontal cortex is sometimes referred to as the "CEO" of the brain because it is responsible for planning, strategizing and judgment. Frontal cortex functions also include impulse control, decision-making, abstract thinking and moral reasoning.

16.    The frontal cortex helps manage or regulate other parts of the brain, including the amygdala. In a fully developed adult brain, the frontal cortex helps moderate or control the primitive, impulsive and instinctual impulses.

17.    The brain undergoes a growth spurt in early adolescence, when neurons develop new connections. This phenomenon is known as "arborization." It is followed by a period of "pruning", during which neurons which have not been consistently utilized are selectively eliminated, thereby allowing for greater efficiency of the remaining neural connections—which is associated with heightened regulation of behavior and improved impulse control. This period can last until the mid-20's.

18.    The lack of a fully developed frontal cortex makes adolescents and young adults more likely to act on instinct or impulse. It also makes it harder for them to modulate emotional

**EXHIBIT 1 pg. 084**

Exhibit G-3

responses, regulate behavior, control impulses, assess risks or fully contemplate the consequences of their actions.

19.    These vulnerabilities—compounded by underdeveloped cognitive functions—render adolescents and young adults particularly prone to reckless, impulsive behavior and poor judgment.

20.    Research further demonstrates that such relative deficits are particularly pronounced and exacerbated when adolescents and young adults are in the presence of peers.

21.    In summary, scientific advances in the understanding of brain development since the time of Mr. Bernard's trial demonstrate that adolescents and young adults are biologically more likely to act on impulse, without stopping to think things through, modify their behavior or fully consider the consequences of their actions.

The above opinions are based on the current research literature. They may be augmented or modified based on additional information, if and when available.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 6, 2016

David Fassler, M.D.

**EXHIBIT 1 pg. 085**

Exhibit G-4

Curriculum Vitae                    1                David Gary Fassler, M.D.

## CURRICULUM VITAE

**NAME:**            David Gary Fassler, M.D.

**ADDRESS:**         Otter Creek Associates
                     86 Lake Street
                     Burlington, VT  05401        802-865-3450

**EDUCATION:**       Wesleyan University
                     Middletown, Connecticut
                     B.A. (magna cum laude) May, 1978
                      biology/psychology

                     Yale University School of Medicine
                     New Haven, Connecticut
                     M.D. - June, 1982

                     Department of Psychiatry
                     University of Vermont College of Medicine
                     Medical Center Hospital of Vermont
                     Burlington, Vermont
                     Resident in Psychiatry - June 1982 - June 1985

                     Department of Child Psychiatry
                     Cambridge Hospital
                     Harvard Medical School
                     Cambridge, Massachusetts
                     Fellow in Child Psychiatry - July 1985 - June 1987

**CURRENT POSITIONS:**

            Clinical Director, Otter Creek Associates/Matrix Health Systems,
               Burlington, VT (1986-present)

            Director of Advocacy and Public Policy, Vermont Center for
               Children, Youth & Families

**ACADEMIC APPOINTMENT:**

            Clinical Professor of Psychiatry, University of Vermont
               College of Medicine

**LICENSURE AND CERTIFICATION:**

**EXHIBIT 1 pg. 086**

Exhibit G-5

Curriculum Vitae                        2                    David Gary Fassler, M.D.

Vermont Medical License
New York Medical License
American Board of Psychiatry and Neurology
– Board Certified in Adult Psychiatry 1990
– Board Certified in Child and Adolescent Psychiatry 1991

## RELEVANT ACTIVITIES:

Research Assistant in Behavioral Genetics, 1977

Teaching Assistant in Child Development, 1978

Member, Yale Student Psychiatric Society, 1978-82; President, 1980-81

Member, State Advisory Council, Connecticut Department of Children and Youth Services, 1981-82

Member, Alumni Schools Committee, Wesleyan University, 1982-1992

Faculty member, Human Sexuality Course, 1983-1984

Member, Professional Advisory Board, Vermont Epilepsy Association, 1984-1987

Member, Program and Planning Committee for 1985 Annual Conference, Association for the Care of Children's Health, 1984-1985

Faculty member, Human Behavior Course, 1984-1985

Member, Residency Education Committee, Department of Psychiatry, University of Vermont, 1984-1985

Seminar Leader, "Ethical Issues in Psychiatry," 1984-1985

Psychiatric consultant, Pediatric Cardiology Clinic, 1984-1985

Faculty member, Biopsychosocial Medicine Course, 1985

Psychiatric consultant, Strawberry Mill Day Care Center, Stoneham, MA, 1985-1986

Psychiatric consultant, Early Intervention Center, Stoneham, MA, 1986-1990

Member, Board of Directors, Association for the Care of Children's Health, 1986-1989

Participant, Intensive Program in Family Systems Therapy, Cambridge Family Institute, Cambridge, MA, 1986-1987

Member, governing board, Child Life Certifying Commission, 1986-1989

Psychiatric consultant, bereavement support group, New England Memorial Hospital, 1986-1987

Psychiatric consultant/supervisor, Revere Community Mental Health Center, 1986-1987

Clinical coordinator, Determination of Need Application process, New England Memorial Hospital, 1986-1987

Psychiatric consultant, Vermont Achievement Center, 1987-1989

Member, Professional Awareness Committee, Association for the Care of Children's Health, 1987-1989

Member, Selection Committee, Innovative Service Award, Association for the Care of Children's Health, 1987-1992

**EXHIBIT 1 pg. 087**

Exhibit G-6

Curriculum Vitae                    3              David Gary Fassler, M.D.

Psychiatric consultant, State of Vermont Department of Health, Handicapped Children's Services and Child Development Clinic, 1987-1992

Psychiatric consultant, Parent to Parent Project, 1987-1991

Member, Committee on Community Psychiatry and Consultation to Children's Agencies, American Academy of Child and Adolescent Psychiatry, (Chair, Subcommittee on Health), 1988-1992

Member, Executive Committee, Vermont Psychiatric Association, 1988-

Member, Executive Committee, Vermont Association for Psychoanalytic Study, 1988-1992

Organizer and consultant, The PlayCare Center, a play based child care facility in Richmond, Vermont, 1988-

Co-chair, Mental Health Quality Assessment Committee, Vermont State Senate, 1988-1990

Member, Post Graduate Medical Education Committee, University of Vermont, 1988-1992

Delegate, Young Physicians Section, AMA House of Delegates, representing the American Academy of Child and Adolescent Psychiatry, 1988-1990

Member, Advisory Committee for Children with Special Health Needs and Their Families, Vermont Department of Health, 1988-1992

Director, Health and Environmental Research, Environmental Law Foundation, 1989-1992

Member, Board of Directors, Children's Legal Services, 1989-1990

Representative, APA Assembly, 1989-1996

Member, Clinical Faculty Standards Committee, UVM Department of Psychiatry, 1989-1994

Co-Chair, Mental Health Study Group, Vermont Program for Quality in Health Care, 1990-1992

Member, Woman's Day Special Interest Magazines Medical Advisory Board, 1990-1995

Alternate Delegate, AMA House of Delegates, 1990-1996

President, Choate Health Systems, 1990-1997

Reviewer, AIDS Education and Prevention, 1990-1995

Reviewer, Pediatrics, 1990-1995

Reviewer, Children's Health Care, 1990-1995

Reviewer, Journal of the American Academy of Child and Adolescent Psychiatry, 1990-

Guest Editor, Special Section on Ethics, Journal of the American Academy of Child and Adolescent Psychiatry, 1990-1991

Editor, Psychiatry News, University of Vermont Department of Psychiatry, 1990-1992

Member, Advisory Panel, Raising Happy Kids in a Troubling World, 1990-1992

Member, Vermont Coalition for Cancer Prevention and Control, 1990-1992

Member, Task Force on Violence Prevention, State of Vermont,

**EXHIBIT 1 pg. 088**

Exhibit G-7

Curriculum Vitae                          4                     David Gary Fassler, M.D.

Department of Health, 1990-1992

Member, APA Committee on the Practice of Psychotherapy, 1991-1993; Corresponding Member, 1993-1995

Co-chair, Task Force on Lead Poisoning, AACAP, 1991-1995

Alternate Delegate, AACAP Assembly of Regional Councils, 1991-1996

Member, Nominating Committee, Association for the Care of Children's Health, 1991-1992

Consultant, Early Childhood Programs, New England Memorial Hospital, 1991-1994

Member, Board of Advisors, Boston Institute for the Development of Infants and Parents, 1992-1995

Member, APA Committee on Psychiatry and Mental Health in the Schools, 1992-1993; Chair, 1993-1997

Selectee, Nominating Committee, APA Assembly, 1992-1993

Member, Mental Health Subcommittee, Health of the Cities Task Force, Cambridge, Mass., 1992-1993

Assembly Liaison, APA Council on International Affairs, 1993

Member, AACAP Work Group on Consumer Issues, 1992-

Member, 40th Anniversary Committee, AACAP, 1992-1993

Delegate, AACAP Assembly, 1996-

Member, APA Nominating Committee, 1996-1997

Federal Legislative Representative, Vermont Psychiatric Association, 1996-

AACAP Liaison, National Depression Screening Day, 1996-2000

Treasurer, Vermont Psychiatric Association, 1997-

AACAP Alternate Delegate, AMA House of Delegates, 1997-

Chair, APA Council on Children, Adolescents and Their Families, 1997-2002

President-elect, Vermont Association of Child and Adolescent Psychiatry, 1998

Member, Board of Directors, Federation of Families for Children's Mental Health, 1998-2006

Treasurer, Physician Services of Vermont, 1999-2001

Member, Task Force on Assembly Restructuring, AACAP, 1999-2000

Member, Task Force on Institutes, AACAP, 1999-2000

President, Vermont Association of Child and Adolescent Psychiatry, 1999-

Councilor, American Association of Psychiatric Administrators, 1999-2004

Commissioner, National Commission on Youth Violence, 1999-2000

Member, Policy Statement Advisory Committee, AACAP, 1999-2005

Member, Board of Directors, SMILE: Students Mastering Important Lifeskills Education, 1999-2008

Member, Search Committee for the Chair of Psychiatry, UVM, 2000-2004

Secretary/Treasurer, AACAP Assembly, 2001-2003

Member, Task Force to develop a "Vision for the Mental Health System", APA, 2002-2003

**EXHIBIT 1 pg. 089**

Exhibit G-8

Curriculum Vitae                      5                  David Gary Fassler, M.D.

Member, Worker Compensation, Medical Advisory Committee, State of
    Vermont, 2002-2003
Member, Physician Policy Council, Vermont Medical Society, 2002-
Grant Application Reviewer, Fund for Better Health, American Medical
    Association Alliance, June, 2002-2003
Trustee-at-Large, APA Board of Trustees, 2002-2008
Advisory Board, Child Magazine, 2002-2003
Selection Committee, Health Living Grant Program, AMA Foundation,
    2003-2004
Chair, Convention Committee on Rules and Credentials, AMA House of
    Delegates, 2003
Vice-Chair, AACAP Assembly, 2003-2005
Chairman, Walden Behavioral Care, 2003-2010
Member, Ad Hoc Committee on Intellectual Property Issues, AACAP,
    2003-2004
Member, Vermont ADHD/Mental Health Initiative, Vermont Department
    of Health, 2003-2004
Invited Participant, NIH COPR Workshop on "Public Participation in
    Clinical Research: Building Trust Trough Partnerships", 2004
Member, Vermont Futures Committee, 2004-2007
Chair, APA/AACAP Antidepressant Advisory Workgroup, 2004
Co-Chair, APA Task Force on College Mental Health, 2004-2006
Member, SAMSHA Acute Care Task Force, 2004-2006
Member, National Mental Health Association/Mental Health America,
    Board of Directors, 2005-2010
Member, APA Child & Adolescent Psychiatry Fellowship Selection
    Committee, 2003-
Member, Acute Care Work Group, Center for Mental Health
    Services, 2004-2006
Participant, Roundtable Discussion, Integration of Primary Care and
    Behavioral Health, Bazelon Center for Mental Health Law,
    February, 2005
Chair, AACAP Assembly of Regional Organizations, 2005-2007
Member, AACAP Task Force on Intellectual Property, 2005-2007
Advisory Board, Parents Magazine, 2005-
Member, Expert Panel, Health, Mental Health, and Safety Guidelines
    for Schools, American Academy of Pediatrics and the National
    Association of School Nurses, 2005-2007
Member, Corresponding Committee on Mental Health on College and
    University Campuses, American Psychiatric Association,
    2006-2012
Member, Vermont Medical Society, PAC Board, 2006-
Member, Advisory Council, Campaign for Youth Justice, 2006-
Press Relations/Media Coordinator, Local Arrangements Committee,
    AACAP, 2006-2007
Member, eAACAP Advisory Committee, 2007-2010
Clinical Review Committee, Depression and Bipolar Wellness Guide,

**EXHIBIT 1 pg. 090**

Exhibit G-9

Curriculum Vitae                    6                    David Gary Fassler, M.D.

Families for Depression Awareness, 2007-2008

Board Member, Child and Adolescent Bipolar Foundation, 2007-2011

Member, Educational Policy Committee, University of Vermont
Child Psychiatry Fellowship Program, 2008-

Director of Advocacy & Public Policy, Vermont Center for Children,
Youth & Families, 2008-

American Medical Association Patient Education Advisory Board,
2008-2012

Secretary/Treasurer, APA, 2008-2010

Member, APA Audit Committee, 2008-2014

Member, APA Investment Oversight Committee, 2008-

Member, APA Long Term Financial Planning Committee, 2008-2014

Member, APA Award and Award Lecture Oversight Corresponding
Committee, 2008-2014

Member, APA Finance and Budget Committee, 2008-

Member, APA Corresponding Committee on Juvenile Justice, 2008-2010

Member, Editorial Board, Textbook of Hospital Psychiatry,
Sharfstein, S. (ed), American Psychiatric Publishing, Inc.,
Washington, DC: 2008.

Member, APA Parents Med Guide Work Group, 2009-2011

Treasurer, APA, 2010-2014

Board Member, American Psychiatric Foundation, 2010-2014

Member, APA Committee on Advocacy and Litigation Funding, 2011

Reviewer, Psychiatric Services, 2011

Participant, Meet the Experts, APA Annual Meeting, Honolulu, HI,
May 2011

Organizer and Presenter, Advocacy and Media Relations, University of
Vermont, College of Medicine, June 2011

Member, Board-Assembly Ad Hoc Work Group on APA National
Collaboration with State Associations/District Branches,
2011-2012

Member, APA Medical Director/CEO Search Committee, 2012-2013

Member, APA Board of Trustees' Ad Hoc Work Group on
International Psychiatrists, 2012

Treasurer, American Academy of Child and Adolescent Psychiatry,
2013-2015

Chair, APA Investment Oversight Committee, 2014-

Member, APA Board of Trustees' Ad Hoc Work Group on Real Estate,
2014-2015

Consultant, APA Board of Trustees' Ad Hoc Work Group on Liability,
2014-2015

Teller, Annual Meeting, AMA House of Delegates, June, 2015

Co-Chair, AACAP Committee on Children and the Law, 2015-

Member, Task Force on Integrated Care, American Academy of Child
and Adolescent Psychiatry, 2015-

**HONORS:**         Honorary Olin Scholar, Wesleyan University, 1974

**EXHIBIT 1 pg. 091**

Exhibit G-10

Curriculum Vitae                    7              David Gary Fassler, M.D.

 DeWitt Wallace Fellowship at New York University Institute of
  Rehabilitation Medicine, 1975

 Sigma Xi Award for creativity in scientific presentation, 1978

 Thorndike prize for excellence in psychology, 1978

 High honors in psychology for thesis - The Effect of Intervention
  Techniques on Preoperative Anxiety in Children, 1978

 Hobart Keese Prize for best thesis presented in the School of Medicine,
  1982

 American Psychiatric Association Mead/Johnson Fellowship, 1984-1985

 Susan H. Eastman Award for Excellence in Media, Association for the
  Care of Children's Health, 1986

 Annual Achievement Award, Epilepsy Association of Vermont, 1986

 Presidential Scholar Award, American Academy of Child and Adolescent
  Psychiatry, 1986-1987

 Parent's Choice Approved Book Award, 1990

 Benjamin Franklin Award, 1991

 Distinguished Fellow, American Academy of Child and Adolescent
  Psychiatry, 1992

 Mary Finocchiaro Award for Excellence in the Development of
  Pedological Materials, 1993

 Special Merit Award, Vermont Book Publishers Association, 1993

 Exemplary Psychiatrist Award, National Alliance for the Mentally Ill
  (NAMI), 1998

 Special Recognition Honoree, Welcome Back Awards, 1999

 Outstanding Media Spokesperson Award, American Academy of Child
  and Adolescent Psychiatry, 1999

 Green Ribbon Award for Public Education and Advocacy, National
  Mental Health Association, 2000

 Braceland Award for Public Advocacy and Education, American
  Psychiatric Association, 2002

 Distinguished Fellow, American Psychiatric Association, 2004

 Honorary Award, Vermont Psychiatric Association, 2004

 Distinguished Service Award, American Psychiatric Association, 2014

**AREAS OF MAJOR INTEREST:**

 Child psychiatry, adolescent development, health care delivery, public
 policy

**MEMBERSHIPS:** American Academy of Child and Adolescent Psychiatry (Fellow)
 National Association for the Education of Young Children
 American Psychiatric Association (Distinguished Fellow)
 Vermont Psychiatric Association
 American Medical Association
 Vermont State Medical Society
 Vermont Association of Child and Adolescent Psychiatry

**EXHIBIT 1 pg. 092**

Exhibit G-11

Curriculum Vitae                    8                David Gary Fassler, M.D.

American Academy of Psychiatry and the Law

**GRANTS RECEIVED:**

|  |  |
|---|---:|
| State of Vermont, Department of Health | |
|   Health Education Project: | |
|     Cardiology videotape - 1984 | $2,000 |
|     Children's Literature Project - 1985 | 1,000 |
| | |
| Epilepsy Foundation of America - 1985-86 | |
|   "Psychosocial Aspects of Childhood | |
|   Epilepsy" | 14,962 |
| | |
| Spina Bifida Association - 1986-87 | |
|   "Meeting the Emotional Needs of Families | |
|   with Handicapped Children" | 5,000 |
| | |
| State of Vermont, Department of Health | |
|   "AIDS Education Project" - 1988 | 1,000 |
| | |
| Gannett Foundation | |
|   "AIDS Education Project" - 1989 | 18,460 |
| | |
| Blue Cross | |
|   "Short Term Dynamic Psychotherapy" – 1989 | 3,000 |
|                      - 1990 | 3,000 |
| | |
| NIMH | |
|   "Depression:  Awareness, Recognition | |
|   and Treatment" - 1989-1992 | 299,561 |

**PUBLICATIONS:**

1. Fassler D:  Experiences with children and books in hospital settings.  Journal of the Association for the Care of Children in Hospitals 6, 1, 1977

2. Fassler D:  Preparing the young child for hospitalization.  Hospital Forum:  Journal of the Association of Western Hospitals 22, 7, 1980
   Reprinted in The Bulletin (San Bernardino County Medical Society) May, 1980

3. Fassler D:  Book Review.  Encyclopedia of Pediatric Psychology, in The New Physician 29, 3, 1980

4. Fassler D:  The young child in the hospital.  Young Children 35, 1980

   Reprinted in the A.W. Evans, Issues in Child Development.  Baltimore University Park Press, 1982

**EXHIBIT 1 pg. 093**

Exhibit G-12

Curriculum Vitae                    9                    David Gary Fassler, M.D.

and
McCracken, J. (ed), Stress and Young Children. Washington: National Association for the Education of Young Children, 1986

5.    Fassler D: Reducing preoperative anxiety in children: Information versus emotional support. Patient Counseling and Health Education 2, 3, 1980

      Reprinted in G.G. Kent, The Psychology of Dental Care. London: John Wright and Sons Ltd., 1983
            and
      G.G. Kent, Psychology and Medical Care. London: Baillier Tindell, Ltd., 1985

6.    Fassler D, Wallace N: Children's fear of needles. Clinical Pediatrics 21, 59, 1982

7.    Fassler D, Krystal J: Letter. The role of medical student societies in psychiatric recruitment. American Journal of Psychiatry 140, 5, 1983

8.    Fassler D: The fear of needles in children. American Journal of Orthopsychiatry 53, 3, 1985

9.    Fassler, D., Andrews, L.B. and Tiefel, H.O. (1985), When Baby's Mother is also Grandma – and Sister. Hastings Center Report, 15: 29-31

      Reprinted in Schaefer, Millman and Riegelhaupt - Zwilling (eds.) Therapies for Children - Volume II. New York: Jossey-Bass, Inc. 1986

10.   Fassler D: Ethical issues in in vitro fertilization: A case study. Hastings Center Report 15, 5, 1985

11.   Fassler D: Medical education about alcoholism. Journal of Medical Education 60, 7, 1985

12.   Mizutani A, Fassler D: Computer technology in psychiatric practice: The automated interview in perspective. Psychiatric Hospital 16, 3, 1985

13.   Fassler D: Children's drawings from China and the Soviet Union. Journal of the Association for Childhood Education International 63, 1, 1986

14.   Fassler, D: Children's Books About Alcoholism. Childhood Education, February 1987

15.   Stewart, J, Fassler, D: Alcoholics: What Their Children Feel. The Single Parent July/August 1988

16.   Fassler, D, Ives, S, and Lash, M: Living in a Stepfamily: Helping Children Adjust. Creating Excellence, Spring, 1988

**EXHIBIT 1 pg. 094**

Exhibit G-13

Curriculum Vitae                      10                 David Gary Fassler, M.D.

17.    McQueen, K, Fassler, D:  Children's Books About AIDS.  Children's Literature in
       Education 20, 3, 1989

18.    Fassler, D, McQueen, K, Duncan, P, and Copeland, L:  Children's Perceptions of AIDS.
       Journal of the Academy of Child and Adolescent Psychiatry 29, 3, 1990

19.    Fassler, D, McQueen, K, Duncan, P, and Copeland, L:  Attitudes About AIDS Education
       for Young Children Among Parents and Teachers.  Children's Health Care, 21, 1, 1992

20.    Fassler, D:  Administrative Principles in Child and Adolescent Psychiatry:  Negotiating in
       Effective Job Contract.  Newsletter of the American Academy of Child and Adolescent
       Psychiatry, Winter, 1992

21.    Fassler, D (ed):  Ethical Issues in Child and Adolescent Psychiatry.  Journal of the
       American Academy of Child and Adolescent Psychiatry, 31, 3, 1992

22.    Fassler, D, and Cotton, N:  The Use of Seclusion in the Psychiatric Treatment of
       Children.  Hospital and Community Psychiatry, 43, 4, 1992

23.    Fassler, D, and McQueen, K:  The role of the pediatrician in educating young children
       about AIDS.  Children's Hospital Quarterly, 4, 1, 1992

24.    Fassler, D, and Conroy, L:  Expressing Anger.  Vermont Parent and Child, 4, 1, 1993

25.    Fassler, D:  Administrative Principles in Child and Adolescent Psychiatry:  Implementing
       a Patient Satisfaction Questionnaire.  Newsletter of the American Academy of Child and
       Adolescent Psychiatry, Fall 1993

26.    Fassler, D:  Psychiatric Aspects of Day Care.  In Kaplan, H, and Sadock, B:
       Comprehensive Textbook of Psychiatry VI, Baltimore:  Williams and Wilkins, 1995

27.    Fassler, D., Hanson-Mayer, G., and Brenner, E:  Home-Based Care.  In Sederer, L. and B.
       Rothschild (eds.).  Acute Care Psychiatry:  Diagnosis and Treatment.  Baltimore:
       Williams & Wilkins, 1997

28.    Fassler, D., Hanson-Mayer, G., and Hubbard, T:  Emergency Crisis Services.  In Schreter,
       R., Sharfstein, S., and C. Schreter (eds.).  Managing Care, Not Dollars:  The Continuum
       of Mental Health Services. Washington:  APA Press, 1997

29.    Fassler, D: Childhood Depression: Early Recognition Leads to Successful Treatment,
       Pediatrics for Parents, Family Practice News, 22:7, 2006

30.    Fassler, D: Adolescent Depression: Early Recognition Leads to Successful Treatment,
       The Prevention Researcher, Volume 13, Supplement, December 2006

EXHIBIT 1 pg. 095

Exhibit G-14

Curriculum Vitae                          11                    David Gary Fassler, M.D.

31.    Fassler, D. and S. Harper:  Science and the Juvenile Death Penalty in The Mental Health Needs of Young Offenders. Kessler, C., and L. Kraus (eds.).  Cambridge, UK: Cambridge University Press, 2007

32.    Fassler, D.: Writing Letters to the Editor: 20 Tips for Child and Adolescent Psychiatrists. AACAP News, September/October 2010

**PAMPHLETS:**

Fassler D, Lawrence B, Ritter M:  Understanding Individual Differences:  Children's Books about Hospitalization and Handicapping Conditions.  State of Vermont, Department of Health, Burlington, Vermont, 1985

Fassler D, et al:  Going Public in Psychiatry:  Personal Experiences and Professional Perspectives.  APA/Mead Johnson, 1985

Fassler, D, Macht-Greenberg, M, and Danforth, K:  Books on Emotional and Health Related Themes for Young Children and Families.  Preventive Mental Health Project, Burlington, Vermont, 1993

**BOOKS:**

1.    Ives S, Fassler D, Lash M:  The Divorce Workbook.  Burlington:  Waterfront Books, 1985

       Translated into Dutch as Het Echtscheidings-Werkboek.  Amsterdam:  Vitgeverij Boom Meppel, 1989

2.    Fassler D, Lash M, Ives S:  Changing Families.  Burlington:  Waterfront Books, 1988

3.    Fassler, D, and McQueen, K:  What's A Virus, Anyway?  Burlington:  Waterfront Books, 1990

       Translated into Spanish as ¿Qué es un Virus?  Burlington:  Waterfront Books, 1991

4.    Loughridge, S, Lash, M, Fassler, D:  My Kind of Family.  Burlington:  Waterfront Books, 1990

5.    McQueen, K and Fassler, D:  Let's Talk Trash.  Burlington:  Waterfront Books, 1991

6.    Fassler D (ed):  Emergency Medical Intervention with the Alcoholic Patient.  New York: Gardner Press, 1992

7.    Fassler, D and Danforth, K:  Coming to America.  Burlington:  Waterfront Books, 1993

8.    Fassler, D and Dumas, L:  Help Me, I'm Sad:  Recognizing, Treating and Preventing

EXHIBIT 1 pg. 096

Exhibit G-15

Curriculum Vitae                    12                David Gary Fassler, M.D.

Childhood and Adolescent Depression.  New York:  Viking, 1997

Translated into Italian as Aiutami, Sono Triste: Come Riconescere, Curare e Prevenire la Depressione mei Bambini e Negli Adolescenti (Milano: Tea Pratica, 2004)

**FILMS:**

1.    "Hospital Bear Goes to Boston" - a program aimed at preparing children and families from Vermont for hospitalization and cardiac surgery at Boston Children's Hospital, produced in conjunction with University of Vermont Instructional Development Center and the State of Vermont Department of Health, 1985.

2.    "On Top of the Pyramid" - an educational film about epilepsy for children, produced with funding provided by the Epilepsy Foundation of America.  Winner of the 1986 Susan B. Eastman Award for Excellence in Media.  Translated into Cambodian, Hmong, Laotian and Vietnamese.

3.    "Your Child Has Spina Bifida" - a film exploring parents' reactions to the birth of a handicapped child, produced with funding provided by the Spina Bifida Association, 1986.

4.    "What's A Virus, Anyway?" - an educational film about AIDS for young children, produced with funding from the Gannett Foundation, 1990.

**PRESENTATIONS:**

The Responses of Pigeons to Selected Auditory Stimuli, Sigma Xi lecture delivered at Wesleyan University, Middletown, Connecticut, April, 1977

The Use of Projective Drawing and Storytelling Techniques to Help Children Cope with Hospitalization and Illness, delivered at the 13th Annual Conference of the Association for the Care of Children in Hospitals, Washington, D.C., June, 1978

Reducing Preoperative Anxiety in Children.  Paper delivered at the 56th Annual Meeting of the American Orthopsychiatric Association, Washington, D.C., April, 1979

Enhancing Communication with Hospitalized Children.  Paper delivered at the 31st Annual Meeting of the American Association of Psychiatric Services for Children, Chicago, Illinois, November, 1979

The Hospitalized Child:  Emotional Considerations.  Grand Rounds presentation, Department of Psychiatry, University of Miami School of Medicine, March, 1980

Understanding the Child's View of Hospitalization and Illness.  Paper delivered to the 57th Annual Meeting of the American Orthopsychiatric Association, Toronto, Canada, April, 1980

Expressions:  Children's Artwork.  Talk given at National Children in Hospitals Week

**EXHIBIT 1 pg. 097**

Exhibit G-16

Curriculum Vitae                    13                David Gary Fassler, M.D.

Symposium, Yale-New Haven Hospital, March, 1981

Taking the Hurt out of Shots:  The Fear of Needles in Children.  Paper delivered at the 16th Annual Conference at the Association for the Care of Children's Health, Chicago, Illinois, May, 1983

Bad Guys Wear Masks:  Understanding Children's View of Surgery.  Presentation at the 18th Annual Conference of the Association for the Care of Children's Health, Chicago, Illinois, May, 1983

Children's Perceptions of Epilepsy.  Presentation to the Vermont Epilepsy Association, November, 1983

Children's Reactions to Hospitalization and Illness.  Grand Rounds presentation, Department of Psychiatry, University of Vermont College of Medicine, January, 1984

Emotional Aspects of Chronic Illness in Children, presented at Conference on "Caring for Children with Special Needs," Vermont Association of School Nurses, Randolph Center, Vermont, March, 1984

Over the Edge:  Children's Perceptions of Hospitalization and Illness, presented at Annual Conference of New England Association for the Education of Young Children, Manchester, New Hampshire, April, 1984

Arts and the Handicapped, Workshop for Teachers and Parents, University of Vermont, Burlington, Vermont, May, 1984

Tell Me If It's Gonna Hurt:  Children's Perceptions of Illness, Pediatric Grand Rounds, University of Vermont College of Medicine, Burlington, Vermont, May, 1984

Children and Death.  Seminar conducted at Trinity College, Burlington, Vermont, May, 1984

Children's Drawing from China and the Soviet Union.  Paper presented at Annual Conference of the Association for the Care of Children's Health, Houston, Texas, May, 1984

Issues in Preventative Child Psychiatry.  A series of presentations delivered at the Alaska Regional Conference on "New Approaches to Common Problems in Pediatrics," Anchorage, Alaska, June, 1984

Enhancing Communicating with Children through Drawings:  Guidelines for Teachers and Parents.  Workshop presented at the Early Childhood Education and Resource Information Center, New York Public Library, New York, New York, September, 1984

Clinical Use of Children's Drawings.  Vermont Art Therapy Association, Vermont College, Montpelier, Vermont, January, 1985

Mastering Chronic Illness:  Personal Experiences and Professional Perspectives.  Workshop

EXHIBIT 1 pg. 098

Exhibit G-17

Curriculum Vitae                    14                David Gary Fassler, M.D.

organized and moderated for 62nd Annual Meeting of the American Orthopsychiatric Association, New York, April, 1985

Working with Children in Hospitals.  Program for students and educators organized and moderated for 20th Annual Conference, Association for the Care of Children's Health, Boston, Massachusetts, May, 1985

Psychological Aspects of Diabetes in the Elderly.  Vermont Diabetes Association, May, 1985

Meeting the Emotional Needs of Adolescents with Chronic Illnesses.  State of Vermont, Department of Health, June, 1985

Issues in Public Psychiatry.  Workshop moderator and participant at the 37th Institute on Hospital and Community Psychiatry, Montreal, Quebec, October, 1985

Helping Children Cope with Hospitalization and Illness.  Presentation to Human Behavior course.  University of Vermont College of Medicine, Burlington, Vermont, October, 1985

Understanding Children's View of Divorce.  Somerville Mental Health Center, November, 1985

Computer Technology in Psychiatric Practice.  (with A. Mizutani)  Presentation at the 9th Annual Symposium on Computer Applications in Medical Care, Baltimore, Maryland, November, 1985

Working with Hospitalized Children and Their Families.  Department of Psychology, University of Michigan, Ann Arbor, Michigan, February, 1986

Children's Reactions to Divorce.  Seacoast Mental Health Center, Portsmouth, New Hampshire, March, 1986

The School Aged Child and Family Stress.  Department of Pediatrics, Carney Hospital, Boston, Massachusetts, March, 1986

Preparing Children for Hospitalization.  Videotape presentation at 63rd Annual Meeting of the American Orthopsychiatric Association, Chicago, Illinois, April, 1986

Emotional Reactions of Children to Hospitalization and Illness.  Grand Rounds, Department of Child Psychiatry, Cambridge Hospital, Harvard Medical School, March, 1986

The Impact of Chronic Illness on Children and Families.  Boston Center for Family Health, Brookline, Massachusetts, March, 1986

Psychosocial Aspects of Epilepsy in Children.  Grand Rounds, Department of Psychiatry, University of Vermont College of Medicine, Burlington, Vermont, May, 1986

On Top of the Pyramid.  Videotape presentation at the 21st Annual Conference of the Association for the Care of Children's Health, San Francisco, California, June, 1986

EXHIBIT 1 pg. 099

Exhibit G-18

Curriculum Vitae                    15                David Gary Fassler, M.D.


Bagging Your Anger and Taking Your Time:  Creative Therapeutic Management of the Difficult Child.  Workshop participant, 33rd Annual Meeting, American Academy of Child and Adolescent Psychiatry, Los Angeles, October, 1986

My Teddy Bear Doesn't Like Shots:  Children's Perception of Hospitalization.  Presentation at Southeastern Regional Conference on "Psychosocial Issues in High Tech Pediatric Environment."  Georgia State University, Atlanta, Georgia, October, 1986

Children's View of the World.  Presentation at Annual Meeting of the International Society for Political Psychology, San Francisco, October, 1986

Media as an Educational Tool in Pediatric Health Care Settings.  Workshop participant, 5th Annual Meeting, International Association for Pediatric Social Services, Boston, Massachusetts, November, 1986

Dealing with Difficult Children:  Creative Milieu Programming on an Inpatient Psychiatric Unit.  Presentation at Gaebler Hospital, Waltham, Mass., February, 1987

Exploring the Worlds of Children.  Keynote address at Annual Regional Conference for Early Childhood Educators, Spring Valley, New York, April, 1987

Growing Up In Cuba.  Grand Rounds, Department of Child Psychiatry, Cambridge Hospital, Harvard Medical School, May, 1987

Pediatric Health Care in Central America:  A Psychosocial Perspective.  Paper presented at the 22nd Annual Conference of the Association for the Care of Children's Health, Halifax, Nova Scotia, May, 1987

This is My World:  The Use of Children's Drawings as a Universal Medium.  Paper presented at the Annual Meeting of the International Society of Political Psychology, San Francisco, July, 1987.

A View from the Quiet Room:  The Use of Seclusion in the Psychiatric Treatment of Children.  Workshop participant, 34th Annual Meeting, American Academy of Child and Adolescent Psychiatry, Washington, D.C., October, 1987

Coping with Divorce.  YMCA Single Parents Program, Burlington, Vt., March, 1988

Therapeutic Management of the Difficult Child.  Workshop participant, 65th Annual Meeting of the American Orthopsychiatric Association, San Francisco, April, 1988
Introduction to Video Production.  Presentation at 23rd Annual Conference of the Association for the Care of Children's Health, Cleveland, June, 1988

Changing Families.  Workshop participant, Vermont Association for the Education of Young Children, October, 1988

EXHIBIT 1 pg. 100

Exhibit G-19

Curriculum Vitae                    16              David Gary Fassler, M.D.

Restraint and Seclusion with Difficult Children and Adolescents, Workshop participant, 35th Annual Meeting, American Academy of Child and Adolescent Psychiatry, Seattle, October, 1988

Changing Families:  Children's Reactions to Divorce, Separation and Remarriage, Gertrude Friedman Memorial Lecture, Minneapolis Children's Hospital, October, 1988

Changing Families.  Grand Rounds, Department of Pediatrics, University of Vermont, College of Medicine, January, 1989.

Children's Perceptions of AIDS.  Presentation co-author, New England Association for the Education of Young Children, April, 1989

What's A Virus Anyway?  Children's Perceptions of AIDS.  Presentation co-author, 66th Annual Meeting of the American Orthopsychiatric Association, New York, April, 1989

Introduction to Video Production.  Institute co-presenter, 24th Annual Conference of the Association for the Care of Children's Health, Anaheim, California, May, 1989

Children's Perceptions of AIDS.  Presentation co-author, 24th Annual Conference of the Association for the Care of Children's Health, Anaheim, California, May, 1989

The Use of Seclusion in the Psychiatric Treatment of Children.  Institute Faculty, APA Annual Meeting, San Francisco, June, 1989

Building a Community of Caring:  Family Centered Care in Practice.  Workshop presentation, Burlington, Vermont, November, 1989

Blended Families.  Workshop presentation, Department of Family Practice, University of Vermont, Burlington, Vermont, November, 1989

Changing Families.  Grand Rounds presentation, Institute of Community and Family Psychiatry, McGill University, Montreal, Quebec, December, 1989

Changing Families.  Grand Rounds presentation, Cambridge Hospital, Harvard Medical School, February, 1990

Changing Families.  Grand Rounds presentation, New England Memorial Hospital, Stoneham, Massachusetts, February, 1990

Working with "Challenging" Families:  A Child's Perspective.  Cambridge Hospital Continuing Education Series, Cambridge, Massachusetts, March, 1990

Changing Families.  Early Childhood Resource and Information Center, New York Public Library, New York, February, 1990

Tell Me What I Need to Know:  Knowledge and Attitudes About AIDS and AIDS Education

**EXHIBIT 1 pg. 101**

Exhibit G-20

Curriculum Vitae                    17                David Gary Fassler, M.D.

Among Young Children, Parents and Teachers.  67th Annual Meeting American Orthopsychiatric Association, Miami, April, 1990

The Overburdened Child of the Post Divorce Family.  Workshop presenter, 67th Annual Meeting, American Orthopsychiatric Association, Miami, April, 1990

Too Young To Know?:  Educators' and Parents' Perceptions of Young Children's Knowledge About AIDS.  Association for the Care of Children's Health, Washington, D.C., May, 1990

Children's Perceptions of AIDS.  Symposium participant, 37th Annual Meeting, American Academy of Child and Adolescent Psychiatry, Chicago, October, 1990

Helping Children Cope with Divorce.  Pembroke Hospital, Pembroke, Mass., October, 1990

Teaching Young Children About AIDS.  National Association for the Education of Young Children, Washington, D.C., November, 1990

Children's Perceptions of AIDS:  A workshop for teachers and parents.  New York Public Library, January, 1991

Children's Reactions to War.  Colchester School System, Colchester, Vermont, January, 1991

Working with Children from Divorced and Remarried Families.  YMCA Workshop, Burlington, Vermont, February, 1991

Changing Families.  Cambridge Child Guidance Center, Cambridge, Mass., April, 1991

Coming to America:  A Kid's View of Immigration.  New Americans Conference, Burlington, Vermont, May, 1991

Helping Children Cope with Divorce, Separation and Remarriage.  Association for the Care of Children's Health, Minneapolis, Minn., May, 1991

Changing Families.  Grand Rounds Presentation, University of Massachusetts Medical Center, Worcester, Mass., February, 1992

Talking with Young Children About a Troubled World.  Symposium participant, Association for the Care of Children's Health.  Atlanta, Ga., May, 1992

Children's Reactions to Divorce.  Grand Rounds presentation, Massachusetts Mental Health Center, Boston, Mass.  September 1992

There's No Place Like Home:  Intensive Treatment for Children and Families in Home-Based Settings.  American Academy of Child and Adolescent Psychiatry.  Washington, D.C., October 1992

Negotiating Contracts for Child and Adolescent Psychiatrists.  American Academy of Child and

**EXHIBIT 1 pg. 102**

Exhibit G-21

Curriculum Vitae                    18                David Gary Fassler, M.D.

Adolescent Psychiatry, Washington, D.C., October 1992

Custody and Visitation Issues for Children Under Age 2.  Co-presenter, Boston Institute for the Development of Infants and Parents, April 1993

A Celebration of Fathering.  Conference presenter, Burlington, Vt.  April 1993

Leadership Issues in Mental Health Systems.  Course faculty, American Psychiatric Association, San Francisco, May 1993 (also presented annually 1994-1996)

On the Edge with Managed Care.  Workshop participant, American Psychiatric Association, San Francisco, May 1993

Starting a Group Practice.  American Academy of Child and Adolescent Psychiatry, San Antonio, October 1993 (also presented annually 1994-1998)

Managed Care and Children:  Promoting Public-Private Collaboration.  National Technical Assistance Center for Children's Mental Health, Nashville, Tennessee, May 1995

Child Psychiatric Practice in the Community.  Texas Association of Child and Adolescent Psychiatry, Austin, Texas, January, 1998

Childhood Depression:  Recognition and Treatment.  Institute of Living, Hartford, Connecticut, March, 1998

Childhood Depression:  Recognition and Treatment.  4 Winds Hospitals, Katonah and Saratoga, New York, October, 1998

Childhood Depression:  Recognition and Treatment.  Alliance for the Mentally Ill of Cayuga County, Cleveland, Ohio, 1999.

Childhood Depression:  Recognition and Treatment.  Massachusetts Behavioral Health Partnership, June, 1999.

New Directions in the Treatment of Depression, Unity Health System, Rochester, New York, April, 2000.

Mental Health Consultation in the Schools, Society for Developmental Education, April, 2000.

Overview of Geriatric Psychiatry, Charles Cole Memorial Hospital, Coudersport, Pennsylvania, September, 2001.

Childhood and Adolescent Depression, Grand Rounds, New York Medical College, Valhalla, New York, March, 2002.

Medication Use for Children in Systems of Care, APA Annual Meeting, Philadelphia,

**EXHIBIT 1 pg. 103**

Exhibit G-22

Curriculum Vitae                    19                    David Gary Fassler, M.D.

Pennsylvania, May, 2002.

Recognizing, Treating and Preventing Childhood and Adolescent Depression, Rochester, New York, April, 2003.

"Child and Adolescent Psychiatry: National Trends, Local Solutions", Illinois Council of Child and Adolescent Psychiatry, Chicago, IL, June, 2003

"Childhood and Adolescent Suicide", AMA Media Briefing, New York, NY, May, 2003.

"The Future of Child and Adolescent Psychiatry: The Crisis of Our Workforce and the Economics of Access", AACAP Annual Meeting, Miami, October 2003.

Clinical Perspective on ADHD, AMA Media Briefing, New York, NY, September, 2004.

"Child Psychiatric Services: National Trends/Local Solutions", Maine Council of Child and Adolescent Psychiatrists, Annual Meeting, Rockport, ME, September, 2004.

"Developing a National Registry of Clinical Trials", American Enterprise Institute for Public Policy Research, Washington, DC, September, 2004.

"Adolescent Brain Development and the Juvenile Death Penalty", Harvard Law School, Cambridge, MA, November, 2004.

"Advocacy and Ethics in Child and Adolescent Psychiatry", 10th Annual Psychopharmacology Update Conference, Las Vegas, NV, February, 2005.


"Advocacy in Child and Adolescent Psychiatry: National Trends/Local Solutions", Minnesota Association for Children's Mental Health, Duluth, MN, April, 2005.

"The Diagnosis and Treatment of Child and Adolescent Depression", Minnesota Association for Children's Mental Health, Duluth, MN, April, 2005.

"Advocacy in Child and Adolescent Psychiatry: National Trends/Local Solutions", Alaska Psychiatric Association, Girdwood, AK, April, 2005.

"The Diagnosis and Treatment of Child and Adolescent Depression", Alaska Psychiatric Association, Girdwood, AK, April, 2005.

"Help Me, I'm Sad": Recognizing and Addressing Child and Adolescent Depression in School, Burlington, VT, May, 2005.

"Adolescent Brain Development", Montana Statewide Juvenile Justice Conference, Big Sky, MT, September, 2005.

"Children and SSRIs: Policy, Perception and Practice", American Academy of Child and

**EXHIBIT 1 pg. 104**

Exhibit G-23

Curriculum Vitae                    20              David Gary Fassler, M.D.

Adolescent Psychiatry, Toronto, October, 2005.

"Enhancing Access to Child Psychiatric Services: The Vermont Experience", American Academy of Child and Adolescent Psychiatry, Toronto, October, 2005

"Depression, Treatment and Controversy", National Mental Health Association, Health Writers' Workshop, New York, NY, November, 2005.

 "Disorder in the Court: Mental Health Issues in Criminal, Juvenile and Civil Commitment Cases", the Oregon Criminal Defense Lawyers Association, Portland, OR, December, 2005.

"Adolescent Brain Development", Inter-American Commission on Human Rights, National Juvenile Defender Center, Georgetown University Law Center, Washington, DC, January, 2006.

"Adolescent Brain Development and the Juvenile Death Penalty", Beyond These Walls: Promoting Health and Human Rights of Youth in the Justice System, Physicians for Human Rights, Yale University School of Law, New Haven, CT, April, 2006.

"The Diagnosis and Treatment of Childhood and Adolescent Depression", Mental Health Association of Duchess County, Poughkeepsie, NY, May, 2006.

"The Diagnosis and Treatment of Childhood and Adolescent Depression", Maine Association of Psychiatric Physicians, Portland, ME, May, 2006.

"Adolescent Brain Development and the Juvenile Death Penalty", 2006 Juvenile Justice National Symposium, Burlingame, CA, May, 2006.

"Enhancing Access to Child Psychiatric Services: The Vermont Experience", American Academy of Child and Adolescent Psychiatry Annual Meeting, San Diego, CA, October, 2006.

"Emerging Issues in Adolescent Brain Development: Implications for Youth in the Justice System", Child Welfare League of America National Conference, Washington, DC, February, 2007.

"Enhancing Collaboration Between Child Psychiatry and Pediatrics: The Vermont Experience", Oregon Council of Child and Adolescent Psychiatry/Oregon Pediatric Society Spring Meeting, Portland, OR, June 2007.

"The Diagnosis and Treatment of Childhood and Adolescent Depression", Vermont Food Allergy Organization Annual Conference, South Burlington, VT, June, 2007.

"Thinking Outside the Black Box: Advocacy for Child and Adolescent Psychiatry", Wolfe Adler Lecture, Sheppard Pratt Health Systems, Baltimore, MD, September, 2007.

"The Diagnosis and Treatment of Childhood and Adolescent Depression" and "Adolescent Brain Development", Philhaven Behavioral Health Services, Mt. Gretna, PA, September, 2007.

EXHIBIT 1 pg. 105

Exhibit G-24

Curriculum Vitae                    21                David Gary Fassler, M.D.

"The Diagnosis and Treatment of Childhood and Adolescent Depression", 2008 Harrison Lectureship Distinguished Visiting Speaker in Child and Adolescent Psychiatry, University of Tennessee, Department of Psychiatry, Memphis, TN, April, 2008.

"Thinking Outside the Box: Treating Depression in Children", Public Symposium at APA Institute on Psychiatric Services, Chicago, IL, October, 2008.

"Thinking Outside the Black Box: Update on Child and Adolescent Depression", Wisconsin Psychiatric Association 2009 Annual Spring Conference, Kohler, WI, March, 2009.

"Thinking Outside the Black Box: Advocacy for Child and Adolescent Psychiatry", WCCAP Presentation at the Wisconsin Psychiatric Association 2009 Annual Spring Conference, Kohler, WI, March, 2009.

"Emerging Issues in Adolescent Brain Development: Implications for Juvenile Justice", Oregon Criminal Defense Lawyers Association, Juvenile Law Seminar, Newport, OR, April, 2009.

"Thinking Outside the Black Box: Advocacy in Child and Adolescent Psychiatry", Michigan Psychiatric Society Fall Scientific Meeting, Novi, Michigan, September, 2009.

"Enhancing Collaboration Between Pediatrics and Child Psychiatry: The Vermont Experience", Grand Rounds, University of Wisconsin Department of Psychiatry, Madison, WI, April, 2010.

"Thinking Outside the Black Box: Advocacy for Child and Adolescent Psychiatry", Rogers Memorial Hospital, Oconomowoc, WI, April, 2010.

"Thinking Outside the Black Box: Advocacy for Child and Adolescent Psychiatry", Grand Rounds, Brown Medical School, Bradley Hospital, East Providence, RI, April, 2011.

"Thinking Outside the Black Box: Advocacy for Child and Adolescent Psychiatry", 18th Herman Staples Memorial Lecture, Narberth, PA, June, 2012.

"`Help Me, I'm Sad': Recognizing, Treating and Preventing Childhood and Adolescent Depression", The Mental Health Association, Rochester, NY, September, 2012.

"Advocacy in Psychiatry: National Trends/Local Solutions", Grand Rounds, State University of New York Downstate Medical Center, Brooklyn, NY, March, 2014.

"Adolescent Brain Development", American Bar Association Annual Meeting, Commission on Youth at Risk, Boston, MA, August, 2014.

EXHIBIT 1 pg. 106

Exhibit G-25

Declaration of Novotny Baez

I, Novotny Baez, make the following declaration:

1. My name is Novotny Baez. I have a degree in criminology and corrections from Sam Houston State University in Huntsville, TX. I started my career as a detention officer and then became a juvenile probation officer for Bell County, TX probation department working with juveniles in the Intensive Supervision Probation program or ISP. The ISP program was for juveniles who committed felonies.

2. I was Brandon Bernard's juvenile probation officer. I supervised Brandon Bernard when he was 16 or 17 years old and remember him well. Brandon was always very low-key and respectful. He was a sweet, nice kid. Brandon had a "go along to get along" character. He always said "yes ma'am" or "no ma'am." I never felt threatened or feared Brandon, unlike other juveniles I supervised. As part of my job duties, I was required to do a random visit at Brandon's home once a week and he was always home when I came. I put his home visits as my last one of the day, usually at 8 or 9 at night, because I felt safe around him because he had a calming presence. I never thought twice about my safety when visiting Brandon in the evening. He was required to report to my office two to three times a week and he did. He was well liked by the staff at the probation office. He was an easy person to supervise and his supervision was terminated early because of good behavior. It does not surprise me that Brandon has done well in custody over the years.

3. When I heard of Brandon's involvement in the murders, I thought the crime did not fit Brandon's character. Brandon was a follower. I did not think Brandon would do anything like this on his own. It was part of his "go along to get along" character. I thought that Brandon would not have gone along if he knew people would be killed.

1

**EXHIBIT 1 pg. 107**

Exhibit H-1

4.  In terms of Brandon and his friend's "gang affiliation," they were a bunch of neighborhood "wannabes." They were not in a real organized gang. They were playing like they were in a gang but had no affiliation to any. Brandon and his friends would wear the clothes and bandanas that made them appear to be in a gang, but it did not mean anything.

5.  When I heard about the crime through the media coverage, I knew that the race of the defendants and the victims would be a factor in the outcome of the trial. Since Brandon and his friends were African-American and the victims were white, church going people, race would be an issue, especially in this part of Texas.

6.  At the time of Brandon's trial, I was never contacted by anyone on Brandon's defense team. I would have been willing to testify on Brandon's behalf. I think my testimony during penalty phase would have helped a jury see Brandon was a good person at heart and did not deserve the death penalty. My testimony would be observations as an independent source who worked with Brandon in the criminal justice system.

7.  I hope the victim's families know I think that their loss is incalculable, that they have suffered greatly, and this whole process has not been easy on them. At the same time, I also hope that President Trump will see that Brandon is a good person who got caught up in a bad situation and should have his sentence commuted to life in prison.

I have read the foregoing declaration. Under the laws of the United States and the State of Texas, I declare under penalty of perjury that this declaration is true and correct.

Executed at Killleen, TX on ___8-25-20___

_Novotny Baez_
Novotny Baez

2

**EXHIBIT 1 pg. 108**

Exhibit H-2

Declaration of Laird Cooper

I, Laird Cooper, make the following declaration,

1.  My name is Laird Cooper.  I was a juror in case number W-99-CR-70, in the Western District of Texas. This case charged both Brandon Bernard and Christopher Vialva with carjacking and murder.  These charges carried the punishment of either a life sentence or the death penalty. This declaration is being presented by Brandon Bernard in his clemency petition to the President of the United States of America. I am aware that Mr. Bernard is asking that the President commute Brandon's death sentence to a life sentence.

2.  There was no question in my mind, during the guilt phase of the trial, that Mr. Bernard was guilty.  The evidence made it clear that Mr. Bernard was present and participated in the charged crimes.

3.  While the evidence proved that there is no doubt that Mr. Bernard is guilty, I also believe Mr. Bernard's trial attorneys, failed to even adequately represent him. Due to this failure in legal representation, I am not opposed to Mr. Bernard requesting his death sentence be commuted to life without the possibility of parole.

I have read the foregoing declaration. Under the laws of the United States and Texas, I declare under the penalty of perjury that this declaration is true and correct.

Executed at Mexia, Texas on  May 26 2016

Laird Cooper

EXHIBIT 1 pg. 109

Exhibit I-1

## DECLARATION OF DAVID A. RUHNKE

David A. Ruhnke, pursuant to the provisions of 28 U.S.C. §1746, makes the following sworn declaration:

### Qualifications of Declarant

1. My name is David A. Ruhnke. I have been a practicing attorney for nearly 29 years and practice almost exclusively in the area of criminal defense. I graduated from law school in 1975, clerked for one year, and then went to work in the Office of the Federal Public Defender for the District of New Jersey. In 1983, after seven years with the Federal Defender, I went into private practice and founded the law firm that is now known as Ruhnke & Barrett. I am in partnership with my wife, Jean D. Barrett. Since entering private practice in 1983, I have devoted a substantial part of my professional life to defending capital murder cases in both state and federal court. A copy of a current resume, setting forth my general background and my experience in capital cases, is appended to this declaration as Appendix A and is incorporated by reference.

2. To date I have tried 12 capital cases to a verdict, six in the New Jersey Superior Court and six in various United States District Courts. In addition to capital cases which actually went to trial, I have been involved in numerous other potentially capital cases, as set forth particularly in the attached resume, that were negotiated to a sentence of less than death without a trial or where, in the federal arena, the Attorney General of the United States decided not to authorize a capital prosecution.

Declaration of David A. Ruhnke
Page 1 of 82

**EXHIBIT 1 pg. 110**

Exhibit J-1

3. I lecture frequently on the defense of capital cases. I also regularly attend seminars and conferences on the subject of the death penalty, and related topics, in order to stay current in this field. I was a member of the faculty of the initial Capital Trial Advocacy Program held in Austin, Texas, in January 2002, under the sponsorship of the Center for American and International Law. I also served as a member of the faculty for that program in March of this year in Plano, Texas. I have been asked to return next year and deliver the keynote address.

4. Based upon on my experience and background, including regular and frequent contact with attorneys handling capital cases all around the country, I am familiar with the prevailing professional norms of capital representation. I am familiar, as well, with the Guidelines adopted by the American Bar Association (ABA) for such representation, both as originally formulated in 1989 and as revised last year. Because the relevant events of this case took place in 1999-2000, any citations to the ABA Guidelines will be to the version in effect at that time, although I view the 2003 revision as more of an up-date than a totally new look at the responsibility of defense counsel in capital cases.

5. On five prior occasions, I have been qualified to testify as an expert witness regarding attorney performance in defending capital cases.

**Basis and Standards for Review**

6. I have been asked to render an opinion whether, in the matter of *United States v. Brandon Bernard*, No. W-99-CR-070(2) (W.D. Tex.), defendant Bernard's attorneys

Declaration of David A. Ruhnke
Page 2 of 82

**EXHIBIT 1 pg. 111**

Exhibit J-2

provided effective assistance of counsel. More specifically, I have been asked to assess whether trial counsel's performance "fell below an objective standard of reasonableness ... under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003). I have also considered the "prejudice" prong of the *Strickland* inquiry, *i.e.*, whether there is a reasonable probability that, had counsel not performed deficiently, the outcome of the proceeding would have been different.

7. My opinions here pertain only to trial counsel's acts and omissions in this particular trial. The first part of the *Strickland* analysis, *i.e.*, whether a minimum standard of performance was violated, involves an objective assessment of the particular challenged facet of representation, and not an evaluation of the lawyer's general competence, professionalism, dedication, or reputation. Otherwise competent, experienced, and highly-respected attorneys can and do make mistakes which either alone or in combination may seriously undermine confidence in the verdict in a particular case. This is particularly true in capital cases, where courts have recognized that a single error or omission can amount to a denial of constitutionally adequate representation. I have tried at all times to distinguish between minimum standards of attorney performance and optimal representation. When I express the opinion that a particular act or omission by Mr. Bernard's counsel was ineffective or deficient, I mean that it fell below minimum standards of attorney performance.

Declaration of David A. Ruhnke
Page 3 of 82

**EXHIBIT 1 pg. 112**

Exhibit J-3



**Documents Reviewed**

8. In preparing to render an opinion, I have reviewed the following materials: the pleadings and orders filed in the case; the transcript of testimony from both the guilt and punishment phases of trial; the files apparently maintained by Bernard's trial counsel; the Fifth Circuit's opinion affirming Bernard's conviction and sentence; plea and sentencing transcripts for Tony Sparks, Chris Lewis, and Terry Brown; pre-sentence investigation report for Terry Brown; report of psychological evaluation of Terry Brown by Dr. James Shinder; grand jury testimony of FBI Special Agent Chadwick; affidavits from Terry Brown; report of fire investigator Thomas Sing; affidavit of Dr. Michael Gelbort, and a June 2, 2004 draft social history report and assessment by mitigation specialist Jill Miller, M.S.S.W.

**Summary and Scope of Opinion**

9. Upon reviewing the materials described above, and considering them in light of the applicable legal standard, it is my opinion that Mr. Bernard did not receive effective assistance of counsel as guaranteed by the Sixth Amendment, based on the acts and omissions of trial counsel described in this declaration, and the likely cumulative prejudice that resulted to Mr. Bernard.

10. The instances of deficient performance and resulting prejudice set out below may not constitute a complete list of the Sixth Amendment violations in Mr. Bernard's trial. I continue to review information provided by Mr. Bernard's current counsel, and have not yet formed an opinion respecting whether other specific acts or omissions of

Declaration of David A. Ruhnke
Page 4 of 82

**EXHIBIT 1 pg. 113**

Exhibit J-4

counsel in this case constituted deficient performance under *Strickland*, or prejudiced the outcome of either phase of trial.

11. I am prepared to supplement these findings if requested to do so, and to testify to these opinions at a hearing if one is ordered by the Court.

### Failure to Investigate in Preparation for the Guilt-Innocence Phase of Trial

12. The time records submitted by Mr. Bernard's lead trial counsel Russ Hunt, Sr., reflect that during the first four months he represented Mr. Bernard (*i.e.*, from his appointment on June 23, 1999 to October 23, 1999), Mr. Hunt, Sr. ▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

13. Similarly, from October 24, 1999 to May 3, 2000, Mr. Hunt, Sr., ▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮

14. During the same time period, his investigator, "Criterion Investigations," ▮

▮▮▮▮

15. Second-chair counsel Russ Hunt, Jr., was appointed in March 2000, and from then until mid-May 2000 ▮▮▮

▮▮▮▮

Declaration of David A. Ruhnke
Page 5 of 82

**EXHIBIT 1 pg. 114**

Exhibit J-5



16. As a result, during the entire period of pre-trial preparation, from June 1999 to May 2000, Mr. Bernard's defense team collectively ███████████████████████ ██████████████████████████. While of course every case is different, based on my experience defending capital cases I believe it is exceedingly unlikely that an adequate investigation of a capital murder case, inquiring into issues relevant to both phases of trial, could be conducted in that amount of time.

17. Similarly, records reflect that the total number of hours spent on Mr. Bernard's case by both his attorneys before trial began (*i.e.*, by Mr. Hunt, Sr., from the date of appointment through May 3, 2000, and by Mr. Hunt, Jr., from his appointment in March 2000 through May 14, 2000) ████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████

18. By way of contrast, according to the authoritative 1998 report of the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Administrative Office of the U.S. Courts, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, the average amount of time billed by defense counsel in federal capital cases that

Declaration of David A. Ruhnke
Page 6 of 82

**EXHIBIT 1 pg. 115**

Exhibit J-6

874

proceeded to trial was 1,889 hours, representing 409 hours of in-court time and 1,480 hours of out-of-court time.

19. Mr. Bernard's counsel failed to investigate in preparation for the guilt-innocence phase of his trial. The standard of practice for attorneys defending federal capital cases in 1999-2000 required counsel to undertake a thorough and independent investigation of the facts and circumstances of the offense. By "independent," I mean that it is objectively unreasonable for defense counsel to rely solely on the information provided by the Government through formal or informal discovery, rather than conducting their own investigation. It was also understood in 1999-2000 that reasonably effective counsel could not rely exclusively on their client as a source of information that might be relevant to a defense at either phase of a capital trial. Under prevailing professional norms of defense representation in 1999-2000, it was understood that counsel had a duty to conduct an investigation into the offense regardless of any statement or admission by the client concerning the facts of the alleged crime or what might otherwise appear to be strong or even overwhelming evidence of guilt.

20. Mr. Bernard's trial counsel performed deficiently in failing to obtain the services of

Declaration of David A. Ruhnke
Page 7 of 82

**EXHIBIT 1 pg. 116**
Exhibit J-7

an investigator for the guilt phase. Counsel was appointed June 23, 1999. Counsel waited about six weeks before filing a motion seeking funds for an investigator. In that motion, counsel noted that there were a large number of witnesses in the case and three co-defendants as well as a large amount of physical evidence. Once counsel had access to the services of an investigator, however, counsel did not direct the investigator to inquire into any area of the case related to the offense or the co-defendants. Instead, counsel appears simply to have had the investigators ("Criterion Investigations") interview persons named on a list of names provided by Mr. Bernard's mother. Many of these interviews were conducted by telephone. This investigation had little relevance to the issues that would arise at the guilt phase of trial.

21. In addition to failing to ensure that their investigator conducted an appropriate independent investigation, Mr. Bernard's counsel unreasonably failed to conduct any investigation in preparation for the guilt phase on their own, including specifically failing to interview the co-defendants and other witnesses (such as Greg Lynch, Tony Sparks, or Joey Presley). Counsel unreasonably failed to obtain copies of the transcript of the plea hearing of cooperating co-defendants Lewis and Brown, or of Tony Sparks. Counsel never made any efforts, as reasonably effective counsel would have, to obtain the pleadings or transcripts for either the detention hearings or the juvenile transfer proceedings for Lewis or Sparks, nor to obtain the juvenile records of Lewis or Sparks.

Declaration of David A. Ruhnke
Page 8 of 82

**EXHIBIT 1 pg. 117**

Exhibit J-8

874

22. Counsel unreasonably failed to investigate evidence that would have shown that Lewis and Brown had opportunities to communicate with one another prior to trial. Counsel unreasonably failed to conduct any investigation into evidence that might undermine the credibility of Lewis or Brown, such as Brown's mental illness and history of frequent drug use, or Lewis' prior criminal conduct. There is good reason to conclude that such investigation would have been fruitful, as Brown has indicated in an affidavit that he would have been willing to speak with Bernard's attorneys even if his own lawyers advised against it, and the affidavit reflects extensive drug use by Brown around the time of the crime.

23. Reasonably effective counsel in 1999-2000 would have sought the assistance of an independent arson expert or fire investigator to examine the evidence relating to the fire that consumed the Bagleys' car. In this case, questions relating to the fire (*e.g.,* where and how it started, where and how quickly it burned, etc.) were critically important to determining such issues as Mr. Bernard's intent with respect to the victims' deaths, as well as several of the statutory and non-statutory aggravating circumstances the jury would likely have to determine if the case reached a penalty phase (such as whether the murder was committed in an "especially heinous, cruel, or depraved" manner, or whether there was "substantial planning and premeditation" to cause the Bagleys' deaths, or whether Mr. Bernard was likely to be a future danger to the lives and safety of others).

24. Reasonably effective counsel would have obtained the services of an independent

Declaration of David A. Ruhnke
Page 9 of 82

**EXHIBIT 1 pg. 118**

Exhibit J-9

arson expert or fire investigator to review the evidence with respect to these questions. I am advised that the report of fire investigator Thomas Sing, which apparently was in the file of counsel for co-defendant Vialva but not in the file provided to Bernard's current counsel by his trial counsel, contains Sing's expert opinion about the car fire. The report states that "It is my opinion the fire that completely destroyed the vehicle originated in two separate areas of the vehicle. The indication of an ignitable liquid on the exterior surface of the engine compartment hood and exterior surface of the rear deck of the trunk are evidence of one area of origin of the fire. A second area of origin is located with in [sic] the passenger compartment in the area of the rear passenger seat in the floor pan immediately to the rear of the driver's seat." If true, this demonstrates that had Mr. Bernard's counsel obtained the assistance of an independent arson expert or fire investigator, they could have raised serious and important doubts about the Government's theory that the fire had a single origin and Mr. Bernard was solely responsible for setting it. Indeed, reasonably effective counsel would have used Sing's own report to show the jury that the "single point of origin" theory was not consistent with the physical evidence.

**Failure to advocate meaningfully to persuade the Government not to seek the death penalty against Bernard**

25. Reasonably effective counsel in a federal capital case in 1999-2000 would have understood the importance of aggressively pressing the Government in an attempt to influence its decision about seeking the death penalty. In my view, counsel's actions in this case during the pre-authorization period do not reflect that kind of zealous

Declaration of David A. Ruhnke
Page 10 of 82

**EXHIBIT 1 pg. 119**

Exhibit J-10

advocacy.

26. From the moment he was appointed, lead counsel Russ Hunt, Sr., knew that the Government might seek the death penalty for Mr. Bernard and that the authority to do so rested with the Attorney General. He also knew, or should have known, that it was his duty to try to demonstrate to both the local U.S. Attorney and then to the Attorney General why a sentence less than death was appropriate for Mr. Bernard. Indeed, in a motion seeking appointment of co-counsel filed on February 25, 2000 – only about 30 days before the Government formally announced its decision to seek the death penalty, which may well have been reached some time earlier – Mr. Hunt wrote that "[o]ne of defense counsel's most important functions is to present information first to the local U.S. Attorney and then to the Justice Department that would justify a lesser sentence [than death]. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors."

27. While Mr. Hunt's motion correctly described the obligations of counsel at the pre-authorization stage of a potentially capital federal prosecution, it was objectively unreasonable to wait eight months after appointment to file such a motion. This conclusion is strengthened by the fact that the local United States Attorney had, on August 17, 1999, written a letter to Mr. Hunt in which he indicated his intention to recommend to the Justice Department that it authorize him to seek the death penalty

Declaration of David A. Ruhnke
Page 11 of 82

**EXHIBIT 1 pg. 120**

Exhibit J-11

against Mr. Bernard, and invited Mr. Hunt to respond in writing or orally.

28. Nothing indicates Mr. Hunt made an oral presentation to the local United States Attorney. On August 31, 1999, Mr. Hunt sent a 1½ page letter to the Government stating that Vialva had instigated and led the crime, that Mr. Bernard had attempted to persuade Vialva to release the victims unharmed, and that Mr. Bernard was not a leader. In support of these claims, Mr. Hunt referenced an unspecified article from the local newspaper quoting the opinion of a local high school principal that Mr. Bernard was a "follower." Mr. Hunt also stated that Mr. Bernard's mother had given him a list of at least 80 people who would say that Mr. Bernard was not violent and would not have initiated the murders. Finally, Mr. Hunt offered to have Mr. Bernard cooperate and testify about Vialva's actions.

29. At the time Mr. Hunt wrote this letter, two months after his appointment, reasonable counsel would have been well underway in conducting the extensive mitigation investigation required by the existing standard of practice. All it appears Mr. Hunt had done was engage "Criterion Investigations" to interview the witnesses named on the list provided by Thelma Bernard. Counsel does not appear to have gathered any documentary evidence whatsoever about Mr. Bernard's social history. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Nothing in the records I have reviewed indicates that counsel's preparation had advanced by January or February 2000, when Mr. Hunt appears to have participated in a telephone conversation with attorneys

Declaration of David A. Ruhnke
Page 12 of 82

**EXHIBIT 1 pg. 121**

Exhibit J-12

from the Justice Department in Washington, D.C., purportedly to permit defense counsel to be heard on the question of why the Government should not seek the death penalty against Mr. Bernard.

30. Counsel's performance in all these respect was deficient. Based on my review of the mitigating evidence a properly conducted investigation would have produced, I believe that Mr. Bernard suffered prejudice from trial counsel's failure to advocate effectively for Mr. Bernard during the authorization process. The Government officials who ultimately made the decision to authorize the death penalty did so without receiving vital input about the Government's case and Mr. Bernard's background. In my opinion, a reasonable probability (as that term is used in *Strickland*) exists that if those officials had been made aware of the complete picture, they would have declined to authorize a death penalty prosecution against Mr. Bernard.

Declaration of David A. Ruhnke
Page 13 of 82

**EXHIBIT 1 pg. 122**

Exhibit J-13

**Failure to Preserve Objection to Indictment**

31. Mr. Bernard's counsel unreasonably failed to make appropriate and necessary constitutional objection to the indictment, the first superseding indictment, or the second superseding indictment on the grounds that the grand jury was required to find or allege intent factors and at least one of the statutory aggravating factors that the Government had identified in its notice of intent to seek the death penalty and was required to prove to the petit jury in order to authorize the maximum sentence (*i.e.*, death) upon conviction.

32. At least by the time Mr. Bernard went to trial in May 2000, reasonably effective defense counsel in a federal capital case would have been aware that there existed colorable grounds for a Fifth Amendment challenge to the Government's then-existing practice of not seeking grand jury indictment on aggravating factors. The legal basis for this Fifth Amendment challenge was apparent from the Supreme Court's March 1999 decision in *Jones v. United States*, 526 U.S. 227 (1999), and its November 1999 grant of certiorari in *Apprendi v. New Jersey*. Defense attorneys in other federal capital cases around the country in 1999-2000 were making such Fifth Amendment objections. The standard of practice for defending capital cases obliged Mr. Bernard's counsel to preserve such an objection to the second superseding indictment for purposes of subsequent legal review.

Declaration of David A. Ruhnke
Page 14 of 82

**EXHIBIT 1 pg. 123**
Exhibit J-14

### Failure to make opening statement at the guilt-innocence phase

33. Counsel performed deficiently in failing to make an opening statement at the guilt phase of trial. While failure to make an opening statement is not *per se* deficient performance under *Strickland*, in the factual context of this case counsel's decision to waive opening at the guilt phase was objectively unreasonable.

34. First, no physical or forensic evidence established the respective roles played by, or the acts committed by, the persons alleged to have been involved in the carjacking and murder. As a result, the Government's case at the guilt phase rested almost entirely on the credibility of the testimony of Lewis and Brown, the co-defendants who had pleaded guilty and were cooperating with the Government in hopes of obtaining leniency in their own cases. Lewis and Brown had participated in the key events of the carjacking and murder, and Mr. Bernard's trial counsel knew, or reasonably effective counsel would have known, that their testimony would form the linchpin of the Government's case.

35. Prior to trial, Mr. Bernard's counsel were aware, or reasonably effective counsel would have been aware, that both Lewis and Brown had made numerous statements regarding the events of the carjacking and murder, and that each of their statements contained inconsistencies and contradictions when compared to that defendant's own prior statements and to the other cooperating co-defendant's statements. Thus, prior to trial, Mr. Bernard's counsel were aware, or reasonably effective counsel would have been aware, that no matter what version of events the Government promised to

Declaration of David A. Ruhnke
Page 15 of 82

**EXHIBIT 1 pg. 124**

Exhibit J-15

prove in opening statement or what version of events Brown and Lewis actually recounted in their testimony at trial, Mr. Bernard's trial counsel would be able to show the jury that both Brown and Lewis had previously made statements that were at odds with their trial testimony and whatever theory the Government advanced. Under the prevailing professional norm of defense representation in existence in 1999-2000, it was understood that in such a case, it is essential for defense counsel to make an opening statement that alerts the jury to the known problems with the credibility of the testifying co-defendants.

36. Prior to trial, Mr. Bernard's counsel were aware, or reasonably effective counsel would have been aware, that both Lewis and Brown had obtained significant benefits in their plea agreements by being permitted to plead guilty to reduced charges rather than facing first-degree murder charges, which would have carried a mandatory life sentence without possibility of release. The range of actual imprisonment each faced could have been calculated with reasonable confidence under the United States Sentencing Guidelines. Their actual guideline ranges were approximately 20 years for Brown and approximately 27 years for Lewis, given their criminal histories and the facts to which they had admitted in pleading guilty. Given that the Government's case against Bernard would stand or fall on the credibility of the allegations leveled by Lewis and Brown, reasonably effective counsel would have taken the opportunity to develop in detail, through cross-examination and through independent evidence if necessary, the presumptive applicable Guideline ranges for Brown and Lewis, and

**EXHIBIT 1 pg. 125**

Exhibit J-16

would also have made clear to the jury that there was no realistic possibility, given the operation of the Guidelines, that either would face a life sentence.

37. In addition, reasonably effective counsel would have understood the importance of having the jury appreciate the significance of the fact that, under the plea agreements entered by Lewis and Brown, the Government would have the sole discretion to determine whether they had testified truthfully and whether their testimony had substantially assisted the Government in prosecuting Mr. Bernard.

38. These matters are sufficiently complex and unfamiliar to lay jurors that there is a corresponding need for trial counsel to explore them at the earliest opportunity in the case. Reasonably effective counsel accordingly would have included them in an opening statement at the guilt phase.

39. Prior to trial, Mr. Bernard's counsel were aware, or reasonably effective counsel would have been aware, that cooperating co-defendant Terry Brown had been using illegal drugs on the day of the offense and that he had a long history of drug use. Brown's drug use included heavy consumption of drugs that distort and interfere with one's perceptions and memory. Because of the importance of Brown's testimony to the Government's case, reasonably effective counsel would have advised the jury in an opening statement of the nature, extent, and effects of Brown's drug use during the events in question.

40. Attorneys might reasonably disagree about how much detail regarding these issues trial counsel might choose to include in his opening statement. There can be no

Declaration of David A. Ruhnke
Page 17 of 82

**EXHIBIT 1 pg. 126**

Exhibit J-17

disagreement, however, that it fell below prevailing professional norms for defense counsel in a federal capital case in 1999-2000 to fail to make *any* opening statement at all where the prosecution's case rested exclusively on the credibility of cooperating co-defendants who had previously made numerous inconsistent statements and were testifying in hopes of leniency. This conclusion is strengthened by the fact that Mr. Bernard's counsel had not subpoenaed any witnesses and did not intend to introduce any evidence at the guilt phase. Under such circumstances, reasonably effective defense counsel would have made an opening statement to preview the flaws in the credibility of Lewis and Brown that would be demonstrated through cross-examination during the Government's case-in-chief.

Declaration of David A. Ruhnke
Page 18 of 82

**EXHIBIT 1 pg. 127**

Exhibit J-18

### Failure to cross-examine Terry Brown effectively

41. Counsel performed deficiently in cross-examining cooperating co-defendants Terry Brown and Chris Lewis. As noted, the Government's entire case rested on the testimony of Lewis and Brown, and no physical evidence corroborated their accounts. Accordingly, no reasonable attorney would have failed to recognize, in preparing for trial, that it would be vital to undercut their credibility in the eyes of the jurors. This was, in fact, the only route to raising reasonable doubt about Mr. Bernard's guilt.

42. Under such circumstances, reasonable counsel would have taken advantage of every available opportunity to impeach Lewis and Brown's trial testimony with prior inconsistent statements, to demonstrate their bias and motivation to testify in a manner consistent with the Government's (current) theory, and to raise any other fact or circumstance that would undermine their credibility with the jury. Counsel inexplicably failed to employ the extensive available proof that Lewis and Brown were lying – *i.e.*, their own prior statements, both sworn and unsworn, that contradicted their trial testimony. Counsel also failed to cross-examine Lewis and Brown on the benefits they expected to receive as a result of cooperating with the Government, including the likely application of the federal Sentencing Guidelines to their cases and the Government's exclusive power to determine whether Lewis and Brown had discharged their part of the "deal" so as to be entitled to those benefits. Counsel also failed to cross-examine Brown regarding the drug use he admitted during his testimony at trial, and its effect on his ability to recall the many important

Declaration of David A. Ruhnke
Page 19 of 82

**EXHIBIT 1 pg. 128**

Exhibit J-19

parts of the Government's case to which he was a vital, or indeed the only, witness. In each of these ways, counsel fell below an objective standard of reasonableness in presenting Mr. Bernard's defense.

43. First, counsel performed deficiently in cross-examining Lewis and Brown regarding their own prior inconsistent statements. To appreciate the deficiencies in counsel's performance in this regard, it is essential to keep in mind throughout that if counsel's overarching goal was to undercut the credibility of Brown and Lewis – which was the only goal reasonably effective counsel could have identified in the circumstances of this case – there was effectively no risk associated with bringing to the jury's attention prior statements by either Lewis or Brown that otherwise might have appeared superficially damaging to Mr. Bernard – e.g., that although Lewis and Brown testified at Mr. Bernard's trial that they did not see who set fire to the Bagleys' car (a version nominally favorable to Mr. Bernard), they had earlier testified under oath that they saw Mr. Bernard set the fire, at Vialva's direction (a version nominally less favorable to Mr. Bernard). Reasonable defense counsel would make clear to the jury that counsel is not vouching for the truth of either version, but simply confronting the Government's witnesses with their prior statements to show that they are mistaken, lying, or have no independent recall of what actually happened. In that event, there is no downside to multiplying the number and variety of prior inconsistent statements before the jury.

44. In the same fashion, in a prosecution based exclusively on the testimony of

Declaration of David A. Ruhnke
Page 20 of 82

**EXHIBIT 1 pg. 129**
Exhibit J-20

cooperating co-defendants, there is almost no inconsistency "too trivial" to form the basis of impeachment with a prior inconsistent statement. There was no basis for the jury to find reasonable doubt about Mr. Bernard's guilt of premeditated murder unless they had doubt about whether to believe Lewis and Brown. Under those circumstances, it was vital for defense counsel to bring to the jury's attention any prior inconsistency that added to the list of reasons to disbelieve Lewis and Brown.

45. In briefly cross-examining Terry Brown, Mr. Bernard's counsel did not ask a single question regarding any of Mr. Brown's prior statements. Other than eliciting from Mr. Brown the admission that he did not tell Mr. Bernard that Vialva planned to kill the Bagleys, defense counsel's examination did not impeach either Brown's credibility or the substance of his testimony for the Government. The cross-examination of Brown by counsel for Vialva addressed only the statements made by Brown on the day after the murders. In those statements, Brown variously denied responsibility altogether, claimed he was at Mr. Bernard's car when the shootings occurred, and claimed that Mr. Bernard was also at his own car when the shootings took place at the Bagleys' vehicle. Vialva's counsel did not ask any statements regarding any statements Brown made after the day immediately following the murders. Although Brown was briefly questioned about his plea agreement, neither Mr. Bernard's counsel nor counsel for Vialva elicited any information about the difference between the Guideline sentencing range for first-degree murder and the lower Guideline sentencing range for second-degree murder.

Declaration of David A. Ruhnke
Page 21 of 82

**EXHIBIT 1 pg. 130**

Exhibit J-21

46. By the time of trial, Mr. Bernard's counsel possessed, or reasonable counsel would have possessed, other information which could have impeached Brown in a number of critical respects, including but not limited to the following.

47. Brown testified at trial that he poured lighter fluid on his shirt in order to help save the Bagleys. FBI agent Chadwick had testified at the preliminary hearing and stated in a sworn affidavit that Brown told Chadwick that he had poured lighter fluid on the shirt to use it to set the fire. These earlier statements by Brown were made at a time before he was cooperating with the Government. Introducing these statements would have both impeached Brown's self-serving explanation at trial and also undercut the prosecutor's argument that once Brown started cooperating, he started "telling more on himself."

48. Brown testified at trial that either he or Chris Lewis opened the trunk of the car before Vialva shot the victims. Reasonably effective counsel would have impeached Brown with his statement at his plea of guilty, made under oath, that Vialva himself opened the trunk before he shot the victims. This inconsistency would not only have cast serious doubt on the truth of Brown's entire version of events, but would also have suggested that in order to please the government Brown was now attributing to Mr. Bernard actions Brown had earlier, and under oath, attributed to others.

49. Brown testified at trial that he went back inside the convenience store where the lighter fluid was purchased because Mr. Bernard needed something to light his cigarettes. Reasonably effective counsel would have impeached Brown with his

Declaration of David A. Ruhnke
Page 22 of 82

**EXHIBIT 1 pg. 131**

Exhibit J-22

earlier statement to investigators, after he had begun to cooperate, that he had gotten the matches in order to ignite the lighter fluid. This inconsistency would have both shown that, far from "telling more on himself," Brown was attempting to minimize his own guilt; it would also have demonstrated, again, that Brown was incapable of telling a consistent, credible story.

50. Brown testified at trial that he did not see who set the Bagleys' car on fire but that Mr. Bernard was the only person who could have started the fire. Reasonably effective counsel would have impeached Brown with his sworn statement at his plea of guilty that Mr. Bernard set the Bagleys' car on fire by lighting a match.

51. Brown testified at trial that he accompanied Lewis, Sparks, Vialva and Bernard to Greg Lynch's home to get the .40 caliber Glock handgun with which Vialva eventually shot the Bagleys. Reasonably effective counsel would have impeached Brown with his sworn statement at his guilty plea hearing that he was not among the people who went to Lynch's home.

52. Brown testified at trial that only he and Mr. Bernard poured lighter fluid on the car. Reasonably effective counsel would have impeached Brown with his sworn statement from his guilty plea hearing that Vialva also poured lighter fluid on the car.

53. Brown gave no testimony at trial that Chris Vialva ordered either Brown or Mr. Bernard to pour lighter fluid on the car. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he stated that Vialva, after shooting the Bagleys, ordered him (Brown) to pour lighter

Declaration of David A. Ruhnke
Page 23 of 82

**EXHIBIT 1 pg. 132**

Exhibit J-23

fluid on the car and ordered Mr. Bernard to start the fire.

54. Brown testified at trial that he and Mr. Bernard, after coming out of the Mickey's convenience store to find Vialva, Sparks, and Lewis missing, had filled out and submitted job applications at the Winn-Dixie grocery and then, of their own volition, went to their respective homes. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he claimed that he and Bernard went to their homes to "await further instructions."

55. Brown testified at trial that Mr. Bernard parked his own car down the hill from where Vialva drove the Bagleys' because Mr. Bernard could not get his car up the hill. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he testified that Mr. Bernard parked his car "on the main road to enable a quick getaway."

56. At trial, Brown testified that he had had no idea what was supposed to happen if Sparks, Vialva, and Lewis succeeded in securing a ride from a prospective carjacking victim. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he testified that he and Mr. Bernard were waiting in Mr. Bernard's car with the understanding that they were to follow whatever vehicle was to be carjacked. Again, highlighting this conflict would have demonstrated for the jury both that Brown's story was constantly changing and that at trial Brown was actually admitting *less* about his own involvement than he had previously.

Declaration of David A. Ruhnke
Page 24 of 82

**EXHIBIT 1 pg. 133**

Exhibit J-24

57. At trial, Brown denied having any idea what range of sentencing he might be facing under the federal Sentencing Guidelines, or indeed knowing anything about what sentence he might receive except that he hoped or believed it wouldn't be death. Reasonably effective counsel would have impeached Brown with the fact that at his guilty plea, under oath, after the court had carefully explained and outlined how the Sentencing Guidelines operate, Brown specifically confirmed that he had discussed the Guidelines with his lawyer, that he knew how they would probably affect his case, and that he had no questions on that issue for the court.

58. Much as I observed earlier with respect to the many important points that could have been made in an opening statement at the guilt-innocence phase, it may be the case that reasonable defense counsel might have chosen to forego impeaching Brown with one or two of the many available inconsistencies with which his credibility could have been dramatically attacked. I do not believe, however, that Mr. Bernard's defense counsel performed reasonably in failing to confront Brown with any of these inconsistencies. This is particularly true, in my view, with respect to the statements of fact that Brown affirmed under oath during his own plea hearing. Counsel evidently made no informed strategic judgment not to use those statements, because counsel never even had them transcribed.

59. In sum, in reading the transcript of Brown's testimony after reviewing Brown's various other statements, one is struck by the fact that Bernard's counsel never made it clear to the jury that Brown had made multiple inconsistent statements about

Declaration of David A. Ruhnke
Page 25 of 82

**EXHIBIT 1 pg. 134**

Exhibit J-25

843

numerous important details of his story, and that Brown continued to do so even after deciding to cooperate with the Government. If only because introducing those statements would have directly rebutted the Government's claim that Brown was "telling the whole truth" after he decided to cooperate, reasonably effective counsel would have made certain to cross-examine Brown about them in detail.

**Failure to cross-examine Chris Lewis effectively**

60. As with their cross-examination of Terry Brown, Mr. Bernard's attorneys unreasonably failed to question Chris Lewis about prior statements which would have demonstrated that his trial testimony was unreliable and inconsistent with his earlier accounts.

61. At trial, in response to questioning from the Government on direct examination, Lewis stated that he did not know who had opened the trunk of the Bagleys' car before Vialva shot the victims. Lewis was impeached with his prior statement from June 22, 1999, in which he had stated that Vialva himself opened the trunk before he shot the Bagleys. However, Lewis rehabilitated himself with the claim that his June 22, 1999 statement was a lie and just designed to blame Vialva. Reasonably effective counsel would have also impeached Lewis with his sworn statement from his plea of guilty, made at a time after he had decided to cooperate and had signed a plea agreement (*i.e.*, at a time when, according to the Government, he had "come around" and was telling the truth about everything) in which he stated – consistent with his June 22, 1999 statement – that Vialva himself opened the trunk before shooting the

Declaration of David A. Ruhnke
Page 26 of 82

**EXHIBIT 1 pg. 135**

Exhibit J-26

Bagleys.

62. At trial, Lewis gave an elaborate account of how, on the night before the day the Bagleys were killed, he had the .22 pistol concealed in his shoe and then tossed it into the bushes when the police arrived. Reasonably effective counsel would have impeached Lewis with both his sworn statement at his guilty plea hearing, in which he stated that Vialva threw the .22 into the bushes, and with his prior statement to investigators that it was Sparks who threw the .22 into the bushes.

63. At trial, Lewis testified that he did not see anything about how the fire started after the Bagleys were shot. Reasonably effective counsel would have impeached Lewis not only with his initial account, in which he stated that Vialva set the car on fire himself, but also with his sworn statement from the guilty plea hearing, in which he stated that Mr. Bernard set the car on fire with a match at the direction of Vialva.

64. At trial, Lewis implicated Mr. Bernard in efforts to dispose of the evidence, testifying that Mr. Bernard threw the .22 pistol into the woods once the foursome realized they could not drive away from the scene. Reasonably effective counsel would have impeached Lewis with both his earlier sworn statement that Vialva threw the .22 into the woods, and with his failure ever to mention in any earlier statement or interview that Mr. Bernard threw the .22 into the woods.

65. At trial, Lewis stated that Brown was present with, and talked to, Greg Lynch when the .40 Glock firearm was obtained from Lynch. Reasonably effective counsel would have impeached Lewis with his sworn statement on plea of guilty that Brown was not

Declaration of David A. Ruhnke
Page 27 of 82

**EXHIBIT 1 pg. 136**

Exhibit J-27

even present when the .40 Glock was obtained from Lynch.

66. At trial, Lewis gave no testimony that Mr. Bernard and Brown were to go to their homes to "await further instructions." Reasonably effective counsel would have impeached Lewis with his sworn statement on plea of guilty that this is what they did.

67. At trial, Lewis gave a dramatic account of how, at Long Branch park, Brown screamed at Vialva that the Bagleys did not have to die and Vialva screamed back that they must be killed. Reasonably effective counsel would have impeached Lewis with the fact that he had failed to offer any such account of any such incident in any of the numerous interrogations conducted before trial by investigators. Reasonably effective counsel would also have cross-examined Lewis regarding his apparently newly minted testimony that Mr. Bernard had approached the Bagleys' car to ask for a cigarette – which likewise appears nowhere in any of Lewis' earlier versions – or the evident contradiction between this claim and Brown's testimony that Mr. Bernard never left his own car, as well as with Brown's testimony that Mr. Bernard already had cigarettes of his own (for which he, according to one of Brown's versions of his story, needed matches). Cross examination on this issue was especially important because Lewis' account of the claimed shouting match at Long Branch park was the only evidence presented at trial that Mr. Bernard knew in advance about a plan to murder the Bagleys.

68. Reasonably effective counsel would also have impeached Lewis and Brown with the

Declaration of David A. Ruhnke
Page 28 of 82

**EXHIBIT 1 pg. 137**

Exhibit J-28

Government's own admissions.    Such evidence would have shown that the Government had assured the court on two separate occasions (on the date in December 1999 when Brown and Lewis pleaded guilty, and on the date in April 2000 when Sparks pleaded guilty) that it would prove at trial a particular set of facts which could only have come from Brown and Lewis – and was now presenting a different set of facts coming from the same witnesses.

69. Reasonably effective counsel would also have elicited available testimony to disprove the Government's claim that Brown and Lewis's testimony had not been shaped by investigators in any way.  Reasonably effective counsel would have called the Government's own investigators to acknowledge that in their own reports, they admitting having declined to take written statements from both Brown and Lewis after they had given proffers with their attorneys present, because the investigators and/or their superiors believed that Brown and Lewis were not telling the whole truth.  Similarly, reasonably effective counsel would have presented evidence to show that when the Government first sought an indictment, which was after both Brown and Lewis had given proffers, FBI agent Chadwick had recounted the "story" of the offense in a way that was fundamentally based on the same June 22, 1999 statement from Chris Lewis that the Government at Mr. Bernard's trial disparaged as a lie.

70. Reasonably effective counsel could further have shown that when FBI agent Chadwick testified at the December 14, 1999 grand jury session, he gave an account of what Vialva said at Long Branch park that directly contradicted Lewis's testimony

EXHIBIT 1 pg. 138
Exhibit J-29

at trial, and that agent Chadwick (who, again, was basing his grand jury testimony about the events of the crime on interviews of Lewis and Brown) said nothing about Mr. Bernard's having been informed of any plan to kill the Bagleys. The transcript of Chadwick's December 14 grand jury testimony confirms that reasonably effective counsel could also have elicited from agent Chadwick that Lewis had told him he (Lewis) poured lighter fluid on the Bagleys' car, in contrast to his denial of that fact at his guilty plea hearing and at Mr. Bernard's trial.

**Failure to dispute misleading suggestion regarding Terry Brown's ineligibility for the death penalty**

71. Mr. Bernard's counsel did not contest the Government's suggestion that cooperating co-defendant Terry Brown was not eligible for the death penalty. Under Texas law, Brown, being 17 years old, was eligible for the death penalty if prosecuted in state court. Texas has both sentenced 17-year-olds to the death penalty in recent years and has actually executed a number of offenders for capital crimes they committed at age 17. According to testimony the Government sponsored at Mr. Bernard's trial, State authorities had concurrent jurisdiction over the location on Fort Hood where the murders were committed. If that is correct, reasonable counsel would have made sure the jury understood that an additional benefit Brown was obtaining by virtue of being prosecuted solely in federal court was that he was being spared the death sentence he could potentially face in a state prosecution.

**Failure to cross-examine Brown and Lewis about the potential reduction in sentence they stood to gain by testifying for the Government**

Declaration of David A. Ruhnke
Page 30 of 82

**EXHIBIT 1 pg. 139**

Exhibit J-30

858

72. Counsel failed effectively to cross-examine cooperating co-defendants Brown and Lewis with respect to the probable sentences they faced under the U.S. Sentencing Guidelines, the potential for a reduction in those sentences as a result of their cooperation with the Government in prosecuting Mr. Bernard, and the terms of their plea agreements under which the Government would have final and unreviewable discretion to determine whether they had testified "truthfully" as required by those agreements. Reasonable counsel in any federal case, capital or non-capital, is obliged to acquaint the jury with the operation of the Guidelines and how they may affect the length of the sentence that may be imposed on a cooperating Government witness, at least where – as here – the witness' primary motive in cooperating is evidently to reduce his own sentencing exposure. In this case, defense counsel's failure to cross-examine on these subjects permitted the Government to suggest through its witnesses, falsely, that the sentences Brown and Lewis would receive for their own roles in the carjacking and murder of the Bagleys were entirely up to the sentencing judge. That false impression prejudiced Mr. Bernard.

**Failure to cross-examine Brown about his admitted drug use and to investigate and present other evidence of Brown's drug use**

73. Counsel failed to impeach cooperating co-defendant Terry Brown with his admission at trial that he was using drugs on the day of the offense. Greg Lynch testified without contradiction that Terry Brown was smoking marijuana on the day of the crime. Brown omitted this fact from his own testimony, but had admitted in an earlier statement to investigators that he had smoked marijuana with Lynch on the

Declaration of David A. Ruhnke
Page 31 of 82

**EXHIBIT 1 pg. 140**
Exhibit J-31

day of the crime. Reasonably effective counsel would have cross-examined Brown about his use of marijuana, because it might well have persuaded the jury that Brown's claim to recall many important facts about the offense (who did what, who said what to whom, who was present when things were said, what happened in what order) was too unreliable to trust.

74. In addition, Mr. Bernard's counsel unreasonably failed to investigate and develop other available evidence that Brown was a frequent user of drugs which could affect his perceptions and memory. Had counsel performed a reasonably effective investigation into the facts and circumstances of the offense, they would have learned that in the weeks before the offense, Brown consumed numerous drugs including "acid," PCP, cocaine, and marijuana dipped in embalming fluid. All these drugs distort one's memory and perceptions. Indeed, an epidemiological report from the Texas Commission on Alcohol and Drug Abuse notes that "toxic psychosis, hallucinations and delusions" are "common effect[s]" of marijuana dipped in embalming fluid. Persons who have smoked it see "things that aren't there," and experience an "altered reality" similar to "tripping" on LSD. In addition, persons who have smoked the combination frequently experience emotional turbulence including feelings of "panic, paranoia, [and] disorientation," as well as "intense anger." One of its signal consequences is memory disruption or loss. Reasonably effective counsel would have developed and presented this information, both through cross-examination of Brown regarding the drugs he took and their effects on him, and

Declaration of David A. Ruhnke
Page 32 of 82

**EXHIBIT 1 pg. 141**

Exhibit J-32

through independent evidence to show how profoundly these drugs may have altered or distorted Brown's perceptions and memory of the events he claimed to recall in his testimony.

### Failure to conduct other reasonably necessary investigation regarding Government witnesses

75. Post-conviction investigation suggests that a reasonable investigation would have uncovered additional facts helpful to Mr. Bernard's defense. For example, Brown has stated in an affidavit that he would have told Mr. Bernard's trial counsel, had they spoken to him, that he suffers from a serious mental illness and was being administered psychotropic medication by jail staff at the time of his testimony against Mr. Bernard. Reasonably effective counsel would have discovered this information through investigation or through pre-trial motions seeking disclosure of the existence of such circumstances, and would have presented it to the jury through cross-examination of Brown and independent evidence if necessary. Similarly, it is my understanding that Greg Lynch has recently acknowledged that after the crime, Brown told him (Lynch) that he (Brown) set the fire that consumed the Bagleys' car. I believe that reasonably effective trial counsel would have interviewed Lynch prior to trial, and presumably would then have had Lynch's statement to impeach Brown and to challenge the reliability of the Government's claim that Mr. Bernard was solely responsible for the fire.

76. Similarly, it is my understanding that Tony Sparks has stated in a recent interview that he would have been willing to speak with Mr. Bernard's attorneys or their

Declaration of David A. Ruhnke
Page 33 of 82

**EXHIBIT 1 pg. 142**

Exhibit J-33

representative prior to trial, and would have told them that there was no conversation at Long Branch Park about killing the Bagleys. Such testimony would have directly impeached the testimony of Chris Lewis, which was the only evidence at trial that Mr. Bernard knew in advance that the Bagleys were to be killed. Counsel performed deficiently in failing to interview Sparks.

**Failure to take reasonable steps to exclude irrelevant and highly inflammatory evidence concerning gangs**

77. In a pretrial hearing, counsel for co-defendant Vialva's moved to prohibit evidence of gang membership. The Government asserted that it needed to introduce gang evidence because all four defendants were "members of the same gang and they planned this crime together. And the fact that they are members of the same or associated with the same gang is probative to show association." The court deferred ruling on the motion, stating that it understood the government's position but thought that "gang membership or activity or association [might] be so prejudicial" that it needed to "know more about the specific evidence" before ruling. Mr. Bernard's counsel did not file any *in limine* motion on gang evidence and did not join Vialva's motion.

78. Immediately before opening statements and before any evidence had been taken, Vialva's lawyers again raised the issue. The court then indicated that it would not exclude the evidence of gang association, ruling that "when the Government alleges a conspiracy," "any kind of association that belongs to the defendants [sic] is admissible and it is not more prejudicial than probative." Mr. Bernard's counsel

Declaration of David A. Ruhnke
Page 34 of 82

**EXHIBIT 1 pg. 143**

Exhibit J-34

offered no argument but did join in the objection by Vialva's counsel. When the Government's attorney in his opening statement first mentioned the defendants' alleged gang association, counsel for Vialva objected. The Court overruled the objection but noted that Vialva would "have a running objection on that throughout the trial." Mr. Bernard's lawyers did not object.

79. The trial evidence did not establish that the carjacking and murders involved gang activity, and no evidence was presented that the motive or opportunity for the crime was gang-related. While the evidence supported a conclusion that the participants in the crime belonged to different subsets of self-styled "Bloods," it did not show in any way that this membership either instigated or facilitated the crimes. Although the Government professed that the gang evidence was intended to show the "association" of the alleged participants, its questioning of witnesses far exceeded that purpose.

80. For example, the Government asked co-defendant Terry Brown "what it means to be in a gang," as well as eliciting from him details including: the territory supposedly controlled by the 212-Piru "Bloods," the clothing they wore, other gangs operating in Killeen on their own "turfs," including the "Crypts [sic], Folks, and Vice-Lords;" that it was "common for there to be violence and fights between gangs and gang members," and that such violence usually followed "disrespect" shown by a member of one gang toward a member of another gang. The Government similarly questioned Chris Lewis at length about gangs, including: rivalries with other gangs, the meaning of "PIRU" (according to Lewis, it stood for "Pimps In Red Uniforms"), whether gang

Declaration of David A. Ruhnke
Page 35 of 82

**EXHIBIT 1 pg. 144**

Exhibit J-35

members were reluctant to "rat" on other gang members, and whether gang members "commit crimes together, certain crimes together, if they choose to do that."

81. The Government did not confine its questions to establishing that the participants in the carjacking-murder were gang members, as it had originally represented to the Court in seeking approval to offer the evidence. The Government questioned many other witnesses (e.g., Greg Lynch, Ramona Berry, Greg Rousseau, and Billie Rorie) about whether they were gang members. The government elicited information about topics such as getting "jumped into" a gang, and that a "Bloods" gang member might need a gun because he feared the "Crips." Similarly, when the Government elicited from Ricky Lynch that Vialva had phoned him after the crimes, asking, "Do people think I'm real?", the Government tried to insinuate that this statement had something to do with Vialva's gang membership, even though Lynch insisted that Vialva's comment meant nothing to him and even though Lynch did not say Vialva ever mentioned the gang to him.

82. In other words, gang evidence suffused the entire guilt-innocence phase. Mr. Bernard's attorneys did not object to any of this evidence. Nor did Mr. Bernard's attorneys seek any limiting instructions on the gang evidence and none were given, either at the time the evidence was introduced or in the court's instructions at the close of the case. Mr. Bernard's counsel did not object to any of these questions or answers, despite the fact that they all concerned matters other than "mere association," the Government's ostensible basis for introducing the evidence.

Declaration of David A. Ruhnke
Page 36 of 82

**EXHIBIT 1 pg. 145**

Exhibit J-36

Reasonably effective counsel would have objected that the Government was introducing evidence far beyond anything it needed to show the defendants' "association," and that the additional evidence was far more prejudicial than probative, and would have sought limiting instructions to attempt to ameliorate the extraordinarily prejudicial impact of such extensive testimony about gangs.

83. While the risk of "guilt by association" is great whenever evidence of gang membership or affiliation is in the picture, the circumstances of this case present an even greater likelihood of prejudice. At least one of the jurors who sat in the case, Paula Lenox, had expressed during *voir dire* her fear that jury service in the case would be "very stressful," probably because she doubted that she and her "family …  would be safe from other gang members if the death penalty is chosen," and was "concerned for retaliation" because of having read in the newspapers that the crime was committed by "gang members."

**Failure to Object to Irrelevant and Extraordinarily Prejudicial Testimony About Todd and Stacy Bagley**

84. Defense counsel also unreasonably failed to object to irrelevant and extraordinarily prejudicial testimony about the victims that was offered and admitted at the guilt-innocence phase of trial. Mr. Bernard's attorneys took no steps to prevent or ameliorate the impact of this inflammatory evidence, failing to make any in limine motions, to object during trial, or to request curative or limiting instructions. Reasonably effective counsel would have been aware that the horror of the Bagleys' deaths presented a real danger that the terrible facts of the crime alone would drive

the jury toward conviction. In such circumstances, it is even more important than in the typical case for defense counsel to take every available step to keep irrelevant and inflammatory evidence from getting before the jury. Mr. Bernard's counsel failed in that duty.

85. For example, the Government questioned Chris Lewis at length about what the Bagleys had said to him while they were imprisoned in the trunk of their car. Lewis first testified that the Bagleys told him that God got "them different items and about how he gave people different stuff, too." The Government followed up by asking Lewis, "[W]hat did you take it to mean when they said God had gotten them stuff?," to which Lewis answered, "That they were blessed, sir." The Government echoed his response: " That they were blessed." The Government also brought out that the Bagleys had asked what church Lewis and Sparks attended, and further elicited testimony from Lewis about when he had attended Grace Christian Church, where the Bagleys worshiped. Lewis was also led to recount statements from the Bagleys in which they said that they did not have a lot of money and that friends had given them money for car tires, which the Government followed up by asking, "Was that at the same time they were telling you that God provided for them what they needed?"

86. Perhaps the most striking testimony was offered when the Government questioned Lewis about how Mr. Bernard's car had gotten stuck in the ditch as they attempted to leave the scene, asking him three times how it ended up there. Lewis' response: "God put it there, sir." The Government emphasized the supernatural intervention,

**EXHIBIT 1 pg. 147**

Exhibit J-38

recounting Lewis' description: "You pulled up, turned around, and then the car felt like it was in neutral and then it just slid off." Lewis repeated, "It felt like someone pushing it, sir," to which the prosecutor asked, "Was there anybody out there pushing it?" Lewis admitted there was not.

87. The Government elicited testimony from Terry Brown about what Stacie Bagley said just before the trunk opened and Vialva shot her: "Jesus loves you," and "Jesus, take care of us." Brown added that Vialva responded, "Shut the fuck up, bitch, I'm about [to] open the trunk and I don't want to hear that shit." Similarly, the Government elicited testimony from Billie Rorie that Stacie Bagley, locked in the trunk, had asked the boys whether they "believe[d] in Christianity," to which Tony Sparks had retorted, "I don't give a fuck, because we [are] thugs."

88. The Government also elicited testimony about the Bagleys' religious beliefs and their character from friends of the Bagleys. Robert Rimes testified about his relationship with the Bagleys at Grace Christian Church, ostensibly to establish that the Bagleys were engaged in ministering to youths and thus explain why they would have offered a ride to Vialva, Lewis, and Sparks. Vialva's counsel objected that Mr. Rimes' testimony would constitute irrelevant victim impact evidence; the court agreed. Mr. Bernard's attorney did not join in the objection. Despite the court's ruling, the Government thereafter elicited testimony from Mr. Rimes that he met the Bagleys at a "home group Bible study" and that the Bagleys attended a week long revival service just before the murders. Mr. Rimes also testified that he took the Bagleys to lunch

EXHIBIT 1 pg. 148
Exhibit J-39

and that they talked about "their families and why they were there that week," and that the Bagleys "kind of opened the door to their life to be me briefly," talking of their possible plan to open "a Christian gym." Although the court sustained an objection to this question, no request was made to strike the testimony or seek a curative instruction.

89. Directly following Mr. Rimes testimony, the government put on Pastor Timmerman, who testified that he knew the Bagleys through the church. Pastor Timmerman identified two pictures of Todd and Stacie Bagley taken at Sea World, saying that this was how they had looked just prior to June 21, 1999.

90. The Government waited to offer the in-life photographs of the victims, however, until Stacie Bagley's father Charles Woodward testified. First, the Government established that Mr. Woodward worked as a criminal investigator for the Texas Department of Criminal Justice and had previously worked for twenty years on the Killeen Police Department. The Government next elicited testimony that Stacie was the Woodwards' only child, and then had Mr. Woodward identify a watch that had belonged to Stacie. Finally, the Government questioned Mr. Woodware about the Sea World photographs, including the fact that Mr. Woodward and his wife had paid for the trip, which took place just a few days before June 21, 1999, because they "wanted to do something special for them."

91. None of this testimony was relevant to the guilt-innocence phase, regardless of whether any of it might have constituted appropriate "victim impact" testimony at the

Declaration of David A. Ruhnke
Page 40 of 82

**EXHIBIT 1 pg. 149**

Exhibit J-40

punishment phase. Reasonably effective counsel would have recognized it as highly prejudicial and taken appropriate steps to protect Mr. Bernard from its poisonous effect by, *e.g.*, filing motions in limine, making objections at trial, or asking for curative or limiting instructions.

**Failure to take reasonable steps to protect Mr. Bernard's rights when evidence arose of possible extraneous influences on the jury**

92. The trial record reflects that, before it summoned the jury into the courtroom for closing arguments at the guilt phase, the trial court stated that, earlier that morning, "a juror said as they came past where some people were out on the sidewalk . . . some person they described as a 'Black lady,' said to them, 'Someone is going to die in that trial today.' So, if you notice some extra security or something today, that will be the reason." Mr. Bernard's trial counsel did not respond. The jury was summoned and trial proceeded.

93. Reasonably effective counsel would have viewed these allegations as raising a distinct risk that one or more jurors had been exposed to an extraneous influence that might influence their decision with respect to either Mr. Bernard's guilt or his eventual sentence. Under such circumstances, reasonably effective counsel would have objected to proceeding unless and until a proper inquiry could be made into the nature and extent of the contact with the jurors and their reaction to it. Reasonably effective counsel would have requested the opportunity to examine the juror(s) involved regarding the facts of the incident. Reasonably effective counsel would also have asked that the Court place on the record the names of the jurors involved, what

Declaration of David A. Ruhnke
Page 41 of 82

**EXHIBIT 1 pg. 150**
Exhibit J-41

they had told the Court about the incident, what it had asked them in response, and what instructions, if any, it had given them regarding the incident (*e.g.*, not to disclose it to jurors who were not aware of it, or discuss it with any who were aware of it). Reasonably effective counsel would also have objected to the presence of a "noticeable" increase in courtroom security without the Court's having considered alternative means to the same end, such as the presence of court security officers not identifiable as such.

94. Reasonable counsel would have been concerned about the possible influence of such an incident on the jurors. In numerous capital cases, reviewing courts have found that third-party contact with jurors can taint their deliberations, especially as to the appropriate punishment in a particular case. Given the information disclosed by the trial court, particularly the fact that in response to the concerns aired by these jurors it had apparently ordered "extra security" that might be apparent (since the Court acknowledged counsel might "notice" the increased security, which appears to be the reason it advised counsel of the incident in the first place), reasonable counsel would have been concerned about the likely prejudice to Mr. Bernard and would have taken steps to minimize that risk.

**Failure to provide effective assistance during closing argument at the guilt-innocence phase**

95. Counsel failed to object to the Government's misstatement of the evidence during closing arguments at the guilt phase. The following examples are illustrative of counsel's failures in this regard.

Declaration of David A. Ruhnke
Page 42 of 82

**EXHIBIT 1 pg. 151**

Exhibit J-42

910

96. Prosecutor Frazier unequivocally stated in argument that Mr. Bernard was guilty and particularly culpable because he had lit a match and set the car on fire: "He lit that match. And, at that point, there is no distinction between lighting that match and pulling that trigger." Reasonably effective counsel would have objected to this argument as improper because no evidence supported either of these statements; no one testified that a match had ignited the fire, and both Brown and Lewis denied having seen the fire start.

97. Similarly, reasonably effective counsel would have objected when the prosecutor argued that the physical evidence supported the testimony of Brown and Lewis. Even if the physical evidence was consistent with some parts of their testimony (*e.g.*, even if the person who shot the Bagleys was standing at the passenger side rear of the trunk), it could not and did not corroborate their claims about which defendant did what (*e.g.*, that the person standing in that location was Vialva). Permitting the prosecutor to make such a misleading argument imperiled Mr. Bernard's right to a fair assessment of the evidence, and reasonably effective counsel would have objected.

98. Counsel performed deficiently in failing to object to prosecutor Frazier's argument that Lewis and Brown had no opportunity to concoct their stories and that they had been housed in separate wings of the same facility, as Lewis had testified without rebuttal that he and Brown had been together every day while housed in the same facility. Because Lewis and Brown's credibility was indispensable to the

Declaration of David A. Ruhnke
Page 43 of 82

**EXHIBIT 1 pg. 152**

Exhibit J-43

Government's case, reasonably effective counsel would have been especially vigilant for improper arguments attempting to bolster it.

99. Similarly, counsel performed deficiently in permitting prosecutor Frazier to argue without objection that there was no evidence that anyone had told the Government's witnesses what to say and that the Government's witnesses had denied any such coaching: "Did you ever hear any evidence or testimony that any investigator coached anybody and told them what to say. Of course not." Reasonably effective counsel would have objected because this argument was contrary to the evidence; Brown testified that CID agents told him what happened and that he "just confirmed, basically, whatever [they] said." As far as the Government's investigators went, they did not deny any such coaching took place, because they were not asked if it had.

100. On another occasion, prosecutor Frazier specifically told the jury that Brown had told Mr. Bernard about a plan to murder the Bagleys, arguing, "Terry Brown himself [testified] that after they left Long Branch Park, he told Brandon Bernard what the plan was," and adding that Mr. Bernard "deliberately associated himself with a plan and acted on that plan to kill Mr. Bagley." This argument was directly contradicted by Brown's testimony on cross-examination that he had not told Mr. Bernard about a plan to murder but only about a plan to burn the car. Reasonably effective counsel would have objected to this argument.

101. Similarly, reasonably effective counsel would have objected when prosecutor Frazier argued that Mr. Bernard was guilty because he knew about and had agreed to

Declaration of David A. Ruhnke
Page 44 of 82

**EXHIBIT 1 pg. 153**

Exhibit J-44

participate in a plan to go pick up Vialva, Lewis, and Sparks after they had completed the carjacking, and that this plan did not change when the group pulled into the Mickey's. This argument was rebutted by Brown's unequivocal statement on direct examination that there had been no discussion about what he and Mr. Bernard were to do if a carjacking occurred, and his further testimony that he had no idea what he and Mr. Bernard should do in that event.

102. The prevailing standard of practice does not oblige counsel to object anytime there is a colorable legal basis to do so, because the decision whether to lodge an objection must be informed by considerations such as the potential effect on the jury. In these instances, however, making an objection would not have directed the jury's attention to improper or inadmissible evidence potentially prejudicial to Mr. Bernard, because the entire point of the objection is that the Government was *misstating* the facts that were properly in evidence. Particularly where the Government's witnesses themselves lacked credibility due to their motive to testify favorably to the prosecution and their own involvement in the gang, it was essential for defense counsel not to permit the Government's counsel to misstate the testimony and thereby effectively substitute himself as a more credible witness supporting the prosecution's theory of the case. This is especially true when the misstatements were made during the Government's final argument, to which defense counsel would have no opportunity to respond.

Declaration of David A. Ruhnke
Page 45 of 82

**EXHIBIT 1 pg. 154**

Exhibit J-45

**Failure to conduct an adequate investigation into potentially available and relevant mitigating circumstances**

103.    Counsel failed to conduct an investigation into all potentially available and relevant mitigating circumstances. The standard of practice for defending capital cases in 1999-2000 required counsel to investigate the client's complete social history, beginning before the time of conception and continuing to the time of trial, employing the services of appropriately qualified persons where necessary. The standard of practice in 1999-2000 obliged counsel to investigate, *inter alia*, the client's medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, and neurological damage or neuropsychological impairment); family and social history (including family trauma such as physical or emotional abuse, domestic violence, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence or the loss of loved ones; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities); educational history (including achievement, performance, behavior, and activities); special educational needs; employment and training history (including skills and performance, and barriers to employability); and prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

104.    Reasonably effective counsel in 1999-2000 would have understood that much of

Declaration of David A. Ruhnke
Page 46 of 82

**EXHIBIT 1 pg. 155**

Exhibit J-46

the investigation that must be elicited for the penalty phase investigation is very personal and may be extremely difficult for the client, or other witnesses who may possess relevant information, to discuss. Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer. For this reason, the assistance of a person specially trained in recognizing and overcoming such barriers, and has the skills necessary to help the client cope with the emotional and psychological impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

105. As a practical matter, conducting the type of mitigation investigation demanded by the prevailing standard of practice in 1999-2000 required counsel to locate and interview the client's immediate family members and virtually everyone else who knew Mr. Bernard and his family, including neighbors, other relatives, teachers, clergy, case workers, doctors, correctional officers (including probation or parole officers or supervisors), and others. It also required counsel to seek and obtain all available documentary records concerning the client's educational history, work history, medical history, family history, etc., as well as comparable records of other family members where they reflect information relevant to the client's own social history. Such records include school records, juvenile court records, medical records, military records, employment records, criminal and correctional records, family birth, marriage, divorce, or death records; and so forth.

Declaration of David A. Ruhnke
Page 47 of 82

**EXHIBIT 1 pg. 156**
Exhibit J-47

106.   Mr. Bernard's attorneys do not appear to have conducted any such investigation into potential mitigating circumstances. Their penalty-phase investigation appears to have been limited to having Criterion Investigations interview a list of persons provided by Mr. Bernard's mother. Many of those people report almost no personal knowledge of Mr. Bernard, or at most a vague recollection that he was a "good boy" when he was younger. This type and scope of investigation into potential mitigating circumstances was wholly inadequate and fell below the minimum standard of practice for defending capital cases in 1999-2000.

107.   At the same time, at least some of the persons interviewed by Criterion Investigations attested to events and circumstances that would have alerted reasonably effective counsel in 1999-2000 to the need for additional investigation into certain areas, such as the relationship between Mr. Bernard's parents, his relationship with his father, and so on. Counsel did not conduct any such follow-up investigation. Indeed, based on the statements of some of these witnesses, it is not at all clear why they were not called to testify at the punishment phase, rather than the witnesses who did testify. The files of Mr. Bernard's counsel give no indication that counsel exercised any informed judgment in the selection of which witnesses would be called to testify.

108.   Jail records reflect that trial counsel visited Mr. Bernard only eleven times in the approximately one year between his arrest and the beginning of his trial. Under the prevailing standard of practice, Mr. Bernard's attorneys were obliged to engage in a

Declaration of David A. Ruhnke
Page 48 of 82

**EXHIBIT 1 pg. 157**

Exhibit J-48

continuing interactive dialogue with him concerning all matters that might reasonably be expected to have a material impact on the case. Close and frequent contact with the client is essential to create and maintain a relationship of trust, which in turn is indispensable to the task of investigating and developing potential mitigating evidence for presentation at the penalty phase. Moreover, reasonably effective counsel in 2000 would have understood that significant racial and cultural barriers stood in the way of forming a relationship of trust with their client, such that a substantial investment of time would be necessary to create a fully functional attorney-client relationship.

109.    Any reasonably competent attorney handling a capital case in 1999-2000 would have recognized that the preparation of a social history is a vastly time-consuming and often delicate process. For that reason, Mr. Bernard's original attorney, Russell Hunt, Sr., performed deficiently both in failing to initiate such an investigation immediately upon his appointment in June 1999, and in failing promptly to seek the appointment of second-chair counsel to assist him. It is no excuse that Mr. Hunt may have believed, however sincerely, that a plea deal would ultimately be struck with the Government under which Mr. Bernard would avoid the death penalty. Counsel in a capital case have a duty to begin preparing for two potential cases – guilt and penalty – from the earliest moments of their entry into a potential capital case. Once the death penalty is a potential punishment, as it was from the day Mr. Hunt was appointed as counsel for Mr. Bernard in June 1999, the prevailing standard of

Declaration of David A. Ruhnke
Page 49 of 82

EXHIBIT 1 pg. 158

Exhibit J-49

practice requires counsel to prepare for a death penalty trial.

110.    A reasonably competent attorney would have been aware that 18 U.S.C. § 3005 entitled Mr. Bernard to two attorneys and would have requested the appointment of co-counsel as quickly as possible upon entry into the case. It should be noted that by late July, Vialva already had two attorneys representing him. The extremely limited time Mr. Hunt, Sr., spent on Mr. Bernard's case strongly suggests there was a need for second counsel much sooner than February, when Mr. Hunt, Sr., finally filed such a motion. At a minimum, Mr. Hunt, Sr., was obliged to advise Mr. Bernard that he had a right to the appointment of second counsel under § 3005, and failed to do so.

111.    In addition, investigation must be substantially complete before trial to inform counsel's decisions during jury selection. Defense counsel in this case appear to have anticipated that Mr. Bernard would be convicted of a death-eligible offense. If that were the case, their primary goal in selecting the jury would be to look for jurors who might be persuaded not to impose the death penalty. If counsel has only a vague idea during jury selection what kind of information about the client's character and background the defense will present at sentencing, and, indeed, has no idea what witnesses will testify for the defense and what their manner and the content of their testimony will be, counsel will have a difficult time performing the essential task of attempting to seat jurors who might respond personally to those witnesses and their stories. At a minimum, counsel whose penalty-phase investigation and presentation are unfinished during *voir dire* will be handicapped in exercising peremptory

Declaration of David A. Ruhnke
Page 50 of 82

**EXHIBIT 1 pg. 159**

Exhibit J-50

challenges to remove jurors who pose too great a risk of unfairness toward the defendant's case. Attempting to accomplish that task "in the dark," without a substantially completed mitigation investigation or any idea what evidence counsel would present at the penalty phase, was objectively unreasonable.

**Failure to adhere to standard of practice with respect to the selection and use of mental health experts for the defense**

112.    On May 22, 2000, counsel had Mr. Bernard evaluated by psychologist Dr. James Shinder. For several reasons, counsel's actions in this regard fell below the minimum standard of practice.

113.    First, reasonably effective counsel would have been aware that a minimally adequate mental health evaluation cannot be accomplished in the absence of a thorough social history investigation. This is because the results of such an investigation may be necessary for the evaluating expert to provide context for interpreting, e.g., current or prior test data or information obtained in clinical interviews. The standard of practice for defending capital cases in 1999-2000 required counsel to conduct such an investigation before deciding what kind of experts to employ in the first place. Reasonably effective counsel would have been aware of this norm, as it had been reflected in professional journal articles as well as in every reputable training program for capital defense attorneys since at least the mid-1990's. *See, e.g.,* Liebert & Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice,* 15 AM. J. FORENSIC PSYCHIATRY 4:43 (1994) (thorough social history is prerequisite for reliable mental health evaluation). Mr.

Declaration of David A. Ruhnke
Page 51 of 82

**EXHIBIT 1 pg. 160**
Exhibit J-51    919

Bernard's attorneys fell below the standard of practice in engaging an expert without first having compiled the necessary body of information about their client's background and history.

114.    Second, it appears that counsel decided to have Dr. Shinder evaluate Mr. Bernard "to specifically assess [his] intelligence quotient" and "to determine his overall psychological functioning." The former concern (allegedly regarding Mr. Bernard's I.Q.) is difficult to understand except as it reflects counsel's failure to spend much time with their client or obtain any of the many available records documenting his academic performance, which is not suggestive of significantly sub-average overall intellectual functioning. The latter goal (of determining Mr. Bernard's "overall psychological functioning") suggests that counsel may have been attempting to determine whether Mr. Bernard was suffering from a mental disease or defect, an inference strengthened by the fact that Dr. Shinder concludes his report by stating a number of diagnostic impressions indexed to the Diagnostic and Statistical Manual of Mental Disorders. Seeking such an examination suggests that Mr. Bernard's counsel were laboring under a misguided and needlessly narrow conception of what might be relevant as a mitigating factor at the penalty phase, and one entirely at odds with the prevailing standard of practice for defending capital cases in 1999-2000.

115.    Moreover, even if there were a reasonable strategic justification for having Mr. Bernard submit to a psychological evaluation of this type, counsel performed deficiently in waiting until trial had begun to undertake such an important task. The

Declaration of David A. Ruhnke
Page 52 of 82

**EXHIBIT 1 pg. 161**
Exhibit J-52

report reveals many potentially mitigating facts which would require additional investigation and development before counsel could make an appropriate judgment about whether to introduce them at the penalty phase, and by the time counsel obtained this information there was insufficient time to accomplish the careful and thorough investigation and deliberation required by the prevailing standard of practice. Of course, reasonably effective counsel would have previously been aware of these facts, having uncovered them in a properly conducted social history investigation of Mr. Bernard.

116.

117.   Having failed to conduct a thorough investigation into Mr. Bernard's background and history, counsel apparently were unaware that his background includes certain facts and circumstances which would have alerted reasonably effective counsel in 1999-2000 to the need to have Mr. Bernard evaluated by a qualified neuropsychologist. For example, the fact that Mr. Bernard had experienced several head traumas, including two that resulted in his being rendered unconscious (one of

Declaration of David A. Ruhnke
Page 53 of 82

**EXHIBIT 1 pg. 162**

Exhibit J-53   921

those occurring in the spring of 1999), was a clear indicator of a need for neuropsychological evaluation. Similarly, the fact that Mr. Bernard had regularly smoked marijuana dipped in formaldehyde or embalming fluid would have suggested to reasonably effective counsel in 1999-2000 that neuropsychological evaluation was in order. Such an evaluation would have shown that Bernard suffers from neuro-cognitive dysfunction which, along with all the other mitigating circumstances counsel failed to develop or present, would have been reasonably likely to result in a life sentence at the punishment phase.

118.     The potential significance of neuro-psychological dysfunction as a mitigating circumstance was well known and widely recognized in the capital defense community by the mid-1990's. Every national capital defense training program I recall from that era included at least some attention to the importance of seeking neuro-psychological assessment for clients whose histories included circumstances like those in Mr. Bernard's. It was, and is, understood that being alert to such signs is an obligation of reasonably effective *defense counsel* – not simply a area of concern that may be delegated to other members of the defense team.

**Failure to make an opening statement at the penalty phase**

119.     Counsel performed deficiently in failing to make an opening statement at the penalty phase. The prevailing norm of capital defense representation in 1999-2000 required that trial counsel develop and prepare an appropriate case in mitigation prior to trial, so that mitigating evidence would be available to present in the event the

Declaration of David A. Ruhnke
Page 54 of 82

**EXHIBIT 1 pg. 163**

Exhibit J-54

client was convicted of an offense that could carry the death penalty. While the specific content of such a case in mitigation would necessarily vary from case to case, the standard of practice indisputably required trial counsel to be prepared to present the defendant's case in mitigation when the penalty phase arrived. The prevailing norm of capital defense representation in 1999-2000 also obliged trial counsel to take advantage of all appropriate opportunities to explain to the jury why death was not the appropriate punishment for the particular client. Mr. Bernard's counsel's failure in this regard is particularly notable, given that Vialva's attorneys made an opening statement, which may well have communicated to the jury that there was even less to be said on Mr. Bernard's behalf than on Vialva's.

120.    In short, it was objectively unreasonable for trial counsel not to know at the outset of the penalty hearing what mitigating evidence they intended to present and what relevance it had to the appropriateness of a life sentence for their client. Reasonably effective counsel, knowing in advance what evidence they intended to present in mitigation, would not forfeit the important opportunity to outline that case for the jury. In addition, reasonably effective counsel in 1999-2000 would have understood the need to make an opening statement at the penalty phase to "set the tone" for that portion of the proceedings, by explaining that the jurors' task was different – to decide the appropriate punishment, rather than simply determining whether the Government had proven certain facts, as in the guilt phase. It is important that counsel ensure, to the extent possible, that the jurors assume a different

Declaration of David A. Ruhnke
Page 55 of 82

**EXHIBIT 1 pg. 164**

Exhibit J-55

mind-set with respect to the purpose of the penalty phase than they had assumed during the first phase of trial. By failing to make an opening statement at the penalty phase, Mr. Bernard's attorneys unreasonably abandoned a valuable opportunity to give the jury essential guidance in its sentencing task.

**Failure to prepare witnesses actually called to testify at the penalty phase, and to exercise due care in the selection of those witnesses**

121.    Counsel failed to prepare the witnesses they actually called to testify at the penalty phase. At least some of those witnesses report that counsel did not explain to them the purpose of their testimony, what they would be asked on direct examination, or what they might be asked on cross-examination. At most, it appears that counsel may have stated to the witnesses as a group, immediately prior to their testimony, that they were being called to testify about Mr. Bernard's character. Failing to prepare witnesses individually for their testimony, and to do so sufficiently in advance of the penalty phase to exercise reasonable professional judgment about whom to call and whom not to call, fell below the prevailing standard of practice in 2000.

122.    Counsel failed to exercise due professional care in the selection of which witnesses would be called to testify at the penalty phase. Several of the witnesses called to testify on Mr. Bernard's behalf report that their attendance as witnesses at the penalty phase was solicited by Mr. Bernard's mother, rather than by defense counsel. They were not subpoenaed. The prevailing standard of performance in 2000 required counsel to select their witnesses with care and not to delegate to any person outside the defense team the responsibility for communicating with those

Declaration of David A. Ruhnke
Page 56 of 82

**EXHIBIT 1 pg. 165**

Exhibit J-56

witnesses and securing their attendance in court via subpoena.

123.   Mr. Bernard's counsel failed to prepare the witnesses they actually called to testify at the penalty phase, and examined those witnesses in a manner that was objectively unreasonable and deficient. Reasonably effective counsel were obliged to prepare the witnesses they would call on Mr. Bernard's behalf by explaining to them the purpose of their testimony or what they would be asked on direct or cross-examination. Counsel had not interviewed these witnesses and had no idea what they might know that would be relevant to Mr. Bernard's case in mitigation. Counsel's examination of each witness followed the same pattern: a handful of questions directed to identifying the witness and establishing how long they had known Bernard, followed by a open-ended plea that the witness come up with something helpful, *e.g.*:

> [T]his part of the trial is really for a very specific purpose, and that's for these twelve good folks here on the jury to decide whether to give Brandon Bernard the death penalty, or life in prison without the possibility of release. What kinds of things can you – what kind of information can you give to the jury that you think would help them in making that decision about Brandon Bernard?

(to Billy Spiller).   Counsel's examination of every defense witness followed this pattern.

124.   Counsel's failure to prepare their mitigation witnesses individually for their testimony, and to do so sufficiently in advance of the penalty phase to exercise reasonable professional judgment about whom to call and whom not to call, fell below the prevailing standard of practice in 2000. Reasonably effective counsel

Declaration of David A. Ruhnke
Page 57 of 82

**EXHIBIT 1 pg. 166**

Exhibit J-57            925

would have interviewed the witnesses in advance, identified the information they possessed which counsel wanted to elicit before the jury, and then structured the examination to elicit that information. Counsel appear to have chosen instead simply to call the witnesses to the stand, without knowing what they might say, and hope they might volunteer something to "help" the jury make its sentencing decision. Counsel's actions in this regard fell below the prevailing standard of practice in 1999-2000.

125.    Counsel also failed to exercise due professional care in choosing to call Billy Spiller and Isolde Rorie-Cody as defense witnesses at the punishment phase. Because counsel had never interviewed these witnesses or performed any meaningful investigation, counsel had no idea that Spiller and Rorie-Cody's own children were members of the same youth gang as Mr. Bernard. The credibility of both witnesses was devastated when the Government elicited this admission on cross-examination. Reasonably effective counsel would have been aware of this fact and would have either (1) developed this fact on direct examination as part of a broader mitigating explanation for how young African-American men became involved in gang activity in Killeen, or (2) chosen not to call these witnesses at all.

**Failure to develop and present readily available mitigating evidence concerning Mr. Bernard's successful adjustment to incarceration and his prior positive response to intensive supervision as a juvenile probationer**

126.    Counsel performed deficiently in failing to investigate, present and argue available, affirmative evidence of Mr. Bernard's successful adjustment to

Declaration of David A. Ruhnke
Page 58 of 82

**EXHIBIT 1 pg. 167**

Exhibit J-58

incarceration while awaiting trial, as well as his positive response to intensive supervision as a juvenile probationer. Reasonably effective defense counsel would have understood that evidence tending to show that a defendant has lived peacefully and productively in a structured environment like jail can persuade jurors to impose a sentence less than death. Moreover, reasonably effective defense counsel would have been aware that experience and research both indicate that capital jurors regard the defendant's possible future dangerousness as a vital consideration in choosing between life imprisonment and the death penalty. *See, e.g.,* Blume, *et al., Future Dangerousness in Capital Cases: Always "At Issue,"* 86 CORNELL L. REV. 397, 398-99 (2001). Indeed, the Government in this case had given notice that it would seek to prove as an aggravating factor that Mr. Bernard was "likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others." Reasonably competent capital defense counsel in 1999-2000 would have looked for such evidence. Nothing in the files of Mr. Bernard's trial counsel, much less in the case they presented at the penalty phase, indicates that trial counsel undertook any investigation in this area.

127.    The records of the McLennan County Jail documenting Mr. Bernard's pre-trial incarceration reflect that although he spent nearly a year in custody there, he was disciplined for misbehavior on only two occasions, and that neither incident involved violence against another inmate or against correctional staff. The two disciplinary reports do not reflect that Mr. Bernard possessed contraband or weapons, or that his

Declaration of David A. Ruhnke
Page 59 of 82

**EXHIBIT 1 pg. 168**

Exhibit J-59

misbehavior was in any way gang-related. The latter point is vital because the Government's primary argument that Mr. Bernard would be dangerous in prison if not put to death rested on the claim that prisoners who had been gang members in the "free world" would inexorably be drawn into gang-related violence in prison once incarcerated. Reasonable counsel would have developed and presented this evidence through Mr. Bernard's records and the testimony of jail personnel.

128. In addition, reasonably competent counsel would have investigated whether lay witnesses might also be able to testify to Mr. Bernard's successful adjustment to incarceration. Had Mr. Bernard's counsel done so, they would have found such witnesses. For example, Michael Cherry, then a fellow jail inmate and now an ordained minister, would have testified, *inter alia*, that Mr. Bernard was deeply remorseful and ashamed about his role in the crime; that Mr. Bernard was an active and enthusiastic participant in the jail Bible study group; that Mr. Bernard had a positive influence on the behavior of other inmates; that Mr. Bernard expressed concern about his family, including especially his younger brother Max, and how his actions had hurt them; that Mr. Bernard was haunted by the photographs of the victims that he saw during trial; and that Mr. Bernard was distraught that his involvement in the crime was going to result in his being separated forever from his own children. Comparable testimony was available from Rev. Jackie Hetzel, a "free world" minister who came into the jail to minister to the prisoners there and who had frequent contact with Mr. Bernard. Reasonable counsel in 1999-2000 would have

Declaration of David A. Ruhnke
Page 60 of 82

**EXHIBIT 1 pg. 169**

Exhibit J-60

been aware that life verdicts in other federal capital trials around the country have demonstrated the effectiveness of presenting such evidence, which both displays the defendant's positive human qualities and shows the jury that he would not pose a threat of violence to other inmates or correctional staff if his life were spared.

129.    In addition, reasonably effective counsel would have investigated Mr. Bernard's juvenile criminal history and examined whether any comparable evidence existed with respect to those adjudications.  Had counsel conducted such an investigation, they would have discovered that juvenile probation officer Novotny Baez, who had supervised Mr. Bernard about two years before the Bagley murders, found that he generally responded very positively to supervision.  Ms. Baez would have testified, *inter alia*, that Brandon, who was on "intensive supervision," duly reported to her 2-3 times per week and was always at home when she made her unannounced visits to the family home once each week; that nothing about his character suggested a capacity for violence; that she felt extremely safe around Brandon and would have gone with him anywhere unaccompanied; that he was quiet, respectful, and well-mannered; that he had a calming presence; that she never thought twice about making her visits to the family home late at night, because she was completely confident that Brandon posed no threat to her; and that during this period of intensive supervision Brandon kept curfew, went to school as required, and worked regularly and successfully at a local Burger King restaurant.  Perhaps equally important, Ms. Baez could have testified that although the juvenile court originally ordered that Mr. Bernard reside in

Declaration of David A. Ruhnke
Page 61 of 82

**EXHIBIT 1 pg. 170**
Exhibit J-61   929

the "Catch-22" residential facility in Brownwood for a full year, he was released after only six months despite the fact that he still had treatment needs.

130.    While it is my opinion that counsel in any death penalty case is obliged to develop and present available "*Skipper* evidence," counsel's failure to develop and present such evidence in Mr. Bernard's case is especially noteworthy because the Government had given formal notice that it would ask the jury to sentence Mr. Bernard to death based on the non-statutory aggravating factor of future dangerousness. The Supreme Court emphasized in *Skipper v. South Carolina*, 476 U.S. 1 (1986), that evidence of a defendant's successful adjustment to prison can powerfully rebut a prosecutorial claim of future dangerousness. Knowing that future dangerousness would form an important part of the Government's case for the death penalty, counsel were under a special obligation to develop and present available evidence that Mr. Bernard had successfully responded to supervision in the past and to incarceration prior to trial.

**Counsel's other errors and omissions in defending Mr. Bernard at the penalty phase**

131.    Mr. Bernard's attorneys also performed deficiently with respect to rebutting and explaining the evidence offered in aggravation by the Government. To take one example, the Government presented evidence that Mr. Bernard had gotten in trouble at school, allegedly for provoking a conflict with another student by directing the latter's attention to the Mr. Bernard's gold teeth, which bore the letters "C.K." (allegedly an abbreviation for "Crip Killer," *i.e.*, a member of a Bloods gang).

Declaration of David A. Ruhnke
Page 62 of 82

**EXHIBIT 1 pg. 171**

Exhibit J-62    930

Reasonably effective counsel would have been aware through investigation that shortly after and in response to this incident, Mr. Bernard went to his family dentist and had these gold caps replaced with plain ones, with no letters on them. That fact is documented by Mr. Bernard's dental records and could have been presented to rebut the inference that Mr. Bernard was incorrigible or a willfully "hard-core" gang member, and to disprove Ranger Aycock's claim that he saw the "C.K." on Mr. Bernard's teeth when he was arrested after the murders.

132.    Defense counsel performed deficiently with respect to cross-examining Terry Brown at the penalty phase regarding his claim that he, Vialva, and Bernard, as the "Kick-Door Boys," had committed a large number of residential burglaries. These burglaries were an important part of the Government's case for Bernard's "future dangerousness." Reasonably effective counsel would have conducted an independent investigation into these allegations to determine if there were any documents or other records concerning these burglaries that implicated Bernard, which counsel unreasonably failed to do. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he stated that the "Kick-Door Boys" consisted of himself, Vialva, and *Tony Sparks*, rather than Bernard.

133.    Reasonably effective counsel would also have objected to the form of many of the prosecutor's questions and much of Brown's testimony. The absence of any objections from defense counsel made it possible for Brown from time to time to

Declaration of David A. Ruhnke
Page 63 of 82

**EXHIBIT 1 pg. 172**

Exhibit J-63

testify in the form of a narrative, without having to respond to questions from the Government, and also allowed the prosecutor to frame many of his questions to lead Brown to the desired response, including by asking the same question repeatedly when Brown failed to answer as the prosecutor hoped. While reasonable lawyers might disagree about whether to interpose such objections generally, in this case I believe that any reasonable lawyer would have chosen to maintain an aggressive stance toward Brown. He was a cooperating co-defendant and much of his testimony was devastating for Bernard. Perhaps most important, Brown was not a skillful witness; when he was not being led by the prosecutor or permitted to testify in the form of a narrative, he appears to have been far less capable of testifying as the Government desired. Reasonable defense counsel would have pressed Brown, through interposing appropriate objections, to come up with his story on his own.

134.    Counsel also performed deficiently by permitting Government witnesses to exaggerate the length and seriousness of Mr. Bernard's prior criminal history, and to speculate about facts concerning which there was no proof they had personal knowledge. For example, witness Jeff Fholer was allowed to testify that Mr. Bernard at age 15 committed "several" burglaries in July 1995, while the truth was that he committed only two burglaries in July 1995. Police officer John Wedge testified that Mr. Bernard was involved in a burglary in January 1998; although some jurors might have understood from the context of his testimony that Wedge had misspoken and meant "January 1995," defense counsel failed to correct that misstatement explicitly,

Declaration of David A. Ruhnke
Page 64 of 82

**EXHIBIT 1 pg. 173**

Exhibit J-64

leaving jurors who might not have been following the testimony closely to add a nonexistent burglary to Mr. Bernard's record. Police officer Alex Gerhardt testified that although Mr. Bernard and his cousin Melsimeon Pollock were apprehended after one burglary with a single Nintendo game cartridge in their possession, they had had "plans to take other things." The Government elicited from Gerhardt that one person victimized in a burglary by Mr. Bernard had been next door "helping a neighbor out" at the time of the burglary – a fact both irrelevant and unsupported by any evidence. Similarly, Ranger Aycock testified without objection that Mr. Bernard and Melsimeon Pollock committed "numerous" burglaries when Bernard was fifteen (the actual number of burglaries was three). Reasonably effective counsel likewise would have objected to Aycock's utterly speculative testimony that "some" of the so-called "Kick-Door Boys" (which, according to the version of events promoted by the Government at trial, included Mr. Bernard) "may have been" involved in other burglaries that did not involve the rest of the "Kick-Door Boys."

135.   Counsel unreasonably failed to object to speculative hearsay testimony from sheriff's investigator David Wical concerning an incident in which someone apparently rang the doorbell of a local woman and then got into a vehicle and drove away after she looked out.   While the Government later elicited testimony from Terry Brown designed to suggest that the incident was a narrowly averted residential burglary by the "Kick-Door Boys," it failed to present any substantial or reliable evidence from which a reasonable juror could conclude that the event alleged by

EXHIBIT 1 pg. 174
Exhibit J-65

Wical was the same one claimed by Brown. By introducing the claim through Wical, however, the Government was able to imbue the story with the credibility of a law enforcement officer, rather than presenting it solely through the testimony of a compromised and unreliable cooperating co-defendant. Reasonably effective counsel would have objected to Wical's testimony.

136.    Counsel also performed deficiently in failing to challenge the testimony of Government witness John Bowman, called to testify that Vialva and Bernard had engaged in confrontations with other students at school as a result of their identification with the 212 PIRU gang. Reasonably effective counsel would have objected to Bowman's irrelevant testimony that Hispanic teenagers affiliated with the "Thirteeners" gang, "if they [go] to the penitentiary, [would] be Mexican [M]afia associate kids." No evidence had been presented to show that Bowman was qualified to testify about what gang, if any, Hispanic teenagers might join if sent to prison, and any such testimony was both grossly speculative and irrelevant by its own terms. Moreover, this testimony was highly prejudicial to Bernard, as it provided specious corroboration for the testimony of Dr. Richard Coons that a teenager who belonged to any gang in the "free world" would necessarily associate himself with a gang in prison. Reasonably effective counsel would have asked for a Daubert hearing to test Bowman's qualifications to make any such "expert" pronouncements, about these matters and others related to Bowman's asserted specialized knowledge about gangs, such as his global claim that "violence" is the "likely result[] of showing disrespect to

Declaration of David A. Ruhnke
Page 66 of 82

**EXHIBIT 1 pg. 175**

Exhibit J-66

other gang members."

137.    Counsel also performed deficiently in cross-examining Bowman about the particulars of the incident in which Mr. Bernard was issued a citation for provoking another student by showing him Mr. Bernard's gold teeth, which bore the letters "C.K." ("Crip Killer.") In questioning Bowman, defense counsel suggested that Mr. Bernard had told the officer that "C.K." were his girlfriend's initials. Bowman denied ever having been told that, although he stated that Mr. Bernard "apparently" had made such a claim in an informal hearing at school after the incident. Defense counsel never introduced any evidence to show that Bernard ever had a girlfriend with the initials "C.K." Reasonably effective defense counsel would have known through investigation that Bernard never had a girlfriend with those initials. Introducing the suggestion through cross-examination of Bowman both created an expectation in the jury that such proof might be forthcoming; when it was not, the jury could only have drawn the conclusion that Mr. Bernard had lied in his campus-level hearing (and presumably to defense counsel as well). Reasonably effective counsel would not have pursued such a line of questioning without any factual basis for doing so, and an attorney who had reasonably investigated and prepared for trial would have known that no such factual basis existed.

138.    Counsel performed deficiently in failing to object to narrative testimony from Ranger Aycock, based on hearsay, concerning how the murder weapon originally came into Mr. Bernard's possession. Counsel performed deficiently in failing to

EXHIBIT 1 pg. 176

Exhibit J-67

object to irrelevant and prejudicial hearsay testimony from Ranger Aycock regarding the gang affiliation of the "Bell brothers," as well as to Aycock's wholly unsupported claim that Mr. Bernard and the "Bell brothers" were "rivals" and "had problems."

139.    Counsel also performed deficiently in failing to object to testimony by Aycock about his conversations with other members of the 212 PIRU gang and/or other persons, in which Aycock described having asked those persons for their opinions "rating" the four persons "charged in this crime" (apparently Vialva, Bernard, Lewis, and Brown). This testimony was objectionable on multiple grounds (*e.g.*, hearsay, inadmissible opinion, irrelevant, unduly prejudicial, etc.) and reasonably effective counsel would have objected to it.

140.    Reasonably effective counsel would have objected to Aycock's long hearsay narrative regarding what he was told by James Presley with respect to a fatal shooting on December 31, 1998, at which Vialva was alleged to have been present. That irrelevant narrative also contained prejudicial and inflammatory characterizations of the shooting victim in that incident, whom Aycock claimed was "as square a fellow as you ever saw," with "no gang connection" and "no criminal history," and wholesale speculation about what thoughts ran through the mind of the deceased during the incident (*e.g.*, "he didn't know exactly how to react to it"). This testimony was prejudicial because it had nothing to do with Bernard and because it paralleled the elaborate overall comparison the prosecution was developing between the lawless defendants on one hand versus the law-abiding ("square") Bagleys on the other.

EXHIBIT 1 pg. 177
Exhibit J-68

Reasonably effective counsel would also have known that Bernard was living with his relatives hundreds of miles away in Michigan at the time of that shooting on December 31, 1998, and would have made the jury aware of that fact.

141.    In cross-examining Aycock at the punishment phase, counsel amazingly invited a lengthy and damaging narrative including hearsay testimony supposedly expressing the views of other gang members concerning Vialva, Bernard, Lewis, and Brown, by giving Aycock an open-ended invitation to "[g]o ahead" and say whatever he liked. Then, in response to defense counsel's question about Terry Brown, Aycock volunteered non-responsive hearsay that Bernard "would assist and help and would not run from a fight," a characterization both false and directly at odds with testimony the defense later presented from its own witness Matthew Mitchell.

142.    As all these examples illustrate, Mr. Bernard's attorneys stood mute in the face of a great deal of extraordinarily prejudicial evidence to which any reasonable lawyer would have objected. Notwithstanding the fact that 18 U.S.C. § 3593(c) provides that the Federal Rules of Evidence do not apply at the punishment phase of a federal capital trial, there are available legal grounds for pursuing the same goal of keeping unreliable and prejudicial testimony away from the jury. The federal statute itself provides that evidence may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. This is a familiar test and in fact is more generous than Rule 403 itself, under which the probative value must be "substantially" outweighed by unfair prejudice before the

Declaration of David A. Ruhnke
Page 69 of 82

**EXHIBIT 1 pg. 178**

Exhibit J-69

evidence is inadmissible. In addition, the Eighth Amendment requires "heightened reliability" in capital sentencing proceedings, which may provide an independent legal basis for objection or for limiting instructions.

143.    In my own experience, federal district judges very often continue at the penalty phase to evaluate the admissibility of evidence largely on the basis of the same interests and policies reflected by the Rules of Evidence; indeed, the record of Mr. Bernard's trial reflects that the trial judge on several occasions during the punishment phase sustained conventional evidentiary objections by the Government to testimony offered by the defense, so there is no reason to believe he would have treated Mr. Bernard's lawyers any less fairly had they voiced comparable objections.

144.    Mr. Bernard's counsel took none of these steps, nor even appear to have considered them in preparing for trial. At the same time, nothing I have seen indicates counsel had any informed strategic reason for failing to challenge the introduction of the kinds of evidence described in the above examples, and no such reason readily comes to mind. Counsel's inaction in this regard fell below the prevailing standard of capital defense practice in 1999-2000.

**Failure to take steps to challenge or limit the Government's presentation of "victim impact" evidence at the punishment phase**

145.    Counsel failed to file appropriate *in limine* motions to limit the nature and extent of the "victim impact" evidence the Government would be permitted to introduce at the penalty phase. In 2000, the prevailing standard of practice for counsel defending capital cases required that counsel ascertain what, if any, "victim impact" evidence

Declaration of David A. Ruhnke
Page 70 of 82

**EXHIBIT 1 pg. 179**

Exhibit J-70

the prosecution intended to introduce and evaluate all available strategies for contesting the admissibility of such evidence.    In numerous federal capital cases prior to 2000, district judges had been persuaded to limit the type and amount of "victim impact" evidence the Government would be allowed to present at the penalty phase. Reasonable counsel would have been aware of this fact. In this case, counsel were aware that the potential victim impact witnesses had expressed very strongly the view that the death penalty was the appropriate sentence.  For example, Donna McClure (mother of Stacie Bagley) had included in her written victim impact statement the phrase "Although it saddens me I know the death penalty is right." Likewise, Georgia Bagley (mother of Todd Bagley) included in her written statement the phrase, "I ask that they receive no mercy.  Please please give them the death penalty.  Todd and Stacie's blood cries out from the grave and just as they pleaded for their lives and did not receive mercy they now plead for justice – Hear their cries and avenge their blood." Rick Bagley (father of Todd Bagley) included in his written statement the phrase, "Once again I ask that you will impose the maximum penalty on the defendants."  Reasonable defense counsel would have recognized that the testimony of witnesses with such an emphatic view as to the appropriate punishment, whether or not they would be allowed expressly to testify to those views at the penalty hearing, presented a significant risk of rendering Mr. Bernard's penalty hearing fundamentally unfair, and would have attempted to limit the scope and character of the "victim impact" statements to be offered.

Declaration of David A. Ruhnke
Page 71 of 82

**EXHIBIT 1 pg. 180**

Exhibit J-71

146.    Counsel failed to object to "victim impact" testimony that exceeded the scope of such evidence permissible under *Payne v. Tennessee*.    As the Fifth Circuit acknowledged in its opinion on direct appeal, part of the testimony of Donna McClure was irrelevant and might have been excluded upon a timely objection, and other "victim impact" testimony was admitted that improperly characterized the defendants and their offense. Mr. Bernard's counsel performed deficiently in failing to make appropriate and necessary objections to exclude such testimony.

147.    Counsel failed to object to evidence that was irrelevant under Payne and which, even if marginally relevant, was so inflammatory that it should have been excluded. For example, witness Anastasio Torres, himself a police officer with the Killeen ISD, was allowed to recount without objection a conversation about Todd Bagley's having considering becoming a police officer, including how Stacie Bagley had expressed her desire that Todd "[not] get involved in any of that violence that's out there," to which Torres had responded that violence could happen anywhere, but that if Todd pursued a career in law enforcement he would be "trained" and could "spot bad things" and "protect [her]."

148.    This testimony was objectionable and reasonable counsel would have objected to it.    Torres' testimony, at least as to his speculation about how Todd, properly "trained," might have responded to "bad things" and "protect[ed]" Stacie, was speculative, irrelevant, and highly unfairly prejudicial.  It contributed significantly to the Government's overall campaign to paint the deaths of the Bagleys as a

Declaration of David A. Ruhnke
Page 72 of 82

**EXHIBIT 1 pg. 181**

Exhibit J-72

particularly cruel irony – as with the Government's argument that the Bagleys were victimized precisely *because* they had "reached out" to the defendants – both in the beginning (in agreeing to give them a ride, failing to "spot" the "bad thing" that was about to ensnare them) and at the very end (as they went to their deaths singing hymns).

149.    Counsel unreasonably failed to object to "victim impact" testimony that had the obvious effect of communicating to the jury that the victims desired a death sentence for Bernard. For example, Georgia Bagley was permitted to address the jury directly, rather than answering questions from the prosecutor, and stated, "Please, I beg you, let justice be done for my children." Reasonably effective counsel would have objected to this improper testimony before Ms. Bagley took the stand (since counsel had been provided with a copy of the statement Ms. Bagley was allowed to read to the jury) and sought to exclude it.

150.    Counsel unreasonably failed to object to testimony from Rick Bagley that characterized the defendants as "brutal" and lacking "guts." Counsel failed to object to leading questions from the prosecutor on direct examination that had the effect of permitting the prosecutor to add his personal credibility to the witnesses' characterizations. For example, the Government asked one witness, "Tell us about Todd's character. Was he the type of person that would throw himself totally into whatever he was asked to do? In other words, whether it be in the military, or any other type of endeavor, that he gave it his all, it was a hundred and ten percent for

Declaration of David A. Ruhnke
Page 73 of 82

**EXHIBIT 1 pg. 182**

Exhibit J-73

him, or nothing?").    Counsel failed to object, at both phases of trial, to the prosecution's improper use of testimony about the victims' lack of concern for material possessions to encourage the jury to compare the moral worth of their lives to that of the defendants'.

151.    In short, any reasonable capital defense lawyer in 1999-2000 would have recognized and anticipated that "victim impact" evidence poses a terrific threat to the fairness of the punishment phase.    Such evidence can – as it appears to have done here – effectively replace the moral inquiry properly understood to lie at the heart of capital sentencing with an emotional outpouring of sympathy for the deceased and unbridled righteous fury at the defendants.    Because the constitution imposes no *per se* bar to the admission of such evidence, it is defense counsel's duty to insist that the trial judge monitor the scope and character of such evidence to prevent the punishment phase from degenerating into a referendum on the respective value of the lives of the victims on the one hand and the defendants on the other.    Mr. Bernard's attorneys took no steps whatsoever in that regard, and in so failing to act fell below the prevailing standard of practice for attorneys defending capital cases in 1999-2000.

**Failure to take any steps to keep the jury from considering against Mr. Bernard evidence offered against co-defendant Vialva**

152.    Counsel failed to seek appropriate limiting instructions to ensure that the jury would not consider evidence against Mr. Bernard that was nominally offered by the Government against co-defendant Christopher Vialva.    Federal criminal prosecutions

Declaration of David A. Ruhnke
Page 74 of 82

**EXHIBIT 1 pg. 183**

Exhibit J-74    942

routinely involve the joint trial of co-defendants, and the standard of practice requires counsel to object and/or seek appropriate limiting instructions to cabin the jury's consideration of evidence offered against other defendants but not against one's own client.

153.    In this case, for example, the Government presented at the penalty phase the testimony of psychiatrist Dr. Richard Coons, who stated that he had "examine[d] … the offense report records and the medical records as [to] Christopher Vialva," and who proceeded to testify at length about his opinion regarding "Mr. Vialva's future dangerousness." Mr. Bernard's counsel evidently understood Dr. Coons' testimony to be offered only against Mr. Vialva, because they conducted no cross-examination of Dr. Coons.

154.    Under such circumstances, however, the standard of practice required that Mr. Bernard's attorneys also seek appropriate limiting instructions to inform the jury that Dr. Coons' testimony could not be considered against Mr. Bernard. In the absence of such an instruction, there was no legal bar against the jury's doing so, or the Government's arguing for the death penalty for Mr. Bernard based on facts that came into evidence through Dr. Coons, as it did. For example, Dr. Coons testified that a person who "was capable of planning a situation that [would] place other people in danger," who could commit "theft for [his] own benefit," who could participate in "deliberation about the execution of people, … discussing it with co-conspirators and making a decision to execute people," would be "highly dangerous" and "does not

Declaration of David A. Ruhnke
Page 75 of 82

**EXHIBIT 1 pg. 184**
Exhibit J-75

have a conscience," and thus "would present a significant danger in the penitentiary system." According to other evidence presented by the Government in the course of the trial, each of these descriptions could also apply to Mr. Bernard. Reasonably effective counsel would have sought limiting instructions to keep the jury from considering Dr. Coons' testimony against Mr. Bernard, and their failure to do so creates a high likelihood that the jury treated his opinion as applying not only to Mr. Vialva but also to Mr. Bernard.

155.    Similarly, Dr. Coons testified that "[i]f [someone is] a member of a gang on the outside, they'll be a member of the gang inside." The Government had laid no foundation to show that Dr. Coons had any professional expertise related to gangs or prisons, or that he had any basis of knowledge whatsoever for offering such an opinion. Regardless of whether this testimony was nominally offered against Mr. Vialva, it had an immediate and prejudicial relevance to Mr. Bernard and Mr. Bernard's attorneys should have objected to it; if the court admitted it over their objection, they should have sought an instruction limiting its consideration to Mr. Vialva.

156.    The harm from counsel's failure to make appropriate objections and seek limiting instructions is apparent from, *inter alia*, the Fifth Circuit's opinion on direct appeal, which found the evidence of Mr. Bernard's "future dangerousness" to be legally sufficient in part based on Dr. Coons' testimony regarding gang membership inside and outside of prison, which the Fifth Circuit treated as testimony offered against Mr.

Declaration of David A. Ruhnke
Page 76 of 82

EXHIBIT 1 pg. 185

Exhibit J-76

Bernard. *See United States v. Bernard*, 299 F.3d 467, 482 (5ᵗʰ Cir. 2002).

157.   In addition, and for the same reasons, Mr. Bernard's counsel performed deficiently in not requesting an instruction to preclude the jury from considering the testimony of Anthony Davis against Mr. Bernard.

158.   On the whole, counsel's deficient performance indicates a complete lack of appreciation of the dangers of a joint penalty phase. Reasonably effective counsel would have sought an instruction directing the jury not to consider against Mr. Bernard for any purpose the testimony of Dr. Mark Cunningham, whether on direct or cross-examination, or the testimony of Anthony Davis or Dr. Coons.

**Failure to object to prejudicial and improper closing argument by the Government at the punishment phase**

159.   Counsel failed to object to improper argument by the Government during closing argument at the punishment phase. For example, counsel failed to object when the Government's attorneys repeatedly expressed their personal belief that they had proven their case, and attempted to impart their personal prestige to the Government's case. *See, e.g.*, Tr. 3200 ("we believe we have met the intent factors"), 3204 ("we believe we have [proved our case]"); 3210 ("This case is important. That's why we had all the evidence. That's why we took our time to show you everything, to let you know all the evidence").

160.   Counsel also unreasonably failed to object to arguments that were themselves based on earlier, improper testimony. For example, the Government argued at the punishment phase that "they almost got away with it, but something put them in the

Declaration of David A. Ruhnke
Page 77 of 82

**EXHIBIT 1 pg. 186**
Exhibit J-77          945



mud." The latter reference to "something"'s having "put them in the mud" was a direct reference to the improper, inflammatory and irrelevant testimony of Chris Lewis at the guilt phase that "God" had pushed Mr. Bernard's car into the ditch, presumably to ensure their arrest, prosecution, and condemnation. This argument was objectionable and highly, unfairly prejudicial.

161.   Counsel unreasonably failed to object when the Government made arguments that were unsupported by the evidence and/or misstated or mischaracterized the evidence. For example, the Government repeatedly stated in argument, as it had been proven by the evidence, that Bernard set the fire. The Government also argued that Bernard poured lighter fluid on or in the trunk, which was directly contrary to the testimony of Terry Brown that Bernard sprayed lighter fluid only into the passenger compartment of the car. Similarly, the Government mischaracterized Brown's testimony about what Bernard knew about the "plan" after the meeting at Long Branch Park. This argument was impossible to square with Brown's actual testimony – that Bernard was told that the car would be burned, but *not* that Vialva intended to kill the Bagleys. The Government also, without objection, argued that the jury should "recognize" Bernard for having "assist[ed]" Vialva in Vialva's desire to be "top gangster." No evidence supported the argument that Bernard had engaged in any actions whatsoever with the intent of promoting Vialva's reputation as a "gangster." The Government claimed that Bernard's mitigation witness Matthew Mitchell never testified that Bernard said "that he was sorry for what he did." In fact, Mitchell had testified that

Declaration of David A. Ruhnke
Page 78 of 82

**EXHIBIT 1 pg. 187**

Exhibit J-78

Bernard told Mitchell that his lawyers had instructed him not to talk about the crime with anyone.

162. Reasonably effective defense counsel, in my view, would object to flat misstatements of the evidence in the Government's closing argument, at least where the factual matters misrepresented by the prosecutor are highly material, as they were in these instances.

163. Perhaps most important, counsel were totally unprepared to respond to what the Government expressly called the central theme of its closing argument, i.e., that Mr. Bernard was responsible for his own "choices" in taking part in the crime, and should be punished accordingly. Specifically, the Government repeatedly and emphatically rejected the suggestion by Mr. Bernard's counsel and his mitigating witnesses that Mr. Bernard was a "follower." Reasonably effective counsel would have known, having obtained the transcripts of the plea hearings of Lewis and Brown, that both Brown and Lewis affirmed under oath that Mr. Bernard set fire to the car only because he was directed to do so by Vialva, and that Vialva had generally issued directions to the others during the events of the crime.

**Counsel's failures, considered cumulatively, were prejudicial at both phases of trial**

164. Based on my experience and training in defending capital cases, it is my opinion that counsel's numerous errors and omissions were prejudicial to Mr. Bernard at both phases of trial, in the sense that I find that they undermine confidence in the reliability of the verdict finding him guilty of a death-eligible offense and the jury's

Declaration of David A. Ruhnke
Page 79 of 82

**EXHIBIT 1 pg. 188**
Exhibit J-79

verdict at sentencing.

165.  The only evidence of Mr. Bernard's knowing and intentional participation in a premeditated killing (both that he knew about the plan to kill the Bagleys, and that he took any action at the scene of their deaths that contributed to the murder) came exclusively from Brown and Lewis. Their credibility would have been completely undermined by a reasonably effective cross-examination, undertaken using all the available ammunition reasonable defense counsel could have assembled. In addition, the extraordinarily prejudicial impact of the introduction at the guilt phase of extensive and irrelevant evidence about gangs and about the character and religious devotion of the victims, all of which would have been challenged by reasonably effective counsel, supports this conclusion. I believe it is impossible to have confidence that the jury would have found all the elements necessary to expose Mr. Bernard to a death sentence if counsel had performed in accordance with the existing standard of practice in 1999-2000.

166.  With respect to the penalty phase, my view regarding the prejudice that resulted from counsel's deficient performance is informed by the report prepared for Mr. Bernard's post-conviction counsel by mitigation specialist Jill Miller, M.S.S.W. In my opinion and based on my experience, Ms. Miller's report reflects the information that would have been gathered in the course of any reasonably competent investigation of this case, had trial counsel conformed to the existing standard of practice. That report reliably indicates that there was a wealth of readily available

Declaration of David A. Ruhnke
Page 80 of 82

**EXHIBIT 1 pg. 189**

Exhibit J-80

mitigating evidence which reasonably effective counsel would have developed and presented. Not only would this evidence have provided an independent basis for imposing a life sentence, but it would have dramatically undercut the Government's case in aggravation and thereby further altered the balance of sentencing factors to be considered by the jury. While a reasonably effective attorney would not necessarily have presented every detail included in Ms. Miller's report, Mr. Bernard's counsel were in no position to make informed strategic choices of any kind at the punishment phase because their wholesale failure to investigate left them ignorant of all the potentially relevant facts which reasonably competent counsel would have had in their possession.

167.   This fully developed portrait stands in stark contrast to the meager and misleading sketch of Mr. Bernard presented at the punishment phase of his trial. It is precisely the kind and quantity of evidence that, in my experience, can persuade a jury to spare the life of a youthful defendant like Mr. Bernard even when he has taken part in a terrible and tragic crime. In my opinion, if counsel had conducted an appropriate investigation into mitigating circumstances and presented the full picture of Mr. Bernard's life story to the jury that held his fate in its hands, there is a reasonable likelihood that at least one juror would have concluded that a sentence of life imprisonment without the possibility of release was the appropriate punishment.

Declaration of David A. Ruhnke
Page 81 of 82

EXHIBIT 1 pg. 190
Exhibit J-81

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___June 8, 2004___

_____
DAVID A. RUHNKE

Declaration of David A. Ruhnke
Page 82 of 82

**EXHIBIT 1 pg. 191**

Exhibit J-82

RUHNKE & BARRETT

ATTORNEYS AT LAW

DAVID A. RUHNKE
  MEMBER N.J. AND NEW YORK BARS
  davidruhnke@ruhnkeandbarrett.com
JEAN DeSALES BARRETT
  MEMBER N.J. AND COLORADO BARS
  jeanbarrett@ruhnkeandbarrett.com

47 PARK STREET
MONTCLAIR, NEW JERSEY 07042
(973) 744-1000
FAX: (973) 746-1490

### Resume of Death Penalty Experience – David A. Ruhnke
(Revised June 2004)

| | |
|---|---|
| Education: | B.A., English Literature, Dartmouth College, 1965 |
| | J.D. *cum laude*, Seton Hall University, 1975<br>Class rank -1/250 |

| | | |
|---|---|---|
| Work History | 1965-1967: | Management trainee<br>Prudential Ins. Co. of America<br>Newark, New Jersey |
| | 1967-1969: | Peace Corps Volunteer<br>Republic of the Philippines |
| | 1969-1970: | Instructor of English<br>East-West Cultural Institute<br>Chiba City, Japan |
| | 1970-1972: | Free-lance journalist/photographer<br>Part-time construction worker |
| | 1972-1975: | Summer employment while in law school included project to revise New Jersey child-abuse legislation (summer, 1973) and law clerk in Office of the Federal Public Defender for the District of New Jersey (summer, 1974) |
| | 1975-1976: | Law clerk to Hon. Lawrence A. Carton, Jr., Presiding Judge, Appellate Division of the New Jersey Superior Court |
| | 1976-1983: | Assistant Federal Public Defender for the District of New Jersey |
| | 1983-present: | Partner, Ruhnke & Barrett, Montclair, New Jersey |

**EXHIBIT 1 pg. 192**

Exhibit J-83

DAVID A. RUHNKE<br>
Death Penalty Resume<br>
Page 2

Teaching:        Adjunct faculty member, Seton Hall University Law School, teaching primarily Criminal Law and Criminal Procedure (inactive at present).

Bar
Admissions:

State of New Jersey, 1975
State of New York, 1984
District of New Jersey, 1975
Eastern District of New York, 1983
Southern District of New York, 1983
First Circuit 2004
Third Circuit, 1977
Second Circuit, 1993
Tenth Circuit, 1997
United States Supreme Court, 1983

Memberships: American Bar Association New Jersey Bar Association; National Association of Criminal Defense Lawyers; Association of Criminal Defense Lawyers of New Jersey (Past President and chair of death-penalty committee); New Jersey State Bar Association, Criminal Law Section (former trustee); former member, Death Penalty Subcommittee, Federal Defender Advisory Committee, Administrative Office of the United States Courts (Defender Services Division).

## FEDERAL DEATH-PENALTY CASES (trial level):[1]

- *United States v. Bing Yi Chen* (S.D.N.Y. 2003). Court-appointed by Hon. Deborah K. Batts, U.S.D.J. Double homicide in context of large-scale drug-dealing. Pending authorization decision.

- *United States v. Christian DelRosario* (S.D.N.Y. 2003). Court-appointed by Hon. Gerard E. Lynch, U.S.D.J. Double homicide in context of large scale drug-dealing. Pending authorization decision.

- *United States v. Albert Burgos* (S.D.N.Y. 2003). Court-appointed by Hon. Loretta A. Preska, U.S.D.J. Single murder occurring in context of drug-dealing and gang activity. Pending authorization decision.

- *United States v. Freddy Abad* (S.D.N.Y. 2002). Court-appointed by Hon. George P. Daniels. Indictment alleges single murder, accompanied by torture and home invasion, of reputed drug dealer in unsuccessful effort to steal drugs and money.

---

[1] The date shown is the year of entry into the case as retained or appointed counsel.

**EXHIBIT 1 pg. 193**

Exhibit J-84

DAVID A. RUHNKE
Death Penalty Resume
Page 3

Death penalty was not sought after it was demonstrated the defendant was mentally retarded.

- *United States v. John Petrucelli* (S.D.N.Y. 2002). Court-appointed by Hon. Thomas P. Griesa. Defendant accused of single murder occurring in 1995 in an organized crime context. United States did not request authorization to seek the death penalty.

- *United States v. Gary Lee Sampson* (D.Mass. 2001). Court-appointed by Hon. Mark L. Wolf, U.S.D.J. Defendant guilty of committing three murders in Massachusetts and New Hampshire while on run from bank robbery prosecution. Case tried from September through December 23, 2003. Death verdict. Pending appeal.

- *United States v. Michael O'Driscoll* (M.D.Pa. 2001). Court-appointed by Hon. Malcolm Muir, Senior Judge. Prisoner kills fellow prisoner at the United States Penitentiary, Allenwood. Defendant alleged to have a long and serious history of violence, including prior murder. Case authorized for capital prosecution. On March 4, 2003, non-unanimous jury returned life verdict.

- *United States v. Elijah Bobby Williams* (S.D.N.Y. 2000). Court-appointed by Hon. Naomi Reice Buchwald, U.S.D.J. Case brought pursuant to the Federal Death Penalty Act of 1994 and involves an allegation of a triple homicide occurring in the context of large-scale drug trafficking and racketeering. Case authorized for capital punishment, over contrary recommendation of United States Attorney. Pending trial March 2005.

- *United States v. Khalfan Khamis Mohamed* (S.D.N.Y. 1999). Court-appointed by Hon. Leonard Sand, U.S.D.J. Case brought pursuant to Federal Death Penalty Act of 1994 and charged the defendant with participation in the August 1998 bombings of the American Embassies in Kenya and Tanzania, allegedly at the behest of the lead defendant, Usama Bin Laden. Case began trial January 3, 2001. Defendant convicted of the murder of 11 people in the bombing of the embassy in Dar es Salaam. On July 10, 2001, at severed penalty-phase, non-unanimous jury returned life verdict. Capital co-defendant also received a life verdict. Defendant withdrew appeal of underlying conviction.

- *United States v. Anthony Greco* (S.D.N.Y. 1999). Court-appointed by Hon. Lawrence McKenna. Case brought pursuant to Federal Death Penalty Act of 1994. Alleged single murder in organized crime context. United States did not seek capital authorization.

- *United States v. John Tibbs* (D.Mass. 1999). Court-appointed by Hon. Nancy Gertner, U.S.D.J. Drug "kingpin" case. Single murder. Department of Justice did

**EXHIBIT 1 pg. 194**

Exhibit J-85    953

not authorize for capital prosecution.

• *United States v. Lee Arthur Taylor* (D.Mass 1999). Court-appointed by Hon. Nancy Gertner, U.S.D.J. Drug "kingpin" case. Single murder. Department of Justice did not authorize for capital prosecution.

• *United States v. Joseph Calco* (E.D.N.Y. 1999). Court-appointed by Hon. Edward R. Korman, U.S.D.J. Three murders set in organized crime/narcotics trafficking context. Defendant entered into cooperation agreement with the United States and death-penalty not sought.

• *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y. 1998). Retained as co-counsel to Gerald Shargel, Esquire. Brought pursuant to Federal Death Penalty Act of 1994. Millionaire Sikh businessman charged with two murders-for-hire to silence witnesses to fraudulent scheme. Convicted after eight-week trial. Penalty phase ended in unanimous life verdict.

• *United States v. Clarence Heatley* (S.D.N.Y. 1996). Court-appointed by Hon. Sonia Sotomayor, U.S.D.J. Drug "kingpin" case. Nineteen murders. Death penalty authorized for Heatley and co-defendant. Both capital defendants plead out to life sentences.

• *United States v. Moses Clary* (D.N.J. 1996). Court-appointed by Hon. Joseph Rodriquez as co-counsel to Federal Public Defender. Brought pursuant to Federal Death Penalty Act of 1994. Bank-robbery shoot-out at suburban shopping mall. Two bystanders and one perp killed. Security guard wounded. (Guard killed one by-sander; dead perp killed other. Clary is the survivor.) Death-penalty authorized. Plead to life sentence.

• *United States v. David Paul Hammer* (M.D. Pa. 1996). Court-appointed by Hon. Malcolm Muir, U.S.D.J. Case brought pursuant to Federal Death Penalty Act of 1994. Prison killing at U.S.P./Allenwood. Defendant charged with strangling cellmate. Defendant confessed in grisly detail, said he did not fear the death-penalty and that, given the opportunity, he would kill again. Was serving equivalent of life sentences from Oklahoma. In federal custody as "transfer" since Oklahoma could not keep him from running economic and other scams from Oklahoma State Prison. IQ of 138. Death-penalty authorized and death verdict returned 7/98. Client withdrew appeal in order to speed his execution. *United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000). Client changed mind again and execution date of 11/15/00 was vacated. Petition for post-conviction relief is presently pending at the district court level.

• *United States v. Chen* (E.D.N.Y. 1995). Court-appointed by Hon. Edward R.

EXHIBIT 1 pg. 195

Exhibit J-86    954

Korman, U.S.D.J. Case brought pursuant to Federal Death Penalty Act of 1994. Charged rape/torture/shooting death of Chinese immigrant held captive for ransom and/or repayment of fees owed to smugglers. Department of Justice authorized capital prosecution in summer of 1996. Plead guilty to life sentence.

• *United States v. Christopher Green* (D.N.J. 1995). Court-appointed by the Hon. Joseph H. Rodriguez, U.S.D.J., as co-counsel to Federal Public Defender. Case brought pursuant to Federal Death Penalty Act of 1994. On March 21, 1995, Christopher Green, a 29 year-old man with no criminal record, entered a small postal sub-station in Montclair, New Jersey and announced a robbery. After receiving approximately $5,000, he ordered the five people in the post office — two postal employees and three customers — to the ground and methodically shot each in the head with a 9mm pistol loaded with "Black Talon" bullets. Four of the individuals died instantly; the fifth survived made a full recovery. After several negotiating sessions, the United States Attorney dropped her request for the death penalty and, on June 8, 1995, Green entered a guilty plea to the indictment and was sentenced to a life sentence without parole on September 22, 1995.

• *Moore v. Reynolds* (W.D.Ok 1994). Court-appointed by Hon. Robin J. Cauthron, U.S.D.J., to represent death-sentenced Oklahoma inmate on federal habeas. Petition denied January, 1997. Decision affirmed by divided panel of Tenth Circuit. *Moore v. Reynolds*, 153 F.3d 1086 (10th Cir. 1998). Supreme Court denied *certiorari*. Board of Pardon and Parole refused clemency. Client executed 6/3/99.

• *United States v. Tyrone Walker* (N.D.N.Y. 1994). Court-appointed by Hon. Thomas J. McAvoy, Chief Judge. Drug "kingpin" case. Case went to trial from October 1995 to February 1996. Convicted. At penalty, jury found defendant responsible for two additional murders. Jury returned a non-unanimous life verdict.

• *United States v. Michael Murray* (M.D.Pa. 1993). Court-appointed by Hon. Sylvia H. Rambo, Chief Judge. Drug "kingpin" case. Young client (19) charged with drug-related shooting of 20 year-old drug-dealer. Alleged "kingpin," although charged with having ordered killing, did not face death penalty. Case plead out on June 16, 1994 after one week of jury selection to max 27-year sentence. Unfortunately, the trial judge rejected the plea bargain and in late June, 1995 the defendant was permitted to retract his guilty plea. The case was scheduled to go to trial on July 21, 1995. Defense counsel sought Justice Department review of the decision to seek the death penalty and, over the objection of the local United States Attorney, Attorney General Reno withdrew capital authorization. The case went to trial as a non-capital murder case and defendant was convicted and sentenced to life imprisonment. Murder conviction reversed by Third Circuit 1/3/97. *United States v. Murray*, 103 F.3d 310 (3d Cir. 1997) (Trial court erred in admitting second murder on 404(b)

**EXHIBIT 1 pg. 196**

Exhibit J-87

basis); *but see, United States v. Murray,* 144 F.3d 270 (3d Cir. 1998) (Permissible to re-sentence defendant to life sentence on drug counts without conducting new trial on reversed murder charge).

- *United States v. Dandeny Munoz-Mosquera* (E.D.N.Y. 1993). Court-appointed by the Hon. Sterling Johnson. Drug "kingpin" case. Defendant alleged "assassin" for the Medillin Cocaine Cartel; co-defendant was the late Pablo Escobar, alleged head of the cartel and then a fugitive in the Republic of Colombia. The capital count charged mid-air bombing of a domestic Colombia airliner (Avianca Airlines) in which 110 people — including two American citizens — were killed. The United States Attorney in Brooklyn eventually declined to seek Justice Department authorization and the case went to trial as non-capital prosecution.

- *United States v. Thomas Pitera* (E.D.N.Y. 1992). Court-appointed by the Hon. Reena Raggi, U.S.D.J. Drug "kingpin" case. First such prosecution in Eastern District of New York., Case alleged nine murders set in context of organized-crime RICO and CCE. Client was 38-year old alleged male [you have made] member of Bonnano organized crime family. At conclusion of guilt-phase, jury convicted client of seven homicides. At death-penalty phase, divided jury returned life verdict.

- *United States v. Bilal Pretlow* (D.N.J. 1992). Court-appointed by the Hon. Harold A. Ackerman, U.S.D.J. Drug "kingpin" case. First such case in District of New Jersey. After several weeks of trial, 21-year old client committed suicide by hanging self in jail cell.

STATE DEATH-PENALTY CASES (trial level):

- *State v. James Minett* (New Jersey Superior Court 1996). Murder-for-hire of defendant's girlfriend. Shooter cooperated and testified. Life verdict spring 1998. Conviction affirmed on appeal. Pending federal habeas filing.

- *State v. William David Jones* (New Jersey Superior Court 1995). Designated counsel by Public Defender. On July 19, 1995 defendant was arrested for knife-, bat- and pitchfork-slaying of acquaintance. Related charge of sexual assault. Case tried in fall of 1999 into early 2000. Jury convicted of capital murder after seven days of deliberations. Jury deliberated slightly over one hour after three-day penalty-phase presentation and did not find any aggravating factors. Guilt-phase verdict pending appeal.

- *State v. Eddie Lee Oliver a/k/a Al Damany Kamau* (New Jersey Superior Court 1993). Designated counsel by the Office of the Public Defender. Defendant charged with June 3, 1993 murder of a Newark Police Officer as he waited to testify in the

**EXHIBIT 1 pg. 197**
Exhibit J-88

DAVID A. RUHNKE
Death Penalty Resume
Page 7

hallway outside a courtroom on the 11th floor of the Essex County Courthouse in Newark, New Jersey. In the ensuing escape attempt, a sheriff's officer was shot in the chest. Defense was insanity. Jury convicted after five days of deliberations but, after two days of penalty deliberations, returned a non-unanimous verdict rejecting death penalty.

- *State v. Anthony McDougald* (New Jersey Superior Court 1990). Designated counsel by the Office of the Public Defender. This was a double-murder by stabbing of the parents of the 13-year old girlfriend of 27-year old defendant. After the murder, he inserted baseball bat into the vagina of the mother with the comment that this was in retaliation for her having given birth to the 13-year-old. Aggravating factors are that the murders were outrageously and wantonly vile and that there were committed to avoid prosecution for another offense. (The statutory rape of the 13-year-old.) This case was a penalty-only re-trial after the New Jersey Supreme Court affirmed the murder convictions but vacated the death verdict. See *State v. McDougald*, 120 N.J. 523, 577 A.2d 419 (1990). On November 18, 1995, following six weeks of jury selection and a two-week trial, the jury returned a verdict for life.

- *State v. Bryan Coyle* (New Jersey Superior Court, 1991). Designated counsel by the Office of the Public Defender. This was a shooting death of the husband of a woman with whom defendant was romantically involved. Aggravating factors were that defendant has a prior murder conviction and that the filling was outrageous and wantonly vile in that it was a killing committed purely for the pleasure of killing. First jury convicted and imposed death sentence. This was a re-trial following the New Jersey Supreme Court's reversal of both the guilt- and penalty- phase verdicts. See *State v. Coyle*, 119 N.J. 194, 574 A.2d 951 (1990). After plea negotiations, prosecution withdrew aggravating factors and defendant plead guilty to murder and was sentenced to 30 years.

- *State v. Julius Boeglin* (New Jersey Superior Court 1990). Retained as counsel to handle pre-trial motions and jury-selection only. Aggravating factors are murder-by-hire and avoiding detection for another offense. Allegations were defendant — the son of a millionaire industrialist — paid another to kill victim for informing on defendant's drug activities. Case went to trial with substituted counsel and jury returned verdict of non-capital murder.

- *State v. James Jerald Koedatich* (New Jersey Superior Court, 1990). Designated counsel by the Office of the Public Defender.) Case involved the kidnaping, sexual assault and stabbing murder of an 18-year old adopted Korean girl. Aggravating factors were the defendant's two prior murder convictions; that murder was committed in a manner that was outrageous and wantonly vile; that murder was committed for the purpose of escaping detection for the other felonies; and that

**EXHIBIT 1 pg. 198**

Exhibit J-89

DAVID A. RUHNKE
Death Penalty Resume
Page 8

murder was committed in the course of certain other felonies. This was a penalty-phase only re-trial. Because of the massive publicity, venue was moved out of the county where the crime occurred to a rural adjacent county. Trial took place in the summer of 1990. Jury selection took approximately five weeks. There was one week of penalty-phase evidence. Jury was unable to agree unanimously on whether the death penalty should be imposed and, therefore, as required by New Jersey law, defendant was sentenced to life imprisonment.

- *State v. Eneida Berrios* (New Jersey Superior Court, 1983). Designated counsel by the Office of the Public Defender. Case involved the arson-murder of a six-year old child motivated by an argument between two families in the City of Newark. Building was set on fire in the middle of the night. Child was trapped. Aggravating factors were that defendant hired the arsonist and that the murder was outrageously and wantonly vile. Case tried in 1986. Defendant found not guilty at conclusion of guilt phase.

### APPELLATE DEATH-PENALTY EXPERIENCE

- *State of Delaware v. Thomas Capano*, 781 A.2d 556 ((Del.Supreme Ct. 2001). Retained as appellate co-counsel to politically prominent attorney found guilty of murdering his girlfriend (appointments secretary to the Governor of Delaware) and disposing of her body at sea. Sentenced to death. Conviction and sentence of death affirmed by Delaware Supreme Court. *Certiorari* petition pending in United States Supreme Court raising *Apprendi* challenge to Delaware capital punishment scheme. Outcome of case will be controlled by analysis of the United States Supreme Court's decision in *Ring v. Arizona*. Case is now in state post-conviction at the trial level.

- *State v. John Martini, Sr.*, 144 N.J. 603, 678 A.2d 164 (1996). Martini was New Jersey's first potential "volunteer" for execution. Served as counsel to *amicus curiae*, the Association of Criminal Defense Lawyers of New Jersey, taking the position that an otherwise competent defendant may not waive a state court post-conviction challenge to a death sentence where the attorneys handling the case are of the view that there are meritorious issues to be presented. Court accepted that argument. Societal interest in reliability of death sentences outweighs individual defendant's wish to forgo post-conviction review. *State v. Martini*, 144 N.J. 603, 678 A.2d 164 (1996).

- *State v. Marshall*, 130 N.J. 109, 613 A.2d 1059 (1992). *Marshall* was the first death sentence affirmed by the New Jersey Supreme Court. See, 123 N.J. 1, 586 A.2d 85 (1991). (Defendant was convicted of hiring others to murder his wife for insurance proceeds and was subject of book and made-for-TV movie entitled "Blind Faith.") In this aspect of *Marshall*, served as counsel to *amicus curiae*, the American Civil

**EXHIBIT 1 pg. 199**
Exhibit J-90

Liberties Union of New Jersey, concerning the methodology to be employed by the New Jersey Supreme Court in carrying out statutorily-mandated proportionality review.

- *State v. Koedatich*, 112 N.J. 225, 548 A.2d 939 (1988). Defendant originally tried and sentenced to death in 1984. Firm became involved in the case on direct appeal to the New Jersey Supreme Court. Above-cited opinion affirmed defendant's underlying convictions by 4-3 vote but unanimously vacated the death penalty. See also, *State v. Koedatich*, 118 N.J. 513, 572 A.2d 622 (1990). State appealed trial court's decision to grant motion striking two of four aggravating factors on ground that previous penalty-phase jury had not been able to reach a unanimous finding that those aggravating factors existed. The New Jersey Supreme Court, in another 4-3 opinion, reversed the trial court and re-instated the dismissed aggravating factors which were then presented to the jury when the penalty-phase was re-tried in the summer of 1990. Jury returned life verdict.

## OTHER RELEVANT EXPERIENCE

- Qualified and testified as expert witness in area of effective assistance of counsel in handling guilt- and penalty-phases of capital-murder cases: *State v. Jermaine Wright* (Delaware Superior Court 1994); *Hooks v. Ward*, (U.S. Dist. Ct., W.D.Ok. 1997); *State v. Jackson*, (Delaware Superior Court 1998); *Mollett v. Ward* (U.S. Dist. Ct. W.D.Ok. 2000); *State v. Donald Loftin* (N.J. Superior Court 2004).

- April, 2004. Faculty Member, Capital Trial Advocacy Program, Plano, Texas. Small group leader and plenary presentations on mitigating evidence and future danger.

- March 2004. Faculty member and presenter Life in the Balance program, Memphis, Tennessee. Presented small group and plenary sessions on mitigation, closing instructions and penalty-phase summation.

- February 2004. Presentation at the mid-winter meeting of the Association of Criminal Defense Lawyers at San Antonio,. Texas, "Putting a Human Face on the Despised."

- July 2003. Presentation, the Airlie Conference, 2003 NAACP Legal Defense Fund, Inc. Capital Punishment Conference, Warrenton, Virginia: "What we are Learning About Mitigation: Findings from the LifeVote Project."

- March 2003. Faculty member at Federal Strategy Session and Life in the Balance programs, Austin, Texas.

**EXHIBIT 1 pg. 200**

Exhibit J-91

DAVID A. RUHNKE<br>
Death Penalty Resume<br>
Page 10

- February 2003. Faculty Member, Virginia Death Penalty College, Richmond, Virginia.

- October 2002. Presentation to First Circuit Judicial Conference, Chatham, MA. "The Ability of the Federal Courts to Handle Cases of International Terrorism."

- August 2002. Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA

- April 23, 2002, Presentation, Internal Law Society, Suffolk University Law School, Boston, "International Law Issues Arising from the Embassy Bombing Case."

- National Seminar for Federal Defenders, Philadelphia, March 13-15, 2002. Presentation, "Mitigating Evidence in Death Penalty Cases."

- 2002 Federal Capital Defense Strategy Session, Kansas City, MO, March 8, 9, 2002. Presentations: Discussion Leader, Caucus of First, Second and Third Circuits; "Political and Terrorist Prosecutions," (with Jerry Zerkin and David Bruck); "Mitigation: Federal Jury Findings" (with Margaret O'Donnell and William Brennan); "Ethical Considerations in Federal Capital Cases" (with Carol Kolinchak and David Lewis); "Litigating Racial, Ethnic and Geographic Diversity" (with Sam Gross and Tim Sullivan); "Mitigation that Opens the Door" (with Jerry Zerkin, David Bruck and Mark Cunningham).

- Faculty Member, South Carolina Bar Association's 17th Annual Update on the Criminal Law, Charleston, South Carolina January 2002, Panel, "The Criminal Law in the Aftermath of September 11."

- Faculty Member, Capital Trial Advocacy Program, Austin Texas, January 2002. Small group leader and plenary presentation, "Thinking About, Discovering and Presenting Mitigating Evidence"

- Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA, August 2001.

- Daylong seminar, "Saving Lives in a New Millennium," co-sponsored by the Association of Criminal Defense Lawyers of New Jersey and the ABA Death Penalty Representation Project, moderator and speaker, "Capital Cases – Answering the Hardest Question," East Brunswick, N.J., March 17, 2001

- Presentation, Federal Death Penalty Strategy Session, "Volunteers – Dealing With the Client Who has Lost the Will to Fight," Albuquerque, NM, March 3, 2001

**EXHIBIT 1 pg. 201**

Exhibit J-92

- August 2000. Presentation, the Airlie Conference, 2000 NAACP Legal Defense Fund, Inc. Capital Punishment Conference, Warrenton, Virginia: "Jury-Selection in Capital Cases."

- Faculty Member, Clarence Darrow Darrow Death Penalty College, University of Michigan Law School, Ann Arbor, MI, May 2000

- Presentation, Federal Death Penalty Strategy Session, "The Department of Justice and the Authorization Process," Crystal City, MD, March, 2000.

- Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA, August 1999.

- Presentation to Federal Defense Investigators Conference, New Orleans, LA, May 1999, "Investigating Mitigating Evidence."

- Life in the Balance, Atlanta, GA, May 1999 (National Legal Aid and Defenders Association), faculty member. Presentation at special federal death-penalty seminar and on "What to do When a Client Volunteers for Execution?" and "Opening Address to the Jury at a Penalty Phase."

- American Academy of Forensic Psychology, Philadelphia, PA, April 1998, co-presenter, with Alan Goldstein, Ph.D., of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."

- American Academy of Forensic Psychology, Palm Springs, CA, January 1998, co-presenter, with Alan Goldstein, Ph.D., of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."

- American Academy of Forensic Psychology, New Orleans, LA, January 1997, co-presenter, with Alan Goldstein, Ph.D. and Jean D. Barrett, Esquire, of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."

- Life in the Balance, Dallas, TX, March 1997 (National Legal Aid and Defender Association), faculty member. Presentations on "Cross-examining the Government's Expert;" "Working with Expert Witnesses;" "Brainstorming the Case;" and "Direct Examination of Penalty-Phase Witnesses."

- Presentation, seminar sponsored by Federal Judicial Center, "Appellate Capital Case Issues: the Attorney's Perspective," Miami, FL, August 5, 1996.

**EXHIBIT 1 pg. 202**

Exhibit J-93

DAVID A. RUHNKE
Death Penalty Resume
Page 12

- Presentation, "Death is Different," at training seminar sponsored by New York Capital Defender Organization, Rochester, NY, March 1996.

- Presentation, the Airlie Conference, 1996 NAACP Legal Defense Fund, Inc. Capital Punishment Conference, "Hard Lessons Learned from Federal Death Penalty Cases," July 26, 1996 at Georgetown University, Washington, D.C.

- Presentation, "Death is Different," at training seminar sponsored by New York Capital Defender Organization, White Plains, NY, October, 1995.

- Presentation, "Counsel in Federal Death Penalty Cases," 1995 meeting of Federal Defenders and Resource Center Directors, Marco Island, FL, January 1995.

- Presentation, "Why Death is Different," New York Association of Criminal Defense Lawyers, N.Y.U. Law School, New York, NY, February 1995.

- Presentation, "Opening Arguments in a Death Penalty Case," Life in the Balance (National Legal Aid and Defender Association), Austin, TX, March 1994.

- Presentation, "The Federal Death Penalty," July 1994 Capital Punishment Conference, NAACP Legal Defense Fund, Inc., Warrenton, VA.

- Presentation, "Litigating the Federal Death Penalty Case," Ohio Association of Criminal Defense Lawyers, Columbus, OH, December 2, 1994.

- Presentation, "Opening and Closing in Theme," 1993 Capital Punishment Conference, NAACP Legal Defense Fund, Inc., Warrenton, VA.

- Keynote speaker and panel member, "Saving Client's Lives in the 90's." Day-long seminar presented by the Association of Criminal Defense Attorneys of New Jersey, New Brunswick, N.J., Spring 1993.

**EXHIBIT 1 pg. 203**

Exhibit J-94



MARK A. BEZY & ASSOCIATES, LLC
CORRECTIONAL CONSULTING

3587 East Sierrita Rd. San Tan Valley, AZ 85143
Phone. 480.588.5835 • Cell. 330.559.6079 • markabezy@gmail.com

My name is Mark A. Bezy, and I have over 36 years working as a correctional professional which involved managing and assessing male and female prisoners. My curriculum vitae is attached; for ease of reference, I note the following particularly relevant facts: At the time of my retirement from the Federal Bureau of Prisons (BOP), I maintained a Top Secret Security Clearance and of the date of this report, I still hold a Top Secret Security Clearance. From 2004 to 2006, I was Warden of the BOP Federal Correctional Complex in Terre Haute, Indiana, which housed 37 death-sentenced adult male inmates, as well as 1,500 High Security adult male inmates, 1200 Medium Security adult male inmates, and 450 Minimum Security adult male inmates. From 2002 to 2004, I was Warden of the BOP Federal Correctional Institution in Elkton, Ohio, which housed 2,400 Low Security adult male inmates. From 2006 to 2008, I was Warden of the Central Arizona Correctional Facility in Florence, Arizona, which housed 1000 Medium Custody adult male sex offenders. From 1999 to 2002, I was Associate Warden of the BOP United States Penitentiary in Leavenworth, Kansas, which housed 1,500 High Security adult male inmates. Prior to serving in those capacities, I was Captain of BOP facilities in Marion, Illinois; Lexington, Kentucky; and Ray Brook, New York. I have also served in other positions at BOP facilities in Belmont, California; Phoenix, Arizona; Duluth, Minnesota; Kansas City, Kansas; and Oxford, Wisconsin. Currently, I am the Owner and President of Mark A. Bezy and Associates, LLC, a correctional consulting company. In that role, I advise prisons in the management of inmate populations, including by providing risk assessment.

Through this work I have become an expert in conducting risk assessments of prison populations, including populations significantly comprised of inmates convicted of violent offenses and inmates who are members of Disruptive Groups and Security Threat Groups. Managing the behavior of offenders at higher security levels presents substantial challenges, because 71 percent of offenders in high-security custody have been sanctioned for violating prison rules, and more than 90 percent of such offenders have a history of violence. Moreover, one out of every four offenders in high-security custody is gang-affiliated.

Based on this professional experience and my analysis of the prison records of inmate Brandon Bernard, it is my assessment that Bernard has followed the program goals/requests of his Unit Team and has maintained clear conduct (*i.e.*, has not been sanctioned for a violation of prison rules) since 2000 while confined in the Special Confinement Unit (Federal Death Row). Based on that evidence, it is my opinion that if Bernard were sentenced to imprisonment for life without parole, he could function well in a less-restrictive environment without posing a risk to institutional security and good order, or posing a risk to the safety and security of staff, inmates or the general public.

A brief summary of Bernard's prison records follows:

In July of 1998, Bernard was arrested in the Western District of Texas for Theft by Receiving Stolen Property. Those charges were later dismissed, superseded by charges for Conspiracy to Commit Murder, Carjacking, First Degree Murder on a Government Reservation, and Aiding and Abetting. Bernard was convicted on those charges, three of which carried a potential death sentence. On June 16, 2000, a jury sentenced Bernard to death on one count of First Degree Murder and to life imprisonment without the possibility of release on each of the other death-eligible counts.

In the instant offense, Bernard was a party to a carjacking plan that involved abducting two victims in their car. Another participant in the crimes ultimately shot both victims to death in their car trunk, and their car was set on fire.

After his arrest, Bernard was housed in the McLennan County Jail Facility from June 23, 1999 to June 13, 2000. During that time, he received two (2) Disciplinary Reports. On 10-15-99, he was charged with Tampering with any Plumbing, Water, Electric or TV Fixture. His punishment was 5 days' Segregation with Loss of All Privileges. On 12-24-99,

EXHIBIT 1 pg. 204

1

Exhibit K-1

he was charged with Cursing at a Staff Member. His punishment was 3 days' Disciplinary Segregation and Loss of all Privileges. There were no other problems reported with Bernard at the McLennan County Jail Facility.

Bernard's record within the Bureau of Prisons likewise reflects that he is a program-compliant inmate. He has been assigned to the position of Orderly on the Special Confinement Unit on multiple occasions. Orderly is the only job position available to an inmate in the Special Confinement Unit, and there are fewer Orderly positions than there are inmates who seek to serve in them. For that reason, inmates rotate in and out of the positions over time. Orderlies work in different locations around the unit and with unit staff, under staff supervision and wearing no restraints. Because Orderlies have access to mops, brooms, and other implements that can be turned into weapons or are inherently dangerous, that assignment necessarily entails the BOP's assessment that inmate Bernard presents no security risk and poses no danger to staff or other inmates.

The record also reflects that Bernard has had, and continues to have, a solid support base with his family and friends. Again, it should be noted that Bernard has not received a single Incident Report for violating any prohibited act in the Inmate Disciplinary Program for over 16 years on the Special Confinement Unit (Death Row). This is remarkable. I am unaware of any other inmate who has been on the federal Death Row for at least 16 years without receiving a single incident report.

During Bernard's sentencing hearing, the government raised the issue of his gang involvement, suggesting that an inmate identified with the Bloods gang in the outside world would necessarily affiliate with the Bloods gang in prison, and cause problems in prison because of that affiliation. The trial record suggests that whatever "gang" Bernard may have been involved with prior to his admission to the Bureau of Prisons was not terribly well organized. Moreover, in my opinion the trial testimony that suggested that Bernard would necessarily associate with any such gang in prison was exaggerated and inaccurate. The truth of the matter is that the Bloods lack a common leadership or council which would direct or influence all Blood sets; because of this lack of centralized leadership, an individual who may have associated himself with some Blood set in the neighborhood where he grew up will not necessarily associate himself with a similar set in prison. And it should be noted that the Bureau of Prisons classifies the Bloods as a "Security Threat Group," which reflects a lower level of violence than that exhibited by groups that the BOP deems "Disruptive." This fact seems to have been left out of the future dangerousness testimony presented in Bernard's trial, which suggested incorrectly that the Bloods were among the most dangerous entities that the BOP confronts. In any event, nothing in Bernard's records suggests that he has affiliated with any gang inside the BOP. Indeed, his record of zero disciplinary infractions in 16 years is strong evidence of no gang involvement, since gang activity in prison frequently leads directly to disciplinary infractions (indeed, simply displaying gang paraphernalia, clothing, signs, etc., is itself a disciplinary infraction).

For the above reasons, I anticipate that should Bernard's death sentence be commuted, he could and would function exceptionally well in a less-restrictive environment without posing any risk to institutional security and good order, or posing any risk to the safety and security of staff, inmates or others.

Mark A. Bezy

Date 8/20/2016

**EXHIBIT 1 pg. 205**

Exhibit K-2

 B. Bernard
Chris Tyner
to:
stacey_brownstein, charles_formosa
03/15/2015 01:50 PM
Hide Details
From: Chris Tyner
To: stacey_brownstein@fd.org, charles_formosa@fd.org

Good afternoon Stacey & Charles,

I hope this email finds you well.

I received your calls this week however I have been on spring break and have not checked messages until today.

In regards to Mr. Bernard and the conversation we discussed several weeks ago regarding his appeal to the U.S. Supreme Court, I give my approval to move forward with a life in prison without parole sentence vs. the death penalty.

Please do not hesitate to contact me if you need further information.

Blessings,

Chris Tyner

**EXHIBIT 1 pg. 206**

Exhibit L-1

Declaration of Charles Formosa

I, Charles Formosa, make the following declaration:

1.  My name is Charles Formosa. I am an investigator with the Federal Public Defender's Office for the Western District of Washington, where I have been employed since February of 2007. I have been an investigator since July of 1995, and my entire career has been as a defense investigator. From July 1995 through November 1998, I was employed by the Office of the Capital Collateral Representative in Florida, where I was assigned to investigate the cases of inmates sentenced to death by the State of Florida throughout state post-conviction proceedings and habeas corpus review. From November 1998 to February 2007, I was employed by the Federal Public Defender's Office in the Eastern District of California, where I was assigned to investigate the cases of inmates sentenced to death by the State of California during *Habeas Corpus* review.

2.  I and Stacey Brownstein, another Federal Public Defender investigator, were assigned to conduct investigation for Mr. Bernard's habeas petition and subsequently, his clemency. Ms. Brownstein and I met with a number of witnesses and explored many issues and facts from the guilt and mitigation phases of Mr. Bernard's trial, including issues and facts that were never presented during Mr. Bernard's trial. I also explored issues and facts related to Mr. Bernard's clemency petition.

3.  Reverend Elmer "Jack" Hetzel, who ministered to Mr. Bernard when he was a teenager awaiting trial, was one of the witnesses Ms. Brownstein and I interviewed. Reverend Hetzel told Ms. Brownstein and me that he unequivocally supported the death penalty and felt that most people sentenced to death deserved to be executed. Despite being a supporter of the death penalty, Mr. Hetzel felt that Mr. Bernard did not deserve a death sentence. The reasons that he

1

EXHIBIT 1 pg. 207

Exhibit M-1

cited in support of this belief were that Brandon was very young at the time of the crime, was not a leader in the offense, and was sincerely remorseful for his crime.

4.  During the Clemency Petition investigation, Ms. Brownstein and I also attempted to contact all of the jurors in Mr. Bernard's case to ask them about their experiences as jurors, to inform them about the status of the case, and to talk to them about newly developed information related to both the guilt and mitigation phases of Mr. Bernard's trial that was never presented to them by Mr. Bernard's trial attorneys. We also discussed with them Mr. Bernard's remarkable and unblemished adjustment to prison, especially given that they had heard from Dr. Coons during the penalty phase that he would not adapt well, would be dangerous in prison, and should therefore be put to death. We also wanted to talk to them about any questions they might have had about the trial they had been curious about and never been able to ask. To the extent we could do so consistent with the attorney-client privilege, we also offered them information about the status of Mr. Bernard's case in the process of post-trial judicial and executive review.

5.  While locating the jurors so we could speak with them, we learned that three of the twelve jurors -- Mr. Johnnie Sledge, Mr. Ronald Sulak, and Mr. Harvey Raesz – had passed away. We located and attempted to contact the nine surviving jurors.[1]

6.  Four of nine serving jurors wrote declarations that either actively support Mr. Bernard's petition for clemency or do not oppose this petition. These jurors are Calvin Kruger (the presiding juror), Jason Fuller, Gary McClung, Jr., and Laird Cooper. True and correct copies of these declarations are attached to Mr. Bernard's petition as Exhibits A, B, D, and H, respectively.

7.  A fifth juror, Chris Tyner, wrote an e-mail giving his "approval to move forward with a life in prison" sentence for Brandon. A true and correct copy of this email sent to both Ms. Brownstein

---

[1] Three of those nine declined to speak with us, and one who did speak with us declined to provide any statement for use in this petition

2

EXHIBIT 1 pg. 208

Exhibit M-2

and me is attached to Mr. Bernard's clemency application as Exhibit K.   During our interview of Mr. Tyner, he was more open with his thoughts.  He told us that Mr. Bernard's trial attorneys had done a terrible job and seemed overwhelmed.  He added that other jurors had the same view, and that the poor performance of Mr. Bernard's lawyers was discussed during the jury's deliberations.  Mr. Tyner said it was almost like Mr. Bernard had no legal representation at all, and that is was like they "laid down" for the prosecution.  Mr. Tyner said Mr. Bernard made some bad choices, like not trying to stop Mr. Vialva from shooting the Bagleys.  When we showed Mr. Tyner the Declaration of Medical Examiner Stephen Pustilnik, who opined that it was likely that Mrs. Bagley was immediately rendered medically dead by Christopher Vialva's gunshot, Mr. Tyner became emotionally upset because he had not been presented this information at trial.   He stated that this information would have been important to know at trial and was an example of what Mr. Bernard's trial attorneys should have done for him.  He stated that from the way the evidence was introduced and argued during Mr. Bernard's trial, he was left with the understanding that Mrs. Bagley was alive and feeling pain from the fire as she died, and that was the view he took into the jury's deliberations.  Everything considered, Mr. Tyner said that he did not have an issue if Mr. Bernard had his death sentence commuted to life.  It would not matter to him if that happened through the Clemency process or through the court process. Ultimately, he would not feel like his decision at sentencing would be invalidated by a change of sentence, whether it was by the courts or the President. It was clear that Mr. Tyner's discussion with us was extremely emotional and unnerving for him.  Several times after the interview and email, Ms. Brownstein and I attempted again to speak with Mr. Tyner.  We hoped to ask him to expand on his email and possibly providing a fuller written statement. Unfortunately, we were unsuccessful in our attempts.

3

EXHIBIT 1 pg. 209

Exhibit M-3

I have read the foregoing declaration and under the laws of the United States and the State of

Washington, I declare under penalty of perjury that this declaration is true and correct.

Executed at Seattle, WA on    9/16/16 .

Charles Formosa

EXHIBIT 1 pg. 210

Exhibit M-4

**Declaration of Stacey Brownstein**

I, Stacey Brownstein make the following declaration:

1.    My name is Stacey Brownstein.  I am an investigator at the Federal Public Defender for the Western District of Washington.  I have been employed by the Federal Public Defender since September 2012. I hold a master's degree in criminology and a certificate in private investigations. I have been a defense investigator since June 2009. As part my job, I was assigned to work in support of Brandon Bernard's habeas corpus petition and then subsequently Mr. Bernard's clemency application.    I worked in conjunction with Charles Formosa, another investigator employed by the Federal Public Defender.

2.    In my capacity as one of Mr. Bernard's clemency investigators, I met with a number of witnesses, including six of the nine surviving jurors from Mr. Bernard's trial.  I also conducted other investigation aimed at developing evidence concerning a variety of mitigating facts and issues that were never presented during Mr. Bernard's trial.

3.    One witness we interviewed was Reverend Elmer "Jack" Hetzel. Reverend Hetzel ministered to Mr. Bernard for roughly a year while Mr. Bernard was in jail awaiting trial in Waco. Rev. Hetzel conveyed to Mr. Formosa and me that he is a staunch supporter of the death penalty and believes it is a just and fair sentence for many defendants who receive it. However, Rev. Hetzel was equally adamant that Mr. Bernard is not someone who deserves a death sentence and should not be executed. Rev. Hetzel believes mercy is appropriate because Mr. Bernard was a teenager when

**EXHIBIT 1 pg. 211**

Exhibit N-1

the crime occurred, was not a leader in the offense, and appeared genuinely remorseful for his role in the crime.  Rev. Hetzel explained that Mr. Bernard asked about meeting with a religious advisor soon after being jailed, and after speaking with Mr. Bernard on many occasions Rev. Hetzel came to believe that Mr. Bernard was sincere in all of his attempts to reconcile and come to terms with the horrific crime that he had played a part in.

4.    Mr. Formosa and I also attempted to locate and contact the individuals who served as jurors at Mr. Bernard's trial, to speak with them about their overall experiences as jurors, inform them about the status of the case, and advise them of the many important facts about Mr. Bernard's background and character that had not been presented at trial.  We also wanted to update them about how Mr. Bernard was doing in prison, and make sure they knew that he had behaved extraordinarily well.  We believed that some jurors might have voted for a death sentence based on the testimony of the government's expert, Dr. Coons, who predicted that Mr. Bernard would be dangerous in prison. Mr. Formosa and I also made ourselves available to answer any general questions that we could with regard to the trial and Mr. Bernard's post-conviction appeals and clemency petition.

5.    During the juror outreach phase of our post-conviction investigation, we learned that three of the twelve original jurors had passed away (Mr. Johnnie Sledge, Mr. Ronald Sulak and Mr. Harvey Raesz).  We made contact with the remaining nine jurors.  Of these, three declined to speak with us.  Another was open and willing to discuss the case with us, but ultimately decided not to take a position regarding Mr. Bernard's clemency petition.

**EXHIBIT 1 pg. 212**

Exhibit N-2

6.    Four of nine jurors signed declarations that either actively support Mr. Bernard's petition for clemency or do not oppose his petition.  These jurors are Calvin Kruger (the presiding juror), Jason Fuller, Gary McClung, Jr., and Laird Cooper.  True and correct copies of these declarations are attached to Mr. Bernard's petition as Exhibits A, B, D, and H, respectively.

7.    A fifth juror, Chris Tyner, met with us and later wrote an email giving his "approval to move forward with a life in prison" sentence for Mr. Bernard.  A true and correct copy of this email is attached to Mr. Bernard's clemency application as Exhibit K.  During our initial conversation with Mr. Tyner, when we talked generally about the trial, he relayed that Mr. Bernard's trial attorneys seemed overwhelmed and did a terrible job.  Mr. Tyner remembered that the jurors discussed the poor performance of Mr. Bernard's trial counsel during their deliberations.  Mr. Tyner stated that it was as if Mr. Bernard's trial attorneys had "laid down" for the prosecution.  He stated that it was as if Mr. Bernard had no legal representation at all.  When we showed Mr. Tyner the declaration of Medical Examiner Stephen Pustilnik,[1] which opined that it was likely that Mrs. Bagley was immediately rendered medically dead when she was shot by Christopher Vialva, and it may have not been the fire that caused Mrs. Bagley's death, Mr. Tyner appeared disheartened and taken aback to just be learning this information so many years after the trial.   Mr. Tyner stated that this trial has weighed on him over the years. He stated that this information would have been important to know at trial and Mr. Bernard's attorneys could have brought up these issues and discrepancies with the medical examiner who testified at trial.  He stated that during his deliberations, he believed that Mrs. Bagley was alive and would have felt pain and suffered from the fire.  Mr. Tyner wanted to think more about the new facts presented to him during our

_____

[1] Dr. Pustilnik's declaration is attached to Mr. Bernard's clemency application as Exhibit C.

**EXHIBIT 1 pg. 213**

Exhibit N-3



conversation. It appeared that Dr. Pustilnik's report was impacting Mr. Tyner, as he asked to take it home and review it again. I later followed up with Mr. Tyner to give him the opportunity to talk with us more about his feelings about Mr. Bernard's clemency petition.  Mr. Tyner chose to respond with his email referenced above, in which he gave us his approval to move forward with seeking a life sentence.

I have read the foregoing declaration. Under the laws of the United States and Washington, I declare under the penalty of perjury that this declaration is true and correct.

Executed at Tacoma, WA on: _Sept 16, 2016_

Stacey Brownstein

**EXHIBIT 1 pg. 214**

Exhibit N-4

**JILL MILLER, MSSW**

Forensic Social Work Services          6701 Seybold Road, Suite 122
Madison, Wisconsin 53719
(608) 271-0227
FAX (608) 271-0491

## REPORT

**TO:**      Attorneys Rob Owen & Robert Gombiner
**RE:**      U.S. v. Brandon Bernard, No. W-99-CR-070
Results of Social History Investigation
**DATE:**    June 4, 2004

Brandon Bernard is currently under sentence of death for his role in the car-jacking murders of Todd and Stacie Bagley, which occurred on Ft. Hood, in Bell County, Texas on June 21, 1999. The trial in this case began on May 15, 2000, with jury selection. The government began it's case in chief on May 24, 2000. On June 1, 2000, the jury returned guilty verdicts on all counts charged against Brandon Bernard and his co-defendant, Christopher Vialva. The penalty phase began on June 8, 2000. On June 12, 2000, the jury recommended, by unanimous verdict, that Bernard be sentenced to life imprisonment without the possibility of release for the murder of Todd Bagley, and that he be sentenced to death for the murder of Stacie Bagley.  Brandon Bernard remains confined at the United States Penitentiary in Terre Haute, Indiana during the pendency of his post-conviction proceedings. Christopher Vialva was also sentenced to death in the same trial. Co-defendant Tony Sparks was sentenced to life in prison, and co-defendants Terry Brown and Christopher Lewis, who were juveniles at the time of the offense, are serving sentences in facilities of the US Bureau of Prisons. This report is prepared in support of Brandon Bernard's application for post-conviction relief.

## SOCIAL HISTORY

### Early Family History: 1949 - 1980

Brandon Anthony Micah Bernard was born on July 3, 1980, in San Antonio, Texas, to Thelma Johnson Bernard and Kenneth Bernard. He is the first of their three children. Thelma Johnson was born on February 2, 1952,

**EXHIBIT 1 pg. 215**

Exhibit O-1

in Hayti, Missouri to Versia Mitchell Johnson and L.T. Johnson. She was the eighth of sixteen children born to the Johnsons; and had eight brothers and seven sisters. The Johnson family lived in a poor, rural area in the boot heel of Missouri, and worked as sharecroppers and migrant workers during Thelma's childhood. Thelma recalled that they picked and chopped cotton in Missouri, and went to Michigan in the summers, where they picked blueberries and cherries. She attended school in Michigan during the fall, and in Missouri during the spring. Thelma's sister, Mary Pollock, who is twenty months younger, said that she and Thelma would drive the tractor together as children. She noted that picking cotton was hard, and they didn't like it. Chopping the cotton was easier. Martha Johnson, Mary's twin, said that the large family always had food to eat. They had a large garden. Their mother canned food and sewed their clothes... "we managed." She noted that they did receive government commodities at times.

Versia Johnson is described has having been a strong-willed, "tough", and "God fearing" woman. She was a Seventh Day Adventist and raised her children in that faith. Thelma noted that there was some Native American blood on her mother's side of the family, and also described her maternal great, great grandfather as being very light-skinned... "he could pass as white." He is the ancestor who moved the family to Missouri. Mary Pollock said that their mother was a tough disciplinarian and would whip her children for infractions. Noting that her mother "had babies every two years....got tired", Mary said that her parents' marriage was strained. They would frequently argue. Thelma reported that her father was abusive towards her mother. She witnessed her father hitting her mother, and was determined to never be victimized in a similar fashion. The senior Johnsons separated and were divorced when Thelma was still a child. It appears that financial pressures and the abuse were factors in the divorce, though Martha Johnson thought that her father might also have been seeing another woman. Thelma said that on one occasion, when her father had hit her mother, her older brothers threatened to beat him. He left, and subsequently divorced Versia. Mary reported that her parents marriage was always stormy, and they separated and reconciled several times before finally divorcing.

Thelma is described by her sister Mary as having been a good student, and as always having been independent and strong-willed.... "she wanted to be in charge." Martha said that she always looked up to Thelma and described her as a person who always took care of her responsibilities. Martha said that Thelma was a loving and kind sister. Thelma reported that she started working - apart from the farm work she had always done with her family - at age fifteen, taking a job at the local high school. After graduating from high school in May, 1970, she enrolled in at Oakwood College in Huntsville, Alabama. She worked and had loans to help pay for college. Mary noted that Thelma, having grown up as a middle child in a poor family,

**EXHIBIT 1 pg. 216**

Exhibit O-2

was determined to escape her family's situation. She went to school in Huntsville for two years, then went to live with her older sister, Versia Howard, in Michigan, where she worked in a factory for a year before returning to college. Thelma graduated from Andrews University in Berrien Springs, Michigan, with a degree in nursing in August, 1975. She then went to work at Borgess Hospital, in Kalamazoo, Michigan. She was working at the hospital and living with her sister when she met Kenneth Bernard in late 1975.

Kenneth Bernard was born on April 13, 1949 to Mary Paige Bernard. He does not know who his father was and doesn't know where the Bernard name came from. Mary Paige had been adopted by Leola and William Paige. Kenneth knows little about his mother's early life. He is the oldest of six boys born to his mother. A sister died at birth. One brother is deceased, and the others still reside in New Orleans. Mary Paige was described as an alcoholic. Kenneth can remember his mother drinking. He believes that his deceased brother Gerald also had problems with alcohol. Stating that his mother "had issues of her own", Kenneth said that Mary Paige "sold her body." He noted that his mother was out a lot at night, and often brought men home.

Kenneth can remember that as a child, he and his mother lived in a small apartment above a bar. He slept in the same bed as his mother. She would bring men home and into the bed with him, where she would have sex. He and his brothers were removed from his mother's custody by the state when Kenneth was about seven years old. They were placed in a foster homes. Kenneth was placed with three of his brothers; the other two were in a different home. Kenneth's foster parents were named Boudreau. Kenneth thought that he lived with the foster family until he was about twelve years old. At that time, his brother Gerald wanted to leave. Gerald argued with the foster parents. Kenneth and his brothers were then sent to live with a maternal aunt, Annie Paige. Kenneth saw little of his mother when he was in foster care, but recalled that when he did see her, "she was a loving parent...she just couldn't take care of us." Mary Paige died of complications of alcoholism when Kenneth was about ten years old.

While the foster family had been kind to Kenneth and his brothers, his aunt was described as strict and abusive. She would whip Kenneth and his brothers with a strap. Kenneth said that his uncle was also mean. Annie Paige had children of her own, and Kenneth felt that she favored her children over Kenneth and his brothers. She often kept Kenneth out of school and made him care for the younger children. He said that he loved school, but struggled to learn because he missed so much school. Kenneth recalled that he got behind in his school work, and had to repeat a couple grades. He persevered and graduated from high school in 1969, at age twenty. None of his brothers finished high school. Kenneth thought it was possible his

**EXHIBIT 1 pg. 217**

Exhibit O-3

4

brothers had learning problems. It appears that Kenneth may have some learning problems, as well. He reports having memory problems, particularly short term, but also had great difficulty in reporting the ages or birth years of his brothers.

Upon graduation from high school, Kenneth enlisted in the Navy. He trained at Sacramento, California, and was stationed in Memphis, Tennessee and Pensacola, Florida before taking an early discharge in 1971. Kenneth worked for a time in the shipyards in New Orleans before going through a period during which he admits that he wasn't working and that he was smoking marijuana. He had a son by a woman he knew in New Orleans. He had no real involvement in this child's life. Finally, Kenneth said, an uncle persuaded him that he needed to straighten out his life. He moved with the uncle to Michigan in 1975, where he got a job on the loading dock at an electrical plant. He also began taking classes at a local community college. He met Thelma Johnson through a friend. Kenneth recalls that, at the time, he felt Thelma "had a spiritual outlook" and might help him in his life. The two began dating.

Thelma recalls that when she met Kenneth, he seemed like a nice and polite young man. He would not talk about his early life, though she knew he had been in foster care and that he didn't know his father's name. In early 1977, Thelma became pregnant by Kenneth Bernard. She decided to have an abortion. Kenneth said that he didn't want the abortion, but decided to support Thelma in her decision. He felt that she didn't want to tell her mother, who would be upset due to their religious beliefs and the fact that Kenneth and Thelma weren't married. Kenneth stated that Thelma's mother was very controlling of her daughters, and didn't approve of Kenneth, who she referred to as "the devil." Kenneth felt that Thelma did whatever her mother told her to do. Thelma reported that she wasn't ready to be a mother. She knew that Kenneth didn't want the abortion, but she went ahead and had it. Later that same year, both Thelma's sister Cora, with whom she was living at the time, and Kenneth's uncle, with whom he lived, decided to move. Kenneth and Thelma decided to marry. Kenneth had lost his job at the electrical plant at that time, but Thelma was still working as a nurse. They were married on August 14, 1977. Thelma recalls that when she married Kenneth, remembering how her father had treated her mother, she told him that he better never hit her.

Prior to her marriage to Kenneth, Thelma entered the Army Reserves. She entered as an officer with the rank of 2nd Lieutenant. In March, 1978, Thelma Bernard decided to apply for active duty in the military. She said that Kenneth tried to discourage her, but she did it anyway. She said that one of the reasons she requested active duty in the Army was to get away from Kenneth. She reported that there was an incident with Kenneth that

EXHIBIT 1 pg. 218

Exhibit O-4

contributed to her decision.  She and Kenneth were arguing, when he threw water at her.  She didn't tell Kenneth her reason for entering the military for many years.    Kenneth reported that he and Thelma did have some differences early in their marriage.  She accused him of being bossy; and he didn't like her telling him what to do.  He also said that Thelma's mother interfered in the marriage.

Thelma left Michigan for Army training in June, 1978, leaving Kenneth behind.  After completing her officer's training in mid July, she was assigned to Brooke Army Medical Center (BAMC) at Ft. Sam Houston in San Antonio, Texas.  She was promoted to 1st Lieutenant at that time.  Thelma's military records indicate that she was a Clinical Staff Nurse at BAMC.    Her performance evaluations during her first fifteen months there were positive, and noted that she worked many hours of overtime voluntarily, and performed "her assigned responsibilities in an exemplary manner."  She was described as "highly efficient" and as having "infectious enthusiasm for nursing."   She was promoted to the rank of Captain on December 20, 1979. Kenneth joined Thelma  in San Antonio in 1979.    Within a few months, she became pregnant with Brandon.   Thelma noted that she was using birth control pills at the time she became pregnant; the pregnancy was not planned.

## Early Childhood: 1980-1992

Medical records indicate that Brandon Anthony Micah Bernard was born at 5:37 p.m. on July 3, 1980, at Brooke Army Medical Center, Ft. Sam Houston, Texas.   His birth weight was 6 pounds, 1½ ounces.   He was described as generally healthy, with an Apgar score of 9.  Records note that Thelma had a prolonged labor, 17+ hours, and suffered from pre-eclampsia (high blood pressure).  Noting that the pre-eclampsia had been diagnosed in the later weeks of her pregnancy, Thelma said that her pregnancy was closely monitored during the final weeks, and labor was induced.   She reported that she worked as a nurse at the hospital right up to the day of delivery.  Thelma and Brandon were discharged from the hospital on July 6, 1980.

Thelma reported that Brandon was a generally healthy, though colicky infant.  He was irritable and cried a lot.  His developmental milestones were normal.  He walked at about 10 months of age; said words at about 11 months; and was toilet trained at 18 months.  He did sustain a head injury when he was a year old.  Thelma said that he rolled off a bed onto a concrete floor.   She took him to Brooke Army Medical Center, where his skull was x-rayed, with negative results,  and he was sent home.  Kenneth worked during the time they were in San Antonio. Thelma returned to duty following Brandon's birth.   He was cared for by a babysitter.   Her performance evaluations continued to be very positive,  noting her high standards,

**EXHIBIT 1 pg. 219**

Exhibit O-5

discipline, integrity, loyalty, and "outstanding leadership abilities."

Thelma was transferred to Ft. Wainwright, outside Fairbanks, Alaska, in February, 1982. The family lived in a duplex on the base, near Bassett Army Community Hospital, where Thelma worked as a Clinical Staff Nurse. Kenneth did some part-time roofing and contracting work and took classes in architectural engineering at a local community college during the three years that they lived in Alaska. Brandon was cared for by a babysitter. Brandon has few memories of his time in Alaska, other than that it "was nice" and he liked the snow. He does remember that he got his dog, Peabody, while they lived there. Kenneth admitted that there was a strain in his and Thelma's marriage during this period. He felt she didn't support his efforts to get a college education; she felt he wasn't contributing enough to the support of the family or Brandon's care. Kenneth said he felt like "she was the husband and I was the wife." Thelma continued to receive very positive evaluations of her military performance. Records noted her "outstanding duty performance, leadership and organization skills...strong sense of responsibility. She was described as highly skilled, dedicated and respected.

Brandon experienced some health problems in Alaska. At age two he was reportedly diagnosed with asthma. He also suffered another head injury at about age two. Thelma stated that they lived in a two story townhouse. Brandon was watching television on the second floor. She said she heard a thump; went outside; and found Brandon unconscious on the ground. She took him to the emergency room at Bassett Hospital, where he was treated and released. They knew she was a nurse, and instructed her to observe him for complications of concussion. Brandon said that he had been watching Batman and decided to try to copy him, when he fell from the window. It is doubtful that he actually remembers this; he was probably told. Medical records reveal that Brandon was admitted to BAMC on April 26, 1986, at age four years, nine months for treatment of left otitis media (ear infection) and pneumonitis (inflammation of the lung caused by virus or allergic reaction). Records indicate possibility of asthma. Pneumonia was confirmed by x-ray. He was treated with medication and discharged on April 28, 1984.

In late 1984, Thelma was given a transfer by the Army to Ft. Hood in Killeen, Texas. Kenneth reported that he was the one who wanted the transfer, and that Thelma didn't want to go to Texas. She accused him of trying to manipulate her in the matter. Kenneth further noted that Thelma was unhappy about the move, and that it caused her to be "difficult...her moods were difficult." It appears that the marital relationship continued to be strained. The family left Alaska at the end of November, 1984, and drove to Texas, stopping at Disneyland along the way. Brandon remembers this trip. Kenneth recalls that Peabody rode in the back seat with Brandon, adding that Brandon was very attached to his dog. Thelma reported for duty

**EXHIBIT 1 pg. 220**

Exhibit O-6



at Ft. Hood on January 14, 1985.

Thelma was stationed at Darnell Army Medical Center at Ft. Hood. Kenneth eventually got a part-time job driving a school bus, and enrolled in classes at the local community college. There were extended periods of time during which Kenneth did not work. Brandon was placed in day care until he started school in the fall of 1986. Kenneth reported that he and Thelma argued about who should take care of Brandon. Thelma felt that he should, since he wasn't working full time. He felt she wasn't being supportive of his efforts to continue his education. When they arrived in Killeen, the family lived for a short time on the base until the new home they purchased at 1712 Wickfield Way was completed. The family attended two different local Seventh Day Adventist Churches, one on Clear Creek Road and one on Rancier Street.

Brandon's asthma problems became worse after the family moved to Texas. He reportedly was taken to the emergency room at Darnell Army Medical Center (DAMC) several times for treatment of asthma attacks. On April 15, 1986, Brandon was admitted to the hospital after being taken to the emergency room following a severe asthma attack. Records note that he was in respiratory distress, and was anxious and mildly dehydrated. They further note that he had been taking Theodur, and another asthma medication. Problems indicated in the records were: respiratory distress due to asthma; anxiety; and potential deficit in nutritional status. His low weight was apparently a concern. Brandon was initially treated with IV medication. He has a memory of this hospitalization. Apparently something was wrong with the IV hookup and his arm bled profusely. He saw the blood coming out onto the bedding, and said, "it was scary." Brandon was discharged from the hospital on April 17th, with prescriptions for Alupent and Theodur, both for treatment of asthma. He recalls that he took asthma medication throughout his childhood and adolescence.

Thelma had some health problems following the move to Killeen, as well. She reported that in 1985, she fainted and had a seizure. At the time, it was discovered that she had a tumor on one ovary, for which she underwent surgery. She also had high blood pressure. Thelma noted that heart problems and diabetes run in her family. Military records indicate that she had difficulty maintaining the weight requirement during this period; she was overweight. The military eventually waived the weight requirement. Her performance evaluations in 1985 and 1986 rated her as "a superb clinician", and described her as conscientious, responsible, enthusiastic, self-directed and highly motivated. Evaluations, citing her outstanding performance, recommended that Thelma be given the opportunity to attend the Advanced Course at the Academy of Health Science and to complete her Master's Degree in nursing. She did attend the Advanced Course, completing it in

**EXHIBIT 1 pg. 221**

Exhibit O-7

November, 1986.

Brandon was enrolled in the first grade at the Seventh Day Adventist Academy in Killeen on August 25, 1986. The Academy was a small, parochial school with between 50 and 100 students total in the 1st through 8th grades during the time Brandon attended. Class sizes varied from 5 or 6 to 10 to 12 students. They had only three teachers at the school, so there were multi-grade classes, generally with three grade levels in one room. The teacher would call children up to a table in the front for individual help. Debbie King, a fellow member at the Seventh Day Adventist church that the Bernards attended, also volunteered at the school. She described it as a pretty structured school with small classes, but also said that staff at the school were not adept at detecting learning problems that students might have had. She felt there were a number of students in the school with learning disorders or attention deficit disorder (with or without hyperactivity) that were not diagnosed and did not receive help.

Records indicate that Brandon was an average to above average student during his early years at the academy. He received all Satisfactory marks during his first grade year (1986-87), and a mix of Satisfactory and Excellent marks for the second and third grades. His first grade teacher was Mona Rae Ferris and his second grade teacher was Carolyn Stewart. Brandon's third grade teacher, Viddena Cruz, commented on his first quarter report card that Brandon was having difficulty in some subjects. He improved during the year. Achievement testing on several occasions generally yielded grade level scores, except for early in his third grade year (9-1988) when he scored below grade level.

Brandon and his family attended church every week, though Kenneth didn't always attend with them. The practice of Seventh Day Adventists is to observe the Sabbath from Friday evening until Saturday evening. Brandon regularly attended Saturday school, which is similar to the Sunday School offered by most Protestant churches. Brandon's mother remained a devout practitioner of the faith. Kenneth was less involved. Both Debbie King and Bonnie Wainwright, fellow church members, commented on the family's involvement in the church and Brandon's behavior. He was described as a quiet, polite and well-behaved child.

Thelma Bernard was transferred to a post at Ft. Fitzsimmons in Aurora, Colorado for several months in 1987, where she was the Head Nurse on the hematology and oncology wards. She also took graduate courses while in Colorado. She continued to be described in military evaluations as an outstanding clinician, who was exceptionally competent and intensely dedicated. Brandon remained at home with his father during the spring, but spent the summer months with his mother in Colorado. He was in a summer

**EXHIBIT 1 pg. 222**

Exhibit O-8

day care program there. Thelma was pregnant with her second child at the time. Kenneth, stating that the marriage continued to be strained, said that he didn't feel that they should have a child at that time. He said it was Thelma's decision to get pregnant, despite his feelings. He said that his courses were difficult, and he was feeling that he couldn't handle the additional stress. In September, 1987, Thelma applied for discharge from the regular Army, and appointment to the Ready Reserve. Her discharge was effective November 30, 1987, with the reason for separation listed as "failure of selection for permanent promotion." Thelma returned to Killeen in late 1987, and was reassigned to the 94th General Hospital, Mesquite, Texas, as a member of the Army Reserve. She was promoted to Major effective December 1, 1987. Thelma gave birth to a daughter, Quiona, on December 21, 1987. In early 1988, Thelma began working at Scott & White, a medical clinic in Killeen. She worked as a nurse for the Scott & White Insurance plan.

Brandon, though generally healthy, continued to have problems with asthma during his elementary school years. He was frequently seen at the Scott & White Clinic for asthma attacks. Brandon recalled that when he had serious attacks, he would have difficulty breathing, which was scary. His asthma was generally managed with medication, both pills and an inhaler. On one occasion, in March, 1990, Brandon was taken to the clinic following an attack that occurred because he had gone off his medication. Records indicate that he had run out of Theodur, and his parents hadn't obtained the medication he needed.

During these formative years of Brandon's it is clear, according to all concerned - Brandon, Thelma and Kenneth - that there was continuous strain in the Bernard marriage and tension in the household. The parents did not communicate well, and held negative views of one another. Thelma stated that she felt that she had to be the primary breadwinner; she felt that Kenneth didn't contribute adequately to the financial support of the household, nor did he help out enough at home. Stating that she usually had to send Brandon to a babysitter, Thelma, referring to Kenneth, said, "I didn't know what he did" with his time. He did attend school on a part-time basis. She noted that he struggled with his course work and frequently had to repeat classes. Thelma feels Kenneth may have a learning problem. She also noted that Kenneth had a temper and often exhibited mood swings. Conversely, Kenneth felt that Thelma didn't support his efforts to continue his education. He admitted that school was difficult for him and that he struggled with his classes. He said that Thelma was often gone, sometimes working two jobs, going to school or just out. Kenneth said that he and Thelma argued about his perceived lack of support from her.

Brandon described his mother as a very religious and resourceful woman, noting that she worked and went to graduate school while he was

**EXHIBIT 1 pg. 223**

Exhibit O-9

growing up. He said he felt close to her and always felt he could talk to her. Brandon said that he always tried to listen to his mother and do what she asked. He said he didn't feel close to his father, and wasn't really able to talk to him. He remembers that things seemed tense in the home and that his parents frequently argued. Brandon reported that his father was verbally abusive towards his mother. Kenneth yelled at Thelma and called her names. Calling it "emotional abuse", Brandon said that his father tried to make his mother feel bad about herself. Brandon thought it was possible that his father had low self-esteem, and that he was bothered by the fact that Thelma was working and going to graduate school, while he struggled with his community college courses and only worked part-time. While Thelma was extremely successful in her professional/military life, where she was described as a highly skilled manager and exceptionally competent nurse, who had good rapport with staff and patients, she had less success in managing relationships in her personal life.

Brandon remembered a particular incident between his parents that he described as traumatizing. He recalls that it happened in the living room. He father was wrestling with his mother. He then held her down on the floor, so that she couldn't move and had difficulty breathing. She was crying and asking Kenneth to stop. Brandon said that he was very upset by the incident..."I was crying a lot that day...it really affected me." Brandon reported that he is very claustrophobic, adding that he felt this incident had something to do with it. Thelma remembered the incident, as well. She confirmed that Brandon has been claustrophobic since about age six or seven, but said she didn't know why.

Brandon saw himself as having been a quiet child and somewhat of a loner. He said that he was pretty active and energetic, and couldn't sit still for very long. Thelma thought that Brandon was a bit hyperactive as a child. She said he liked to be on the go, and had some problems with concentration and focus at school; he was easily distracted. Thelma had a theory that Brandon had some level of Down's Syndrome because his little finger curved in. Thelma, noting that a relative of Kenneth's has Down's Syndrome, still holds this idea about Brandon, even though he clearly is not retarded, which is a characteristic of Down's Syndrome. She said that she told Brandon of this belief as he was growing up. Brandon reported that his mother told him, when he was a child, that she thought he had Down's Syndrome, and he believed it. He stated that he believed there were different forms of Down's Syndrome, not all including mental retardation. He felt that if he had it, it just resulted in some type of learning disability.

The two parents also had very different parenting styles, and did not appear to communicate or agree on rules and discipline. This led to unpredictability and inconsistency in expectations for Brandon. While Thelma

**EXHIBIT 1 pg. 224**

Exhibit O-10

agrees that she was probably too lenient with Brandon, she said she felt Kenneth was too rigid, demanding and strict.  Brandon said that this was one of the things his parents argued about.  Thelma said that Brandon was a generally well-behaved child who was respectful towards his parents and minded them.  Everyone interviewed described Brandon in this way.  Yet, it appears he was harshly punished by his father for infractions that would seem minor by most people's standards.  Thelma seldom punished Brandon and claims to not know much about Kenneth's discipline, stating that she wasn't home much.

Brandon described his father as having been "mean....really strict", adding that Kenneth had a temper.  He said he got "whuppings" a lot, and cited as an example of the types of things for which he could be whipped with a belt a time when he had been eating lemon and salt.  There was no explanation for what was wrong with this.  Another time, he recalled, he had some Nickleodeon slime that his mother had won.  He wanted to play with it and his father didn't want him to.  Brandon said that his father, "caught me with it...whupped me real bad with a belt...on my bare butt." He said his father used a cowboy belt with a large metal buckle.  Brandon commented that his father was moody, and that he "took his anger out with a belt."  He also called Brandon names, including "stupid", "ignorant" and "lazy."  When asked how things were during the period in 1987 when his mother was in Denver, and he was home alone with his father, Brandon responded, "the same...he was mean."  Brandon said that his father drank during these years (mid 1980's into early 1990s).  He drank beer on a daily basis.  Brandon described him "a mellow drunk", and said that beatings were not related to drinking.  Kenneth admitted that he drank beer, but denied abusing alcohol.

Thelma denied knowing about the beatings, but then said that she knew Kenneth had a temper and believed that he could've whipped Brandon.  She noted that Kenneth "had a thing about doing chores around the house."  If things weren't done to his liking or when he wanted them done, he would punish Brandon.  She agreed that Kenneth was verbally abusive, both to her and to Brandon.  Thelma said that Brandon was afraid of his father, and would often withdraw from him.  If his father yelled, Brandon would flinch or step back.  She also said that if she tried to intervene in Kenneth's discipline of Brandon, he'd tell her to stay out of it.

Kenneth admitted that he "was on Brandon a lot" and that he used a belt to punish him.  He said that he didn't want Brandon out in the neighborhood.  He did make him stay in the house a lot and made him do chores.  He said he would punish Brandon if Brandon didn't do what he asked.  While he admitted to spanking Brandon with a belt, he said that he didn't mean to harm him.  Then he said that he was "always careful about where I whipped him" (where on the body), and denied "brutalizing him."

**EXHIBIT 1 pg. 225**

Exhibit O-11

Kenneth said that he and Thelma argued about his discipline of Brandon. Dettrick Spiller, a neighborhood child and friend of Brandon's, who lived across the street from the Bernards, recalled that Brandon had to stay in the house a lot when other children were able to be outside playing. He described Kenneth Bernard as "loud" and "strict", and said that there were many times when he could hear Kenneth yelling at Brandon and could hear the sound of the belt. When asked how frequently he would hear this, Spiller responded that it occurred about once a week or so. Dettrick said that Brandon wouldn't talk about it.

Brandon said that Kenneth's other form of punishment was worse than the "whuppings", which, he said "at least would end." The other "punishment" was confining him to his room for long periods of time. Brandon remembered one time when he was confined to his room for three months, only being able to come out for school and meals. Brandon had to do a lot of chores at home, and if they weren't done when his father wanted them done, he'd be punished. Chores included such things as cleaning his room and the bathroom, doing the dishes, vacuuming, mowing the lawn, and taking out the trash. As he got older, he had to take care of his younger siblings. Kenneth admitted that he kept Brandon in the house a lot and made him do a lot of chores. He said that if he grounded Brandon, Thelma would argue with him. He felt she didn't back him. She felt he was too strict.

Brandon did have friends in the neighborhood and at school, including Dettrick Spiller, Michael Voegele and Matthew Mitchell. The latter two attended the Seventh Day Adventist Academy with Brandon. Michael Voegele met Brandon when they were in the second grade together at the Academy. He said that Brandon had "a different family life than I did...I was more spoiled." Voegele said that Brandon was a disciplined child who had respect for his parents. Brandon never got into trouble at school. Voegele said that Brandon was quiet and well-behaved. He said he and Brandon enjoyed playing basketball together. Voegele thought that Brandon might have had some learning problems, and recalled that Brandon sometimes had difficulty understanding things in school. Matthew Mitchell also met Brandon in elementary school. He recalled that Brandon loved to play with his friends. He described Brandon as a child who was "never one to go against the grain...would go along." He followed the lead of others. Dettrick Spiller was a friend from the neighborhood. Spiller said that he met Brandon in the 4th grade, when he and his family moved across the street from the Bernards. Dettrick and Brandon enjoyed playing street football and basketball. Spiller described Brandon as kind and funny.

Brandon sometimes visited maternal relatives in Missouri in the summers. His grandmother and his Aunts Martha and Ellen still lived together in Hayti, Missouri, where Thelma had grown up. Brandon thought

**EXHIBIT 1 pg. 226**

Exhibit O-12

he did this for about three or four summers, stating that he usually stayed for a couple months. He said he enjoyed spending time there, and playing with his many cousins. Brandon added that his family also frequently visited maternal relatives in Missouri on holidays. While he was close to his maternal grandmother, Versia Johnson, he described her as a pretty strict disciplinarian who could be "mean." He said that she whipped him with a belt or wooden spoon, striking him on his butt, hand, legs or arms. Brandon added that his grandmother didn't like his father because Kenneth was not as devoted a member of the church as she was. She called Kenneth "the devil."

Brandon's fourth grade teacher at the Academy was James Starr. He had Mr. Starr for three years, the fourth through the sixth grades. Brandon did well during those years in performance classes, such as Art, Music, and Physical Education. He also did well in Bible class. His grades in language based classes, such as English, Reading and Spelling, began to deteriorate, as did his performance in Mathematics.. He received some D's and F's in these classes in the fourth and fifth grades. Teacher comments indicate problems with organization of work and time. Mr. Starr declined to promote Brandon from the fifth grade in May, 1991, until he completed a summer school course in English. Thelma reported that Brandon's teacher wanted to retain Brandon in the fifth grade, but she and Kenneth opposed the decision after Brandon "cried and cried." They persuaded the school to promote him to the sixth grade. Thelma acknowledged that school was a struggle for Brandon after that, though his grades for the sixth grade did improve somewhat. Brandon was prescribed glasses for reading in about 1991. He said he had blurry vision and that his eyes crossed. It is significant that during this period, when school performance deteriorated, there was a great deal of tension in the Bernard home due to marital difficulties between Kenneth and Thelma.

In about 1990, when Brandon was ten years old, his dog Peabody was struck by a car and killed. Brandon said it happened one morning before school. He saw Peabody laying on the street. They tried to get him to the veterinarian, but it was too late. Both Thelma and Kenneth said that Brandon was very attached to the dog, and it was a difficult loss for him.

Thelma became pregnant again in the fall of 1990. She said that her marriage to Kenneth was pretty rocky at the time. She reported that Kenneth wanted her to have an abortion, but she didn't want it. Kenneth agreed that things were difficult in the marriage during this period. He just referred to Thelma's pregnancy as "that decision...she blamed me." He claimed that he did want the baby, but that Thelma accused him of not wanting another child. During her pregnancy, Thelma's Army unit was called up for Desert Storm. She was unable to go due to being pregnant. Max Bernard was born to Thelma and Kenneth on June 10, 1991. Thelma's

**EXHIBIT 1 pg. 227**

Exhibit O-13

mother spent the summer with the Bernards, helping to care for the new baby. During that period, Versia Johnson, who was diabetic, suffered kidney failure and had to go on dialysis. Stating that Thelma "was always off doing her Army thing", Kenneth said that Thelma didn't seem to want to take care of Max. He said that she was never very involved in the care of her children.

Following the birth of Max, Thelma took a position at Central Texas College as a lab coordinator. She remained in the Army Reserves, with duty as a head nurse in the emergency room at Darnell Army Medical Center. Performance evaluations continued to be very positive. She had previously been promoted to the rank of Major, in 1989. Kenneth continued to take courses at Central Texas College. Thelma noted that he had difficulty with his studies, and often had to repeat classes. Kenneth reported having memory problems and possible learning problems. He said that he was able to eventually get an associate's degree (two year), but was never able to finish his bachelor's degree. He felt he never got the encouragement he needed from Thelma. Thelma reported that Kenneth blamed her for his inability to complete his college education. Feeling that Kenneth was doing enough to help with the children, Thelma enrolled Brandon in a babysitting class at Ft. Hood. He began caring for Quiona and Max after school.

Thelma stated that Kenneth was very moody and angry during this period. She said he yelled a lot and had a temper. One time, during an argument, she said, "he hit me upside the face....and threatened to do it again if I made him angry." Kenneth said that he and Thelma just didn't communicate. Fellow church members felt that Kenneth might have had self-esteem issues, due to the fact that Thelma was the primary breadwinner, and he was often unemployed or only employed part time. Kenneth said that it was true that Thelma supported the family and he didn't earn much. He agreed that this was a source of tension in the marriage.

The family remained active in the Seventh Day Adventist Church during these years, though Kenneth was less involved than Thelma and the children. Brandon attended regular church services and Sabbath School on Saturdays. He often played basketball at the church on Saturday evenings. He participated in Pathfinders, a church youth group that did outdoor activities, including camping and hiking trips. Church members described Brandon as a very polite and respectful child who was generally quiet and reserved. He often helped out at the church including with such things as setting up for, or cleaning up after, fellowship dinners. Members said that Brandon would always do whatever was asked of him. He did not initiate activities and was described as a follower. He never got in trouble at church, the church school or church activities. Matthew Mitchell, a friend, noted that there was a school bully; when this youngster picked on Brandon, Brandon would just walk away. He wouldn't fight. Bonnie Wainwright, a church member and

**EXHIBIT 1 pg. 228**

Exhibit O-14

volunteer at the school, commented on this, as well. She said that if other kids were instigating trouble, or provoking Brandon, he just backed up and left. She described Brandon as "a mild-mannered and sweet kid."

## Pre-Adolescence and Adolescence: 1992-1998

In June, 1992, Thelma experienced serious blood pressure and heart problems. She had to have open heart surgery to correct an atrial septal defect (hole in the heart). Brandon remembers visiting his mother in the hospital, stating, "it was traumatizing." His mother was sedated and had IV tubes in her arms. Quiona and Max were sent to spend the summer with maternal relatives in Missouri. Brandon remained at home to help take care of his mother during her recuperation. He recalled that his mother came home "with all those staples in her."

In August, 1992, Brandon withdrew from the Seventh Day Adventist Academy and enrolled in the seventh grade at Rancier Middle School, part of the Killeen Independent School District. He said that he wanted to go there so that he could play football. Medical records from Scott & White Clinic indicate that he had an athletic physical on August 4, 1992. He was not on medication for asthma at the time, and was described as healthy and "doing well." According to school records, Brandon was tested at Rancier in September, 1992. He passed the standardized math and writing tests, but did not pass the reading test. Achievement testing was generally in the average range on sub-tests, but language scores were low.

On September 7, 1992, an incident occurred in the Bernard home that led to the arrest of Kenneth, and the Bernards' subsequent divorce. Brandon recalls that his mother had come home with some new clothes for him. She wanted him to try them on. Kenneth insisted that Brandon wash the dinner dishes first. An argument ensued. Brandon said that his mother told his father that she would do the dishes later. He insisted they be done immediately. Thelma recalled the argument somewhat differently, saying that Kenneth wanted her to "put up the spaghetti sauce" from dinner, and she refused. Stating that she decided she "was going to go outside the bonds of marriage", Thelma said she told Kenneth she wouldn't pay his school bills anymore. Kenneth's version is that he did want Brandon to do the dishes, and put away the spaghetti sauce, and Thelma said it could wait. He wanted it done immediately. Kenneth said they argued; he grabbed Thelma and tried to pull her into the kitchen. Thelma said she grabbed a can of mace while Kenneth was pulling her into the kitchen. They struggled and he struck her in the chest. She noted that she had open heart surgery only three months before this incident. She fell to the floor and threatened to spray Kenneth with the mace. According to Thelma, Kenneth grabbed the can and sprayed her. Stating that Thelma had sprayed the mace on him first, he said, "that invoked a problem ...I didn't think...grabbed the mace...I was angry."

EXHIBIT 1 pg. 229

Exhibit O-15

Brandon reported that he heard the noise of the argument and struggle coming from the kitchen. He went out of his room and saw his mother on the floor. His father was outside of the house, coughing. He went outside. Thelma said that Brandon grabbed the younger children and took them outside. She described him as being "very upset." She said that she then went into the bedroom and phoned the police. Brandon recalled that the police came to the house and arrested his father. Police department records indicate that Kenneth was taken into custody and charged with Assault with Bodily Injury; he was held in the Bell County Jail. He appeared in court on September 18, 1992, and pled guilty to the charge. He was sentenced to 20 days in jail, plus fine and costs. With good time credit, he was released that same day. He reportedly left the jail and went right to the house on Wickfield. Thelma stated that he broke a window to get into the house, while no one was home. Kenneth said that he went to the house to try to talk to Thelma and that she reported that he had threatened to kill her.

Following this incident, Kenneth said he got an apartment. At some point around this time, he lost his part-time job as a bus driver for the Killeen Independent School District. Kenneth said that he and Thelma had what he described as "a little mutual fund", which appears to have been a savings account. He took the money. He admitted that he then was "following her around asking for money...I had to eat, pay the rent."

On November 5, 1992, Thelma Bernard petitioned the court in Bell County for a protective order. The order applied to her and the three minor children, Brandon, Quiona and Max. The Court found that acts of family violence had occurred and were likely to occur in the foreseeable future. Kenneth was prohibited from committing family violence; communicating with Thelma or the children; and going within 1000 feet of the home or Thelma's place of employment. The order was granted for one year, to November, 1993.

On October 23, 1992, Brandon was seen at Scott & White Clinic for asthma problems. Records note that he was given a prescription for Theodur which he "needs today." Around this same time, he withdrew from Rancier Middle School and returned to the Seventh Day Adventist Academy to complete the seventh grade. His teacher was Rick Marasco. Brandon said that following the incident at home in September, and his parents' separation, he started having problems with schoolwork. His grades began to fall. He said his mother decided to put him back in the Academy.

Rick Marasco, who now works for the Killeen Independent School District, had known the Bernard family through the church and the school. He said that he knew that Kenneth had been a very strict parent, and that

EXHIBIT 1 pg. 230

Exhibit O-16

Thelma was less so, though he described her as a conscientious parent who wanted her son in church school. After Kenneth left the home, Marasco noticed some changes. He felt that there was less structure in the home and that Brandon "watched way too much TV", something that would not have been allowed when Kenneth was in the home. Marasco described Brandon as "a neat kid...likeable." He said Brandon always did what he was asked, and was well-liked by his classmates. He added that Brandon was "a follower."

School records reveal that during the remainder of seventh grade (1992-93 year), Brandon's grades were primarily C's, with a few D's. He did better in performance classes, such as Art, Music, Computer Science and Physical Education. He received B's in Citizenship. Marasco said that Brandon behaved well at school and did not cause problems. He recalled that Brandon had difficulty with Math, and that low grades were due to not completing work or being disorganized. He thought that Brandon may have had some learning problems that weren't detected by the small church school.

Kenneth stated that he wanted to talk to Thelma about their situation. He was upset that she remained in the home with all their belongings, and he couldn't go there. He said he got the idea of getting the video camera and filming when he went to talk with her. It appears, from records, that before doing this, he broke into the house and took a number of items. On December 30, 1992, Thelma contacted the police department to report a burglary at the home and to report that Kenneth had violated the protective order. The police report indicates that a window had been broken at the home and that items, including a TV, VCR and camera, fish tank and other household goods, were missing. When the police arrived at the home, Kenneth was outside with the video camera. Kenneth admits that he had taken the items from the home, and that he was entering the home while filming with the camera when the police arrived. They took the camera and gave it to Thelma, then took him into custody for violation of the protective order. Kenneth appeared in court on February 3, 1993, and pled guilty to Violation of a Protective Order. He was sentenced to 45 days in jail, fined $100 and ordered to pay costs of $132. He had remained in custody since his arrest on 12-30-92, and was given credit for that time. At the time of his arrest, he was listed as unemployed. He was released from custody on the day of his plea and sentencing. He was not charged with the Burglary.

Following this incident, Thelma decided to file for divorce. Records indicate that a petition for divorce was filed in Bell County Court on January 6, 1993. Thelma alleged cruel treatment by Kenneth. Kenneth cross-complained alleging "discord or conflict of personalities." Thelma was granted the divorce and a decree was entered on July 16, 1993. Thelma admitted that during this period, between the separation and the divorce, she

EXHIBIT 1 pg. 231

Exhibit O-17

went through some depression. She felt that Kenneth, prior to their separation, had periods of depression, as well. She said that his drinking had escalated in the months preceding the separation. Brandon said he was upset by his parents' divorce, and he worried about his father. He knew his father didn't have a job, and said that he "pictured him on the street....in a box...I didn't know how he was going to survive."

Brandon's fears were not unfounded. Kenneth reported that following his release from jail in early February, 1993, he lived in a homeless shelter in Copperas Cove for a few weeks. He said he tried unsuccessfully to get some money from Thelma. When he could no longer stay in the Copperas Cove shelter, he went to a shelter in Temple, the Home of Hope, which was run by the Catholic Church. He said that he remained in that shelter for about seven months, until late 1993. He was required to look for work, and finally got a job as a bus driver for the Temple Independent School District. He was eventually able to get his own apartment in Temple. He had no contact with his children during this time. Brandon said that he was greatly affected by the divorce and the fact that he didn't see his father or even hear from him. He said that there were times that he felt something bad might have happened to his father.

After Kenneth left the home, Brandon had to take on complete responsibility for Quiona and Max from after school until his mother got home from work. Max was in day care until entering school, so, at first, he primarily cared for Quiona. He recalled that when she was about five or six years old, in about 1993, she wandered away from the house one day, and was gone for a couple hours. He finally found her about two blocks away from their home. Thelma said she remembered this incident vaguely, and that Quiona had been found a couple streets over.

In the summer of 1993, Brandon, Quiona and Max were sent to their maternal relatives in Missouri. Martha Johnson, a maternal aunt, recalled that the children spent several weeks that summer in the home of Versia Johnson, their grandmother. Martha and Ellen Johnson, Thelma's sisters, lived in the home, as well. Versia, who had a history of kidney problems and was on dialysis, became very ill that summer. She reportedly had a stroke and had to be hospitalized for a time. Martha reported that Brandon behaved very well in the home and helped take care of Quiona and Max for the summer.

Brandon entered the eighth grade at the Academy in August, 1993. His teacher was once again Rick Marasco. He attended until January 3, 1994, when he withdrew to transfer back to Rancier Middle School. His grades for the first half of the year were primarily C's and D's, with better grades in performance classes. Marasco said that Brandon continued to behave well,

**EXHIBIT 1 pg. 232**

Exhibit O-18     981

but seemed a bit "pensive."  He knew that the parents had divorced. Marasco noted that Brandon had nice friends at the school, including Matthew Mitchell and Michael Voegele.  Mitchell said that Brandon was quiet and didn't talk about his parents' divorce.  He kept his feelings in.  Mitchell recalled that there was another student in the eighth grade that used to bully Brandon and beat him up.  He said that Brandon wasn't a fighter and never reacted.  He would just shrug it off.  Both Mitchell and Voegele had made plans to go away for high school to a Seventh Day Adventist boarding school.  Thelma wanted Brandon to remain at home.  She had him transferred to Rancier for the second half of eighth grade in order to help him make the transition to public high school.  Brandon's performance for the second half of eighth grade was poor.  His grades in language based classes were very low: 71 in English; 70 in Reading; 68 in US History; and 71 in Science.  His best grade was in Athletics (89).  He did pass the standardized tests in Writing, Reading and Math, and was promoted to the ninth grade.

In the summer of 1994, before the start of the school year, Thelma and the children attended a family wedding in Michigan.  Her sister, Mary Pollock, was there with her three children, Salukis, Melsimeon and Naomi.  Mary had split up with her husband at the time.  Melsimeon, who is ten months older than Brandon, noted that he and his family had not been allowed to visit the Bernard home while Kenneth was still living there.  Thelma and Mary agreed, while at the wedding, that Melsimeon would return to Killeen with Thelma, and live with her family.  He enrolled in school in Killeen.  Later in the fall, Mary and her other two children went to live with Thelma and her family in Killeen.  Mary was unemployed for some time when she first lived there.

Brandon entered the ninth grade at Killeen 9th Grade Center on August 17, 1994.  He had a sports physical at Scott & White Clinic on August 24th, 1994.  Records indicate that he was healthy and his asthma was controlled by Theodur and a Ventolin inhaler.  Brandon's grades for the fall semester were very poor.  He barely passed Biology and World History, earning grades of 70 in each, the lowest passing score.  Susan McLaughlin, Brandon's Algebra teacher, noticed that his grades seemed to deteriorate in the late fall, after his cousin Melsimeon came into the home.  She could not recall any behavioral problems on Brandon's part at that time.  Brandon said that he found the transition to public school difficult.  The classes were large and there were too many distractions.  He said it was hard to concentrate and focus in class, and that he had trouble sitting still.  Brandon said that he continued to enjoy sports, particularly football and basketball, which he played at school or at church.  By this time, it had been two years since Brandon had any contact with his father.

After Brandon left the Academy and transferred to public school, he spent less time with his church school friends, and more time with peers from

**EXHIBIT 1 pg. 233**

Exhibit O-19

the neighborhood. One of them was Dettrick Spiller, who lived across the street. Brandon reported that when they were in the ninth grade, they started a neighborhood group. They called themselves, at first, The King of Spades. He said it was just a group of kids who hung around together in the neighborhood. Dettrick described the group the same way, and said they later called themselves the 415s. They were a loosely formed group of neighborhood friends.

In November, 1994, Thelma was promoted to the rank of Lieutenant Colonel in the Army Reserves. Her performance evaluations had continued to be extremely positive. She was described as responsible and dedicated. She was assigned as a medical surgical nurse in the emergency room at Darnell during 1992 and 1993. She was encouraged by her superiors to seek further education including her Master's degree in Nursing. By spring of 1994, she was assigned as a teacher to Nursing Education and Staff Development, and had enrolled in a graduate nursing program.

Melsimeon (hereafter Mel) said that Brandon had friends in the neighborhood, including Dettrick Spiller, when he (Mel) first arrived. He said that Brandon and Dettrick would "talk about doing stuff", e.g. stealing or getting into trouble, but didn't do it. Mel said that he had the courage... "I was about doing it." He said that he didn't have any money, because his mother wasn't working, and he wanted money. Mel suggested that he and Brandon do something to get some money for Mel, adding, "I needed money ...Brandon didn't...he needed a friend, so he helped me."

Records indicate that on January 6, 1995, Brandon and his cousin, Melsimeon Pollock, entered the home of Kye Sun Laguerre and attempted to commit theft. They reportedly had gone to see a friend, who wasn't home. They went in the house and took Mrs. Laguerre's purse. A petition was filed in Juvenile Court alleging that Brandon was delinquent, based on this offense. Friends noted that Brandon's trouble began after Mel moved into the home. Matt Mitchell described Mel as "hyper" and "slick", and as "not the best influence" on Brandon. Dettrick Spiller described Mel as "goofy...loud", adding that Mel might come up with some idea to get money, and Brandon would go along. Mel admitted that this was probably true. He did say that when he did something wrong, his mother would discipline him. Thelma, on the other hand, might yell at Brandon, but then she would go out and buy him something. Brandon was involved in another incident in January, with Mel, in which he was picked up for shoplifting bolt cutters. This occurred on January 20, 1995. Brandon said that he wanted to use the bolt cutters to break into a swimming pool so he could go swimming. There is no record of this being referred to juvenile court. Thelma did take him out of Killeen 9th Grade Center at that time. Records indicate he was withdrawn on January 23, 1995 at the request of his mother. The reason given was that he would

**EXHIBIT 1 pg. 234**

Exhibit O-20

be home schooled.  There is no indication that any home school program was provided.

Both Brandon and Mel admit that during early 1995 they were doing some drinking and smoking some marijuana.  Brandon said he also started smoking cigarettes during this time.  Michael Voegele said he knew Mel from church, and knew that Mel smoked marijuana.  He noted that Brandon never got into trouble until Mel came to live with Brandon's family.  He said that Brandon never drank or used marijuana until he was with Mel.  Dettrick Spiller said the same thing.  Mel does not disagree, and admits that he and Brandon were doing some drinking and using some marijuana in early 1995. He stated, "when I came, I gave him the courage to do this stuff."

In the spring of 1995, Kenneth Bernard ran into Thelma at the local bank.  He recalls that she was holding Max in her arms.  He said that he hadn't seen his children since the fall of 1992.  When asked why he made no effort to see them, he said first that Thelma had hid the children from him. When it was pointed out that they lived in the same house that he had left in 1992, he then pointed to the protective order and said he couldn't go there. The order had expired in November, 1993.  Kenneth said that he and Thelma began talking.  Thelma told him that Brandon was getting into trouble with his cousin.

Bonnie Wainwright, a fellow church member of the Bernards, noticed some things about Brandon during this period, in the months after Mel had begun living in the home.  Mel and his family attended the same church. She described Mel as "kind of arrogant...charming", and said she tried to talk to him about getting into trouble.  Wainwright said that she talked to Thelma at this time, telling her that she should make Mary and her children move out... "I told her Mary's kids were causing problems...she just looked at me and smiled ...didn't get it about how Brandon was getting into stuff...getting into trouble with Mel."  Stating that Mel was "the biggest part of Brandon's problems, Wainwright said that Brandon would never have done these things on his own.  She felt that Thelma was too busy to get involved in Brandon's situation.

Bonnie Wainwright said that when she saw Brandon at church during this time, she always hugged him.  She noted that one time, when she hugged Brandon, he smelled of tobacco...  "I talked to him about it...asked him to quit ...he was looking down....couldn't look me in the eyes."  Stating that he seemed depressed, Wainwright said, "I saw this lost person....it made me sad...his spirit was down...there was a sadness, a weight."  She thought the divorce of Brandon's parents had an effect on him... "like all kids, it takes their security away...tears the foundation of the family apart...he did look depressed after the divorce."  Wainwright recalled seeing Kenneth again in

EXHIBIT 1 pg. 235

Exhibit O-21

early 1995, after not seeing him for over two and a half years... "he looked so thin....he looked terrible."

On March 9, 1995, Brandon got into trouble with his cousin Mel again. The two broke into the local Army Surplus store during the night and stole some knives. A petition was filed in Juvenile Court alleging that Brandon was delinquent, based on this offense. At that time, Thelma asked Kenneth if Brandon could live with him. She felt that he would be less likely to get into trouble if he was not in Killeen and not around his cousin Mel.

Brandon moved to his father's apartment at 904 West Avenue E in Temple in March of 1995. He said that it was a tiny one bedroom apartment, and he slept on the couch in the living room. His father was a part-time bus driver for the Temple school district at the time. Brandon recalled that money was tight, and he and his father would eat dinner every night at Martha's Kitchen, a soup kitchen that was across the street from the shelter at which Kenneth had lived in 1993. Brandon enrolled at Temple High School on April 4, 1995. His grades improved for the remainder of the semester, and were generally in the mid to high 80's, with a 100 in physical education.

Following the juvenile court petition in March, 1995, Brandon was referred by Bell County Juvenile Probation for psychological evaluation. The evaluation was conducted on May 22, 1995 by Dr. Frank Pugliese, Ph.D. Pugliese met with both Brandon and Thelma. Thelma described Brandon as being a generally well-behaved and compliant child who began to get into trouble after his cousin Mel moved into the home. She reported that Brandon had become more distant and uncommunicative. After the March burglary, Thelma stated that she had decided to separate Brandon from his cousin, and had sent him to live with his father. She noted that Brandon's problems had motivated Kenneth to become re-involved in his life. Thelma told Pugliese that she and Kenneth were contemplating reconciliation and were communicating regularly regarding Brandon. She added that Kenneth was monitoring Brandon's activities very closely.

Brandon is described in Dr. Pugliese's report as a quiet and reserved youth who was responsive in the evaluation process. He expressed positive feelings about his parents, and said that his father was much stricter than his mother. Testing indicated that Brandon usually used good judgement; was responsive to the needs and concerns of others; was usually compassionate and empathetic; and had appropriate regard for the authority of his parents. Other tests revealed age appropriate qualities of youthfulness, e.g. some self-centeredness, and a need for recognition and attention from peers. Pugliese noted that Brandon could be impulsive without structure. He was described as easily influenced by others, and has having a desire to win approval and attention that could outweigh his use of good judgement,

**EXHIBIT 1 pg. 236**

Exhibit O-22

leading him to yield to pressure from peers. There were no indications of strong anti-social tendencies. Dr. Pugliese recommended intensive supervision and counseling.

A Court Report, with social history information and recommendations, was prepared on June 12, 1995. The report noted that Brandon's aunt, Mary Pollock, and her children, including Mel, had been living in the home; and that Mel was Brandon's co-defendant in the offenses. For this reason, according to the report, Brandon had gone to live with his father. Records indicate that Brandon was not considered to be a danger; had the support of both parents; and was cooperative in the interview. Kenneth's history of violence towards Thelma was noted in the records. The caseworker, Joel Salas, recommended that Brandon be placed on probation, in the care of his father, with conditions including curfew, random urine screens, and restitution, and that he not associate with Melsimeon Pollock. Brandon appeared in Juvenile Court for adjudication and disposition on the January and March petitions on June 27, 1995. The Court adjudicated him delinquent, placed him on one year probation, and ordered his removal from the home. This had already been done, when he moved from his mother's home to his father's apartment in Temple. The court ordered intensive supervision with conditions including counseling, attendance at school, curfew, and restitution. He was ordered not to associate with Mel.

On July 4th, while visiting his mother's home in Killeen for the holiday, Brandon and his cousin Mel were taken into custody and charged with two counts of burglary of a habitation. Brandon had just turned fifteen years old. Police were dispatched to a burglary in progress, and Brandon was apprehended while fleeing. According to testimony in Brandon's penalty phase, he told the police about the other burglary, which they had not known about, and in which he had taken a Nintendo game. They were held in the Bell County Detention Center. A petition was filed with the Court on July 5, 1995, alleging delinquent conduct.

A report was prepared for the Court, and was dated July 14, 1995. It included updated social history information. By that time, Thelma had left her job at Central Texas College, and was not working. She was enrolled in a master's degree program in Nursing. Caseworker Joel Salas recommended that Brandon be placed on probation for two years, initially in the Intensive Supervision Program, and that he: submit to random urine screens; voluntarily participate in Operation Outreach and counseling; pay restitution; and not associate with Melsimeon Pollock unless supervised by parents. The Juvenile Probation file contains information from the Bell County Juvenile Detention Center indicating that during the entire time Brandon was in the facility, from July 4 to August 3, 1995, he was on thirty minute watch, and that he behaved well. No reason is given for the thirty minute watch, though

**EXHIBIT 1 pg. 237**

Exhibit O-23

24

the probation agent stated that it was generally used when there was a risk of suicide attempt. Brandon said he didn't know why he was on thirty minute watch. He said he had no conduct problems while in detention.

Brandon was adjudicated delinquent in a hearing on July 20, 1995. His dispositional hearing was held on July 27, 1995. Bonnie Wainwright, a church friend of the family, worked for the Juvenile Court in Bell County at the time. She remembered that she would see Brandon in the hallway outside the court whenever he had hearings. She recalled that she hugged Brandon and urged him to listen to the Judge. The Court ordered that Brandon be placed on probation for two years, initially in Intensive Supervision. He was ordered to refrain from associating with Mel and to complete his high school education. He was further ordered to voluntarily place himself in the Catch 22 residential program in Brownwood, Texas until he was satisfactorily discharged. He was to remain in detention until he was transferred to Catch 22. At the same time, Melsimeon Pollock was placed by the Court at Mineral Wells, a family run group home.

Catch 22 in Brownwood was a community residential living facility licensed by both the Texas Department of Protective and Regulatory Services and the Texas Juvenile Probation Commission. It was operated by Dan and Melba Barger. The initial contract request for Brandon was for one year, until August, 1996. He was placed at the facility on August 3, 1995. The Bargers described the facility as an open campus housed in apartment buildings that had six apartments. Two youths were housed in each apartment, with staff residing in a separate unit. Brandon was fifteen years old at the time. He described Catch 22 as a sort of independent living program. During the time he lived there, he had one roommate who was fifteen, and another who was fourteen. Brandon said that all the boys living in the facility usually ate together and sometimes had group meetings. There were times when he had to buy his own food and cook it. The residents attended public school in Brownwood. There is no indication that Brandon received any counseling services during this placement.

Brandon was enrolled in Brownwood High School on August 23, 1995. He attended until January 26, 1996, at which time he was discharged from Catch 22, and returned to his father's home. His grades were very low. He failed Spanish, and had grades in the low 70's for most other classes, except for Physical Education, in which he had a 90. Dan Barger said that his wife had regular contact with the schools in which residents were enrolled. Brandon had no behavioral problems at school. He described Brandon as "a normal kid", adding that he was nice-looking and athletic. He did not have any significant problems in the facility. Monthly progress reports to Bell County Juvenile Probation indicate that he made progress in the program, though he had not met his treatment needs at the time he was released in

**EXHIBIT 1 pg. 238**

Exhibit O-24

January, 1996, after less than six months in the program. Novotny Baez, a Juvenile Probation Agent in Bell County, who supervised Brandon upon his return to his father's home in Temple, noted that it wasn't unusual for juveniles to be discharged early, prior to meeting treatment goals, and that it was generally a money issue. Though a one year placement had been requested, the county only contracted for six months. The cost of the program was $58.08 per day. The Catch 22 program no longer exists.

Brandon returned to Temple, Texas at the end of January, 1996. His father was still living in the small apartment on West Avenue E, where Brandon again slept on the couch. Brandon enrolled in the 10th grade at Temple High School on January 30, 1996, taking only four classes. His performance for the spring semester was very poor. He failed Algebra and English for the semester. He did, however, attend regularly. Kenneth was still working as a bus driver for the schools. He later obtained a full time job in maintenance for the Temple Independent School District. Brandon said that his father remained a strict disciplinarian. However, he did not whip Brandon as much as he had previously, and relied more on grounding. His father had firm rules about curfew, schoolwork and chores. Kenneth noted that he had clear and firm expectations, and "demanded" compliance... "If I said food was at 7:00, if he came in five minutes later, food was gone." Brandon would not be allowed to eat until the following day if he was even a few minutes late for dinner.

Novotny Baez was Brandon's probation agent for Intensive Supervision in Temple. She reported that Brandon did well on supervision. He had to report to her office two or three times a week, which he always did. She made random home visits once a week. Brandon was always there. Ms. Baez described Kenneth as very polite and very involved as a parent ... "(he) seemed to really care." Kenneth maintained regular contact with Ms. Baez and discussed any concerns with her. She described Brandon as "really quiet, respectful and mannerful", adding that he had "a safe, calming presence." She recalled that she often made her home visits late at night, and always felt safe with Brandon. Probation records indicate that Brandon looked for work in the spring of 1996. He started working at a furniture factory, but was not called back after the first day. Ms. Baez said that she knew that Brandon's parents were divorced, and she had very little contact with Thelma Bernard. Brandon was able to visit his mother on weekends and holidays. Thelma was working at Scott & White Clinic at the time, and remained in the Army Reserve, where she continued to perform well.

In 1996, after Brandon returned to his father's home, Kenneth informed Brandon of some health issues he (Kenneth) had. He had been diagnosed as HIV+ and as having Hepatitis C. Kenneth stated that he contracted these conditions from a woman he had been involved with. The

**EXHIBIT 1 pg. 239**

Exhibit O-25

woman died in late 1998. He told Brandon, but has still not told his other two children. He is on medication, and is doing well. Brandon was under the impression that his father had been infected while in jail. Displaying little knowledge of HIV and Hepatitis, Brandon said that when he learned of his father's condition, he wondered if he could get sick, too. He thought it was contagious. He never talked to anyone about it. Late in 1996 or early 1997, Kenneth, having obtained the maintenance job in the Temple schools, with better pay, moved into a larger apartment on Main Street in Temple. Brandon was able to have his own room.

Brandon was still in the 10th grade when he returned to Temple High School for the 1996-97 school year on August 14, 1996. His grades were very low and he was frequently absent the fall semester and the first part of the second semester. On December 16, 1996, Brandon was seen by his pediatrician, Dr. Truman Douty, at Scott & White Clinic in Killeen. He had been with his mother for the holidays. Dr. Douty referred Brandon for a psychological consult due to "stress." An appointment was made with a psychologist at the clinic, but was cancelled twice by Thelma. Stating that she now regrets this, Thelma said Brandon didn't want to go, so she didn't make him. She also didn't want him to be labeled. Thelma said that she did see signs of depression in Brandon at the time. He was sleeping a lot, lost weight and looked tired. He told her he would be all right... "I listened to him."

Brandon was withdrawn from Temple High School on February 20, 1997, due to truancy problems and was court ordered to a GED program operated by the Temple Independent School District. He began attending the program in about March, 1997. His teacher was Mattie Adams. Ms. Adams reported that she had two sessions of classes a day, with about 30 to 35 students in a session. While Brandon was required to attend only one session a day, he often came to both. Most of the students in the program had attendance problems in school. Ms. Adams stated that during the time that Brandon was in her program, she saw no signs of gang involvement. She was familiar with the indicators and did have students she knew to be gang-involved. Adams said that she never had problems with Brandon. His father was very concerned about his progress in the program and maintained regular contact with Ms. Adams, checking on attendance and class work.

Mattie Adams described Brandon as one of the better students in the program at that time. He had a good attitude, was responsible, behaved well, and participated in class. She did say he was a quiet youth. Adams noted that she pre-tested Brandon when he entered the program. He then knew what he needed to work on in order to pass the GED test. She recalled that he "just needed to remediate", and did pretty well in the class. He attended until the end of the school year. Adams said that Brandon had

**EXHIBIT 1 pg. 240**

Exhibit O-26

friends in Temple and seemed to associate with "the better students who stayed out of trouble." She recalled that Brandon was working at Burger King during this time. Brandon did start working at a Burger King located in a gas station in Temple in about April, 1997. He worked there until returning to Killeen in June, earning a total of $1590.30. Probation records noted this job, as well. Brandon continued to comply with the rules and conditions of probation, and had no problems.

In late spring, 1997, an incident occurred between Brandon and his father that led to his moving back to his mother's home. The incident happened at the Seventh Day Adventist Church in Temple. A number of members of the Killeen Church were there, as well, and witnessed the incident. Kenneth stated that Brandon and Mel had gone outside of the church and were in the parking lot. Kenneth went out and told Brandon to get back inside. They began arguing. The argument continued as church members were walking down the street from the church to a recreation center. Kenneth said that the argument escalated into a physical altercation. Brandon reported that his father swung at him. Kenneth admitted his role in the fight, stating, "I probably instigated it...hit him on the back of the head...we started tangling up...I was in a really angry mood." Debbie King said that church members had to separate the two. Max ran into the church and told Thelma what was happening. Kenneth said that Thelma decided that Brandon should go home to Killeen with her. Thelma confirmed this, stating she decided that Brandon should live with her again. Brandon saw little of his father after this time. Brandon stated that he had never felt very close to his father. He said they really couldn't communicate, and that his father was just primarily a disciplinarian. Debbie King, who was there, said that she didn't feel that Brandon wanted to be living with his father.

By the time Brandon returned to Killeen, Mel Pollock and his family had moved out of the Bernard home, but were still living in Killeen. They lived in a trailer. Brandon, then sixteen, began spending time with Mel again. He also re-connected with Dettrick Spiller, his friend from the neighborhood. Noting that his father had always been very strict, Brandon stated that things "were a lot looser" at his mother's. She was working at Metroplex Hospital and was still active in the Reserves. There was little discipline in the home. Kenneth said that he would hear that Brandon would come home late, and Thelma wouldn't do anything about it. She bought him whatever he wanted. According to Kenneth, if he didn't have money, Thelma wouldn't tell him to get a job. She just gave him money. He did work briefly, at some point in 1997, for West Telemarketing, earning $183.18.

Brandon had completed his GED preparation program in Temple. He had planned to take the test in Temple, but then moved back to Killeen. He applied to take the test at Central Texas College in Killeen on July 17, 1997.

EXHIBIT 1 pg. 241

Exhibit O-27

His scores on the various sub-tests were all in the 50's. A minimum score of 40 on each test is required. He passed and was awarded his Certificate of High School Equivalency on July 29, 1997. His two years of probation were completed at about the same time.

Though he had earned his GED, Brandon wanted to get a high school diploma. He wanted to go to college and felt that it would be easier to do so if he had a regular high school diploma. He enrolled in the twelfth grade at Killeen High School on August 13, 1997. A couple weeks later Mel left Killeen and went to stay with his father. He was gone only a few weeks, but it was during that time that Brandon began spending time with other youths who lived in the neighborhood and went to the high school, and who had formed a loosely organized "gang." Brandon said that when he returned to Killeen, Dettrick Spiller and his other friends from the neighborhood had started a new group, and were calling themselves the 415s. While they said it was a "gang", it was just a group of friends from the Heather Glen and Long Branch neighborhoods who hung out together. They didn't really have any structure or rules, and weren't affiliated with any national gang. Mel said that they were just "neighborhood wannabes...no way close to a real gang...not organized." Another group of Brandon's friends, including Joey, James and Prince Presley, called themselves the 212 PIRUs. Brandon said he was a part of the 415s, but also spent time with 212s.

Stating that Brandon had never been involved with any gang or similar group in Temple, Kenneth said he knew about the 415s. He, too, viewed it as just a bunch of kids from the neighborhood who hung out together. Dettrick Spiller said that Brandon became involved with the 415s after he came back to Killeen. He described it as "just a bunch of guys hanging out together...a loose group of kids." They gave themselves a name and picked colors, choosing red. Spiller said it wasn't organized and wasn't formally linked to any national group. Though they referred to themselves, at times, as "Bloods", they were not really formally affiliated. Spiller described them all as kids "looking for attention, looking for love, wanting to be a part of something." Old friends of Brandon's from the church school noticed a difference in Brandon when he returned to Killeen from Temple. Matt Mitchell said that Brandon dressed more "hip", and seemed to be "hooked up with the wrong crowd." Michael Voegele said that Brandon was hanging out with guys from his neighborhood... "they'd wear colors...it was a neighborhood thing, the Long Branch area....not an organized gang." He said he started hearing that Brandon was drinking and using marijuana.

Two of Brandon's friends that fall (1997) were Antonio Jackson and Terry Brown. Jackson said that he met Brandon in the neighborhood in 1997. He knew Mel, as well. He said that Brandon was a part of the 415s, but also spent time with the 212s, a group started by the Presleys. While

**EXHIBIT 1 pg. 242**

Exhibit O-28

they said they were "Bloods", they weren't really affiliated with them. Like the others, Jackson said that the groups weren't really organized... "just a bunch of kids hanging around together...no rules or anything...just a loose association...we were all wannabes" He said that they did all drink and smoke marijuana. With respect to Brandon, Jackson said that "even when Brandon was part of it, he wasn't...that wasn't his nature." Terry Brown reported that he moved to Killeen from Omaha, Nebraska, in the fall of 1997, and met Brandon at school. He recalled that Brandon was with his cousin Mel at the time he met him. Brown noted that he had been in a gang in Omaha. He said that while Brandon was part of the 415s, most of the guys they hung around with were 212s... "it was a made-up gang...the Long Branch and Heather Glen areas of Killeen were where the 212s and 415s were." They were neighborhood kids, not connected to any national gang. Brandon, Mel and Dettrick, according to Brown, were 415s.

Others in the community were aware of these neighborhood groups. Rick Marasco, who had been Brandon's teacher at the Academy, and is now teaching for the Killeen Independent School District, said that they weren't really organized gangs, but, rather, were neighborhood groups in the Long Branch area of Killeen. There were groups in other parts of the city, as well. Brad Hobbs, another teacher who had Brandon in class in 1998, described the groups as "little gangs...neighborhood things." He said that they did wear colors, recalling that Brandon wore red. Hobbs noted that the "gangs" haven't been around for the last four or five years, and seemed to be more prevalent in the mid to late 1990s. Novotny Baez, who has been a juvenile probation officer in Bell County for a number of years, said that the "gang" issue was somewhat related to the large military presence in the area. There were always a lot of families coming in and out, including a lot of different nationalities and cultures. Adolescents sometimes brought the practice with them when they moved in from areas where they had been associated with a gang. Baez said that, in her experience, they kids were "wannabes....we saw the clothes, bandanas, shirts...the identification...they wanted you to know who they were...it wasn't formalized."

The gang identification system in the Killeen Police Department was not well-organized until late 1999. They did have a more informal system for identifying possible gang members before that time. There were several criteria that could lead to one's name being listed on their cards. They included such things as: self admission; identification by a reliable informant; association with known gang members; display of gang affiliation; and presence in known gang hang-outs. Terry Brown reported that there was a man from the police department who would ride around the neighborhood in an old car. Whenever he saw some youths standing around together, he would take their pictures with a camera he carried. He would see juveniles in a car and pull them over. Terry experienced this and said Brandon did, as

EXHIBIT 1 pg. 243

Exhibit O-29

well. The man would have them get out of the car, take their photo, and let them leave. He never asked if they were gang members. Reportedly, if a youth had two pictures taken on two separate days, he was considered affiliated.

Brandon withdrew from Killeen High School on November 13, 1997. The reason given on the withdrawal form was that he would be attending either Alternative School or Central Texas College. His grades at the time were poor; he was flunking Algebra. On January 5, 1998, he enrolled in Killeen Alternative Center, an alternative program run by the Killeen Independent School District for students who had excessive absences or other problems in the regular school setting. He attended that Alternative Center until March 12, 1998, at which time he transferred back to Killeen High School.

Brandon continued to have problems with his asthma, and to take asthma medication. He also used Albuteral, an inhaler. Medical records from Scott & White Clinic indicate that his asthma was flaring in the spring of 1998. He was seen in the clinic for breathing problems on April 10, 1998. Brandon was in a car accident on May 18, 1998, and was taken by ambulance to Metroplex Hospital. According to the records, he was a passenger in the back seat of a vehicle when it was struck on the side by another vehicle. He was wearing a seat belt at the time. He sustained a cervical injury and arrived at the hospital immobilized and wearing a cervical collar. X-rays were negative for cervical fracture. He denied any loss of consciousness. He was given Naprosyn, a pain killer, and Flexiril, a prescription muscle relaxant, and released to home.

During this period, the 1997-98 school year, Brandon continued to be actively involved in his church and to help care for his younger siblings. He said that even though he was 'in the streets" with his friends, he obeyed the Friday night to Saturday night Sabbath in his church... "that was my choice." Terry Brown, who was spending a lot of time with Brandon during this period, agreed, stating, "he (Brandon) went to church faithfully, every Saturday...I hated that...that's the time you want to go out...he would leave his friends on Friday night...there was no talking him out of it." Brandon continued to volunteer at his church. He was involved in Pathfinders, a youth group, in which he collected and distributed food to the needy. Debbie King ran the church youth group for a time. She said that she saw Brandon at church, and he was always polite and respectful. King recalled that Brandon wanted to be in the church choir. Members were required to show up for all practices in order to perform. Brandon wasn't always at practice, so he wasn't allowed to perform. Brandon did help people around his neighborhood, generally with yard work.

**EXHIBIT 1 pg. 244**

Exhibit O-30

Terry Johnson became the pastor of Brandon's church in January, 1998. He remembered meeting Brandon and his family at a church potluck dinner shortly after he arrived. He said that Brandon seemed very quiet. Pastor Johnson recalled that Matthew Mitchell expressed some concerns to him about the people with whom Brandon was involved. Johnson also knew Mel, and said that Brandon's cousin "could be inappropriate." He felt that Mel had influence over Brandon, adding that Mel would come up with ideas and Brandon was a follower. Mel did continue to get into trouble during this period. He had arrests for Assault with Bodily Injury on December 9, 1997; and Evading Arrest on March 21, 1998.

Brandon spent a lot of time with his sister and brother. He took care of them after school, usually from 3:00 until about 6:00 p.m., when his mother would get home. He said that he made them do their homework and chores before they could play or watch television. They didn't watch much TV as Thelma wouldn't subscribe to cable. Quiona and Max both commented on Brandon's babysitting of them. They said he would make them behave, but was also fun. He played with them. After school, they had to do their chores and homework. Then he would play with them or take them to the park. Max recalled that Brandon took them roller-skating and played basketball with him. Quiona was active in sports, and he would go to her games.

Antonio Jackson lived in the Bernard home for a while in 1998, after being kicked out of his aunt's home. He said that Brandon watched his sister and brother "all the time...any time his mother was gone...he loved them, was real good to them." Jackson said that Thelma took him to church and helped him get a job. He noted that Brandon had a good relationship with his mother, and was "real respectful to his family." Terry Brown also spoke of Brandon's care for his siblings. He said that Brandon would have to pick them up from school at the Seventh Day Adventist Academy, and take them home. Brandon had a car that his mother had bought for him. He agreed that Brandon made them do their chores and homework before they could play. Brown said that all of Brandon's friends knew his mother and liked her, adding that Thelma was very religious and would "just preach at us all day."

As stated above, Brandon re-enrolled at Killeen High School on March 16, 1998. He was frequently absent, and no grades are recorded. He was withdrawn from the school on May 16, 1998, with the reason given that he was going to New Orleans, Louisiana. Brandon's father had relatives in New Orleans. Brandon went to spend a few weeks with them at that time. Just before leaving for New Orleans, Brandon was involved in the car accident described above. Kenneth said they sent Brandon to New Orleans because he wanted Brandon to get to know his paternal relatives. Terry Brown thought that Thelma had sent Brandon, possibly to get him away from the negative influences in his life. He stayed about a month, and returned to

**EXHIBIT 1 pg. 245**

Exhibit O-31



Killeen in late June.

Brandon's use of alcohol and drugs escalated after his return to Killeen from Temple, where his father had been better able to control his behavior. He admits that by early 1998, he was using marijuana every day. He was drinking off and on, primarily on weekends. He generally drank malt liquor, binging on weekends. Dettrick Spiller confirmed Brandon's use, stating that they used marijuana and drank together. Mel said the same thing, though he saw less of Brandon after moving to Austin with a girlfriend in 1998. Terry Brown said that during 1997 and 1998, they primarily used marijuana and alcohol, but admitted that they tried powder cocaine a few times. Thelma admitted that she suspected marijuana use on Brandon's part, but did nothing about it. Brandon said his mother did know about his alcohol use, as he came home drunk one night. Looking back, she feels that Brandon was depressed during this period. He was quiet and slept a lot. He kept his feelings in and didn't talk to her about what was going on his life. She didn't confront him. Thelma said she had begun seeing Kenneth again by late 1997, and was talking about reconciling with him. Brandon didn't want her to do that.

In July, 1998, Prince and James Presley told Brandon that they were driving to Georgia to visit relatives. They invited him to go along. Thelma said that she and Kenneth agreed to let Brandon go, as there were maternal relatives in Atlanta that Brandon could visit. Antonio Jackson went on the trip, as well. On July 23, 1998, the four were taken into custody in Macon, Georgia, when it was discovered that the vehicle the Presleys were driving was stolen. All four youths were wearing red colors at the time, and had a photo album in the car which allegedly contained photos with gang identification colors and symbols. Brandon recalled that they had taken the pictures for fun when they were at a party. Thelma went to Georgia and bailed Brandon out of jail. He and Antonio Jackson were not charged in this incident, as it was determined that they did not know that the vehicle, a Jeep Cherokee, was stolen. Brandon returned to Killeen with his mother.

Matthew Mitchell recalls seeing Brandon shortly after his return from Georgia. He had heard about the incident, and was concerned about Brandon. He was extremely active in the church at the time, and had returned to Killeen for the summer from the church boarding school he had been attending. He said that he confronted Brandon about what he was involved in... "I preached to him...I was begging him to turn over his life....he was listening...struggled ...wanted to, but never made the decision." Mitchell said that this conversation took place at church... "I was on fire, and talked to him."  He sensed that Brandon did want to change, and said that Brandon responded, "I'm tired...it's tiring being out there...I don't know how to get out of it...how to escape."

**EXHIBIT 1 pg. 246**

Exhibit O-32

Brandon admits he was getting tired of things, and that he realized he was just drifting. He said that he tended to go along with the group, and agreed that he was a follower. He said he wanted to fit in, so if someone wanted to do something, he just went along. Brandon stated that he still had the desire to go to college, but felt that he had plenty of time. He did want to get a regular high school diploma first. He admitted that his alcohol use escalated over the summer. He was drinking Old English and Cisco, a liquor sometimes referred to as "liquid crack." He described Cisco as pretty strong, and said he would often get drunk. Finally, he thought of enlisting in the military as a way to get out of the situation and straighten his life out. He reported that he went to the Army recruitment office, near the Killeen Mall, and tried to enlist. It appears that he tried to do this in late summer of 1998, after he turned eighteen. Brandon said that his mother tried to discourage him from enlisting. He said that he was denied because of his juvenile record. Thelma, on the other hand, said that she and Kenneth thought it was a good idea, and that he might "get re-directed" in the Army. She believed he was denied because of his asthma.

Brandon re-entered Killeen High School on October 13, 1998. He was in the 12th grade. He attended less than one month, withdrawing on November 3, 1998, to move to Michigan. One of his teachers that fall was Brad Hobbs, who had Brandon in his shop class. Hobbs remembered Brandon, and said that he was a quiet student who never caused problems in class. He did well during the short time he was in the class.

In the fall of 1998, Thelma and Kenneth decided to send Brandon to live with maternal relatives in Kalamazoo, Michigan. They were concerned about the people he was spending time with and did not want him to get into trouble. Brandon said that one of the reasons he left for Michigan was that the Killeen Schools were going to place him back at the Alternative Center. He moved to Michigan and quickly found a job at Meijer's, a discount store. Records indicate that he applied for the job on November 5, 1998; was interviewed on the 10th; and starting working there on the 22nd. Brandon said that he worked third shift as a stocker in housewares. He worked at Meijer's until December 30, 1998, after which he just didn't go back. He was officially terminated on January 14, 1999. He earned a total of $1082.83 at this job. While in Michigan, he enrolled in night school at Paw Paw Adult & Community Education.

## Circumstances Leading to Offense: 1999

Brandon said that he left the job and Michigan when he learned that his girlfriend, Shay Grimstead, was pregnant with his child. He went to New York, where she was living at the time, to see her and to see if she needed

**EXHIBIT 1 pg. 247**

Exhibit O-33



anything. His plan was to go back to Killeen to get his car, and return to New York to be with her. When he got to Killeen in early to mid January, his car was not working. His decided to get a job so that he could save money, buy a car and go to New York. Shortly after he got back to Killeen, his maternal grandmother, Versia Johnson, died.

When he got back to Killeen in early 1999, Brandon quickly re-connected with old friends, including Terry Brown, Antonio Jackson and Chris Vialva. Antonio Jackson said that they were drinking every day. Dettrick Spiller, stating that he had taken a different road than Brandon, said he didn't see much of Brandon in 1999. Spiller is married, a father, working, and living in a new home. He said he knew that Brandon was with Terry Brown and Chris Vialva, and heard about their alcohol and drug use. Mel, Brandon's cousin, had a girlfriend and was living in Round Rock. He didn't see much of Brandon during this period, either. Mel said that Brandon was spending time with Terry Brown and was "high all the time." Brandon admits that his drinking and drug use escalated in early 1999. He was drinking and using marijuana on a daily basis, and was frequently drunk. Mel said that he tried to talk to Brandon, but "he didn't listen."

Brandon did look for work. He went to Adecco Services, Inc., a temporary employment agency. Adecco placed him in a job at Dell Computers. He worked there on an as-needed basis. Records indicate that Brandon worked 15.75 hours at Dell the weeks of March 3rd and April 1st, and 26.75 hours the week of April 5th. His gross pay was $379.96. He was a forklift operator and materials handler; he put computer chips and parts at the front of the assembly line. At some point that spring, Brandon also worked for Spherion Corporation, earning a total of $441.62. He described this is a factory job in Temple, at a company that made chairs. Brandon said that he used some of his earnings to send money to Shay Grimstead, who was pregnant with his child and living in North Carolina at the time. Thelma helped Brandon get a car. Kenneth, noting that most of Brandon's friends didn't have cars, did not approve of Thelma's actions in getting a car for Brandon. He noted that Brandon's friends would rely on him for rides, and felt that Brandon was easily taken advantage of in this. Brandon noted that he "had the only car....when someone needed a ride, I would just go." Kenneth continued to feel that Thelma was too lenient with Brandon, and that she exercised no discipline or control over him. He said that he and Thelma argued about this.

Brandon still wanted to obtain a regular high school diploma. He said that he didn't want to go back to Killeen High School, where he felt he would be labeled as a gang member. His mother helped him get a small apartment at 1306 W. Stan Schlueter Loop, which was in the Ellison High School district. He enrolled in the 12th grade at Ellison High School on March 16,

**EXHIBIT 1 pg. 248**

Exhibit O-34

1999, after applying there on March 8ᵗʰ.  On about March 20ᵗʰ, while on a trip to Houston with friends, Brandon decided to get a couple of gold teeth.  He had the initials "CK" engraved on the teeth.  Thelma noted that Kenneth had gold teeth when Brandon was young.

On March 25, 1999, there was an incident outside Ellison High School. Brandon stated that there was an altercation between two groups near the bus stop.  He walked over to where it was occurring.  According to the testimony of Officer John Bowman, who testified in the penalty phase of the trial, one youth was "throwing (gang) signs" at Brandon.  Brandon rubbed his gold teeth.  Bowman said that he saw Brandon do this, and pulled him aside to warn him.  He took a photo of Brandon's teeth.  Brandon was referred to the school office, and was immediately suspended for displaying what was referred to as gang paraphernalia (the teeth).  Bowman said that Brandon was referred to the Killeen Alternative Center.  He was formally withdrawn from Ellison High School on April 8, 1999.

The day after the incident at Ellison High School, Brandon went to his family dentist, Dr. Wayne Pundt, and had the initials "CK" removed from his teeth.  Dr. Pundt's records confirm this, and indicate that he converted the teeth to open-faced crowns, removing the initials, on March 26, 1999.

Brandon's daughter by Shay Grimstead, Kiara, was born on March 29, 1999.  Shay was living in Mt. Vernon, New York at the time.  She later went, with Kiara, to live with relatives in North Carolina.  Brandon did not see his daughter until after he had been arrested in this case.

In late March, 1999, Brandon was involved in an incident at Ft. Hood, in which he sustained a head injury.  A dispute broke out between two groups at a party, and blows were exchanged.  Terry Brown, who was at the party, reported that they had been drinking a lot that day.  They had started drinking at Brandon's apartment before going to the party.  He said they were drinking 40 ounce bottles of Old English malt liquor, mixed with gin. Later, at the party, they also had a blunt of marijuana dipped in cocaine. Brandon admitted that he was drunk at the party and could not remember much of what occurred.  Brown said that they were "acting the fool" with females at the party when James Presley got into an argument with someone.  A fight broke out.  Terry had gone to the car to get more gin. When he returned, he saw Brandon unconscious on the ground, with blood on his forehead.  Antonio Jackson said that someone had picked Brandon up and slammed his head on the cement.  He had witnessed the incident, and said that Brandon was knocked unconscious.  Brandon just remembered that he "blacked out", and "the next thing I knew I was in the hospital."   Brandon was taken by ambulance to Darnell Army Medical Center, where he was treated and released to his mother.

**EXHIBIT 1 pg. 249**

Exhibit O-35

Brandon made one last effort to complete high school by enrolling in the Killeen Alternative Center on April 9, 1999. He attended only a week, withdrawing on April 15, 1999, with the reason given that he was going to get a job. Records indicate that he was doing well in the school. They used a point and privilege system. He earned the highest level of points possible, 26, in each class, and was given the highest privileges. Brandon stated that he still had the desire to earn a high school diploma and attend college. He felt that he still had time, even though he wasn't making much progress towards his goal. He did tell people, including his mother, that he wanted to be a neurosurgeon. He displayed little understanding of what was involved in pursuing such a career. When asked why he wanted to do this, he responded that he had read a book about a Seventh Day Adventist who had been a neurosurgeon, who was able to help a lot of people. He thought he would like to do that. He also said he wanted to fly a fighter plane. Brandon said that around this time, he "was getting tired of hanging around the streets...wanted to go to college...just couldn't do it, couldn't take the steps.' He felt "lost...just caught up, swept along." He wanted out of his situation, but just didn't seem able to take the steps to do it.

Brandon's drug use escalated around April, 1999. He began using cocaine heavily. Brandon was seeing Terry Brown and Antonio Jackson every day. He also spent time with Chris Vialva. In April, the three (Brandon, Brown and Jackson) obtained some powder cocaine. According to Brandon, they sniffed it every day for a couple weeks or so. Antonio Jackson confirmed this, stating, "we were on cocaine real bad...snorting as much as we could." He said that he and Brandon became more agitated. Vialva, according to Jackson, was using drugs, too, though not as much cocaine as Brandon, Jackson and Brown were using. Brandon was also abusing alcohol and using marijuana regularly during this period.

Around this time, Sherise Scott informed Brandon that she was pregnant, and said that it was his child. He had known Sherise for a while, and did spend some time with her, including at her mother's house. Sherise's mother was a known cocaine user. She also had boyfriends who abused drugs. Brandon said that when Sherise told him she was pregnant, "I wasn't sure." He stated that he only had sex with her one time, and had used a condom. He said he accepted her assertion that it was his child because he "didn't want her to go through it by herself...didn't want the child to not have a father." Terry Brown knew about Sherise's pregnancy, and said that Brandon seemed to accept that the child was his. He said that Brandon tried to be supportive of Sherise. Sherise's daughter, Tinea, was born in December, 1999, while Brandon was awaiting trial in this case. It is entirely possible that the child is not his.

Terry Brown testified at trial that he, Chris Vialva and Brandon

**EXHIBIT 1 pg. 250**

Exhibit O-36

committed at least twenty-five residential burglaries in the Killeen area between April, 1999 and mid June, 1999. According to Terry Brown, he and Chris Vialva began doing the burglaries in late April and Brandon started doing burglaries with them in about May. Terry said that the burglaries were his (Terry's) idea, which Antonio Jackson confirms. Terry Brown further stated that Brandon was primarily a driver, and would generally sit in the car while Terry and Chris broke into the homes. Brandon was the only one who had a car. According to Terry, they always knocked first, to make sure no one was home, and would gain entry by kicking in the door. Terry said that Chris Vialva even had t-shirts made up with the name "Kick Door Boys" on them. Testimony at trial indicated that the authorities had evidence that two residential burglaries were committed on May 24, 1999, and that Brandon and Terry Brown were present with Chris Vialva when Christ attempted to pawn items taken in those two burglaries. Brandon admitted having committed some burglaries with Terry Brown and Chris Vialva, but stated that the it was not as many as Terry reported, and that the burglaries took place over a period of two weeks or so in late May.

Brandon was involved in a motor vehicle accident on May 25, 1999. His car was struck from behind by a school bus. He did not seek medical attention immediately. Medical records from Scott and White Clinic indicate that he came into the clinic the day after the accident, on May 26, 1999, with a complaint of pain in his neck. He was examined and prescribed Advil 3 (Advil with codeine) three times a day, for pain, and Flexiril, a muscle relaxant, also three times a day. Thelma stated that she filled the prescriptions and that Brandon did take the Flexiril and Advil. He was also on medication for his asthma, including pills and an inhaler. In June, Thelma used the insurance settlement from the accident to get Brandon a car, a Buick Park Avenue.

During May and June, 1999, up until the time of the offense on June 21, 1999, Brandon was drinking heavily and using a number of different drugs. While his primary drug of choice was marijuana, he also used cocaine, acid and
embalming fluid. Marijuana laced with embalming fluid was popular in the street. It was often referred to as "wet" or "water", and sometimes as "fry." They also did "primo", which was marijuana laced with cocaine. Antonio Jackson said that Brandon started doing "water" in late May or early June, with Terry Brown. Terry Brown admitted that he and Brandon were using marijuana with embalming fluid, and said they were on it every day in the weeks before the offense. He acknowledged this use in his pre-sentence report and to the psychologist who evaluated him in July, 1999.

Brandon and Terry were also drinking heavily on a daily basis. They generally drank malt liquor, E & J Brandy, and Cisco, which is fortified wine,

**EXHIBIT 1 pg. 251**

Exhibit O-37

with a high alcohol content. Brandon admits that they were "getting drunk every night", and that he drank more than Terry, Antonio or Chris Vialva. Antonio Jackson went to jail in early June. Brandon continued to abuse alcohol and drugs, primarily with Terry Brown. He said that "wet" made him high for a long time, and he would become disoriented. It made him feel "crazy...real high, then down, then back up...strange." Matthew Mitchell recalled that he ran into Brandon one day, and that Brandon was talking about doing "wet." He said that Brandon "smelled like it...was talking loud, acting weird." His impression was that Brandon was doing this frequently.

Brandon said that he was feeling tired by the middle of June. He wanted to get away from the scene. He recalls that his mother tried to talk to him about what he was doing... "I didn't listen....thought I was doing petty little things...didn't see breaking into houses and stealing stuff as serious....thought it was mischief." Now, he said, he understands it was serious. He talked to his cousin Mel about finding a job. Mel was living in Round Rock, near Austin. On the Friday before the offense, Brandon went to Round Rock to interview, along with Mel, for a job at Dell. They were in a minor motor vehicle accident that day. Brandon did not need medical treatment. He planned to go back to Round Rock for a job interview the following week.

On the day of the offense, June 21, 1999, Brandon was drinking and smoking marijuana. Terry Brown stated that they did some "wet" that day. Brandon admits to drinking and using drugs that day. He picked up Terry at about 11:00 a.m.. They drank and smoked marijuana together. Sometime in the afternoon, Brandon went to Sherise's house. He said that Sherise's mother's boyfriend gave him something to drink. He didn't know what it was, but said that he drank a couple cups of the liquid, and it made him tipsy. That evening he met the co-defendants at Long Branch Park, and followed the Bagley car to Ft. Hood, where Todd and Stacie Bagley were killed.

**Pre-trial Confinement**

Brandon was taken into custody at the scene of the crime, and was initially held at the CID offices at Ft. Hood. He was then transported to the Bell County Jail in Belton, before being transferred to the McLennan County Jail in Waco, where he remained until the conclusion of his trial and sentencing. An arrest warrant was issued on June 23, 1999, and he was initially indicted on July 13, 1999. A second superseding indictment was filed on March 28, 2000; and the notice of intent to seek the death penalty was filed on March 30, 2000.

Brandon was visited regularly by his parents, and had visits by relatives, pastors of his church and other spiritual advisors. He said that Shay Grimstead went to the jail one time with his daughter Kiara. Sherise

**EXHIBIT 1 pg. 252**

Exhibit O-38

Scott gave birth to Tinea on December 5, 2000, and, according to Brandon, she took Tinea to visit him at the jail several times. Brandon's childhood friend, Matthew Mitchell, visited a couple times, once with the pastor from Brandon's church. Mitchell testified that Brandon had expressed remorse during a visit, though he (Brandon) was precluded by his attorney from discussing any details of what had occurred. Antonio Jackson reported being in touch with Brandon while he was in the jail, and said that Brandon "was praying...telling me to go to church...he talked about his kids...wanted me to send them books on religion."

Brandon reported that he got along well with the staff at the jail and had no serious problems. Records include two conduct reports. The first one was dated October 15, 1999, and was for using a stinger to start a fire. He had rigged up a "stinger" using a razor and tissue, which was inserted in an electrical plug to light a cigarette. He received five days segregation for this. On December 24, 1999, Brandon received a conduct report for standing on a chair and cursing. He received three days segregation and loss of all privileges for this report. He had no conduct reports after that time.

Medical records from the jail indicate that Brandon had complaints of pain in his neck and shoulders in July and August, 1999. They cited his previous motor vehicle accident. He asked for the Flexiril he had been prescribed, and which Thelma said she took to the jail, but was given Tylenol instead. A note in the records dated November 10, 1999 indicates that Brandon was depressed. He also reported being claustrophobic. He declined transfer to the medical unit at that time, and said he would let staff know if the depression became worse. Brandon admits to experiencing depression in the jail in the fall of 1999.

Soon after admission to the McLennon County Jail, Brandon met Michael Cherry, an inmate housed in his same unit. Cherry was leading Bible studies on the unit at the time. Michael Cherry is now an ordained minister and conducts a prison ministry. He said he noticed that Brandon would stand nearby when he was conducting Bible studies. He seemed to be listening. Then, one day, Brandon asked if he could join the group. He was a regular member after that. Pastor Cherry and Brandon developed a close relationship during the time that Brandon was in the jail. Cherry felt that Brandon was able to open up to him about his feelings.

Pastor Cherry reported that Brandon was generally well-behaved in the jail. He said that Brandon never got into any fights or confrontations. He participated in Bible studies, read the Bible, played basketball and tried to stay occupied in positive activities. He noted that there were no organized programs on the unit, and no jobs for inmates. Cherry recalled that Brandon asked his mother to bring his Bible to the jail so he would have it for Bible

**EXHIBIT 1 pg. 253**

Exhibit O-39

40

studies.  Pastor Cherry commented that Brandon had a positive influence on other young inmates in the jail... "guys who were prone to violence, agitation...he tried to get them to mellow out."

Brandon talked with Cherry about his concern for his family and his worries about his younger brother.  Brandon worried about the emotional toll the case was having on his mother.  He was concerned that his brother Max might get "off track" and get into trouble.  Cherry recalled that one time Brandon had received a letter from his brother, in which Max wrote "something upsetting....(about) gangs...it freaked Brandon out."  Brandon didn't want Max to follow in his footsteps.  Pastor Cherry said that he had the impression that Brandon's relationship with his father was "distant."

Pastor Terry Johnson of the Seventh Day Adventist Church in Killeen visited Brandon a little over a week after the offense.  He visited on a couple other occasions.  Other pastors from the church, Adam Andreassen and Vandeveegate, also visited.  Pastor Johnson recalled that Brandon told him he was reading the Bible and "trying to find the roots he had lost for a time." He said that Brandon talked about Pastor Cherry and the Bible studies group. He was enjoying reading the Bible with understanding of what he read. Johnson noted that Matthew Mitchell came with him on one of his visits, and Brandon and Matthew spoke about the Bible at length.  Johnson said that Brandon, while he couldn't discuss his legal situation, did express regrets about the mistakes he had made and the people he had been involved with. While Brandon couldn't talk about the offense, Johnson stated that his impression was that Brandon was remorseful.  He noted that Brandon was very concerned about the judgement of the church, and wrote a letter in which Pastor Johnson felt Brandon's feelings of remorse came through. Johnson noted that the desire to make amends is an important part of remorse.    Pastor Johnson read the letter to the church board and to the church congregation.  The letter reads as follows (typed exactly as written):

Dear SDA Church,
    I'm writing to let you know that I'm sorry to Disappoint you. I've been in your church for almost my whole life.  I've grown up with most of the church family.  But some where in my life It took a turn for the worst.  Some where in my life Satan took my mind for a ride.  Through all this the lord has been able to sit me down and tell me that I'm going in the wrong direction.  I hope my exsperience of being around the wrong crowd has showed that It doesn't madder how much you go to church and around church members, if you don't give your life to Christ and really mean it you can still be consumed by the devil.  I wish that It didn't take

EXHIBIT 1 pg. 254

Exhibit O-40

an exsperience like this for me to know what Path I'm to take. Even though me and my family really can't afford to get me a good lawyer, so I have to deal with this court appointed lawyer. But, with ya'll prayers from the whole church can help me in my quest to deliverance. And that helps me come to the reason of my letter. At your prayer time I would like you to pray as a congregation for me to get through this mishap. So that I can make amend with my family and church friends. To show everyone that I can be successfull and that I've changed and have finally grown up. And also, so I can make those that love me and care proud. Finally, I hope that I have been an example to any young people out there trying to be a ganster or trying to fit in with these in crowd. The bottom line is be yourself and don't let anyone else push you to do something you don't want to. Because this I can assure you is not the place to be. Well I got to go and I hope you have a happy Sabbath.

Brandon

Pastor Johnson said that the church members were glad that Brandon had written the letter. Debbie King remembered the letter being read to the congregation. She said that they did pray for Brandon at their Saturday services. When asked about the letter, Brandon said he just felt that he wanted to express his feelings to the church. He felt he had embarrassed his family and the church.

Pastor Cherry stated that he believed that Brandon was very remorseful for his actions. While Brandon couldn't discuss details, he did tell Cherry that he regretted his mistakes. He said that he knew the victims were God's servants and felt very bad about their deaths. Brandon also felt bad about the pain he had caused his family, and about decisions he had made that would separate him from his own children. Stating that Brandon was "absolutely very sorry" for his involvement and knew how wrong it was, Cherry said that he and Brandon "prayed for the families of the victims." They prayed individually and in the Bible studies group. Cherry added that Brandon's faith was genuine... "he drew strength and courage from God." Brandon stated that he felt bad about what had happened in the offense. He understood that many people had been hurt. When he found out the couple was involved as youth leaders in their church, he called their deaths "a real tragedy...I'm sorry they're gone ...sorry for their families."

**ASSESSMENT**

EXHIBIT 1 pg. 255

Exhibit O-41

Brandon Bernard is a twenty-three year old African-American man who is currently under sentence of death, pursuant to conviction for a federal capital offense, and who is confined in the federal death unit at the United States Penitentiary in Terre Haute, Indiana. He was eighteen years old at the time of the instant offense.  He had no other adult convictions or arrests, though he did have two adjudications of delinquency for the commissions of burglaries at ages fourteen and fifteen.  He has no prior history of violent or assaultive offenses.  His actions as a party to the instant offense contributed to the tragic deaths of Todd and Stacie Bagley.  He has expressed remorse and regret for his involvement in this offense.

Brandon's young age at the time of the offense was a major contributor to his involvement, i.e. his actions were, to a great extent, products of the qualities of youthfulness, including lack of maturity, poor judgement, vulnerability to peer pressure and impulsiveness.  No one who knew him, adults or peers, viewed him as a young man who would harm others. Brandon was raised in a devout Christian home, and remained active in his religious practices throughout his childhood and adolescence.  He had an understanding of right and wrong.   He had a commitment to education, as evidenced by his earning his high school equivalency, continuing efforts to obtain a high school diploma, and desire to attend college.  He had limited work history.  He was described by all as a follower, who was easily led by others and prone to suggestion.   Like all adolescents, he was influenced by peers, and by a need for acceptance, approval and a sense of belonging. There are indications that he may have had learning problems, and that he suffered from depression.

Family disintegration as he entered adolescence; disparate parenting practices between his father and mother; low self-esteem, anxiety and depression all were likely contributors to his abuse of alcohol and drugs.  This use further impaired his judgement, decision-making and problem solving ability.  In the months preceding the offense, Brandon was under mounting stress.   This stress contributed to escalating use of alcohol and drugs. Brandon made a generally positive adjustment during pre-trial incarceration, and had a number of ties to conventional norms that would have indicated positive rehabilitative potential.

Parents are the most powerful influences for the developing child.  Each of Brandon's parents had developmental experiences of their own that affected the way in which their personalities were formed and the way in which they parented Brandon.  Thelma Johnson Bernard was the middle child of sixteen in a poor family of migrant farm workers.  She had a strong religious upbringing in the Seventh Day Adventist Church.  Thelma was driven to escape the poverty of her upbringing by obtaining an education and having a successful career.   She was described by all as a strong-willed and

EXHIBIT 1 pg. 256

Exhibit O-42



ambitious woman, though also as kind and loving. The victim of harsh physical discipline in her childhood and the witness of violence towards her mother by her father, Thelma eschewed physical punishment of her own children. She was an overly lenient parent who exercised few controls over Brandon. She was frequently absent from the home, due to work, duties in the Army Reserve, and enrollment in graduate training. When home, she failed to discipline or control Brandon during his adolescence, when his father, the primary disciplinarian, was no longer in the home. She enabled Brandon to the extent that she bought him cars and other material things, and did not make him work to earn them.

Kenneth Bernard had a difficult and traumatic childhood. He never knew the identity of his father. His mother was an alcoholic and a prostitute. He was removed from his mother's care by the state when he was a young child and placed in foster care. Later, he lived in the home of a maternal aunt, who was a harsh disciplinarian. Kenneth exhibits indicators of low cognitive functioning and learning disability. He also reports having difficulty with short-term memory. He suffers from low self-esteem which appears to be primarily due to learning problems and inability to compete, in terms of education and career, with his wife. He has had extended periods of unemployment and underemployment, though he has maintained his maintenance job with the Temple Independent School District for a number of years. Having experienced little in the way of positive modeling for parenting, Kenneth was rigid and harsh in his child-rearing practices.

During Brandon's childhood, the Bernard marriage was almost continuously strained. There was little communication between the parents, and frequent disagreements. Each blamed the other for problems. Thelma, who was the primary breadwinner, felt that Kenneth didn't fulfill his responsibilities at home, particularly when it came to care of the children. Kenneth felt that Thelma didn't support his efforts to get an education. The two had very different parenting styles, which can be problematic for children. While Thelma was overly lenient, Kenneth was overly harsh. He engaged in harsh physical discipline of Brandon, bordering on abuse, and often for very minor infractions. Brandon said that he never felt close to his father, and didn't feel he could talk to him. When parents disagree about expectations and discipline, it can be confusing for the developing child, who needs consistency and predictability.

In 1992, when Brandon was on the verge of adolescence, the tension between his parents erupted into a physical confrontation that led to Kenneth's removal from the home. Brandon remembered this fight as being about him, and likely felt responsible for the breakup of his parents' marriage. He didn't see his father for more than two and half years, and worried about him. He feared that his father was homeless or worse. These

**EXHIBIT 1 pg. 257**

Exhibit O-43

are difficult feelings for a child to handle.  Brandon was not able to talk about them with anyone.  Fellow church members noticed that Brandon seemed more withdrawn and sad following his parents separation.  After Kenneth left the home, Brandon had to take on a lot of responsibility for the care of his younger siblings.  He was, by all accounts, a responsible care-giver to Quiona and Max.

During Brandon's early adolescence, a number of factors, in addition to the divorce of his parents and absence of his father, had negative consequences for him.  He was transferred by his mother to public school. He left the small, structured and protected environment of the church school for the larger public school system, where he struggled, particularly in language based classes, and seemed to have difficulty with attention and concentration.   This change in schools contributed to a change in peer groups.  He saw less of his friends from the church school, most of whom went away to a boarding high school run by the church, and began spending time with other youth from the neighborhood.  Then, his cousin Mel came to live with Brandon's family.  Brandon had not been in any trouble in the community prior to the time Mel came into the home.  Mel admits to being a negative influence and the prime mover behind the burglaries that he and Brandon committed, and which led to the 1995 referrals to Juvenile Court.

Brandon's juvenile offenses, at age fourteen and fifteen, led initially to a move from his mother's home to his father's, who had come back into Brandon's life at that time; then to placement in a residential facility in Brownwood.  He was transferred from the Killeen 9th Grade Center to Temple High School, then to Brownwood High School.  This was the beginning of numerous changes in high schools for Brandon, making it difficult for the schools to recognize and assist him with learning problems, and for Brandon to earn his high school diploma.  Catch 22, the program in which Brandon was placed by Bell County, did not appear to be appropriate for his age and needs, and provided little in the way of rehabilitative services.  He had just turned fifteen years old and was placed in type of independent apartment living arrangement, with some supervision and few services.  He was never provided with the counseling services ordered by the Court.  Nevertheless, he did not have behavioral problems while in Catch 22, and was discharged from the program after only six months.  Records indicate that his treatment needs had not been met.

Brandon returned to his father's home, and to Temple High School, in early 1996.  For about seventeen months, while he lived with his father, he avoided further legal difficulties and earned his GED.  He worked at a job in Temple.  Kenneth Bernard kept a tight rein on Brandon, and maintained regular contact with his school and probation officer. Brandon complied with all rules and seemed to do well.  He was apparently, however, still

EXHIBIT 1 pg. 258

Exhibit O-44



experiencing some emotional distress, possibly depression, as his pediatrician referred him for psychological evaluation due to "stress" in late 1996. Thelma cancelled the appointment. Unfortunately, in late spring of 1997, a dispute between Brandon and his father at a church event led Thelma to decide that Brandon should return to live with her.

Back in his mother's home, with few rules or controls, Brandon, then almost seventeen years old, re-connected with old friends from the neighborhood. By that time, Dettrick Spiller, Mel Pollock and some others had started a loosely formed gang called the 415 Tree Tops (or just 415s). Brandon associated with them. Others of his friends were in a group called the 212 PIRUs, which had reportedly been started by the Presleys, also friends of Brandon's. As stated above, all, including the former members of the groups, teachers from the community, and Brandon's probation officer, characterized these groups as gang "wannabes", essentially comprised of kids from one or more neighborhoods - in this case, Heather Glen and Long Branch - who hung around together, and adopted colors and symbols of national gangs. Though they called themselves "Bloods", there is no evidence that they were formally organized or had any formal affiliation with a national gang. Even the officers who testified at Brandon's trial about gangs presented no evidence that the 415s or 212s were formally affiliated with any national gang.

Young people become involved in gangs for a number of reasons, including for: a sense of family, belonging or acceptance; protection in the community; subsistence; respect; and as a response to peer pressure. Persons tend to join in adolescence, which is a time of identity formation, with issues of masculinity and self-esteem; and a time of life characterized by risk-taking, impulsivity, vulnerability to peer pressure, problems with judgement and problem-solving, and a need for a sense of belonging or group identity (see below). For minority youth, identity development in an atmosphere or environment that has so many negative images of them, so many insults to their sense of self, is particularly difficult. Gang membership offers them a sense of acceptance, respect and self-esteem.

The U.S. Department of Justice, through the Office of Juvenile Justice and Delinquency Prevention (DOJ - OJJDP), has studied gangs for a number of years. It has sponsored the annual National Youth Gang Survey, conducted by the National Youth Gang Center, since 1995, in an effort to track the development and characteristics of gangs across the country. Their studies indicate great differences between the traditional early onset gangs in large urban areas, such as the Bloods and Crips of Los Angeles, and the Gangster Disciples, Vice Lords or Latin Kings of Chicago, and later onset gangs in less urban areas. OJJDP has published a number of reports and

EXHIBIT 1 pg. 259

Exhibit O-45

studies related to gangs in the U.S., which provide useful information in more accurately portraying the youth gangs in existence in Killeen at the time of this offense. They note the problem of popularly held, media-influenced misconceptions about modern day youth gangs outside central urban areas, stating that the public continues to perceive youth gangs and gang members in terms of the media stereotype of the Crips, Bloods or Gangster Disciples rather than in terms of current scientific data. These misconceptions have unnecessarily fueled the public's fears.

Research and studies indicate that in less urban areas, gangs developed during the 1980's and 1990's. While many of these groups took on the names or symbols of the older, more formally structured gangs of large urban areas, they were not actually affiliated with them, and did not share the same characteristics. By 2001, 65% of cities with a population of 50,000 to 99,999 reported gang presence in their communities (Killeen's population in 1999 was about 85, 000). These tended to be the later onset type of local gangs and have been described as modern day "hybrid" gangs. They tend to: have younger members, with most members being fifteen to seventeen years old; have both male and female members; be racially mixed; have unclear rules or codes of conduct; and have symbolic associations with more than one well-established gang. They are less likely to be involved in drug dealing or gang-related homicides, and more likely to be involved in property crimes. Most adolescents do not remain in these gangs for long periods of time, and generally leave after adolescence. Contrary to popular myth, in these later onset, hybrid gangs, lifetime membership is not the practice, and it is easy to leave. Many of these groups adopt colors or symbols of different national gangs, or have members who switch from one gang to another. This is evident in the 415s and 212s, which called themselves Bloods (a Los Angeles gang) and wore the color red, but also used symbols of the Gangster Disciples, or People Nation from Chicago. True, traditional, organized gangs would not have this mix of colors and symbols.

The expanded presence of gangs outside of large urban areas has been viewed as a function of the relocation of young people from central cities to smaller cities, which is sometimes called gang migration. In most cases, there is little or no real connection between local groups with the same name, and national, urban gangs. Law enforcement professionals, according to studies, may have difficulty differentiating among local gangs that have adopted the names, colors or symbols of national gangs, but have no real connection with them. Several persons interviewed in this case pointed to the fact that Ft. Hood, located on the boundary of the Killeen city limits, contributed to a great deal of transiency in the population and the migration of gangs into the area. Teachers interviewed indicated that these gangs seemed to have been a phenomenon of the mid to late 1990's in Killeen, and are not viewed as a serious problem today. The school system no longer

**EXHIBIT 1 pg. 260**

Exhibit O-46

47

provides gang training for its teachers and staff.

During the remainder of 1997 and all of 1998, Brandon spent time with these friends. His alcohol and drug use increased during this period. His primary drug of choice was marijuana, which he used on a regular basis. Despite the fact that he earned his GED in the summer of 1997, Brandon made repeated efforts to obtain his high school diploma. He had the desire to eventually attend college, and felt that a regular high school diploma would enhance his chances of getting into college. He made little progress towards this goal, but, rather, just seemed to drift, spending his time with friends in the community. Some efforts were made by Brandon, and by his parents, to extract him from this situation. He tried to enlist in the military. His parents sent him to visit relatives in Louisiana for a few weeks. Finally, they sent him to live with relatives in Michigan. He did work and attend school in Michigan, but the pregnancy of a girlfriend led him back to Killeen. He had planned to stay only a short time, but instead remained. Within a few months of his return in early 1999, he was involved in the instant offense.

During the first few months of 1999, Brandon experienced a number of stressors. He returned to Killeen concerned about how he could handle the responsibilities of parenthood. Shortly after his return, his maternal grandmother died. He had spent a great deal of time in her home during his childhood. He was still determined to earn a high school diploma, but felt he couldn't do it at Killeen High School, where he felt he would be labeled. In order to enroll at Ellison High School, he rented a small apartment in the Ellison district. He did this with his mother's help, but was ill equipped to live on his own. Left to his own devices, and subject to the vulnerabilities of youth, his drug and alcohol use escalated. He began using cocaine heavily in the spring, along with regular use of alcohol and marijuana. He tried other substances, including marijuana dipped in embalming fluid, a substance that can have a damaging effect on the brain (see below; also affidavit of Michael Gelbort, Ph.D.). His daughter by Shay Grimstead was born in late March, 1999. Though he said he looked forward to having a child, he clearly felt the pressures of parenthood at such a young age, and with little ability, financially or emotionally, to take on such responsibility.

In late March, Brandon sustained a serious head injury, resulting in a loss of consciousness. He had several prior head injuries, including two as a very young child. Shortly after this, he was informed by Sherise Scott that she was pregnant with his baby. While there is a question as to whether this is really his child, Brandon decided to accept Sherise's assertions. This created added pressures for him. He was injured in a motor vehicle accident in late May, 1999, less than one month before the offense. He was prescribed Flexiril and Advil 3 for treatment of neck pain. Brandon held two short term jobs in the spring of 1999, but was unable to maintain them. He

**EXHIBIT 1 pg. 261**

Exhibit O-47

was feeling pressure to find work in the weeks preceding the offense. His alcohol and drug use escalated, and he became involved, along with Terry Brown and Chris Vialva, in some burglaries in the Killeen area. He was generally the driver; the others entered the residences and took items.

During the weeks preceding the offense, Brandon was taking Theodur, in pill form, and Alupent, in an inhaler, for treatment of his asthma; and had been prescribed Flexiril and Advil 3 for injuries sustained in the car accident. He was also heavily abusing drugs and alcohol. He regularly consumed malt liquor, Brandy and Cisco, a fortified wine with a high alcohol content. On occasion, he drank gin. He regularly smoked marijuana, and at times, marijuana dipped in embalming fluid. He also smoked cigarettes. Theodur and Alupent are bronchodilators, which can have interactive effects with other drugs, including alcohol. Flexiril is a muscle relaxant which can also have interactive effects, including with alcohol and other central nervous system depressants, e.g. marijuana. Flexiril can enhance the effects of alcohol. Advil 3 is an analgesic pain reliever containing codeine. Codeine is derived from opium/morphine, and also has an additive effect to central nervous system depressants such as alcohol and marijuana. Codeine is contraindicated for head injury. All of these substances can act to impair brain functioning. They can impair judgement, memory, concentration and cognitive functioning; they can inhibit emotional control and increase risk-taking behavior.

One of the most dangerous substances Brandon used during this period was marijuana dipped in embalming fluid. This trend began on the east coast in the 1980's and was reported in Texas in the early 1990's. A report prepared by the Texas Commission on Alcohol and Drug Abuse in 1998, noted that adolescent use of marijuana had escalated in Texas during the early to mid 1990's, as had smoking of cigarettes. Marijuana and cigarettes were viewed as "gateway" drugs that led to increased use of other illegal drugs, including what became known as "fry" or "wet", marijuana cigarettes or tobacco cigarettes soaked in embalming fluid, and often laced with PCP. Embalming fluid is a compound of formaldehyde, methanol, ethyl alcohol or ethanol, and other solvents. The fluid found on the streets often also contained PCP. Most buyers were unaware of that fact. PCP (Phencyclidine) is a dissociative anesthetic with hallucinogenic properties. The effects of use of embalming fluid include bronchitis, body tissue destruction, brain damage, lung damage, impaired coordination, and inflammation of the throat and esophagus.

Brandon's use and abuse of these substances appears to have been a function of several factors. It was certainly a part of adolescent experimentation and a product of peer influence. It was also a form of self-medication for underlying low self-esteem, anxiety and depression. The

EXHIBIT 1 pg. 262

Exhibit O-48

use of these substances, with their concomitant effects, combined with Brandon's young age, were contributors to his actions in the offense.

Brandon was youthful at the time of the instant offense, only eighteen years old.  Youthfulness has historically been considered mitigating as to punishment in capital cases.  This is because it is understood that youth is a time in life when a person is still developing and maturing. Many of the characteristics of youth, that contribute to impulsive and risky behavior, are products of a stage in life that the person will mature out of.  Adolescents have not yet developed the psychological, cognitive and emotional characteristics of mature adults.  They are more impulsive, and less capable of controlling their behavior or thinking in terms of long-term consequences. They have problems with judgement and problem-solving.  Stress interferes with their capacities, especially for good decision-making, more-so than with adults.  A very small percentage of youths who commit violent behavior by age 18 go on to commit violent crimes as adults.  Most youths arrested for a violent offense do not engage in further violence.

Adolescents mature gradually and unevenly.  Chronological age does not necessarily correspond with maturity, and is not a reliable indicator of development due to the great variations among individuals. [Note: much of this information regarding adolescent development is based on the work of Thomas Grisso, Ph.D. and Marty Beyer, Ph.D., psychologists with expertise in adolescent development and behavior.]  Each adolescent develops at his or her own pace.  Boys mature more slowly than girls.  The maturation process involves cognitive development, identity formation, developing competence, moral development, and physical development.  Even late in their teens, young people have difficulty employing mature cognitive strategies and engaging in rational decision-making.  Adolescents are often surprised by the outcomes of their actions, and view as "accidental" unintended consequences. Adolescents often do not plan, or follow through with a plan, and can get caught up in unanticipated events.  Risk-taking behavior is common at this stage of development, and reduces the ability to use mature and rational cognitive strategies.  Learning difficulties and substance abuse can further compromise their judgement, decision-making and problem-solving ability. These capabilities evolve throughout adolescence and are often not adequately developed until a person is well into his or her twenties.

Adolescence is a time of identity development. Family, culture, peers and gender affect one's definition of self.  While the core of a child's sense of belonging comes from family, during adolescence peers take on an increasingly important role. Identifying with peers is an important part of self definition.  Adolescents need to feel that they belong and fit in.  Group membership adds to their sense of belonging.  Peers are often more unconditionally accepting, and less critical, than parents.  Peers have a great

**EXHIBIT 1 pg. 263**

Exhibit O-49

influence on day to day choices during adolescence. Boys are generally more susceptible to peer pressure than girls.   Experiences with racism, including negative media images of one's race, can affect self-image and susceptibility to peer pressure. Adolescents who have painful or difficult experiences and feelings will often turn to substances to numb their feelings.

Adolescents need to experience success to feel good about themselves, and to be able to resist negative peer pressure. Many teens develop anxiety because they don't feel competent, or don't feel they can meet the expectations of adults, including parents.   Teens respond better to encouragement rather than punishment. They do not respond to structure in which they don't have a choice, and can resist and rebel against limits which they perceive of as unfair or too restrictive.   They need a combination of nurturing and reasonable limits, with opportunities for choice and success in order to grow into healthy functioning and responsible adults.

The physical changes of puberty also can affect adolescents in may ways.  Boys reach puberty later than girls. Differences in the onset and rate of physical development can affect self-confidence and identity.  Neurological and biochemical functioning can affect adolescent behavior.  In recent years, studies have shown that the adolescent brain is far from mature.  The brain is generally not fully developed until well into the twenties.  Boys brains tend to develop later than girls.  Different parts of the brain develop at different rates.  One of the last parts to develop is the prefrontal cortex, that part of the brain responsible for emotional controls, judgement and decision-making. [Note: see, for example, U.S. News & World Report: August 9, 1999.]  The connections between neurons that affect emotional skills, and physical and mental abilities are still being forged throughout adolescence.   Until the prefrontal cortex is fully formed, in a process called "pruning", most teens don't have the brain power they need to exercise good judgement, or gain access to critical memories and emotions that help them in rational decision-making.   In addition, levels of serotonin appear to decline temporarily in most adolescents, making them more prone to act impulsively. The brain's capacity for growth through adolescence indicates that even troubled teens can still learn restraint, judgement and empathy. For all these reasons, which relate to a stage in human development out of which persons mature, youthful defendants have been deemed less morally culpable as it relates to punishment, as their actions are, to a great, extent, a product of that time in life.

There are a number of indicators in Brandon's history that he had rehabilitative potential and the capacity to make a positive adjustment to incarceration.   Brandon did not have a history of violent or assaultive behavior prior to the instant offense.  He was viewed as someone who would, under normal circumstances, not harm others. Psychological testing at age fifteen, in 1995, indicated that he was responsiveness to the needs and

EXHIBIT 1 pg. 264

Exhibit O-50

concerns of others; was compassionate and empathetic in relationships; and had appropriate regard for authority. Ties to conventional norms are indicators of rehabilitative potential. In Brandon's case, this includes: strong religious upbringing and faith; positive motivation for education as evidenced by earning his GED, efforts to obtain a high school diploma, and the desire to attend college; and positive attachment to his family. His family has remained attached to and supportive of him. His parents have reconciled and remarried; they were together at the time of his trial. They communicate better, including about child rearing, and Kenneth has mellowed in his disciplinary practices. Except for a couple of minor infractions, which were early in his pre-trail confinement and typical for his age, Brandon made a generally positive adjustment to incarceration. He was respectful of rules and staff, did not engage in confrontations, and made constructive use of his time. He regularly attended Bible studies, and counseled with the pastor from his church and other spiritual advisors. He would have been expected to continue to make a positive adjustment to incarceration in the federal prison setting. Brandon has a clear understanding of right and wrong, and appreciates the wrongfulness of his actions in this offense. He has expressed remorse and a desire to make amends to his church and family. As Pastor Johnson pointed out, the desire to make amends is an important aspect of remorse.

## SOURCES

Brandon Bernard
Thelma Bernard, mother
Kenneth Bernard, father
Quiona Bernard, sister
Max Bernard, brother
Mary Pollock, maternal aunt
Melsimeon Pollock, maternal cousin
Martha Johnson, maternal aunt
Novtony Baez, former juvenile probation officer
Dann Barger, former director of Catch 22
Melba Barger, former staff of Catch 22
Rick Marasco,former elementary teacher
Brad Hobbs, high school teacher
Susan McLaughlin, high school teacher
Mattie Adams, GED teacher
Rev. Terry Johnson, former pastor at Seventh Day Adventist Church
Debbie King, fellow church member
Bonnie Wainwright, fellow church member
Pastor Michael Cherry
Terry Brown, co-defendant
Matthew Mitchell, friend

EXHIBIT 1 pg. 265
Exhibit O-51

Michael Voegele, friend
Dettrick Spiller, friend
Antonio Jackson, friend
Alice Brown, mother of Terry Brown
Richard Hoppe, investigator
Carolyn Hoppe, investigator
Dr. Michael Gelbort, neuropsychologist
Rob Owen, attorney

Memoranda re: interviews by Investigator Royce Rutherford with:
   Terry Brown
   Tony Sparks
   Christopher Lewis
   Greg Lynch

## Records and Documents

Indictment, Second Superceding
Notice of Intent to Seek the Death Penalty
Motions
Portions of the trial transcript, including testimony of Terry Brown and Chris
   Lewis
Penalty Phase transcript
Victim Impact statements
Investigation reports by the Texas Department of Public Safety, Texas
   Rangers Division
Trial court docket
Special Findings Form (verdict sheet)
McLennon County Jail records
Investigative Report by Criterion Investigations
File of trial attorneys, Russell Hunt & Russell Hunt, Jr.
Birth record, Brooke Army Medical Center
Medical records, Bassett Army Medical Center
Medical records, Darnel Army Medical Center
Metroplex Hospital records
Scott and White Clinic records
Dr. Wayne Pundt, dental records
School records:
   Seventh Day Adventist Academy
   Rancier Middle School
   Killeen 9th Grade Center
   Killeen High School
   Temple High School
   Brownwood High School

**EXHIBIT 1 pg. 266**

Exhibit O-52

Ellison High School
Killeen Alternative Center
GED Certificate
Juvenile Court files
Bell County Juvenile Probation files
Psychological evaluation by Dr. Frank Pugliese (1995)
Psychological evaluation James Shinder, Ph.D. (2000)
Social Security Itemized Statement of Earnings
Meijers, employment records
Adecco Services, Inc., employment records
Military records, Thelma Bernard
Macon Police Department Incident Report
Criminal history records re: Melsimeon Pollock
Presentence Investigation Report re: Terry Brown
Psychological evaluation of Terry Brown by James Shinder, Ph.D.
Plea and sentencing transcripts for Terry Brown, Tony Sparks and
     Christopher Lewis
Brandon Bernard's letter to his church
Family photos and film
Divorce records, Thelma and Kenneth Bernard
Arrest and Court records re: Kenneth Bernard
Protective order granted to Thelma Bernard against Kenneth Bernard
"Inside the Teen Brain"; U.S. News & World Report; August 9, 1999
Report of the Texas Commission on Alcohol and Drug Abuse: "Fry": A Study
     of Adolescents' Use of Embalming Fluid with Marijuana and Tobacco
     (1998)
"Embalming Fluid-Soaked Marijuana: New High or New Guise for PCP?",
     article found on internet
"Highlights of the 2001 National Youth Gang Survey", U.S. Department of
     Justice, Office of Juvenile Justice and Delinquency Prevention
"Modern-Day Youth Gangs"; U.S. Department of Justice, Office of Juvenile
     Justice and Delinquency Prevention
"Hybrid and Other Modern Gangs"; U.S. Department of Justice, Office of
     Juvenile Justice and Delinquency Prevention
"Juvenile Competency: Presenting the Lives of Juveniles in a Capital Case",
     materials presented at Life in the Balance XI, death penalty conference
     sponsored by the National Legal Aid and Defender Association (1999);
     includes materials by Thomas Grisso, Ph.D. and Marty Beyer, Ph.D.
Declaration of Michael M. Gelbort, Ph.D.

**EXHIBIT 1 pg. 267**

Exhibit O-53



## JILL MILLER, MSSW

Forensic Social Work Services    6701 Seybold Road, Suite 122
E-mail: jillemiller@sbcglobal.net  Madison, Wisconsin  53719
(608) 271-0227
FAX (608) 271-0491

## RESUME

## CURRENT POSITION

1984-present    Forensic Social Work Services.  Private practice in forensic social work, providing consultation and expert witness services to attorneys and courts in criminal, juvenile, family and other civil proceedings.  Specializing in social history investigations and psycho-social assessments; the development of treatment and rehabilitation plans for sentencing and dispositional hearings; preparation for the penalty phase of capital murder cases; and analysis of penalty phase preparation and presentation in post-conviction capital cases.  Primary focus in recent years has involved work on capital cases, at the trial and post-conviction levels; and in state, federal and military cases.  Sole proprietorship; opened in January, 1984.  Previously engaged in limited private practice from 1973 to 1976, and 1978 to 1983.

## LICENSE

Licensed as a Clinical Social Worker, State of Wisconsin, License Number 1662.

## EDUCATION

1983            Completed 20 hour training program on Mediation in Divorce and Family Disputes.

1973-74         Doctoral student, University of Wisconsin-Madison, School of Social Work.  Emphasis on legal aspects of social work practice and welfare economics.

1971            Masters of Science Social Work, University of Wisconsin-Madison.  Field placements at Legal Services

**EXHIBIT 1 pg. 268**

Exhibit O-54

Page 2

Center and Dane County Mental Health Center. Thesis research on attitudes of welfare recipients toward welfare rights organizations. Recipient of HEW Social and Rehabilitation Services Training Grant.

1967        Bachelor of Arts Degree, major in Social Work, University of Wisconsin-Madison. Recipient of UW-Madison tuition scholarship during all semesters

1963-64     Attended Carroll College, Waukesha, Wisconsin. Recipient of tuition scholarship as National Merit finalist

## EMPLOYMENT HISTORY

1973-85     Clinical Assistant Professor, School of Social Work, University of Wisconsin-Madison. Taught courses in Social Work Advocacy and the Law, Social Work Methods, and Field Experience. Supervised field course units at the Wisconsin State Public Defender Office, Youth Policy and Law Center, Legal Services Center of Dane County, Dane County Juvenile Court, Wisconsin Indian Legal Services and Wisconsin Council on Criminal Justice. Areas of expertise included law and legal skills for social workers, advocacy, criminal and juvenile justice, and policy development.

1979-84     Client Services Director, Office of the State Public Defender, Wisconsin. Position entailed responsibility for the social work services of the statewide public defender system and other administrative responsibilities. Duties included development of positions, hiring, training, supervising, legislative monitoring, development of resource materials, consultation with trial offices throughout the state, development of student placements, and other duties as determined by the State Public Defender. Special assignments included: coordinating the representation of unaccompanied Cuban minors placed in Wisconsin after the Mariel boat-lift; conducting a study of the issue of recoupment from parents for the costs of legal representation of their minor children; and developing and directing a joint training program with the Division of Corrections on probation and parole revocation procedures. In addition, provided services to attorneys on selected cases.

1976-78     Associate Director, Youth Policy and Law Center, statewide public interest agency in Wisconsin. Agency involved child

**EXHIBIT 1 pg. 269**

Exhibit O-55

Page 3

advocacy and policy reform in the state's juvenile justice system. Responsibilities included administrative duties, fund-raising, supervising intern program, personnel and affirmative action, and involvement in substantive issues. Special projects included state budget issues, detention practices, dispositional alternatives, correctional practices, mental health issues and legislative monitoring. Involved in the drafting and passage of a new state juvenile code. Co-founder of agency.

1975          Instructor, University of Wisconsin Extension course on Law and Social Work.

1974-75       Program Co-director of U.S. HEW-funded project on "Legal Training for Child Welfare Workers", sponsored by the University of Wisconsin Center for Social Services. Program involved workshops on legal aspects of substantive areas in child welfare field, production of eight videotape programs to be used as training tools in agencies, and production of training manual. Co-authored grant proposal.

1974          Instructor, University of Wisconsin Extension course on Law and Social Work

1973          Instructor, University of Wisconsin Extension course on Juvenile Justice

1971-73       Staff Social Worker, Legal Services Center of Dane County, Madison, Wisconsin. Supervisor of social services in juvenile, criminal and civil programs of agency; caseload in Juvenile Defender Program; liaison field instructor for graduate students of the University of Wisconsin-Madison School of Social Work.

1971-72       Staff, Emergency Mental Health Services; twenty-four hour suicide and crisis intervention service operated by the Dane County Mental Health Center, Madison, Wisconsin. Part-time position.

1970-71       Teaching Assistant, School of Social Work, University of Wisconsin-Madison. Assisted in teaching of undergraduate field experience and social work methods course at the Dane County Department of Social Services.

**EXHIBIT 1 pg. 270**

Exhibit O-56

1019

Page 4

1967-70        Undergraduate Counselor, School of Social Work, University of Wisconsin-Madison. Provided academic counseling to undergraduate students; prepared timetable of courses; assisted during registration; contributed to preparation of school bulletin; and performed other duties as required by the Director of the School of Social Work.

## PROFESSIONAL MEMBERSHIPS

1998 - present   The American Academy of Experts in Traumatic Stress; Board certified in Forensic Traumatology (January, 1999)

1995 - present   National Association of Sentencing Advocates; member of Conference Committee for 2004 annual conference; past member of Policy Committee  and Mitigation committee; past co-ordinator of mentor project

1992 - 2000      National Organization of Forensic Social Work; also a member from 1986 to 1989; Elected member of Board of Directors (1993 - 1996); Secretary of Board of Directors (1995 - 1996)

1980 - present   National Legal Aid & Defender Association.   Elected member of Defender Council (1993 - 1998, and 1983 - 1990); elected member of Board of Directors (1986 - 1990);  chairperson of Social Services Section and co-chairperson of Death Penalty Litigation Section; founder of Social Services Section; Chairperson of Defender Council (1996 - 1998); past member of Executive Committee, Conference and Awards Committee, Membership Committee, and Nominating and Resolutions Committee at various times.

## AWARDS

2000            Recipient of "Life in the Balance" Achievement Award, presented annually to a lawyer or mitigation specialist by the National Legal Aid & Defender Association in recognition of contributions to capital defense representation

1999            Recipient of award for "Outstanding Contributions to the Profession", annual award by the National Association of

**EXHIBIT 1 pg. 271**

Exhibit O-57



Page 5

Sentencing Advocates, for dedication in the advancement of sentencing advocacy

**PROFESSIONAL SERVICES**

2002        Consulted on the updating and revision of "Guidelines for the Appointment and Performance of Counsel in Capital Cases", American Bar Association; adopted by ABA in February, 2003

1997        Appointed member of Working Group for the U.S. Department of Justice, Bureau of Justice Assistance and Bureau of Justice Statistics co-sponsored national study of indigent defense systems.

1995-96     Member of Blue Ribbon Advisory Committee appointed by the National Legal Aid & Defender Association under a grant from the U.S. Department of Justice, Bureau of Justice Assistance. Committee composed of experienced academics and practitioners who were knowledgeable about the criminal justice system, particularly the defense function. Purposes of the committee were to identify successful models of indigent defense programs, alternative initiatives crucial to the improvement of the criminal justice system, and areas of indigent defense representation that required further research and development.

1993-96     Board Member, Consortium for the National Equal Justice Library.

1990-92     Consultant, National Legal Aid & Defender Association, for Mitigation Specialists Training Project and Mitigation Affidavit Project.

1991        Consultant to the Missouri State Public Defender System; provided training for mitigation investigation staff.

1990-91     Consultant to the Illinois Capital Resource Center, provided two sixteen-hour training programs for mitigation staff.

1986-89     Consultant, Project FIT (Families in Transition), an intensive in-home treatment program for adolescents and their

**EXHIBIT 1 pg. 272**

Exhibit O-58

Page 6

families, operated by Family Services, Madison, Wisconsin

1988 — Consultant to State of Florida, Department of Health and Rehabilitation Services. Prepared training monograph for state juvenile court workers titled "The Social Worker in Court: Case Preparation and Testifying."

1983-89 — Task Force on Women in the Criminal Justice System, Wisconsin Women's Network. Member and legislative coordinator.

1979-86 — Mental Health Association in Wisconsin. Member, Board of Directors; chairperson of the Public Policy Committee and the Child Advocacy Committee; treasurer.

1983-84 — Judicial Council, State of Wisconsin, General Projects Committee. Represented the Office of the State Public Defender at meetings to study the issue of recoupment from parents for the costs of legal representation of their children and appellate procedures in state courts.

1978-84 — Project TRY Advisory Committee. TRY (Treatment and Rehabilitation for Youth) was an intense treatment program for delinquent children in need of mental health treatment in a secure setting.

1981-82 — Committee on Revision of Administrative Rules Governing Child Welfare Institutions. Appointed by Secretary of the Wisconsin Department of Health and Social Services.

1980-82 — Consultant, ABT Associates, private consulting firm in Cambridge, Massachusetts. Consulted on federally-funded project to develop program model materials on social services in public defender offices.

1980 — Consultant, to Briarpatch (runaway center in Madison, Wisconsin) on the development of a group home for Cuban juveniles.

Consultant to University of Kentucky School of Social Work on the development of social work field placements in legal settings.

**EXHIBIT 1 pg. 273**

Exhibit O-59

Page 7

1978-79          Consultant and Research Associate, Youth Policy and Law
Center.

1979             Foster Care Monitoring Project, Advisory Committee, joint
project of the Wisconsin Department of Health and Social
Services and the University of Wisconsin-Milwaukee.

Consultant to research project on issues in mental health,
conducted by Dr. Dave Gustafson, Center for Health
Sciences, University of Wisconsin

1977-79          Juvenile Grievance Procedure Implementation Committee,
state committee appointed by Wisconsin Division of Corrections
to implement a grievance mechanism in juvenile correctional
programs.

1976-79          Law-Related Education Advisory Committee, committee
established to oversee project co-sponsored by Wisconsin
Department of Public Instruction and State Bar of Wisconsin, to
establish law-related education in the state's secondary and
middle schools.

1975-79          Wisconsin Civil Liberties Union, Children's Rights
Committee.

1977-78          Juvenile Detention Implementation Committee,
co-chairperson.  State committee established by the Wisconsin
Department of Health and Social Services to implement the
recommendations of the Juvenile Detention Study.

Juvenile Grievance Procedure Committee.    State
committee appointed by the Wisconsin Division of
Corrections to study the need for a grievance procedure in
juvenile correctional programs and to establish guidelines
for the development of a procedure.

Prison Health Care Advisory Committee. State committee
appointed by the Wisconsin Department of Health and
Social Services to study and make recommendations on
health care programs in adult and juvenile correctional
facilities.

EXHIBIT 1 pg. 274

Exhibit O-60

Page 8

> Title XX Advisory Committee. Committee appointed by the Wisconsin Department of Health and Social Services to develop Title XX plan for the state.

1975-76 Joint Legislative Committee on Institutional Closings. Committee mandated and appointed by the Wisconsin Legislature to study the closing of the Wisconsin School for Girls and the Wisconsin Child Center, and to develop plans for alternate placements of the juveniles.

1972-75 Board of Directors, Briarpatch; Madison, Wisconsin agency serving runaway youths and their families.

1972-73 Consultant to Jonah House, a group home for emotionally disturbed adolescents in Madison, Wisconsin.

## TRAINING, WORKSHOPS AND SPEECHES

2004 Faculty, Annual Conference of the National Association of Sentencing Advocates; Milwaukee, Wisconsin

> Coordinator and faculty, Death Penalty Mitigation Institute; sponsored by the National Association of Sentencing Advocates; Milwaukee, Wisconsin

> Faculty, Life in the Balance XVI, annual death penalty conference sponsored by the National Legal Aide and Defender Association; Memphis, Tennessee

2003 Faculty, Annual Conference of the National Association of Sentencing Advocates, presentation on 'Mitigation A to Z: A Primer"; Albuquerque, New Mexico

> Faculty, Making the Case for Life VI: Mitigation Investigation in Capital Cases", death penalty training sponsored by the National Association of Criminal Defense Lawyers; Memphis, Tennessee

> Presenter, "Strengthening the Guiding Hand of Counsel: Reforming Capital Defense Systems", conference on the

**EXHIBIT 1 pg. 275**

Exhibit O-61

Page 9

American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, sponsored by the ABA Death Penalty Representation Project and Hofstra University School of Law

2002     Faculty, "Making the Case for Life V: Mitigation Investigation in Capital Cases", death penalty training sponsored by the National Association of Criminal Defense Lawyers; Raleigh, North Carolina

Faculty, "Defending Complex Cases", Naval Justice School; Newport, Rhode Island

Faculty, "Life in the Balance XIV", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Kansas City, Mo.

2001     Faculty, "Life in the Balance XIII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Albuquerque, New Mexico

Faculty, "Capital Litigation Defense Course", sponsored by the Naval Justice School; Newport, Rhode Island

2000     Faculty, "Making the Case for Life IV: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Houston, Texas

Trainer, "Death Penalty Defense Workshop", sponsored by the Office of the State Appellate Defender - Death Penalty Trial Assistance Division; Chicago, Illinois

Faculty, "Life in the Balance XII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Washington, D.C.

Faculty, Annual Conference of the National Association of Sentencing Advocates; San Diego, California; also, co-coordinator and faculty, Death Penalty Institute, held in conjunction with annual conference

**EXHIBIT 1 pg. 276**

Exhibit O-62

Page 10

1999    Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Boise, Idaho

Faculty, Death Penalty Training Seminar, sponsored by the Florida Association of Criminal Defense Lawyers; Haines City, Florida

Faculty, Annual Conference of the National Association of Sentencing Advocates; Miami, Florida

Faculty, "Life in the Balance XI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Atlanta, Georgia

1998    Faculty, "The Fight for Life: Mitigation That Wins", sponsored by the Tennessee Association of Criminal Defense Lawyers and The Tennessee District Public Defenders Conference; Nashville.

Trainer, Annual Conference of the National Association of Sentencing Advocates; Washington, D.C..

Faculty, "Life in the Balance X", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Philadelphia, Pennsylvania.

Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Scottsdale, Arizona.

Trainer, Death Penalty Seminar sponsored by the Federal Defender Office of Washington & Idaho; Boise, Idaho

1997    Trainer, Annual Conference of the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Annual Conference of the New Mexico Public Defender; Glorietta, New Mexico.

Trainer, Nebraska Commission on Public Advocacy;

**EXHIBIT 1 pg. 277**

Exhibit O-63

Page 11

presented day-long training program on mitigation in capital cases for staff of the Major Case Resource Center; Lincoln, Nebraska.

Faculty, "Life in the Balance IX", annual death penalty conference sponsored by the National Legal Aid & Defender Association.

1996    Trainer, Annual Conference of the National Legal Aid & Defender Association; Las Vegas, Nevada.

Faculty, "Understanding Violence: Prevention Strategies and Mitigation Training", seminar sponsored by the Center for Death Penalty Litigation, the Carolina Justice Policy Center, and the UNC-Chapel Hill School of Social Work; Chapel Hill, North Carolina.

Faculty, "Life in the Balance VIII", annual death penalty conference sponsored by the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Client Services Workshop, Office of the State Public Defender; Madison, Wisconsin.

1995    Trainer, Annual Conference of the National Legal Aid & Defender Association; New Orleans, Louisiana.

Trainer, Indiana Public Defender Council, Sentencing Training; Indianapolis, Indiana.

Trainer, "The Defense of Drug Cases", National Legal Aid & Defender Association regional conference; Baltimore, Maryland.

Trainer, Annual Conference of the National Association of Sentencing Advocates; Chicago, Illinois.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Reno, Nevada.

Faculty, "Life in the Balance VII", annual death penalty conference sponsored by the National Legal Aid & Defender

**EXHIBIT 1 pg. 278**

Exhibit O-64



Page 12

Association; Kansas City, Missouri.

1994   Trainer, Annual Conference of the National Legal Aid & Defender Association; Washington, D.C..

Speaker, University of Wisconsin-Madison Law School, course on Capital Punishment.

Trainer, NAACP Legal Defense and Education Fund; annual Capital Punishment Conference; Warrenton, Virginia.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Atlanta, Georgia.

Faculty, "Life in the Balance VI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Austin, Texas.

1993   Trainer, Annual Conference of the National Legal Aid & Defender Association; Albuquerque, New Mexico.

Trainer, Defender Association of Philadelphia; day-long training for homicide unit; Philadelphia, Pennsylvania; April, 1993.

Faculty, "Life in the Balance V", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana; March, 1993.

1992   Trainer, Annual Conference of the National Legal Aid & Defender Association; Toronto, Ontario, Canada; October, 1993.

Trainer, Criminal Defense Conference, the Wisconsin State Public Defender; Oconomowoc, Wisconsin; October, 1992.

Faculty, Death Penalty Seminar, sponsored by the Indiana Public Defender Council; Indianapolis, Indiana.

1991   Trainer, Annual Conference of the National Legal Aid & Defender Association; Portland, Oregon.

**EXHIBIT 1 pg. 279**

Exhibit O-65

Page 13

Faculty, "Mitigation Specialists Training", sponsored by the National Legal Aid & Defender Association, the Missouri Capital Punishment Resource Center, and the National Association of Social Workers - Missouri Chapter; St. Louis, Missouri.

Faculty, "Life in the Balance III", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Washington, D.C.

1990    Trainer, Annual Conference of the National Legal Aid & Defender Association; Pittsburg, Pennsylvania.

1989    Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Collinsville, Illinois.

1988    Trainer, Annual Conference of the National Legal Aid & Defender Association; San Diego, California.

1987    Trainer, "Critical Issues in Juvenile Justice: A Working Conference", sponsored by the Wisconsin Department of Health and Social Services; Madison, Wisconsin.
Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Chicago, Illinois.

Trainer, "All About Families Conference", sponsored by the Wisconsin Child Advocacy Project; Madison, Wisconsin.

1986    Trainer, Annual Conference of the National Legal Aid & Defender Association; Atlanta, Georgia.

Speaker, Milwaukee Young Lawyers Association.

Trainer, Regional Conference of the National Defender Investigator Association; Madison, Wisconsin.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

**EXHIBIT 1 pg. 280**

Exhibit O-66

Page 14

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1985     Trainer, Annual Conference of the National Legal Aid & Defender Association; also, coordinator of day-long training program for social services personnel in defender offices and private practitioners providing sentencing services to attorneys; Washington, D.C.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Speaker, University of Wisconsin-Madison School of Social Work, Spring Symposium; Madison, Wisconsin.

1984     Trainer, American Bar Association, Annual Program Meeting; Chicago, Illinois.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Trainer, Jefferson County Human Services Department and county law enforcement personnel.

Trainer, Eau Claire, Wisconsin region of Social Services Departments; Eau Claire, Wisconsin.

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1982     Trainer, Annual Conference of the National Legal Aid & Defender Association; Boston, Massachusetts.

1981     Trainer, Annual Conference of the National Legal Aid & Defender Association; San Francisco, California.

Faculty, Annual Conference of the Office of the State Public Defender; Madison, Wisconsin.

Trainer, First Annual Juvenile Court Intake Training Seminar, sponsored by the Wisconsin Juvenile Court Intake Association; Madison, Wisconsin.

**EXHIBIT 1 pg. 281**

Exhibit O-67

Page 15

> Trainer and coordinator; Client Services Spring Workshop, Office of the State Public Defender; Madison, Wisconsin.

1973-80    Trainer and speaker at numerous programs in Wisconsin on Legal Skills for Social Work, Sentencing, Child Advocacy, Mental Health, Juvenile Justice, and Child Abuse and Neglect.

## PUBLICATIONS, PROFESSIONAL PAPERS & MEDIA PRODUCTIONS

2003    Author of article, "The Defense Team in Capital Cases", Hofstra Law Review; summer, 2003; Volume 31, No. 4, page 1117

1991-96    Contributed several newsletter articles to "Capital Report", newsletter of the Death Penalty Litigation Section of the National Legal Aid & Defender Association; articles covered various topics relating to the death penalty and mitigation, including articles on mentally retarded capital defendants, Fetal Alcohol Syndrome and Effects, and cultural and environmental mitigation; several articles have been reprinted in newsletters published by state defender programs, resource centers, and criminal defense attorney associations.

1981-82    Developed a series of videotape programs on "Probation and Parole Revocation Procedures in Wisconsin", as part of the Joint Training Program on Probation and Parole Revocation Procedures, funded by the National Institute on Corrections. Directed the development of the training manual to be used in conjunction with the tapes; authored the grant proposal.

1980    Paper presented before the 1980 Program Meeting of the Council on Social Work Education, on "The Social Worker as Client Advocate: Teaching Advocacy in a Legal Setting"; Los Angeles, California.

1979    Article published in the Journal of Education for Social Work (Fall, 1980), titled "Teaching Law and Legal Skills to Social Workers"; also presented as a paper before the 1979 Annual Program Meeting of the Council on Social Work Education; Boston, Massachusetts.

**EXHIBIT 1 pg. 282**

Exhibit O-68

Page 16

1978              Paper prevented to the Prison Health Care Advisory
                  Committee, state of Wisconsin, title "Health Care Needs in
                  Juvenile Correctional Facilities."

1977              "Children in Jail and Detention", report to Acting Governor
                  Martin Schreiber, state of Wisconsin, on the need for
                  non-secure temporary care alternatives for juveniles.

1974              Developed and produced a series of eight videotape
                  programs titled "Legal Training for Child Welfare Workers",
                  used as training aids in social service agencies and social
                  work classes; wrote grant proposal for development of
                  training program, videotapes, and training manual;
                  co-directors of program.

## RESEARCH

1980-81           "Study of Recoupment From Parents for Costs of Legal
                  Representation for Their Children", study mandated by the
                  Wisconsin Legislature in Chapter 356, Laws of 1979.  Study
                  included analyzing statutes from other states on recoupment and
                  parental responsibility for costs of legal representation of their
                  children; surveying policies and practices in a number of public
                  defender systems in the country; researching case law on the
                  issue; and conducting a survey of parents of juvenile clients
                  regarding their ability to pay and attitudes towards recoupment.
                  Resulted in legislative provision for recoupment in Chapter 20,
                  laws of 1981.

1977-78           Conducted study of all juveniles present in Wisconsin
                  juvenile correctional institutions on June 30, 1977.  Variables
                  included age, sex, race, county of residence, committing
                  offense(s), prior offense history, prior services and placements,
                  history of running away from placement, and recommendations
                  of Juvenile Offender Review Board.  Data was used by state
                  officials for future planning of juvenile correctional programs.

**EXHIBIT 1 pg. 283**

Exhibit O-69

Page 17

## GRANTS

1973-1982      Authored or co-authored grant proposals resulting in over $550,000 in grant awards for various projects, including for: the establishment of the Youth Policy and Law Center, a statewide public interest agency involved in juvenile justice policy issues in Wisconsin; a staff social worker position at the Legal Services Center of Dane County, in Madison, Wisconsin; a joint training program on probation and parole revocation procedures for the Department of Corrections and the Office of the State Public Defender; a project to train child welfare workers in the state of Wisconsin on law and legal skills; projects for the representation and resettlement of unaccompanied Cuban minors in Wisconsin; and a project to provide special services to indigent minority and veteran defendants through the Office of the State Public Defender.

## OTHER ACTIVITIES

Testified before committees of the Wisconsin legislature on numerous occasions since 1976 on issues related to juvenile justice, mental health, and state funding for human services.

Served on oral examining boards for state and county positions in Wisconsin approximately twelve times since 1975.

Participated in the drafting and passage of several pieces of legislation in Wisconsin, including the Children's Code revision (1978), the Mental Health Act, bills related to the criminal justice and human services systems, and state budget proposals.

Guest speaker on numerous occasions in classes at the University of Wisconsin-Madison.

Along with husband, own and operate a Christmas tree farm in western Wisconsin.

**EXHIBIT 1 pg. 284**

Exhibit O-70

1033

Declaration of Quiona Bernard

I, Quiona Bernard, make the following declaration:

1. My name is Quiona Bernard. I am Brandon Bernard's sister. I am 29 years old, about 7 years younger than Brandon. I have a lot of fond memories of Brandon before he went to prison.

2. When I first heard Brandon was in jail, my family was in disarray. My mom was very upset. No one knew how to react and Max and I thought Brandon would come home soon. My mom, my brother Max, and I prayed together all of the time for Brandon and the victims' families. We slept on the floor in the living room because we did not know what to do. It felt strange to stay in our bedrooms while Brandon was in jail. I forgot how long we slept in the living room, but it seemed like a long time before we were able to accept that Brandon was gone and move back into our separate beds.

3. I am sorry for everyone involved in this case. Killeen was not a good place for Brandon to grow up. I believe that there were too many bad influences there. I am glad that my brother Max got out of there.

4. My cousin Mel was a bad influence on Brandon. They seemed like good friends and best of cousins but Mel was the instigator of the two and took advantage of Brandon's willingness to help people. He took Brandon's suits and wore them. Mel stole the Nintendo in the house, but always denied it even though everyone knew he did it. After Mel moved in with us, Brandon started getting into trouble with the law.

5. Brandon was a good son and brother. If mom asked him to do something, he did it and never complained about it. He was never disrespectful. He would help out anybody if he could. His friends were always calling asking Brandon to give them rides because Brandon was the only one with a car. He always gave them a ride. Brandon's friends would always come over and

EXHIBIT 1 pg. 285

Exhibit P-1

hang out at our house because Brandon allowed them to. I never saw a violent side to Brandon. If he was drinking or using drugs, he never did it in front of me.

6. I do not believe Brandon would have gone to meet with his friends if he really believed people would be hurt. Brandon never gave me any reason to think he could do anything to hurt anybody. That is not the Brandon I know and grew up with nor is that the Brandon I know today.

7. We were not raised in a home of loving parents. Our mom did her best to raise us, teach us morals through our faith, and work to pay the bills. Our dad was not really a dad to any of us. He was always in and out of our lives, and when he present, he was rarely a good influence. He never acted loving or acted like a dad, really. He was particularly hard on Brandon, always giving him orders. He treated us all like servants. My dad did not get along with Brandon, and I don't think he even liked Brandon very much growing up. There was no reason for this, it was just the way he was. He did not spend time with us even when we stayed with him. He always seemed to drink. He would drink four or five beers a day. I remember seeing my dad threatening to hit Brandon with a paddle with nails in it. Our mother stopped him from doing anything with it. When Brandon did not do something Dad told him to do, Dad would hit Brandon to punish him. He would mostly use his belt and sometimes an extension cord. My mom used a switch when Brandon seriously disobeyed her, but that was rare.

8. Dad was intense and would get angry at us for just being kids. Brandon felt threatened by dad and dad liked it that way. He was never supportive of Brandon. Our dad did whatever he wanted to do. He would leave us alone and go hang out with his friends. He was emotionally detached from us. This changed as he got older but in many respects it was too late for Brandon by then. He simply never had a caring father growing up.

2

**EXHIBIT 1 pg. 286**

Exhibit P-2

9.  Mom and dad fought a lot, and I attribute these fights to my Dad's constant drinking. He seemed to leave in his own world, never caring what other's thought or felt. One time, my mom called the police on dad after one of their more violent fights. After she did this, he just went into this little office and sat. When the cops arrived, he acted as if nothing had happened. I guess he couldn't even appreciate that what he did was wrong. My mom and dad really didn't like each other. I could tell this early on. It was a bad relationship. No kid should have had to grow up in such an environment. Dad was not a happy person before the divorce. I did not want to spend time with him. I was happy when he moved out. When we saw dad at his place, things did not get better. His apartment had a lot of cockroaches. He told us kids to kill them, but did nothing to prevent them from breeding. They were everywhere. At least mom sprayed and tried to control the roach population at her house. We often had to eat at soup kitchens while staying with my dad.

10. When I was about 10 or 11, Dad took us kids to a gathering of his work friends from the Temple School District at a park. He hung out with his friends and left us kids alone to fend for ourselves. This was the first time I tasted beer. Dad handed me his cup of beer and told me to take it. I did not like the taste. At another gathering, there were five scantily clad women hanging over three men at a ball field. It stuck out in my mind as being rather inappropriate. These were my dad's friends. They all seemed more interested in partying than anything else.

11. Despite his difficult childhood, Brandon's relationship with Dad improved as Brandon grew into an adult while in prison. I felt that Brandon took our dad's death harder than I did because he could not be with him in the final days. I was relieved when Dad died because his life was not very fulfilling and he could not get out for quite a long time. He was confined to a wheelchair and sat in it or was sleeping in the bedroom for most of each day.

3

EXHIBIT 1 pg. 287

Exhibit P-3

12. I would be devastated if Brandon was executed. I believe he is worth saving. He is loyal to a fault, but I cannot believe he would ever have done anything to hurt anyone intentionally. He encouraged me to get good grades and graduate from high school and medical assistant training. He is still my older brother and fills that role when I need him. Brandon is a pal. He is a good listener. He gives me good advice. He helps keep me calm and keep things in perspective. He helps me remember that I should not worry about things that I can't control. I love him very much.

13. Brandon accepts responsibility for why he is in prison. He knows he got involved in a terrible situation. He knows this without question. He has made mistakes and bad choices with his friends. He does not want to see me make the same ones. I have not talked with Brandon about the crime. I was so young when it happened, it took a long time before I understood he was never coming home and that he was on death row. I can tell he feels badly about where he is, how it has affected the family, and his choices that resulted in the deaths of two young people.

14. My family would like to visit Brandon more, but our finances don't allow us to. We try to visit him once a year, but this is not always possible. When we can make it there, we take turns talking to him on a phone. We can't really have a group discussion, and he is separated by glass, so we can't hug him or anything. But we do get to catch up a bit, filling him in on what our lives are like on the outside.

15. In recent years, I started exchanging emails with Brandon regularly. If I write early enough in the day, he will often answer by late afternoon or evening so when I check my email after work I can read them. I tell him everything. He is my best friend and my big brother. He is a kind hearted person who has been taken advantage of in the past. Brandon cautions me against people he thinks might take advantage of me. I depend on Brandon to advise me and he helps me make better decisions.

**EXHIBIT 1 pg. 288**

Exhibit P-4

16. Despite losing Brandon as a brother and friend if he was executed, I know that the victims' families have not had a chance to have a continued relationship with their loved ones. I am truly sorry for that and it pains me to think of the magnitude of their loss.

I have read the foregoing declaration. Under the laws of the United States and the State of Texas, I declare under penalty of perjury that this declaration is true and correct.

Executed at Dallas, TX on ___7-12-16___.

Quinoa Bernard

EXHIBIT 1 pg. 289

Exhibit P-5

Declaration of Thelma Bernard

I, Thelma Bernard, make the following declaration:

1. My name is Thelma Bernard. I am Brandon Bernard's mother. I have three children, Brandon, Quiona, and Max. Their father is Kenneth Bernard. Kenneth and I were first married on August 14th, 1977. Brandon was born on July 3rd, 1980. Kenneth and I divorced in 1994. We reunited and remarried in 2003.

2. I graduated from Andrews University in 1975 with a nursing degree. I retired as a Lieutenant Colonel in the Army and was on active reserve after retiring. After retiring from the Army, I went into the private sector as a nurse. I became the coordinator at several places in the Killeen area and ended up working with Metroplex Health System when I was activated by the Army in 2003. I retired from the Army in 2007.

3. I tried my best to raise Brandon but was not around as much as I should have been when he was growing up. When I could not take care of Brandon, he was left with his father. Kenneth struggled to be a parent, having had no good role models of his own. Kenneth was hard on Brandon and I was not there to see what took place most of the time. Although I knew Kenneth took a strict and sometimes harsh approach to raising Brandon, I was working and in the Army Reserves. That made it difficult for me to fully understand the extent of Kenneth's strictness and punishment of Brandon.

4. Brandon was my buddy. When Brandon was about 12 years old, I came home from the hospital following heart surgery. I depended on Brandon to prepare food, get water, and pick up around the house. At the same time, he helped take care of Quiona and Max. He was a good caring and supportive son. I have no memory of Kenneth being around to help out.

1

**EXHIBIT 1 pg. 290**

Exhibit Q-1

5. Sometime around 1994, my nephew Melsimeon, who now goes by Jordon, moved in with me and the kids. Jordon's mother Mary and his sister Naomi moved in shortly thereafter. At a family wedding, Brandon asked if Jordon could come live with us since they had no place to stay. Initially, I refused because my other sisters warned me against having Jordon live with my family. They said he was trouble. I eventually relented and Mary and her children moved in with me and my children.

6. After moving in, Jordon and his family acted as if the house was theirs. Mary was always jealous of me and my family. I provided for my family and Mary could not provide for hers. Jordon stole things from my children and then denied it. The years Mary and her children lived with me were not pleasant. They were less generous with me and my family than we were with them.

7. Brandon looked up to Jordon. Jordon took advantage of that because Brandon was such a generous person. Brandon would do anything for his friends and family. When I bought Brandon new clothes for school, before Brandon wore them, Jordon had to wear them. When Brandon wanted to wear some of Jordon's new clothes, Jordon would not let him, saying he needed to wear them first, not Brandon.

8. Kenneth was a strict and dominant father. He rarely talked to Brandon, or anyone for that matter. He treated Brandon with the attitude that he was Brandon's father and Brandon should do whatever Kenneth told him to do without question. Kenneth was verbally abusive toward Brandon. When Kenneth yelled at Brandon, Brandon would flinch in fear. Kenneth was also physical with Brandon. One time, Kenneth got into a fight with Brandon in the church parking lot.

9. Kenneth was never taught how to be a father himself. As a child, he was shuffled from foster home to relatives because his mother could not care for him. However, after Brandon went to

**EXHIBIT 1 pg. 291**

Exhibit Q-2

death row, Kenneth changed. He became more patient with Max and Quiona and listened to them.

10. One time when Kenneth hit me, I called the cops on him. I did not tolerate being hit by any man. I was hit by Kenneth once and I called the cops on him. We were arguing in Brandon's bedroom. We were arguing about Brandon. I forgot what he said exactly, but it was something about Brandon I did not like. I responded to Kenneth by telling him if he did something I would "stop paying for his school." We got into an argument and he began pushing me around. I threatened to spray him with mace that I kept in my handbag for personal protection. Kenneth grabbed the mace from me and sprayed me. Then he hit me in the chest where I recently had heart surgery three months prior. I was shocked he would hit me, especially in the place I just had surgery. He was trying to hurt me. Despite this attack, I was able to call the police and Kenneth was arrested. Brandon witnessed this attack and took the younger kids outside. This assault precipitated my filing for divorce from Kenneth. Kenneth did not return to live in our home following his release from jail, but he came back and threatened to kill me. After that, Kenneth did not see his children for about three years by his own choice.

11. I know Brandon is sorry for what happened. A month after he was arrested, he wrote a letter to our church members apologizing for what had happened. I was not surprised that Brandon felt bad, because he was always taught to respect life.

12. After Brandon was arrested, Quiona, Max, and I were upset and everything was in turmoil. We did not know how to cope. We all slept together on the floor in the living room. Eventually, we moved back into our rooms, but it took a while. Brandon receiving the death penalty had a big impact on all of us emotionally and physically.

13. From the day Brandon was born, I have loved him. My family was active in the local Seventh-day Adventist Church. Brandon was raised in our church and attended their school until the 10th

3

**EXHIBIT 1 pg. 292**

Exhibit Q-3

grade. He was raised to know God and right from wrong. Even knowing right from wrong, Brandon was too frail to do the right thing when he needed to. Instead, he followed the wrong people down the wrong path and that led to the tragic deaths of a young couple.

14. If Brandon was executed, it would weigh heavily on my soul. My faith is a tremendous source of strength and optimism but even my faith cannot overcome the longing to hold my eldest child in my arms. I enjoy visiting him and talking with him over the phone, but it's hard for me not to be able to hug my son. At every visit, we put our palms up against the glass, but it is a poor substitute for an embrace. However, I am grateful for it since that is all I can do.

15. I would ask that President Trump spare my son's life. People lost their lives because of Brandon's poor decisions and it fills me with immense sorrow. I pray for their families too and know that whatever happens, it is God's will. I wish the victims could be brought back to make their families whole again. I know it is a lot to ask for, but I hope they can forgive Brandon.

I have read the foregoing declaration. Under the laws of the United States and State of Alabama, I declare under penalty of perjury that this declaration is true and correct.

Executed at Huntsville, AL on _14 August 20_

_Thelma Bernard_
Thelma Bernard

4

**EXHIBIT 1 pg. 293**
Exhibit Q-4

Declaration of Melsimeon Jordon Pollock

I, Melsimeon Jordon Pollock, make the following declaration:

1. I am over the age of 18 and am a resident of Travelers Rest, South Carolina.

2. I hold a degree in instrumentation and control processes from Texas State Technical College.

3. I am Brandon Bernard's first cousin. My mother and Brandon's mother are sisters. Even though Brandon and I are cousins, he is like a little brother to me. I am almost one year older than Brandon. As kids, we tried to spend as much time with each other as we could, including spending time together in the summers.

4. There was a point in my life where my mother and I moved in with Brandon's family.

5. My mother was not able to provide for my family financially, the same way Brandon's mother was able to. Brandon's mother was not wealthy, by any means, but Thelma did have a steady job with the military.

6. When Brandon's parents split up, he stayed with his mother, Thelma, and my family moved from Indiana to live with them. My family was in need and Thelma welcomed us into her home. Around this time, I was able to spend more time with Brandon. This is when our brotherly bond really grew.

7. Brandon had more than me, in terms of possessions, but was always willing to share what he had and help provide for me. Brandon's mother would buy Brandon new clothes and Brandon would always let me wear them.

8. Brandon was raised in a Christian home and when I moved in, I attended services with Brandon.

9. We were teenagers when I moved to Killeen, Texas to live with Brandon. Around the time I moved in with the Bernards, Brandon was following his friends into very petty crime. When I moved in, I taught Brandon how to 'better' commit crimes. As bad as it sounds now, at the time, I helped Brandon be 'smarter' with how he went about committing the neighborhood crimes. I say I helped him, because Brandon was a follower. If you asked or told Brandon to do something, he did it.

10. Brandon and I got into some trouble after I moved in. I know I am responsible for the trouble that Brandon got into when we were together. While I may have helped Brandon get into trouble, I also know that I 'controlled' Brandon a bit as well. I was more experienced with committing crimes, much more experienced than Brandon, and he followed my lead. We committed thefts together so that I could get money. Brandon did not need money, but because Brandon is a follower, he felt like he was helping me. Brandon stole things with me because

MP

EXHIBIT 1 pg. 294

Exhibit R-1

Brandon knew I needed the money and Brandon wanted to support me and feel a sense of belonging. Brandon would not have broken into these houses on his own. He is not a mastermind, Brandon just followed what others had planned.

11.    I don't believe that Brandon was taught proper boundaries or punished consistently for wrongdoings. Thelma had a hard time enforcing her own rules, and even after deciding to punish Brandon by denying him something he wanted, she would end up giving in. Because of this, I do not believe that Brandon always understood consequences and repercussions.

12.    Brandon was always willing to help. Brandon would help anyone in need. Brandon would help out neighbors by cutting their grass for free. Brandon was very generous and would give the shirt off his back to anyone who needed it. It is just the kind of the person Brandon was.

13.    I noticed a difference with Brandon after Brandon's father moved out of their family home. I know that Brandon needed and missed a father figure in his life.

14.    Since I am almost a year older than Brandon, I graduated high school first and then moved out. While I was gone and no longer around Brandon, Brandon made friends with the individuals involved with this case. I moved away for about six months and then moved back to Killeen. When I moved back, I was introduced to these kids by Brandon. I believe that these kids filled a void in Brandon's life after I left. Brandon turned to them for a sense of belonging. Again, Brandon was a follower with this group of kids. Brandon strives to make the people in his life happy, and that's why he often just goes along with what his friends say and do.

15.    I know Brandon and it is hard for me to believe that he would have been involved in any of this if he had really appreciated that people were going to be killed That is completely out of character for Brandon. I believe that Brandon's new friends took advantage of his need for a sense of belonging and his willingness to go along with what they wanted to do. However, had Brandon known that going along with his friends was going to lead to two innocent people being killed, I know that Brandon would have held his line and said no.

16.    I believe that the victims' families have suffered a great, unimaginable loss. As a parent myself, I cannot fathom experiencing and living through the death of a child. I regret any pain that my efforts on Brandon's behalf might cause them to feel and I pray that they are able to find peace.

17.    I was never interviewed or approached by anyone on Brandon's trial defense team. If I had been, I would have been able to offer insight into who Brandon was as a young adult and why his life is worth saving.

18.    I believe that my life's journey is a good example of how an African American youth can turn his life around if lucky enough to have the chance. I got into trouble when I was a teenager and had trouble following some rules. By the grace of God, my immaturity never led me into a situation as serious as the one in which Brandon ended up. If things had gone just a little differently, I could easily be in Brandon's place today. Instead, I grew to see that I needed to change and better myself. That led me to college, a degree, a good job, and a happy marriage blessed with four children. I left the life of crime years ago, and I believe Brandon would have done the same once he grew in maturity and understanding

EXHIBIT 1 pg. 295

Exhibit R-2

19.    Brandon is a source of strength for our family, especially now that his father has passed away. Brandon has grown into a respectful and peaceful adult who has proven that he can follow rules. My family would be devastated if Brandon was taken from us.


I have read the foregoing declaration. Under the laws of the United States and South Carolina, I declare under the penalty of perjury that this declaration is true and correct.


Executed at Travelers Rest, South Carolina on:    6/3/16

Melsimeon Jordon Pollock

EXHIBIT 1 pg. 296

Exhibit R-3

Declaration of Bonnie Wainwright

I, Bonnie Wainwright, make the following declaration:

1. My name is Bonnie Wainwright. I have known Brandon Bernard and his family since soon after coming to this area. I have been actively involved in the Seventh-day Adventist Church in Killeen, TX since 1975. I met Brandon when he was four or five years old which was in the early 1980's. I got to know Brandon well because I volunteered at the church school while he was a student there. Brandon regularly attended services with his mother but not as regularly in 1999. I also used to work for Judge Johnson, the juvenile court judge in Bell County.

2. Brandon was a good kid who never caused any problems at school or in church. He did whatever was asked of him. Brandon was a sweet boy who would back out of confrontations and never got into fights. Even as he grew into a teenager, Brandon was passive and cooperative. He got into this trouble because he followed the friends he met outside of the church.

3. Brandon did not get into trouble before his cousin Mel, who I understand now goes by Jordon, and Mel's family moved in with Brandon's family. After Mel moved in, Brandon started to get into trouble. Brandon always wanted to fit in and be part of a group. He had trouble saying "no" to people. Brandon was not a leader. He always acted respectfully and deferentially when he interacted with me. Mel took advantage of Brandon as Mel had a sharp mind.

4. As he got older, Brandon did not come to church as often as he did before. He became more distant. I saw Brandon's name show up as a defendant in juvenile cases in front of Judge Johnson. This troubled me greatly. I knew that he was a good kid and I feared that he was being negatively influenced by Mel.

5. Even though Brandon was becoming more distant, he was still very respectful. I remember one time talking to Brandon about the hazards of smoking cigarettes. I used to be a smoker and probably because of it, contracted a lung infection. Brandon could have walked away or been uncaring, but he was not. I hugged Brandon after talking to him. I knew that he was scared and concerned for me.

**EXHIBIT 1 pg. 297**

Exhibit S-1

6. Thelma and Kenneth, Brandon's father, ran into a snag in their marriage. Kenneth was more "deliberate" and Thelma was a "go getter". Kenneth loved his children and expected them to do their best. They split for a while but eventually got back together after Brandon was on death row. It is clear to me that couples who separate have problems long before they actually separate. I am not sure what exactly the problems were, but I know it was not good for Brandon. Brandon lost a father figure in the home and Thelma was not really a role model because she was busy and gone all of the time. That was when Mel was in the house an Mel became the only role model Brandon had. With all of the dysfunction at home, I think Brandon looked for a place of acceptance. I think that because Thelma and Kenneth eventually got back together years later, Brandon's younger sister Quiona and his younger brother Max benefited from their reunion.

7. At the time of Brandon's sentencing, I remember writing the judge at Thelma's request and asking for mercy. I would have been happy to come and testify on behalf of Brandon during his sentencing as my testimony would have been more personal than a letter, but I was never contacted by Brandon's trial attorneys.

8. Brandon is a good natured, sweet person. It is still hard for me to believe that he got into a situation where people were killed. The victims' families have lost so much. My heart goes out to them as they have suffered a terrible loss. But, I also do not think Brandon should be executed. Brandon is naturally a good person who got caught up in a bad situation at a time when he lacked the strength and especially the maturity to get himself out of it. I will hope and pray that President Trump will spare Brandon's life and commute his death sentence to a life sentence in prison.

I have read the foregoing declaration. Under the laws of the United States and State of Texas, I declare under penalty of perjury that this declaration is true and correct.

Executed at Belton, TX on _August 13, 2020_

_Bonnie Wainwright_
Bonnie Wainwright

**EXHIBIT 1 pg. 298**

Exhibit S-2

Declaration of Debra King

I, Debra King, make the following declaration:

1.      My name is Debra King and I reside in Belton, Texas. Currently, I am a Registered and Licensed Dietitian, and work for Meals and Wheels Waco. I have been an adjunct professor at Baylor University, located in Waco, Texas. I was a member of the Seventh-day Adventist Church in Killeen, Texas and it is through this congregation that I came to meet and know Brandon Bernard and his family. I was an active member of this church until about 2008.

2.      I first met Brandon in the early 1990's when his family moved to Killeen. I volunteered at the church with teens so I interacted more with Brandon when he was about 14 years through his early teen years. Brandon was a bit older than my children, but they all went to the same church school together. I also remember Brandon's siblings, Quiona and Max. They were a bit younger than Brandon and closer to my kids' age, so I saw them more often. I was known as 'Mrs. King' to all three kids.

3.      When Brandon was a teenager, I remember that he loved to play basketball and spend time with the kids his age who also attended the church. I saw Brandon as a follower amongst his friends and he was more likely to 'go with the flow' than to speak up and tell people what to do.

4.      I do remember an incident that took place outside the church that involved Brandon and his father Kenneth. Kenneth had recently returned home after spending time in jail for domestic violence issues at the Bernard home. I did not see the actual altercation but I did arrive outside right after it happened. Kenneth had shown up to the church and he and Brandon had gotten into a fist fight. Other male church members stepped in to control the situation and stop the fight. I came outside and saw the two of them around this time. I could see that whatever had triggered the altercation had made Brandon really angry at his father. After the fight, both Brandon and Kenneth seemed to calm down and no one was injured. Besides this fight, I have never seen Brandon stand up for himself.

**EXHIBIT 1 pg. 299**

Exhibit T-1

5.     I did not know much about Brandon's home life, but I did notice a change in Brandon when his father was sent away to jail. This absence of a father figure seemed to really negatively impact Brandon and I believe that Brandon had a tough time while his father was away. I am aware that Kenneth and Brandon's mother eventually got back together, but I do not think that Brandon was living at home when this happened.

6.     As Brandon got older, I didn't interact with him as much at the church, but we would always say 'hi' to each other and I always found Brandon to be very respectful to all the church members. Brandon was always very polite and was never one to 'talk back' to anyone at the church.

7.     I first heard about the tragic incident involving the Bagleys from reading the newspaper. I noticed that Brandon's name was in the paper and associated with the horrendous crime. Thelma had first told me that it all must be a big mistake and that it would hopefully all work itself out. I couldn't believe what I was reading. This was not the Brandon that I knew.

8.     Around this time, 1999 and 2000, our church pastor was Terry Johnson. Pastor Johnson believed and taught the members forgiveness and kindness. The congregation took a very 'wait and see' attitude with regard to Brandon's involvement in the crime. People did not want to judge Brandon without knowing all the facts. As the congregation began to learn more, some members were definitely taken aback but were still taught to be kind and forgive and did our best to practice that belief.

9.     I remember a letter that Brandon wrote to the congregation while he was in jail awaiting trial. Brandon wanted to apologize to the church for having become involved in the crime and he wanted the church members to know and understand that he felt remorse for what he had participated in. I remember that in the letter, Brandon wanted us to know that he was going to accept his punishment for what he had done. I truly appreciate that Brandon was able to say he was sorry and that he wanted his church to know that. I believe that under Pastor Johnson's leadership, we were able to hold Brandon and forgive him. The church continued to love the Bernards. I never heard anyone in the congregation utter a bad word about Brandon, nor anyone in his family. The church's goal was to help Brandon and his family get through this case.

10.     I know that the families of the victims have suffered a catastrophic loss. I hope they have found peace and have been able to move forward with their grief and pain for the

Exhibit T-2

lives of their children.

11.    The congregation was very sad to learn about Brandon's death sentence. I was dumbfounded as well as sad for Brandon and his family. It was hard for me to understand why Brandon was charged and tried with the shooter and mastermind of the crime.

12.    I believe in forgiveness and I believe that people can change. I have forgiven Brandon for his part in the crime and I know Brandon is no longer the reserved follower that he was when he was a teenager. Brandon's life is worth saving, even if his life is behind bars. I know from talking with his mother that she cherishes her visits with her son and all she wants to be able to do is hold Brandon and hug him. I pray that President Trump sees that a death sentence is needlessly harsh for someone like Brandon and commutes his death sentence to a life in prison sentence.

I have read the foregoing declaration. Under the laws of the United States and Texas, I declare under the penalty of perjury that this declaration is true and correct.

Executed at Belton, TX on: ___9/9/2020___

_____
Debra King

**EXHIBIT 1 pg. 301**

Exhibit T-3

Declaration of Pastor Andres Terry Johnson

I, Pastor Andres Terry Johnson, make the following declaration:

1.  My name is Pastor Andres Terry Johnson.  Most people know me as Pastor Terry Johnson.  I am the President of the Greater Sydney Conference of SDA in Sydney, Australia.  I earned my Bachelor's degree at Southwestern Adventist University.  I earned my Master's degree at Andrews University.  I spent 9 years in Texas as a Pastor.  From January of 1998 to June of 2002, I was the Pastor at the Seventh Day Adventist Church in Killeen, Texas.  I met Brandon, his mother Thelma, his father Kenneth, his sister Quiona, and his younger brother Max, while I was the Pastor at the church.  When Brandon got into trouble, there were fewer than 300 people in the congregation. I knew all of the members well because it was a small intimate group of people.

2.  I became familiar with the Bernard family right away when I became Pastor at their church in 1998. Brandon's parents Thelma and Kenneth were not together at the time, and their relationship was troubled.  Thelma came to church every Sabbath (Saturday) with her younger children.  Brandon also attended regularly with Thelma, but less frequently when he was living with his father in Temple.

3.  I do not know the details of the problems in Thelma and Kenneth's marriage, but I feel they may have been shaped by Kenneth's own difficult upbringing.  Kenneth lacked the mental skills to express his feelings and I felt that he sometimes behaved intimidatingly towards Brandon. Certainly, Kenneth and Brandon got along poorly during that period.

4.  The years I have spent as a Pastor have given me some insight on how children respond when their parents' relationship breaks down.   Brandon had a void in his life that he was trying to fill. He needed to belong to something and be accepted.

1

EXHIBIT 1 pg. 302

Exhibit U-1

5. Unfortunately for a young man facing such a struggle, Brandon was a lamb and not a lion. He seemed easily influenced and impressionable. He was nowhere near emotionally or morally an adult when he reached age 18. He was more like fourteen or fifteen, "a little boy in a man's body." He could not say "no" to anybody. At church functions, this tendency was positive; Brandon seemed at ease and fit in naturally. But when he was on his own and away from the church, Brandon's tendency to be a follower left him vulnerable to the negative influences of others.

6. After Brandon was arrested in June 1999, Matthew Mitchell, a friend of Brandon's from the church, asked me to go with him to the jail to see Brandon, and I went with him. When we saw Brandon, he was in an unnaturally calm state of mind. I would have expected someone in Brandon's position to be more emotional. It might have been partly depression, but I thought it was also a sense of remorse and acceptance. I remember Brandon saying he could not talk about the details of his case because his lawyer told him not to. Asking Brandon about how he was doing spiritually told me a lot. It was clear from what Brandon said that he felt the crime should never have happened and that he felt bad for not having done something to stop it Brandon knew that he had been involved in something bad and knew that he would be punished. To me, all of these sentiments meant to me he was remorseful for his actions and their terrible consequences.

7. When I saw Brandon, he expressed his concern about how his actions had affected the congregation. He felt like he had let them down. He was concerned that they would not love and accept him as family anymore. He was wrong about that. The congregation still loved and accepted Brandon, even though they were greatly disappointed in him.

8. Brandon wrote a letter expressing his remorse to the Church. I believe that we posted it on the Church bulletin board. The Church felt a lot of grief for what happened, especially towards the

2

EXHIBIT 1 pg. 303

Exhibit U-2

families of the victims.  The congregation was shocked by the circumstances of the crime. Everyone knew Brandon as a kind, gentle, young man, not a killer.  Brandon had a way about him that indicated being easy going, a follower and not a leader.  Brandon was someone who wanted to be accepted.

9.  Even at the time, I did not believe Brandon should receive a death sentence.  I did not think this should have been a death penalty case, but knowing Texas, I was not surprised - especially when I considered that it was a black on white crime.  I do not want my thoughts about the justice system to mean I thought less of the victims themselves.  I saw the victims as good Christian people and this crime was a senseless tragedy.

10.  I would have testified if I had been asked to, but I was never asked. I did not think Brandon received good legal representation.  This is not surprising to me since we lived in Texas, a state that is not known for providing good legal representation to poor defendants.  Thelma would have paid for a different attorney if she could have and the church would have paid for that if we had the money. But neither had the money to pay for one.

11.  I have been told that Brandon has behaved well in prison and has not been in any trouble.  The fact that Brandon has not been in any trouble does not surprise me.  I have always thought that Brandon's involvement in this terrible crime resulted from his immaturity and desire to be accepted, which led him to follow the wrong crowd.  Now that he has matured into an adult, I do not think he will pose any problems for the prison authorities.

12.  I wish to express my deepest sympathy to the victims' families.  They have lost two of their children and the world has lost two good Christian people.  There is nothing I could say to alleviate any pain they might have.  I pray that they have found peace through God.

13.  I do not think Brandon Bernard should be executed.  Brandon is naturally a good person who got caught up in a bad situation.  And he chose poorly.  I pray President Trump will commute

3

**EXHIBIT 1 pg. 304**

Exhibit U-3

Brandon's death sentence to a sentence of life imprisonment.  That would be the appropriate

sentence for Brandon and would serve the interests of justice and punishment for his crime.

I have read the foregoing declaration.  Under the laws of the United States and Australia, I declare under penalty of perjury that this declaration is true and correct.

Executed at Sydney, Australia on  _12 – 08 – 2020_

_____
Pastor Andres Terry Johnson

4

**EXHIBIT 1 pg. 305**

Exhibit U-4

# RUSSELL D. HUNT
## *Attorney at Law*

BOARD CERTIFIED IN CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
AND
NATIONAL BOARD OF TRIAL ADVOCACY

August 30, 1999

Mr. Mark Frazier
Assistant U. S. Attorney
P. O. Box 828
Waco, Texas 76703-0828

     Re:   *Brandon Bernard*

Dear Mark:

I am responding to your request that I provide you with a written communication that outlines the basis for our opposition to your suggestion that the Government seek the death penalty in the case of Brandon Bernard.

As you are aware, Mr. Bernard was not the shooter in this action. Instead, both of the victims were shot by co-defendant Chris Vialva.

We believe that the evidence will show that Mr. Bernard was not the instigator of this action, nor was he the leader. I believe all of the evidence will show that Vialva was the instigator and leader.

I further believe that the evidence will show that Mr. Bernard and at least one of the juveniles tried to persuade Vialva to release the victims unharmed. We believe that evidence will show that Mr. Bernard believed that Vialva would release the victims until the moment that Vialva shot them both.

Mr. Bernard is not a leader and has even been characterized by his former high school principal, Corbett Lawler, as a "non entity." Mr. Lawler was quoted by the *Austin American Statesman* as saying that Bernard is "never at the front of anything" and is instead "almost defined by the group he is with."

ALICO Building
Suite 1202
425 Austin Avenue
Waco, Texas 76701
254/753-3738
Fax 254/753-8118

4264

Post Office Box 726
Waco, Texas 76703-0726
*RHuntAtty@aol.com*
*RussHuntAtty@abanet.org*
*www.rhuntlaw.com*

**EXHIBIT 1 pg. 306**
Exhibit V-1

Mr. Mark Frazier
Re:  ***Brandon Bernard***
August 30, 1999
Page 2

As I have informed you, the Court has appointed Criterion Investigations to work with me in preparing mitigating evidence on behalf of Mr. Bernard. Mr. Bernard's mother has provided us with the names of at least eighty people who will be willing to come to court and testify that Mr. Bernard is not violent and would not initiate an incident such as this.

As I have also informed you, Mr. Bernard stands ready to enter a plea to his involvement in this matter and testify to the actions of Mr. Vialva. Mr. Bernard has given a complete statement to the police and is not trying to escape responsibility for his involvement in the matter. I would urge you to avail yourself of his cooperation instead of seeking his death.

There can be no question that a horrible crime was committed. I implore you to spare the life of Brandon Bernard.

Please contact me if you need additional information in order to assist you in determining a future direction.

Sincerely,


RUSSELL D. HUNT

RDH/ppr

ALICO Building
Suite 1202
425 Austin Avenue
Waco, Texas 76701
254/753-3738
Fax 254/753-8118

4265

Post Office Box 726
Waco, Texas 76703-0726
*RHuntAtty@aol.com*
*RussHuntAtty@abanet.org*
*www.rhuntlaw.com*

**EXHIBIT 1 pg. 307**
Exhibit V-2

The jury sentenced Christopher Vialva to death for the "Carjacking Resulting in Death" charge.

DECISION FORM C

Based upon consideration of whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death, we, the jury, recommend, by unanimous vote, that the defendant should be sentenced to death.

_____
FOREPERSON

Date: _____ 6-12-___, 2000

**EXHIBIT 1 pg. 308**

Exhibit W-1

The jury sentenced Christopher Vialva to death for Todd Bagley's murder.

## DECISION FORM C

Based upon consideration of whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death, we, the jury, recommend, by unanimous vote, that the defendant should be sentenced to death.

_Calvin Kinge_
FOREPERSON

Date: _____ 6-12-, 2000

**EXHIBIT 1 pg. 309**

Exhibit W-2

**DECISION FORM C**

The jury sentenced Christopher Vialva to death for Stacie Bagley's murder.

Based upon consideration of whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death, we, the jury, recommend, by unanimous vote, that the defendant should be sentenced to death.

_____
FOREPERSON

Date: _____ 6-12- , 2000

EXHIBIT 1 pg. 310

Exhibit W-3

The jury spared Brandon's life for the "Carjacking Resulting in Death" charge.

DECISION FORM D

We, the jury, recommend, by unanimous verdict, a sentence of life imprisonment without possibility of release.

_Calvin Kruger_
FOREPERSON

Date: _____ 6-12- _____, 2000

**EXHIBIT 1 pg. 311**

Exhibit W-4

The jury spared Brandon's life for Todd Bagley's murder.

DECISION FORM D

We, the jury, recommend, by unanimous verdict, a sentence of life imprisonment without possibility of release.

_Calvin Kruger_
FOREPERSON

Date: _____6 -12 -_____, 2000

**EXHIBIT 1 pg. 312**

Exhibit W-5

The jury sentenced Brandon to death for Stacie Bagley's murder.

DECISION FORM C

Based upon consideration of whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death, we, the jury, recommend, by unanimous vote, that the defendant should be sentenced to death.

_____
FOREPERSON

Date: _____ 6-13-, 2000

**EXHIBIT 1 pg. 313**

Exhibit W-6

Declaration of Max Bernard

I, Max Bernard, make the following declaration:

1. My name is Max Bernard. I am Brandon Bernard's brother. My father's name is Kenneth Bernard and my mother's name is Thelma Bernard. I have an older sister named Quiona Bernard. I was about 7 years old when Brandon was arrested.

2. If Brandon were executed, I would be devastated. I would feel as if there were no hope in the world. He is my big brother and has always been there for me. I know that he made horrible choices years ago and I have great sympathy for the Bagleys and their families. But I believe that he has learned from those mistakes. Even though he is in prison – and maybe in some ways because he is in prison – he has helped me stay clear of getting into trouble or getting mixed up with the wrong crowd. Brandon is supportive of me and has helped me through some very hard times. He has been supportive of me in positive ways, without judging me. I appreciate that. I don't have this sort of connection with anybody else.

3. I know Brandon feels badly about what happened because I hear the regret in Brandon's voice. He knows he should be punished for his role in these senseless murders. Brandon wishes this had never happened and not just because he is on death row. He has tremendous remorse for not preventing those murders from happening. He is sorry for what he has put our family and the victims' family through. I think Brandon was in the wrong place at the wrong time. If he knew the Bagleys were going to be killed, he would never have gone. I do not think Brandon should be measured by his actions on that one day as it does not resemble who Brandon was and is the rest of the time.

4. When I was growing up, I spent a lot of time with Brandon. Brandon took care of Quiona and me growing up. He was a good brother. He never used drugs in front of me. I never saw him high,



1

EXHIBIT 1 pg. 314

Exhibit X-1

and never even heard him curse. He always made sure I was dressed for school. He was always protecting me, making me feel safe and secure.

5. When I first heard about what happened, I thought about the victims and their families. I can only imagine how devastated they must be. Their loved ones' lives ended in a blink of an eye and that is tragic. I have great sympathy for them. I also want them to know that a different man would be executed today than the one involved in the crime that took their family members many years ago.

6. Quiona and I were not close to our father Kenneth until after he and our mom reunited. I have memories of him being mean and strict. He was mean to us kids and my mother. My mother and my father argued a lot. Over the years, I was able to come to know my dad in a different way. He changed. He mellowed with age. Brandon did not have that person as a father in his life.

7. When our father passed away, Brandon helped me come to terms with his death. Brandon, more than anyone else, helped me feel better and at peace by talking with me about our dad and his passing. Brandon reassured me that I had done all I could to help our father, and helped me accept that our father's illness had taken its toll on him and that his death was inevitable. Brandon was sad he couldn't be there to help with our dad in his final years, but supportive of me on my feelings of loss and grappling with my father's absence. For the longest time, I could not look at his wheelchair or go into his bedroom. It was too painful. It was Brandon who helped me move past my father's death.

8. I depend on Brandon to talk straight with me about issues or concerns I have. I believe what Brandon tells me is not said to please me, but is an honest assessment and a solid opinion, based on experience and observations. I am torn between reaching out and connecting on a more regular basis with my brother on death row and simply denying it is happening. I



2

**EXHIBIT 1 pg. 315**

Exhibit X-2

sometimes prefer to believe that Brandon is away, living his own life, even though that is not a good approach to the situation. Brandon keeps the lines of communication open and never makes me feel guilty for not keeping in touch.

9. I would like the President to know more about Brandon. I would tell the President that how Brandon appears on paper does not represent who Brandon really is. I would ask the President to not judge the entirety of Brandon as a person based on one situation. Brandon has to live with what he has done for the rest of his life. If the President met Brandon, he would understand that Brandon a kind, thoughtful and supportive person who does not deserve the death penalty. The President would see that Brandon does not want to harm anybody and could not believe it when the victims were actually killed that day. I would tell the President I hope he would grant the gift of Brandon's life by commuting his sentence.

I have read the foregoing declaration. Under the laws of the United States and the State of Alabama, I declare under penalty of perjury that this declaration is true and correct.

Executed at Huntsville, AL on ___6/27/16___.

_____
Max Bernard

EXHIBIT 1 pg. 316

Exhibit X-3

Declaration of Sherise Scott

I, Sherise Scott, make the following declaration:

1. My name is Sherise Scott. I am the mother of Brandon Bernard's daughter Taneah Scott. I got pregnant with Taneah in 1999. Taneah was born after Brandon was arrested in this case. Because he was already in jail before she was born, Brandon has never had the chance to hold or touch her.

2. Taneah and Brandon's relationship is limited because he is in prison. Although Taneah has visited him only once, Brandon writes and calls Taneah monthly. She looks forward to his calls and his letters. It is important to Brandon, Taneah and me that he play as large a role in her life as he can, even while he is in prison. I know Brandon is sorry for what he did that affected his and Taneah's relationship.

3. Brandon is important to Taneah because he is her father, and she treats him like one. Brandon's experience serves as an important life lesson for her Taneah has never gotten into trouble and does well in school. Brandon encourages her to keep up her grades. He explains to her that who she has as friends is very important. He is an example of what can happen if she hangs out with the wrong friends. Taneah does not wish to make the same mistakes, so she goes to school and to work and does not go out to parties. Brandon continually reminds her of what her choices mean.

4. I ask that the President commute Brandon's death sentence to a life sentence. It is important for Taneah to have her father around. He can never be replaced. She can continue to learn from him and seek his guidance. He is a different person than the one who got into trouble 17 years ago. If he was executed, more victims would be created, like my daughter Taneah. He has much to offer even though he is in prison. Please do not punish my daughter for something her

1

**EXHIBIT 1 pg. 317**

Exhibit Y-1

father did.  Brandon will still be punished. He will be punished by spending the rest of his life in prison, with no chance to ever be home with his family.

5.   I understand that the Bagley family has lost two people because of the crimes that Brandon was involved in. I am very sorry for that and wish there was something I could do to change things for them. They have suffered, and if I were them, I too would want to see Brandon punished harshly.  I truly believe that if Brandon could trade places with the victims, he would.  But executing Brandon will not bring back their children.  It will only punish another child, our daughter Taneah.  I ask the Bagleys to understand that although this was a terrible crime, Brandon committed it when he was young and that he is not that person anymore.  I hope that someday they can find it in their hearts to forgive him, even though they will never forget the pain of their loss.

I have read the foregoing declaration.  Under the laws of the United States and the State of Texas, I declare under penalty of perjury that this declaration is true and correct.

Executed at Belton, TX on ___8|23|16___ .

_____

Sherise Scott

2

**EXHIBIT 1 pg. 318**

Exhibit Y-2

Declaration of Taneah Scott

I, Taneah Scott, make the following declaration:

1. My name is Taneah Scott and I am 16 years old. I am the daughter of Brandon Bernard and Sherise Scott. I have visited my dad in prison, but my main contact with him is through phone calls and letters. We talk and I get letters from him on a monthly basis.

2. I know my dad is on death row for being involved in a horrific crime that cost the Bagleys their lives and I know he is sorry. I am sorry for what his actions cost the Bagley family, and I cannot imagine what their pain must feel like.

3. My father is there for me as much as he can be from prison. I have never been able to hug my dad, but mentally and emotionally he is there for me as much as possible. It might not seem like much of a relationship, but it is the best one I have and it is important to me. I will never have a normal father-daughter relationship with my dad. He will never be able to attend my graduation or take part in my wedding, but I hope to be able to share those things with him.

4. I have learned a lot about the consequences of my actions from my father. He is very firm with me about making the right choices, staying out of trouble, keeping away from the wrong crowd, and keeping my grades up. He stresses to me how important those things are and how one bad choice could ruin my life.

5. I am hoping and asking the President to spare my dad's life. I know he has done wrong, but also know he is sorry. It would be a tremendous loss to me if my dad was executed. I depend on him for his guidance and support and hope I will be able to continue to get it from him while he is in prison for the rest of his life.

I have read the foregoing declaration. Under the laws of the United States and the State of Texas, I declare under penalty of perjury that this declaration is true and correct.

Executed at Belton, TX on ___8/23/10___ .

_____Taneah Scott_____
Taneah Scott

1

**EXHIBIT 1 pg. 319**

Exhibit Z-1

Declaration of
Elmer V. Hetzel

I, Elmer Hetzel, make the following declaration:

1.      My name is Elmer 'Jack' Hetzel and I live in Tyler Texas. I have lived here for over 6 years. Prior to living in Tyler, I lived in Waco, Texas.

2.      I founded the Moments of Faith International Church and am an ordained minister. I have been preaching and teaching for over sixty-two years. I have also served in the Air Corps and Air Force, as a non-commissioned officer. I was in the US Army for fourteen years. I retired from the military as Sergeant First Class. Prior to founding the church, I taught military science as A&M University of Texas. I also hold an honorary Doctor of Divinity.

3.      In the late 1990's, I made the choice to reach out and minister to individuals in jail. I began a ministry at the Waco County Jail. I led this ministry for roughly four years. During this time, I was introduced to, and got to know, Brandon Bernard. I ministered to roughly 400 people during those four years at the jail and to this day, I still remember Brandon.

4.      Brandon had heard about my jail ministry from another inmate and asked that I visit him, while he was awaiting trial.

5.      I first met Brandon when he had been in jail for about six weeks. I remember this first meeting. Brandon asked me how he could possibly be forgiven for what had happened to the Bagleys.

6.      Brandon was remorseful for all that he was putting his mother and family through. Brandon felt he had embarrassed his mother so much and it was important for Brandon to tell me what a good mother he had. His mother had raised him to be a good person, and had been unhappy that he had been hanging out with the group of kids that he got in trouble with. Brandon was adamant that I understood just how much he loved his family and that he did not blame them for the situation he found himself in.

7.      I ministered to Brandon for about a year, while he was in custody at the Waco jail, awaiting trial and then sentencing. During this year, I visited Brandon roughly every week and our visits lasted about 20 minutes.

8.      During my time visiting Brandon, I never heard anyone, including the

EXHIBIT 1 pg. 320

Exhibit AA-1

correctional staff, say a negative word about him. A staff member with the first name Morris, told me that Brandon was a dedicated Christian and Morris believed that Brandon was sincere in his religious study and repentance.

9.    Over the year, I got to know Brandon more as a person and he began to share his feelings with me. Brandon shared his regret and shame at the grief he had caused. Brandon often talked to me about his love for his family.

10.    Brandon confided in me that he regretted his choices to start using drugs and hanging out with the kids who got into trouble with him. He felt that by making these decisions, he let the devil into his heart. Brandon worried that others would never forgive him. I understood how Brandon could have been led astray. I knew that immaturity played a part in Brandon's inability to say 'no' or stand up for himself. I think these other kids used Brandon, because he had a car. From my many conversations with him, I do not believe that Brandon knew that the Bagleys were going to be killed. While this may not make sense to everyone who has heard about the case, I truly believe that this is what Brandon thought.

11.    Brandon showed true remorse during our conversations. I counsel and minister a lot of individuals in custody. Many of them fail to see the seriousness of their actions and seem unaware of the need to reform themselves. Brandon was different. He showed true remorse during our conversations, applied himself to the task of understanding where he had gone wrong and thought about this future.

12.    Over time, Brandon told me that he felt ashamed for not having tried to stop the events that led to the Bagleys' deaths. He wanted to apologize to the victims' families and ask for forgiveness, but did not know how to reach them or if the families even wanted to hear from him. I know that Brandon struggled with talking about what happened, but that he felt relief by getting these feelings off his chest, by talking with me and praying with me.

13.    I stopped talking to Brandon around 2000, when he was sentenced and moved from Waco. After he moved, I received three separate letters from Brandon.

14.    I was never contacted by anyone on Brandon's trial team. Had I been, I would have liked to have shared with the jury my experiences with the young man I came to know over the year we spent talking and praying together in the Waco Jail. I would have also told the jury how remorseful and grief- stricken he was over what happened. I could have been able to tell the victims' families that Brandon had regret and sorrow for his actions.

EXHIBIT 1 pg. 321

Exhibit AA-2

15.     I pray for the victims' families. I know they have suffered an insurmountable loss and nothing can be said or done to bring their children back. My wish for Brandon's life to be saved does not take away my sorrow for their loss.

16.     I pray that President Donald Trump will spare Brandon and commute his death sentence to a life sentence. I am grateful that I had the opportunity to minister to this young man. In my professional opinion, based on years of ministering to people, Brandon Bernard could make a positive contribution to society, even if he spent the rest of his natural life in prison. I believe that his life is worth saving.

I have read the foregoing declaration. Under the laws of the United States and Texas, I declare under the penalty of perjury that this declaration is true and correct.

Executed at Big Sandy, TX on: _____8-12-20_____

Jack Hetzel

**EXHIBIT 1 pg. 322**

Exhibit AA-3

## DECLARATION OF DAVID BOYD

I, David Boyd, make the following declaration:

1. My name is David Boyd. I am an insurance professional for Progressive Insurance and I live in Indianapolis, IN. I am friend of Brandon Bernard. I am about five years younger than Brandon. I have a twin brother named Michael.

2. Brandon and I attended the Killeen Adventist Junior Academy in Killeen, TX together. We also went to church together. I remember looking up to Brandon when I was younger. Brandon was the older kid who would play with us younger kids during recess. Most of the older kids would not play with us younger kids, but Brandon would. I remember tossing the football around with Brandon.

3. I knew Brandon as kind and gentle with a calm demeanor. He joked and laughed, but was always respectful, especially to my family. I was unaware of Brandon being in any trouble and never saw any negative influences on Brandon. I think Brandon has a good heart and was raised in the church but was led astray.

4. I found out that Brandon was in trouble on the news. I was in disbelief and thought the news had to be talking about someone else at first. The crime did not fit Brandon's personality.

5. I went to some of Brandon's trial with my family. Brandon had an empty look on his face that conveyed: "This is not happening." It struck me as a sign of his remorse. Brandon did not seem angry or mad. He looked more like he had made a mistake and felt saddened. It was unlike I had ever seen Brandon.

6. In 2003, Michael and I started up the Enlightenment Tour which was directed at helping "at risk" youth stay out of trouble. It was a nonprofit national youth missionary project dedicated to youth outreach in America, an effort that was important to Michael and me. Brandon wrote a letter to us after reading an article about the tour. (See Exhibit A, Insight Magazine article). My brother and I did not reach out to Brandon. Brandon reached out to us. He wanted to help prevent kids from making the same mistakes he had made. He wanted to share his testimony, or story, with the youth. He wanted the kids to understand where bad choices would lead them.

**EXHIBIT 1 pg. 323**

Exhibit BB-1

7. Brandon provided powerful testimony to kids that we were trying to help. He explained how quickly he fell, how much he regretted it, and how others should learn from his mistakes. It was the most powerful testimony that we received. Here is a sample:

> At 18 years old most kids are preparing to embark on life. At 18, I was getting processed by the FBI, but [at] 19 I was sitting on death row ....

> A person reading this might think to themselves ... this would never happen to me. Don't be a fool! This whole place is filled with people who thought it couldn't happen to them; now they wish they would of [sic] listened. Most of the time it starts from doing small things. It just continues to escalate at such a rapid pace, that before you know it, it's over and your [sic] left either dead, in prison, or in here (which actually is combination of both.) How do I know, because I thought the same way ....

> I didn't have a violent record or an adult [record] (matter of fact[,] I barely had a record at all.) I went to church every week. I attended numerous church functions. I even went to church school, but sin does not discriminate about whose life it will destroy. Maybe you'll understand this better if I put it this way. It took me only 3 years to ruin my life. ~ yrs from the time I first stole from my moms [sic] purse to being in death row. Now marinate on that! ...

> It may be too late for me (only God knows the answer to that), but it is not too late to help others. It's not too late to let youths know that this [criminal] lifestyle is not glamorous. There are no rewards. There is only pain ....

> Stop breaking those who care about your hearts! Make the decision to do what is right, walk the path of righteousness ....

> Listen to my words and learn from my life's mistakes so you don't have to experience it yourself.

8. Michael and I spent the month of June 2008 talking to "at risk" youth, telling them Brandon's story, and providing his testimony to them. Brandon's story had a huge impact on the kids who heard it. Brandon helped keep a lot of young kids stay on the right path who had been on the verge of walking the wrong path.

9. I worked as a correctional officer in Texas, so I am familiar with the criminal justice system. remember there being offenders who were proud of being incarcerated. It was a lifestyle for some of them. Brandon has never had that attitude. Brandon has opened his heart to God. He keeps a positive attitude by continuing to better himself spiritually and mentally.

10. Michael and I visited Brandon on death row in 2008. Brandon was calm, but happy that we cared enough to come see him. We talked about how Brandon is trying to turn his life around and stay positive in a place where it is always easy to feel sorry for yourself

EXHIBIT 1 pg. 324

Exhibit BB-2

rather than think about how your own actions put you there. Brandon said he was doing his best to stay positive. Helping us with the Enlightenment Tour was a way Brandon stayed positive. To Brandon, it was doing something right. Brandon wishes he had made better decisions when he was eighteen and blames only himself for what happened. There was no sense of falseness from Brandon. He was not pandering to us. He was being honest. He was remorseful. Michael and I told Brandon to keep his faith and Brandon said he would.

11. If I could say anything to the victims' families, I would tell them I am deeply sorry for their loss. I would tell them that Brandon has a good heart and Brandon knows he made terrible, life altering decisions. I would tell them I think Brandon was following his friends and I believe he would not have gone with them if he had fully grasped the potential consequences that could follow. I would tell them that Brandon apologizes to all the people and families he hurt that day.

12. I would also ask President Trump to spare Brandon's life and commute his death sentence to life imprisonment without the possibility of parole. It is clear to me that Brandon recognizes that he has made seriously bad decisions and an awful tragedy resulted from his decisions. He has reached out and helped other kids stay out of trouble by sharing his story. These are the actions of a remorseful person who deserves mercy.

I declare under the penalty of perjury under the laws of Indiana and the United States of America that I have read the foregoing declaration and it is true and correct.

Executed at Indianapolis, Indiana on August, 07 2020.

David Boyd

EXHIBIT 1 pg. 325

Exhibit BB-3



EXHIBIT 1 pg. 326

Exhibit BB-4

## DECLARATION OF MICHAEL BOYD

I, Michael Boyd, make the following declaration:

1. My name is Michael Boyd. I live in Killeen, TX. I am an electrician who works on Ft. Hood. I am a friend of Brandon Bernard. I am about five years younger than Brandon. I have a twin brother named David.

2. Brandon's family and my family attended the New Hope Seventh-day Adventist Church together. Brandon came from a good church-going family. He was humble and respectful. He was pleasant to be around and reserved. He did not use profanity. I never saw him use drugs or drink alcohol. He looked out for the younger kids in church. I saw him tell younger kids they were doing something that would get them into trouble with their parents or tell them what they were doing was not the smartest thing to do. I would never have guessed Brandon would get himself involved in the situation he did.

3. I went with my family to court for some of Brandon's trial. We were all shocked at what had happened. It was difficult for me to reconcile the Brandon I knew with the Brandon that was charged with these crimes. It was hard for me to make sense of it. The person that was described in the court proceedings was not the Brandon I knew. After Brandon was sent to Death Row, I had no contact with him until I went with David to visit him in 2008.

4. In 2006, David and I set up the Enlightenment Tour which was a nonprofit national youth missionary project that my brother and I founded in 2003. It was directed at helping "at risk", youth stay out of trouble through the teachings of Christ. On December 9th, 2006, Southwestern Union Record published an article about the tour. Unbeknownst to David and me, Brandon read the article. After he did, he reached out to us. He sent us a letter praising the work we were doing and offered his help. The letter was directed at telling the youth where bad choices could lead them. Brandon wanted the kids to make better choices than he had made.

5. We integrated Brandon's statement and his story into our presentation. His story changed the lives of a lot of kids for the better. Brandon's story was a real life example of what could happen to them if they followed the wrong crowd or thought only about themselves rather than others.

6. I believe Brandon's statement and story helped many kids stay out of trouble. It was a very effective statement. Brandon did this out of his own will. We never asked him to do anything and Brandon did not expect anything from us other than to get his message out to the kids. The fact that Brandon reached out to us is an example of the Brandon I always knew.

7. In 2008 or 2009, David and I went to visit Brandon on death row in Terre Haute, IN. The conversation went well. Brandon asked about the tour and whether his statement had helped us reach the kids the Enlightenment Tour was aimed at. He also wanted to know how people in the church were doing. He asked how his family was doing because David and I had kept contact with them. We talked about the growth of Killeen and a lot of other things. But we were mostly focused on our faith and the healing power of Christ.

8. I understand Brandon took part in committing a terrible crime that inflicted awful suffering on two innocent people and a tragic loss on their families. But that is not the Brandon I knew when I was young, and it is not the Brandon I know today.

9. I am praying that the President commutes Brandon's death sentence to a sentence of life imprisonment. He knows he owes a debt to the community and to the families of the victims. He is remorseful. He wants to help keep other people from making the same mistakes he has. That is a life worth saving.

10. I feel deeply sorry for the victims' family and their losses. I would like to express my condolences to them. My wanting Brandon to have his death sentence commuted to life imprisonment should in no way be interpreted as not acknowledging their pain. I pray that they find peace in this tragic situation.

I declare under the penalty of perjury under the laws of Texas and the United States of America that I have read the foregoing declaration and it is true and correct.

Executed at Killeen, Texas on August, 9 2020.

EXHIBIT 1 pg. 327
Exhibit CC-1

Scanned with CamScanner

_Michael Boyd_

**EXHIBIT 1 pg. 328**
Exhibit CC-2
Scanned with CamScanner

Declaration of Pastor Aaron Chancy

I, Pastor Aaron Chancy, make the following declaration:

1. My name is Pastor Aaron Chancy. I am a friend of Brandon Bernard and his family. I am a two years younger than Brandon. I have known Brandon since he was about 7 years old. When I first met Brandon, I think I was in 1st grade and Brandon was in 2nd grade. We both went to school at the Killeen Seventh-day Adventist Junior Academy. My siblings also went to school there. At that time, my family lived down the street from the Bernards. We attended school and lived near each other for a couple of years before my family moved to Hawaii. My family moved back to Killeen when I was in the 5th grade. I did not attend the same school as Brandon anymore and I did not live down the street from Brandon and his family. We saw each other at church but did not play with each other as much as we used to.

2. When Brandon was 14 or 15, I heard he had started getting in trouble, hanging out with the kids on the streets. I found out about the murders from the news. It was horrible. My heart goes out to the victims and their families. I could not believe that Brandon was involved. I knew he was getting into trouble, but not to that degree.

3. I have been in contact with Brandon through letters and phone calls for most of the time Brandon has been on death row. I have never spoken to Brandon about the actual crime, but have spoken to Brandon about how he feels. Brandon knows that he made bad decisions and has told me that he wishes he could undo what has been done, but knows that he can't. He has sought forgiveness from God and prayed that the Bagleys' families can somehow find peace despite the fact that their loved ones' lives were unjustly and senselessly taken from them

4. I had a ministry and traveled all over parts of the country, like New York, Tennessee, North Carolina and other states and have spoken at many churches in those states. In 2008, I asked

1

**EXHIBIT 1 pg. 329**

Exhibit DD-1

AC

Brandon to help me use his story to reach out to kids in the community who might stray from the Lord's path. Brandon wrote me a letter detailing his story and telling kids to be careful with the decisions they make. I am attaching the letter as Exhibit A. I do not have the original letter, but typed up the letter in 2011 because I will make Brandon's story a chapter in my book. What I typed up is almost identical to the original letter Brandon sent me. Here are brief excerpts from that letter:

> I'm a grown man sitting on Federal Death Row. Twelve years of my life (Written in 2011) is gone. Since the age of eighteen (Now 31 in 2011) I have called concrete walls, electric doors, and handcuffs my home.
>
> The Bible says, "The wages of sin is death". When I embraced what I knew was contrary to what I was taught as a Seventh-day Adventist, I turned in my application to the devil. I had an arrogance that came with my youth, which masked my ignorance to my future. I was fixated on the here and now. For an immediate good time I was willing to throw away my whole life.
>
> I ultimately got what I wanted for a little bit of time, then got what I deserved for a lifetime.

5. Brandon wanted to reach out to kids and keep them from making the same mistakes he did. It was a way for Brandon to contribute to society from where he was. I have presented this to many people through many states and think it has had a huge positive impact on the people who heard it.

6. I believe that even if Brandon spends the rest of his life in prison, he can still continue to reach out to people who have strayed from the Lord's path. Brandon could still help me spread his word. The people who hear Brandon's story could reach out to him and learn from the mistakes he made in his life. If Brandon is put to death, we will lose the best messenger for his important story. Executing Brandon will also deprive other listeners of the opportunity to reach out to him and learn even more from his experiences.

2

**EXHIBIT 1 pg. 330**

Exhibit DD-2

7. Brandon deserves to have his death sentence commuted to life without the possibility of parole. The fact that Brandon was only 18 when this happened is important. Brandon was not thinking as an adult. I know because I made mistakes in my life that put me in prison when I was the same age as Brandon. It was not until my mid- 20's that - with the Lord's help - I straightened up and started living an honest lifestyle. We all make mistakes, though of course some are worse than others. I realize Brandon's mistakes had the gravest of consequences. But Brandon's life should not be taken because of what happened in a short part of all of Brandon's life.

8. I am not trying to minimize the loss that two families felt when their family members were killed. It is a great loss to the world but executing Brandon will not bring them back. I know Brandon would change places with them if he could.

9. I submit this declaration in hopes it helps support that Brandon is a changed man and deserves a second chance. I pray that the President hears my words and commutes Brandon's death sentence to a life sentence with no chance of parole.

I have read the foregoing declaration. Under the laws of the United States and the State of Michigan, I declare under penalty of perjury that this declaration is true and correct.

Executed at                      MI on   7/28/16   .

_Aaron Chancy_ , Berrien Springs, Michigan
Aaron Chancy

3

**EXHIBIT 1 pg. 331**

Exhibit DD-3

## Brandon Bernard's Second Letter

## The first one was in 2008 and this one was 2011

## I have to look for the handwritten cop(ies) but this one I re-typed on the

## computer because I have it in my soon to be published book. Hope this helps

"I'm a grown man sitting on Federal Death Row. Twelve years of my life (Written in 2011) is gone. Since the age of eighteen (Now 31 in 2011) I have called concrete walls, electric doors, and handcuffs my home.

What hurts most as I lay on my thin narrow mattress-staring at the ceiling at night is that this could've been avoided as easy as stepping around a quarter size puddle on an empty four lane highway. I could have done something better with myself. I knew the winning numbers of the lottery, but I still wanted to try someone else's ticket.

Now I find myself in a place where there is mentally no peace. No contentment. I feel as one thing will make everything better, but as soon as I think the hole is filled another takes its place. Outside of God and doing what is right, there is never any true peace.

The Bible says, "The wages of sin is death". When I embraced what I knew was contrary to what I was taught as a Seventh-day Adventist, I turned in my application to the devil. I had an arrogance that came with my youth, which masked my ignorance to my future. I was fixated on the here and now. For an immediate good time I was willing to throw away my whole life.

I was a young man employed by the devil. Everyday I wake up in this cold box; I'm living off the pension plan I invested in. I wanted it all. I wanted to have a life of fun. I wanted money. I wanted ladies in my bed and the respect of my circle, but I wanted it for free. At least what I thought was free, but a heavy tab was stored for later. I ultimately got what I wanted for a little bit of time, then got what I deserved for a lifetime.

**EXHIBIT 1 pg. 332**

Exhibit DD-4



I tried to balance two worlds, my Christian friends and lifestyle and the streets. Two worlds that don't match at all! When I wasn't running around in the streets I thought I was missing something. I saw how my friends were acting and it looked fun from the outside, but it was and still is all false. Once I found myself engrossed in the lifestyle I coveted so; I saw how unglamorous things really were.

A hatred and disdain for life and others grew in my heart. I knew if I continued on the road I was on I would be either dead or in prison, where street life always ends. I had to always look over my shoulder. Everyone I thought was my friends ended up betraying me. It is the same story for everyone before me and after me. Everyone on my tier could tell you the same story.

We all knew the end game. We were all told but didn't listen. In the back of my head I thought, "not me, not me, I won't be in that situation", but yes, yes, it happened to me and it can happen to you. See, there in lies the deception, the devil puts forward to his employees. Even though my lifestyle of sin was worst then my lifestyle of righteousness, I still stayed in it, as many of you ready this may choose to do, but know this, and it will never change: You will end up dead or in prison the remainder of your life if you continue in the streets, that's a fact.

Another reason that I strayed was because I thought that there was a sacrifice of fun that I had to make as a young man of God. I though I had to choose between having fun as a sinner or being bored as a Christian, but as a Christian it isn't an either or choice. The Bible says, "Choose", you cannot have both worlds. Either you are one or the other.

I wish I would of understood that back in 1998 before I ended up in this situation and wish that I would have found joy in what I was doing, instead of reaching for what I didn't need. "There's a way that seemeth right unto a man, but the end thereof is death".

**EXHIBIT 1 pg. 333**

Exhibit DD-5

I had great times with my friends and family in Christ. I, like you reading this book, was so distracted by the devil that I never appreciated or even noticed the good times. I was selling myself short. I was eating the seeds and spitting out the watermelon, which is totally backwards.

Don't end up like me. Thinking you always have tomorrow to get right. Take it from me…one day tomorrow doesn't come. Everybody becomes the same, act now, because hell can find a home on earth."



**EXHIBIT 1 pg. 334**

Exhibit DD-6